**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Yu Shi
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re NIO, Inc. Securities Litigation* | Case No. 1:19-cv-01424-NGG-VMS<br><br>CLASS ACTION<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NIO Inc. ("NIO" or the "Company"), analysts' reports and advisories about the Company, interviews

1

with officials from the Shanghai Municipal Planning and Natural Resources Bureau and former NIO employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the American Depositary Shares ("ADSs") of NIO from September 12, 2018 through March 5, 2019, inclusive (the "Class," and the period from September 12, 2018 to March 5, 2019 is the "Class Period").[1]

2.      Plaintiffs bring the following claims on behalf of the Class: (I) Sections 11  and 15 under the Securities Act for all purchasers of NIO ADSs pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with NIO's September 12, 2018 initial public offering ("IPO"); and (II) Sections 10(b) and 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of NIO ADSs during the Class Period, except persons who purchased directly from the Underwriters (defined below) at the offering price in the IPO.

3.      NIO is a Chinese company that develops electric vehicles ("EVs").  NIO aims to fill a niche market in China by offering premium EVs at lower prices than import models from foreign manufacturers such as Tesla, Audi, and Mercedes-Benz, which had dominated the premium EV market in China.

4.      According to NIO, it is able to sell cars at lower prices than foreign models in China because all of NIO's manufacturing is done domestically in China; thus, its manufacturing

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of NIO at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

costs are lower.  It is also able to take advantage of EV subsidies from the Chinese government to domestic EV companies.  Additionally, NIO's EVs are able to avoid import duties and other custom fees because it is a domestic company.

5.      There is, however, an unusual and embarrassing aspect to NIO's business model. Unlike most other auto manufacturers and its competitors, NIO does not have a manufacturing facility and does not manufacture its own cars.  Instead, NIO's EVs are manufactured by an obscure, inexperienced, Chinese state-owned truck manufacturer known as Jianghuai Automobile Group Co. Ltd. ("JAC Motors").  JAC Motors has been described by equity analysts as "third tier" and lacking experience manufacturing passenger vehicles.

6.      Moreover, under NIO's manufacturing cooperation agreement with JAC Motors, not only is NIO obligated to pay JAC Motors for every vehicle it manufactures for NIO, NIO also is required to compensate JAC Motors for all operating losses associated with manufacturing NIO's EVs for the first 36 months of production.

7.      NIO's dependence on JAC Motors to manufacture its vehicles carries many risks for NIO and its investors.  For example, JAC Motors could experience delays or manufacturing problems over which NIO has no control. There is also potential for disputes between NIO and JAC Motors. Additionally, NIO's reputation may also be adversely affected by the public's perception of JAC Motors and the quality of JAC Motors' vehicles in general.  NIO admitted in the Registration Statement that building its own manufacturing facility and controlling production of its electric vehicles was an important part of its business strategy.

8.      Not surprisingly, CNN Business called NIO's arrangement with JAC Motors an "unusual business model" and "a source of concern for investors."

3

9.      In September 2018, NIO went public in the U.S. via an IPO, and raised $1.095 billion in net proceeds. NIO was able to raise this massive sum because NIO's Registration Statement for the IPO stated that: (a) NIO was constructing its own manufacturing facility in Shanghai (the "Shanghai Facility"), (b) construction of the Shanghai Facility was already underway and set to open in 2020, and (c) 25% of the IPO proceeds, or more than $276 million, was earmarked for building and outfitting the Shanghai Facility.

10.     The Registration Statement was misleading.  *First*, construction on the Shanghai Facility was not underway at the time of the IPO.   In fact, construction never started. Construction of the Shanghai Facility would have required a construction planning permit from the Shanghai government, but the website of the Shanghai Municipal Planning and Natural Resources Bureau shows that no construction planning permit was ever issued for NIO's Shanghai Facility. Furthermore, the Shanghai Facility would have needed to pass an environmental impact assessment prior to commencing construction, but the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform does not show that an environmental impact approval was ever issued for the Shanghai Facility. Indeed, three former NIO employees, including one who was directly involved with the Shanghai Facility project, confirmed to Plaintiffs that construction on the Shanghai Facility *never* commenced. *Second*, the Registration Statement failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations.  It did not disclose to investors the risk - which was very real – that NIO might abandon plans to build the Shanghai Facility after the IPO.

