UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| | : | 19-cv-1424 (NGG) (VMS) |
| | : | |
| *In re NIO, Inc. Securities Litigation* | : | **Oral Argument Requested** |
| | : | |
| | : | |

------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

<table>
<tr><td>

Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

*Attorneys for Defendants NIO Inc. and
Padmasree Warrior*

</td><td>

Scott Edelman
Jed Schwartz
Micaela Manley
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001-2163
Phone: (212) 530-5000

*Attorneys for Defendants Morgan Stanley
& Co. LLC, Goldman Sachs (Asia) L.L.C.,
J.P. Morgan Securities LLC, Merrill
Lynch, Pierce, Fenner & Smith Inc.,
Deutsche Bank Securities Inc., Citigroup
Global Markets Inc., Credit Suisse
Securities (USA) LLC, UBS Securities
LLC and WR Securities, LLC*

</td></tr>
</table>

Served on October 19, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS .......................................................................................... 4

      A.      NIO's Business ...................................................................... 4

      B.      The Shanghai Factory ........................................................... 5

      C.      NIO's IPO and Related Disclosures ...................................... 6

      D.      NIO's Post-IPO Decision to Terminate the
            Construction of the Shanghai Facility...................................... 7

LEGAL STANDARD................................................................................................. 9

ARGUMENT............................................................................................................ 11

I.      ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT
      ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION .... 11

      A.      Plaintiff Fails to Allege Any Misrepresentation
            About the Construction of the Shanghai Facility..................................... 11

            1.      Plaintiffs Fail to Plead Facts Showing Construction
                  Was Not Underway at the Time of the IPO ............................... 11

            2.      Plaintiffs Do Not Allege Facts Showing the
                  Status of Construction Was Material Information ...................... 15

      B.      Plaintiffs Fail to Allege Any Actionable Omission Regarding
             the Risk That the Shanghai Facility Would Not Be Completed .............. 17

            1.      NIO Warned of the Risk Plaintiffs Claim Was Omitted.............. 17

            2.      Plaintiffs Fail to Establish That NIO Had a
                  Duty to Disclose Any Additional Information............................. 19

II.      PLAINTIFFS' EXCHANGE ACT CLAIMS ALSO FAIL BECAUSE
      PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED SCIENTER .............. 21

III.     NO CAUSAL CONNECTION EXISTS BETWEEN THE
      PURPORTED MISREPRESENTATIONS AND ANY ALLEGED LOSS ....... 24

IV.     PLAINTIFFS HAVE NOT ALLEGED CONTROL PERSON LIABILITY...... 25

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

Page

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017),
     *aff'd*, 731 F. App'x 35 (2d Cir. 2018)........................................................................17

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d. Cir. 2007).........................................................................3, 22, 25

*In re Bare Escentuals, Inc. Securities Litigation*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ..............................................................10

*In re Bayou Hedge Fund Litigation*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007),
    *aff'd sub nom. South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98
    (2d Cir. 2009)......................................................................................................22

*Delfonce v. Eltman Law, P.C.*,
    No. 16 Civ. 6627 (AMB) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017),
    *aff'd*, 712 F. App'x 17 (2d. Cir. 2017)....................................................................4

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................24

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................22

*Ford v. Voxx International Corp.*,
    No. 14-CV-4183(JS)(AYS), 2016 WL 3982466 (E.D.N.Y. July 22, 2016)..........12

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................22

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of
    Scotland Group*, PLC,
    783 F.3d 383 (2d Cir. 2015)................................................................................16

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ...........................................................................13

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).................................................................16

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................22

*Kalnit v. Eichler*,
    85 F. Supp. 2d 232 (S.D.N.Y. 1999)....................................................................25

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................17, 23

*Ladmen Partners Inc. v. Globalstar, Inc.*,
    No. 07 Civ. 0976(LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...............10

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................24

*In re Liberty Tax, Inc. Securities Litigation*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020),
    *aff'd*, No. 20-652, 2020 WL 5807566 (2d Cir. Sept. 30, 2020).........................9, 11

*Local No. 38 International Bhd. of Electrical Workers Pension Fund v. American
    Express. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010),
    *aff'd*, 430 F. App'x 63 (2d Cir. 2011)....................................................................22

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d. Cir. 2010)..............................................................................9, 25

*In re MSC Industrial Direct Co. Securities Litigation*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...............................................................12, 13

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)...............................................................................................21

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008),
    *aff'd*, 347 F. App'x 617 (2d Cir. 2009).............................................................19, 21

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
    Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)...................................................................23

*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...................................................................25

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................10

iii

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ...............................................................23

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)......................................................................10

*In re Stac Electronics Securities  Litigation*,
    89 F.3d 1399 (9th Cir. 1996) ..................................................................10

*Steamfitters' Industries Pension Fund v. Endo International PLC*,
    771 F. App'x 494 (2d Cir. 2019) .............................................................20

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015).......................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................22, 24

*In re Travelzoo Inc. Securities Litigation*,
    Nos. 11 Civ. 5531 GBD, 11 Civ. 6845 GBD, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) .............................................................................24

*In re UBS AG Securities Litigation*,
    No. 07 CIV. 11225 RJS, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012),
    *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014)...................................................19

**STATUTES**

15 U.S.C. § 78u-4(b)(2) .................................................................................1

**RULES**

Federal Rule of Civil Procedure 8(a) ...........................................................1, 10

Federal Rules of Civil Procedure 9(b) .........................................................1, 10

Federal Rule of Civil Procedure 12(b)(6) .........................................................1

