**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re NIO, Inc. Securities Litigation* | Case No: 1:19-cv-01424-NGG-VMS<br><br>**Oral Argument Requested** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT**
**MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

Served on November 20, 2020

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

   A.   NIO's Business.................................................................................................... 2

   B.   NIO Becomes a Publicly-Listed Company in the U.S. ....................................... 3

   C.   The Shanghai Facility Actually Never Started Construction ............................... 4

   D.   NIO Abruptly Announces Termination of the Shanghai Facility ....................... 5

ARGUMENT ....................................................................................................................... 6

   I.   CLAIMS UNDER THE SECURITIES ACT OF 1933........................................... 6

      A. The Applicable Pleading Standard .................................................................. 6

      B. The Registration Statement Included Materially False and Misleading Statements and Omissions.................................................................................................. 7

        1. The Complaint Adequately Alleges that the Shanghai Facility was not under Construction at the time of the IPO .............................................................. 7

        2. The Status of the Shanghai Facility was Material to Investors ................................. 10

        3. The Registration Statement Failed to Warn that Construction of the Shanghai Facility Depended on NIO having Sufficient Cash and Meeting Sales Expectations ............. 12

      C. Plaintiffs' Securities Act Claims Do Not Sound in Fraud ............................................ 15

      D. Even if Rule 9(b) Applies, Falsity is Pled with Particularity, and Scienter Need Not be Pled for the Securities Act Claims .................................................................. 16

   II.   CLAIMS UNDER THE EXCHANGE ACT ................................................................... 17

      A. The Complaint Adequately Pleads Scienter ................................................................ 17

      B. The Complaint Adequately Alleges Loss Causation .................................................... 19

   III.   DEFENDANTS FAIL TO ESTABLISH THEIR NEGATIVE-CAUSATION AFFIRMATIVE DEFENSE.................................................................................................. 20

IV.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY UNDER BOTH SECTION 15(a) AND SECTION 20(a) ................................................. 21

CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Adair v. Bristol Tech. Sys., Inc.*,
179 F.R.D. 126 (S.D.N.Y. 1998) ....................................................................................... 6

*Akerman v. Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987) ............................................................................................ 21

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017) .............................................................................. 16

*Brown v. Enstar Grp., Inc.*,
84 F.3d 393 (11th Cir. 1996) ............................................................................................ 23

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ............................................................................................ 20

*Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014) ................................................................................ 23

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) .............................................................................. 17

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) .............................................................................. 23

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015) .............................................................................. 21

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .............................................................................. 15

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................... 9, 19, 20

*G.A. Thompson & Co. v. Partridge*,
636 F.2d 945 (5th Cir. 1981) ............................................................................................ 23

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ................................................................................... 11, 12, 18

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008) ................................................................... 16

*Gould v. Winstar Comm'ns, Inc.,*
  692 F.3d 148 (2d Cir. 2012) ........................................................................... 19, 20

*Harrison v. Dean Witter Reynolds, Inc.*,
  974 F.2d 873 (7th Cir. 1992) ............................................................................... 23

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ............................................................................................. 6

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ............................................................................. 23

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ..................................................... 19

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................. 16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................. 16

*In re Avon Sec. Litig.*,
  No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............. 18

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ................................................................. 22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ................................................................................. 20

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................................ 20, 21

*In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...................................................... 18

*In re IPO Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................. 23

*In re LaBranche Sec. Litig.*,
  405 F. Supp. 2d 333 (S.D.N.Y. 2005) ................................................................. 23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ............................................................................. 11

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................................................... 16

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ............................................................... 16

*In re Parmalat Sec. Litig.*,
594 F. Supp. 2d 444 (S.D.N.Y. 2009) ............................................................... 24

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................... 15

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ................................................................. 16

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ................................................................................ 6

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545 (S.D.N.Y. June 28, 2010) ................................................... 24

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................... 22

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................... 23

*Indepen. Energy Hldgs. PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001) ............................................................... 23

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011) ............................................................... 16

*Jones v. Perez*,
550 F. App'x 24 (2d Cir. 2013) ......................................................................... 10

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ............................................................................. 19

*Levine v. AtriCure, Inc.*,
508 F. Supp. 2d 268 (S.D.N.Y. 2007) ......................................................... 20, 21

v

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ................................................................................. 7, 11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ..................................................................................... 20

*McKenna v. Smart Techs. Inc.*,
   2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) ............................................................ 16

*Metge v. Baehler*,
   762 F.2d 621 (8th Cir. 1985) .................................................................................... 23

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ..................................................................................... 14

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ....................................................................................... 7

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ....................................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
   575 U.S. 175 (2015) .................................................................................................. 18

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ..................................................................................... 14

*Pearson Capital Partners LLC v. James River Ins. Co.*,
   151 F. Supp. 3d 392 (S.D.N.Y. 2015) ........................................................................ 9

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*,
   2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ............................................................ 22

*Porat v. Lincoln Towers Cmty. Ass'n*,
   464 F.3d 274 (2d Cir. 2006) ..................................................................................... 24

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................................. 6, 16

*S.E.C. v. Constantin*,
   939 F. Supp. 2d 288 (S.D.N.Y. 2013) ...................................................................... 19

*Sennett v. Rodman & Renshaw*,
   414 U.S. 926 (1973) .................................................................................................. 23

vi

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .................................................................................. 9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) .................................................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................................... 17, 18

*Trust Investment Luxemburg AG v. United Technologies Corp*,
336 F.Supp.3d 196 (S.D.N.Y. 2018) ..................................................................... 18

