UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NIO, INC. SECURITIES LITIGATION | Master File No. 19-cv-01424 (NGG) (VMS) |

**ANSWER OF UNDERWRITER DEFENDANTS TO
SECOND AMENDED CLASS ACTION COMPLAINT**

Defendants Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, UBS Securities LLC and WR Securities, LLC (collectively, the "Underwriter Defendants"), by and through their undersigned counsel, answer Lead Plaintiff Mark Mundy and named plaintiff Eva Huang (together, "Plaintiffs")'s *Second Amended Class Action Complaint for Violations of the Federal Securities Laws* (ECF No. 67) (the "Complaint") as follows:

**INTRODUCTION**

In responding to Plaintiffs' allegations, the Underwriter Defendants:  (i) specifically deny all allegations set forth in the Complaint not expressly admitted herein; (ii) incorporate into each response a denial of any allegations in the Complaint (including those outside of the knowledge or information of the Underwriter Defendants) to the extent such allegations assert or suggest that the Underwriter Defendants made any untrue statement of material fact, omitted to state a material fact necessary to make statements made not misleading, or failed to conduct an adequate due diligence investigation; (iii) to the extent that any response is required, deny any allegations in the headings and subheadings of the Complaint; and (iv) intend to respond only as to the allegations

- 1 -

directed at the Underwriter Defendants; the Underwriter Defendants should not be deemed to be responding to allegations that are directed solely to other Defendants.  All answers to allegations in a particular paragraph of the Complaint should be construed to apply equally to the allegations in the footnote or subpart, if any, accompanying or comprising such paragraph of the Complaint.  To the extent any allegation is not specifically admitted, it is denied.  To the extent an allegation in the Complaint is admitted herein, that is not an admission that any Underwriter Defendant knew a particular fact at the time of the securities offering at issue in this action.  The Underwriter Defendants reserve all rights to amend this answer.

The Underwriter Defendants further respond to the specific allegations set forth in the Amended Complaint as follows:

### INTRODUCTORY PARAGRAPH

Lead Plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NIO Inc. ("NIO" or the "Company"), analysts' reports and advisories about the Company, interviews with officials from the Shanghai Municipal Planning and Natural Resources Bureau and former NIO employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**RESPONSE**: The introductory paragraph of the Complaint consists of legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations set forth in the introductory paragraph, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs' and its counsels' purported investigation.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the American Depositary Shares ("ADSs") of NIO from September 12, 2018 through March 5, 2019, inclusive (the "Class," and the period from September 12, 2018 to March 5, 2019 is the "Class Period").[1]

> [1]      Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of NIO at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 1, except admit that Paragraph 1 purports to be a description of this Action.

2.      Plaintiffs bring the following claims on behalf of the Class: (I) Sections 11 and 15 under the Securities Act for all purchasers of NIO ADSs pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with NIO's September 12, 2018 initial public offering ("IPO"); and (II) Sections 10(b) and 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of NIO ADSs during the Class Period, except persons who purchased directly from the Underwriters (defined below) at the offering price in the IPO.

**RESPONSE**: Paragraph 2 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants admit that the allegations in Paragraph 2 purport to describe Plaintiffs' claims and that Plaintiffs purport to bring this action pursuant to the statutes cited in Paragraph 2.

3.      NIO is a Chinese company that develops electric vehicles ("EVs"). NIO aims to fill a niche market in China by offering premium EVs at lower prices than import models from foreign manufacturers such as Tesla, Audi, and Mercedes-Benz, which had dominated the premium EV market in China.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, except admit that NIO is a company, which is based in China and markets EVs.

4.      According to NIO, it is able to sell cars at lower prices than foreign models in China because all of NIO's manufacturing is done domestically in China; thus, its manufacturing costs are lower. It is also able to take advantage of EV subsidies from the Chinese government to

domestic EV companies. Additionally, NIO's EVs are able to avoid import duties and other custom fees because it is a domestic company.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4, except admit that NIO is a company, which is based in China and markets EVs.

5.      There is, however, an unusual and embarrassing aspect to NIO's business model. Unlike most other auto manufacturers and its competitors, NIO does not have a manufacturing facility and does not manufacture its own cars. Instead, NIO's EVs are manufactured by an obscure, inexperienced, Chinese state-owned truck manufacturer known as Jianghuai Automobile Group Co. Ltd. ("JAC Motors"). JAC Motors has been described by equity analysts as "third tier" and lacking experience manufacturing passenger vehicles.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 5, except deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second and last sentences of Paragraph 5.

6.      Moreover, under NIO's manufacturing cooperation agreement with JAC Motors, not only is NIO obligated to pay JAC Motors for every vehicle it manufactures for NIO, NIO also is required to compensate JAC Motors for all operating losses associated with manufacturing NIO's EVs for the first 36 months of production.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 6, and respectfully refer to the Registration Statement and any document incorporated therein (collectively, with the Registration Statement, the "Offering Documents") for an accurate description of NIO's relationship with JAC Motors, and deny any allegations inconsistent therewith.

7.      NIO's dependence on JAC Motors to manufacture its vehicles carries many risks for NIO and its investors. For example, JAC Motors could experience delays or manufacturing problems over which NIO has no control. There is also potential for disputes between NIO and JAC Motors. Additionally, NIO's reputation may also be adversely affected by the public's perception of JAC Motors and the quality of JAC Motors' vehicles in general. NIO admitted in

- 4 -

the Registration Statement that building its own manufacturing facility and controlling production of its electric vehicles was an important part of its business strategy.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 7, except admit that the manufacturing relationship with JAC carried risks,  respectfully refer to the Offering Documents for a description of those risks, and deny any allegations inconsistent therewith.

8.          Not surprisingly, CNN Business called NIO's arrangement with JAC Motors an "unusual business model" and "a source of concern for investors."

**RESPONSE**:  The Underwriter Defendants admit that the quotation in Paragraph 8 is a partial quotation of the CNN Business article *Chinese Tesla Rival NIO Warns of Weak SUV Demand and Scraps Factory Plans*[1] and respectfully refer to that article for its complete contents and deny any allegations inconsistent therewith.

9.          In September 2018, NIO went public in the U.S. via an IPO, and raised $1.095 billion in net proceeds. NIO was able to raise this massive sum because NIO's Registration Statement for the IPO stated that: (a) NIO was constructing its own manufacturing facility in Shanghai (the "Shanghai Facility"), (b) construction of the Shanghai Facility was already underway and set to open in 2020, and (c) 25% of the IPO proceeds, or more than $276 million, was earmarked for building and outfitting the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 9, except admit the allegations in the first sentence of Paragraph 9.

10.          The Registration Statement was misleading. ***First***, construction on the Shanghai Facility was not underway at the time of the IPO. In fact, construction never started. Construction of the Shanghai Facility would have required a construction planning permit from the Shanghai government, but the website of the Shanghai Municipal Planning and Natural Resources Bureau shows that no construction planning permit was ever issued for NIO's Shanghai Facility. Furthermore, the Shanghai Facility would have needed to pass an environmental impact assessment prior to commencing construction, but the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform does not showthat an environmental impact approval was ever issued for the Shanghai Facility. Indeed, three former NIO employees, including one who was directly involved with the Shanghai Facility project, confirmed to Plaintiffs that construction on the Shanghai Facility *never* commenced. ***Second***, the Registration Statement failed to warn investors that the construction of the Shanghai Facility depended on NIO having

---

[1]          Daniel Shane, *Chinese Tesla Rival NIO Warns of Weak SUV Demand and Scraps Factory Plans*, CNN Bus. (Mar. 6, 2019), https://www.cnn.com/2019/03/06/business/nio-china-electric-cars-stock/index.html.

sufficient cash flow and its sales meeting expectations. It did not disclose to investors the risk - which was very real – that NIO might abandon plans to build the Shanghai Facility after the IPO.

