**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re NIO, Inc. Securities Litigation* | Case No: 1:19-cv-01424-NGG-JRC |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

Served on June 28, 2022

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.  Applicable Standards Favor Class Certification in this Securities Action .......................... 4

II.  The Requirements of Rule 23(a) are Satisfied ................................................................. 5

  A.  Numerosity is Established ............................................................................................ 5

  B.  Commonality is Established ......................................................................................... 6

  C.  Typicality is Established .............................................................................................. 7

  D.  Adequacy is Satisfied ................................................................................................. 8

III.  The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied ............. 9

  A.  Common Questions of Law and Fact Predominate as to the Securities Act Claims ....... 9

  B.  Common Questions of Law and Face Predominate as to the Exchange Act Claims .... 10

    1.  Plaintiffs are Entitled to a Presumption of Reliance under Basic .............................. 10

      a.  NIO's Listing on the NYSE Shows Market Efficiency ........................................ 11

      b.  The *Cammer* Factors Show Market Efficiency .................................................... 12

      c.  The Unger/Krogman Factors Further Support a Finding of Market Efficiency ......... ............................................................................................................................ 16

    2.  Damages Will be Calculated Using a Common Methodology .................................. 17

  C.  The Same Common Issues Predominate as to the Control Person Claims ................... 18

  D.  A Class Action is Superior to Other Methods of Adjudication ................................... 18

IV.  The Rosen Firm Should be Appointed Class Counsel under Rule 23(g) .......................... 19

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Winsdor*,
  521 U.S. 591 (1997)............................................................................................ 2, 5, 9, 18

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)................................................................................................. 2, 10

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)............................................................................................. 8

*Basic v. Levinson*,
  485 U.S. 224 (1988)............................................................................................. 3, 5, 10

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................................. 17

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ............................................................... 12, 13, 14, 15

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................ 11, 12

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995)............................................................................................. 5

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) .................................................................................. 5

*Erica P. Fund, Inc. v. Halliburton Co.*,
  (*"Hallib*urton I"), 563 U.S. 804 (2011) ...................................................................... 10

*Fogarazzao v. Lehman Bros.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................................... 6

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968)........................................................................................... 5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)................................................................................................ 9, 10

ii

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................................ 6, 14

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) ...................................................................................... 2

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................................... 17

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................................... 5, 19

*In re IndyMac Mortgage-Backed Sec. Litig.*,
286 F.R.D. 226 (S.D.N.Y. 2012) ........................................................................ 9, 10

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ......................................................................... 14, 15

*In re Merk & Co., Inc. Sec. Deriv. & "ERISA"* Litig.,
2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................ 18

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
241 F.R.D. 435 (S.D.N.Y. 2007) ............................................................................. 18

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
310 F.R.D. 230 (S.D.N.Y. 2015) ............................................................................. 18

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ............................................................................. 11

*In re NTL, Inc. Sec. Litig.*,
2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ............................................................. 6

*In re NYSE Specialists Sec. Litig.*,
260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................................... 5, 6

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) ............................................................................. 19

*In re Petrobras,*
*Sec.*, 862 F.3d 250 (2d Cir. 2017) ...................................................... 9, 11, 12, 16

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007) .................................................................. 17

iii

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ............................................................................. 10

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ............................................................. 15

*In re Vale S.A. Sec. Litig.*,
    2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ............................................................ 15

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .................................................................................... 19

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ......................................................................... 6, 13

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................................. 19

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ................................................................................... 13

*Khunt v. Alibaba Grp. Holding Ltd.*,
    102 F. Supp. 3d 523 (S.D.N.Y. 2015) ...................................................................... 20

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................ 16

*Loritz v. Exide Techs.*,
    2015 WL 12488514 (C.D. Cal. Dec. 17, 2015) ........................................................ 18

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................. passim

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ................................................................................. 6

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .................................................................................... 17

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ...................................................................................... 7

*Rocco v. Nam Tai Elecs. Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................................... 6

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ................................................................................. 18

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................... 12

*Teachers' Ret. Sys. of La. v. ACLN Ltd.,*
  2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ........................................................... 7

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)...................................................................................... 12

