# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re NIO, Inc. Securities Litigation* | Case No. 1:19-cv-01424-NGG-JRC |

DECLARATION OF
DR. ADAM WERNER
June 21, 2022

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     PROFESSIONAL BACKGROUND AND EXPERIENCE ...................................................1

III.    SUMMARY OF OPINIONS AND FINDINGS....................................................................3

IV.     BACKGROUND ...........................................................................................................4

        A.      About NIO ......................................................................................................4

        B.      About NIO ADSs ............................................................................................6

V.      EFFICIENCY OF THE MARKET FOR NIO ADSs ..........................................................6

        A.      Market Efficiency in Finance Academia and Economic Theory.............................6

        B.      The Legal Foundation and Application of Market Efficiency................................9

        A.      The *Cammer* Factors and Their Application in This Case ...................................10

                1.      Cammer Factor 1: Average Weekly Trading Volume................................10

                2.      Cammer Factor 2: Analyst Coverage.........................................................11

                3.      Cammer Factor 3: Market Makers and Listing on the NYSE ...................13

                4.      Cammer Factor 4: SEC Form F-3 Eligibility............................................14

                5.      Cammer Factor 5: Price Reaction to New Information .............................16

        B.      The *Unger/Krogman* Factors Considered........................................................29

                1.      Market Capitalization................................................................................29

                2.      Float .......................................................................................................30

                3.      Bid-Ask Spread.......................................................................................31

VI.     COMMON DAMAGE METHODOLOGY .........................................................................32

        A.      Section 10(b) Damages Methodology ................................................................32

        B.      Section 11 Damages Methodology ....................................................................35

VII.    CONCLUSION............................................................................................................36

VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS.................................................37

I, Adam Werner, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief. If called to testify, I could and would testify competently to the following facts.

## I.    INTRODUCTION

1.    I was asked by The Rosen Law Firm, P.A, counsel for Plaintiffs, to determine whether the American Depositary Shares ("ADSs") of NIO Inc., ("NIO" or the "Company") traded in an efficient market during the period from October 8, 2018 through March 5, 2019, inclusive (the "Relevant Period").

2.    In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology that can be calculated on a class-wide basis for all Class members in connection with their claims under Section 11 and Section 15 of the Securities Act of 1933 (the "Securities Act") as well as Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)").

3.    I understand that as an expert witness in this proceeding, my duty in providing my declaration is to the Court and that this duty overrides any obligation to the parties who have engaged me, from whom I have received instructions or compensation. I confirm that I have complied with this duty.

## II.    PROFESSIONAL BACKGROUND AND EXPERIENCE

4.    I am currently a Lecturer in economics at the Orfalea College of Business at California Polytechnic State University San Luis Obispo (Cal Poly) where I have taught managerial economics to graduate students, and international finance, macroeconomics and microeconomics to undergraduates. I am also an affiliated expert at Crowninshield Financial Research, Inc. ("Crowninshield"). Prior to accepting my lecturer position at Cal

1

Poly and being affiliated with Crowninshield, I spent 16 years working for consulting firms including Cornerstone Research, CRA International, and NERA. I have been retained by both plaintiffs and defendants to consult on matters pertaining to market efficiency, materiality and loss causation, damages, investment banking, financial valuation, security issuance, bankruptcy, and options backdating. My expert opinions have been accepted in Federal, State, and Bankruptcy courts within the United States as well as courts in Australia and Canada. I have lectured frequently to attorneys on the topic of damage estimation and settlements in securities class actions. I have also spoken on the estimation of capital rates in emerging economies at a conference organized by the University of Texas School of Law.

5. I hold a Ph.D. in Finance (1999) from Northwestern University's Kellogg Graduate School of Management. While at Kellogg, I taught M.B.A. classes in corporate finance, and futures and options. I was also awarded a University Scholarship during my time at Kellogg. Prior to graduate school, I served as a Research Assistant at the Federal Reserve Bank of Cleveland. My full Vitae including prior testimony is attached as Exhibit-1 to this declaration.

6. A list of documents I reviewed in forming my opinion in this matter is set forth in Exhibit-2 to this declaration.

7. Crowninshield is currently being compensated at $675 per hour for my ongoing work on this matter. Additional Crowninshield consultants have assisted me with my work at rates ranging from $250 per hour to $500 per hour. This compensation is not contingent on the outcome of this matter.

III.    **SUMMARY OF OPINIONS AND FINDINGS**

**OPINION 1: NIO ADSs traded in an efficient market throughout the Relevant Period.**

8.    My opinion is based on the following observations, analyses, and findings from the Relevant Period:

a.    The average weekly trading volume of NIO ADSs as a percentage of ADSs outstanding was 45.68%, higher than the 2% required to meet the strong-presumption-of-efficiency benchmark set forth by the court in *Cammer v. Bloom*;[1]

b.    At least 7 securities analysts covered NIO and there were at least 109 news stories, press releases, and SEC filings published about the Company;

c.    NIO ADSs traded on the New York Stock Exchange ("NYSE") and had at least 77 market makers;

d.    At least 108 institutional investors owned NIO ADSs, as indicated by public filings;

e.    NIO was eligible to file an F-3 registration statement with the SEC throughout the Relevant Period;

f.    Event study analysis indicates that a cause-and-effect relationship existed between the release of new Company-specific information and movements in the price of NIO's ADSs (*i.e.,* the stock price exhibited statistically significant abnormal returns);

g.    The market capitalization of the NIO ADSs averaged $1.33 billion over the Relevant Period, which was larger than the total market capitalization of at least 69% of all other publicly traded companies in the U.S.;

---

[1] *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

3

h.  NIO's float averaged $1.28 billion and was larger than the total market capitalization of at least 68% of all other publicly traded companies in the U.S.;

i.  NIO's ADSs had an average bid-ask spread[2] of 0.17% compared to the average bid-ask spread of 0.65% for all stocks in the CRSP database.

**OPINION 2: With expert assistance, the finder of fact in this matter will be able to compute damages using a common class-wide methodology that applies to the calculation of damages for each and every Class member.**

## IV.   BACKGROUND

### A.   About NIO

9.  NIO was founded in China in 2014.[3] The Company designs, jointly manufactures, and sells electric vehicles ("EV") in China's premium electric vehicle segment.[4] In June 2018, prior to the start of the Relevant Period, the Company began delivering its first EV, the ES8.[5] In December 2018, during the Relevant Period, the Company launched its second EV, the ES6, to be delivered beginning in March 2019.[6]

10.  During the Relevant Period, NIO operated under an agreement with Jianghuai Automobile Group Co. Ltd ("JAC Motors"), a state-owned automobile manufacturer in China.[7] JAC

---

[2] A bid-ask spread is the price at which a market maker (intermediary) is willing to buy and sell a security. For example, if one is making a market in Company Y's security, one might be willing to buy (bid) security of Company Y at $10 per share and sell (ask) the same security at $10.15 per share. In this instance, the bid-ask spread would be $0.15, or approximately 1.5%.

[3] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 7.

[4] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 59.

[5] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 59.

[6] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 59.

[7] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 8.

Motors manufactured both of NIO's EVs at its Hefei manufacturing plant.[8] Under the agreement, NIO paid JAC Motors on a per-vehicle basis and was required to compensate JAC Motors for any operating losses associated with manufacturing NIO's EVs for the first 36 months of production.[9]

11.    On September 12, 2018, NIO completed its IPO in the U.S.  In the IPO, 160,000,000 ADSs were sold, raising $1.099 billion in net proceeds.[10] According to the registration statement, NIO planned to use 40% of the net proceeds for R&D of products, services, and technology; 25% for selling, marketing, and development of sales channels; 25% for the development of its new Shanghai manufacturing facility; and 10% for general corporate purposes and working capital.[11]

12.    Plaintiffs allege that, contrary to its registration statement representations, NIO had not begun construction on its Shanghai Facility at the time of its IPO.[12] Furthermore, Plaintiffs allege that NIO failed to disclose that the construction of the Shanghai Facility would be dependent on the Company having sufficient revenue and cash flows and that NIO would abandon this project if these criteria were not met.[13]

13.    Plaintiffs allege that the truth about NIO and its Shanghai Facility was revealed on March 6, 2019, when the Company disclosed that it had terminated its plans to construct the

---

[8] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 8.

[9] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 8.

[10] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. F-11.

[11] NIO Inc., Form 424B4, filed September 12, 2018, p. 63.

[12] Second Amended Class Action Complaint for Violation of the Federal Securities Laws, filed September 18, 2020 ("Complaint"), ¶10.

[13] Complaint, ¶10.

facility due to a yet-to-be-finalized government policy.[14] Plaintiffs also allege that certain market participants discussed the real reason for the construction termination, which was that the Company had cash shortages and underwhelming sales.[15]

### B.    About NIO ADSs

14.    Throughout the Relevant Period, NIO's ADSs traded on the NYSE under the trading symbol NIO.[16] The price of NIO's ADSs at the start of the Relevant Period was $6.04 per ADS.[17] NIO's ADS price peaked at $10.16 on March 5, 2019. By March 7, 2019, the price of NIO ADSs fell to $7.09 per share, a loss of 30.22% from its Relevant Period peak.

## V.    EFFICIENCY OF THE MARKET FOR NIO ADSs

### A.    Market Efficiency in Finance Academia and Economic Theory

15.    The efficient market hypothesis is the foundation of modern finance theory. In essence, a security trades in an efficient market when all publicly available information is incorporated in the security price and any new information that impacts the economic outlook of the firm gets quickly reflected in its security price. In over 50 years' worth of academic articles, financial economists have used event study analysis to evaluate market efficiency by examining how new information affects securities prices.[18] Event studies are a set of analytical methods used to measure the response of security prices to typical corporate news events such as earnings releases, merger announcements, guidance

---

[14] Complaint, ¶67.

[15] Complaint, ¶ ¶71-73.

[16] NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019, p. 129.

[17] Share data obtained from the Center for Research in Security Prices ("CRSP").

[18] *See*, *e.g.*, "The Event Study Methodology Since 1969," by John J. Binder, *Review of Quantitative Finance and Accounting*, vol. 11, 1998, pp. 111-137.

revisions, etc., after controlling for, among other things, market-wide factors. Campbell *et al.* [1997] provide a detailed description of the methodology and document its wide use in academic research.[19]

16.     Furthermore, event study analysis has formed the basis for assessing loss causation and artificial inflation in securities class actions.[20] Gold *et al*. [2017] write that financial economists generally accept and widely use the methodology in forensic applications.[21]

17.     While financial economists rely on event study analysis as direct evidence demonstrating security price response to new information, they accept other factors as tending to support the existence of an efficient market for a security. For example, financial economists have argued that trading volume is correlated with a market's efficiency such that the higher the trading volume, the more likely it is to be efficient.[22]

18.     Financial economists also believe that the number of analysts that follow a company is related to the market efficiency of the company's security. This is based on the theory that:

> [a]nalysts gather and independently generate information about companies and disseminate such information to their clients (e.g., in the form of earnings forecasts

---

[19] "Event-Study Analysis," by John Campbell et al., Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.

[20] *See*, *e.g.*, "Materiality and Magnitude: Event Studies in the Courtroom," by David I. Tabak and Frederick C. Dunbar, Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2001.

[21] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook*: *The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2017.

[22] *See*, *e.g.*, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 291.

and recommendations). Accordingly, it can be expected that the larger the number of analysts following a security, the more efficiently it is traded.[23]

19.     Put another way, the more analysts covering a security, the more likely it is that the market for that security will timely incorporate new information in that security's price.

20.     Similarly, financial economists have considered the market value of a firm and its relationship with market efficiency.[24] Larger companies tend to attract more analyst and news media coverage and gain the attention of a greater number of investors. All of these characteristics, which accompany a large market capitalization, promote, and therefore tend to support, market efficiency.

21.     A narrow bid-ask spread[25] of a particular security is also often associated with efficiency. In academia, a security's bid-ask spread is frequently used as a measure of liquidity[26] or cost of trading.[27] All things equal, a narrower bid-ask spread implies that there is a sufficient demand for and supply of an asset—the number of investors willing to buy or sell a security. Thus, the cost of executing a trade is low. A lower cost of trading implies that there are fewer impediments for investors to trade on new information.

---

[23] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 292.

[24] *See, e.g.*, "The Cross-Section of Expected Stock Returns," by Eugene F. Fama and Kenneth R. French, *The Journal of Finance*, vol. 47, no. 2, 1992, pp. 427-465 (discussing how the role of size explains returns).

[25] The bid-ask spread is the amount by which the ask price (the lowest price that a seller is willing to accept) for a share of a security exceeds the bid price (the highest price that a buyer is willing to pay).

[26] Liquidity refers to the degree to which investors can buy and sell a security in the market without affecting the price.

[27] *See, e.g., Trading & Exchanges: Market Microstructure for Practitioners*, by Larry Harris, Oxford University Press, 2003, pp. 420-441.

### B.      The Legal Foundation and Application of Market Efficiency

22.      In *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989) ("*Cammer*"), the seminal decision on demonstrating market efficiency, the court's definition of efficiency was generally consistent with how financial economists and the academic community define efficiency.[28] The *Cammer* court then related efficiency to the reliance element of securities fraud claims and the applicability of the fraud-on-the-market doctrine, stating:

> [a]s relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in 'efficient markets' (*i.e.*, markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price).[29]

23.      Just one year earlier, the United States Supreme Court confirmed its understanding of the efficient market theory focusing on the same fundamental characteristic of market efficiency in the context of the availability of the fraud-on-the-market doctrine for establishing the reliance element of a securities fraud claim stating:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business …[30]

---

[28] *Cammer*, 711 F.Supp. at 1276, n. 17 (quoting *Securities Fraud and Commodities Fraud*, by Alan Bromberg & Lewis Lowenfels, §8.6 (Aug. 1988)) ("An efficient market is one which rapidly reflects new information in price.")); *id*. at 1280, n. 25 (quoting "Efficient Capital Markets: A Review of Theory and Empirical Work," by Eugene F. Fama, *The Journal of Finance*, vol. 25, no. 2, 1970) ("A market in which prices always 'fully reflect' available information is called 'efficient'").

[29] *Cammer*, 711 F.Supp. at 1273, n. 11.

[30] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988); and *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 458 (2013) ("[t]he fraud-on-the market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company . . .").

24. In advance of laying out a number of criteria that courts should examine in determining market efficiency, the *Cammer* court credited financial experts such as Bromberg and Lowenfels. The *Cammer* court explicitly acknowledged the importance of a listing on a developed exchange and the implications of such a listing for market efficiency:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[31]

## A. The *Cammer* Factors and Their Application in This Case

25. The *Cammer* court applied five factors to determine market efficiency.[32] Widely-accepted academic finance literature provides the economic basis for these factors as indicia of market efficiency. The five factors considered are (1) a security's/firm's average weekly trading volume; (2) analyst coverage; (3) number of market makers; (4) eligibility to file an SEC Form S-3; and (5) price reaction to new information.

### 1. Cammer Factor 1: Average Weekly Trading Volume

26. The first *Cammer* factor examines whether a security's "average weekly trading volume … [would be] in excess of a certain number of shares."[33] More specifically, the court credited Bromberg who recognized that "turnover measured by average weekly trading of

---

[31] *Cammer,* 711 F. Supp. at 1292.

[32] *Cammer,* 711 F. Supp. at 1286-87.

[33] *Cammer,* 711 F. Supp. at 1286 ("the reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest …. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information").

2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[34]

27.    During the Relevant Period, NIO's weekly trading volume ranged between 24,712,517 and 270,596,538 shares of ADS.[35] As shown in Exhibit-3, the average weekly trading volume of NIO's ADSs during the Relevant Period as a percentage of its ADSs outstanding was 45.68%. This level of weekly average trading volume exceeds the *Cammer* benchmark of 2% necessary for a "strong presumption" of market efficiency and exceeds the benchmark of 1% necessary for a "substantial presumption" of market efficiency.[36] Thus, one can make a strong presumption of market efficiency for NIO ADSs during the Relevant Period.