11.     On March 6, 2019, NIO shocked investors when it announced that it had terminated plans to construct the Shanghai Facility. The price of NIO's ADS plunged by 30%

over the next two days following this surprising announcement. NIO's CEO, Defendant Bin Li, told investors that NIO decided to not build the Shanghai Facility because in November 2018, the Chinese government had issued a policy directive that endorsed cooperation between automobile "research and development" companies like NIO and third-party manufacturers like JAC Motors, and that the Chinese government would issue additional details about this endorsement at a future date.

12.   Unsurprisingly, investors, analysts, and the media did not believe Bin Li's explanation that NIO terminated construction of the Shanghai Facility because of a nebulous, yet-to-be-finalized government policy directive endorsing cooperation between auto developers and manufacturers – something that NIO had already been doing before the IPO anyway, before it told investors that it was building its own facility in Shanghai.

13.   In the days following NIO's surprising announcement, analysts, investors, and media outlets revealed that the real reason for NIO's decision to abandon construction of the Shanghai Facility was because of a cash shortage and underwhelming sales.

14.   A former NIO employee confirmed to Plaintiffs' investigator that "cash shortage difficulties" was the "main reason" behind NIO's decision to terminate the construction of the Shanghai Facility.

15.   In contravention of the requirements of the Securities Act, NIO's Registration Statement failed to mention this risk.  Rather, it presented NIO building its own manufacturing facility in Shanghai as a *fait accompli,* with construction already underway.  There was no indication and no warning that the Shanghai Facility may not be built at all.

16.   That construction on NIO's Shanghai Facility was already underway at the time of the IPO – as opposed to merely being in the planning stages – was highly material to

5

investors. If construction had already commenced and was ongoing at the time of the IPO, then that greatly reduces the risk that NIO or the Shanghai government would later walk away from the project. In contrast, if the Shanghai Facility was merely in the planning stages, then the parties would have much less stake in the project and there would be significantly more risk of the project falling through.

**JURISDICTION AND VENUE**

17.     The claims asserted herein arise under and pursuant to Sections 11,  and 15 of the Securities Act (15 U.S.C. §§ 77k,  and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein occurred in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

**PARTIES**

21.     Lead Plaintiff Mark Mundy ("Mundy") purchased NIO ADSs pursuant and traceable to the Registration Statement and during the Class Period, and was damaged thereby.

Mundy's PSLRA certification was previously filed with the Court and is incorporated by reference herein.  *See* Dkt. No. 21-2.

22.     Named plaintiff Eva Huang ("Huang") purchased NIO ADSs pursuant and traceable to the Registration Statement and during the Class Period, and was damaged hereby. Huang's PSLRA certification was previously filed with the Court and is incorporated by reference herein.  *See* Dkt. No. 48-1.

23.     Defendant NIO is a Chinese company that designs, jointly manufactures, and sells electric vehicles. It describes itself as a "pioneer in China's premium electric vehicle market." NIO is headquartered in Shanghai, China. The Company's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker "NIO."

24.     Defendant Bin Li is NIO's founder.  He has been, at all relevant times, NIO's Chief Executive Officer ("CEO") and chairman of NIO's board of directors.  Prior to the IPO, Bin Li held 17.2% of NIO's stock.  Immediately after the IPO, Bin Li held 48.3% of NIO's aggregate voting power, including through his beneficial ownership of all of NIO's Class C shares, each of which is entitled to eight votes.  According to the Registration Statement, because of the disparate voting powers of Class C shares, Bin Li "will have considerable influence over important corporate matters."   Bin Li is sometimes known as William Bin Li or William Li.

25.     Defendant Louis T. Hsieh ("Hsieh") was NIO's Chief Financial Officer ("CFO") at all relevant times.  Hsieh resigned from his position at NIO on October 30, 2019.

26.     Defendant Lihong Qin ("Qin") is NIO's co-founder.  Qin was NIO's president and a director of NIO at all relevant times.

27.     Defendant Padmasree Warrior ("Warrior") was NIO's chief development officer from December 2015 until her abrupt resignation in November 2018.  During this time, she was

also the chief executive officer of NIO USA, NIO's U.S.-based subsidiary.  Warrior was also a director of NIO from March 2016 until her resignation from the Company.

28.     Defendant Tian Cheng ("Cheng") was, at all relevant times, a director of NIO.

29.     Defendant Xiang Li ("X. Li") was, at all relevant times, a director of NIO.

30.     Defendant Hai Wu ("Wu") was, at all relevant times, a director of NIO.

31.     Defendant Yaqin Zhang ("Zhang") was, at all relevant times, a director of NIO.

32.     Defendant Xiangping Zhong ("Zhong") was, at all relevant times, a director of NIO.

33.     Defendant Zhaohui Li ("Z. Li") was, at all relevant times, a director of NIO.

34.     Defendants Bin Li, Hsieh, Qin, Warrior, Cheng, X. Li, Wu, Zhang, Zhong, and Z. Li are sometimes referred to herein as the "Individual Defendants."