NIO Inc. ("NIO" or the "Company"), Padmasree Warrior, and the Underwriter Defendants[1] (collectively, "Defendants") respectfully submit this Memorandum of Law in support of their Joint Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 67) ("SAC" or "Complaint") pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b)(2) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) ("PSLRA").[2]

## PRELIMINARY STATEMENT

In a classic attempt to plead fraud-by-hindsight, Plaintiffs bring this putative securities fraud class action based on NIO's decision—six months after the disclosure documents at issue—to terminate its plans to establish an in-house manufacturing facility. NIO, a leading electric car developer in China, disclosed in the registration statement and prospectus ("Offering Documents") for its September 12, 2018 initial public offering ("IPO") that it was working with the local authorities in Shanghai to develop a new manufacturing facility ("Shanghai Facility"), expected to be ready by the end of 2020, which would then be leased to NIO. Six months later, NIO terminated those plans based on unanticipated subsequent developments, including a post-IPO government policy shift explicitly endorsing NIO's existing joint manufacturing model. Plaintiffs now claim IPO investors were defrauded because construction of the Shanghai Facility purportedly had

---

[1]    The Underwriter Defendants are Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, UBS Securities LLC and WR Securities, LLC.

[2]    Defendants Bin Li, Louis T. Hsieh, Lihong Qin, Tian Cheng, Xiang Li, Hai Wu, Yaqin Zhang, Xiangpang Zhong and Zhaohui Li (collectively, "Individual Defendants") have not been served. Nevertheless, the Court can dismiss the Complaint in its entirety. *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14-cv-9826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

not yet begun at the time of the IPO and NIO allegedly failed to warn investors that its plans for the Shanghai Facility might change. This is not a basis for a securities fraud claim. As demonstrated below, Plaintiffs' theory fails as a matter of law for multiple independent reasons, and this Action should be dismissed in its entirety with prejudice.

First, Plaintiffs fail to allege any material misrepresentation about the status of construction of the Shanghai Facility. In fact, Plaintiffs' well-pled factual allegations make clear that NIO took numerous steps to ready the Shanghai Facility, contradicting Plaintiffs' conclusory assertion that construction had not begun at the time of the IPO. Although Plaintiffs cite three anonymous purported former NIO employees, Plaintiffs do not allege any facts to show that these individuals—a purchasing manager, a sales person and a car designer—had any involvement in or knowledge of the status of construction (which was being handled by the Shanghai government, not NIO). Plaintiffs also assert that construction could not possibly have begun because certain records of the relevant construction and environmental approvals could not be found. But the absence of these records, even if true, can have multiple alternative explanations. What is clear is that it does not support Plaintiffs' conclusion, as various *other* documents cited by Plaintiffs affirmatively show that significant construction steps had already occurred.

Furthermore, Plaintiffs fail to allege any facts to show that the construction status of the Shanghai Facility was material information to investors. Plaintiffs do not dispute the Offering Documents were accurate in describing NIO's agreement with the Shanghai government on the construction and lease of the Shanghai Facility. The Offering Documents also warned that the Shanghai Facility was not "expect[ed] to be ready [until] the end of 2020" (*i.e.*, two years after the IPO) and that "construction [was] largely

2

outside of [NIO's] control and could experience delays or other difficulties."   (Ex. A (Prospectus) at 32.[3])  Indeed, the Offering Documents expressly acknowledged that construction may not be completed "on time *or at all*."  (*Id.* at 33 (emphasis added).)  In light of these risk disclosures and the fact that the facility was not expected to be completed for another two years even under the best of circumstances, Plaintiffs fail to allege materiality.

Second, Plaintiffs also fail to allege any material misrepresentation based on the Offering Documents' supposed failure to warn that construction of the Shanghai Facility might be terminated.  As highlighted above, the Offering Documents *did* expressly disclose the possibility that construction may not be completed "on time *or at all*" and specifically warned that the project would require "significant capital" that was dependent on "user demand for [its] products and services."  (Ex. A at 26, 32.)  It is a truism that business strategies are subject to change, and NIO highlighted various examples of contingencies on which the Shanghai Facility depended.

Third, Plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act") independently fail because Plaintiffs do not allege particularized facts supporting the requisite strong inference of scienter.  Indeed, Plaintiffs do not allege Defendants had any motive and opportunity to defraud investors about the status of the Shanghai Facility, nor do they allege that Defendants had any information at the time of the IPO that was contrary to the Offering Documents' disclosures.  Instead, Plaintiffs resort to vague

---

[3]    Exhibits cited herein are attached to the accompanying Affirmation of Robert A. Fumerton, dated October 19, 2020.  The Court may consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

3

assertions that Defendants *must have known* that construction had not begun—a tired tactic that courts in this Circuit have repeatedly rejected.

Finally, there is no causal connection between any of the purported misstatements and Plaintiffs' purported losses because NIO's announcement that it was terminating the Shanghai Facility was coupled with various other news that Plaintiffs plead no facts to disentangle, and the announcement did not reveal any concealed information.

## STATEMENT OF FACTS[4]

### A.     NIO's Business

NIO is a leading electric car developer that designs, jointly manufactures, and sells smart electric vehicles ("EVs") in China, the world's largest car market.  (Ex. A at 1–2; SAC ¶ 3.)  Known as a "pioneer in China's premium electric vehicle market," NIO provides its customers with premium EVs at competitive prices.  (Ex. A at 1, 4.)