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .............................................................................................. 11

## Statutes

28 U.S.C. § 2072(b) ................................................................................................... 17

## Rules

Fed. R. Civ. P. 8 ....................................................................................................... 11

Fed. R. Civ. P. 8(a) ..................................................................................................... 7

## Regulations

17 C.F.R. § 229.303(a)(3)(ii) .................................................................................... 12

## Other Authorities

H.R. Conf. Rep. No. 73-1383 .................................................................................... 23

*Offering Reform*,
S.E.C. Release No. 8501, 2004 WL 2610458 (Nov. 3, 2004) ................................ 12

S. REP. 73-792 ........................................................................................................... 23

*S.E.C. Release No.* 6835, 1989 WL 1092885 ........................................................... 12

Lead Plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Joint Motion to Dismiss the Second Amended Class Action Complaint.[1]

## PRELIMINARY STATEMENT

This securities class action arises from a false and misleading Registration Statement that Defendant NIO Inc., a China-based electric vehicle company, issued to investors in its $1.1 billion initial public offering ("IPO") on the New York Stock Exchange.

In the Registration Statement, NIO told investors that it was building its own manufacturing facility in Shanghai – and that construction had already started. This was important to investors because NIO did not have its own manufacturing facility, and instead relied on an inexperienced Chinese state-owned truck manufacturer to make its vehicles. This unusual arrangement carried a myriad of risks for NIO, and for a company that hopes to compete with the likes of Tesla and Mercedes-Benz, the reliance on an obscure third-party manufacturer was an Achilles' heel for NIO and a source of concern for investors.

Buoyed by the claim that its own manufacturing facility was under construction, NIO's IPO was a hit with U.S. investors, who purchased $1.1 billion of NIO stock in the IPO.

Unbeknownst to investors, however, construction on NIO's manufacturing facility had not commenced at the time of the IPO. In fact, construction never started on NIO's Shanghai manufacturing facility before NIO abruptly cancelled the project. NIO announced, half a year after the IPO in the face of declining sales, that it had decided to terminate construction of the Shanghai

---

[1] Defendants Bin Li, Louis T. Hsieh, Lihong Qin, Tian Cheng, Xiang Li, Hai Wu, Yaqin Zhang, Xiangpang Zhong, and Zhaohui Li are Chinese nationals residing in China, and have yet to appear in this action. Plaintiffs are currently in the process of serving these Defendants through the Hague Service Convention.

manufacturing facility, and would instead continue relying on state-owned truck manufacturer JAC Motors to produce its electric vehicles. This sudden and surprising announcement rattled the market, causing NIO's stock price to drop by 30%.

Indeed, not only did the Registration Statement falsely state that construction had already begun on NIO's Shanghai manufacturing facility, it also did not warn investors that construction of the Shanghai manufacturing facility was dependent on NIO having sufficient cash and meeting sales expectations. Hence investors were unaware of the very real risk – one that eventually came into fruition – that NIO might abandon plans to build the Shanghai manufacturing plant after the IPO.

This action seeks recovery for investors' losses, pleading two sets of independent claims under each of the Securities Act and the Exchange Act.

## STATEMENT OF FACTS

### A.  NIO's Business

Headquartered in Shanghai, NIO develops and sells electric vehicles ("EVs") to Chinese consumers. ¶¶ 3, 47.[2] NIO seeks to fill a niche market in China by selling purportedly premium EVs at substantially lower prices than comparable models from foreign automakers such as Tesla, Audi, and Mercedes-Benz. ¶¶48-49. These Western companies had been the dominant players in China's premium EV market and are NIO's primary competitors. *Id.*

NIO has an unusual business model. Unlike its competitors, NIO does not have its own manufacturing facility and does not manufacture its own EVs. ¶51. Instead, NIO contracts with a relatively obscure Chinese state-owned company, Jianghuai Automobile Group Co. Ltd. ("JAC

---

[2] All citations to "¶_" are to paragraphs of the Second Amended Class Action Complaint Violations of the Federal Securities Laws, filed on September 18, 2020. Dkt. #67.

2

Motors"), to make its EVs. ¶¶51-53. Industry analysts describe JAC Motors as a "third tier" truck manufacturer with "limited experience in manufacturing passenger vehicles." ¶53.

NIO acknowledges that its reliance on JAC Motors carries significant risks, including: (1) having its "premium" brand "adversely affected by perceptions" of the quality of JAC Motors' vehicles; (2) experiencing delays if JAC Motors fails to deliver on agreed-upon timelines or experiences capacity constraints; (3) getting embroiled in potential disputes with JAC Motors, and (4) inability to guarantee that JAC Motors can meet NIO's quality standards. ¶58. Moreover, NIO had to pay JAC Motors for producing NIO's cars and compensate it for operating losses. ¶52. Not surprisingly, the financial media reports that NIO's dependence on JAC Motors was a "source of concern for investors." ¶57. Thus, building its own manufacturing capabilities - and having control over the manufacturing process - was a critical component of NIO's business strategy. ¶59.

## B. NIO Becomes a Publicly-Listed Company in the U.S.

On September 12, 2018, NIO completed its IPO on the New York Stock Exchange ("NYSE"), raising $1.1 billion from U.S. investors. ¶55.

In the Registration Statement that NIO used to woo investors, NIO not only told investors that it had entered into an agreement with the Shanghai government to build NIO's own manufacturing facility in Shanghai (the "Shanghai Facility"),[3] but also declared that construction of the Shanghai Facility was already underway:

- "*Construction has started* on our own manufacturing facility in Shanghai[.]" ¶61.