**RESPONSE**:  The Underwriter Defendants deny the allegations in the first, second, sixth, and seventh sentences of Paragraph 10, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10.

11.     On March 6, 2019, NIO shocked investors when it announced that it had terminated plans to construct the Shanghai Facility. The price of NIO's ADS plunged by 30% over the next two days following this surprising announcement. NIO's CEO, Defendant Bin Li, told investors that NIO decided to not build the Shanghai  Facility because in November 2018, the Chinese government had issued a policy directive that endorsed cooperation between automobile "research and development" companies like NIO and third-party manufacturers like JAC Motors, and that the Chinese government would issue additional details about this endorsement at a future date.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 11, except admit that the NIO stock price decreased from $10.16 per ADS on March 5, 2019 to approximately $8.01 per ADS on March 6, 2019, and to approximately $7.09 per ADS on March 7, 2019, and that the final sentence of Paragraph 11 is an attempt to paraphrase a statement from Defendant Bin Li, respectfully refer to that statement for its complete contents, and deny any allegations inconsistent therewith.

12.     Unsurprisingly, investors, analysts, and the media did not believe Bin Li's explanation that NIO terminated construction of the Shanghai Facility because of a nebulous, yet-to-be-finalized government policy directive endorsing cooperation between auto developers and manufacturers – something that NIO had already been doing before the IPO anyway, before it told investors that it was building its own facility in Shanghai.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13.     In the days following NIO's surprising announcement, analysts, investors, and media outlets revealed that the real reason for NIO's decision to abandon construction of the Shanghai Facility was because of a cash shortage and underwhelming sales.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14.    A former NIO employee confirmed to Plaintiffs' investigator that "cash shortage difficulties" was the "main reason" behind NIO's decision to terminate the construction of the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.    In contravention of the requirements of the Securities Act, NIO's Registration Statement failed to mention this risk. Rather, it presented NIO building its own manufacturing facility in Shanghai as a *fait accompli,* with construction already underway. There was no indication and no warning that the Shanghai Facility may not be built at all.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 15.

16.    That construction on NIO's Shanghai Facility was already underway  at the time of the IPO – as opposed to merely being in the planning stages – was highly material to investors. If construction had already commenced and was ongoing at the time of the IPO, then that greatly reduces the risk that NIO or the Shanghai government would later walk away from the project. In contrast, if the Shanghai Facility  was merely in the planning stages, then the parties would have much less stake in the project and there would be significantly more risk of the project falling through.

**RESPONSE**:  Paragraph 16 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 16.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 11, and 15 of the Securities Act (15 U.S.C. §§ 77k,  and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

**RESPONSE**:  Paragraph 17 consists of legal conclusions to which no response is required.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of  the Exchange Act (15 U.S.C. §78aa).

**RESPONSE**:  Paragraph 18 consists of legal conclusions to which no response is required.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein occurred in this District.

**RESPONSE**:  Paragraph 19 consists of legal conclusions to which no response is required.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

**RESPONSE**:  Paragraph 20 consists of legal conclusions to which no response is required.

## PARTIES

21.     Lead Plaintiff Mark Mundy ("Mundy") purchased NIO ADSs pursuant and traceable to the Registration Statement and during the Class Period, and was damaged thereby. Mundy's PSLRA certification was previously filed with the Court and is incorporated by reference herein. *See* Dkt. No. 21-2.

**RESPONSE**:  The first sentence of Paragraph 21 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 21.  The Underwriter Defendants admit the second sentence of Paragraph 21.

22.     Named plaintiff Eva Huang ("Huang") purchased NIO ADSs pursuant and traceable to the Registration Statement and during the Class Period, and was damaged hereby. Huang's PSLRA certification was previously filed with the Court and is incorporated by reference herein. *See* Dkt. No. 48-1.

**RESPONSE**:  The first sentence of Paragraph 22 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22.  The Underwriter Defendants admit the second sentence of Paragraph 22.

23.     Defendant NIO is a Chinese company that designs, jointly manufactures, and sells electric vehicles. It describes itself as a "pioneer in China's premium electric vehicle market." NIO

is headquartered in Shanghai, China. The Company's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker "NIO."

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 23, except admit that NIO is a Chinese company that designs, manufactures, and sells electric vehicles, that it is headquartered in Shanghai, China, and that its ADSs trade on the NYSE under the ticker "NIO".

24. Defendant Bin Li is NIO's founder. He has been, at all relevant times, NIO's Chief Executive Officer ("CEO") and chairman of NIO's board of directors. Prior to the IPO, Bin Li held 17.2% of NIO's stock. Immediately after the IPO, Bin Li held 48.3% of NIO's aggregate voting power, including through his beneficial ownership of all of NIO's Class C shares, each of which is entitled to eight votes. According to the Registration Statement, becauseof the disparate voting powers of Class C shares, Bin Li "will have considerable influence over important corporate matters." Bin Li is sometimes known as William Bin Li or William Li.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, except admit that Defendant Bin Li is the founder of NIO and was Chairman and CEO of NIO at the time of the IPO, that prior to the IPO, Bin Li held 17.2% of NIO's stock, and that immediately after the IPO, Bin Li held 48.3% of NIO's aggregate voting power, including all of NIO's Class C shares.

25. Defendant Louis T. Hsieh ("Hsieh") was NIO's Chief Financial Officer ("CFO") at all relevant times. Hsieh resigned from his position at NIO on October 30, 2019.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, except admit that Defendant Louis T. Hsieh was the CFO of NIO at the time of the IPO.

26. Defendant Lihong Qin ("Qin") is NIO's co-founder. Qin was NIO's president and a director of NIO at all relevant times.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, except admit that Defendant Lihong Qin was co-founder and a director of NIO at the time of the IPO.

27.     Defendant Padmasree Warrior ("Warrior") was NIO's chief development officer from December 2015 until her abrupt resignation in November 2018. During this time, she was also the chief executive officer of NIO USA, NIO's U.S.-based subsidiary. Warrior was also a director of NIO from March 2016 until her resignation from the Company.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, except admit that Defendant Padmasree Warrior was CDO and a director of NIO and CEO of NIO USA at the time of the IPO.

28.     Defendant Tian Cheng ("Cheng") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, except admit that Defendant Tian Cheng was a director of NIO at the time of the IPO.

29.     Defendant Xiang Li ("X. Li") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, except admit that Defendant Xiang Li was a director of NIO at the time of the IPO.

30.     Defendant Hai Wu ("Wu") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, except admit that Defendant Hai Wu was a director of NIO at the time of the IPO.

31.     Defendant Yaqin Zhang ("Zhang") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, except admit that Defendant Yaqin Zhang was a director of NIO at the time of the IPO.

32.    Defendant Xiangping Zhong ("Zhong") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, except admit that Defendant Xiangping Zhong was a director of NIO at the time of the IPO.

33.    Defendant Zhaohui Li ("Z. Li") was, at all relevant times, a director of NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, except admit that Defendant Zhaohui Li was a director of NIO at the time of the IPO.

34.    Defendants Bin Li, Hsieh, Qin, Warrior, Cheng, X. Li, Wu, Zhang, Zhong, and Z. Li are sometimes referred to herein as the "Individual Defendants."