*Trinidad v. Breakaway Courier Sys., Inc.*,
  2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ............................................................... 7

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8,*
  283 F.R.D. 199 (S.D.N.Y. 2012) ................................................................................. 5

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ..................................................................................... 16

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)..................................................................................... 5, 11

*Wallace v. IntraLinks*,
  302 F.R.D. 310 (S.D.N.Y. 2014) ................................................................................. 7

## **Rules**

Fed. R. Civ. P. 23.......................................................................................................... passim

Lead Plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs") respectfully submit this memorandum of support of their motion pursuant to Rule 23 of the Federal Rule of Civil Procedure for: (1) certification of the Securities Act Class and the Exchange Act Subclass consisting of: All persons and entities who purchased or otherwise acquired the American Depository Shares ("ADSs") of NIO Inc. pursuant and/or traceable to the registration statement and prospectus (together, the "Registration Statement") issued in connection with NIO's September 12, 2018 Initial Public Offering (the "Securities Act Class" or "Class"), including a subclass of those persons and entities who purchased or otherwise acquired NIO ADSs during the period from October 8, 2018 to March 5, 2019, inclusive (the "Exchange Act Subclass" or "Subclass");[1] (2) the appointment of Mr. Mundy and Ms. Huang as Class Representatives of the Class and Subclass, and (3) the appointment of The Rosen Law Firm, P.A. as Counsel for the Class and Subclass.

## PRELIMINARY STATEMENT

This securities action is a paradigmatic case for certification as a class action. Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") arising out of Defendants' common course of misconduct – namely, Defendants' issuance of a materially false and misleading Registration Statement in connection with NIO Inc.'s $1.1 billon Initial Public Offering (the "IPO").

---

[1] Excluded from the Class and Subclass are (a) persons and entities who suffered no compensable losses; and (b) Defendants, the present and former officers and directors of NIO, members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

1

Both the Supreme Court and the Second Circuit have long held that securities cases are especially well-suited to class-wide adjudication, and that the class action mechanism is an important tool for enforcing securities laws. *See, e.g.*, *Amchem Prods., Inc. v. Winsdor*, 521 U.S. 591, 624 (1997); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) (noting that the predominance test of Rule 23 is "readily met" in cases alleging securities law violations).

Consistent with this precedent, certification is appropriate here as the proposed Class and Subclass satisfy all of the requirements of certification under Fed. R. Civ. P. 23. NIO sold more than 180,000,000 shares of NIO ADSs in the IPO, and NIO ADSs were widely held and were traded on the New York Stock Exchange ("NYSE") at all relevant times. As such, the proposed Class and Subclass likely number in the thousands, satisfying Rule 23(a)(1)'s numerosity requirement. The nature of the proposed Class Representatives' injuries resulted from Defendants' common course of conduct and is identical to that of members of the proposed Class and Subclass such that no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, The Rosen Law Firm, P.A. ("Rosen Firm" or "Lead Counsel") possesses the requisite experience and resources to successfully prosecute this matter as a class action, further supporting adequacy under Rule 23(a)(4), as well as the appointment of the Rosen Firm as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. The core issue raised by Plaintiffs' Securities Act and Exchange Act claims is whether NIO's IPO Registration Statement contained material misrepresentations. The answer to that central question will not vary from investor to investor. As to Plaintiffs' Exchange Act claims, for which Plaintiffs

2

must prove the additional element of reliance, the predominance requirement is satisfied because the Exchange Act Subclass is entitled to a presumption of reliance based on the "fraud-on-the-market" doctrine established by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988). Thus, any potential individual questions of reliance do not predominate over common issues in this case. Finally, a class action is the superior method of litigating this action because the costs of individual litigation and the resulting burden on the judicial system would be prohibitive if a myriad of individual suits were filed. Class adjudication allows all the claims to be heard in one court, and provides investors who suffered small losses the only realistic opportunity to pursue their claims given the costs of litigation.

In sum, for the reasons set forth herein, Plaintiffs respectfully request that their Motion for Class Certification be granted in its entirety.