### 2.    *Cammer Factor 2: Analyst Coverage*

28.    The *Cammer* Court found that "it would be persuasive [if] a significant number of securities analysts followed and reported on a company's stock." [37] If investment professionals were closely monitoring a firm's information and subsequently making buy/sell recommendations to their clients based on that information, "the market price of the stock would be bid up or down to reflect the [company's] financial information…as interpreted by the securities analysts."[38] This suggests that the more analysts who followed a security, the greater the likelihood that a security traded in an efficient market. Barber *et*

---

[34] *Cammer,* 711 F. Supp. at 1293.

[35] Volume data obtained from CRSP.

[36] This corresponds to 84,045,203 shares traded per week during the Relevant Period on average.

[37] *Cammer,* 711 F.Supp. at 1286.

[38] *Cammer,* 711 F.Supp. at 1286.

*al.* [1994] found that coverage by one or two analysts strengthened the presumption of efficiency for a publicly traded stock.[39]

29. During the Relevant Period, at least 5 firms/analysts following NIO issued recommendations and/or research reports. The firms were Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, and UBS.[40] These firms/analysts released at least 26 reports and recommendations during the Relevant Period. An additional 2 analysts, Goldman Sachs and Wolfe Research, attended NIO's earnings conference calls. *See* Exhibit-4 attached hereto.

30. The various avenues of news media coverage also facilitate the flow of material information to the marketplace, which promotes efficiency. Such avenues of information dissemination include company press releases.[41]

31. During the Relevant Period, over 109 news stories, press releases, and SEC filings featuring NIO appeared in financial publications and newswires, including *Dow Jones Institutional News, GlobeNewswire, PR Newswire*, and *Reuters.*

32. The number of analysts covering NIO supports a finding of market efficiency. In addition, the wide dissemination of information about NIO from company press releases and from well-regarded and widely-read sources in the news media such as *Dow Jones Institutional News, GlobeNewswire, PR Newswire,* and *Reuters* also supports a finding of market efficiency.

---

[39] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994.

[40] Analyst reports obtained from *Refinitiv Eikon*.

[41] *See*, *e.g., Cammer*, 711 F. Supp at 1283, n. 30, citing that the company "issued numerous press releases concerning its business operations …."

### 3.    *Cammer Factor 3: Market Makers and Listing on the NYSE*

33.    The third factor considered by the *Cammer* court to indicate market efficiency is that a security had numerous market makers.[42] The *Cammer* court stated, "the existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[43]

34.    A security with a large number of market makers would indicate that many market participants are trading in that security, thereby increasing liquidity and decreasing trading costs. It follows that a large number of market makers indicates efficiency of the market for a particular security. During the Relevant Period, there were at least 77 market makers for NIO ADSs, including well-known firms such as: Barclays, Deutsche Bank, Goldman Sachs, Morgan Stanley, and UBS.[44] *See* Exhibit-5 for a list of market makers during the Relevant Period. Again, citing Bromberg and Lowenfels, the *Cammer* court noted that "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption."[45]

35.    As the *Cammer* court considered market-making infrastructure as indicative of the efficiency of a security's market, that NIO ADSs traded on the NYSE during the Relevant

---

[42] *See, e.g.,* "The Fraud-on-the-Market Theory and The Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 291.

[43] *Cammer*, 711 F. Supp. at 1286-1287.

[44] Market Maker data obtained from Bloomberg.

[45] *Cammer*, 711 F. Supp at 1293 (quoting Bromberg & Lowenfels, Securities Fraud and Commodities Fraud §8.6 (1988))

Period further supports a finding of market efficiency. The NYSE is one of the most renowned, most liquid, and most efficient stock trading forums in the world. Unlike NASDAQ or over-the-counter markets, the NYSE employs a "designated market maker (DMM)," similar to a specialist, that is charged with ensuring that there is a well-functioning market. Thus, for securities that trade on the NYSE, there is always one entity that acts as a market maker.

36.    Another indication of market efficiency is the presence of institutional investors – sophisticated and professional full-time investors – in the market, as economists presume them "to be better informed about the securities they hold and better able to interpret new information than individual investors."[46]

37.    During the Relevant Period, at least 108 unique institutional investors owned NIO ADSs.[47] The presence of at least 108 sophisticated professional investors is further support for finding that the market for NIO ADSs was efficient during the Relevant Period.

38.    The existence of market makers and a large number of unique institutional investors further supports that NIO ADSs traded in an efficient market.

### 4.    *Cammer Factor 4: SEC Form F-3 Eligibility*

39.    The fourth *Cammer* factor is a firm's ability to file a Form S-3 (or the equivalent Form F-3 with respect to foreign private issuers) Registration Statement. For a company to be

---

[46] "The Fraud-on-the-Market Theory and The Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 292. For discussion of the role of institutional investors in incorporating information into equity prices, *see*, *e.g.*, "The Influence of Analysts, Institutional Investors, and Insiders on the Incorporation of Market, Industry, and Firm-Specific Information into Stock Prices," by Joseph D. Piotroski and Darren T. Roulstone, *The Accounting Review*, vol. 79, no. 4, 2004, pp. 1119-1151.

[47] According to filings that reported holdings, there were 108 unique institutions that held NIO ADSs  as of at least one of the following reporting periods: December 31, 2018. There may have been additional institutions that held NIO ADSs during the Relevant Period, though not on the quarterly reporting dates.

eligible to file a Form S-3, the Securities and Exchange Commission ("SEC") requires 12 months of filings and at least $75 million of float. A company with less than $75 million of float and 12 months of filings is eligible to file a Form S-3 registration so long as the company has "a class of common equity securities listed and registered on a national securities exchange, and the issuers do not sell more than the equivalent of one-third of their public float in primary offerings over any period of 12 calendar months."[48] Despite the fact that the SEC has loosened the $75 million float requirement, courts continue to focus on the $75 million float benchmark when analyzing this *Cammer* factor.[49] As a foreign company, NIO would not file a Form S-3, and would be instead file a Form F-3 with the same filing requirements.

40.    The *Cammer* court noted that S-3 registration eligibility is indicative of market efficiency because the filing requirement ensured that financial data are available to market participants, and the public float requirement indicated that many market participants would have examined the information.[50]

> Proposed Form S-3 recognizes the applicability of the efficient market theory to the registration statement framework with respect to those registrants which usually provide high quality corporate reports, including Exchange Act reports, and whose corporate information is broadly disseminated, because such companies are widely followed by professional analysts and investors in the market place. Because of the foregoing

---

[48] "Revisions to The Eligibility Requirements for Primary Securities Offerings on Forms S-3 And F-3," SEC Release No. 33-8878, December 19, 2007.

[49] *See*, *e.g.*, *Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012).

[50] *Cammer*, 711 F. Supp. at 1284-85.

> observations made by the SEC, the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient.[51]

> The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document.[52]

> Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[53]

41. NIO was eligible for F-3 registration for all Relevant Period trading days. During the Relevant Period, NIO float ranged in value from $0.93 billion to $1.81 billion, which was above the minimum requirement for S-3 registration. The Company also regularly filed financial reports with the SEC throughout the Relevant Period. Therefore, to the extent that F-3 registration eligibility indicates company characteristics associated with market efficiency, NIO clearly possessed those particular characteristics throughout the Class Relevant.

### 5. Cammer Factor 5: Price Reaction to New Information

42. The fifth factor cited in *Cammer* suggests "it would be helpful to . . . [have] empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[54] The empirical factor was cited by the *Cammer* court as "one of the most convincing ways to demonstrate efficiency."[55]

---

[51] *Cammer*, 711 F. Supp. at 1284-85.

[52] *Cammer*, 711 F. Supp. at 1285.

[53] *Cammer*, 711 F. Supp. at 1287.

[54] *Cammer,* 711 F. Supp. at 1287.

[55] *Cammer,* 711 F. Supp. at 1291.

16

43. The empirical test I conducted was an event study investigating whether the market for NIO ADSs was efficient, specifically with respect to major news events during the Relevant Period (which includes the alleged corrective disclosure). Significant price reactions to such events would demonstrate market efficiency, not only generally, but also specifically with respect to the information at issue in this case. Furthermore, if alleged corrective information events also elicit statistically significant price reaction(s), this would be evidence of that the price of NIO ADSs was impacted by the allegation-related information.

### a.    *Event Study Tests of Market Efficiency*

44. The event study is the paramount tool for testing market efficiency. Professor Fama states that:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.[56]

45. Since the seminal papers by Ball and Brown [1968] and Fama *et al.* [1969] first introduced event study analysis to a broader audience of accounting and finance researchers, event studies have "become ubiquitous in capital markets research."[57] Campbell *et al.* [1997] provide a detailed background and description of how event studies are used in econometric

---

[56] "Efficient Capital Markets: II," by Eugene F. Fama, *The Journal of Finance*, vol. 46, no. 5, 1991, p. 1607.

[57] "Event Studies: A Methodology Review," by Charles J. Corrado, *Accounting and Finance*, vol. 51, 2011, p. 207.

analysis.[58] Gold *et al*. [2017] write about how the methodology is generally accepted and widely used in forensic applications.[59]

46.     In its application, an event study can measure how much a firm's security price rises or falls in response to new information. An event study first calculates the difference between the actual return on an individual security and the return predicted by the market model. This difference is called an "abnormal return" (or residual return). It measures the impact of new, firm-specific information on a firm's security price. If the abnormal return over an event period is deemed to be statistically significant, it indicates that the security price movement was likely caused by firm-specific information and therefore cannot be attributed to market and/or industry factors, or to random volatility alone. Indeed, a cause-and-effect relationship between new material information and the reaction in the security price establishes market efficiency.

47.     Not every piece of new information will result in a statistically significant abnormal security return. To the extent that the new information may have been expected, or the valuation impact of the new information is appropriately modest, the appropriate abnormal price return should be statistically insignificant. As such, a finding of non-significance does not necessarily establish inefficiency as a modest non-significant security price reaction

---

[58] "Event-Study Analysis," by John Campbell et al., Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.

[59] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2017.

may be the appropriate and efficient security price reaction to a particular information event.[60]

48.     For example, if a company announces earnings that are in-line with analysts' and investors' expectations, even though the announcement contains important information, it may not change the total mix of information sufficiently enough to elicit a statistically significant security price reaction on that date. Appropriate candidate events for inclusion in a market efficiency event study, therefore, are events on which company-specific information was released that is new, unexpected, not confounded by major countervailing news, and is of such import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance.

### (1)     Selection of NIO Market Efficiency Events

49.     Not only did the *Cammer* Court single out the empirical factor as "one of the most convincing ways to demonstrate efficiency," but it also recognized the special importance of the information allegedly misrepresented that is the subject of the litigation:

> The central question under the fraud on the market theory is whether the stock price, at the time a plaintiff effected a trade, reflected the 'misinformation' alleged to have been disseminated.[61]

50.     By focusing an event study on disclosures of information related to the allegations in the Complaint, I have ascertained that the market for NIO ADSs was efficient, not only generally, but also with respect to the particular information at issue in this case. Consequently, the empirical behavior of NIO ADSs following the disclosure of allegation-

---

[60] "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," by Alon Brav and J. B. Heaton, *Washington University Law Review*, vol. 93, no. 2, 2015, p. 602.

[61] *Cammer*, 711 F.Supp. at 1282

related information best determines whether the market for NIO ADSs was efficient for purposes of the fraud-on-the-market principle.

51. An event study testing market efficiency does not require a comprehensive identification of all events during the Relevant Period, including all of those cited in the Complaint, on which new material allegation-related information was disclosed.[62] Further, because of the high threshold for statistical significance, it is also important to note that new information may be economically significant without being statistically significant.

52. The following are amongst the event dates identified where important, relevant and material information was disclosed:

    a. **October 9, 2018:** On October 9, 2018 multiple news outlets disclosed that Baillie Gifford & Co. (the largest investor in Telsa, Inc.) had taken a 11.4% stake in NIO, worth $515 million.[63] News media noted that this disclosure was a positive development for the Company's reputation.[64]

    b. **November 6, 2018:** On November 6, 2018 NIO announced its Q3 FY 2018 financial results.[65] Analysts and market participants highlighted that the Company's results were in-line with expectations. Deutsche Bank analysts wrote that while 3Q18 losses were widening, NIO's "core loss level is in line with

---

[62] A comprehensive identification of all disclosures of information related to the alleged fraud is beyond the scope of this declaration and is properly addressed in an analysis of loss causation and damages.

[63] "NIO Jumps after Big Tesla Investor Discloses 11% stakeShares of NIO...," press release, *Theflyonthewall.com*, October 9, 2018.

[64] "NIO Jumps after Big Tesla Investor Discloses 11% stakeShares of NIO...," press release, *Theflyonthewall.com*, October 9, 2018.

[65] "NIO Inc. Reports Unaudited Third Quarter 2018 Financial Results," Company press release, *GlobeNewswire*, November 6, 2018.

expectations."[66] JPMorgan similarly stated that NIO's "3Q18 result (non-GAAP earnings) today was broadly in line with JMPe".[67] Morgan Stanley repeated the sentiment, explaining that NIO's reported results were "in line as we expect."[68] While earnings announcements are major news events, this particular earnings announcement is unlikely to elicit a statistically significant price reaction given that market participants were unsurprised by the reported financial results. In an efficient market, one would expect a non-statistically significant price reaction to this news.

c. **November 30, 2018:** On November 29, 2018, after the close of trading, NIO issued a press announcing that Ms. Padmasree Warrior, the chief development officer of NIO and the chief executive officer of NIO USA, "has decided to resign from her roles with the Company for personal interests, effective from December 17, 2018."[69] In response to this development, Deutsche Bank analysts, in a report titled "CDO/US CEO Resignation Unlikely to Affect Operation and Outlook" wrote "Since NIO's technology direction is already well set and its Silicon Valley office has been up and running for a few years already, we do not think that Ms. Warrior's departure would bring any disruption to NIO's daily operation or R&D efforts."[70]

---

[66] "3Q18 Loss Widening, but Core Loss Level is In Line with Our Expectations," by Vincent Ha and Yan Lin, Deutsche Bank, analyst report, November 7, 2018, p. 1.

[67] "3Q18 Result First Take," by Nick Lai et al., JPMorgan, analyst report, November 6, 2018, p. 1.

[68] "3Q18 Results in Line," by Jack Yeung, Morgan Stanley, analyst report, November 6, 2018, p. 1.

[69] "NIO Inc. Announces Management Change," Company press release, *GlobeNewswire*, November 29, 2018.

[70] "CDO/US CEO Resignation Unlikely to Affect Operation and Outlook," by Vincent Ha and Yan Lin, Deutsche Bank, analyst report, November 30, 2018, p. 1.

While management changes are often major news events, this particular management change did not affect the market's perception of the Company's ability to operate and deliver on its goals. Thus, in an efficient market, one would expect a non-statistically significant price reaction to this news.

d. **March 6-7, 2019:** On March 5, 2019, after the close of trading, NIO announced in its Q4 and FY 2018 financial results press release that it had terminated its plan for constructing the Shanghai Facility.[71] During the conference call with investors, NIO explained that the reason for the plan's termination due to new policies introduced by Chinese "government authorities." [72] Analysts and market participants noted that the Company's reported financial results were disappointing and that the termination of the plan to construct the Shanghai Facility was a negative surprise.[73] Reactions from market participants continued onto the next trading day, March 7, 2019.[74]

(2)    **Market Model**

53.    A market model is used to determine how much of a company's security return on each event was driven by company-specific information as opposed to market and peer group factors. The market model involves running a regression to determine how NIO ADSs typically behaved in relation to the overall stock market and industry-specific factors. The

---

[71] "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," Company press release, *GlobeNewswire*, March 5, 2019, 4:14 PM.

[72] "Q4 2018 Nio Earnings Call," *Thomson Reuters*, conference call, March 5, 2019, 7:00 PM.

[73] "Chinese Electric Car Maker NIO Plunges Most Since its IPO," by Esha Dey and Ryan Vlastelica, *Bloomberg News*, March 6, 2019.