35.     The Individual Defendants each reviewed and signed the Registration Statement.

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley) served as an underwriter for the IPO.  In the IPO, Morgan Stanley purchased 38,400,000 ADSs, which it then resold to the investing public.

37.     Defendant Goldman Sachs (Asia) L.L.C ("Goldman Sachs") served as an underwriter for the IPO.  In the IPO, Goldman Sachs purchased 20,800,000 ADSs, which it then resold to the investing public.

38.     Defendant J.P. Morgan Securities LLC ("JP Morgan") served as an underwriter for the IPO.  In the IPO, JP Morgan purchased 24,000,000 ADSs, which it then resold to the investing public.

39.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the IPO.  In the IPO, Merrill Lynch purchased 14,400,000 ADSs, which it then resold to the investing public.

40.     Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter for the IPO.  In the IPO, Deutsche purchased 16,000,000 ADSs, which it then resold to the investing public.

41.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO.  In the IPO, Citigroup purchased 14,400,000 ADSs, which it then resold to the investing public.

42.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the IPO.  In the IPO, Credit Suisse purchased 16,000,000 ADSs, which it then resold to the investing public.

43.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the IPO.  In the IPO, UBS purchased 14,400,000 ADSs, which it then resold to the investing public.

44.     Defendant WR Securities, LLC ("WR") served as an underwriter for the IPO.  In the IPO, WR purchased 1,600,000 ADSs, which it then resold to the investing public.

45.     Defendants Morgan Stanley, Goldman Sachs, JP Morgan, Merrill Lynch, Deutsche, Citigroup, Credit Suisse, UBS, and WR are collectively referred to hereinafter as the "Underwriters."

46.     The Company, the Individual Defendants are referred to herein, collectively, as the "Defendants."

## BACKGROUND

*NIO and its Business*

47.     NIO was founded in 2014 and is headquartered in Shanghai, China. NIO develops

and markets electric vehicles ("EVs") for Chinese consumers. It has been commonly referred to

as the "Tesla of China."

48.     At the time of the IPO, NIO's purported competitive advantage was its ability to

offer premium EVs that cost much less than imported models from foreign manufacturers such

as Tesla, Audi, and Mercedes-Benz.

49.     Thus, NIO believed that they were filling a niche by selling EVs that were of

higher quality than entry-level Chinese EVs, and yet at a price point below established foreign

models.  This is illustrated in the following graph from the Registration Statement:



China BEV SUV Market Landscape

50.     According to NIO, it is able to achieve its price advantage because of three main

reasons: (1) all manufacturing is localized within China, (2) Chinese government subsidies for

purchases of domestically-manufactured EVs, and (3) absence of custom duties.

51.     Unlike its competitors, however, NIO does not actually manufacture its own EVs. Rather, NIO's EVs are manufactured by a relatively obscure Chinese state-owned automobile manufacturer, JAC Motors.

52.     Indeed, in May 2016, NIO entered into a manufacturing cooperation agreement with JAC Motors to manufacture NIO's EVs.  Under NIO's agreement with JAC Motors, JAC Motors would manufacture NIO's model ES8 (NIO's first and only EV model at the time of the IPO) for five years. The agreement required NIO to pay JAC Motors a fee for every vehicle manufactured by JAC Motors.  NIO was also required to compensate JAC Motors for any operating losses associated with manufacturing of the ES8 for the first 36 months after production of the ES8 began.

53.     According to the equities research firm JL Warren Capital LLC, JAC Motors is a "third tier" Chinese truck manufacturer with "limited experience in manufacturing passenger vehicles."

*NIO's Registration Statement and IPO*

54.     On September 11, 2018, after a series of amendments, NIO filed its final registration statement with the SEC on Form F-1/A.  On the same day, the SEC declared the registration statement effective.  Subsequently, on September 12, 2018, NIO filed the final prospectus ("Prospectus") for the IPO, which forms part of the registration statement (the registration statement and Prospectus are collectively referred to herein as the "Registration Statement").

55.     In the IPO on September 12, 2018, NIO sold 184,000,000 ADSs at a price of $6.26 per ADS.  NIO received net proceeds of approximately $1.095 billion from the IPO.