Historically, NIO's vehicles have been manufactured by Jianghuai Automobile Group Co., Ltd. ("JAC"), a major state-owned automobile manufacturer.  (Ex. A at 135; SAC ¶ 52.)  JAC has a 50-year history in the automobile industry and a wealth of experience in manufacturing EVs for other major car developers, including Volkswagen.  (Ex. A at 135.)  According to NIO, "[g]iven its advances in new energy vehicle manufacturing, JAC [] contributed to our ability to bring the [new car model] ES8 to the market more quickly and help[ed] us to meet our production requirements."  (*Id*.)  By August 31, 2018, NIO had delivered 1,602 ES8s since the model was first launched in December 2017, and had received 15,778 additional orders.  (*Id.* at 1.)

---

[4]     These facts are drawn from the well-pled allegations in the SAC and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman L. ,P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).

### B.      The Shanghai Factory

To complement its existing joint manufacturing model and to "facilitate [its] ability to obtain our own EV manufacturing license," NIO entered into an agreement with the Shanghai government to build the Shanghai Facility.  (*Id.* at 137.)  Pursuant to this agreement, government entities would construct the Shanghai Facility and, upon completion, grant NIO a leasehold interest in the property.  (*Id.*; *see* SAC ¶ 62.)  In January 2018, the Shanghai government announced that a site had been selected for the Shanghai Facility and that "both parties communicated thoroughly [o]n aspects of factory construction, plan design, environmental assessment formulation and approval, so as to advance vigorously the construction of the project within the shortest time at the fastest speed."  (Ex. B (*NIO complete vehicle base will be relocated to Waigang Town*, Shanghai Jiading Government Website); *see also* Ex. C (*The environmental protection bureau window makes full efforts to advance the environmental assessment of major project NIO*, Shanghai Jiading Government Website).)  As Plaintiffs acknowledge, in May 2018, an environmental impact assessment for the Shanghai Facility was completed.  (SAC ¶ 84; Ex. D (Announcement about the environmental impact assessment).)

While government entities handled construction, NIO entered into agreements to obtain financing, tax incentives, and other support for the Shanghai Facility.  (Ex. A at 137; SAC ¶ 64.)  As Plaintiffs also acknowledge, NIO began procuring construction-related materials and equipment for outfitting the Shanghai Facility, negotiating contracts with suppliers, and publicly accepting bids for equipment.  (SAC ¶ 87; *see, e.g.*, Ex. E (Bidding Invitation for NIO Co., Ltd. Jiading Newly Constructed Factory Project).)

5

### C.      NIO's IPO and Related Disclosures

On September 12, 2018, NIO launched its IPO, selling approximately 184 million

American Depositary Shares ("ADSs") that raised approximately $1.095 billion.  (SAC ¶

55.)  The Offering Documents described NIO's business at length, including its

partnership with JAC and the attendant risks related to its joint manufacturing model.

(SAC ¶ 58; Ex. A at 16, 135–136.)  The Offering Documents also described NIO's plans

for the Shanghai Facility:  "Construction has started on our own manufacturing facility in

Shanghai in order to expand manufacturing capacity for the ET7 and future [car] models,

complementing our JAC manufacturing alliance supplying the ES8 and ES6."  (Ex. A at

122.)  The Company warned that the project was subject to various uncertainties:

> We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020.  Such manufacturing facility is currently being constructed by relevant Shanghai authorities.  As a result, such *construction is largely outside of our control and could experience delays or other difficulties.* . . . Construction projects of this scale are subject to risks and will require significant capital.  Any failure to *complete these projects* on schedule and within budget could adversely impact our financial condition, production capacity and results of operations.  Under PRC law, construction projects are subject to broad and strict government supervision and approval procedures, including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, the pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. . . . Any of the foregoing could have a material adverse impact on our operations.
>
> Furthermore, we expect that the construction of our own vehicle manufacturing facility in Shanghai will facilitate our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit score system in the future. There can be no assurance that the completion of such factory will ensure that we will be able to obtain such license. In addition, *to the extent we are unable to successfully complete construction on time or at all*, our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit score system could be adversely affected, which in turn could impact our growth prospects.

(Ex. A at 32–33.)

6

The Offering Documents also explained that NIO "plan[s] to use . . . 25% of the [IPO] net proceeds . . . for the development of our manufacturing facilities and the roll-out of our supply chain." (*Id.* at 63.)  However, with respect to financing, NIO warned:

> *[W]e also expect to require significant capital and incur substantial costs in setting up, equipping and improving our future manufacturing plant in Shanghai, which could potentially face cost overruns*. . . . *We expect that our level of capital expenditures will be significantly affected by user demand for our products and services*.  The fact that we have a limited operating history means we have limited historical data on the demand for our products and services.  As a result, our future capital requirements may be uncertain . . . *If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities* or substantially change our corporate structure.  *We might not be able to obtain any funding, and we might not have sufficient resources to conduct our business as projected*, both of which could mean that we would be forced to curtail or discontinue our operations."

(Ex. A at 26–27.)

### D.   NIO's Post-IPO Decision to Terminate the Construction of the Shanghai Facility

On March 6, 2019, before the market opened, the Company filed its Form 6-K with the SEC announcing its Q4 2018 and FY 2018 financial results.  (SAC ¶ 65; Ex. F (4Q/FY 2018 Financial Results).)  NIO reported net losses of approximately $1.4 billion for FY 2018, an increase of 92% from the previous year.  (Ex. F at 6.)  NIO also disclosed that it had experienced a "greater than anticipated slowdown in monthly deliveries . . . mainly caused by accelerated deliveries made at the end of last year in anticipation of EV subsidy reductions in China in 2019, the seasonal slowdowns surrounding the January 1st and Chinese New Year holidays, as well as the current slowdown of macro-economic conditions in China, particularly in the automotive sector." (*Id.* at 7.)  Looking ahead, NIO warned that it "expect[s] deliveries in the second quarter

7

2019 to reflect continued weakness as we await the results of the 2019 EV subsidy policy in China and improvement in the macro-economic conditions." (*Id.* at 8.)