- "Our own manufacturing facility in Shanghai *is currently under construction* by certain Shanghai government authorities." ¶62

---

[3] According to the Registration Statement, the Shanghai government would construct the shell of the building for the Shanghai Facility, and NIO would be responsible for outfitting and equipping it (*i.e.* turning it from a shell into an actual manufacturing facility). ¶64 n.5.

3

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility *is currently being constructed* by relevant Shanghai authorities." ¶62.

The Registration Statement said that 25% of the proceeds from the IPO, or approximately $276 million, was earmarked for building the Shanghai Facility, which was expected to cost approximately $650 million in total. ¶66. The rest of the funds for the Shanghai Facility would come from sales revenue, prior financing, and government loans. ¶64.

### C. The Shanghai Facility Actually Never Started Construction

Contrary to NIO's representations in the Registration Statement, the Shanghai Facility actually never began construction. ¶10.

For construction on the Shanghai Facility to commence, the Shanghai Municipal Planning and Natural Resources Bureau ("Shanghai Planning Bureau") would have to have issued a construction planning permit for the project. ¶77. All construction planning permits issued by the Shanghai Planning Bureau after 2010 can be found on the website of the Shanghai Planning Bureau. ¶¶77, 81. Government construction projects are not exempt from obtaining a construction planning permit. ¶¶78, 79. The Shanghai Planning Bureau's website does not show that a construction planning permit was ever issued for the Shanghai Facility. ¶80.

Nor did the Shanghai Facility obtain the environmental impact assessment approval needed for construction to begin. ¶82. Chinese law requires construction projects – including government construction projects - to conduct and pass an environmental impact assessment before any construction work can begin. *Id,* ¶83. This is a multi-step process: first, an environmental impact assessment is conducted and a report issued, then, following a public review period, relevant authorities decide whether to approve the environmental impact assessment. *Id.* In Shanghai, construction projects that have conducted environmental impact assessments *and* obtained approval following public review are listed on a website known as the Shanghai Environmental

4

Impact Assessment For Construction Projects Publication Platform ("Shanghai Environmental Impact Assessment Platform"). ¶83. While an environmental impact *assessment* was completed for the Shanghai Facility in May 2018, the project never received the required environmental impact *approval* from the Shanghai government. ¶84. If it did, the project would have appeared on the Shanghai Environmental Impact Assessment Platform, but it does not. *Id.*

Without a construction planning permit and without the environmental impact approval, it would have been illegal to begin construction work on the Shanghai Facility, and indeed, multiple former NIO employees confirmed that construction of the Shanghai Facility never commenced. A former NIO Purchasing Manager ("FE1") who was directly involved with the Shanghai  Facility project – including participating in its design, planning and procurement from prospective suppliers - told Plaintiffs that construction never started on the Shanghai Facility before the project was terminated in the second half of 2018. ¶¶87, 89. A former NIO senior sales executive based in Shanghai ("FE2") corroborated this account, telling Plaintiffs that the Shanghai Facility did not begin construction, and instead was still in the "planning stages" when the decision was made to terminate the project. ¶¶74, 90. Lastly, a NIO car design engineer based in Shanghai ("FE3") confirmed that although an environmental impact assessment was conducted for the Shanghai Facility, the project was cancelled before construction began. ¶91.

### D.  NIO Abruptly Announces Termination of the Shanghai Facility

On March 6, 2019, less than half year after the IPO, NIO filed a Form 6-K with the SEC in which NIO announced that it would no longer be building the Shanghai Facility, and instead would continue to rely on JAC Motors to manufacture its EVs. ¶65. NIO's surprising announcement rattled the market, as NIO's stock price fell by 30% in response to this unexpected news. ¶146.

5

While NIO pointed to a vague, yet-to-be-finalized November 2018 government policy directive "endorsing" cooperation between vehicle research & development enterprises (such as NIO) and manufacturing companies (such as JAC Motors) as the reason for terminating the Shanghai Facility, securities analysts, industry insiders, and investors overwhelmingly agreed that the real reason was NIO's sluggish sales and projected demand. ¶¶70-73. This is corroborated by FE2, who told Plaintiffs that it was NIO's "cash shortage difficulties," rather than the policy directive, that drove NIO to cancel the Shanghai Facility. ¶74. Indeed, NIO's sales fell precipitously in 2019; while NIO delivered 3,089 and 3,318 EVs respectively in November and December 2018, deliveries fell to 1,805 EVs in January 2019 before plummeting even further to 811 EVs in February 2019. ¶75.

## ARGUMENT

### I. CLAIMS UNDER THE SECURITIES ACT OF 1933

#### A. The Applicable Pleading Standard

Under Section 11 of the Securities Act, a plaintiff "need only show a material misstatement or omission to establish his prima facie case," which "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege…scienter." *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) (Section 11 is a "virtually absolute liability provision"). In addition, neither reliance nor loss causation is required. *See Rombach*, 355 F.3d at 169 n.4; *Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998).

Because fraud is not an element of a Section 11 claim, pleading a Section 11 claim is governed by Rule 8(a)'s notice-pleading standard, which requires only "a short and plain statement

of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). "Nor do the heightened pleading standards of the Private Securities Litigation Reform Act [PSLRA] apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012).[4]

### B. The Registration Statement Included Materially False and Misleading Statements and Omissions

NIO's Registration Statement included two sets of misrepresentations: (1) it falsely stated that construction of the Shanghai Facility was underway at the time of the IPO; and (2) it failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations. ¶10.