**RESPONSE**:  The Underwriter Defendants admit the allegations in Paragraph 34.

35.    The Individual Defendants each reviewed and signed the Registration Statement.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, except admit that each of the Individual Defendants' signatures appear on the Registration Statement.

36.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley) served as an underwriter for the IPO. In the IPO, Morgan Stanley purchased 38,400,000 ADSs, which it then resold to the investing public.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 36, except admit that Morgan Stanley served as an underwriter for the IPO and was allocated 38,400,000 ADSs in the IPO.

37.      Defendant Goldman Sachs (Asia) L.L.C ("Goldman Sachs") served as an underwriter for the IPO. In the IPO, Goldman Sachs purchased 20,800,000 ADSs, which it then resold to the investing public.

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 37, except admit that Goldman Sachs served as an underwriter for the IPO and was allocated 20,800,000 ADSs in the IPO.

38.      Defendant J.P. Morgan Securities LLC ("JP Morgan") served as an underwriter for the IPO. In the IPO, JP Morgan purchased 24,000,000 ADSs, which it then resold to the investing public.

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 38, except admit that JP Morgan served as an underwriter for the IPO and was allocated 24,000,000 ADSs in the IPO.

39.      Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the IPO. In the IPO, Merrill Lynch purchased 14,400,000 ADSs, which it then resold to the investing public.

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 39, except admit that Merrill Lynch served as an underwriter for the IPO and was allocated 14,400,000 ADSs in the IPO.

40.      Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter for the IPO. In the IPO, Deutsche purchased 16,000,000 ADSs, which it then resold to the investing public.

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 40, except admit that Defendant Deutsche Bank Securities Inc. ("DBSI") served as an underwriter for the IPO and was allocated 16,000,000 ADSs in the IPO.

- 12 -

41.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO. In the IPO, Citigroup purchased 14,400,000 ADSs, which it then resold to the investing public.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 41, except admit that Citigroup served as an underwriter for the IPO and was allocated 14,400,000 ADSs in the IPO.

42.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the IPO. In the IPO, Credit Suisse purchased 16,000,000 ADSs, which it then resold to the investing public.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 42, except admit that Credit Suisse served as an underwriter for the IPO and was allocated 16,000,000 ADSs in the IPO.

43.    Defendant UBS Securities LLC ("UBS") served as an underwriter for the IPO. In the IPO, UBS purchased 14,400,000 ADSs, which it then resold to the investing public.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 43, except admit that UBS served as an underwriter for the IPO and was allocated 14,400,000 ADSs in the IPO.

44.    Defendant WR Securities, LLC ("WR") served as an underwriter for the IPO. In the IPO, WR purchased 1,600,000 ADSs, which it then resold to the investing public.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 44, except admit that WR served as an underwriter for the IPO and was allocated 1,600,000 ADSs in the IPO.

45.    Defendants Morgan Stanley, Goldman Sachs, JP Morgan, Merrill Lynch, Deutsche, Citigroup, Credit Suisse, UBS, and WR are collectively referred to hereinafter as the "Underwriters."

**RESPONSE**: The Underwriter Defendants admit the allegations in Paragraph 45.

46.    The Company, the Individual Defendants are referred  to herein, collectively, as the "Defendants."

**RESPONSE**: The Underwriter Defendants admit the allegations in Paragraph 46.

- 13 -

## BACKGROUND

### *NIO and its Business*

47.      NIO was founded in 2014 and is headquartered in Shanghai, China. NIO develops and markets electric vehicles ("EVs") for Chinese consumers. It has been commonly referred to as the "Tesla of China."

RESPONSE:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 47, except admit that NIO was founded

in 2014, is headquartered in China, and develops and markets electric vehicles.

48.      At the time of the IPO, NIO's purported competitive advantage was its ability to offer premium EVs that cost much less than imported models from foreign manufacturers such as Tesla, Audi, and Mercedes-Benz.

RESPONSE:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation in Paragraph 48.

49.      Thus, NIO believed that they were filling a niche by selling EVs that were of higher quality than entry-level Chinese EVs, and yet at a price point below established foreign models.  This is illustrated in the following graph from the Registration Statement:



RESPONSE:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 49, except admit that the illustration

was excerpted from the Registration Statement, respectfully refer to the Registration Statement for the context of the illustration, and deny any allegations inconsistent therewith.

50.      According to NIO, it is able to achieve its price advantage because of three main reasons: (1) all manufacturing is localized within China, (2) Chinese government subsidies for purchases of domestically-manufactured EVs, and (3) absence of custom duties.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51.      Unlike its competitors, however, NIO does not actually manufacture its own EVs. Rather, NIO's EVs are manufactured by a relatively obscure Chinese state-owned automobile manufacturer, JAC Motors.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

52.      Indeed, in May 2016, NIO entered into a manufacturing cooperation agreement with JAC Motors to manufacture NIO's EVs. Under NIO's agreement with JAC Motors, JAC Motors would manufacture NIO's model ES8 (NIO's first and only EV model at the time of the IPO) for five years. The agreement required NIO to pay JAC Motors a fee for every vehicle manufactured by JAC Motors. NIO was also required to compensate JAC Motors for any operating losses associated with manufacturing of the ES8 for the first 36 months after production of the ES8 began.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 52, except admit that in May 2016, NIO entered into a manufacturing agreement with JAC Motors and respectfully refer to the Registration Statement for an accurate description of NIO's relationship with JAC Motors, and deny any allegations inconsistent therewith.

53.      According to the equities research firm JL Warren Capital LLC, JAC Motors is a "third tier" Chinese truck manufacturer with "limited experience in manufacturing passenger vehicles."

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

*NIO's Registration Statement and IPO*

54.     On September 11, 2018, after a series of amendments, NIO filed its final registration statement with the SEC on Form F-1/A. On the same day, the SEC declared the registration statement effective. Subsequently, on September 12, 2018, NIO filed the final prospectus ("Prospectus") for the IPO, which forms part of the registration statement (the registration statement and Prospectus are collectively referred to herein as the "Registration Statement").

RESPONSE:  The Underwriter Defendants admit the allegations in Paragraph 54.

55.     In the IPO on September 12, 2018, NIO sold 184,000,000 ADSs at a price of $6.26 per ADS.  NIO received net proceeds of approximately $1.095 billion from the IPO.

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 55.

## SECURITIES ACT CLAIMS

*NIO Tells Investors that it is Constructing its Own Manufacturing Facility in Shanghai, then Scraps the Plan Due to Cash Shortage and Underwhelming Sales*

56.     Automobile manufacturers, including NIO's competitors, generally do not rely on other companies to manufacture their vehicles. For a company that aims to sell premium EVs comparable to models from Tesla, Audi, and Mercedes-Benz, NIO's reliance on JAC Motors, a third-rate state-owned enterprise that specializes in truck manufacturing, was an Achilles' heel for the Company.

RESPONSE:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56.

57.     CNN Business's Daniel Shane described NIO's arrangement with JAC Motors as an "unusual business model" and a "source of concern for investors."

RESPONSE:  The Underwriter Defendants deny the allegations in Paragraph 57, except admit that Paragraph 57 contains partial quotations of the CNN Business article *Chinese Tesla Rival NIO Warns of Weak SUV Demand and Scraps Factory Plans*,[2] respectfully refer to that article for its complete contents, and deny allegations inconsistent therewith.