### STATEMENT OF FACTS

NIO is a Shanghai-based company that develops and sells electric vehicles ("EVs") to Chinese consumers. ¶¶ 3, 47.[2] NIO seeks to fill a niche market in China by selling purportedly premium EVs at substantially lower prices than comparable models from foreign automakers such as Tesla, Audi, and Mercedes-Benz. ¶¶48-49. On September 12, 2018, NIO became a publicly-traded company in the U.S., completing its IPO on the NYSE. ¶55.

In its Registration Statement for the IPO, NIO told investors that it was building its own manufacturing facility in Shanghai (the "Shanghai Facility") – and that construction had already started. ¶¶61, 62. This was important to investors because NIO did not have its own manufacturing facility, and instead relied on an inexperienced Chinese state-owned truck manufacturer to make

---

[2] All citations to "¶_" are to paragraphs of the Second Amended Class Action Complaint Violations of the Federal Securities Laws ("Complaint"), Dkt. #67.

its vehicles. ¶¶51-53. This unusual arrangement carried a myriad of risks for NIO, and for a company that hopes to compete with the likes of Tesla and Mercedes-Benz, the reliance on an obscure third-party manufacturer was an Achilles' heel for NIO and a major source of concern for investors. ¶52.

Buoyed by the claim that its own manufacturing facility was under construction, NIO's IPO was a hit with U.S. investors, who purchased $1.1 billion of NIO ADSs in the IPO. ¶55.

Unbeknownst to investors, however, construction on the Shanghai Facility had not commenced at the time of the IPO. ¶10. In fact, construction was never started on the Shanghai Facility at all before NIO abruptly cancelled the project. ¶¶10, 74, 87, 89-91. NIO announced on March 6, 2019, half a year after the IPO in the face of declining sales, that it had decided to terminate construction of the Shanghai Facility, and would instead continue relying on state-owned truck manufacturer JAC Motors to produce its electric vehicles. ¶65. This sudden and surprising announcement rattled the market, causing NIO's share price to fall by 30%, from $10.16 per ADS on March 5, 2019 to $7.09 per ADS on March 7, 2019. ¶146.

Indeed, not only did the Registration Statement falsely state that construction had already begun on the Shanghai Facility, it also did not warn investors that construction of the Shanghai Facility was dependent on NIO having sufficient cash and meeting sales expectations. ¶¶96, 99. Hence investors were unaware of the very real risk – one that eventually came to fruition – that NIO would abandon plans to build the Shanghai Facility after the IPO. *Id.*

## ARGUMENT

### I.    Applicable Standards Favor Class Certification in this Securities Action

Securities cases such as this one are ideally suited for class certification because of the predominance of common issues of fact and the impracticability of bringing individual actions to redress a common wrong. Indeed, the Supreme Court has repeatedly recognized that

4

"[P]redominance is a test readily met in certain cases alleging" violations of the federal securities laws. *Amchem,* 521 U.S. at 625; *see also, Basic,* 485 U.S. at 250 (noting that a class action is the most favorable means of adjudicating federal securities claims).[3]

The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulations of public markets, to maximize the benefit to the public provided by class actions." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) ("[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action[.]").[4]

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a) – numerosity, commonality, typicality, and adequacy – as well as one of the three provisions in Rule 23(b). *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). As discussed below, each of these requirements are met in this case.

## II.     The Requirements of Rule 23(a) are Satisfied

### A.     Numerosity is Established

Rule 23(a)(1) is satisfied when a class is "so numerous that a joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "[n]umerosity is presumed when a class consists of forty members or more." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.

---

[3] Unless otherwise noted, internal quotations and citations are omitted and emphasis is added throughout.

[4] *See also Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("violations of the securities laws…are "especially amenable" to class action certification and resolution."); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("Class treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws.").

1995)). Precise quantification of the proposed class is not necessary because the court may "make common sense assumptions" and "may rely on reasonable inferences drawn from the available facts" to estimate the size of the class. *Rocco v. Nam Tai Elecs. Inc.,* 245 F.R.D. 131, 134-35 (S.D.N.Y. 2007). Indeed, in securities actions "relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 275 (S.D.N.Y. 2008).