[74] "Why Shares of Chinese Electric-Car Maker NIO Fell 47% in March," press release, *TheMotleyFool*, March 7, 2019.

regression model is then used to determine how much of each event day's observed security price return can be explained by the market and industry-specific factors (the "expected return" or "explained return"). That is, a market model measures the expected return of the company's security over an event period after controlling for the overall market and industry-specific factors.

54. Next, the abnormal return (or residual return) is computed by subtracting the expected return from the observed security price return. The abnormal return is the return of the company's security after controlling for market effect and industry-specific factors.

55. I ran a regression modeling the return of NIO ADSs as a function of 1) a constant term, 2) the returns of the overall stock market, and 3) an industry index return. The regression model is formulaically expressed as follows:

$$Rs_t = \alpha + \beta_1 Rm_t + \beta_2 Ri_t + \epsilon_t$$

Where:

$Rs_t$ = the return of the ADSs;

$Rm_t$ = the return of the market index;

$Ri_t$ = the daily return of the industry index.

56. The regression model produces a "constant" term ("α") also referred to as an "intercept" term, and one or more slope coefficient, or "beta" ("β"). The betas quantify the sensitivity of a security's return to the return on the market index ("$\beta_1$") and industry index ("$\beta_2$"). A security with a market index beta of 1.0 is expected to increase (decrease) by one percent for each one percent increase (decrease) in the market index. Similarly, a security with a

23

market beta of 2.0 is expected to increase (decrease) by two percent for each one percent increase (decrease) in the market index.

57. To control for movements in the overall stock market, I used the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index ("Market Index"), which is a generally accepted measure of the performance of the overall stock market. The Market Index incorporates payment of dividends by the constituent companies. To control for industry-related factors, I used the S&P 500 Automobile Manufacturers Index[75] as the peer group index ("Industry Index").

58. Exhibit-6 presents the NIO return, Market Index return, and Industry Index return used in the regression model. NIO's ADS prices and trading volume on the event study dates are shown in Exhibit-7.[76]

59. Prior to running a regression, one must decide on an estimation period over which to measure the relationship between the security at issue and the corresponding market and industry indices. I ran the regression over the interval October 8, 2018 through October 8, 2019. In event study analysis, the choice of using a regression estimation period during the event window of interest is a widely used and generally accepted methodology.[77] The results of the regression are summarized in Exhibit-8.

---

[75] The S&P 500 Automobile Manufacturers Index is a widely-known index that tracks the performance of the largest publicly-traded electric vehicle companies in the U.S. This index was selected because NIO is an electric vehicle company, and its performance was likely affected by sector news for the electric vehicle industry.

[76] In my regression analysis, I use log returns $R_1 = \ln(P_1/P_0)$ rather than normal returns $R_1 = ((P_1-P_0)/P_0)$ where $P_1 =$ ending ADS price and $P_0 =$ beginning ADS price, as security returns are considered to be log normally distributed.

[77] "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window." ("Materiality and Magnitude: Event Studies in the Courtroom," by David I. Tabak and Frederick C. Dunbar, Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2001, p. 19.5.)

(3)      *t*-Test

60.    For each event, I conducted a statistical test called a *t*-test to determine whether NIO's abnormal return was statistically significant. If the absolute value of the "*t*-statistic," which is equal to the abnormal return on an event date divided by the standard deviation of all abnormal returns in the regression estimation, is greater than the critical *t*-statistic value of ±1.96, then the security price return is deemed statistically significant. That is, there is less than a 5% chance that the abnormal return was caused by random volatility alone, which is generally accepted to be so unlikely that the random volatility explanation can be rejected. If an event date's abnormal return is deemed to be statistically significant, one can conclude that the security price return was caused by company-specific information, rather than random volatility.

61.    The results of the event study are presented below and in Exhibit-9.

b.      ***Event Study Results***

(1)      **October 9, 2018**

62.    On October 9, 2018 multiple news outlets disclosed that Baillie Gifford & Co. (the largest investor in Telsa, Inc.) had taken a 11.4% stake in NIO, worth $515 million.[78] News media noted that this disclosure was a positive development for the Company's reputation.[79]

63.    On October 9, 2018, NIO's share price rose 20.17% (on a logarithmic basis), on volume of 38,464,354 shares traded. The Market Index return on that date was -0.18% and the Industry Index return was -4.16%. Based on the regression model, the expected portion of

---

[78] "NIO jumps after Big Tesla Investor Discloses 11% stakeShares of NIO...," press release, *Theflyonthewall.com*, October 9, 2018.

[79] "NIO jumps after Big Tesla Investor Discloses 11% stakeShares of NIO...," press release, *Theflyonthewall.com*, October 9, 2018.

the return on NIO ADSs was -1.74%. The difference between the actual return of 20.17% and the expected return of -1.71% is an abnormal return of 21.92%.

64. According to the event study, the abnormal return of 21.92% is associated with a *t*-statistic value of 5.13, which indicates that the residual return is statistically significant at the 99% confidence level. The *t*-statistic value of 5.13 indicates that the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal ADS return is deemed statistically significant and is indicative of market efficiency.

### (2)    November 6, 2018

65. On November 6, 2018 NIO announced its Q3 FY 2018 financial results.[80] Analysts and market participants highlighted that the Company's results were in-line with expectations. Deutsche Bank analysts wrote that while 3Q18 losses were widening, NIO's "core loss level is in line with expectations."[81] JPMorgan similarly stated that NIO's "3Q18 result (non-GAAP earnings) today was broadly in line with JMPe".[82] Morgan Stanley repeated the sentiment, explaining that NIO's reported results were "in line as we expect."[83] While earnings announcements are major news events, this particular earnings announcement is unlikely to elicit a statistically significant price reaction given that market participants were unsurprised by the reported financial results. In an efficient market, one would expect a non-statistically significant price reaction to this news.

---

[80] "NIO Inc. Reports Unaudited Third Quarter 2018 Financial Results," Company press release, *GlobeNewswire*, November 6, 2018.

[81] "3Q18 Loss Widening, but Core Loss Level is In Line with Our Expectations," by Vincent Ha and Yan Lin, Deutsche Bank, analyst report, November 7, 2018, p. 1.

[82] "3Q18 Result First Take," by Nick Lai et al., JPMorgan, analyst report, November 6, 2018, p. 1.

[83] "3Q18 Results in Line," by Jack Yeung, Morgan Stanley, analyst report, November 6, 2018, p. 1.

66. On November 6, 2018, NIO's share price fell 4.28% (on a logarithmic basis), on volume of 49,855,770 shares traded. The Market Index return on that date was 0.57% and the Industry Index return was 0.37%. Based on the regression model, the expected portion of the return on NIO ADSs was 0.48%. The difference between the actual return of -4.28% and the expected return of 0.48% is an abnormal return of -4.76%.

67. According to the event study, the abnormal return of -4.76% is associated with a $t$-statistic value of -1.12, which is not statistically significant. However, given the nature of news and the tenor of the market reactions, a non-statistically significant price response is consistent with market efficiency.

(3)     **November 30, 2019**

68. On November 29, 2018, after the close of trading, NIO issued a press announcing that Ms. Padmasree Warrior, the chief development officer of NIO and the chief executive officer of NIO USA, "has decided to resign from her roles with the Company for personal interests, effective from December 17, 2018."  In response to this development, Deutsche Bank analysts, in a report titled "CDO/US CEO Resignation Unlikely to Affect Operation and Outlook" wrote "Since NIO's technology direction is already well set and its Silicon Valley office has been up and running for a few years already, we do not think that Ms. Warrior's departure would bring any disruption to NIO's daily operation or R&D efforts." While management changes are often major news events, this particular management change did not affect the market's perception of the Company's ability to operate and deliver on its goals. Thus, in an efficient market, one would expect a non-statistically significant price reaction to this news.

69. On November 30, 2018, NIO's share price fell 1.03% (on a logarithmic basis), on volume of 10,994,730 shares traded. The Market Index return on that date was 0.68% and the

27

Industry Index return was 2.02%. Based on the regression model, the expected portion of the return on NIO ADSs was 1.07%. The difference between the actual return of -1.03% and the expected return of 1.07% is an abnormal return of -2.10%.

70.     According to the event study, the abnormal return of -2.10% is associated with a *t*-statistic value of -0.49, which is not statistically significant. However, given the nature of news and the tenor of the market reactions, a non-statistically significant price response is consistent with market efficiency.

(4)     <b>March 6-7, 2019</b>

71.     On March 5, 2019, after the close of trading, NIO announced in its Q4 and FY 2018 financial results press release that it had terminated its plan for constructing the Shanghai Facility.  During the conference call with investors, NIO explained that the reason for the plan's termination due to new policies introduced by Chinese "government authorities." Analysts and market participants noted that the Company's reported financial results were disappointing and that the termination of the plan to construct the Shanghai Facility was a negative surprise.  Reactions from market participants continued onto the next trading day, March 7, 2019.

72.     On March 6, 2019, NIO's share price fell 23.78% (on a logarithmic basis), on volume of 73,522,653 shares traded. The Market Index return on that date was -0.78% and the Industry Index return was -1.81%. Based on the regression model, the expected portion of the return on NIO ADSs was -1.94%. The difference between the actual return of -23.78% and the expected return of -1.94% is an abnormal return of -21.84%.

73.     According to the event study, the abnormal return of -21.84% on March 6, 2019 is associated with a *t*-statistic value of -5.12, which indicates that the abnormal return is statistically significant at the 99% confidence level. The *t*-statistic value of -5.12 indicates

28

that the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal ADS return is deemed statistically significant and is indicative of market efficiency.

74. On March 7, 2019, NIO's share price fell 12.20% (on a logarithmic basis), on volume of 52,469,571 shares traded. The Market Index return on that date was -0.75% and the Industry Index return was -0.85%. Based on the regression model, the expected portion of the return on NIO ADSs was -1.64%. The difference between the actual return of -12.20% and the expected return of -1.64% is an abnormal return of -10.56%.

75. According to the event study, the abnormal return of -10.56% on March 7, 2019 is associated with a $t$-statistic value of -2.47, which indicates that the abnormal return is statistically significant at the 95% confidence level. The $t$-statistic value of -2.47 indicates that the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal ADS return is deemed statistically significant and is indicative of market efficiency.

76. Over the two-day event window from March 6, 2019 to March 7, 2019, the two-day abnormal return for NIO ADSs was -32.40%, which is statistically significant at the 99% confidence level. The $t$-statistic value of -5.37 indicates that the two-day abnormal return was too severe to have been a random fluctuation. Consequently, the two-day abnormal ADS return is deemed statistically significant and is indicative of market efficiency.

(5)    **Cause and Effect Summary**

77. Based on the results of my tests which examined how NIO's ADSs reacted to new information, it is clear that based on this criterion, NIO's ADSs traded in an efficient market.

### B.    The *Unger/Krogman* Factors Considered

78.    In addition to evaluating market efficiency using the *Cammer* factors, I also analyzed three factors considered by the Fifth Circuit Court of Appeals in *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005) and the district court in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D.Tex. 2001) as indicative of market efficiency.

#### 1.    *Market Capitalization*

79.    Economists have often considered the market value of a firm and its relationship with market efficiency when attempting to determine market efficiency. Larger companies tend to attract more analyst and news media coverage and gain the attention of greater numbers of investors, including very large institutional investors. All these characteristics, which accompany a large market capitalization, promote market efficiency.

80.    The court in *Krogman* held that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[84] In addition, some investors such as pension funds are often restricted to owning securities whose market capitalization is sufficiently high.

81.    During the Relevant Period, NIO's average market capitalization was \$1.33 billion (*See* Exhibit-7), putting NIO in the 4th decile of U.S. companies by size – NIO's market capitalization was larger than the market capitalization of at least 69% of all other publicly-traded companies in the United States.[85]

---

[84] *Krogman*, 202 F.R.D. at 478.

[85] Using averaged month-end data from CRSP for October 2018 through February 2019, I grouped public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, NASDAQ, and ARCA while the 10th decile contains the smallest 10%.

82.    Consistent with the *Unger/Krogman* opinions, NIO's market capitalization throughout the Relevant Period is further evidence of market efficiency during the Relevant Period.

### 2.    Float

83.    NIO's ADS float averaged $1.28 billion during the Relevant Period. While float excludes shares held by insiders and affiliated corporate entities, NIO's ADS float was still larger than the total market capitalization of at least 68% of all other publicly traded companies in the U.S. The size of NIO's float is indicative of market efficiency.[86]

84.    Float can also be analyzed as a percentage of total shares outstanding as well as in absolute share and value terms. On average during the Relevant Period, there were 177.0 million ADSs in NIO's float and 183.0 million ADSs outstanding, resulting in an average float of 96.69% of ADSs outstanding.

85.    The magnitude of NIO's float is indicative of the efficiency of the market for its ADSs during the Relevant Period.

### 3.    Bid-Ask Spread

86.    A narrow bid-ask spread of a particular security is also often associated with efficiency. A narrow bid-ask spread implies that there is a large number of investors willing to buy or sell a security, thus the cost of executing a trade is lower, all else equal.

87.    I obtained from CRSP the daily closing bid and ask quotes for NIO ADSs during the Relevant Period. I measured the percentage bid-ask spread as the difference between the

---

[86] Using averaged month-end data from CRSP for October 2018 through February 2019, I grouped public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, NASDAQ, and ARCA while the 10th decile contains the smallest 10%.

bid and ask quotes, divided by the average of the bid and ask quotes.[87] Exhibit-7 presents NIO's bid-ask spread data.

88. The average bid-ask spread for NIO ADSs during the Relevant Period was 0.17% (*See* Exhibit-7). By comparison, the average month-end bid-ask spread over the course of the Relevant Period for all stocks in the CRSP database was 0.65%.[88]

89. NIO's average bid-ask spread was narrower than the average level among all other CRSP stocks. The bid-ask spread measure favors a finding of market efficiency.

## VI.   COMMON DAMAGE METHODOLOGY

90. Plaintiffs' counsel has asked me to opine on whether per share out-of-pocket damages could be measured for each Class member under Section 10(b) of the Exchange Act using a common methodology for all Class members.[89] Plaintiffs' counsel also requested that I describe how damages would be calculated under Section 11 of the Securities Act for Class members who purchased certain NIO ADSs issued pursuant to the registration statement filed on September 11, 2018.

### A.   Section 10(b) Damages Methodology

91. Nonetheless, the methodology a financial economist can employ to calculate individual and Class-wide damages stemming from various alleged misrepresentations and omissions will accommodate alternative potential determinations of liability. Economic analysis can be used to estimate the relationship between specific statements or sets of statements and

---

[87] "Price Reversals, Bid-Ask Spreads, and Market Efficiency," by Allen B. Atkins and Edward A. Dyl, *Journal of Financial and Quantitative Analysis*, vol. 25, no. 4, 1990.

[88] This calculation is based upon averaged month-end data from CRSP for October 2018 through February 2019.