## SECURITIES ACT CLAIMS

### NIO Tells Investors that it is Constructing its Own Manufacturing Facility in Shanghai, then Scraps the Plan Due to Cash Shortage and Underwhelming Sales

56.     Automobile manufacturers, including NIO's competitors, generally do not rely on other companies to manufacture their vehicles.  For a company that aims to sell premium EVs comparable to models from Tesla, Audi, and Mercedes-Benz, NIO's reliance on JAC Motors, a third-rate state-owned enterprise that specializes in truck manufacturing, was an Achilles' heel for the Company.

57.     CNN Business's Daniel Shane described NIO's arrangement with JAC Motors as an "unusual business model" and a "source of concern for investors."

58.     In the Registration Statement, NIO admitted its reliance on JAC Motors carries significant risks.  NIO admitted that it "could experience delays" if JAC Motors fails to "meet agreed upon timelines or experience capacity constraints."  Further, there is "risk of potential dispute" with JAC Motors. Additionally, NIO's aim to be a "premium" brand could be "adversely affected by perceptions" of the quality of JAC Motors' vehicles.  Lastly, there is no guarantee that JAC Motors will successfully meet NIO's quality standards.

59.     Hence NIO recognized that, to be taken seriously by consumers and investors alike, it needed to have its own manufacturing facility and manufacture its own vehicles.  Taking control over the manufacturing of its electric vehicles was thus a critical component of NIO's business strategy.

60.     To that end, NIO repeatedly stated in the Registration Statement that NIO was currently "developing its own manufacturing facility in Shanghai which we expect to be ready by the end of 2020."

61.     To further reassure investors NIO's Shanghai manufacturing facility was a reality and not just a theoretical possibility, the Registration Statement stated that construction on the Shanghai Facility was already underway.  The Registration Statement states that: "***Construction has started*** on our own manufacturing facility in Shanghai[.]"[2]

62.     This is repeated elsewhere in the Registration Statement: "Our own manufacturing facility in Shanghai ***is currently under construction*** by certain Shanghai government entities."[3]; and "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is ***currently being constructed*** by relevant Shanghai authorities."[4]

63.     Additionally, NIO stated in the Registration Statement that it intended to allocate 25% of the expected net proceeds from the IPO, approximately $276 million, for the construction of its own manufacturing facility in Shanghai.

64.     The Registration Statement stated it would cost NIO approximately $650 million to complete the Shanghai Facility; half of that amount would be financed through proceeds from the IPO and cash from car sales and prior financings.  The other half would be financed through government loans.[5]

65.     On March 6, 2019 before market open, NIO filed a Form 6-K with the SEC announcing the Company's 4Q2018 and FY2018 financial results (the "3/6/19 Form 6-K").  In the 3/6/19 Form 6-K, NIO announced that it would not be building the Shanghai Facility after all, and instead would continue to rely on JAC Motors to manufacture NIO's EVs.

---

[2] Registration Statement on Form F-1/A, page 122.
[3] *Id.* page 137.
[4] *Id.* page 32.
[5] According to the Registration Statement, the Shanghai government would construct the building for the Shanghai Facility, and NIO would be responsible for outfitting and equipping it (*i.e.* turning it from a shell into an actual manufacturing facility).

66.     This news caught investors by surprise, because NIO had told investors in the Registration Statement that: (a) NIO was constructing its own manufacturing facility in Shanghai, (b) construction of the Shanghai Facility was already underway and set to open in 2020, and (c) 25% of the IPO proceeds, or more than $276 million, was earmarked for building the Shanghai Facility.

67.     During a conference call held on March 6, 2019 to discuss NIO's 4Q18 earnings results, Defendant Bin Li told securities analysts covering NIO that the reason NIO decided to not build the Shanghai Facility was because in November 2018, the Chinese government issued a policy directive endorsing "cooperation between the car R&D companies like NIO with the existing manufacturing companies…that means the cooperative mode between NIO and JAC is endorsed by the Chinese government."   Bin Li explained that much of the details and implications of this policy directive were yet to be finalized.

68.     This policy directive, however, merely allows partnerships between vehicle research & development enterprises and vehicle manufacturers.[6]  This is something that NIO and JAC Motors have been doing all along. It does not prohibit NIO from constructing its own manufacturing facility.  It does not confer on NIO any additional benefits for partnering with JAC Motors that NIO would not receive if it had its own manufacturing facility.  Nor does it

---

[6] The relevant provision states: "It is encouraged that automobile manufacturing enterprises cooperate with each other on research and development and manufacturing capabilities; it is permissible for automobile manufacturing enterprises that meet the required standards to outsource its manufacturing.  It is encouraged that automobile research and development and design enterprises work with manufacturing enterprises; it is permissible for research and development and design enterprises that meet the required standards to borrow manufacturing enterprises' manufacturing capabilities to apply for automobile manufacturing permit."
Source: <<道路机动车辆生产企业及产品准入管理办>> ("Provisions on Licensing of Automobile Manufacturers and Products"), Section 28.

prevent NIO from continuing to contract with JAC Motors to manufacture certain models while also having its own manufacturing plant.