In the same SEC disclosure, the Company announced that it had recently "agreed in principle with [government entities] to terminate the plan for [the Shanghai Facility], pending signing of definitive termination agreement[s]." (*Id.* at 7.)  During the conference call held on the same date, the Company disclosed that this decision was based, in part, on "a new policy [] issued by the government authorities, which allow[s] and encourage[s] the entities that operate [their] vehicle research and development and design to work with vehicle manufacturing companies to manufacture vehicles cooperatively."  (Ex. G (FY/Q4 2018 Earnings Call) at 6.)  Although "the details of this [new law would] be finalized officially" in the coming months, the Company predicted that the government's explicit endorsement of its existing joint manufacturing model would confer certain advantages on NIO, including that it would no longer "need to apply for the subsidies or the carbon emission credit via JAC." (*Id.* at 11.)  Overall, the Company believed that from "an efficiency perspective, [it] can leverage the existing capacity of NIO's JAC plant and enjoy the flexibilities to expand the capacity to support NIO's market penetration and growth plans for the next 2 or 3 years." (*Id.* at 6.)

NIO's ADS price closed at $8.01, down approximately 21% from $10.16 the prior day, but still significantly higher than the IPO price of $6.26.  (Ex. H (Stock Price).)  The media reported that news of NIO's net losses and disappointing sales spooked investors. (Ex. I (Daniel Shane, *Chinese Tesla rival Nio warns of weak SUV demand and scraps factory plans*, CNN Business) (cited in SAC ¶ 57).)  Other sources speculated that NIO's decision to terminate the Shanghai Facility might be "linked to underwhelming sales."

8

(Ex. J (Jane Zhang & Sarah Dai, *Chinese electric vehicle maker Nio scraps Shanghai factory plan after losses double to US$1.4 billion*, South China Morning Post) at 3 (cited in SAC ¶ 72); Ex. K (Mark Kane, *NIO Terminates Plan For Shanghai Manufacturing Plant*, InsideEVs.com) at 3 (cited in SAC ¶ 73).)

Unlike the Company's financial results, NIO's announcement regarding the Shanghai Facility was well-received by many, including securities analysts, who viewed the move as "positive" given the potential return on invested capital. (Ex. G at 11; *see* Ex. L (Deutsche Bank Research Report) at 2 ("[w]e indeed view this move as positive") (cited in SAC ¶ 71).) News reports noted that the decision "was in line with the government's new policy issued last year to encourage entities doing research, development and design on EVs to work in cooperation with other carmakers." (Ex. J at 2.)

## LEGAL STANDARD

Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Exchange Act. (SAC ¶¶ 1–2.) To state a claim under Section 11 of the Securities Act, Plaintiffs must allege that the Offering Documents contained: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder, Plaintiffs must allege: "'(1) a material misrepresentation (or omission); (2) scienter; . . . (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp.

9

3d 457, 465 (E.D.N.Y. 2020) (Garaufis, J.) (alteration in original) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019)), *aff'd*, No. 20-652, 2020 WL 5807566 (2d Cir. Sept. 30, 2020).

All of Plaintiffs' claims are subject to the heightened pleading requirements of Rule 9(b) because, as explained below, all are based on the same securities fraud allegations pled under the Exchange Act. *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010) (Section 11 claims sound in fraud where "the course of conduct pled in connection with plaintiffs' section 11 claim is so substantively similar to the conduct pled in connection with plaintiffs' section 10(b) claim"). Plaintiffs cannot escape their pleading burden with nominal disclaimers of fraud (SAC ¶¶ 123, 133) that are belied by their factual allegations sounding in fraud. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) ("[N]ominal efforts [to disclaim fraud] are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus."); *Ladmen Partners Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976(LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (allegations that defendant "had to know" of problems sound in fraud).[5]

---

[5] In any event, Plaintiffs' Securities Act claims fail even under Rule 8 as Plaintiffs have not plausibly alleged that construction of the Shanghai Facility had not begun at the time of the IPO or that the Offering Documents failed to warn of any material risk they were required to disclose. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I.   ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION

Plaintiffs assert two theories of misrepresentation: (i) that the Offering Documents falsely stated the Shanghai Facility was under construction; and (ii) that the Offering Documents "failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations." (SAC ¶ 10.) Both theories fail as a matter of law.

#### A.   Plaintiff Fails to Allege Any Misrepresentation About the Construction of the Shanghai Facility

Plaintiffs' first theory fails for two reasons. First, Plaintiffs do not plead any facts, let alone allege particularized facts, showing that the Shanghai Facility was not in fact under construction at the time of the IPO. Second, Plaintiffs fail to plead any facts showing that the status of construction at the time of the IPO was material to investors.

##### 1.   Plaintiffs Fail to Plead Facts Showing Construction Was Not Underway at the Time of the IPO

Plaintiffs cannot plead a securities violation by simply asserting, in conclusory fashion, that construction of the Shanghai Facility had not begun at the time of the IPO. They must allege facts plausibly demonstrating that was the case. *See Liberty Tax*, 435 F. Supp. 3d at 464 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs try to do so by alleging that former NIO employees informed Plaintiffs' investigators that construction never began and that the Shanghai government never obtained certain construction planning permits and environmental impact assessment approvals. These contentions are woefully inadequate.