### 1. The Complaint Adequately Alleges that the Shanghai Facility was not under Construction at the time of the IPO

The Registration Statement clearly and repeatedly stated that construction of the Shanghai Facility had already begun. ¶61("Construction has started on [Shanghai Facility]); ¶62 ([Shanghai Facility] is currently under construction); *Id.* ("[Shanghai Facility] is currently being constructed"). These statements are unambiguous; they plainly indicate that construction of the Shanghai Facility was underway.

The Complaint alleges in detail several independent reasons why these statements are false: construction of the Shanghai Facility had not begun at the time of the IPO. It couldn't have, because the Shanghai Facility never obtained the necessary construction planning permit, and no environmental impact approval was ever issued for the Shanghai Facility. ¶¶76-85. Both were

---

[4] Defendants' incorrect assertion that the Securities Act claims "sound in fraud" is addressed in § I.C below.

7

required to begin construction of the Shanghai Facility, and neither were ever issued for the Shanghai Facility. ¶85. Moreover, multiple former NIO employees, including FE1 who was directly involved in the Shanghai Facility project, confirmed that construction never began prior to NIO terminating the Shanghai Facility. ¶¶86-91.

Defendants concede that no construction planning permit or environmental impact approval was ever issued for the Shanghai Facility. Instead, Defendants argue that "substantial steps" were taken to begin construction of the Shanghai Facility.[5] But the Registration Statement did not say that NIO had merely taken steps to begin construction of the Shanghai Facility - or even that construction of the Shanghai Facility would begin imminently - the Registration Statement unequivocally said construction **had already** started. The "positive indicators" that Defendants describe at most suggest that **planning** of the Shanghai Facility was underway; they do not show that **construction** had commenced.

Unable to credibly dispute that construction had not begun at the time of the IPO, Defendants attempt to stave off liability by proffering an unreasonably expansive definition of "construction." But a reasonable investor would not have interpreted the Registration Statement's disclosure that "construction has started" or that the Shanghai Facility "is currently under construction" to mean that NIO was simply signing financing agreements or procuring prospective suppliers for the Shanghai Facility. A reasonable investor would have read those statements to mean that there were boots on the ground and workers had begun constructing the Shanghai Facility. At minimum, the way that Defendants worded these statements would have easily misled investors, which is all that is necessary for them to be actionable. *Freudenberg v. E\*Trade Fin.*

---

[5] *See* Def. Br. at 16 (arguing that "substantial steps", such as conducting an environmental impact assessment, procuring bids from suppliers, entering into financing agreements, were taken to turn "construction plans into reality").

*Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) ("A statement is misleading if a reasonable investor would have received a false impression from the statement."); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 689 (5th Cir. 2014) (declining to consider defendant's interpretation of a term used in the defendant's statements because plaintiff's interpretation was plausible). On a motion to dismiss, all inferences must be drawn in Plaintiffs' favor. *Pearson Capital Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 399 (S.D.N.Y. 2015).

Nevertheless, despite Defendants' post-hoc attempt to redefine "construction," disclosures in the Registration Statement clearly show that NIO intended "construction" to refer to the actual construction work of building the Shanghai Facility (and not the construction-planning steps that NIO was undertaking):

- "Our own manufacturing facility in Shanghai *is currently under construction by certain Shanghai government authorities*." ¶62

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility *is currently being constructed by relevant Shanghai authorities*." ¶62.

It is clear that "construction" referred to the part of the project that was being handled by the Shanghai government (*i.e.* the actual construction of the building of the Shanghai Facility). Defendants cannot seriously argue that "construction" here referred to something else. *Freudenberg*, 712 F. Supp. 2d at 180 ("The purpose of the disclosure requirements is 'to inform, not to challenge the reader's critical wits'").

Defendants' attempt to discredit the former employee corroborations is unavailing. The Second Circuit held in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) that former employees need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Here, the Complaint describes with more than sufficient particularity to show why FE1 was in position

9

to know that construction never started on the Shanghai Facility:

- ""FE1" was employed as a Purchasing Manager at NIO from May 2018 to August 2020. FE1's department was responsible for overseeing fixed asset investment projects at NIO, including new factories, new joint venture factories, research & development ("R&D") centers, power stations, and NIO servicing and delivery centers.  As a Purchasing Manager, FE1 oversaw site selection and design of new factories, as well as the installation of facilities and equipment at new factories, including the Shanghai Facility.  FE1 was also responsible for negotiating contracts with suppliers of NIO's factories and R&D centers."  ¶87.

- "FE1 was directly involved in the Shanghai Facility project, and participated in design planning and procuring prospective suppliers for the Shanghai Facility. ¶88.

FE1 was directly and personally involved in the Shanghai Facility project, participating in site selection, design planning, and procuring suppliers for the Shanghai Facility. Under *Novak*, FE1's testimony must be credited. Defendants' citation to *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) is inapposite because there the issue was whether the confidential witnesses were in position to know about the defendants' scienter (*i.e.* state of mind); claims under the Securities Act do not require Plaintiffs to plead scienter.[6] FE1's personal involvement in planning for the Shanghai Facility shows his personal knowledge of the facts attributed to him in the Complaint.

## 2.   The Status of the Shanghai Facility was Material to Investors

Defendants contend that the Complaint should be dismissed because it was immaterial whether construction of the Shanghai Facility was already underway. Defendants are wrong.