58.     In the Registration Statement, NIO admitted its reliance on JAC Motors carries significant risks. NIO admitted that it "could experience delays" if JAC Motors fails to "meet agreed upon timelines or experience capacity constraints." Further, there is "risk of potential

---

[2]     *Id.*

- 16 -

dispute" with JAC Motors. Additionally, NIO's aim to be a "premium" brand could be "adversely affected by perceptions" of the quality of JAC Motors' vehicles. Lastly, there is no guarantee that JAC Motors will successfully meet NIO's quality standards.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 58, except admit that Paragraph 58 contains partial quotations of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

59.    Hence NIO recognized that, to be taken seriously by consumers and investors alike, it needed to have its own manufacturing facility and manufacture its own vehicles. Taking control over the manufacturing of its electric vehicles was thus a critical component of NIO's business strategy.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.

60.    To that end, NIO repeatedly stated in the Registration Statement that NIO was currently "developing its own manufacturing facility in Shanghai which we expect to be ready by the end of 2020."

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 60, except admit that Paragraph 60 contains partial quotations of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

61.    To further reassure investors NIO's Shanghai manufacturing facility was a reality and not just a theoretical possibility, the Registration Statement stated that construction on the Shanghai Facility was already underway. The Registration Statement states that: "***Construction has started*** on our own manufacturing facility in Shanghai[.]"[2]

[2]    Registration Statement on Form F-1/A, page 122.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 61, except admit that Paragraph 61 contains partial quotations of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

- 17 -

62.     This is repeated elsewhere in the Registration Statement: "Our own manufacturing facility in Shanghai *is currently under construction* by certain Shanghai government entities."[3]; and "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is *currently being constructed* by relevant Shanghai authorities."[4]

[3]     *Id.* page 137.

[4]     *Id.* page 32.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 62, except admit that Paragraph 62 contains partial quotations of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

63.     Additionally, NIO stated in the Registration Statement that it intended to allocate 25% of the expected net proceeds from the IPO, approximately $276 million, for the construction of its own manufacturing facility in Shanghai.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 63, except admit that Paragraph 63 contains partial paraphrasing of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

64.     The Registration Statement stated it would cost NIO approximately $650 million to complete the Shanghai Facility; half of that amount would be financed through proceeds from the IPO and cash from car sales and prior financings. The other half would be financed through government loans.[5]

[5]     According to the Registration Statement, the Shanghai government would construct the building for the Shanghai Facility, and NIO would be responsible for outfitting and equipping it (*i.e.* turning it from a shell into an actual manufacturing facility).

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 64, except admit that Paragraph 64 contains partial paraphrasing of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

65.     On March 6, 2019 before market open, NIO filed a Form 6-K with the SEC announcing the Company's 4Q2018 and FY2018 financial results (the "3/6/19 Form 6-K"). In the 3/6/19 Form 6-K, NIO announced that it would not be building the Shanghai Facility after all, and instead would continue to rely on JAC Motors to manufacture NIO's EVs.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65, except admit that on March 6, 2019, NIO filed a Form 6-K with the SEC, respectfully refer to the Form 6-K for its complete contents and deny any allegations inconsistent therewith.

66.     This news caught investors by surprise, because NIO had told investors in the Registration Statement that: (a) NIO was constructing its own manufacturing facility in Shanghai, (b) construction of the Shanghai Facility was already underway and set to open in 2020, and (c) 25% of the IPO proceeds, or more than $276 million, was earmarked for building the Shanghai Facility.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66, except admit that Paragraph 66 contains a partial paraphrasing of portions of the Registration Statement, respectfully refer to the Registration Statement for its complete contents, and deny any allegations inconsistent therewith.

67.     During a conference call held on March 6, 2019 to discuss NIO's 4Q18 earnings results, Defendant Bin Li told securities analysts covering NIO that the reason NIO decided to not build the Shanghai Facility was because in November 2018, the Chinese government issued a policy directive endorsing "cooperation between the car R&D companies like NIO with the existing manufacturing companies…that means the cooperative mode between NIO and JAC is endorsed by the Chinese government." Bin Li explained that much of the details and implications of this policy directive were yet to be finalized.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67, except admit that NIO held a conference call on March 6, 2019, respectfully refer to that transcript for its complete contents, and deny any allegations inconsistent therewith.

68.     This policy directive, however, merely allows partnerships between vehicle research & development enterprises and vehicle manufacturers.[6] This is something that NIO and JAC Motors have been doing all along. It does not prohibit NIO from constructing its own manufacturing facility. It does not confer on NIO any additional benefits for partnering with JAC

- 19 -

Motors that NIO would not receive if it had its own manufacturing facility. Nor does it prevent NIO from continuing to contract with JAC Motors to manufacture certain models while also having its own manufacturing plant.

> [6]     The relevant provision states: "It is encouraged that automobile manufacturing enterprises cooperate with each other on research and development and manufacturing capabilities; it is permissible for automobile manufacturing enterprises that meet the required standards to outsource its manufacturing. It is encouraged that automobile research and development and design enterprises work with manufacturing enterprises; it is permissible for research and development and design enterprises that meet the required standards to borrow manufacturing enterprises' manufacturing capabilities to apply for automobile manufacturing permit." Source: <<道路机动车辆生产企业及产品准入管理办>> ("Provisions on Licensing of Automobile Manufacturers and Products"), Section 28.

**RESPONSE**: Paragraph 68 purports to state legal conclusions to which no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68.

69.     If NIO had already obtained governmental approval for the Shanghai Facility, and if the Shanghai Facility was already being constructed, future government directives such as this would not have required NIO to terminate the already-approved project.

**RESPONSE**: Paragraph 69 purports to state a legal conclusion to which no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69.

70.     NIO's abrupt decision to terminate its plan to build the Shanghai Facility garnered much attention from investors, securities analysts, and the media, who did not believe Bin Li's explanation that NIO stopped construction of the Shanghai Facility because of the issuance of a nebulous policy goal from the Chinese government endorsing cooperation between R&D companies and third-party manufacturers – something that NIO had already been doing anyway since 2016 when it entered into the cooperation agreement with JAC Motors.

**RESPONSE**: The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.

71.     Indeed, according to Deutsche Bank's research report dated March 19, 2019, investors believed that NIO terminated the Shanghai Facility because it did not have sufficient cash as a result of declining car sales starting January 2019.

**RESPONSE**: The Underwriter Defendants deny the allegation in Paragraph 71, except admit that Paragraph 71 purports to paraphrase a research report dated March 19, 2019,

- 20 -

respectfully refer to that report for its complete contents, and deny any allegations inconsistent therewith.

72.     The media and independent analysts agree. On March 6, 2019, the South China Morning Post published an article titled "Chinese Electric Vehicle Make NIO Scraps Shanghai Factory Plan After Losses Double to US$1.4 Billion" The article reported that according to the Chinese automotive industry consultant David Zhang, NIO's decision to terminate the Shanghai Facility was due to "underwhelming sales." David Zhang is a prominent Chinese automotive industry expert who consults for the EV industry in China and leads training courses for Chinese automobile executives on behalf of the Chinese Ministry of Industry and Information Technology.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72.

73.     Also on March 6, 2019, in an article titled "NIO Terminates Plan for Shanghai Manufacturing Plant" written by Mark Kane for insideevs.com, a website focused on the EV industry, Kane pointed to two reasons for the termination of the Shanghai Facility: (a) "building a new factory is too capital-intensive for NIO with high losses"; and (b) "the anticipated demand for NIO cars is lower than two years ago."

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73.

74.     Plaintiffs' own investigation also confirmed that NIO's decision to scrap the Shanghai Facility was not due to a vague, yet-to-be-finalized government policy directive endorsing cooperation between auto developers and manufacturers (something that NIO was already doing since 2016), but rather, was primarily due to cash shortage. A former NIO employee ("FE2") who worked in a senior sales position for NIO in Shanghai from March 2018 to October 2019 told Plaintiffs' investigator that "cash shortage difficulties" was the "main reason" behind NIO's decision to abandon construction of the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.