Here, 160,000,000 NIO ADSs were sold in the IPO to geographically dispersed investors likely numbering in the thousands, satisfying numerosity for the Securities Act Class.  Numerosity is also satisfied for the Exchange Act Subclass as NIO ADSs were actively traded on the NYSE at all relevant times, with an average weekly trading volume ranging from 24,712,517 to 270,596,538 ADSs during the Exchange Act class period.  Werner Decl., at ¶27.[5]

### B.      Commonality is Established

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement "has been characterized as a 'low hurdle.'" *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113, at *6 (S.D.N.Y. Feb. 14, 2006). "Even a single common legal or factual question will suffice." *NYSE Specialists,* 260 F.R.D. at 70. "In general, where putative class members have been injured by similar material misrepresentations and omission, the commonality requirement is satisfied." *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).[6] Here, the Complaint identifies numerous common issues of fact and law, all of

---

[5] The Declaration of Dr. Adam Werner ("Werner Decl.") is attached as Exhibit 1 to the accompanying Declaration of Laurence Rosen in Support of Plaintiffs' Motion for Class Certification ("Rosen Decl.").

[6] *Accord In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (same); *see also Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y.

6

which are amenable to class-wide proof, including but not limited to the following:

- Whether the Registration Statement misrepresented or omitted facts;

- Whether the facts misrepresented or omitted were material;

- Whether the price of NIO's ADSs were artificially inflated and by how much;

- Whether members of the Class (and Subclass) sustained damages as a result of the alleged misconduct, and if so, the proper measure thereof;

- Whether the Individual Defendants were control persons of NIO.

Given the numerous common questions of fact and law present in this case, the commonality requirement is established.

### C.    Typicality is Established

Rule 23(a)(3) is satisfied when the claims of the class representatives are "typical" of those of the class. As with commonality, the test for typicality "is not demanding." *Wallace v. IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2d Cir. 1993). Thus, typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007); *See also Teachers' Ret. Sys. of La. v. ACLN Ltd.,* 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004) ("When inquiring into the typicality

---

2011) ("[C]ourts in this Circuit have held that the … commonality requirement is plainly satisfied where the alleged misrepresentations…relate to all the investors, as the existence and materiality of such misrepresentations obviously present important common issues.").

requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of the plaintiffs.").

Here, Plaintiffs' claims and legal theories are typical of the Class and Subclass. Each purchased NIO ADSs traceable to the IPO and during the Exchange Act class period at prices artificially inflated by Defendants' misconduct. As with other members of the Class and Subclass, Plaintiffs' claims are based on the Registration Statements' misrepresentations concerning the Shanghai Facility. As such, typicality is satisfied.

### D.      Adequacy is Satisfied

The final requirement of Rule 23(a) is that "the class representatives…fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, the lead plaintiff's counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," and the class representatives must not have interests conflicting with the class. S*ee Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The interests of the proposed Class Representatives are aligned with those of the Class and Subclass. The proposed Class Representatives' claims are predicated upon the same misconduct that gives rise to the claims of the Class and Subclass. Each of the proposed Class Representatives has actively participated in this action by, among other things, communicating with phone and by email with Lead Counsel, monitoring the progress and status of the case, and reviewing key documents filed in the action. *See* Rosen Decl., Ex. 2 (Declaration of Mark Mundy) and Ex. 3 (Declaration of Eva Huang). In addition, each has attested to his and her understanding of the duty, as a Class Representative, to act in the interests of all other investors who are members of the Class and Subclass. *Id.*

Moreover, Plaintiffs have retained counsel who is qualified, experienced, and able to conduct the proposed litigation. The Rosen Firm has vigorously pursued the Class and Subclass'

8

interests and advanced their claims in this Court, including the filing of comprehensive pleadings and defeating Defendants' motion to dismiss. *See also,* Rosen Decl., Ex. 4 (firm resume of the Rosen Firm). In short, the adequacy requirement has been met because Plaintiffs' interests are not antagonistic of the Class and Subclass, and Lead Counsel is well-qualified and has demonstrated its competence prosecuting this action.