[89] It should be noted that I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage. The loss causation analysis that will be necessary to actually calculate damages in the current case requires the full development of the record.

the subsequent effect on prices, in the case of affirmative statements, omissions, and/or corrective disclosures. As such, class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiffs can be calculated in a straightforward manner common to all Class members. Out-of-pocket damages can be measured as the difference between the amount of security price inflation at purchase and the amount of inflation in the security price at sale taking into account formulaic prescriptions in relevant case law and statutes, including, for example, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)) and the holding in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

92. Assuming a verdict for the Plaintiffs on the allegations of fraud, Section 10(b) per security damages can be measured as follows:

    i. First, valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish that the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of NIO ADSs to fall. This analysis, after controlling for potentially confounding non-fraud-related information, would determine if the alleged misrepresentations and omissions had caused the security prices to be artificially inflated, and that the corrective disclosure(s) caused the inflation to dissipate, in turn causing investor losses. This analysis would be used to measure the effect of a disclosure(s) on NIO ADSs' price and would apply on a class-wide basis.

    ii. Second, an inflation ribbon would be constructed, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of NIO ADSs on each day during the Relevant Period. An inflation ribbon is a time series of the difference between the actual security price observed in the marketplace, and the estimated price that the security would have traded at each day had there been full disclosure from the outset of the

33

Relevant Period, or but-for price. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Relevant Period, accounting for the alleged fraud-related residual price declines as they occurred. The difference between the inflation prior to a corrective disclosure and the inflation after that corrective disclosure is equal to the amount of inflation that is dissipated due to the corrective disclosure. Should it be determined that a disclosure(s) is not corrective, the methodology described herein can accommodate such a change and adjust per security damages accordingly. This analysis is commonly referred to as the "backcasting" method and would also apply on a class-wide basis.

iii.   Third, the measure of per security damages generally applied in 10b-5 cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss). That is, for each Class member, per security damages would be calculated as the difference between the inflation on Relevant Period date shares were purchased and the inflation on the date those same securities were subsequently sold (if during the Relevant Period) or held (if at the end of the Relevant Period). Pursuant to the PSLRA, for any securities sold during the 90-day period after the end of the Relevant Period, per security damages would be calculated as the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price from the final corrective disclosure date to the sale date. Also pursuant to the PSLRA, for any securities held 90 days or more beyond the final corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price over the 90 days following the final corrective disclosure. The calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the

34

same way for all Class members, applying the results of the Class-wide analyses described above to each Class member's trading data.

93. Consequently, each Class member's per security damages under Section 10(b) can be computed in the same way, common to all Class members, using readily available daily pricing information, in accordance with widely used and generally accepted methodologies and the PSLRA.

94. I have not yet been asked to calculate damages for any of the claims alleged on behalf of the Class, and such calculations will likely depend, in part, on the completion of discovery. However, the methodology described above is generally accepted and widely used for calculating damages under Section 10(b) consistently on a class-wide basis in securities class actions. To the extent that there are specific issues complicating the quantification of artificial inflation and damages, such as potential confounding information, these issues relate to the merits of the damages model – not whether damages can be calculated on a class-wide basis pursuant to a common methodology for the Class.

## B.    Section 11 Damages Methodology

95. Plaintiffs' counsel also requested that I describe how damages would be calculated under Section 11 of the Securities Act for Class members who purchased certain NIO ADSs issued pursuant to the IPO and either: a) sold those securities prior to the date of suit that first alleged claims under Section 11, May 10, 2019; 2) sold those shares after May 10, 2019; or 3) continue to hold such shares.

96. According to Section 11(e) of the Securities Act of 1933, statutory damages to investors are computed as follows:

> [T]he difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value

thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought."[90]

97.    As detailed in the excerpt from the statute above, Section 11 damages for any particular investor depend on several considerations, including: (i) when the security was purchased or acquired; (ii) the price at the time of purchase; (iii) whether the security was sold, and if so, when it was sold and for how much; and/or (iv) if held on the date of suit, the value of the security on that date.

301.    For any individual Class member who purchased certain NIO ADSs issued pursuant to the Registration Statement with damages claims under Section 11, that investor's recoverable loss under the statutory formula would be, for each security purchased, the difference between the lesser of (A) the investor's (i) actual purchase price of the security or (ii) that security's respective offering price, and (B) the investor's (i) actual sale price if the security were sold prior to the date suit was brought, or (ii) the price of the security on the day suit was brought if the investor continued to hold the security on the day suit was brought, or if the investor sold after the day the suit was brought at a lower price than the price of the security on the date of suit, or (iii) the actual sale price if the security was sold after the date of suit but before judgment, if the sale price was higher than the price of the security on the date of suit.

---

[90] Section 11 of the Securities Act of 1933.

## VII.   CONCLUSION

98.   Based on my analyses explained in detail above, I conclude that NIO ADSs traded in an efficient market with regard to publicly disclosed information during the Relevant Period.

99.   I also conclude that with expert assistance, the finder of fact in this matter will be able to compute damages using a common class-wide methodology that applies to the calculation of damages for each and every Class member.

## VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS

100.   My analyses and opinions are based on the information available as of the date of this declaration. Should any additional data or information become available subsequent to the submission of this declaration, I reserve the right to supplement or amend this declaration based on this new information.


Dated:   June 21, 2022

Adam Werner, PhD
Affiliated Expert,
Crowninshield Financial Research

37

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## EDUCATION

1998        Northwestern University, Kellogg Graduate School of Management
            Ph.D. in Finance

1992        Oberlin College
            B.A. in Economics

## TEACHING EXPERIENCE

2014 – Present        Cal Poly San Luis Obispo
                      Orfalea College of Business
                      San Luis Obispo, CA
                      Lecturer in Economics

## BUSINESS EXPERIENCE

2015 – Present        Crowninshield Financial Research

2018 – 2021          Pismo Beach Planning Commission

2009 – 2015          Gnarus Advisors/Berkeley Economic Consulting

2008 – 2009          LitiNomics

2004 – 2008          CRA International

2000 – 2003          National Economic Research Associates, Inc.

1998 – 2000          Cornerstone Research

1992 – 1993          Federal Reserve Bank

## PAPERS AND PUBLICATIONS

"The Impact of Underwriter Reputation on Equity Offering: An Empirical Study."
Thesis, 1999.

"The Long-Run Performance of Underwriters and its Impact on Seasoned Equity
Offerings." 1999.

"Dynamic Measures of Underwriter Reputation: A Study of IPO's." 1999.

"CAFE Economics: A Note on the Limits and Effectiveness of Fuel Economy
Regulation." With Stephen Sheppard, 1992.

38

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

"Trading Models Underestimate Securities Class Damages." with Narinder Walia, Law360, 2019.

"More 'Dark Pools" Deepen Litigation Issues." Law360, 2013.

"Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides." with Elaine Buckberg, Todd Foster and Ronald Miller, 2003.

"The Effects of the PSLRA and Subsequent Events on Securities Litigation." With Fred Dunbar and Todd Foster, prepared for the New York City Bar Association, 2003.

"The Energy Tax: Who Pays?" joint with Mark Schweitzer, in Federal Reserve Bank of Cleveland's Economic Commentary, 1993.

## PRESENTATIONS

"Cause or Effect: Are Settlement Statistics Driving Down Settlements?"  Presentation to Robbins Geller Rudman & Dowd, LLP in San Diego, CA on October 10, 2013, Wolf Popper, LLP in New York, NY on September 18, 2013, Abraham, Fruchter & Twersky, LLP in New York, NY on September 17, 2013, Robbins Geller Rudman & Dowd, LLP in Melville, NY on September 11, 2013, Entwistle & Cappucci, LLP in New York, NY on September 10, 2013, and Faruqi & Faruqi, LLP in New York, NY on September 10, 2013.

"The Economics of Securities Litigation." Sidley & Austin in Los Angeles, CA on March 14, 2007.

"The Global Cost of Capital." Panel discussion on valuing assets in foreign countries at the University of Texas School of Law VALCON conference in Las Vegas on February 8, 2007.

"Economic Damages in Securities Fraud Matters." NERA Luncheon Seminars with Alan Cox  given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Shareholder Class Actions: Calculation of Damages." Presentation to Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002, Marsh FINPRO in San Francisco, CA on September 18, 2002, Marsh Risk & Insurance Services in San Diego, CA on September 17, 2002 and Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Capital Formation: Class Action Litigation and Prevention." Speech and panel discussion focusing on securities class action litigation, which sometimes arise from

39

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

initial public offerings and/or market volatility in the aftermarket. Presented at the 2002 CALBIO Summit in San Diego, CA on April 23, 2002.

"Shareholder Class Actions after the NASDAQ Bubble." Speech given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Litigation: How Claims and Losses Are Valued." Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Recent Trends in Securities Litigation." "Basic Economic Analysis in Securities Class Action" and "Challenging the Efficient Market Assumption in Securities Class Action Matters." presented to Cooley Godward in San Diego, CA on November 28, 2001. "Recent Trends in Securities Litigation." presentation with Marcia Mayer given at Howard, Rice, Nemerovski, Canady, Falk & Rabkin in San Francisco, CA on November 27, 2001.

"Recent Trends in Securities Litigation." presentation given to Marsh USA in Denver, CO on November 8, 2001, and Thelen, Reid & Priest in Los Angeles, CA on November 6, 2001.

"Financial Economics in Litigation." speech presented to Simpson, Thacher & Bartlett in Palo Alto, CA on July 31, 2001, Baker & McKenzie in San Diego, CA on July 18, 2001, Brobeck, Phleger & Harrison in San Francisco, CA on June 25, 2001 and to Latham & Watkins in San Francisco, CA on June 26, 2001.

"Economic Analysis in Securities Fraud Cases." Speech with Alan Cox delivered to Morrison & Forester, San Francisco, CA on July 25, 2001.

"Recent Trends: Shareholder Class Actions Five Years After the PSLRA." speech presented to Shearman & Sterling in San Francisco, CA on May 23, 2001, O'Melveny & Myers in Los Angeles, CA on May 30, 2001 and Gray, Cary, Ware & Freidenrich in San Diego, CA on June 6, 2001.

## EXPERT REPORTS AND TESTIMONY

*In Re: Omega Healthcare Investors, Inc. Securities Litigation*. Issued a declaration (2022) and provided deposition testimony (2022) on market efficiency in a securities class action. (Southern District of New York).

*Andrew Trampe v. CD Projekt S.A.* Issued a declaration (2022) on aggregate damages in a securities class action. (Central District of California).

40

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Securities and Exchange Commission v. Bradley C. Davis.* Issued a report (2021), a rebuttal report (2021) and provided deposition testimony (2021) on materiality in a case brought by the SEC (U.S.D.C. Central District of California).

*In re Global Brokerage, Inc. f/k/a/ FXCM Inc.* Issued a report (2020), a rebuttal report (2020), provided deposition testimony (2020) and testified (2020) on market efficiency in a securities class action. Issued a report (2021), a rebuttal report (2021) and provided deposition testimony (2021) on loss causation and damages (U.S.D.C. Southern District of New York).

*George Barney, et al. v. Nova Lifestyle, Inc., et al.* Issued a report on market efficiency in a securities class action (U.S.D.C. Central District of California, 2021).

*Peter Voulgaris, et al. v. Array Biopharma Inc., et al.* Issued a declaration on market efficient in a securities class action (District of Colorado, 2021).

*In re Innocoll Holdings Public Limited Company Securities Litigation.* Issued a report (2020), provided deposition testimony (2020) on market efficiency, and issued a rebuttal report (2020) in a securities class action (U.S.D.C. Eastern District of Pennsylvania).

*Michael Tietz, et al. v. Crytobloc Technologies Corp., et al.* Issued a report on price impact in a securities class action (Supreme Court of British Columbia, 2020).

*In re Horsehead Holding Corp. Securities Litigation.* Issues a report (2020) and provided deposition testimony (2020) on market efficiency in a securities class action (U.S.D.C. District of Delaware).

*Bing Li, et al. v. Aeterna Zentaris, Inc., et al.* Issued a declaration (2016), a report (2017), and provided deposition testimony (2017) on market efficiency in a securities class action. Issued a declaration (2019) a reply report (2019), and provided deposition testimony (2020) on loss causation and damages (U.S.D.C. District of New Jersey).

*In re Patriot National Inc. Securities Litigation.* Issued a declaration (2019) and a supplemental declaration (2019) on damages in a securities class action (U.S.D.C. Southern District of New York).

*Hamza Ramzan, et al. v. GDS Holdings Limited, et al.* Issued a declaration on NASDAQ microstructure in a securities class action (U.S.D.C. Eastern District of Texas, Marshall Division, 2019).

*Ivan Nibur, et al. v. SandRidge Mississippian Trust I, et al.* Issued a declaration (2018), a reply declaration (2018), a supplemental reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a

41

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

declaration (2019) a rebuttal declaration (2019), and provided deposition testimony (2019) on loss causation and damages (U.S.D.C. Western District of Oklahoma).

*In Re Insys Theraputics, Inc. Securities Litigation.* Issued a report on market efficiency in a securities class action (U.S.D.C. Southern District of New York, 2019).

*In Re Spectrum Pharmaceuticals, Inc. Securities Litigation.* Issued a declaration (2019) and provided deposition testimony (2019) on market efficiency in a securities class action (U.S.D.C. District of Nevada).

*Amanda Beezley et al. v. Fenix Parts, Inc., et al.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois, Eastern Division, 2019).

*Michael Desta, et al. v. Volkswagen Aktiengesellschaft, et al.* Issued a declaration regarding benefits to firms that have ADRs listed in a securities class action (U.S.D.C. Eastern District of New York, 2018).

*Michael Desta, et al. v. Wins Finance Holdings Inc., et al.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Central District of California).

*Andrew Meyer, et al. v. Concordia International Corp., et al.* Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on loss causation and damages (U.S.D.C. Southern District of New York).

*In re: K12 Securities Litigation.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Northern District of California).

*Robert Colman, et al. v. Theranos, Inc., et al.* Issued a declaration on damage methodology and price impact in a securities class action (U.S.D.C. Northern District of California, San Jose Division, 2018).

*In re: CytRx Corporation Securities Litigation.* Issued a declaration (2017) and provided deposition testimony (2018) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Lord Abbett Affiliated Fund, Inc., et al. v. American International Group, Inc.* Issued a report regarding market efficiency, loss causation, and damages in a securities case (U.S.D.C. Southern District of New York, 2017).

42

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Xiaolin Chi, et al. v. Qiao Xing Universal Resources, Inc., et al.* Issued a report on damages in a securities class action (District Court of the Virgin Islands, St. Croix Division, 2017).

*John Hosey v. Twitter, Inc., et al*. Issued a declaration (2017) and provided deposition testimony (2017) regarding rebuttal to Defendants' Motion for Summary Judgement in a securities class action (Superior Court of the State of California, County of San Mateo).

*Gwyn R. Hartman Revocable Living Trust v. Southern Michigan Bancorp, Inc. et al.* Issued a report on damages arising from alleged exclusions in a proxy solicitation (U.S.D.C. Western District of Michigan, 2017).

*Fred Kelsey, et al. v. Textura Corporation, et al.* Issued a declaration (2017) and provided deposition testimony (2017) on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois).

*Dave Carlton, et al. v. Fred Cannon.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2016).

*James Middlemiss v. Penn West Petroleum LTD., et al*. Issued a report on damages in a securities class action (Superior Court of Justice Ontario, Canada, 2016).

*David Loritz, et al. v. Exide Technologies, et al.* Issued a report on damages and loss causation in a securities class action (U.S.D.C. Central District of California, 2015)

*Manishkumar Khunt, et al. v. Alibaba Group Holding Limited, et al.* Issued a declaration on potential investor damages in a securities class action (U.S.D.C. Southern District of New York, 2015).

*Biotechnology Value Fund, L.P. et al. v. Celera Corporation et al.* Issued a report (2014), a reply report (2014), a supplemental report (2014), and provided deposition testimony (2014) on damages arising from a merger (U.S.D.C. Northern District of California).

*In re: Hi-Crush Partners L.P. Securities Litigation.* Issued a declaration (2014), a supplemental declaration (2014), and provided deposition testimony (2014) regarding market efficiency in a securities class action (U.S.D.C. Southern District of New York).

*Ian Mausner v. MarketByte LLC, et al.* Issued a declaration about investment advisor incentives and liquidity needs in a securities class action (U.S.D.C. Southern District of California, 2014).

43

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Artes Medical, Inc. v. Lemperle et al.* Provided deposition testimony on behalf of defendants about alleged damages caused by a proxy contest (Superior Court of the State of California, County of San Diego, Central District, 2013).

*In re: Ebix Inc. Securities Litigation.* Issued a declaration (2012) and provided deposition testimony (2013) regarding market efficiency in a securities class action (U.S.D.C. Northern District of Georgia, Atlanta Division).

*Erik Poole and William Rhody v. Alange Energy Corp., et al.* Issued a report (2012) and a reply report (2013) on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada).

*In re: Hecla Mining Securities Litigation.* Issued a declaration on investor losses in a securities class action (U.S.D.C. District of Idaho, 2012).