69.     If NIO had already obtained governmental approval for the Shanghai Facility, and if the Shanghai Facility was already being constructed, future government directives such as this would not have required NIO to terminate the already-approved project.

70.     NIO's abrupt decision to terminate its plan to build the Shanghai Facility garnered much attention from investors, securities analysts, and the media, who did not believe Bin Li's explanation that NIO stopped construction of the Shanghai Facility because of the issuance of a nebulous policy goal from the Chinese government endorsing cooperation between R&D companies and third-party manufacturers – something that NIO had already been doing anyway since 2016 when it entered into the cooperation agreement with JAC Motors.

71.     Indeed, according to Deutsche Bank's research report dated March 19, 2019, investors believed that NIO terminated the Shanghai Facility because it did not have sufficient cash as a result of declining car sales starting January 2019.

72.     The media and independent analysts agree.  On March 6, 2019, the South China Morning Post published an article titled "Chinese Electric Vehicle Make NIO Scraps Shanghai Factory Plan After Losses Double to US$1.4 Billion"  The article reported that according to the Chinese automotive industry consultant David Zhang, NIO's decision to terminate the Shanghai Facility was due to "underwhelming sales." David Zhang is a prominent Chinese automotive industry expert who consults for the EV industry in China and leads training courses for Chinese automobile executives on behalf of the Chinese Ministry of Industry and Information Technology.

73.     Also on March 6, 2019, in an article titled "NIO Terminates Plan for Shanghai Manufacturing Plant" written by Mark Kane for insideevs.com, a website focused on the EV industry, Kane pointed to two reasons for the termination of the Shanghai Facility: (a) "building a new factory is too capital-intensive for NIO with high losses"; and (b) "the anticipated demand for NIO cars is lower than two years ago."

74.     Plaintiffs' own investigation also confirmed that NIO's decision to scrap the Shanghai Facility was not due to a vague, yet-to-be-finalized government policy directive endorsing cooperation between auto developers and manufacturers (something that NIO was already doing since 2016), but rather, was primarily due to cash shortage. A former NIO employee ("FE2") who worked in a senior sales position for NIO in Shanghai from March 2018 to October 2019 told Plaintiffs' investigator that "cash shortage difficulties" was the "main reason" behind NIO's decision to abandon construction of the Shanghai Facility.

75.     Indeed, NIO's sales were falling precipitously in 2019. In November and December 2018, NIO delivered 3,089 and 3,318 vehicles, respectively.  In January 2019, NIO only delivered 1,805 vehicles, and deliveries plummeted even more – to 811 vehicles – in February 2019.

***Materially Misleading Statements and Omissions in the Registration Statement***

76.     Contrary to NIO's representation in the Registration Statement, NIO's Shanghai Facility was not under construction at the time of the IPO.

77.     Construction on the Shanghai Facility would have required a construction planning permit from the Shanghai government. The Shanghai government posts all construction planning permits on its website within 5 business days from the date of issuance.  If construction had commenced on the Shanghai Facility, the Shanghai government would have posted the

16

construction planning permit associated with the project on the website of the Shanghai Municipal Planning and Natural Resources Bureau. It is illegal to begin construction work in Shanghai without the necessary construction planning permit from the Shanghai Municipal Planning and Natural Resources Bureau.

78.     Government construction projects are not exempt from the permit requirement. For example, the website of the Shanghai Municipal Planning and Natural Resources Bureau shows that the Shanghai Municipal Bureau of Public Safety obtained a construction planning permit on July 3, 2020 to build technology facilities in Shanghai. The website also shows that the Shanghai Airport Authority obtained a construction planning permit on March 3, 2020 to construct transport facilities at the Shanghai Hongqiao International Airport. Plaintiffs also located on the website a construction planning permit issued on May 10, 2011 to the Shanghai Chongming District Gangxi Township People's Government to remodel its office building.