11

(a)    **Plaintiffs Fail To Allege Facts Showing the Bases of the Purported Former Employees' Knowledge**

As explained in the Offering Documents, construction of the Shanghai Facility would proceed on two tracks: first, the Shanghai government would construct the "shell" of the factory, and second, "NIO would be responsible for outfitting and equipping" the Shanghai Facility and "turning it from a shell into an actual manufacturing facility." (SAC ¶ 64 n.5.)  While NIO had limited, if any, control over the first phase, Plaintiffs do not deny that the Company had begun work on the second track.  Indeed, Plaintiffs' reliance on Former Employee 1 ("FE1") confirms this point.  According to the Complaint, FE1 was a Purchasing Manager who "oversaw site selection and design of new factories, as well as the installation of facilities at new factories, including the Shanghai Facility" and was "responsible for negotiating contracts with suppliers of NIO's factories and R&D centers."  (SAC ¶ 87; *see e.g.*, Ex. M (Shanghai Jiawei Automobile Parts Co., Ltd. Bidding Website).)  The fact that NIO was procuring and engaging suppliers to outfit the Shanghai Facility contradicts Plaintiffs' assertion that the Shanghai Facility was "just a theoretical possibility" and that nothing was done to turn the plans for the Shanghai Facility into reality.  (SAC ¶ 67.)

To the extent Plaintiffs rely on the anonymous purported former employees for their claim that construction never commenced, these individuals' conclusory assertions fail "to support the probability that they would possess [the] information" that is attributed to them.  *In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003); *Ford v. Voxx Int'l Corp.*, No. 14-CV-4183(JS)(AYS), 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016) (statements attributed to former employee were "too vague to form the basis of a fraud claim").

12

Plaintiffs do not allege that any of these individuals had any involvement with, let alone direct knowledge of, the construction that was carried out by Shanghai government entities. (SAC ¶ 62; *see* Ex. A at 32.) Despite FE1's involvement in procurement, Plaintiffs do not allege that FE1 discussed construction of the Shanghai Facility with the Shanghai government entities, NIO's management, or any of the Defendants. Accordingly, FE1's conclusory assertions are entitled to no weight. *See Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (dismissing securities claim where confidential witnesses did not establish defendants' direct knowledge of challenged conduct).

Plaintiffs' allegations regarding a "senior salesperson" ("FE2") and "a car design engineer" ("FE3") are even more deficient. (SAC ¶¶ 90–91.) Plaintiffs provide no information whatsoever about the bases for FE2's and FE3's purported knowledge, and their job titles (which are all that Plaintiffs provide) suggest their duties and responsibilities would have been far afield from construction. These allegations are therefore also not entitled to any weight. *See In re MSC Indust. Direct Co.*, 283 F. Supp. 2d at 847 (dismissing complaint that failed to show former employees' "work responsibilities would provide them a basis for knowing the details" of the relevant department).

**(b)    The Issuance of Construction Permits and
Environmental Approvals Is Neither a Sufficient
Nor a Necessary Condition for Construction to Begin**

Plaintiffs also contend that because they were unable to locate a construction planning permit and environmental impact assessment approval for the Shanghai Facility, construction must never have commenced. (SAC ¶¶ 76–80, 82–85.) Even assuming *arguendo* that certain permits and approvals had not yet been obtained, it does not follow that construction had not begun. Conversely, the mere fact that permits and approvals

13

were granted would not mean that construction began. As the Offering Documents made clear, "construction projects are subject to broad and strict government supervision and approval procedures," including an array of permits including land planning, project planning, inspection and work safety approvals, etc. (Ex. A at 32.) Like any major undertaking, large construction projects proceed in a well-ordered sequence of steps, some of which—*e.g.*, on-site trial piling and soil investigation—necessarily would have to take place before final permits are granted, for the simple reason that those results— the load-bearing capacity of the foundation—are among the factors that the permitting authority would need to take into account to decide whether or not to grant the permits for construction to proceed to the next phase. Indeed, the Offering Documents never stated that all permits had been acquired—to the contrary, NIO clearly disclosed that it was "undergoing necessary approval procedures as required by law." (*Id.*)

Moreover, Plaintiffs' assertion that construction never began is undermined by other documents referenced in the Complaint. For instance, Plaintiffs concede that the requisite environmental impact assessment was completed. (SAC ¶ 84; Ex. D.) This assessment states that the Shanghai Jiading government planned to construct the Shanghai Facility on designated plots in Waigang Town. (Ex. D.) This fact was similarly touted by the Shanghai government, which, as early as January 2018—eight months before the IPO—publicly announced on its website that it was committed to "advanc[ing] vigorously the construction of the project within the shortest time at the fastest speed." (Ex. C.) Plaintiffs also do not dispute that NIO entered into agreements with government agencies and investment entities to secure financing and tax incentives and began procuring facilities and equipment by accepting bids for equipment and

14

materials and negotiating contracts with suppliers.  (SAC ¶¶ 64, 87–88; Ex. A at 137; *see, e.g.*, Ex. M.)[6]  These are all positive indicators—and all acknowledged by Plaintiffs in their Complaint—that the Shanghai Facility was well underway.[7]

**2.      Plaintiffs Do Not Allege Facts Showing the Status
of Construction Was Material Information**

Separately, even at the motion to dismiss phase, a court may dismiss a complaint if the alleged misstatement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (citation omitted).  Here, Plaintiffs assert that whether "construction on NIO's Shanghai Facility was already underway at the time of the IPO—as opposed to merely being in the planning stages— was highly material to investors" because "[i]f construction had already commenced and was ongoing at the time of the IPO, then that greatly reduces the risk that NIO or the Shanghai government would later walk away from the project."  (SAC ¶ 16.)  But that is nothing more that Plaintiffs' *ipse dixit*.