The Second Circuit has emphasized that, in Section 11 cases, "[w]here the principal issue is materiality, an *inherently fact-specific finding,* the burden on plaintiffs to state a claim is *even lower"* than the "relatively minimal burden" applicable to other elements of their claims under

---

[6] As for FE3, he worked as a car design engineer for NIO. ¶91. As an engineer, it is reasonable to infer that he would need to know who will be manufacturing the EVs that he designs, and how they will be manufactured; as such, he would have information about the status of the Shanghai Facility. Moreover, that he knew that an environmental impact assessment was conducted for the Shanghai Facility further shows that he was knowledgeable about the project. *Id.*

10

FRCP 8. *Litwin*, 634 F.3d at 718. A "complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are *so obviously unimportant* to a reasonable investor that *reasonable minds could not differ* on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). As such, materiality is "rarely dispositive on a motion to dismiss." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010); *see also TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976) (issues of materiality are "peculiarly ones for the trier of fact" and should not be decided on a motion to dismiss or even on summary judgment);

Whether construction of the Shanghai Facility was already underway at the time of the IPO – as opposed to merely being in the planning stages – was highly material to investors. If construction had already commenced and was ongoing at the time of the IPO, then that greatly reduces the risk that NIO or the Shanghai government would later walk away from the project. In contrast, if the Shanghai Facility was merely in the planning stages, then the parties would have substantially less stake in the project and there would be significantly more risk of the project falling through. Indeed, that NIO was able to easily terminate its agreements with the Shanghai government for the Shanghai Facility shows the materiality of the status of construction. If the Shanghai government had already started constructing the Shanghai Facility – as represented in the Registration Statement – then NIO would likely have had a much more difficult time terminating the project.

The importance of the Shanghai Facility also supports materiality of its construction status. The Registration Statement admitted that relying on JAC Motors carries a host of risks for NIO. ¶58. The Registration Statement also stated that having its own manufacturing facility was a critical part of NIO's business strategy. ¶¶7, 59. For a company that hoped to compete with the

11

likes of Tesla, Audi, and Mercedes-Benz, the lack of a manufacturing facility was embarrassing for NIO and concerning for investors. ¶¶5, 8. Thus, the notion that NIO's Shanghai Facility was already under construction at the time of the IPO mattered to investors.

In any event, since the status of the Shanghai Facility was not "so obviously unimportant," and because reasonable minds could differ on its importance, dismissal on materiality grounds is improper. *Ganino*, 228 F.3d at 162.

### 3. The Registration Statement Failed to Warn that Construction of the Shanghai Facility Depended on NIO having Sufficient Cash and Meeting Sales Expectations

The Registration Statement's failure to warn investors that subpar sales or cash flow problems could jeopardize construction of the Shanghai Facility provides a separate and independent basis for liability. Items 303 and 503 of SEC Rule S-K required NIO to disclose the very real risk that NIO may elect to abandon construction of the Shanghai Facility. Item 303 imposes an affirmative duty on issuers to disclose any "uncertainties" that may have a material or unfavorable impact on future business. *S.E.C. Release No.* 6835, 1989 WL 1092885, at *4; 17 C.F.R. §229.303(a)(3)(ii). Item 503 requires disclosure of "material risks" to investing in a company. *Sec. Offering Reform,* S.E.C. Release No. 8501, 2004 WL 2610458, at *6 (Nov. 3, 2004).

Defendants claim that the Registration Statement made several disclosures indicating that the Shanghai Facility may not be constructed. These disclosures, however, fall short because they warn of generic risks that are associated with any construction project – indeed, it is common sense that all construction projects carry risks. None of them warned of the specific risk (and it was a real risk because it ultimately came to fruition) that NIO may itself choose to terminate the

12

Shanghai Facility.[7] For example, Defendants point to the disclosure "to the extent we are unable to successfully complete construction on time or at all, our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit score system could be adversely affected[.]"[8] as sufficient warning that it might not build the Shanghai Facility. But this disclosure was (a) in the context of NIO obtaining its own EV license, and (2) merely states the unremarkable proposition that any construction project is subject to delays and unforeseen exigencies. It falls woefully short of warning investors that *NIO* may *itself* choose to terminate the Shanghai Facility for financial reasons.

Similarly, the disclosure "If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities"[9] is nothing more than a generic discussion about common sense business operations. It doesn't even mention the Shanghai Facility. The disclosure "capital expenditures will be significantly affected by user demand for our products"[10] is likewise a generic disclosure that investors would expect to be true for any company. It also does not mention the Shanghai Facility, let alone warn investors that NIO may elect to terminate the ballyhooed Shanghai Facility. Lastly, the disclosure that construction of the Shanghai Facility was "largely outside of our control and could experience delays or other difficulties" simply reiterates that the Shanghai government was constructing the Shanghai Facility, and that the construction project could experience delays or other unforeseen difficulties – something that a reasonable investor would expect from any construction project. In light of the Registration Statement's repeated and unambiguous proclamation that construction of the Shanghai Facility

---

[7] Nor do any of the disclosures reveal that construction had actually not started.

[8] Exhibit A to the Declaration of Robert A. Fumerton ("Def. Ex.") at 32-33.

[9] Def. Ex. A at 27.

[10] Def. Ex. A at 26

13

was already underway, these boilerplate discussions of generic risks fall far short of adequately warning investors that NIO would pull out of the project if sales did not meet expectations. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (the "generic cautionary language that '[h]ighly complex products such as those that [Ikanos] offer[s] frequently contain defects and bugs…did not fulfill Ikanos's duty to inform the investing public of the particular…uncertainties[.]'")