75.     Indeed, NIO's sales were falling precipitously in 2019. In November and December 2018, NIO delivered 3,089 and 3,318 vehicles, respectively. In January 2019, NIO only delivered 1,805 vehicles, and deliveries plummeted even more – to 811 vehicles – in February 2019.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.

***Materially Misleading Statements and Omissions in the Registration Statement***

76.     Contrary to NIO's representation in the Registration Statement, NIO's Shanghai Facility was not under construction at the time of the IPO.

**RESPONSE**:  The Underwriter Defendants deny the allegation in Paragraph 76.

77.     Construction on the Shanghai Facility would have required a construction planning permit from the Shanghai government. The Shanghai government posts all construction planning permits on its website within 5 business days from the date of issuance. If construction had commenced on the Shanghai Facility, the Shanghai government would have posted the construction planning permit associated with the project on the website of the Shanghai Municipal Planning and Natural Resources Bureau. It is illegal to begin construction work in Shanghai without the necessary construction planning permit from the Shanghai Municipal Planning and Natural Resources Bureau.

**RESPONSE**:  Paragraph 77 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77.

78.     Government construction projects are not exempt from the permit requirement. For example, the website of the Shanghai Municipal Planning and Natural Resources Bureau shows that the Shanghai Municipal Bureau of Public Safety obtained a construction planning permit on July 3, 2020 to build technology facilities in Shanghai. The website also shows that the Shanghai Airport Authority obtained a construction planning permit on March 3, 2020 to construct transport facilities at the Shanghai Hongqiao International Airport. Plaintiffs also located on the website a construction planning permit issued on May 10, 2011 to the Shanghai Chongming District Gangxi Township People's Government to remodel its office building.

**RESPONSE**:  The first sentence of Paragraph 78 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 78.  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78.

79.     Moreover, the construction planning permits associated with Tesla's factory in Shanghai are available on the website of the Shanghai Municipal Planning and  Natural Resources Bureau, even though the contractors for the Tesla Shanghai factory are state-owned construction firms: China Construction Third Engineering Bureau Co. Ltd. (owned by the Central People's

Government) and Shanghai Construction Group Corporation (owned by the Shanghai Municipal Government).

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79.

80.    Yet, the Shanghai Municipal Planning and Natural Resources Bureau website shows that no construction planning permit was ever issued for NIO's Shanghai Facility.[7]

> [7]    According to the environmental impact assessment conducted for the proposed construction of NIO's Shanghai Facility, the construction project was known as "蔚来纯电动乘用车生产基地建设项目." There was no construction planning permit issued for this project name, or any project involving NIO.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80.

81.    The Shanghai Municipal Planning and Natural Resources Bureau told Plaintiffs that construction planning permits are not removed from its website even if a project is suspended or terminated, so long as the permit was originally issued after 2010 (certain permits issued prior to 2010 may no longer appear on the website).

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81.

82.    Not only were there no construction planning permits issued for the Shanghai Facility, the Shanghai Facility also never obtained the required environmental impact assessment approval. In China, under the *Law of the People's Republic of China on Environmental Impact Assessment* a construction project must conduct and pass an environmental impact assessment before any construction work can begin. This is multi-step process. First, an environmental impact assessment must be conducted and a report issued. The report is then made available for public review and comments. After the public review period, relevant authorities decide whether to approve the environmental impact assessment.

**RESPONSE**:  Paragraph 82 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82.

83.    In Shanghai, construction projects that have conducted environmental impact assessments *and* obtained approval following public review are listed on a website known as the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform.[8] This includes government construction projects. For example, proposed construction projects by

government entities such as the Shanghai New Pudong District Gaoxing Township People's Government and the Shanghai Municipal Bureau of Public Safety all appear on the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform, along with their environmental impact approval reference number and date of approval. (E.g. the Municipal Bureau of Public Safety project was approved on June 20, 2014 and the approval reference number is 虹环保管审[2014]82 号).

8      In Chinese: 上海市建设项目环评信息公开.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83.

84.      While an environmental impact *assessment* was completed for NIO's Shanghai Facility by Shanghai Huanke Environmental Assessment Consulting Co., Ltd.[9] in May 2018, the project never received the required environmental impact *approval* from the Shanghai government. If it did, the project would have appeared on the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform, but it does not.

9      In Chinese: 上海环科环境评估咨询有限公司.

**RESPONSE**:  Paragraph 84 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84.

85.      Because NIO never obtained (i) a construction planning permit, and (ii) environmental impact approval, construction of the Shanghai Facility could never begin. Both were required to begin construction. NIO obtained neither.

**RESPONSE**:  Paragraph 85 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85.

86.      Former NIO employees confirmed that construction of the Shanghai Facility never commenced.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 86.

87.      "FE1" was employed as a Purchasing Manager at NIO from May 2018 to August 2020. FE1's department was responsible for overseeing fixed asset investment projects at NIO, including new factories, new joint venture factories, research & development ("R&D")

- 24 -

centers, power stations, and NIO servicing and delivery centers. As a Purchasing Manager, FE1 oversaw site selection and design of new factories, as well as the installation of facilities and equipment at new factories, including the Shanghai Facility. FE1 was also responsible for negotiating contracts with suppliers of NIO's factories and R&D centers.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 87.

88.    FE1 was directly involved in the Shanghai Facility project, and participated in design planning and procuring prospective suppliers for the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 88.

89.    According to FE1, construction never began on the Shanghai Facility before the project was terminated in the second half of 2018.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation in Paragraph 89.

90.    This is corroborated by FE2, who told Plaintiffs that construction of the Shanghai Facility never commenced and that the project was still in the planning stage when it was scrapped.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 90.

91.    Another former employee who worked as a car design engineer for NIO in Shanghai from April 2018 to May 2020 ("FE3") similarly told Plaintiffs' investigator that while an environmental impact assessment was conducted for the proposed construction of the Shanghai Facility, construction of the manufacturing facility never started before the entire project was called off.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 91.

92.    The Registration Statement also failed to disclose that subpar sales or cash flow problems could mean that NIO may terminate the construction of the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 92.

93. Indeed, the Registration Statement presented the Shanghai Facility as a *fait accompli*; there was no indication or warning that slow sales or failure to generate sufficient cash flow could mean that NIO entirely abandons the construction of the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 93.

***Statutory Framework Applicable to the Registration Statement: Item 303***

94. Item 303 imposes an affirmative duty on issuers to disclose "uncertainties" that will have a material or unfavorable impact on the issuer's future business. Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *See S.E.C. Release No.* 6835, 1989 WL 1092885, at *4; 17 C.F.R. §229.303(a)(3)(ii).

**RESPONSE**:  Paragraph 94 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 94, except admit that the second sentence of Paragraph 94 contains partial quotations of *S.E.C. Release No. 6835*, 1989 WL 1092885, respectfully refer to that release for its complete contents, and deny any allegations inconsistent therewith.

95. The SEC has repeatedly emphasized that the "specific provisions in Item 303 … require disclosure of forward-looking information." *Id.* at *3. Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and  long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition…with particular emphasis on the registrant's prospects for the future."

**RESPONSE**:  Paragraph 95 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 94, except admit that the second sentence of Paragraph 95 contains partial quotations of *S.E.C. Release No. 6835*, 1989 WL 1092885, respectfully refer to that release for its complete contents, and deny any allegations inconsistent therewith.