### III.    The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied

The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions…can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject to only individualized proof." *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017). "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem,* 521 U.S. at 625. "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttals does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 276 (2014) ("*Halliburton II*"). Here, issues of both law and fact predominate over any individual issues.

### A.    Common Questions of Law and Fact Predominate as to the Securities Act Claims

Plaintiffs' Securities Act claims do not include the elements - and will not require any analysis - of scienter, reliance, or loss causation. *See In re IndyMac Mortgage-Backed Sec. Litig.,* 286 F.R.D. 226, 236-37 (S.D.N.Y. 2012) (providing elements of Securities Act claims). Instead, analysis of the Securities Act claims will focus on the existence and materiality of the misrepresentations in the Registration Statement, which are issues susceptible to the generalized proof. *See id.* at 235 (noting that materiality is gauged according to an objective standard). As the Supreme Court affirmed in *Amgen*, these elements present common questions of law and fact. *See*

9

568 U.S. at 460. "In no event will the individual circumstances of particular class members bear on the inquiry." *Id.*

The factual and legal inquiries central to Plaintiffs' Securities Act claims are common to all Class members and "each proposed class member's claims will rise or fall on common proof related to the offering documents." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 142 (S.D.N.Y. 2019). Additionally, damages for Securities Act claims are "based on a straightforward statutory formula common to all Class members." *IndyMac,* 286 F.R.D. at 235.

The Securities Act claims raise questions common to the Class and will be answered with common proof; accordingly, the Securities Act claims satisfy the predominance requirement of Rule 23(b).

## B.   Common Questions of Law and Face Predominate as to the Exchange Act Claims

The Supreme Court in *Amgen* held that the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof. *See* 568 U.S. at 474-75. Consequently, in claims under the Exchange Act, whether common questions of law or fact predominate often turns of the element of reliance. *See Erica P. Fund, Inc. v. Halliburton Co. ("Halliburton I"),* 563 U.S. 804, 810 (2011).

### 1.   Plaintiffs are Entitled to a Presumption of Reliance under Basic

Plaintiffs are entitled to a presumption of reliance under the "fraud-on-the-market" doctrine espoused in *Basic,* 485 U.S. at 224. Pursuant to the *Basic* fraud-on-the-market doctrine, Plaintiffs may show reliance by "invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II,* 573 U.S. at 283-84.

10

To invoke this presumption, Plaintiffs must show, based on a holistic analysis of the totality of evidence presented, that NIO's ADSs traded in an efficient market. *Petrobras,* 862 F.3d at 276-78 (affirming class certification where plaintiffs provided direct and indirect evidence of market efficiency, including an event study similar to that provided by Dr. Werner here (s*ee* Sec. III.B.1.b, *infra*), and noting that courts have "consistently suggest[ed] that the burden of [showing market efficiency] is not an onerous one"); *Waggoner,* 875 F.3d at 89, 98-99 (holding that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" and affirming class certification where plaintiffs provided "indirect indicia of an efficient market"). As set forth below and in Dr. Werner's expert declaration, Plaintiffs have shown, based on the totality of the evidence presented, that NIO's ADSs traded in an efficient market, and Plaintiffs are therefore entitled to a presumption of reliance under *Basic.*

### a.    NIO's Listing on the NYSE Shows Market Efficiency

NIO's ADSs trade on the NYSE. The Second Circuit has held that a stock's listing on the NYSE is strong evidence of market efficiency. *Waggoner,* 875 F.3d at 98-99 (nothing that market efficiency shown and a presumption of reliance was warranted because Barclay's stock traded on the NYSE and Barclays was one of the largest financial institutions in the world.). The NYSE is "the world's largest and most liquid stock exchange." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015). It has long been recognized by courts as a "paradigmatic efficient market." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011) (explaining that the Supreme Court in *Basic* presumed that the shares at issue traded on a "well-developed, efficient, and information-hungry market" because they traded on the NYSE).