*Mark Henning, Roman Zaretski and Chrisitan Stillmark v. Orient Paper, Inc. et al.* Issued a declaration (2011), a supplemental declaration (2012) and provided deposition testimony (2012) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Carlos Munoz et al. v. China Expert Technology, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a securities class action regarding market efficiency (U.S.D.C. Southern District of New York).

*Theodore Dean, et al. v. China Agritech, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a case regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Robert Michael Shenk, Derivatively on Behalf of Sirius XM Radio Inc. v. Melvin Alan Karmazin, et al.* Issued an expert report (2011), a supplemental expert report (2012) and provided deposition testimony (2012) in a case involving damages in a shareholder derivative matter (U.S.D.C. Southern District of New York).

*Pathway Investments Pty Ltd and Doystoy Pty Ltd v. National Australia Bank Ltd.* Submitted a report on survey techniques, the efficient market hypothesis and liquidity in a securities class action (Supreme Court of Victoria at Melbourne, Australia, Commercial and Equity Division, Commercial Court, 2012).

*Bruce Simmonds, Robert Grant and Gordon Moore v. Armtec Infrastructure Inc. et al.* Issued a report on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada, 2011).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*In re: BP plc. Securities Litigation.* Issued a declaration regarding damages and materiality in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2010).

*In re: Tripath Technology Inc., Debtor.* Issued a report (2009) and provided deposition testimony (2010) regarding damages arising from Directors' and Officers' breach of fiduciary duty in bankruptcy court (U.S.D.C. Northern District of California, San Jose Division).

*David Ainslie and Muriel Marentette v. CV Technologies et al.* Issued a report estimating damages in a securities class action (Superior Court of Justice, Ontario, Canada, 2010).

*Harry Stackhouse, on Behalf of Himself and All Others Similarly Situated v. Toyota Motor Corporation, et al.* Issued a declaration regarding the relationship between Toyota's U.S. stock price and Japanese stock price in a securities class action (U.S.D.C. Central District of California, 2010).

*Phillip Elliot and William Kormos v. NovaGold Resources Inc., et al.* Issued a declaration in a securities class action regarding trading volume in the U.S. versus Canada. (Superior Court of Justice, Ontario, Canada, 2010).

*International Arbitration between a private equity firm and Chinese biotech company.* Issued a report (2008) and testified (2009) before an International Arbitration Committee regarding the value of a private equity investment.

*Arbitration between Albert Richards and Old Republic Title Insurance.* Deposed regarding estimated damages incurred by plaintiff as a result of a forced sale of Russian securities due to Old Republic's breach of contract (2008).

*Californians United for a Responsible Budget, et al., v. California State Public Works Board, et al.* Issued a report on the cost of issuing revenue bonds to fund California prison expansion (The Superior Court for the State of California, County of Sacramento, 2008).

*Arbitration between Daniel Lyons and Morgan Lyons, and Chinese Hospital Association and Sam English.* Deposed regarding plaintiffs' calculated damages arising from asbestos exposure for plaintiff (2003).

45

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## ENGAGEMENTS

### Securities and Finance

In re: China Medicine Corporation Securities Litigation. Retained by class counsel to estimate damages and determine market efficiency in a securities class action.

In re: Citigroup Inc. Securities Litigation. Testified as to damages and inflation in a securities class action.

In re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Retained by class counsel as damages expert in a derivative securities class action.

Government of Guam Retirement Fund et al. v Countrywide Financial Corp, et al. Retained by class counsel to estimate damages in a securities class action.

Keith Cohn v. Sanford C. Bernstein & Co., LLC and Alliance Bernstein LP. Retained by client to testify on portfolio risk in a FINRA arbitration.

In re: Semgroup Energy Partners, L.P., Securities Litigation. Retained by Plaintiffs to estimate damages in a securities class action.

Asbestos Workers Philadelphia Pension Fund v. Merix Corporation, et al. Retained by Plaintiffs to evaluate fairness of merger between Merix and Viasystems.

Retained by Goldman Sachs to provide consulting on the IPO process, the valuation of securities at IPO and the possible impact of "tie-in" agreements on the pricing of IPOs for the purpose of analyzing class certification and damages.

Joseph Phelps Vineyards, Inc., et al., v Craig Williams, et al. Retained by Joseph Phelps Vineyards to estimate the value of the winery as part of arbitration.

UnitedHealth Group Option Backdating Investigation. Retained by a Special Litigation Committee formed by UnitedHealth Group's board of directors to estimate harm caused by company's decision to backdate options.

SEC v. Henry Nicholas, et al. Retained by founder of Broadcom to estimated harm caused by company's decision to backdate options.

Enrico Bondi on behalf of Parmalat S.p.A. v. Bank of America et al. Hired by Bank of America to rebut damage arguments regarding Bank of America's role in Parmalat's eventual bankruptcy.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Capital Trading Co. v. Conor Medsystems. Retained to analyze a fairness opinion issued by Citigroup regarding the price offered by Johnson & Johnson to acquire Conor.

Enron Solvency. Retained by the surviving Enron Corporation to estimate the value of its assets for litigation purposes.

SEC v. Spear Leeds Kellogg (Goldman Sachs.) et al. Estimated damages associated with trading ahead allegations made by the SEC on behalf of Goldman market makers on the New York Stock Exchange, American Stock Exchange, Philadelphia Stock Exchange and the Chicago Board of Options Exchange.

General Fire and Casualty co. et al. v. Guy Carpenter and Co., Inc. Hired by defendant to rebut allegations that it had given incorrect advice to the plaintiff regarding reinsurance contracts.

R.D. Hubbard v. Pinnacle Entertainment, Inc. Analyzed the value of options granted and later rescinded on behalf of our client, the defendant.

Thomas Slemmer, et al. v. Cucamonga Valley Water District, et al. Estimated the value of restricted stock in a mutual water company.

Department of Labor v. Genuity (investigation). Assisted Genuity in an investigation by the Department of Labor as to whether or not Genuity stock was a safe investment for Genuity's pension fund. Investigation was dismissed.

Jason Stanley, et al. v. Safeskin Corporation, et al. Estimated damages and consulted on materiality for defendant in a securities class action.

Nanogen, Inc. v. Donald D. Montgomery and CombiMatrix Corporation. Estimated damages for defendant in cross complaint over a failed IPO resulting from plaintiff's claims of patent infringement in genomic industry.

Conseco, Inc. Securities Litigation. Retained by defendants to calculate damages in a securities class action matter.

Madison/OHI Liquidity Investors, LLC v. Omega Healthcare Investors. Estimated damages to Madison's investment funds as a result of the early termination of a debt facility.

Barbara Rosen, et al. v. Macromedia, Inc., et al. Prepared rebuttal analyses in securities class action suit on behalf of Macromedia.

Karen Yarborough v. PeopleSoft, Inc. and Does 1-20. Calculated value of stock option package in wrongful termination suit on behalf of PeopleSoft.

47

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Michael Carabetta v. Novadigm, Inc., et al. Did analysis of damages to a former company insider on behalf of Novadigm. Estimated value of lost options and salary.

Allen T. Gilliland Trust, et al. v. H&F MobileMedia Partners, LLC, et al. Engaged by auditors to analyze plaintiffs' decision to affirm a prior transaction.

California Federal Bank v. United States. Estimated damages caused by government in breach of contract case on behalf of Cal Fed.

LaSalle Talman v. United States. Estimated damages caused by government in breach of contract case on behalf of LaSalle Talman.


**Intellectual Property**

Transocean v. Maersk. Retained by Maersk to defend claims of patent infringement in case involving oil drilling technology.

Abbott Laboratories, et al. v. Sandoz, Inc. Retained on behalf of Abbott to estimate patent infringement damages as a result of Sandoz's decision to introduce a generic drug prior to the expiration of a patent.

LG Phillips LCD Co., LTD v. Tatung, Chunghwa Picture Tubes, et al. Provided rebuttal analysis for defendants in a patent infringement case dealing with LCD technology.

PostX Corporation v. Secure Data in Motion, Inc. d/b/a/ Sigaba Corporation. Calculated damages arising from tortuous interference and patent infringement in the secure document delivery market. Client was victorious on both complaint and cross-complaint.

Larkspur Data Resources, Inc. v. Trust Administrators, et al. Assisted plaintiff in calculating damages in trademark and copyright infringement case involving proprietary databases.

Dioptics Medical Products, Inc. v. The Cooper Companies, Inc.; CooperVision, Inc.; A. Thomas Bender; and Does 1-15. Retained by plaintiff to calculate damages in a copyright infringement case over naming of eyewear.

Intel Corporation v. Broadcom Corporation. Retained by Broadcom to estimate damages alleged by Intel based on charges of patent infringement.

Australia Vision Services Pty. Ltd. v. Dioptics Medical Products, Inc., Henry Lane, and individual, and Does 1-10. Estimated profits lost by Dioptics as a result of a competitor's allegations of patent infringement.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

American Booksellers Association, Inc. v. Barnes & Noble, et al. Worked on analysis of publisher discounts and analysis of openings and closings of bookstores on behalf of Borders.

**Exhibit-2**

**Documents and Other Information Considered**

## CASE DOCUMENTS

- Second Amended Class Action Complaint For Violation Of The Federal Securities Laws, filed September 18, 2020.

## NEWS ARTICLES AND PRESS RELEASES

- Factiva news articles (494) from September 12, 2018 to March 5, 2020, downloaded using the following search parameters: All Sources; All Subjects; Company: NIO Inc; All Subjects; All Industries; All Regions.
- "Chinese Electric Car Maker NIO Plunges Most Since its IPO," by Esha Dey and Ryan Vlastelica, *Bloomberg News*, March 6, 2019.

## ANALYST REPORTS

- Morgan Stanley, October 7, 2018.
- Deutsche Bank, October 8, 2018.
- UBS Equities, October 8, 2018.
- JPMorgan, October 9, 2018.
- Morgan Stanley, October 9, 2018.
- Credit Suisse, October 22, 2018.
- Credit Suisse, October 23, 2018.
- Morgan Stanley, October 26, 2018.
- JPMorgan, November 6, 2018.
- Morgan Stanley, November 6, 2018.
- UBS Equities, November 6, 2018.
- Credit Suisse, November 7, 2018.
- Deutsche Bank, November 7, 2018.
- Deutsche Bank, November 30, 2018.
- Credit Suisse, December 3, 2018.
- Credit Suisse, December 6, 2018.
- Credit Suisse, December 17, 2018.
- Credit Suisse, December 17, 2018.
- Deutsche Bank, December 17, 2018.
- UBS Equities, December 17, 2018.
- UBS Equities, January 9, 2019.

50

**Exhibit-2**

**Documents and Other Information Considered**

- Credit Suisse, January 10, 2019.
- JPMorgan, January 14, 2019.
- Deutsche Bank, January 16, 2019.
- UBS Equities, January 31, 2019.
- UBS Equities, February 15, 2019.


**SEC FILINGS**

- NIO Inc., Form 424B4 (Prospectus), filed 12 September 2018.
- NIO Inc., Form CT ORDER (Confidential order), filed 12 September 2018.
- NIO Inc., Form SC 13G (Beneficial ownership report), filed 9 October 2018.
- NIO Inc., Form 6-K (Current report), filed 15 October 2018.
- NIO Inc., Form 6-K (Current report), filed 6 November 2018.
- NIO Inc., Form 6-K (Current report), filed 30 November 2018.
- NIO Inc., Form 6-K (Current report), filed 3 December 2018.
- NIO Inc., Form 6-K (Current report), filed 17 December 2018.
- NIO Inc., Form 6-K (Current report), filed 10 January 2019.
- NIO Inc., Form SC 13G (Beneficial ownership report), filed 23 January 2019.
- NIO Inc., Form 6-K (Current report), filed 24 January 2019.
- NIO Inc., Form 6-K (Current report), filed 29 January 2019.
- NIO Inc., Form 6-K (Current report), filed 29 January 2019.
- NIO Inc., Form 6-K (Current report), filed 31 January 2019.
- NIO Inc., Form SC 13G (Beneficial ownership report), filed 1 February 2019.
- NIO Inc., Form 6-K (Current report), filed 4 February 2019.
- NIO Inc., Form SC 13G/A (Beneficial ownership report), filed 5 February 2019.
- NIO Inc., Form SC 13G (Beneficial ownership report), filed 14 February 2019.
- NIO Inc., Form SC 13G (Beneficial ownership report), filed 14 February 2019.
- NIO Inc., Form S-8 (Registration statement), filed 28 February 2019.
- NIO Inc., Form 20-F, for the Fiscal Year Ended December 31, 2018, filed April 2, 2019.


**ACADEMIC AND PROFESSIONAL LITERATURE**

- Atkins, Allen B., and Edward A. Dyl, "Price Reversals, Bid-Ask Spreads, and Market Efficiency," *Journal of Financial and Quantitative Analysis*, vol. 25, no. 4, 1990.
- Ball, Ray, and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, 1968.

**Exhibit-2**

**Documents and Other Information Considered**

- Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, 1994.
- Binder, John J., "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting*, vol. 11, 1998.
- Brav, Alon, and J.B. Heaton, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, vol. 93, no. 2, 2015.
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.
- Corrado, Charles J., "Event Studies: A Methodology Review," *Accounting and Finance*, vol. 51, 2011.
- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, vol. 46, no. 5, 1991.
- Fama, Eugene F., Lawrence Fisher, Michael C. Jensen, and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review*, vol. 10, 1969.
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, vol. 25, no. 2, 1970.
- Fama, Eugene F., and Kenneth R. French, "The Cross-Section of Expected Stock Returns," *Journal of Finance*, vol. 47, no. 2, 1992.
- Gold, Kevin L., Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017.
- Harris, Larry, *Trading & Exchanges: Market Microstructure for Practitioners*, Oxford University Press, 2003.
- Piotroski, Joseph D., and Barren T. Roulstone, "The Influence of Analysts, Institutional Investors, and Insiders on the Incorporation of Market, Industry, and Firm-Specific Information into Stock Prices," *The Accounting Review*, vol. 79, no. 4, 2004.
- Tabak, David I., and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001.

**Exhibit-2**

**Documents and Other Information Considered**

**CONFERENCE CALLS**

- "Q3 2018 Nio Inc Earnings Call," *Thomson Reuters*, conference call, November 6, 2018.
- "Q4 2018 Nio Inc Earnings Call," *Thomson Reuters*, conference call, March 5, 2019.

**DATA AND DATABASES**

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Refinitiv Eikon

**LEGAL CASES**

- *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 458 (2013).
- *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988).
- *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989).
- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D.Tex. 2001).
- *Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012).
- *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005).

**OTHER**

- Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)).
- "Revisions to the Eligibility Requirements for Primary Securities Offerings on Forms S-3 and F-3," SEC Release No. 33-8878, December 19, 2007.
- Section 10(b) of the Securities Exchange Act of 1934.
- Section 11 of the Securities Act of 1933.
- U.S. Securities & Exchange Commission Rule 10b-5.
- Other documents cited in my report.