79.     Moreover, the construction planning permits associated with Tesla's factory in Shanghai are available on the website of the Shanghai Municipal Planning and Natural Resources Bureau, even though the contractors for the Tesla Shanghai factory are state-owned construction firms: China Construction Third Engineering Bureau Co. Ltd. (owned by the Central People's Government) and Shanghai Construction Group Corporation (owned by the Shanghai Municipal Government).

80.     Yet, the Shanghai Municipal Planning and Natural Resources Bureau website shows that no construction planning permit was ever issued for NIO's Shanghai Facility.[7]

---

[7] According to the environmental impact assessment conducted for the proposed construction of NIO's Shanghai Facility, the construction project was known as "蔚来纯电动乘用车生产基地建设项目." There was no construction planning permit issued for this project name, or any project involving NIO.

81.      The Shanghai Municipal Planning and Natural Resources Bureau told Plaintiffs that construction planning permits are not removed from its website even if a project is suspended or terminated, so long as the permit was originally issued after 2010 (certain permits issued prior to 2010 may no longer appear on the website).

82.      Not only were there no construction planning permits issued for the Shanghai Facility, the Shanghai Facility also never obtained the required environmental impact assessment approval. In China, under the *Law of the People's Republic of China on Environmental Impact Assessment* a construction project must conduct and pass an environmental impact assessment before any construction work can begin.  This is multi-step process.  First, an environmental impact assessment must be conducted and a report issued. The report is then made available for public review and comments. After the public review period, relevant authorities decide whether to approve the environmental impact assessment.

83.      In Shanghai, construction projects that have conducted environmental impact assessments ***and*** obtained approval following public review are listed on a website known as the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform.[8] This includes government construction projects. For example, proposed construction projects by government entities such as the Shanghai New Pudong District Gaoxing Township People's Government and the Shanghai Municipal Bureau of Public Safety all appear on the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform, along with their environmental impact approval reference number and date of approval. (E.g. the Municipal Bureau of Public Safety project was approved on June 20, 2014 and the approval reference number is 虹环保管审[2014]82 号).

---

[8] In Chinese:上海市建设项目环评信息公开.

84.     While an environmental impact *assessment* was completed for NIO's Shanghai Facility by Shanghai Huanke Environmental Assessment Consulting Co., Ltd.[9] in May 2018, the project never received the required environmental impact *approval* from the Shanghai government.  If it did, the project would have appeared on the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform, but it does not.

85.     Because NIO never obtained (i) a construction planning permit, and (ii) environmental impact approval, construction of the Shanghai Facility could never begin.  Both were required to begin construction.  NIO obtained neither.

86.     Former NIO employees confirmed that construction of the Shanghai Facility never commenced.

87.     "FE1" was employed as a Purchasing Manager at NIO from May 2018 to August 2020. FE1's department was responsible for overseeing fixed asset investment projects at NIO, including new factories, new joint venture factories, research & development ("R&D") centers, power stations, and NIO servicing and delivery centers.  As a Purchasing Manager, FE1 oversaw site selection and design of new factories, as well as the installation of facilities and equipment at new factories, including the Shanghai Facility.   FE1 was also responsible for negotiating contracts with suppliers of NIO's factories and R&D centers.

88.     FE1 was directly involved in the Shanghai Facility project, and participated in design planning and procuring prospective suppliers for the Shanghai Facility.

89.     According to FE1, construction never began on the Shanghai Facility before the project was terminated in the second half of 2018.

---

[9] In Chinese:上海环科环境评估咨询有限公司.

90. This is corroborated by FE2, who told Plaintiffs that construction of the Shanghai Facility never commenced and that the project was still in the planning stage when it was scrapped.

91. Another former employee who worked as a car design engineer for NIO in Shanghai from April 2018 to May 2020 ("FE3") similarly told Plaintiffs' investigator that while an environmental impact assessment was conducted for the proposed construction of the Shanghai Facility, construction of the manufacturing facility never started before the entire project was called off.

92. The Registration Statement also failed to disclose that subpar sales or cash flow problems could mean that NIO may terminate the construction of the Shanghai Facility.

93. Indeed, the Registration Statement presented the Shanghai Facility as a *fait accompli*; there was no indication or warning that slow sales or failure to generate sufficient cash flow could mean that NIO entirely abandons the construction of the Shanghai Facility.

**Statutory Framework Applicable to the Registration Statement: Item 303**

94. Item 303 imposes an affirmative duty on issuers to disclose "uncertainties" that will have a material or unfavorable impact on the issuer's future business. Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *See S.E.C. Release No.* 6835, 1989 WL 1092885, at *4; 17 C.F.R. §229.303(a)(3)(ii).