First, Plaintiffs do not explain why the various undisputed steps described above were not part of "construction."  Instead of splitting hairs in defining "construction" to refer only to "work done pursuant to a certain type of construction permit," as Plaintiffs do, the Offering Documents use the term in its ordinary, plain English sense to mean "the action of framing, devising, or forming, by the putting together of parts; erection, building" generally (Ex. N at 1 (*construction, n.*, *Oxford English Dictionary* (2020))):

---

6    The court may take judicial notice of materials integral to the Complaint.  (*See supra* note 4.)

7    Plaintiffs' allegations that they could find permits and approvals for other projects on behalf other companies are irrelevant. (SAC ¶¶ 78–79.)  Plaintiffs do not even allege when these particular projects "began" construction.  (*See id.*)

15

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities."  (Ex. A at 32; SAC ¶ 62.)

-  "Construction has started on our own manufacturing facility in Shanghai . . . ." (Ex. A at 122; SAC ¶ 61.)

- "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities."  (Ex. A at 137; SAC ¶ 62.)

The Offering Documents do not claim that any particular construction steps had been completed or any construction milestones had been achieved—in fact, they specifically warned that the project was still "undergoing necessary approval procedures."  (Ex. A at 32.)  Nor do Plaintiffs dispute that, by the time of the IPO, substantial steps had been taken to turn the construction plans into reality, including completing an environmental impact assessment and entering into agreements with government agencies and investment entities to secure financing and tax incentives.  (Ex. A at 137; Ex. D; SAC ¶ 64.)  Indeed, as the FEs make clear, the Company had also started procuring and accepting bids for equipment and materials for the new facility and negotiating contracts with suppliers.  (SAC ¶¶ 84, 87; Ex. M.)  Plaintiffs have alleged no facts to show that a reasonable investor, reading the Offering Documents holistically, would or did share Plaintiffs' myopic definition of "construction."  *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, *PLC*, 783 F.3d 383, 394 (2d Cir. 2015) ("[A] reasonable investor would have deemed the difference between 'encouraged' and 'required' to be immaterial."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (minutiae about the accounting treatment of prepay transactions "would not have been material to investors").

Moreover, the Offering Documents disclosed that the facility was not "expect[ed] to be ready [until] the end of 2020"—two years after the IPO—and warned that

16

"construction [was] largely outside of [NIO's] control and could experience delays or other difficulties."  (Ex. A at 32.)  The Offering Documents also expressly acknowledged the possibility that construction may not be completed "on time *or at all*." (*Id.* at 33 (emphasis added).)  Given these express warnings and the fact that the facility was not expected to be completed for another two years in any event, Plaintiffs have not alleged any facts to show that the particulars of the construction process would significantly alter the total mix of information available to investors at the time of the IPO.

### B.       Plaintiffs Fail to Allege Any Actionable Omission Regarding the Risk That the Shanghai Facility Would Not Be Completed

Plaintiffs' second theory—that the Offering Documents provided investors with "no indication and no warning that the Shanghai Facility may not be built at all" (SAC ¶ 15)—fails for at least two independent reasons: (i) the Offering Documents *did* disclose that the Shanghai Facility might not be completed "on time or at all" (Ex. A at 33); and (ii) NIO had no duty to disclose any additional information on the subject.

### 1.       NIO Warned of the Risk Plaintiffs Claim Was Omitted

"Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *see also Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) ("[D]efendants cannot be held liable for failing to disclose something that they disclosed."), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

Plaintiffs take aim at the Offering Documents for supposedly portraying the Shanghai Facility as a "*fait accompli*" and a "concrete certainty," and claim that NIO provided investors with "no indication and no warning that the Shanghai Facility might

17

not be built at all." (SAC ¶¶ 15, 93, 140.) But Plaintiffs' assertions are flatly contradicted by the Offering Documents, which did warn investors that NIO may be "*unable to successfully complete construction on time or at all*." (Ex. A at 33.) Far from pitching it as a "*fait accompli*," NIO said that "[w]e *expect* that this facility will expand our manufacturing capacity," and "[w]e *expect* that this facility will be ready by 2020." (*Id.* at 137.) Similarly, the Company explained that "[t]o *encourage and facilitate our establishment of this factory*, we have entered into arrangements" with governmental authorities and investment entities to provide "financing, tax incentives and other support." (*Id.*) If the facility were a "*fait accompli*," it would have needed no more "encourage[ment]" to "facilitate" its establishment. By disclosing to investors that the project was contingent on various factors, the Company made clear that while construction of the Shanghai Facility was underway, completion was not guaranteed.

To the extent Plaintiffs claim the Offering Documents specifically "failed to disclose that subpar sales or cash flow problems could mean that NIO may terminate the construction of the Shanghai Facility," that theory also fails. (SAC ¶ 92.) NIO *did* explicitly warn investors that the construction of the Shanghai Facility depended on sales meeting expectations and an adequate cash flow: "[We] expect to require significant capital and incur substantial costs in setting up, equipping and improving our future manufacturing plant in Shanghai" and that "*capital expenditures will be significantly affected by user demand for our products*." (Ex. A at 26.) "*If we are unable to raise sufficient funds, we will have to . . . delay or cancel our planned activities*." (*Id.* at 27.) No reasonable investor would have been surprised to learn the Shanghai Facility depended on precisely the financial performance indicators that the Company disclosed.