Defendants also argues that because NIO's sales did not decline until January 2019, four months after the IPO, it was not "known" at the time of the IPO that NIO would later terminate the Shanghai Facility due to subpar sales. This argument is a red herring. It is axiomatic that businesses cannot count on future revenue meeting expectation; this is especially true for a new company like NIO with no track record of past performance. The possibility that future sales may not meet expectations is very real and known to NIO. Indeed, NIO acknowledged in the Registration Statement that "We have negative cash flows from operation, have only recently started to generate revenues and have not been profitable, all of which may continue in the future."[11] Yet, instead of disclosing that this could jeopardize the Shanghai Facility (which it eventually did), NIO only makes generic disclosures about subpar sales potentially adversely affecting expenditures, without any reference to possible effects on the Shanghai Facility. Generic warnings of risk do not suffice when omitted facts "would substantially affect a reasonable investor's calculation of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). Here, given the Registration Statement's false assurance that the Shanghai Facility was already under construction, a reasonable investor's "calculation of probability" that the Shanghai Facility would become reality was something approaching certainty. None of the purported

---

[11] Def. Ex. A at 14.

disclosures that Defendants point to in the Registration Statement corrects that calculation of probability; as such, they are inadequate.[12]

### C.  Plaintiffs' Securities Act Claims Do Not Sound in Fraud

Defendants wrongly assert that Plaintiffs' Securities Act claims "sound in fraud" and must therefore satisfy a higher Rule 9(b) pleading standard.

The Complaint pleads the Securities Act and Exchange Act claims separately, and the Securities Act claims expressly disclaim any allegations of fraud. *See* Complaint, Counts I and II. All of Plaintiffs' allegations of fraud or scienter are separately pled in the Exchange Act section of the Complaint. ¶¶139-144. Even if the Securities Act and Exchange Act claims are based on the same course of conduct, it does not turn the Securities Act claims into fraud claims. Indeed, even if "it is clear that plaintiffs believe that [a defendant] and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud….[,] [t]his fact…does not take away plaintiffs' right to ***plead in the alternative*** that defendants violated provisions requiring only negligence." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632-3 (S.D.N.Y. 2007) (emphasis added). The same course of conduct that would support a securities fraud claim under the Exchange Act may also support a Section 11 claim.  *Id.*

Courts in this Circuit applying *Rombach* routinely find that Securities Act claims do not sound in fraud where, as here, a complaint presents them separately from any Exchange Act claims and expressly disclaim any allegations of fraud. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (notice pleading applies to Securities Act claims where complaint "is segregated into two parts" and disclaims fraud allegations in

---

[12] Defendants are correct that "the question of when NIO knew about the [Chinese government policy directive] is irrelevant" (Def. Br. at 20), because that was not the true reason for NIO's decision to terminate the Shanghai Facility.

Securities Act part).[13]

In any event, Plaintiffs' claims against the Underwriters are based on their failure to conduct reasonable due diligence, ¶¶100-110, and must be analyzed under Rule 8(a). *See Rombach*, 355 F.3d at 178 (applying negligence standard to claim that underwriters failed to conduct reasonable due diligence), *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004) (allegation that underwriter "failed to conduct a reasonable investigation" and thus lacked reasonable grounds for believing the contested statements were not misleading did not sound in fraud).

### D. Even if Rule 9(b) Applies, Falsity is Pled with Particularity, and Scienter Need Not be Pled for the Securities Act Claims

Even if the Court were to find that Plaintiffs' Securities Act claims sound in fraud, that would mean only that the falsity of the Registration Statement would need to be pleaded with particularity under Rule 9(b), which Plaintiffs have done. The sounds-in-fraud doctrine does not import any new elements into the Securities Act causes of action, so Plaintiffs still need not plead scienter, reliance, or loss causation for these claims, even if they sound in fraud. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015) ("Claims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), but that Rule does not add substantive elements such as scienter to any claim.") (citing *Rombach*, 355 F.3d at 175); *McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *21 (S.D.N.Y. Apr. 3, 2012) (rejecting argument that claims under Securities Act §15 that sound in fraud require "culpable participation," because procedural sounds-

---

[13] *See also, e.g., Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 185 (E.D.N.Y. 2017) (same); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) (same); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 377 (S.D.N.Y. 2011) (same); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 290 (S.D.N.Y. 2009) (same); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 537 (S.D.N.Y. 2010) (same); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 665 (2d Cir. 2009) (same).

in-fraud doctrine cannot add element to statutory cause of action: "That the Amended Complaint sounds in fraud simply connotes the pleading standard that plaintiff must meet under procedural rules. It is axiomatic that procedural rules cannot eviscerate substantive law, imposed by statute or otherwise.") (citing Rules Enabling Act, 28 U.S.C. § 2072(b)). For the reasons discussed above, if Rule 9(b) applies, it is satisfied here.

## II. CLAIMS UNDER THE EXCHANGE ACT

### A.  The Complaint Adequately Pleads Scienter

Under the PSLRA, a plaintiff needs to plead a "strong inference" of the defendants' scienter - *i.e.,* that they acted either with intent to defraud or with reckless disregard for the truth. As with any 12(b)(6) motion, a court must conduct its "comparative assessment of plausible inferences" while "constantly assuming the plaintiff's allegations to be true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326–27, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). The requisite inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences'"; instead, the inquiry is simply this: "When the allegations ***are accepted as true*** and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.[14]

Since *Tellabs*, the Second Circuit has reaffirmed that a plaintiff may plead scienter by alleging facts showing that defendants "knew facts or had access to information suggesting that their public statements were not accurate" ***or*** "failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190,

---

[14] In other words, "[a] tie . . . goes to the plaintiff." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).