96. NIO's decision to abandon the Shanghai  Facility shows that the construction of the Shanghai Facility was uncertain, and subject to NIO having sufficient cash flow and meeting sales objectives. Yet the Registration Statement did not disclose any uncertainties that could potentially derail NIO's plan to build the Shanghai Facility. Rather, the Registration Statement assures investors, in no uncertain terms, that NIO was building the Shanghai Facility and that

construction had already begun and would be completed in 2020. No reasonable investor would read the Registration Statement to suggest that NIO had not yet begun construction or that the Shanghai Facility may not be built at all.

**RESPONSE**:  Paragraph 96 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 96.

### *Statutory Framework Applicable to the Registration Statement: Item 503*

97.      Item 503 is intended to "provide investors with  a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform,* S.E.C. Release No. 8501, 2004 WL 2610458, at *6 (Nov. 3, 2004).

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 97, except admit that Paragraph 97 contains partial quotations of S.E.C. Release No. 8501, 2004 WL 2610458 (Nov. 3, 2004), respectfully refer to that release for its complete contents, and deny any allegations inconsistent therewith.

98.      Accordingly, Item 503 requires that registration statements "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §229.503(c). The discussion of risk factors: must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell investors how risks may affect their investment. *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

**RESPONSE**:  Paragraph 98 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 98, except admit that Paragraph 98 contains partial quotations of 17 C.F.R. §229.503(c) and partial paraphrasing of *Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers*, 1998 WL 425894 (July 29, 1998), respectfully refer the Court to

those documents statement for their complete contents, and deny any allegations inconsistent therewith.

99.    Recognizing the importance of the Shanghai Facility to investors, the Registration Statement is littered with references to the Shanghai Facility and how it will contribute to the future prospects of the Company. Yet, there is no mention in the Registration Statement that NIO had not yet begun construction of the facility or about the very real risk that the Shanghai Facility may not be built at all, or the negative implications for NIO's business of any decision to not construct the Shanghai Facility.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 99.

100.    Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

**RESPONSE**:  Paragraph 100 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegation in Paragraph 100, except admit that Section 11 of the Securities Act can impose liability under certain circumstances, respectfully refer to that statute for its complete contents, and deny any allegation inconsistent therewith.

101.    Section 11 provides that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

**RESPONSE**:  Paragraph 101 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegation in Paragraph 101, except admit that Section 11 of the Securities Act can impose liability under certain circumstances, respectfully refer to that statute for its complete contents, and deny any allegation inconsistent therewith.

102.    It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13. Underwriters

- 28 -

"assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id.*

**RESPONSE**: The Underwriter Defendants deny the allegation in Paragraph 102, except admit that Paragraph 102 contains partial quotations of *Report of the Business Standards Committee, January 2011*, respectfully refer to that document for its complete contents, and deny any allegation inconsistent therewith.

103.    As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

**RESPONSE**: Paragraph 103 purports to state legal conclusions to which no response is required. To the extent a response is required, the Underwriter Defendants deny the allegations contained in Paragraph 103.

104.    It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

**RESPONSE**: Paragraph 104 purports to state a legal conclusion to which no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104.

105.    It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for NIO's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

**RESPONSE**: Paragraph 105 purports to state legal conclusions to which no response is required. To the extent a response is required, the Underwriter Defendants deny the allegations contained in Paragraph 105.

106.     In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

RESPONSE:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, except admit that Paragraph 106 contains partial quotations of the *Report of the Business Standards Committee, January 2011*, respectfully refer to that document for its complete contents, and deny any allegations inconsistent therewith.

107.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting NIO's ADSs. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

RESPONSE:  Paragraph 107 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 107, except deny knowledge or information sufficient to form a belief as to the allegations in the first and second sentences of Paragraph 107, except admit that Paragraph 107 contains partial quotations of Regulations of Securities Offerings, SEC Release No. 7606A, 63

Fed. Reg. 67174, 67230, Dec. 4, 1998, respectfully refer to that document for its complete contents, and deny any allegations inconsistent therewith.

108.    Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

**RESPONSE**:  Paragraph 108 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations contained in Paragraph 108, except deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second through fourth sentences of Paragraph 108.

109.    The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value. The due diligence process is just the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

**RESPONSE**:  Paragraph 109 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny that Paragraph 109 contains a complete and accurate description of the due diligence process.

110.    The Underwriters failed to conduct a reasonable due diligence investigation with regard to NIO's IPO. In particular, the Underwriters, had they performed adequate due diligence, would have discovered that (1) NIO's Shanghai Facility was not under construction (and indeed, could not have been under construction because it never obtained the required construction planning permit and environmental impact approval), and (2) construction of the Shanghai Facility was not a *fait accompli*, but rather, was contingent on NIO generating sufficient cash flow and meeting sales objectives.

- 31 -

**RESPONSE**: Paragraph 110 purports to state a legal conclusion to which no response is required. To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 110.

## THE DIRECTORS' AND OFFICERS' DUE DILIGENCE OBLIGATIONS

111.    As directors and/or officers of NIO and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of NIO's operations and ensure that all of the statement in the Registration Statement were true, and not misleading in any respect.

**RESPONSE**: Paragraph 111 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.

112.    The Individual Defendants had the ability to visit the proposed construction site and confirm that construction on the Shanghai Facility had begun and that it was progressing as planned.

**RESPONSE**: Paragraph 112 relates to a claim that is not asserted against the Underwriter Defendants and no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112.

113.    The Individual Defendants were negligent for failing to visit the construction site to confirm the status of construction of the Shanghai Facility.

**RESPONSE**: Paragraph 113 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of a legal conclusion, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113.

- 32 -

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

114.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased NIO ADSs from September 12, 2018 through March 5, 2019, inclusive.[10]

> 10      Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of NIO at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

**RESPONSE**:  The Underwriter Defendants admit that Plaintiffs purport to bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased NIO ADSs from September 12, 2018 through March 5, 2019, inclusive.

115.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NIO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**RESPONSE**:  Paragraph 115 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115.

116.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**RESPONSE**:  Paragraph 116 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116.

117.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

**RESPONSE**:  Paragraph 117 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117.

118.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

**RESPONSE**:  Paragraph 118 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118.

119.    whether Defendants violated the federal securities laws;

**RESPONSE**:  Paragraph 119 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 119.

120.    whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

**RESPONSE**:  Paragraph 120 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 120.

121.    to what extent the members of the Class have sustained damages and the proper measure of damages.

**RESPONSE**:  Paragraph 121 purports to state a legal conclusion to which no response is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 121.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RESPONSE**: Paragraph 122 purports to state legal conclusions to which no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122.

## COUNT I

### Violations of §11 of the Securities Act
### Against All Defendants

123. Plaintiffs repeat and re-allege the foregoing contained above, except any allegation of fraud, recklessness or intentional misconduct.

**RESPONSE**: The Underwriter Defendants incorporate by reference their responses to Paragraphs 1–122.

124. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

**RESPONSE**: The Underwriter Defendants admit that Count I of the Complaint purports to be brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

125. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 125.

126. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors or underwriters who are appropriate defendants in this Count.

**RESPONSE**: The Underwriter Defendants deny the allegations in Paragraph 126.

127. Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

**RESPONSE**: The Underwriter Defendants deny the allegation in Paragraph 127.

- 35 -

128.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 128.

129.     The Underwriters owed to the holders of the ADS acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

**RESPONSE**:  Paragraph 129 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 129.

130.     Plaintiffs acquired NIO ADSs pursuant to the Registration Statement.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130.

131.     At the time of their purchases of NIO ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

**RESPONSE**:  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131.

132.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**RESPONSE**:  Paragraph 132 purports to state legal conclusions to which no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 132.