Even courts "reluctant to conclude that a stock was traded efficiently solely because it was

11

traded on the NYSE" usually "agree that such listing is a good indicator of efficiency." *Carpenters,* 310 F.R.D. at 81. It would require, therefore, "unusual circumstances" for a security that trades on the NYSE to not trade efficiently. *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016). No such unusual circumstances exist here. Thus, NIO's listing on the NYSE is evidence of market efficiency that supports invoking the "fraud-on-the-market" presumption of reliance.

### b.       The *Cammer* Factors Show Market Efficiency

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market efficiency. *Petrobras,* 862, F.3d at 276. Courts in the Second Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether a security trades in an efficient market. *Petrobras,* 862 F.3d at 276-79. Those factors include:

> (1) A large weekly trading volume; (2) the existence of a significant number of analyst reports; (2) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer,* 711 F.Supp. 1264 at 1285-87).[7] The *Cammer* factors, however, are neither exclusive nor strictly required, and instead "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432.[8] An analysis of each of the foregoing *Cammer* factors, evaluated both individually and collectively, shows that NIO's ADSs

---

[7] *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *Petrobras,* 862 F.3d at 276 (affirming finding of market efficiency pursuant to *Cammer* factors).

[8] *See also Carpenters,* 310 F.R.D. at 83 ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier,* it has not required their use or held that any one of them is dispositive.").

traded in an efficient market.

**Factor One – NIO's High Weekly Trading Volume**: During the Exchange Act class period, NIO's ADSs had an average weekly trading volume of 45.68% of the outstanding shares. Werner Decl. at ¶27. That turnover rate far exceeds the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer,* 711 F. Supp. at 1286. Accordingly, NIO's weekly trading volume supports a strong presumption that its ADSs traded in an efficient market.  Werner Decl. at ¶27.

**Factor Two – Substantial Coverage by Financial Analysts**: The presence of substantial analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements related to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar,* 290 F.R.D. at 446. This factor is measured alternatively by the *number of analysts* coverage the company or the security, or by the *number of analyst reports* published about the company or security, during the relevant period.[9]

Here, at least 5 analysts or analyst firms covered NIO during the Exchange Act class period. Werner Decl. at ¶29. And these analysts issued at least 26 analyst reports during the approximately five-month Exchange Act class period. *Id.* By comparison, the *Cammer* court found efficiency where the security at issue was the subject of "[a]t least 15 research reports" during the entire one-year class period. 711 F. Supp. at 1283 n.30, 1287. *See also Winstar,* 290 F.R.D. at 446 (analyst coverage weighed in favor of efficiency of bond market where 3 analysts reported on company's bonds and additional analysts followed company's stock); *In re Xcelera.com Sec. Litig.,* 430 F.3d

---

[9] *Compare, e.g. id.* ("the number of securities analysts") with *McIntire*, 38 F. Supp. 3d at 431 ("the existence of a significant number of analyst reports").

13

503, 514-15 (1st Cir. 2005) (affirming class certification with only 1 analyst).

In addition to the analyst reports, NIO was also the subject of extensive media coverage, which further supports market efficiency. During the Exchange Act class period, over 109 news stories, press releases, and SEC filings featuring NIO appeared in financial publications and newswires, including *Dow Jones Institutional News, GlobeNewswire, PR Newswire, and Reuters.* Werner Decl. at ¶31.

*Factor Three – Market Makers, Institutional Investors, and Arbitrageurs*: The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire,* 38 F. Supp. 3d at 431-32. Courts have found the fact that a security trades on the NYSE in itself sufficient to satisfy this factor. *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *Alstom SA*, 253 F.R.D. at 280 (similar). As Dr. Werner explains, the NYSE is one of the most liquid and efficient trading forums in the world, and maintains a "designated market maker (DMM)" that acts to ensure that there is a well-functioning market. Werner Decl. at ¶35. In addition to the NYSE DMM, there were at least 77 market makers for NIO ADSs during the Exchange Act class period. *Id.* at ¶34. Moreover, there were at least 108 institutional investors who owned NIO ADSs during the Exchange Act class period, further supporting efficiency. *Id.* at ¶37.

*Factor Four – NIO Met the Float Requirement to File Form S-3*: Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information. *See Cammer,* 711 F. Supp. at 1284-85.[10] To be eligible for an S-3

---

[10] As a foreign issuer, NIO would file Form F-3, which is substantially similar to Form S-3.