**Exhibit-3**

**Average Weekly Volume as a Percentage of NIO**

| Week Ending | Shares Traded as a Percent of Outstanding Shares |
|---|---|
| 10/12/2018 | 88.16% |
| 10/19/2018 | 40.88% |
| 10/26/2018 | 33.21% |
| 11/2/2018 | 51.84% |
| 11/9/2018 | 65.28% |
| 11/16/2018 | 49.28% |
| 11/23/2018 | 53.37% |
| 11/30/2018 | 36.71% |
| 12/7/2018 | 38.21% |
| 12/14/2018 | 32.52% |
| 12/21/2018 | 34.67% |
| 12/28/2018 | 19.17% |
| 1/4/2019 | 18.73% |
| 1/11/2019 | 26.59% |
| 1/18/2019 | 30.86% |
| 1/25/2019 | 13.43% |
| 2/1/2019 | 48.97% |
| 2/8/2019 | 52.13% |
| 2/15/2019 | 34.91% |
| 2/22/2019 | 35.94% |
| 3/1/2019 | 147.06% |
| 3/5/2019 | 52.95% |
| *Average weekly volume as percentage of outstanding shares:* | *45.68%* |

**Source:** CRSP.

54

**Exhibit-4**

**NIO Research Reports and Analyst Recommendations**

Research reports & analyst recommendations issued during Relevant Period          26

**Research & Recommendations - Relevant Period**
**October 8, 2018 through March 5, 2019**

| Date | Content Provider | Recommendation |
| --- | --- | --- |
| October 7, 2018 | Morgan Stanley | Overweight |
| October 8, 2018 | Deutsche Bank | Buy |
| October 8, 2018 | UBS Equities | Neutral |
| October 9, 2018 | JPMorgan | Neutral |
| October 9, 2018 | Morgan Stanley | Overweight |
| October 22, 2018 | Credit Suisse | Outperform |
| October 23, 2018 | Credit Suisse | Outperform |
| October 26, 2018 | Morgan Stanley | |
| November 6, 2018 | JPMorgan | Neutral |
| November 6, 2018 | Morgan Stanley | Overweight |
| November 6, 2018 | UBS Equities | Neutral |
| November 7, 2018 | Credit Suisse | Outperform |
| November 7, 2018 | Deutsche Bank | Buy |
| November 30, 2018 | Deutsche Bank | Buy |
| December 3, 2018 | Credit Suisse | Outperform |
| December 6, 2018 | Credit Suisse | Outperform |
| December 16, 2018 | Deutsche Bank | Buy |
| December 17, 2018 | Credit Suisse | Outperform |
| December 17, 2018 | Credit Suisse | Outperform |
| December 17, 2018 | UBS Equities | Neutral |
| January 9, 2019 | UBS Equities | Neutral |
| January 10, 2019 | Credit Suisse | Outperform |
| January 14, 2019 | JPMorgan | Neutral |
| January 16, 2019 | Deutsche Bank | Buy |
| January 31, 2019 | UBS Equities | Neutral |
| February 15, 2019 | UBS Equities | Neutral |

**Source:** Thomson Eikon.

55

**Exhibit-5**

**NIO Market Makers**

November 2018 through February 2019

| No. | Code | Market Maker | Gross Volume |
|---|---|---|---|
| 1 | MSCO | MORGAN STANLEY & CO., INCORPOR | 26,921,546 |
| 2 | IBKR | INTERACTIVE BROKERS LLC | 24,656,486 |
| 3 | INCA | INSTINET CORPORATION | 10,955,772 |
| 4 | LEHM | BARCLAYS CAPITAL INC. | 5,597,781 |
| 5 | FQLS | Quantlab Securities LP | 5,469,461 |
| 6 | WSEA | WOLVERINE SECURITIES | 5,286,708 |
| 7 | UBSS | UBS SECURITIES LLC. | 4,454,983 |
| 8 | TRBT | TRADEBOT SYSTEMS, INC. | 4,099,286 |
| 9 | ETEJ | ELECTRONIC TRANSACTION CLEARING, INC. | 3,356,408 |
| 10 | NFSC | NATIONAL FINANCIAL SERVICES LL | 2,977,694 |
| 11 | JMPT | JUMP TRADING, LLC | 2,624,466 |
| 12 | GSCO | GOLDMAN SACHS | 2,560,825 |
| 13 | DBAB | DEUTSCHE BANK SECURITIES INC. | 1,969,796 |
| 14 | GEBB | GLOBAL EXECUTION BROKERS, LP | 1,676,431 |
| 15 | SBSH | CITIGROUP GLOBAL MARKETS INC. | 1,654,310 |
| 16 | NITE | VIRTU AMERICAS LLC | 1,541,493 |
| 17 | ETRS | E*TRADE CLEARING LLC | 1,274,604 |
| 18 | HSBC | HSBC SECURITIES (USA) INC. | 999,409 |
| 19 | GSLT | GOLDMAN SACHS & CO. LLC | 974,767 |
| 20 | SPDR | SPEEDROUTE LLC | 847,554 |
| 21 | GSCS | GOLDMAN, SACHS & CO. | 691,993 |
| 22 | JEFF | JEFFERIES & COMPANY, INC. | 633,559 |
| 23 | TRCM | TRC MARKETS LLC | 625,270 |
| 24 | CLSA | CLSA AMERICAS, LLC | 603,467 |
| 25 | DCHF | Dart Executions, LLC | 580,518 |
| 26 | WEXX | WOLVERINE EXECUTION SERVICES, | 575,956 |
| 27 | CPEM | CLEARPOOL EXECUTION SERVICES, LLC | 574,869 |
| 28 | LSCI | LEK SECURITIES CORPORATION | 463,055 |
| 29 | CHAS | CHARLES SCHWAB AND CO. INC. | 388,518 |
| 30 | WEXM | WOLVERINE EXECUTION SERVICES, LLC | 350,813 |
| 31 | WCHV | Wells Fargo Securities, LLC | 325,841 |
| 32 | FRET | Fox River Execution Tehnology, LLC | 241,084 |
| 33 | ITGI | ITG INC. | 236,692 |
| 34 | LIME | LIME BROKERAGE LLC | 200,896 |
| 35 | GTSZ | GTS SECURITIES LLC | 180,537 |
| 36 | ETFA | ELECTRONIC TRANSACTION CLEARING, INC. | 162,436 |
| 37 | MAXM | MAXIM GROUP, LLC | 143,072 |
| 38 | ETBA | ELECTRONIC TRANSACTION CLEARING, INC. | 129,138 |
| 39 | CPEX | CLEARPOOL EXECUTION SERVICES | 118,729 |
| 40 | BERN | SANFORD C. BERNSTEIN AND CO. I | 117,369 |
| 41 | FOXB | | 109,372 |
| 42 | NQRB | BRUT, LLC | 108,740 |
| 43 | ETDX | ELECTRONIC TRANSACTION CLEARING, INC. | 88,163 |
| 44 | SPTD | Stock USA Investments | 72,910 |
| 45 | CODA | | 60,246 |

**Exhibit-5**

**NIO Market Makers**

November 2018 through February 2019

| No. | Code | Market Maker | Gross Volume |
|---|---|---|---|
| 46 | LAFC | R. F. Lafferty & Co., Inc. | 59,584 |
| 47 | AGIS | AEGIS CAPITAL CORP. | 54,200 |
| 48 | BAYT | BAYPOINT TRADING LLC | 49,003 |
| 49 | PATH | BENJAMIN & JEROLD BROKERAGE I, LLC | 45,517 |
| 50 | CPET | CLEARPOOL EXECUTION SERVICES, LLC | 36,547 |
| 51 | INJX | INSTINET, LLC | 36,135 |
| 52 | DEGS | Dart Executions, LLC | 34,013 |
| 53 | MICA | SPARTAN SECURITIES GROUP LTD | 30,600 |
| 54 | JONE | JONES AND ASSOCIATES INC. | 25,000 |
| 55 | DFIN | ELECTRONIC BROKERAGE SYSTEMS, LLC | 22,042 |
| 56 | DBUL | Deutsche Bank Securities Inc. | 21,677 |
| 57 | GLPX | ACS EXECUTION SERVICES, LLC | 17,500 |
| 58 | ROTH | ROTH CAPITAL PARTNERS, LLC | 16,000 |
| 59 | ETBE | Electronic Transaction Clearing, Inc. | 14,585 |
| 60 | WBPX | WHITE BAY PT LLC | 13,489 |
| 61 | ETCC | Electronic Transaction Clearing, Inc. | 10,650 |
| 62 | CTLR | CUTLER GROUP, LP | 9,726 |
| 63 | SAGL | SAGETRADER, LLC | 7,801 |
| 64 | TRWN | T.R. WINSTON & COMPANY, LLC | 7,700 |
| 65 | CTDL | Citadel Derivatives Group Llc | 6,132 |
| 66 | LTCO | LADENBURG, THALMANN & CO. INC. | 5,000 |
| 67 | TDSI | TD SECURITIES (USA) INC. | 4,500 |
| 68 | VIEW | VIEWTRADE SECURITIES, INC. | 4,363 |
| 69 | BMAK | BMA SECURITIES | 2,000 |
| 70 | PICT | PICTET OVERSEAS INC. | 2,000 |
| 71 | EGAW | BATS TRADING, INC. | 1,700 |
| 72 | BNCH | THE BENCHMARK COMPANY, LLC | 1,000 |
| 73 | JGUN | JOSEPH GUNNAR AND CO. | 1,000 |
| 74 | OTAA | OTA LLC | 1,000 |
| 75 | WABR | WALL STREET ACCESS | 1,000 |
| 76 | HAPX | HAP Trading, LLC | 300 |
| 77 | MKMP | MKM PARTNERS | 100 |
| 78 | BMOC | BMO CAPITAL MARKETS | - |
| 79 | BTIG | BTIG, LLC | - |
| 80 | DJSA | Dawson James Securities, Inc | - |
| 81 | DRWC | | - |
| 82 | DRWK | | - |
| 83 | ETDR | ELECTRONIC TRANSACTION CLEARING, INC. | - |
| 84 | INTL | INTL TRADING, INC. | - |
| 85 | JHDR | J.H. Darbie & Co., Inc. | - |
| 86 | JNST | | - |
| 87 | LSCM | LAKE STREET CAPITAL MARKETS, LLC | - |
| 88 | MBTS | MB TRADING | - |
| 89 | MCBT | MOORS AND CABOT INC. | - |
| 90 | NATL | NATIONAL SECURITIES CORP. | - |
| 91 | NEED | NEEDHAM AND CO. | - |

**Exhibit-5**

**NIO Market Makers**

November 2018 through February 2019

| No. | Code | Market Maker | Gross Volume |
|-----|------|--------------|--------------|
| 92 | OHOS | TWO SIGMA SECURITIES, LLC | - |
| 93 | ONEL | WILLIAM O'NEIL & COMPANY | - |
| 94 | PUMA | Puma Capital, LLC | - |
| 95 | RGLD | REGAL DISCOUNT SECURITIES, INC | - |
| 96 | RHOX | XR Securities LLC | - |
| 97 | STFL | STIFEL NICOLAUS | - |
| 98 | VALR | | - |
| 99 | VALX | <unnamed> | - |
| 100 | VERT | THE VERTICAL GROUP, INC. | - |
| 101 | WBLR | WILLIAM BLAIR & COMPANY L.L.C. | - |

**Source:** Bloomberg.

# Exhibit-6

## NIO Market Index, and Peer Index Returns

8 October 2018 through 7 March 2019

| Date | NIO Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 10/8/2018 | -3.58% | -0.13% | 0.88% |
| 10/9/2018 | 20.17% | -0.18% | -4.16% |
| 10/10/2018 | 4.76% | -3.18% | -0.74% |
| 10/11/2018 | -7.64% | -1.90% | -0.55% |
| 10/12/2018 | 3.83% | 1.22% | -1.76% |
| 10/15/2018 | 4.71% | -0.37% | 1.45% |
| 10/16/2018 | 2.77% | 2.12% | 0.31% |
| 10/17/2018 | -3.42% | -0.14% | -0.90% |
| 10/18/2018 | -3.54% | -1.47% | -2.78% |
| 10/19/2018 | -2.43% | -0.18% | 0.15% |
| 10/22/2018 | -4.04% | -0.39% | 0.57% |
| 10/23/2018 | -3.18% | -0.60% | 2.31% |
| 10/24/2018 | -9.87% | -3.11% | -4.95% |
| 10/25/2018 | 4.44% | 1.73% | 6.78% |
| 10/26/2018 | -1.56% | -1.56% | 1.05% |
| 10/29/2018 | -2.55% | -0.70% | 2.29% |
| 10/30/2018 | -3.95% | 1.55% | 1.54% |
| 10/31/2018 | -0.84% | 1.04% | 5.24% |
| 11/1/2018 | 11.51% | 1.29% | -1.39% |
| 11/2/2018 | -1.98% | -0.48% | -0.27% |
| 11/5/2018 | 2.89% | 0.44% | 1.04% |
| 11/6/2018 | -4.28% | 0.57% | 0.37% |
| 11/7/2018 | 5.18% | 1.91% | 0.92% |
| 11/8/2018 | -0.74% | -0.29% | -1.11% |
| 11/9/2018 | 1.19% | -0.98% | -1.72% |
| 11/12/2018 | -1.79% | -1.91% | 0.49% |
| 11/13/2018 | 1.94% | -0.12% | 0.61% |
| 11/14/2018 | 4.61% | -0.66% | -1.10% |
| 11/15/2018 | 3.32% | 1.07% | -0.57% |
| 11/16/2018 | -2.06% | 0.21% | -0.91% |
| 11/19/2018 | 8.65% | -1.67% | 0.83% |
| 11/20/2018 | -2.19% | -1.81% | -1.84% |
| 11/21/2018 | 0.52% | 0.62% | 0.96% |
| 11/23/2018 | -3.30% | -0.56% | 0.71% |
| 11/26/2018 | -1.21% | 1.45% | 3.91% |
| 11/27/2018 | 1.48% | 0.05% | -2.03% |
| 11/28/2018 | 8.21% | 2.21% | 1.00% |

59

## Exhibit-6

## NIO Market Index, and Peer Index Returns

8 October 2018 through 7 March 2019

| Date | NIO Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 11/29/2018 | -4.15% | -0.18% | -0.49% |
| 11/30/2018 | -1.03% | 0.68% | 2.02% |
| 12/3/2018 | -1.70% | 1.14% | 1.59% |
| 12/4/2018 | -6.82% | -3.23% | -4.86% |
| 12/6/2018 | 4.01% | -0.19% | -1.45% |
| 12/7/2018 | -5.29% | -2.13% | -2.60% |
| 12/10/2018 | 0.57% | -0.02% | -1.93% |
| 12/11/2018 | 0.71% | -0.07% | 0.54% |
| 12/12/2018 | 6.29% | 0.63% | 2.12% |
| 12/13/2018 | 2.75% | -0.21% | -1.61% |
| 12/14/2018 | -0.65% | -1.72% | 0.08% |
| 12/17/2018 | -9.10% | -2.11% | -0.82% |
| 12/18/2018 | 0.57% | -0.02% | 0.24% |
| 12/19/2018 | -3.45% | -1.49% | -0.68% |
| 12/20/2018 | -4.65% | -1.55% | -1.42% |
| 12/21/2018 | -7.15% | -2.08% | -3.31% |
| 12/24/2018 | -2.50% | -2.45% | -3.32% |
| 12/26/2018 | 7.17% | 4.58% | 3.22% |
| 12/27/2018 | 1.09% | 0.68% | 0.77% |
| 12/28/2018 | 0.62% | 0.02% | -0.27% |
| 12/31/2018 | -1.56% | 0.83% | -1.67% |
| 1/2/2019 | -2.71% | 0.18% | 1.65% |
| 1/3/2019 | -2.45% | -2.13% | -3.12% |
| 1/4/2019 | 5.00% | 3.29% | 3.50% |
| 1/7/2019 | 2.18% | 0.92% | 2.85% |
| 1/8/2019 | -1.55% | 1.02% | 1.16% |
| 1/9/2019 | 3.53% | 0.62% | 2.34% |
| 1/10/2019 | 0.45% | 0.45% | -0.99% |
| 1/11/2019 | -1.06% | -0.02% | 4.68% |
| 1/14/2019 | 3.14% | -0.55% | 1.54% |
| 1/15/2019 | 0.29% | 0.98% | -0.86% |
| 1/16/2019 | -1.63% | 0.32% | -2.40% |
| 1/17/2019 | 1.48% | 0.71% | 1.26% |
| 1/18/2019 | -1.48% | 1.20% | 1.59% |
| 1/22/2019 | -2.11% | -1.43% | -1.09% |
| 1/23/2019 | -0.30% | 0.13% | -1.53% |
| 1/24/2019 | 0.46% | 0.28% | 2.01% |