95. The SEC has repeatedly emphasized that the "specific provisions in Item 303 … require disclosure of forward-looking information." *Id.* at *3. Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look

at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition…with particular emphasis on the registrant's prospects for the future.

96.     NIO's decision to abandon the Shanghai Facility shows that the construction of the Shanghai Facility was uncertain, and subject to NIO having sufficient cash flow and meeting sales objectives.  Yet the Registration Statement did not disclose any uncertainties that could potentially derail NIO's plan to build the Shanghai Facility.  Rather, the Registration Statement assures investors, in no uncertain terms, that NIO was building the Shanghai Facility and that construction had already begun and would be completed in 2020.  No reasonable investor would read the Registration Statement to suggest that NIO had not yet begun construction or that the Shanghai Facility may not be built at all.

### Statutory Framework Applicable to the Registration Statement: Item 503

97.     Item 503 is intended to "provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."  *Sec. Offering Reform,* S.E.C. Release No. 8501, 2004 WL 2610458, at *6 (Nov. 3, 2004).

98.     Accordingly, Item 503 requires that registration statements "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. §229.503(c).  The discussion of risk factors: must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell investors how risks may affect their investment.  *Statement of the Comm'n Regarding Disclosure of Year 2000*

21

*Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at \*14 (July 29, 1998).

99.    Recognizing the importance of the Shanghai Facility to investors, the Registration Statement is littered with references to the Shanghai Facility and how it will contribute to the future prospects of the Company. Yet, there is no mention in the Registration Statement that NIO had not yet begun construction of the facility or about the very real risk that the Shanghai Facility may not be built at all, or the negative implications for NIO's business of any decision to not construct the Shanghai Facility.

## THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT

100.    Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement.  15 U.S.C. § 77k(a)(5).

101.    Section 11 provides that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

102.    It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13. Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id.*

103.    As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement.  To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process.  In other words,

underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

104.    It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

105.    It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for NIO's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

106.    In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers."  Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors.  There is much literature that supports the premise of investment banks being gatekeepers.  For example, Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure."  *Id.*  Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors.  In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the

issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id.* at 14.

107.    In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering.  Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering."  (Emphasis added).  Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998.  In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement.  Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided.  The Underwriters had this role and duty in underwriting NIO's ADSs.  Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

108.    Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock

24

offering is accurate and not misleading.  This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

109.    The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied.  The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value.  The due diligence process is just the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

110.    The Underwriters failed to conduct a reasonable due diligence investigation with regard to NIO's IPO.  In particular, the Underwriters, had they performed adequate due diligence, would have discovered that (1) NIO's Shanghai Facility was not under construction (and indeed, could not have been under construction because it never obtained the required construction planning permit and environmental impact approval), and (2) construction of the Shanghai Facility was not a *fait accompli*, but rather, was contingent on NIO generating sufficient cash flow and meeting sales objectives.

### THE DIRECTORS' AND OFFICERS' DUE DILIGENCE OBLIGATIONS

111.    As directors and/or officers of NIO and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of NIO's operations and ensure that all of the statement in the Registration Statement were true, and not misleading in any respect.

112. The Individual Defendants had the ability to visit the proposed construction site and confirm that construction on the Shanghai Facility had begun and that it was progressing as planned.

113. The Individual Defendants were negligent for failing to visit the construction site to confirm the status of construction of the Shanghai Facility.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

114. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased NIO ADSs from September 12, 2018 through March 5, 2019, inclusive.[10]

115. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NIO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

---

[10] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of NIO at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

118.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

119.   whether Defendants violated the federal securities laws;

120.   whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

121.   to what extent the members of the Class have sustained damages and the proper measure of damages.

122.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §11 of the Securities Act
### Against All Defendants

123.   Plaintiffs repeat and re-allege the foregoing contained above, except any allegation of fraud, recklessness or intentional misconduct.

124.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

125.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

27

126.    The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors or underwriters who are appropriate defendants in this Count.

127.    Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

128.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

129.    The Underwriters owed to the holders of the ADS acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

130.    Plaintiffs acquired NIO ADSs pursuant to the Registration Statement.

131.    At the time of their purchases of NIO ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

132.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## COUNT II

**Violations of §15 of the Securities Act
Against the Individual Defendants**

133. Plaintiffs incorporate all the foregoing by reference, except any allegation of fraud, recklessness or intentional misconduct.

134. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of NIO during the relevant period.

135. The Individual Defendants were in positions to control and did control, the misleading statements and omissions contained in the Registration Statement.