18

Finally, contrary to Plaintiffs' claim that "the Registration Statement did not disclose any uncertainties that could potentially derail NIO's plan to build the Shanghai Facility," (SAC ¶ 96), NIO disclosed that the project was "largely outside of our control and could experience delays or other difficulties," and that it was "subject to administrative uncertainty," and "subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits," or could result in "the suspension of use of such projects." (Ex. A at 32.)

### 2. Plaintiffs Fail to Establish That NIO Had a Duty to Disclose Any Additional Information

Plaintiffs cannot establish that NIO had a duty to disclose any additional information. "[I]t is well established that there is no liability in the absence of a duty to disclose . . . ." *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225(RJS), 2012 WL 4471265, at *29 (S.D.N.Y. Sept. 28, 2012) (citation omitted), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). A duty to disclose may either "be imposed by statute or regulation," or "may arise when additional information is needed to make another statement, whether required or voluntarily made, not misleading." *Id.* (citation omitted).

Plaintiffs assert that Items 303 and 503 of Regulation S-K imposed an affirmative duty on NIO to disclose that low sales and cash shortages could cause the Company to terminate its plans to complete the Shanghai Facility. (SAC ¶¶ 94–99.) "[W]hat must be disclosed [under Items 303 and 503] are material '*known* trends' or 'uncertainties,' or the 'most significant' risk factors with respect to an offering, which are *known* to the offering company at the time the registration statements are made." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (emphasis added)

19

(citation omitted), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  Here, Plaintiffs' claim fails because they do not allege that these so-called "uncertainties" were "known" to NIO *at the time of the IPO*.[8]

As NIO explained, the decision to terminate construction of the Shanghai Facility was prompted by a new, *post*-IPO government policy that encouraged research and development companies like NIO to produce their vehicles in cooperation with manufacturers like JAC.  (SAC ¶ 67.)  Plaintiffs do not contend that NIO knew that this policy shift was coming at the time of the IPO, let alone that this would cause the Company to reconsider its plans to build the Shanghai Facility.  Moreover, the question of when NIO knew about this change in Chinese government policy is irrelevant because Plaintiffs themselves argue that NIO's decision to terminate construction "was not due to a vague, yet-to-be-finalized government policy directive . . . but rather, was primarily due to cash shortage" (SAC ¶ 74), which NIO allegedly failed to disclose.  (SAC ¶ 92.)[9]

But this alternative theory—that a cash shortage due to disappointing sales caused NIO to drop the Shanghai Facility plans—also fails to state a claim under the securities laws.  According to Plaintiffs, the cash shortage that allegedly caused NIO to halt construction did not begin until *four months after the IPO* in January 2019.  (SAC ¶ 71.) "It is obvious, of course, that a . . . problem which does not emerge until January [2019]

---

[8]    Moreover, the Second Circuit has recognized that these regulations do not require the disclosure of "business strategy decisions" like the one at issue here, because "[t]he SEC 'has never gone so far as to require a company to announce its internal business strategies.'"  *Steamfitters Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015).)

[9]    Despite claiming that investors "did not believe" NIO's explanation, (SAC ¶ 70), Plaintiffs do not allege that NIO's March 2019 announcement was a material misrepresentation giving rise to liability under the securities laws.  (*See* SAC ¶¶ 92, 96 (alleging claims arising out of omissions in the Registration Statement).)

(at the earliest) cannot be disclosed in September [2018].  An earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized." *Panther Partners*, 538 F. Supp. 2d at 672.  Because Plaintiffs do not allege that the alleged risks were known to NIO at the time of the IPO, they fail to demonstrate that disclosure of such risks was required.

Nor was NIO required to make additional disclosures to make other statements in the Offering Documents not misleading.  *UBS*, 2012 WL 4471265, at *29.  Despite Plaintiffs' repeated claims that "the Registration Statement presented the Shanghai Facility as a *fait accompli*," (SAC ¶¶ 15, 93, 110), they cannot identify *any* language that describes the project in such definitive terms.  Instead, they point to statements that "[w]e are developing our own manufacturing facility in Shanghai which *we expect to be ready* by the end of 2020" and argue that "NIO stated in the Registration Statement that it *intended* to allocate 25% of the expected net proceeds from the IPO" for construction. (SAC ¶¶ 62–63.)  As explained above, such aspirational, forward-looking statements regarding NIO's expectations and intentions are non-actionable.  They also do not trigger a duty to disclose more.  *UBS*, 2012 WL 4471265, at *31; *see also id*. at *34.  Accordingly, Plaintiffs have failed to allege any material misrepresentation.[10]

## II.   PLAINTIFFS' EXCHANGE ACT CLAIMS ALSO FAIL BECAUSE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED SCIENTER

Plaintiffs' Exchange Act claims also fail because Plaintiffs do not "state with particularity facts giving rise to a strong inference that the defendant acted with the

---

[10]   Additionally, the statement that NIO "expect[ed]" the Shanghai Facility to be completed by 2020 was a statement of opinion, which does not establish scienter and is not actionable, unless Plaintiff alleges sufficient facts to show that the statement was not only false, but not reasonably held when made. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015). Plaintiffs here fail to allege any facts to demonstrate either.

21

required state of mind"—*i.e.*, scienter.  *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 314 (2007).  Scienter may be pled through particularized factual allegations showing (1) "motive and opportunity" to commit fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).  The inference of scienter must be "strong," *i.e.*, "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

Here, Plaintiffs do not even attempt to allege motive and opportunity.  Their allegations of recklessness must therefore be "correspondingly greater."  *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (citation omitted); *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  Plaintiffs must "allege facts approaching ***a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts*.**"  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009) (citation omitted).  Plaintiffs "'must ***specifically identify*** the reports or statements that are contradictory to the statements made,' or must 'provide specific  instances in which Defendants received information that was contrary to their public declarations.'"  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (citation omitted).  Plaintiffs fall far short of meeting this standard.

First, Plaintiffs do not identify any documentation or information sent to or from management that was "inconsistent with the statements made."  *Loc. No. 38 Int'l Brotherhood of Elec. Workers Pension Fund v. Am. Express. Co.*, 724 F. Supp. 2d 447,

22

460 (S.D.N.Y. 2010) (citation omitted), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).   Instead, they insist that "it is unfathomable that NIO's senior executives, including the Individual Defendants, were unaware that construction on the ballyhooed Shanghai Facility—NIO's first and only vehicle manufacturing facility—had not commenced," and "[w]ith the proposed construction site so close to NIO's headquarters, it is inconceivable that none of the Individual Defendants knew that construction never started."  (SAC ¶¶ 141, 145.)  But it is well settled that Plaintiffs cannot allege the requisite strong inference of scienter merely by claiming Defendants' "must have known" something.  *See, e.g.*, *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014)  ("The District Court correctly concluded that [plaintiff] *had not* sufficiently pleaded scienter based on what [defendant] 'must have known.'").   This is particularly so here where construction did not fall under NIO's purview but was instead the responsibility of the Shanghai government.

Second, to the extent that Plaintiffs rely on the Individual Defendants' positions at NIO to allege they had access to information contrary to statements in the Offering Documents (SAC ¶ 158), "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d at 388 (allegations that defendants, "because of their high positions" as CEO and CFO, "'undoubtedly' knew of the problems" are precisely the sort of vague conclusions that courts have rejected).

Third, the undisputed facts here—that the Shanghai government oversaw construction of the Shanghai Facility, that an environmental impact assessment was

23

conducted, and that NIO's own employees were procuring equipment and materials to outfit the Facility—support the more "cogent" and "compelling" inference that Defendants sincerely believed construction was underway because it was. *See Tellabs*, 551 U.S. at 314.

## III.   NO CAUSAL CONNECTION EXISTS BETWEEN THE PURPORTED MISREPRESENTATIONS AND ANY ALLEGED LOSS

Whether framed as an affirmative defense of negative causation or Plaintiffs' failure to allege loss causation, all of Plaintiffs' claims also fail because there is no causal link between any of the alleged misstatements and any purported loss. The securities laws protect investors only "against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). In other words, the misstatement or omission must have "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

The sole purported corrective disclosure Plaintiffs allege is NIO's March 6, 2019 announcement of Q4 2018 and FY 2018 financial results. However, this disclosure neither corrected any misstatement in the Offering Documents nor revealed any previously concealed information and thus was not a corrective disclosure. *See In re Travelzoo Inc. Sec. Litig.*, Nos. 11 Civ. 5531 GBD, 11 Civ. 6845 GBD, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) (dismissing securities claims where alleged corrective disclosure "[did] not reveal the falsity of any prior statements made by Defendants"). Moreover, the announcement that NIO would terminate construction of the Shanghai Facility was bundled with various other disclosures regarding the Company's Q4 2018 and FY 2018 performance, including a greater-than-expected

24

slowdown in deliveries.  (*See* Ex. F.)  Plaintiffs plead no facts to disaggregate the tangled effects that these multifarious announcements had on NIO's ADS price.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("[T]o establish loss causation," plaintiffs must "disaggregate those losses caused by '…other events' from disclosures of the truth behind the alleged misstatements.") (citations omitted).

## IV.    PLAINTIFFS HAVE NOT ALLEGED CONTROL PERSON LIABILITY

Finally, because Plaintiffs failed to plead primary liability under Section 11 of the Securities Act or Section 10(b) of the Exchange Act, their claims for control person liability under Section 15 and Section 20(a) also fail.  *See Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *ATSI Commc'ns, Inc.*, 493 F.3d at 108. Plaintiffs also improperly attempt to plead primary liability as to the same defendants for the same conduct  (SAC ¶¶ 133-138, 153-168), and they fail to allege how the Individual Defendants controlled or culpably participated in the alleged violations.  *See Kalnit v. Eichler*, 85 F. Supp. 2d 232, 245 (S.D.N.Y. 1999); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010).

### CONCLUSION

For these reasons, the SAC should be dismissed in its entirety with prejudice.

25

Dated: New York, New York
       October 19, 2020

  /s/ Robert A. Fumerton
     Scott D. Musoff
     (scott.musoff@skadden.com)
     Robert A. Fumerton
     (robert.fumerton@skadden.com)
     Michael C. Griffin
     (michael.griffin@skadden.com)
     **SKADDEN, ARPS, SLATE,**
       **MEAGHER & FLOM LLP**
     One Manhattan West
     New York, NY 10001
     Telephone:   (212) 735-3000
     Facsimile:   (212) 735-2000

*Attorneys for Defendants NIO Inc. and
Padmasree Warrior*

  /s/ Scott Edelman
     Scott Edelman
     (sedelman@milbank.com)
     Jed Schwartz
     (jschwartz@milbank.com)
     Micaela Manley
     (mmanley@milbank.com)
     **MILBANK LLP**
     55 Hudson Yards
     New York, NY 10001-2163
     Phone: (212) 530-5000

*Attorneys for Defendants Morgan Stanley &
Co. LLC, Goldman Sachs (Asia) L.L.C., J.P.
Morgan Securities LLC, Merrill Lynch,
Pierce, Fenner & Smith Inc., Deutsche Bank
Securities Inc., Citigroup Global Markets
Inc., Credit Suisse Securities (USA) LLC,
UBS Securities LLC and WR Securities, LLC*