17

194 (2d Cir. 2008). As the Second Circuit has also long held, plaintiffs need not plead scienter with "great specificity" as long as they allege "enough facts to support 'a strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169. Moreover, in determining whether a complaint gives rise to a strong inference of scienter, a court may "take into account" only "plausible" non-culpable explanations for defendants' conduct that may be "rationally draw[n] *from the facts alleged*" in the complaint. *Tellabs*, 551 U.S. at 324.

Here, the Shanghai Facility was to be NIO's first and only manufacturing facility; constructing the Shanghai Facility means that NIO will no longer be dependent on JAC Motors. ¶139. The Shanghai Facility was located in the same district of Shanghai (*i.e.* Jiading District) as NIO's headquarters, a mere 20-minute drive away. ¶145. It is not credible that NIO's senior executives were unaware of the status of the Shanghai Facility's construction. *See e.g., In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[I]t would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market."). If the Individual Defendants failed to verify the construction status before telling investors that construction was underway, then they were reckless and therefore still had scienter. *See In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *13 (E.D. Pa. Mar. 25, 2020) ("Suggesting that Plaintiffs failed to plead recklessness because Defendants possibly failed to review important information accessible to them equally runs afoul of the policy objective to discourage deliberate ignorance."). Indeed, even a false statement of *opinion* – which is held to a higher pleading standard – gives rise to scienter if the defendant did not make a meaningful inquiry as to its factual basis. *Frank-Trust Investment Luxemburg AG v. United Technologies Corp,* 336 F.Supp.3d 196, 227 (S.D.N.Y. 2018) citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund,* 575 U.S. 175, 188

(2015). Thus, it was at minimum reckless for NIO executives to make a statement of material *fact* in a Registration Statement without first confirming that it is true. *S.E.C. v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ("[defendant] acted recklessly in failing to verify the accuracy of the information [provided to investor clients]").

### B. The Complaint Adequately Alleges Loss Causation

Rule 8(a)'s notice-pleading standard applies to the Complaint's loss-causation allegations. *See IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013), at *12. Indeed, while "[p]leading loss causation is an essential element of a claim . . . [it] is not meant to impose a great burden on plaintiffs." *Id. See also Freudenberg*, 712 F. Supp. 2d at 202 (no heightened pleading standard for loss causation). Under Second Circuit law, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).

Loss causation is adequately pled if a complaint alleges facts such that a "jury could reasonably infer…that the [decline in the company's stock price] was attributable in part to the alleged fraud." *Gould v. Winstar Comm'ns, Inc.,* 692 F.3d 148, 161 (2d Cir. 2012). Plaintiffs readily allege loss causation under this standard. The Complaint alleges that NIO's stock was artificially inflated by false representations that the Shanghai Facility was already under construction and by omissions concerning the risk that NIO may elect to terminate construction of the Shanghai Facility. The Complaint further alleges that when NIO announced that it had decided to abandon construction of the Shanghai Facility, NIO's stock price reacted swiftly and negatively, falling by 30%.

Defendants appear to be asking this Court to adopt a rule that the corrective disclosure need be a "mirror image" tantamount to a confession of fraud, but that is not the law. "Because corporate wrongdoers rarely admit that they committed fraud, it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Freudenberg*, 712 F. Supp. 2d at 202 (quotations and citations omitted).

Defendants further contend that Plaintiffs must "disaggregate" the portion of the loss that results from unrelated statements in NIO's March 6, 2019 announcement. Plaintiffs have no such duty at the pleading stage. "The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015). *See also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price."). Defendants' citation to *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) is inapposite because the court there was discussing what is needed to *prove* loss causation, not what is required to *plead* loss causation. *See Winstar,* 692 F.3d at 161 (loss causation adequately pled if a fact-finder could reasonably infer that the stock drop was caused "in part" by the alleged fraud).

### III.   DEFENDANTS FAIL TO ESTABLISH THEIR NEGATIVE-CAUSATION AFFIRMATIVE DEFENSE

Loss causation is not an element of a Section 11 claim. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Plaintiffs are not required to plead loss causation in the Complaint"); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007). "As an affirmative defense, the burden of disproving loss causation falls on defendants,

20

reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants.'" *Levine*, 508 F. Supp. 2d at 272 (citing *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)).

A defendants' burden in disproving loss causation, *i.e.* showing negative causation, is a "heavy burden." *Akerman*, 810 F.2d at 342. Given the fact-intensive nature of such inquiries, "the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion." *Giant,* 643 F. Supp. 2d at 572. *See also, Levine,* 508 F. Supp. 2d at 272-73 ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant [if ever] on a motion for summary judgment or at trial.").

Here, Defendants conflate establishing their negative causation affirmative defense with arguing that Plaintiffs insufficiently pled loss causation. Indeed, Defendants do not even try to demonstrate negative causation. Defendants' conclusory assertion that Plaintiffs' claims fail "whether framed as an affirmative defense of negative causation or Plaintiffs' failure to allege loss causation" falls far short of establishing their negative causation affirmative defense. To the extent that Defendants suggest that some portion of the stock drop may have been caused by unrelated news, this is insufficient. Defendants have the burden of demonstrating that all of the stock price decline was unrelated to misstatements or omissions in the Registration Statement, which Defendants make no attempt to establish. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 587 (S.D.N.Y. 2015) ("where the burden of proving negative loss causation falls on defendants, the exact same inability to disentangle works to defendants' disadvantage.").

## IV. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY UNDER BOTH SECTION 15(a) AND SECTION 20(a)

The two elements of a control-person liability claim, whether brought under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, are (1) a primary violation of the relevant Act by a controlled person; and (2) "control" of the primary violator by the "alleged controlling"

21

defendant. Defendants' main argument is that the control personal liability claims fail because Plaintiffs fail to state a claim for primary violation of the Securities Act and the Exchange Act. Thus, if the Court finds that Plaintiffs have adequately pled a primary violation of the Securities Act or the Exchange Act, then they have also pled the corresponding control person liability claim.

Contrary to Defendants' assertion, Plaintiffs are not precluded from pleading that the same Defendant is both a primary violator and a control person. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005).

Furthermore, Section 15 does not require that Plaintiffs plead defendants "culpably participated" in the alleged misconduct. *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012) (collecting cases).  For control person liability under Section 15, it is "well settled that officers and directors of the primary violator who signed the registration statements containing [the false statements] fulfill the control prong."  *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012). Each of the Individual Defendants here signed the Registration Statement. ¶35.

While there is a split of authority as to whether – in the Section 20(a) context only – the plaintiff must also plead culpable participation, the better-reasoned view is that culpable participation under Section 20(a) is an affirmative defense that triggers no pleading obligations on Plaintiffs' part. Although the Second Circuit has yet to rule on the issue, a clear majority of those circuits that *have* (including the Fifth, Seventh, Eighth, Ninth (en banc), Tenth, and Eleventh Circuits) have held that plaintiffs need not plead culpable participation to allege a Section 20(a) claim, and that Section 20(a) instead provides an affirmative defense of "good faith" for a defendant to assert. *See Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire*

22

*Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549 (S.D.N.Y. 2014) n.75.[15] In sum, the clear weight of Circuit-level authority holds that "a plaintiff need not plead culpable participation by the control person in order to state a legally sufficient claim." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 256 (S.D.N.Y. 2012); *accord In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363–64 (S.D.N.Y. 2005) (burden of proving good faith is on defendant); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003) ("[I]t does not appear that there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation").

Indeed, Judge Scheindlin - who also initially took the contrary view (*see Indepen. Energy Hldgs. PLC Sec. Litig.*, 154 F. Supp. 2d 741, 771 (S.D.N.Y. 2001)) - later reconsidered her position in *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 392-97 (S.D.N.Y. 2003) (adopting majority view that plaintiff need ***not*** plead culpable participation). In so holding, Judge Scheindlin found the statute's legislative history persuasive. *See IPO*, 241 F. Supp. 2d at 395 (citing S. REP. 73-792 (1934) at 22 & H.R. Conf. Rep. No. 73-1383 (1934) at 26). As Judge Scheindlin also noted:

> Section 20(a) provides that anyone who "controls" a person liable under the 1934 Act is equally liable, ***subject only to the defense of "good faith."*** The section is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable. . . The [Act's] purpose is to expand, not restrict, the public's remedies.

*Id.* at 395-96 (quoting *Sennett v. Rodman & Renshaw*, 414 U.S. 926, 929 (1973) (Douglas, J., dissenting from denial of certiorari)). In sum, Defendants' view that Plaintiffs need to plead culpable participation for their Section 20(a) control person liability claim should be rejected.

---

[15] *Citing G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc); and *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).

Even assuming *arguendo* that Plaintiffs must allege "culpable participation" under Section 20(a), Plaintiffs' allegations plainly suffice, as it is governed by the liberal pleading standard of Rule 8(a). *See, e.g.*, *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) ("[A]lthough the meaning of 'culpable participation' is unclear, there is strong reason to believe that it is not the same as scienter, and thus is governed by Rule 8's pleading standard."); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) (to apply heightened pleading standard "would be inconsistent also with this Court's oft-stated view that a plaintiff relying on Section 20(a) is not obliged to allege or prove a controlling person's culpable participation in the violation"). Here, Plaintiffs allege that each of the Individual Defendants reviewed and signed the Registration Statement that falsely stated that the Shanghai Facility was under construction. Hence each of the Individual Defendants were either complicit in the misrepresentation, or were reckless in not confirming the status of the Shanghai Facility. Furthermore, the Registration Statement states that a construction planning permit and environmental impact approval were necessary for construction; as such, it was at minimum reckless for the Individual Defendants to tell investors that construction had started on the Shanghai Facility without confirming that the necessary regulatory approvals had been issued.

## CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. If the Court grants Defendants' motions, Plaintiffs respectfully request leave to replead. Defendants identify no reason why amendment would be futile, and this Complaint was the first pleading to be tested by a motion to dismiss. *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("Without doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).").

Dated: November 20, 2020                    Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            By: /s/*Laurence Rosen*
                                            Laurence Rosen
                                            Phillip Kim
                                            Yu Shi
                                            275 Madison Avenue, 40th Floor
                                            New York, NY 10016
                                            Telephone: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: lrosen@rosenlegal.com
                                                   pkim@rosenlegal.com
                                                   yshi@rosenlegal.com

                                            *Counsel for Plaintiffs and the Putative Class*

25