## COUNT II

### Violations of §15 of the Securities Act
### Against the Individual Defendants

133.    Plaintiffs incorporate all  the foregoing by reference, except any allegation of fraud, recklessness or intentional misconduct.

**RESPONSE**:  The Underwriter Defendants incorporate by reference their responses to Paragraphs 1–132.

134.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of NIO during the relevant period.

**RESPONSE**:  Paragraph 134 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of a legal conclusion, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134.

135.    The Individual Defendants were in positions to control and did control, the misleading statements and omissions contained in the Registration Statement.

**RESPONSE**:  Paragraph 135 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135.

136.    None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

**RESPONSE**:  Paragraph 136 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the

Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 136.

137.    Plaintiffs and the Class have sustained damages. The value of NIO ADSs has declined substantially due to the Securities Act violations alleged herein.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 137.

138.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 138.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF EXCHANGE ACT CLAIMS

*Scienter*

139.    Unable to manufacture its own vehicles, NIO's reliance on JAC Motors - a Chinese state-owned enterprise with little experience manufacturing passenger vehicles and described as "third tier" by analysts - was a source of embarrassment for NIO and point of concern for investors.

**RESPONSE**:  Paragraph 139 relates to a claim that is not asserted against the Underwriter Defendants and therefore, no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 139, except admit that JAC Motions was a state-owned enterprise.

140.    To ensure a lucrative IPO, NIO needed to assure investors that it would soon have its own manufacturing plant to make its EVs. Furthermore, it was important for NIO to let investors know that the manufacturing plant in Shanghai was not just an aspirational possibility, but rather, it was a concrete certainty. Hence, NIO falsely told investors the construction on the Shanghai Facility was already underway. This allowed NIO to garner shareholder interest and raise more than a billion USD from the IPO.

**RESPONSE**:  Paragraph 140 relates to a claim that is not asserted against the Underwriter Defendants and therefore, no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 140.

141.    Indeed, it is unfathomable that NIO's senior executives, including the Individual Defendants, were unaware that construction on the ballyhooed Shanghai Facility – NIO's first and only vehicle manufacturing facility - had not commenced as claimed in the Registration Statement.

**RESPONSE**:  Paragraph 141 relates to a claim that is not asserted against the Underwriter Defendants and therefore, no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141.

142.    As part of their due diligence for the IPO, the Individual Defendants were required to have reasonable assurance that construction of the Shanghai Facility was progressing in a satisfactory manner. This is particularly so given the importance of the Shanghai Facility to NIO and the fact that 25% of the IPO proceeds were earmarked for the Shanghai Facility.

**RESPONSE**:  Paragraph 142 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142.

143.    The Individual Defendants were, at the very least, reckless in telling investors that construction of the Shanghai Facility was underway if they did not verify that construction had actually commenced.

**RESPONSE**:  Paragraph 143 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of a legal conclusion, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142.

144.    Furthermore, the Registration Statement states that a construction planning permit is required before construction work is able to commence on the Shanghai Facility.[11] The Individual Defendants are therefore aware that a construction planning permit is required prior to the commencement of construction. As such, it was reckless for the Individual Defendants to tell

- 39 -

investors that construction had already started on the Shanghai Facility without confirming that the necessary construction planning permit was issued.

11    Registration Statement on Form F-1/A, page 151.

**RESPONSE**:   Paragraph 144 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 144, except deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 144.

145.    The proposed site for the Shanghai Facility was located in Waigang Town, in Shanghai's Jiading District. Waigang Town is approximately 15 miles (approximately 20 to 25 minute drive in regular traffic conditions) from NIO's headquarters in Shanghai. With the proposed construction site so close to NIO's headquarters, it is inconceivable that none of the Individual Defendants knew that construction never started on the Shanghai Facility.

**RESPONSE**:  Paragraph 145 relates to a claim that is not asserted against the Underwriter Defendants and therefore, no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145.

### *Loss Causation*

146.    NIO's announcement on March 6, 2019 that it had terminated construction of the Shanghai Facility shocked the market. The value of NIO ADSs plunged from $10.16 per ADS on March 5, 2019 to close at $7.09 on March 7, 2019, representing a drop of 30%.

**RESPONSE**:  The Underwriter Defendants deny the allegations in Paragraph 146, except admit that the closing stock price of NIO ADSs decreased from $10.16 per ADS on March 5, 2019 to approximately $7.09 per ADS on March 7, 2019.

### *Respondeat Superior* **and Liability under Section 20 of the Exchange Act**

147.    NIO is liable for the acts of the Individual Defendants and NIO's employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful

acts complained of herein were carried out within the scope of their employment with authorization.

**RESPONSE**: Paragraph 147 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147.

148. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NIO under *respondeat superior* and agency principles.

**RESPONSE**: Paragraph 148 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148.

## Plaintiffs' Fraud-on-the-Market Allegations

149. In pursuing the Section 10(b) claim, Plaintiffs will rely in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) NIO ADSs were traded in efficient markets during the Class Period.

**RESPONSE**: Paragraph 149 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149.

150. NIO's ADSs traded in efficient markets during the Class Period for the following reasons: (i) the ADSs were traded on the NYSE; (ii) on average shares representing more than

2.0% of the total ADSs outstanding were traded weekly during the Class Period; (iii)  NIO met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (iv) As a public issuer, NIO filed periodic reports with the SEC; (v) NIO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vi) NIO was followed by at least nine securities analysts employed by major brokerage firms, including Goldman Sachs, Morgan Stanley, J.P. Morgan, and Credit Suisse, Citi, UBS, and Bank of America, who wrote reports that were widely distributed and publicly available; (vii) More than ten market makers made a market in NIO ADSs during the Class Period; (vii) the price of NIO ADSs responded quickly to incorporate and reflect new public information concerning NIO during the Class Period.

**RESPONSE**:   Paragraph 150 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 150, except admit that the ADSs traded on the NYSE during the Class Period.

151.    Based on the foregoing, the market for NIO ADSs promptly digested current information regarding NIO from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**RESPONSE**:   Paragraph 151 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 151.

152.    Alternatively, in pursuing their Section 10(b) claim, Plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period  statements in violation of a duty to disclose such information as detailed above.

**RESPONSE**:   Paragraph 152 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the

Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152.

**COUNT III**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against NIO and the Individual Defendants**

153.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**RESPONSE**:  The Underwriter Defendants incorporate by reference their responses to Paragraphs 1–152.

154.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**RESPONSE**:  The Underwriter Defendants admit that Count III of the Complaint purports to be based upon Section 10(b) of the Securities Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

155.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**RESPONSE**:  Paragraph 155 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 155.

156.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs

and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

**RESPONSE**: Paragraph 156 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 156.

157. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

**RESPONSE**: Paragraph 157 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 157.

158. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

**RESPONSE**: Paragraph 158 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required. To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 158.

159. As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the

Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

**RESPONSE**:    Paragraph 159 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.    To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 159.

160.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

**RESPONSE**:    Paragraph 160 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.    To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 160.

161.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

**RESPONSE**:    Paragraph 161 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of a legal conclusion, and therefore no response from the Underwriter Defendants is required.    To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 161.

162.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's ADSs during the Class Period.

**RESPONSE**:    Paragraph 162 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the

Underwriter Defendants is required.   To the extent a response is required, the Underwriter

Defendants deny the allegations in Paragraph 162.

**COUNT IV**
**Violations of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

163.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

**RESPONSE**:  The Underwriter Defendants incorporate by reference their responses to

Paragraphs 1–162.

164.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

**RESPONSE**:  Paragraph 164 relates to a claim that is not asserted against the Underwriter

Defendants and therefore, no response from the Underwriter Defendants is required.  To the extent

a response is required, the Underwriter Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 164.

165.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

**RESPONSE**:  Paragraph 165 (i) relates to a claim that is not asserted against the

Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the

Underwriter Defendants is required.  To the extent a response is required, the Underwriter

Defendants deny knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 165.

166.    Because of their positions of control and authority as senior officers,  the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the  wrongful acts complained of herein. The

Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

**RESPONSE**:   Paragraph 166 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 166.

167.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of,  and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

**RESPONSE**:   Paragraph 167 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 167.

168.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**RESPONSE**:   Paragraph 168 (i) relates to a claim that is not asserted against the Underwriter Defendants and (ii) consists of legal conclusions, and therefore no response from the Underwriter Defendants is required.   To the extent a response is required, the Underwriter Defendants deny the allegations in Paragraph 168.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B.      Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**RESPONSE**:   In response to the Prayer for Relief in the Complaint, the Underwriter Defendants deny that Plaintiffs are entitled to any relief.

## DEFENSES

Without assuming the burden of proof as to any defense or issue that would otherwise rest on Plaintiffs or as to any element of Plaintiffs' claims, and reserving the right to amend this Answer to assert any additional defenses, cross-claims, and third-party claims not asserted herein when, and if, in the course of their investigation, discovery, preparation for trial, or otherwise it becomes appropriate to assert such defenses, cross-claims, and third-party claims, the Underwriter Defendants assert the following defenses:

## FIRST DEFENSE

The Complaint fails to state any claim upon which relief can be granted against any Underwriter Defendant.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, because when the Offering Documents became effective, they did not contain an untrue statement of material fact or omission of material fact required to be stated or necessary to make any statements therein not misleading.

## THIRD DEFENSE

Plaintiffs and members of the putative class lack standing to maintain their claims against the Underwriter Defendants.

### FOURTH DEFENSE

The Underwriter Defendants had no duty to disclose any facts allegedly not disclosed or to characterize disclosed facts pejoratively, had no duty to verify, opine upon, audit, review, or correct such information disclosed, and breached no duty to disclose information allegedly omitted or misrepresented.

### FIFTH DEFENSE

The Underwriter Defendants are not liable because any alleged misrepresentation or omission for which the Underwriter Defendants are allegedly responsible was not material to the investment decisions of a reasonable investor.

### SIXTH DEFENSE

The Underwriter Defendants acted at all times in good faith, including by acting in conformity with the law and rules and regulations of the U.S. Securities and Exchange Commission.

### SEVENTH DEFENSE

The Underwriter Defendants are not liable because they acted at all times with reasonable care and due diligence and had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the Offering Documents became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

### EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because with respect to portions of the Offering Documents purported to be made on the authority of experts (other than the Underwriter Defendants), or purporting to be a copy of or extract from a report or valuation of an expert (other

than the Underwriter Defendants), the Underwriter Defendants had no reasonable grounds to believe and did not believe, at the time such part of the Offering Documents became effective, the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make statements therein not misleading.

## NINTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because at all relevant times the Underwriter Defendants relied in good faith on the work, opinion, information, representations, reports, and advice of other persons and/or entities on which the Underwriter Defendants were entitled to rely.

## TENTH DEFENSE

Any damages or injuries suffered by Plaintiffs or the putative class, if any, are the proximate result, either in whole or in part, of actions or omissions of persons or entities other than the Underwriter Defendants.

## ELEVENTH DEFENSE

To the extent the Offering Documents and materials incorporated therein are determined to have contained false or misleading statements (which the Underwriter Defendants deny), Plaintiffs and members of the putative class either knew or should have known about the matters alleged in the Offering Documents, and their own negligence or other fault proximately contributed to the injuries allegedly suffered by Plaintiffs and the putative class from the purchase and sale of the offered securities, and bars any recovery to the extent thereof.

## TWELFTH DEFENSE

Plaintiffs and members of the putative class cannot recover all or part of the amounts they allege are recoverable under Section 11 of the Securities Act because such amounts represent

losses caused by factors other than the depreciation in value of NIO ADSs at issue resulting from such part of the Offering Documents that Plaintiffs allege was untrue or omitted to state a material fact required to be stated therein to make the statement not misleading.

**THIRTEENTH DEFENSE**

Plaintiffs' claims against the Underwriter Defendants are barred in whole or in part because of the lack of transaction causation.

**FOURTEENTH DEFENSE**

The claims asserted in the Complaint are barred, in whole or in part, by the safe harbor provisions for forward-looking statements in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-2, and under the "bespeaks causation" doctrine.

**FIFTEENTH DEFENSE**

Plaintiffs' claims against the Underwriter Defendants are barred in whole or in part because the alleged damages or other injuries were caused solely by the acts or omissions of others over which the Underwriter Defendants had no control.

**SIXTEENTH DEFENSE**

None of the Underwriter Defendants is liable under Section 11 of the Securities Act for damages in excess of the total price at which the specific NIO ADSs underwritten and distributed by such Underwriter Defendant to the public were offered to the public.

**SEVENTEENTH DEFENSE**

Plaintiffs' and the putative class members' claims against the Underwriter Defendants are barred in whole or in part by laches, equitable estoppel, waiver, or other related equitable doctrines.

**EIGHTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to take reasonable action to mitigate any damages allegedly sustained as a result of the facts alleged in the Complaint, and thereby are barred from recovering any damages that might reasonably have been avoided.

**NINETEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the information that Plaintiffs allege to have been omitted or misrepresented was in fact publicly available and/or widely known to the market and to the investing community.

**TWENTIETH DEFENSE**

This action is barred, in whole or in part, because the Court lacks jurisdiction of the claims of any members of the putative class who do not reside in New York.

**TWENTY-FIRST DEFENSE**

Plaintiffs and members of the putative class are not entitled to any recovery from the Underwriter Defendants because they did not reasonably rely on any alleged untrue or misleading statement of material fact when purchasing the relevant securities.

**TWENTY-SECOND DEFENSE**

Plaintiffs' and the putative class members' claims against the Underwriter Defendants are barred in whole or in part by laches, equitable estoppel, waiver, or other related equitable doctrines.

**TWENTY-THIRD DEFENSE**

Plaintiff and members of the putative class are not entitled to any recovery from the Underwriter Defendants because Plaintiff and the putative class would have purchased the relevant securities even with full knowledge of the facts that they now aver were

- 52 -

misrepresented or omitted.

## TWENTY-FOURTH DEFENSE

The Underwriter Defendants hereby adopt and incorporate by reference any and all

other defenses asserted or to be asserted by any of the other Defendants to the extent that the

Underwriter Defendants may share in such a defense.


Dated:   October 25, 2021
         New York, New York


                                        */s/ Jed Schwartz*
                                        Scott Edelman
                                        Jed Schwartz
                                        Micaela Manley
                                        **MILBANK LLP**
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone: (212) 530-5000
                                        sedelman@milbank.com
                                        jschwartz@milbank.com
                                        mmanley@milbank.com

                                        *Counsel for Defendants Morgan Stanley &*
                                        *Co. LLC, Goldman Sachs (Asia) L.L.C, J.P*
                                        *Morgan Securities LLC, Merrill Lynch,*
                                        *Pierce, Fenner & Smith Inc., Deutsche Bank*
                                        *Securities Inc., Citigroup Global Markets*
                                        *Inc., Credit Suisse Securities (USA) LLC,*
                                        *UBS Securities LLC, and WR Securities, LLC*

- 53 -