14

registration, a company must be "seasoned," *i.e.*, it must have filed Exchange Act reports with the SEC for twelve months, and it must meet a certain minimum threshold for public float. *See Cammer,* 711 F. Supp. at 1284-85; Werner Decl. at ¶39. The public float requirement has been loosened from the time of *Cammer* (decreasing from $150 million to $75 million), but NIO vastly exceeded both levels by approximately *a billion* dollars during the Exchange Act class period. Werner Decl. at ¶41 (The value of NIO's float ranged from $0.93 billion to $1.81 billion).[11]

**Factor 5 – NIO's ADS Price Reacted to Unexpected News**: The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. Plaintiffs' expert, Dr. Werner, performed a standard event study to determine whether the price of NIO's ADSs responded to unexpected new information. Werner Decl. at ¶¶42-77. Dr. Werner chose four event dates – two of which were expected to result in statistically significant price reactions and two of which were not expected to do so – and used a statistical test known as a *t*-test to assess whether there was a statistically significant price reaction. *Id.* A *T*-test is commonly used in securities litigation to test cause and effect relationship between news and stock fluctuations and has been accepted by this Court. *See*, *e.g., In re Vale S.A. Sec. Litig.,* 2022 WL 122593, at *10 (E.D.N.Y. Jan. 11, 2022).[12]  Based on his event study, Dr. Werner

---

[11] NIO did not meet the requirement for being current in SEC filings for the past twelve month because the Exchange Act class period ended approximately six months after the IPO. Ineligibility due to the class period's timing does not weight against market efficiency. *In re Initial Public Offering,* 260 F.R.D. at 101 ("this factor will not necessarily weigh against a finding of market efficiency [because] such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."); *accord Cammer*, 711 F. Supp. at 1287 ("Again, it is the number of shares traded and the value of shares outstanding that involve the facts which imply efficiency.").

[12] Judge Bulsara's Report and Recommendation was adopted by Judge Dearie. *In re Vale S.A. Sec. Litig.,* 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).

found that the two events that were expected to result in statistically significant price reactions did in fact do so, while the two other events that were not expected to cause statistically significant price reactions did not result in statistically significant price reactions. Werner Decl. at ¶¶62-76. Accordingly, Dr. Werner concluded that "it is clear" that "NIO's ADSs traded in an efficient market." *Id*. at ¶77.

### c.    The Unger/Krogman Factors Further Support a Finding of Market Efficiency

Courts also consider three other factors identified in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) the stock's float; and (3) the bid-ask spread. *See also Petrobras,* 862 F.3d at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis).

The larger the market capitalization, the more likely the stock is to attract analyst and news media coverage, and gain the attention of investors, including large institutional investors. All these characteristics promote market efficiency. Werner Decl. at ¶¶79-80. During the Exchange Act class period, NIO's average market capitalization was $1.33 billion, making its market capitalization greater than at least 69% of all other publicly-traded companies in the United States. *Id.* at ¶81. NIO's market capitalization was sufficiently large to attract analyst and news coverage, and gain the attention of a greater number of investors, all of which further promotes market efficiency. *McIntire*, 38 F. Supp. 3d at 433 (finding that a market capitalization ranging from $292 to $585 million during the class period weighed in favor of finding an efficient market).

A stock's float is the number of shares outstanding less restricted shares and shares held by insiders and affiliated corporate entities; the float is generally the number of shares available for trading by outside investors in the open market. Under *Krogman*, a large public float helps support a finding of market efficiency. During the Exchange Act class period, the market value of

16

NIO's ADS float averaged $1.28 billion (or 96.69% of NIO ADSs outstanding), which is greater than the *market capitalization* of at least 68% of all other publicly traded companies in the United States. Werner Decl. at ¶¶73-74. The large float of NIO ADSs further supports a finding of an efficient market.

The final *Unger/Krogman* factor is the bid-ask spread, which is the difference between the price at which market makers are offering to buy/sell the security. A narrow bid-ask spread is associated with market efficiency, as it implies that there is a large number of investors willing to buy or sell a security. Werner Decl. at ¶86. Here, the average bid-ask spread for NIO ADSs during the Exchange Act class period was only 0.17%, well below the threshold necessary to support market efficiency. *McIntire*, 38 F. Supp. 3d at 433 (a bid-ask spread of 0.27% supported market efficiency); *See also In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (finding that a bid-ask spread below 1.9% "weighed heavily" in favor of market efficiency).

In sum, the three *Unger/Krogman* factors also strongly weigh in favor of finding that NIO ADSs traded in an efficient market. *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float…strongly indicate…an efficient market such that the *Basic* presumption is appropriate.").

### 2.    Damages Will be Calculated Using a Common Methodology

Courts in this Circuit  regularly find that damages issues in securities fraud actions are common to all class members, as damages can be calculated on a class-wide basis using an event study to measure the price impact of material, company-specific information disclosed to the public. *See, e.g., In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016). While damages for each individual class member may vary, it is "well-established" Second Circuit

17

precedent that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification" under Rule 23(b)(3). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

### C.      The Same Common Issues Predominate as to the Control Person Claims

Whether the Individual Defendants exercised control over NIO under Section 15 of the Securities Act and Section 20(a) of the Exchange Act "constitute a common question for all class members because if Plaintiffs are able to prove a primary violation, the controlling person inquiry would not be specific to individual class members." *Loritz v. Exide Techs.,* 2015 WL 12488514, at \*5 (C.D. Cal. Dec. 17, 2015); *see also In re Merk & Co., Inc. Sec. Deriv. & "ERISA" Litig.,* 2013 WL 396117, at \*3 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to the control person claims as for the primary violation).

### D.      A Class Action is Superior to Other Methods of Adjudication

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (quoting *Amchem,* 521 U.S. at 615). Superiority is typically found in cases in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010). Securities actions "easily satisfy" this requirement "because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015).

18

The following factors are relevant to the superiority assessment:

(1) A large weekly trading volume; (2) the existence of a significant number of analyst reports; (2) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

Given that NIO is based in the People's Republic of China, that the number of relevant documents is voluminous, and that most of the documents are in Chinese, it would be prohibitively difficult and expensive to prosecute this action on an individual basis. The misconduct here, like "[m]ost violations of the federal securities laws[,]…inflict[ed] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. *In re Blech Securities Litigation*, 187 F.R.D. at 107; *see also, In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden such litigation would entail."). Finally, securities class actions like this one generally raise no unusual manageability issues. *See, e.g., In re Petrobras Sec. Litig.,* 312 F.R.D. 354, 363 (S.D.N.Y. 2016) (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 140 (2d Cir. 2001)). Thus, a class action is the superior method for resolving the claims here.

### IV.    The Rosen Firm Should be Appointed Class Counsel under Rule 23(g)

Rule 23(g)(1)(A) sets forth the factors to consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will

19

commit to the case. Under these criteria, Lead Counsel - the Rosen Firm - is eminently qualified. The Rosen Firm has extensive experience litigating securities class actions under federal securities laws, and has recognized expertise and success prosecuting securities class actions against China-based companies such as NIO. *See* Rosen Decl., Ex. 4; *see also Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015) ("[Rosen Firm] has extensive experience navigating the particular complexities of litigation with Chinese companies."). In sum, Plaintiffs respectfully submit that the requirements of Rule 23(g) are met, and thus request that the Court approve the Rosen Firm as Class Counsel.

## <u>CONCLUSION</u>

For the reasons stated herein and in the accompanying supporting exhibits, Plaintiffs respectfully request that the Court issue an order: (i) certifying this action as a class action and certifying the Securities Act Class and the Exchange Act Subclass defined herein; (ii) appointing Mr. Mundy and Ms. Huang as Class Representatives; and (iii) appointing The Rosen Law Firm, P.A. as Class Counsel.

Dated: June 28, 2022                         Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/*Laurence Rosen*
Laurence Rosen
Phillip Kim
Yu Shi
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        yshi@rosenlegal.com

*Counsel for Plaintiffs and the Proposed Class*

20