60

**Exhibit-6**

**NIO Market Index, and Peer Index Returns**

8 October 2018 through 7 March 2019

| Date | NIO Return | Market Index Return | Industry Index Return |
|------|-----------|---------------------|-----------------------|
| 1/25/2019 | 1.06% | 0.95% | 1.94% |
| 1/28/2019 | 0.30% | -0.65% | -1.20% |
| 1/29/2019 | 3.97% | -0.09% | 0.47% |
| 1/30/2019 | 7.23% | 1.43% | 1.42% |
| 1/31/2019 | 5.48% | 0.84% | 0.29% |
| 2/1/2019 | 0.25% | 0.14% | -0.73% |
| 2/4/2019 | -0.63% | 0.67% | 0.15% |
| 2/5/2019 | 0.38% | 0.44% | 0.79% |
| 2/6/2019 | 6.39% | -0.25% | 0.80% |
| 2/7/2019 | -4.38% | -0.89% | -3.84% |
| 2/8/2019 | -4.71% | 0.07% | 0.45% |
| 2/11/2019 | -2.78% | 0.13% | -0.39% |
| 2/12/2019 | -0.27% | 1.23% | 1.23% |
| 2/13/2019 | 0.67% | 0.28% | -0.27% |
| 2/14/2019 | -0.13% | -0.14% | -0.13% |
| 2/15/2019 | -0.94% | 1.08% | 0.88% |
| 2/19/2019 | -2.05% | 0.24% | 1.99% |
| 2/20/2019 | 4.84% | 0.21% | 1.12% |
| 2/21/2019 | 0.26% | -0.35% | -1.53% |
| 2/22/2019 | 6.71% | 0.63% | 0.57% |
| 2/25/2019 | 9.68% | 0.14% | 0.45% |
| 2/26/2019 | 8.41% | -0.15% | 0.50% |
| 2/27/2019 | 0.61% | 0.05% | -0.62% |
| 2/28/2019 | -2.88% | -0.28% | -0.84% |
| 3/1/2019 | 4.99% | 0.61% | 0.17% |
| 3/4/2019 | -2.82% | -0.42% | -0.33% |
| 3/5/2019 | 3.81% | -0.13% | -0.15% |
| 3/6/2019 | -23.78% | -0.78% | -1.81% |
| 3/7/2019 | -12.20% | -0.75% | -0.85% |

**Sources**: Bloomberg and CRSP.

**Note:** All returns are logarithmic returns.

61

**Exhibit-7**

**NIO Market Efficiency Statistics[1]**

8 October 2018 through 5 March 2019

| Date | Closing Price | Log Return | Volume | Closing Bid | Closing Ask | Closing Bid/Ask Spread | Average Bid/Ask Spread % | Outstanding Shares | Market Capitalization |
|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] | | | [f] | [g] |
| 10/8/2018 | $6.04 | -3.58% | 11,508,763 | $6.05 | $6.06 | $0.01 | 0.17% | 160,000,000 | $966,400,000 |
| 10/9/2018 | $7.39 | 20.17% | 38,464,354 | $7.37 | $7.39 | $0.02 | 0.27% | 160,000,000 | $1,182,400,000 |
| 10/10/2018 | $7.75 | 4.76% | 74,971,137 | $7.74 | $7.75 | $0.01 | 0.13% | 160,000,000 | $1,240,000,000 |
| 10/11/2018 | $7.18 | -7.64% | 22,730,045 | $7.17 | $7.18 | $0.01 | 0.14% | 160,000,000 | $1,148,800,000 |
| 10/12/2018 | $7.46 | 3.83% | 14,545,424 | $7.43 | $7.44 | $0.01 | 0.13% | 184,000,000 | $1,372,640,000 |
| 10/15/2018 | $7.82 | 4.71% | 26,781,651 | $7.81 | $7.82 | $0.01 | 0.13% | 184,000,000 | $1,438,880,000 |
| 10/16/2018 | $8.04 | 2.77% | 17,490,452 | $8.02 | $8.03 | $0.01 | 0.12% | 184,000,000 | $1,479,360,000 |
| 10/17/2018 | $7.77 | -3.42% | 11,705,259 | $7.78 | $7.80 | $0.02 | 0.26% | 184,000,000 | $1,429,680,000 |
| 10/18/2018 | $7.50 | -3.54% | 11,905,956 | $7.47 | $7.49 | $0.02 | 0.27% | 184,000,000 | $1,380,000,000 |
| 10/19/2018 | $7.32 | -2.43% | 7,336,209 | $7.31 | $7.32 | $0.01 | 0.14% | 184,000,000 | $1,346,880,000 |
| 10/22/2018 | $7.03 | -4.04% | 12,758,537 | $7.02 | $7.03 | $0.01 | 0.14% | 184,000,000 | $1,293,520,000 |
| 10/23/2018 | $6.81 | -3.18% | 14,901,741 | $6.80 | $6.81 | $0.01 | 0.15% | 184,000,000 | $1,253,040,000 |
| 10/24/2018 | $6.17 | -9.87% | 14,789,857 | $6.17 | $6.18 | $0.01 | 0.16% | 184,000,000 | $1,135,280,000 |
| 10/25/2018 | $6.45 | 4.44% | 9,188,691 | $6.43 | $6.44 | $0.01 | 0.16% | 184,000,000 | $1,186,800,000 |
| 10/26/2018 | $6.35 | -1.56% | 9,458,953 | $6.33 | $6.33 | $0.00 | 0.00% | 184,000,000 | $1,168,400,000 |
| 10/29/2018 | $6.19 | -2.55% | 16,027,640 | $6.18 | $6.19 | $0.01 | 0.16% | 184,000,000 | $1,138,960,000 |
| 10/30/2018 | $5.95 | -3.95% | 21,823,905 | $5.94 | $5.95 | $0.01 | 0.17% | 184,000,000 | $1,094,800,000 |
| 10/31/2018 | $5.90 | -0.84% | 15,213,393 | $5.93 | $5.94 | $0.01 | 0.17% | 184,000,000 | $1,085,600,000 |
| 11/1/2018 | $6.62 | 11.51% | 24,330,932 | $6.61 | $6.62 | $0.01 | 0.15% | 184,000,000 | $1,218,080,000 |
| 11/2/2018 | $6.49 | -1.98% | 17,988,834 | $6.49 | $6.50 | $0.01 | 0.15% | 184,000,000 | $1,194,160,000 |
| 11/5/2018 | $6.68 | 2.89% | 13,188,661 | $6.66 | $6.67 | $0.01 | 0.15% | 184,000,000 | $1,229,120,000 |
| 11/6/2018 | $6.40 | -4.28% | 49,855,770 | $6.40 | $6.41 | $0.01 | 0.16% | 184,000,000 | $1,177,600,000 |
| 11/7/2018 | $6.74 | 5.18% | 23,761,772 | $6.71 | $6.72 | $0.01 | 0.15% | 184,000,000 | $1,240,160,000 |
| 11/8/2018 | $6.69 | -0.74% | 20,510,714 | $6.67 | $6.69 | $0.02 | 0.30% | 184,000,000 | $1,230,960,000 |
| 11/9/2018 | $6.77 | 1.19% | 12,789,789 | $6.75 | $6.77 | $0.02 | 0.30% | 184,000,000 | $1,245,680,000 |
| 11/12/2018 | $6.65 | -1.79% | 12,709,127 | $6.64 | $6.65 | $0.01 | 0.15% | 184,000,000 | $1,223,600,000 |
| 11/13/2018 | $6.78 | 1.94% | 15,374,076 | $6.76 | $6.77 | $0.01 | 0.15% | 184,000,000 | $1,247,520,000 |
| 11/14/2018 | $7.10 | 4.61% | 29,585,149 | $7.11 | $7.12 | $0.01 | 0.14% | 184,000,000 | $1,306,400,000 |
| 11/15/2018 | $7.34 | 3.32% | 18,036,362 | $7.34 | $7.36 | $0.02 | 0.27% | 184,000,000 | $1,350,560,000 |
| 11/16/2018 | $7.19 | -2.06% | 14,972,458 | $7.18 | $7.19 | $0.01 | 0.14% | 184,000,000 | $1,322,960,000 |
| 11/19/2018 | $7.84 | 8.65% | 49,171,758 | $7.82 | $7.84 | $0.02 | 0.26% | 184,000,000 | $1,442,560,000 |
| 11/20/2018 | $7.67 | -2.19% | 26,923,192 | $7.64 | $7.66 | $0.02 | 0.26% | 184,000,000 | $1,411,280,000 |
| 11/21/2018 | $7.71 | 0.52% | 13,993,640 | $7.71 | $7.72 | $0.01 | 0.13% | 184,000,000 | $1,418,640,000 |
| 11/23/2018 | $7.46 | -3.30% | 8,119,651 | $7.46 | $7.47 | $0.01 | 0.13% | 184,000,000 | $1,372,640,000 |
| 11/26/2018 | $7.37 | -1.21% | 12,164,902 | $7.37 | $7.38 | $0.01 | 0.14% | 184,000,000 | $1,356,080,000 |
| 11/27/2018 | $7.48 | 1.48% | 9,084,856 | $7.47 | $7.48 | $0.01 | 0.13% | 184,000,000 | $1,376,320,000 |
| 11/28/2018 | $8.12 | 8.21% | 22,096,929 | $8.12 | $8.13 | $0.01 | 0.12% | 184,000,000 | $1,494,080,000 |
| 11/29/2018 | $7.79 | -4.15% | 13,207,636 | $7.80 | $7.81 | $0.01 | 0.13% | 184,000,000 | $1,433,360,000 |
| 11/30/2018 | $7.71 | -1.03% | 10,994,730 | $7.71 | $7.72 | $0.01 | 0.13% | 184,000,000 | $1,418,640,000 |
| 12/3/2018 | $7.58 | -1.70% | 22,425,412 | $7.57 | $7.58 | $0.01 | 0.13% | 184,000,000 | $1,394,720,000 |
| 12/4/2018 | $7.08 | -6.82% | 19,624,735 | $7.08 | $7.09 | $0.01 | 0.14% | 184,000,000 | $1,302,720,000 |
| 12/6/2018 | $7.37 | 4.01% | 16,688,145 | $7.36 | $7.37 | $0.01 | 0.14% | 184,000,000 | $1,356,080,000 |
| 12/7/2018 | $6.99 | -5.29% | 11,576,166 | $6.99 | $7.01 | $0.02 | 0.29% | 184,000,000 | $1,286,160,000 |
| 12/10/2018 | $7.03 | 0.57% | 9,980,958 | $7.00 | $7.02 | $0.02 | 0.29% | 184,000,000 | $1,293,520,000 |
| 12/11/2018 | $7.08 | 0.71% | 8,095,733 | $7.06 | $7.07 | $0.01 | 0.14% | 184,000,000 | $1,302,720,000 |
| 12/12/2018 | $7.54 | 6.29% | 16,007,523 | $7.53 | $7.54 | $0.01 | 0.13% | 184,000,000 | $1,387,360,000 |
| 12/13/2018 | $7.75 | 2.75% | 14,980,941 | $7.71 | $7.74 | $0.03 | 0.39% | 184,000,000 | $1,426,000,000 |
| 12/14/2018 | $7.70 | -0.65% | 10,773,624 | $7.68 | $7.70 | $0.02 | 0.26% | 184,000,000 | $1,416,800,000 |
| 12/17/2018 | $7.03 | -9.10% | 18,132,776 | $7.10 | $7.12 | $0.02 | 0.28% | 184,000,000 | $1,293,520,000 |
| 12/18/2018 | $7.07 | 0.57% | 10,685,752 | $7.05 | $7.08 | $0.03 | 0.42% | 184,000,000 | $1,300,880,000 |
| 12/19/2018 | $6.83 | -3.45% | 9,299,725 | $6.82 | $6.84 | $0.02 | 0.29% | 184,000,000 | $1,256,720,000 |
| 12/20/2018 | $6.52 | -4.65% | 12,080,014 | $6.53 | $6.54 | $0.01 | 0.15% | 184,000,000 | $1,199,680,000 |
| 12/21/2018 | $6.07 | -7.15% | 13,598,339 | $6.06 | $6.07 | $0.01 | 0.16% | 184,000,000 | $1,116,880,000 |
| 12/24/2018 | $5.92 | -2.50% | 8,835,827 | $5.93 | $5.94 | $0.01 | 0.17% | 184,000,000 | $1,089,280,000 |
| 12/26/2018 | $6.36 | 7.17% | 9,912,348 | $6.34 | $6.37 | $0.03 | 0.47% | 184,000,000 | $1,170,240,000 |
| 12/27/2018 | $6.43 | 1.09% | 8,531,875 | $6.43 | $6.44 | $0.01 | 0.16% | 184,000,000 | $1,183,120,000 |
| 12/28/2018 | $6.47 | 0.62% | 7,996,498 | $6.41 | $6.42 | $0.01 | 0.16% | 184,000,000 | $1,190,480,000 |
| 12/31/2018 | $6.37 | -1.56% | 8,667,438 | $6.28 | $6.30 | $0.02 | 0.32% | 184,000,000 | $1,172,080,000 |

62

**Exhibit-7**

**NIO Market Efficiency Statistics[1]**

8 October 2018 through 5 March 2019

| Date | Closing Price | Log Return | Volume | Closing Bid | Closing Ask | Closing Bid/Ask Spread | Average Bid/Ask Spread % | Outstanding Shares | Market Capitalization |
|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] | | | [f] | [g] |
| 1/2/2019 | $6.20 | -2.71% | 8,823,588 | $6.20 | $6.21 | $0.01 | 0.16% | 184,000,000 | $1,140,800,000 |
| 1/3/2019 | $6.05 | -2.45% | 7,562,892 | $6.05 | $6.06 | $0.01 | 0.17% | 184,000,000 | $1,113,200,000 |
| 1/4/2019 | $6.36 | 5.00% | 9,405,574 | $6.34 | $6.35 | $0.01 | 0.16% | 184,000,000 | $1,170,240,000 |
| 1/7/2019 | $6.50 | 2.18% | 9,709,046 | $6.49 | $6.50 | $0.01 | 0.15% | 184,000,000 | $1,196,000,000 |
| 1/8/2019 | $6.40 | -1.55% | 9,603,777 | $6.39 | $6.40 | $0.01 | 0.16% | 184,000,000 | $1,177,600,000 |
| 1/9/2019 | $6.63 | 3.53% | 11,489,874 | $6.62 | $6.63 | $0.01 | 0.15% | 184,000,000 | $1,219,920,000 |
| 1/10/2019 | $6.66 | 0.45% | 11,221,122 | $6.62 | $6.63 | $0.01 | 0.15% | 184,000,000 | $1,225,440,000 |
| 1/11/2019 | $6.59 | -1.06% | 6,902,293 | $6.58 | $6.59 | $0.01 | 0.15% | 184,000,000 | $1,212,560,000 |
| 1/14/2019 | $6.80 | 3.14% | 19,454,079 | $6.79 | $6.80 | $0.01 | 0.15% | 184,000,000 | $1,251,200,000 |
| 1/15/2019 | $6.82 | 0.29% | 12,632,982 | $6.82 | $6.84 | $0.02 | 0.29% | 184,000,000 | $1,254,880,000 |
| 1/16/2019 | $6.71 | -1.63% | 6,941,150 | $6.70 | $6.71 | $0.01 | 0.15% | 184,000,000 | $1,234,640,000 |
| 1/17/2019 | $6.81 | 1.48% | 8,508,909 | $6.80 | $6.81 | $0.01 | 0.15% | 184,000,000 | $1,253,040,000 |
| 1/18/2019 | $6.71 | -1.48% | 9,240,851 | $6.70 | $6.71 | $0.01 | 0.15% | 184,000,000 | $1,234,640,000 |
| 1/22/2019 | $6.57 | -2.11% | 6,379,619 | $6.56 | $6.57 | $0.01 | 0.15% | 184,000,000 | $1,208,880,000 |
| 1/23/2019 | $6.55 | -0.30% | 5,685,964 | $6.53 | $6.54 | $0.01 | 0.15% | 184,000,000 | $1,205,200,000 |
| 1/24/2019 | $6.58 | 0.46% | 5,919,985 | $6.57 | $6.58 | $0.01 | 0.15% | 184,000,000 | $1,210,720,000 |
| 1/25/2019 | $6.65 | 1.06% | 6,726,949 | $6.64 | $6.65 | $0.01 | 0.15% | 184,000,000 | $1,223,600,000 |
| 1/28/2019 | $6.67 | 0.30% | 5,111,018 | $6.67 | $6.68 | $0.01 | 0.15% | 184,000,000 | $1,227,280,000 |
| 1/29/2019 | $6.94 | 3.97% | 14,200,087 | $6.93 | $6.94 | $0.01 | 0.14% | 184,000,000 | $1,276,960,000 |
| 1/30/2019 | $7.46 | 7.23% | 28,775,026 | $7.45 | $7.46 | $0.01 | 0.13% | 184,000,000 | $1,372,640,000 |
| 1/31/2019 | $7.88 | 5.48% | 21,233,857 | $7.87 | $7.88 | $0.01 | 0.13% | 184,000,000 | $1,449,920,000 |
| 2/1/2019 | $7.90 | 0.25% | 20,788,847 | $7.89 | $7.90 | $0.01 | 0.13% | 184,000,000 | $1,453,600,000 |
| 2/4/2019 | $7.85 | -0.63% | 8,585,348 | $7.84 | $7.85 | $0.01 | 0.13% | 184,000,000 | $1,444,400,000 |
| 2/5/2019 | $7.88 | 0.38% | 9,029,887 | $7.87 | $7.88 | $0.01 | 0.13% | 184,000,000 | $1,449,920,000 |
| 2/6/2019 | $8.40 | 6.39% | 33,404,746 | $8.39 | $8.40 | $0.01 | 0.12% | 184,000,000 | $1,545,600,000 |
| 2/7/2019 | $8.04 | -4.38% | 23,198,212 | $8.00 | $8.01 | $0.01 | 0.12% | 184,000,000 | $1,479,360,000 |
| 2/8/2019 | $7.67 | -4.71% | 21,709,346 | $7.66 | $7.67 | $0.01 | 0.13% | 184,000,000 | $1,411,280,000 |
| 2/11/2019 | $7.46 | -2.78% | 9,750,733 | $7.42 | $7.43 | $0.01 | 0.13% | 184,000,000 | $1,372,640,000 |
| 2/12/2019 | $7.44 | -0.27% | 13,264,105 | $7.43 | $7.44 | $0.01 | 0.13% | 184,000,000 | $1,368,960,000 |
| 2/13/2019 | $7.49 | 0.67% | 10,867,810 | $7.48 | $7.49 | $0.01 | 0.13% | 184,000,000 | $1,378,160,000 |
| 2/14/2019 | $7.48 | -0.13% | 14,728,317 | $7.47 | $7.48 | $0.01 | 0.13% | 184,000,000 | $1,376,320,000 |
| 2/15/2019 | $7.41 | -0.94% | 15,620,191 | $7.40 | $7.41 | $0.01 | 0.14% | 184,000,000 | $1,363,440,000 |
| 2/19/2019 | $7.26 | -2.05% | 9,974,748 | $7.25 | $7.26 | $0.01 | 0.14% | 184,000,000 | $1,335,840,000 |
| 2/20/2019 | $7.62 | 4.84% | 21,495,721 | $7.61 | $7.62 | $0.01 | 0.13% | 184,000,000 | $1,402,080,000 |
| 2/21/2019 | $7.64 | 0.26% | 8,060,138 | $7.62 | $7.64 | $0.02 | 0.26% | 184,000,000 | $1,405,760,000 |
| 2/22/2019 | $8.17 | 6.71% | 26,600,350 | $8.17 | $8.18 | $0.01 | 0.12% | 184,000,000 | $1,503,280,000 |
| 2/25/2019 | $9.00 | 9.68% | 52,424,249 | $8.99 | $9.00 | $0.01 | 0.11% | 184,000,000 | $1,656,000,000 |
| 2/26/2019 | $9.79 | 8.41% | 106,022,591 | $9.77 | $9.78 | $0.01 | 0.10% | 184,000,000 | $1,801,360,000 |
| 2/27/2019 | $9.85 | 0.61% | 53,234,270 | $9.81 | $9.83 | $0.02 | 0.20% | 184,000,000 | $1,812,400,000 |
| 2/28/2019 | $9.57 | -2.88% | 26,506,014 | $9.54 | $9.55 | $0.01 | 0.10% | 184,000,000 | $1,760,880,000 |
| 3/1/2019 | $10.06 | 4.99% | 32,409,414 | $10.04 | $10.06 | $0.02 | 0.20% | 184,000,000 | $1,851,040,000 |
| 3/4/2019 | $9.78 | -2.82% | 43,753,280 | $9.80 | $9.82 | $0.02 | 0.20% | 184,000,000 | $1,799,520,000 |
| 3/5/2019 | $10.16 | 3.81% | 53,680,765 | $10.12 | $10.13 | $0.01 | 0.10% | 184,000,000 | $1,869,440,000 |
| Average | $7.24 | 0.48% | 18,306,876 | $7.23 | $7.24 | $0.01 | 0.17% | 183,049,505 | $1,325.7 million |
| Median | $7.08 | 0.25% | 13,264,105 | $7.10 | $7.12 | $0.01 | 0.15% | 184,000,000 | $1,293.5 million |
| High | $10.16 | 20.17% | 106,022,591 | $10.12 | $10.13 | $0.03 | 0.47% | 184,000,000 | $1,869.4 million |
| Low | $5.90 | -9.87% | 5,111,018 | $5.93 | $5.94 | $0.00 | 0.00% | 160,000,000 | $966.4 million |

**Sources:** Bloomberg and CRSP.

**Exhibit-8**

**NIO Regression Results**

Estimation Period: October 8, 2018 through October 8, 2019

| Regression Statistics | |
|---|---|
| R Squared | 0.348 |
| Adjusted R Squared | 0.324 |
| Standard Error | 4.27% |
| Observations | 252 |

| | Coefficients | Standard Error | *t*- statistic |
|---|---|---|---|
| Intercept | -0.39% | 0.27% | -1.45 |
| Market Index | 1.36 | 0.339 | 4.02 |
| Peer Index | 0.27 | 0.212 | 1.26 |
| 10/9/2018 | 0.22 | 0.044 | 5.03 |
| 11/6/2018 | -4.76% | 4.28% | -1.11 |
| 11/30/2018 | -2.10% | 4.29% | -0.49 |
| 3/6/2019 | -21.84% | 4.29% | -5.09 |
| 3/7/2019 | -10.56% | 4.28% | -2.46 |
| 5/28/2019 | 5.15% | 4.28% | 1.20 |
| 9/24/2019 | -20.69% | 4.28% | -4.83 |

64

**Exhibit-9**

**NIO Event Study Results**

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | t-statistic[1] | |
|---|---|---|---|---|---|
| 10/8/2018 | -3.58% | -0.34% | -3.24% | -0.76 | |
| 10/9/2018 | 20.17% | -1.74% | 21.92% | 5.13 | * |
| 10/10/2018 | 4.76% | -4.93% | 9.68% | 2.27 | * |
| 10/11/2018 | -7.64% | -3.13% | -4.51% | -1.06 | |
| 10/12/2018 | 3.83% | 0.80% | 3.03% | 0.71 | |
| 10/15/2018 | 4.71% | -0.51% | 5.22% | 1.22 | |
| 10/16/2018 | 2.77% | 2.58% | 0.19% | 0.05 | |
| 10/17/2018 | -3.42% | -0.82% | -2.59% | -0.61 | |
| 10/18/2018 | -3.54% | -3.14% | -0.39% | -0.09 | |
| 10/19/2018 | -2.43% | -0.60% | -1.83% | -0.43 | |
| 10/22/2018 | -4.04% | -0.77% | -3.27% | -0.77 | |
| 10/23/2018 | -3.18% | -0.59% | -2.59% | -0.61 | |
| 10/24/2018 | -9.87% | -5.95% | -3.92% | -0.92 | |
| 10/25/2018 | 4.44% | 3.77% | 0.67% | 0.16 | |
| 10/26/2018 | -1.56% | -2.24% | 0.68% | 0.16 | |
| 10/29/2018 | -2.55% | -0.74% | -1.81% | -0.42 | |
| 10/30/2018 | -3.95% | 2.12% | -6.08% | -1.42 | |
| 10/31/2018 | -0.84% | 2.42% | -3.26% | -0.76 | |
| 11/1/2018 | 11.51% | 0.99% | 10.52% | 2.46 | * |
| 11/2/2018 | -1.98% | -1.12% | -0.87% | -0.20 | |
| 11/5/2018 | 2.89% | 0.49% | 2.40% | 0.56 | |
| 11/6/2018 | -4.28% | 0.48% | -4.76% | -1.12 | |
| 11/7/2018 | 5.18% | 2.45% | 2.73% | 0.64 | |
| 11/8/2018 | -0.74% | -1.09% | 0.35% | 0.08 | |
| 11/9/2018 | 1.19% | -2.18% | 3.37% | 0.79 | |
| 11/12/2018 | -1.79% | -2.86% | 1.07% | 0.25 | |
| 11/13/2018 | 1.94% | -0.39% | 2.33% | 0.55 | |
| 11/14/2018 | 4.61% | -1.58% | 6.20% | 1.45 | |
| 11/15/2018 | 3.32% | 0.91% | 2.41% | 0.56 | |
| 11/16/2018 | -2.06% | -0.35% | -1.71% | -0.40 | |
| 11/19/2018 | 8.65% | -2.45% | 11.10% | 2.60 | * |
| 11/20/2018 | -2.19% | -3.35% | 1.16% | 0.27 | |
| 11/21/2018 | 0.52% | 0.71% | -0.19% | -0.04 | |
| 11/23/2018 | -3.30% | -0.96% | -2.33% | -0.55 | |
| 11/26/2018 | -1.21% | 2.62% | -3.83% | -0.90 | |
| 11/27/2018 | 1.48% | -0.86% | 2.34% | 0.55 | |

65

# Exhibit-9

## NIO Event Study Results

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | $t$-statistic[1] |
|---|---|---|---|---|
| 11/28/2018 | 8.21% | 2.88% | 5.33% | 1.25 |
| 11/29/2018 | -4.15% | -0.76% | -3.39% | -0.79 |
| 11/30/2018 | -1.03% | 1.07% | -2.10% | -0.49 |
| 12/3/2018 | -1.70% | 1.58% | -3.28% | -0.77 |
| 12/4/2018 | -6.82% | -6.08% | -0.74% | -0.17 |
| 12/6/2018 | 4.01% | -1.03% | 5.05% | 1.18 |
| 12/7/2018 | -5.29% | -3.98% | -1.31% | -0.31 |
| 12/10/2018 | 0.57% | -0.94% | 1.51% | 0.35 |
| 12/11/2018 | 0.71% | -0.35% | 1.06% | 0.25 |
| 12/12/2018 | 6.29% | 1.03% | 5.27% | 1.23 |
| 12/13/2018 | 2.75% | -1.12% | 3.86% | 0.90 |
| 12/14/2018 | -0.65% | -2.72% | 2.07% | 0.49 |
| 12/17/2018 | -9.10% | -3.49% | -5.62% | -1.32 |
| 12/18/2018 | 0.57% | -0.35% | 0.92% | 0.22 |
| 12/19/2018 | -3.45% | -2.61% | -0.84% | -0.20 |
| 12/20/2018 | -4.65% | -2.88% | -1.77% | -0.41 |
| 12/21/2018 | -7.15% | -4.11% | -3.04% | -0.71 |
| 12/24/2018 | -2.50% | -4.61% | 2.11% | 0.49 |
| 12/26/2018 | 7.17% | 6.70% | 0.47% | 0.11 |
| 12/27/2018 | 1.09% | 0.74% | 0.36% | 0.08 |
| 12/28/2018 | 0.62% | -0.44% | 1.06% | 0.25 |
| 12/31/2018 | -1.56% | 0.29% | -1.85% | -0.43 |
| 1/2/2019 | -2.71% | 0.29% | -2.99% | -0.70 |
| 1/3/2019 | -2.45% | -4.12% | 1.67% | 0.39 |
| 1/4/2019 | 5.00% | 5.01% | -0.01% | -0.00 |
| 1/7/2019 | 2.18% | 1.61% | 0.57% | 0.13 |
| 1/8/2019 | -1.55% | 1.30% | -2.85% | -0.67 |
| 1/9/2019 | 3.53% | 1.07% | 2.46% | 0.58 |
| 1/10/2019 | 0.45% | -0.05% | 0.50% | 0.12 |
| 1/11/2019 | -1.06% | 0.83% | -1.89% | -0.44 |
| 1/14/2019 | 3.14% | -0.73% | 3.87% | 0.91 |
| 1/15/2019 | 0.29% | 0.71% | -0.42% | -0.10 |
| 1/16/2019 | -1.63% | -0.60% | -1.02% | -0.24 |
| 1/17/2019 | 1.48% | 0.90% | 0.57% | 0.13 |
| 1/18/2019 | -1.48% | 1.66% | -3.14% | -0.73 |
| 1/22/2019 | -2.11% | -2.63% | 0.52% | 0.12 |

66

**Exhibit-9**

**NIO Event Study Results**

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | t-statistic[1] | |
|---|---|---|---|---|---|
| 1/23/2019 | -0.30% | -0.62% | 0.32% | 0.07 | |
| 1/24/2019 | 0.46% | 0.52% | -0.06% | -0.01 | |
| 1/25/2019 | 1.06% | 1.42% | -0.36% | -0.08 | |
| 1/28/2019 | 0.30% | -1.60% | 1.90% | 0.45 | |
| 1/29/2019 | 3.97% | -0.39% | 4.36% | 1.02 | |
| 1/30/2019 | 7.23% | 1.93% | 5.30% | 1.24 | |
| 1/31/2019 | 5.48% | 0.83% | 4.65% | 1.09 | |
| 2/1/2019 | 0.25% | -0.40% | 0.65% | 0.15 | |
| 2/4/2019 | -0.63% | 0.55% | -1.19% | -0.28 | |
| 2/5/2019 | 0.38% | 0.41% | -0.03% | -0.01 | |
| 2/6/2019 | 6.39% | -0.53% | 6.92% | 1.62 | |
| 2/7/2019 | -4.38% | -2.62% | -1.76% | -0.41 | |
| 2/8/2019 | -4.71% | -0.18% | -4.53% | -1.06 | |
| 2/11/2019 | -2.78% | -0.33% | -2.45% | -0.57 | |
| 2/12/2019 | -0.27% | 1.60% | -1.87% | -0.44 | |
| 2/13/2019 | 0.67% | -0.09% | 0.76% | 0.18 | |
| 2/14/2019 | -0.13% | -0.62% | 0.49% | 0.11 | |
| 2/15/2019 | -0.94% | 1.31% | -2.25% | -0.53 | |
| 2/19/2019 | -2.05% | 0.46% | -2.50% | -0.59 | |
| 2/20/2019 | 4.84% | 0.19% | 4.65% | 1.09 | |
| 2/21/2019 | 0.26% | -1.28% | 1.55% | 0.36 | |
| 2/22/2019 | 6.71% | 0.62% | 6.09% | 1.43 | |
| 2/25/2019 | 9.68% | -0.09% | 9.77% | 2.29 | * |
| 2/26/2019 | 8.41% | -0.46% | 8.88% | 2.08 | * |
| 2/27/2019 | 0.61% | -0.49% | 1.10% | 0.26 | |
| 2/28/2019 | -2.88% | -1.00% | -1.88% | -0.44 | |
| 3/1/2019 | 4.99% | 0.48% | 4.52% | 1.06 | |
| 3/4/2019 | -2.82% | -1.06% | -1.76% | -0.41 | |
| 3/5/2019 | 3.81% | -0.61% | 4.43% | 1.04 | |
| 3/6/2019 | -23.78% | -1.94% | -21.84% | -5.12 | * |
| 3/7/2019 | -12.20% | -1.64% | -10.56% | -2.47 | * |

**Note:**

[1] t-statistics marked with a "*" are significant at the 95% confidence level.

[2] All returns are logarithmic returns.

67