136. None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

137. Plaintiffs and the Class have sustained damages. The value of NIO ADSs has declined substantially due to the Securities Act violations alleged herein.

138. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF EXCHANGE ACT CLAIMS

*Scienter*

139. Unable to manufacture its own vehicles, NIO's reliance on JAC Motors - a Chinese state-owned enterprise with little experience manufacturing passenger vehicles and described as "third tier" by analysts - was a source of embarrassment for NIO and point of concern for investors.

140.    To ensure a lucrative IPO, NIO needed to assure investors that it would soon have its own manufacturing plant to make its EVs.  Furthermore, it was important for NIO to let investors know that the manufacturing plant in Shanghai was not just an aspirational possibility, but rather, it was a concrete certainty.  Hence, NIO falsely told investors the construction on the Shanghai Facility was already underway.  This allowed NIO to garner shareholder interest and raise more than a billion USD from the IPO.

141.    Indeed, it is unfathomable that NIO's senior executives, including the Individual Defendants, were unaware that construction on the ballyhooed Shanghai Facility – NIO's first and only vehicle manufacturing facility - had not commenced as claimed in the Registration Statement.

142.    As part of their due diligence for the IPO, the Individual Defendants were required to have reasonable assurance that construction of the Shanghai Facility was progressing in a satisfactory manner. This is particularly so given the importance of the Shanghai Facility to NIO and the fact that 25% of the IPO proceeds were earmarked for the Shanghai Facility.

143.    The Individual Defendants were, at the very least, reckless in telling investors that construction of the Shanghai Facility was underway if they did not verify that construction had actually commenced.

144.    Furthermore, the Registration Statement states that a construction planning permit is required before construction work is able to commence on the Shanghai Facility.[11] The Individual Defendants are therefore aware that a construction planning permit is required prior to the commencement of construction. As such, it was reckless for the Individual Defendants to tell

---

[11] Registration Statement on Form F-1/A, page 151.

investors that construction had already started on the Shanghai Facility without confirming that the necessary construction planning permit was issued.

145.    The proposed site for the Shanghai Facility was located in Waigang Town, in Shanghai's Jiading District. Waigang Town is approximately 15 miles (approximately 20 to 25 minute drive in regular traffic conditions) from NIO's headquarters in Shanghai.  With the proposed construction site so close to NIO's headquarters, it is inconceivable that none of the Individual Defendants knew that construction never started on the Shanghai Facility.

*Loss Causation*

146.    NIO's announcement on March 6, 2019 that it had terminated construction of the Shanghai Facility shocked the market.  The value of NIO ADSs plunged from $10.16 per ADS on March 5, 2019 to close at $7.09 on March 7, 2019, representing a drop of 30%.

### *Respondeat Superior* and Liability under Section 20 of the Exchange Act

147.    NIO is liable for the acts of the Individual Defendants and NIO's employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

148.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NIO under *respondeat superior* and agency principles.

### Plaintiffs' Fraud-on-the-Market Allegations

149.    In pursuing the Section 10(b) claim, Plaintiffs will rely in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the

Class Period; (b) the omissions were material; (c) NIO ADSs were traded in efficient markets during the Class Period.

150.    NIO's ADSs traded in efficient markets during the Class Period for the following reasons: (i) the ADSs were traded on the NYSE; (ii) on average shares representing more than 2.0% of the total ADSs outstanding were traded weekly during the Class Period; (iii) NIO met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (iv) As a public issuer, NIO filed periodic reports with the SEC; (v) NIO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vi) NIO was followed by at least nine securities analysts employed by major brokerage firms, including Goldman Sachs, Morgan Stanley, J.P. Morgan, and Credit Suisse, Citi, UBS, and Bank of America, who wrote reports that were widely distributed and publicly available; (vii) More than ten market makers made a market in NIO ADSs during the Class Period; (vii) the price of NIO ADSs responded quickly to incorporate and reflect new public information concerning NIO during the Class Period.

151.    Based on the foregoing, the market for NIO ADSs promptly digested current information regarding NIO from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

152.    Alternatively, in pursuing their Section 10(b) claim, Plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in

their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT III**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against NIO and the Individual Defendants**

153.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

154.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

155.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

157.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued

33

or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

158.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

159.   As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

160.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

161.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

162.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's ADSs during the Class Period.

### COUNT IV
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

163.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

165.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

166.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The

Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

167.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

168.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B.      Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 18, 2020                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:<u>/s/ Laurence Rosen</u>
Laurence Rosen
Phillip Kim
Yu Shi
275 Madison Ave, 40th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
yshi@rosenlegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen