Case 1:19-cv-01424-NGG-JRC   Document 121   Filed 12/23/22   Page 1 of 31 PageID #: 2180

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
                                    :

                                    :      19-cv-1424 (NGG) (VMS)

IN RE NIO, INC. SECURITIES LITIGATION :

                                    :      **Oral Argument Requested**

                                    :
--------------------------------------------------------- x

# DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Served on October 17, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ....................................................................................................................5

      A.      NIO and the Construction of the Shanghai Facility..................................5

      B.      The Alleged Misrepresentations .................................................................5

      C.      The Alleged Corrective Disclosure.............................................................6

      D.      Procedural History .....................................................................................8

      E.      The Proposed Class Representatives ...........................................................8

ARGUMENT...........................................................................................................................9

I.      THE EXCHANGE ACT CLASS CANNOT BE CERTIFIED BECAUSE
      INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE.............................. 10

      A.      Plaintiffs Failed To Prove Market Efficiency,
              as Required To Invoke *Basic* .................................................................. 10

      B.      Even Assuming Market Efficiency, the Challenged
              Disclosures Had No Impact on NIO's ADS Price .................................. 14

II.     THE SECURITIES ACT CLASS IS BARRED BY THE STATUTE
      OF REPOSE...................................................................................................... 17

III.    NEITHER CLASS CAN BE CERTIFIED BECAUSE PLAINTIFFS
      FAIL TO PROVIDE A CLASSWIDE DAMAGES MODEL ........................... 19

IV.    NEITHER CLASS CAN BE CERTIFIED BECAUSE PLAINTIFFS
      ARE ATYPICAL AND INADEQUATE REPRESENTATIVES ......................21

      A.      Plaintiffs' Claims Are Atypical and Subject to Unique Defenses ...........21

      B.      Plaintiffs Are Inadequate To Represent the Class .................................. 23

CONCLUSION.....................................................................................................................25

**TABLE OF AUTHORITIES**

**CASES**

Page

*In re Allergan PLC Securities Litigation*,
 No. 18 Civ. 12089 (CM)(GWG), 2020 WL 5796763 (S.D.N.Y. Sept. 29, 2020).24

*American Pipe & Construction Co. v. Utah*,
 414 U.S. 538 (1974)..................................................................................18

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)...........................................................................1, 10, 16

*Bell v. Ascendant Solutions, Inc.*,
 422 F.3d 307 (5th Cir. 2005) ..................................................................11

*Bell v. Ascendant Solutions, Inc.*,
 No. Civ.A. 301CV0166N, 2004 WL 1490009 (N.D. Tex. July 1, 2004), *aff'd*,
 422 F.3d 307 (5th Cir. 2005) ..................................................................13

*Bensley v. FalconStor Software, Inc.*,
 277 F.R.D. 231 (E.D.N.Y. 2011) ............................................................21

*Berger v. Compaq Computer Corp.*,
 257 F.3d 475 (5th Cir. 2001) ..................................................................25

*Blank v. Jacobs*,
 No. 03-CV2111 (JS)(MLO), 2009 WL 3233037 (E.D.N.Y. Sept. 30, 2009)........21

*California Public Employees' Retirement System v. ANZ Securities, Inc.*,
 137 S. Ct. 2042 (2017)...............................................................3, 18, 19

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ............................................................10

*Chauhan v. Intercept Pharmaceuticals*,
 No. 21-CV-00036 (LJL), 2021 WL 235890 (S.D.N.Y. Jan. 25, 2021) .................25

*In re Cobalt International Energy, Inc. Securities Litigation*,
 No. H-14-3428, 2017 WL 3620590 (S.D. Tex. Aug. 23, 2017) ............................19

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013).......................................................3, 10, 19, 20, 21

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*,
 281 F.R.D. 174 (S.D.N.Y. 2012) ..................................................................13

*Federal Housing Finance Agency v. UBS Americas Inc.*,
  712 F.3d 136 (2d Cir. 2013)..................................................................18

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ...........................................................21

*In re Frontier Insurance Group Securities Litigation*,
  172 F.R.D. 31 (E.D.N.Y. 1997) .............................................................22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) ...................................................21, 22

*George v. China Automotive Systems, Inc.*,
  No. 11 Civ. 7533(KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013)......11, 12, 22

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
  141 S. Ct. 1951 (2021)..............................................2, 10, 14, 15, 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).................................................................9

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  No. 11 Civ. 4209(KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)................13

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ...............................................................15

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) .............................................................24

*Koenig v. Benson*,
  117 F.R.D. 330 (E.D.N.Y. 1987).............................................................24

*In re Kosmos Energy Ltd. Securities Litigation*,
  299 F.R.D. 133 (N.D. Tex. 2014) .........................................................23

*In re Lehman Bros. Securities & ERISA Litigation*,
  655 F. App'x 13 (2d Cir. 2016), *aff'd sub nom. California Public Employees' Retirement System v. ANZ Securities, Inc.*, 137 S. Ct. 2042 (2017) .....................18

*Loritz v. Exide Technologies*,
  No. 2:13-CV-02607-SVW-E, 2015 WL 6790247 (C.D. Cal. July 21, 2015)........21

*In re Monster Worldwide, Inc. Securities Litigation*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ...............................................23, 24

iii

*Morlan v. Universal Guaranty Life Insurance Co.*,
    298 F.3d 609 (7th Cir. 2002) ....................................................................18

*In re PolyMedica Corp. Securities Litigation*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ................................................11, 13

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .....................................................................21

*Rocco v. Nam Tai Electronics*,
    245 F.R.D. 131 (S.D.N.Y. 2007) .................................................21, 22, 23

*Russell v. Forster & Garbus, LLP*,
    No. 17-CV-4274(JS)(AYS), 2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) .........24

*Scott v. N.Y.C. District Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004) .............................................................25

*In re Seagate Technology II Securities Litigation*,
    843 F. Supp. 1341 (N.D. Cal. 1994) .......................................................13

*In re Smart Technologies, Inc. Shareholder Litigation*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ...............................................................18

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ................................................................................18

*In re SunEdison, Inc. Securities Litigation*,
    329 F.R.D. 124 (S.D.N.Y. 2019) .............................................................19

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) .....................................................................11

*In re U.S. Foodservice, Inc. Pricing Litigation*,
    729 F.3d 108 (2d Cir. 2013) .....................................................................10

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) ...............................................................24

**STATUTES**

15 U.S.C. § 77m ....................................................................................8, 17

**RULES**

Fed. R. Civ. P. 23(a)(4) ..............................................................................23

**PRELIMINARY STATEMENT**

Plaintiffs fail to satisfy their heavy burden of proving that this case should be certified as a class action.  Unlike most securities claimants, Plaintiffs cannot invoke the *Basic* presumption of classwide reliance for their Section 10(b) claims because Plaintiffs fail to establish that the market for NIO's American Depositary Shares ("ADSs") was efficient in the Company's first months of public trading.  Moreover, unlike most Section 10(b) claims, Plaintiffs' claims are based on statements in initial public offering ("IPO") materials that had no impact whatsoever on the ADS price and were never revealed to be false.  Apart from these fatal defects, Plaintiffs also impermissibly seek certification of a Section 11 class long after the statute of repose for such claims expired.  Additionally, confounding non-fraud factors and the lack of any corrective disclosure create unique damages issues, which Plaintiffs offer no model or methodology for resolving on a classwide basis.  Finally, Plaintiffs themselves—two unrelated individual investors who have never spoken with each other and have never even seen the offering documents they challenge—stand in stark contrast to the sophisticated institutional investors that often serve as securities class representatives and can provide meaningful oversight of class counsel.  Indeed, Plaintiffs are not even typical of the classes they seek to represent—Plaintiff Huang purchased 97% of her shares after the proposed Class Period.  For these multiple independent reasons, Plaintiffs' motion for class certification should be denied in its entirety.

*First, the proposed Exchange Act class cannot be certified because individual issues of reliance predominate.*  Plaintiffs seek certification for securities fraud claims under Section 10(b) and 20(a), which require proof of reliance on the alleged misrepresentations.  Plaintiffs did not actually rely on any disclosures in NIO's IPO Registration Statement and Prospectus (the "Offering Documents"), which Plaintiffs have never even seen.  Instead, they try to invoke the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

To do so, however, Plaintiffs must prove that the market for NIO's ADSs was efficient throughout the proposed Class Period, such that the market price promptly reflected all publicly available information. Plaintiffs try to make that showing with an event study from Dr. Adam Werner. But Dr. Werner's analysis fails to establish market efficiency for multiple reasons, as demonstrated by Defendants' expert Dr. Faten Sabry. (*See infra* § I.A.)

Even if the market was efficient, Defendants can—and do—rebut the fraud-on-the-market presumption by demonstrating that the alleged misrepresentation had no impact on NIO's ADS price. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1957-58 (2021). Plaintiffs contend that NIO's IPO Registration Statement and Prospectus (the "Offering Documents") misrepresented that construction was underway on a new manufacturing facility in Shanghai (the "Shanghai Facility"). But the construction site itself was public, and thus whether construction was underway was publicly available information that was reflected in NIO's ADS price on day one (assuming an efficient market), regardless of what the Offering Documents said. (*See infra* § I.B.1.) Moreover, Plaintiffs cannot infer a front-end price impact based on a back-end price drop following a corrective disclosure because there never was a corrective disclosure. Plaintiffs point to NIO's press release and analyst call for its fourth quarter and full year 2018 earnings results on March 5-6, 2019 (the "Q4/FY18 Earnings Announcements"), but those disclosures did not reveal that construction of the Shanghai Facility never started. They merely disclosed that NIO decided to terminate the project months after the IPO. Such a "mismatch between the contents of the misrepresentation and the corrective disclosure" undermines an inference of price impact. *Goldman*, 141 S. Ct. at 1961. (*See infra* § I.B.2.)

In any event, the market viewed terminating the Shanghai Facility project as ***good news***. Analysts described the decision as a "positive" that would result in increased flexibility and

significant savings on capital expenditures.  (*See infra* § I.B.3.)  In stark contrast, the market was dismayed by revelations in the Q4/FY18 Earnings Announcements that demand for NIO's electric vehicles ("EVs") had slowed dramatically and was expected to remain weak, including due to the phase-out of government subsidies for EV purchasers.  This led analysts to downgrade their recommendations for NIO and caused a sharp drop in the ADS price, notwithstanding the positive news about terminating the Shanghai Facility project.  (*See infra* § I.B.4.)

 ***Second, the proposed Securities Act class is barred by the statute of repose.***  Plaintiffs seek to certify a class for claims under Section 11 and 15, which must be brought within three years of the offering at issue.  NIO's IPO was on September 12, 2018, meaning the repose period expired more than a year ago on September 12, 2021.  The statute of repose is not subject to any equitable tolling, including under the *American Pipe* doctrine.  *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2055 (2017) ("*CalPERS*").  Accordingly, because absent class members did not bring a Securities Act claim before September 12, 2021, they are now precluded from doing so by joining this action through class certification.  (*See infra* § II.)

 ***Third, no class can be certified because Plaintiffs fail to provide a basis for calculating classwide damages.***  To obtain class certification, Plaintiffs also must demonstrate that damages can be calculated on a classwide basis, including that they can isolate damages attributable only to their theory of liability.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013).  Here, Plaintiffs contend they were damaged when NIO's ADS price fell after the Q4/FY18 Earnings Announcements, but that price drop was driven by the negative surprise that demand had fallen precipitously.  Regardless, even if some portion of the price decline was caused (paradoxically) by the positive news about the Shanghai Facility, neither Plaintiffs nor Dr. Werner even suggest how they would parse that out.  While Plaintiffs do not need to prove and calculate damages at

this stage, they must prove that such calculation is possible and demonstrate how they would do it. Their failure to do so precludes certification. (*See infra* § III.)

*Finally, no class can be certified because Plaintiffs are atypical and inadequate representatives.* Plaintiffs—namely, lead plaintiff Mark Mundy and additional named plaintiff Eva Huang—are subject to unique defenses that render their claims atypical. Huang acquired more than 97% of her NIO ADSs *after* the alleged corrective disclosure and ultimately *profited* approximately $54,000 on her investments in NIO. Moreover, Huang admits she relied on the advice of a friend to invest in NIO, not on any representations in the Offering Documents or on the market being efficient. On the other hand, Mundy was an in-and-out trader who bought and sold his first 100,000 NIO ADSs *before* the alleged corrective disclosure. He subsequently bought another 100,000 NIO ADSs based on a *60 Minutes* report boasting about NIO's *existing* manufacturing facility (not the Shanghai Facility). These unique issues preclude Plaintiffs from representing any class here. (*See infra* § IV.A.)

Plaintiffs also fail to establish they would be adequate class representatives. Neither could provide basic information about the case during their depositions. Neither has ever seen NIO's Offering Documents (including before their trades, when they asserted their claims in this litigation or at any time since). They have no plan for managing this litigation together and have never even spoken to one another (which could be difficult given Mundy speaks English whereas Huang testified entirely in Mandarin Chinese and required a translator for her deposition). Plaintiffs admit that they blindly defer to their counsel. Indeed, Mundy was not even aware that, in his earlier lead plaintiff motion, his counsel mistakenly represented that he had been convicted of felony bankruptcy fraud. Plaintiffs' wholesale abdication of responsibility renders them inadequate to represent any class here, which also precludes certification. (*See infra* § IV.B.)

4

**BACKGROUND**

A.      **NIO and the Construction of the Shanghai Facility**

NIO is a leading electric car developer that designs, jointly manufactures and sells smart EVs in China, the world's largest car market.  (Second Amended Class Action Complaint (Dkt. 67) ("SAC") ¶ 3; Ex. A (Prospectus) at 1-2.)[1]  NIO manufactures its EVs with Jianghuai Automobile Group Co., Ltd. ("JAC"), a major state-owned automobile manufacturer with 50 years of experience.  (SAC ¶ 52; Ex. A at 135.)

In November 2017, NIO entered into an agreement with the Shanghai government for construction of its own manufacturing facility.  (Ex. A at 137; Ex. B.)  In January 2018, the Shanghai government announced that a site had been selected for the Shanghai Facility and that NIO and the government "communicated thoroughly [o]n aspects of factory construction, plan design, environmental assessment formulation and approval" to complete the project as quickly as possible.  (Ex. W.)  While government entities handled construction, NIO obtained financing, tax incentives and other support for the Shanghai Facility.  (Ex. A at 137; SAC ¶ 64; Ex. C at 2 (Q&A #2.5).)  As Plaintiffs acknowledge, NIO began acquiring construction-related materials and equipment for outfitting the Shanghai Facility, negotiating contracts with suppliers, and publicly accepting bids for equipment.  (SAC ¶ 87; Ex. X.)  Photographs indicate construction began as early as March 2018.  (Ex. D.)

B.      **The Alleged Misrepresentations**

On September 12, 2018, NIO launched its IPO, selling approximately 184 million ADSs that raised approximately $1.095 billion.  (SAC ¶ 55.)  Plaintiffs allege the following statements in the Offering Documents were false or misleading because, they contend, construction of the

---

[1]    Exhibits are attached to the accompanying Declaration of Robert A. Fumerton, dated October 17, 2022.

Shanghai Facility never began:

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020.  Such manufacturing facility is currently being constructed by relevant Shanghai authorities." (SAC ¶ 62; Ex. A at 32.)

- "Construction has started on our own manufacturing facility in Shanghai . . . ." (SAC ¶ 61; Ex. A at 122.)

- "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities."  (SAC ¶ 62; Ex. A at 137.)

## C.   The Alleged Corrective Disclosure

After the market closed on March 5, 2019, NIO announced its fourth quarter and full year 2018 financial results.  (Ex. E.)  The press release reported that NIO (i) incurred a net loss of approximately $1.4 billion for FY 2018, a 92% increase from FY 2017; (ii) was experiencing a "greater than anticipated slowdown in monthly deliveries" due to the phase-out of certain favorable governmental subsidies for EV buyers, among other things; and (iii) "expect[ed] deliveries in the second quarter 2019 to reflect continued weakness." (*Id.* at 4-5.)  The press release also announced that NIO had "agreed in principle . . . to terminate the plan for [the Shanghai Facility]." (*Id.* at 4.)  This would enable NIO to "focus on the joint manufacturing model in the long term," which it believed would "give [NIO] capacity and flexibility to support its market penetration and growth plans for the next two to three years."  (*Id.*)  Significantly, the release did not say that construction never began.

In the accompanying earnings call, NIO executives elaborated on the primary reasons for terminating the Shanghai Facility project:

First, in 2018, a new policy was issued by the government authorities, which allow and encourage the entities that operate its vehicle research and development and design to work with vehicle manufacturing companies to manufacture vehicles cooperatively. This joint manufacturing model between NIO and JAC is endorsed and perceived as an innovative manufacturing model in China. Secondly, through an efficiency perspective, we can leverage the existing capacity of NIO's JAC plant

6

and enjoy the flexibilities to expand the capacity to support NIO's market penetration and growth plans for the next 2 or 3 years.

(Ex. F at 4-5.)  NIO's executives went on to explain other benefits of the decision, including that the Company would no longer "need to apply for [manufacturing] subsidies or the carbon emission credit via JAC" and that this arrangement would be better for "long-term strategic funding." (*Id.* at 8.)  Only one analyst commented on the Shanghai Facility during the call, agreeing that terminating the project "could have a very positive implication for return on invested capital." (*Id.*)

The market reacted positively to NIO's decision to terminate the Shanghai Facility project.  For example, Deutsche Bank analysts reported this was a "positive development[]," explaining that "NIO's current production business model will not hinder the original sales outlook," "this as a more flexible option with potentially lower capex outlay," and "[t]he advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency." (Ex. G at 1, 3-4.)  In fact, the Deutsche Bank analysts "raise[d] [their] price target from USD8.6 to USD10.2 mainly on lower overall capex estimate given the termination of the [Shanghai Facility] and hence better free cash flow." (*Id.* at 5.)  Morgan Stanley analysts similarly reported they "view the joint manufacturing mode as [a] positive" that "could save on capex while keeping sufficient capacity." (Ex. H at 1.)  Likewise, J.P. Morgan analysts placed the termination "on the positive side" of the Q4/FY18 Earnings Announcements and highlighted that it will allow NIO to "leverag[e] JAC's existing capacity" and "implies cost savings and better investment returns" that could "translate to higher ROIC [return on invested capital] in the long-run." (Ex. I at 1, 3).

7

### D.  Procedural History

On September 18, 2020, Plaintiffs filed the SAC.  (SAC ¶ 2.)  On August 12, 2021, the Court denied Defendants' motion to dismiss.  (Dkt. 79.)  On September 12, 2021, the repose period expired for any Securities Act claims based on the IPO.  *See* 15 U.S.C. § 77m.  On June 28, 2022, Plaintiffs served the instant motion for class certification.[2]

### E.  The Proposed Class Representatives

Plaintiff Mundy is a retired hospital executive.  (Ex. J.)  On September 20, 2018, ***before*** the proposed Class Period, Mundy purchased 100,000 NIO ADSs.  (Ex. K; Ex. L, Deposition Transcript of Mark Mundy, dated Aug. 30, 2022 ("Mundy Tr.") at 76:19-23.)  On October 11, 2018, approximately five months ***before*** the alleged corrective disclosure (the Q4/FY18 Earnings Announcements), Mundy sold his entire position.  (Mundy Tr. 79:8-13.)  On February 27, 2019, after watching a new *60 Minutes* feature on NIO, Mundy purchased another 100,000 shares.  (Ex. M; Mundy Tr. 69:18-70:18.)  On April 8, 2019, Mundy retained The Rosen Law Firm to represent him in this action.  (Ex. N at 2; Ex. O.[3])  On April 15, 2019, one week after retaining The Rosen Law Firm, Mundy sold all his shares.  (Ex. N; Mundy Tr. 93:24-94:9.)

Mundy has never reviewed NIO's Offering Documents or any other SEC filing.  (Mundy Tr. 63:15-16, 76:4-6.)  He first learned of the Shanghai Facility from the draft amended complaint.  (*Id.* 97:2-21.)  As of his deposition, Mundy did not know if NIO ever made any statements about the Shanghai Facility after the IPO (seemingly unaware of the purported corrective disclosure on which his claims are based).  (*Id.* 97:22-98:13.)  Mundy has never spoken with his proposed co-representative, Plaintiff Huang.  (*Id.* 137:5-22.)

---

[2]  In Plaintiffs' Memorandum of Law in support of their motion (the "Motion" or "Mot."), Plaintiffs truncate their proposed Class Period by 25 days without explanation.  (*Compare* SAC ¶ 1, *with* Mot. at 1.)

[3]  Mundy's retainer agreement (Ex. O) is not dated or signed.  Mundy's counsel has represented that the retainer agreement was executed upon Mundy's signing of his lead plaintiff certification.  (Ex. N.)

Plaintiff Huang is also retired, after spending 20 years making paper molds for clothing in the apparel business.  (Ex. P, Deposition Transcript of Eva Huang, dated Sept. 6, 2022 ("Huang Tr.")  at 21:11-22:7.)  She speaks Mandarin Chinese and required a translator for her entire deposition.  (*Id.* 8:8-25.)  On March 5, 2018, the last day of the proposed Class Period, Huang purchased 1,000 NIO ADSs.  (Ex. Q.)  On March 6, 2019, ***after*** NIO's Q4/FY18 Earnings Announcements, Huang purchased another 1,000 shares.  (Ex. R.)  Over the next two years, Huang purchased an additional 31,325 shares, including 6,325 after she joined this action.[4]  (*See* Declaration of Dr. Faten Sabry, dated Oct. 17, 2022 ("Sabry Decl.") at ¶ 103.)  At the time of each purchase, she believed NIO was a good investment.  (Huang Tr. 108:25-110:21.)  And indeed it was.  Huang has since sold all her shares, netting an overall profit of approximately $54,000.  (Sabry Decl. ¶103.)  She cannot recall a more profitable investment.  (Huang Tr. 112:2-16.)  Like Mundy, Huang has never seen NIO's Offering Documents or any other SEC filing.  (*Id.* 71:6-8, 74:13-18.)  She relied on the advice of a "friend" to invest in NIO.  (*Id.* 33:9-35:5.)  She has never spoken to Mundy and knows nothing about him.  (*Id.* 126:25-127:6.)

## **ARGUMENT**

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  To do so, Plaintiffs must "'prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation" under Rule 23(a), and also "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)," in this case Rule 23(b)(3).

---

[4]   Huang joined this action as a "named plaintiff" added in the consolidated amended complaint, filed on May 18, 2020.  (Dkt. 48.)  Although Huang retained The Rosen Law Firm on March 24, 2019 (Dkt. 48-1 at 2), she did not seek appointment as lead plaintiff when such motions were filed in May 2019—presumably because of the significant profit she has made.

9

*Comcast*, 569 U.S. at 33 (citation omitted) (emphasis in original). The Court must "make a definitive assessment of [these] requirements, notwithstanding their overlap with merits issues, . . . and must find that each requirement is established by at least a preponderance of the evidence." *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (citation and internal quotation marks omitted).

## I. THE EXCHANGE ACT CLASS CANNOT BE CERTIFIED BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE

Plaintiffs do not attempt to plead actual reliance and thus concede this case cannot proceed as a class action without the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). (Mot. at 3.) The "fundamental premise" of *Basic* is the fraud-on-the-market doctrine—*i.e.*, the notion "that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman*, 141 S. Ct. at 1958 (citation omitted). To invoke the *Basic* presumption, Plaintiffs must prove, among other things, that NIO's ADS traded in an efficient market. *See id.* Even then, Defendants can rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* (citation omitted).

### A. Plaintiffs Failed To Prove Market Efficiency, as Required To Invoke *Basic*

To prove market efficiency, Plaintiffs rely entirely on Dr. Werner, who in turn relies primarily on an event study that purports to show "a cause-and-effect relationship existed between the release of new Company-specific information and movements in the price of NIO's ADSs." (Declaration of Dr. Adam Werner, dated June 21, 2022 ("Werner Decl.") ¶ 8(f).) *See generally Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). As the Second Circuit has observed, "[w]ithout the demonstration of such a causal relationship, it is difficult to presume

that the market will integrate the release of material information about a security into its price." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008). Dr. Werner's analysis fails for multiple independent reasons.

First, Dr. Werner's event study relies on an arbitrary and insufficient sample size. He analyzed just four events during the proposed five-month Class Period, two of which he concluded were not accompanied by any statistically significant stock movement. (Werner Decl. ¶¶ 67, 70.) These provide no evidence of the requisite cause-and-effect relationship to establish market efficiency. (Sabry Decl. ¶¶ 30-36.) *See Teamsters*, 546 F.3d at 210. The remaining two events—one of which is the Q4/FY18 Earnings Announcements—are insufficient to establish market efficiency, especially where, as here, the events occurred at the very beginning and end of the proposed Class Period. (Sabry Decl. ¶¶ 30-36.) *See George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("[S]howing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) ("[M]ere listing of five days on which news was released and which exhibited large price fluctuations proves nothing."); *see also Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) ("[T]he single-day price decline on the last day of the class period in response to what [plaintiffs] deem a corrective disclosure . . . is plainly insufficient by itself to show market efficiency throughout the class period.").

Second, Dr. Werner failed to test whether NIO's ADS experienced a statistically significant greater proportion of abnormal returns on days of company-specific news compared to days when there was no such news. *See PolyMedica*, 453 F. Supp. 2d at 270 ("To approach usefulness, an analysis should statistically compare all news days with all non-news days.").

11

Here, there is no statistically significant difference between the proportion of abnormal returns on news days versus no-news days during the Relevant Period. (Sabry Decl. ¶¶ 34-35.) Accordingly, an abnormal return on any given day does not indicate that such return was caused by company-specific news, nor does a lack of abnormal return indicate that there was no company-specific news that day. *See China Auto.*, 2013 WL 3357170, at \*11 n.11 ("[I]nvestor indifference could of course be associated with an inefficient market in which a news event that would—in an efficient market—be associated with a price movement, does not in fact cause any movement . . . ."). Indeed, Dr. Werner's model shows no statistically significant abnormal returns on numerous days when positive company-specific news was announced (*compare* Werner Decl. at 65-67 *with* Sabry Decl. ¶ 33), and he fails to identify any purported cause for statistically significant abnormal returns on various other days (*see* Werner Decl. at 65-67; Werner Tr. 109:23-112:6).

Third, Dr. Werner's entire event study depends on an inappropriate industry index—the S&P 500 Automobile Manufacturers Index—to purportedly control for industry factors affecting NIO's ADS price. (Werner Decl. ¶ 57.) During the Class Period, this index included only Ford and General Motors—traditional U.S. auto manufacturers that are not an appropriate proxy for NIO's industry: the EV market in China. (Sabry Decl. ¶¶ 45-48.) At his deposition, Dr. Werner did not know what companies were in the index but conceded it should include EV companies. (Ex. S, Deposition Transcript of Dr. Adam Werner, dated Sept. 13, 2022 ("Werner Tr.") at 87:20-24, 88:16-23, 89:17-90:10.) Dr. Werner also tried to justify ignoring NIO's geographic market (China) by claiming—incorrectly—that NIO is "a global company . . . selling cars all over the world." (*Id.* 91:14-92:23.) He later backtracked, however, and admitted that "NIO did not sell any cars in the U.S. during the relevant period." (*Id.* 287:18-22.) Because Dr. Werner's

12

entire event study is dependent on an inappropriate industry index, it does not support a finding of market efficiency. *See In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1348 (N.D. Cal. 1994) ("[I]t is necessary to eliminate [industry] factors through the use of industry indices.").[5]

Finally, Dr. Werner failed to test for autocorrelation, which is evidence of market inefficiency. (Werner Tr. 237:11-24; Sabry Decl. ¶¶ 37-44.) Autocorrelation (or serial correlations) in stock prices is the tendency to be able to predict future stock price returns from past performance. (Sabry Decl. ¶¶ 39-40.) Here, NIO's ADS price exhibits autocorrelation during the Class Period, further undermining Dr. Werner's opinion of market efficiency. (Sabry Decl. ¶ 41.) *See PolyMedica*, 453 F. Supp. 2d at 276-77 (evidence of autocorrelation "tend[s] to show that the market for [defendant's] stock was not information efficient").[6]

Separately, Dr. Werner's Declaration also contains numerous other errors, which generally undermine his opinions. For example, Dr. Werner opined that "NIO was eligible for F-3 registration for all Relevant Period trading days." (Werner Decl. ¶ 41.) But, as Plaintiffs concede, "NIO did ***not*** meet the requirement for being current in SEC filings for the past twelve month [sic] because the Exchange Act class period ended approximately six months after the IPO." (Mot. at 15 n.11 (emphasis added); *see also* Sabry Decl. ¶¶ 49-50.)[7]

---

[5]  Dr. Werner's event study also depends on an arbitrary "regression estimation period." (Sabry Decl. ¶ 28.)

[6]  Plaintiffs rely heavily on the fact that NIO's ADS trade on the New York Stock Exchange, but "no court has ever held that efficiency is established solely by the listing of a stock on a national stock exchange." *Bell v. Ascendant Solutions, Inc.*, No. Civ.A. 3:01-CV-0166-N, 2004 WL 1490009, at *5 (N.D. Tex. July 1, 2004), *aff'd*, 422 F.3d 307 (5th Cir. 2005); *see also IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 5815472, at *16 (S.D.N.Y. Oct. 29, 2013) (refusing to certify a class of purchasers of shares on New York Stock Exchange); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181-82 (S.D.N.Y. 2012) (same).

[7]  Dr. Werner's deposition was riddled with other corrections and backtracking. (*See, e.g.*, Werner Tr. 53:8-53:19 ("I should probably put some qualifiers on [Paragraph 19] . . . ."), 193:8-196:11 ("I agree [Paragraph 52(d)] should say 'a' reason and not 'the' reason [for terminating the Shanghai Facility]"), 19:22-21:18 (admitting he "may have cut and pasted [Paragraph 3] from a previous report" and is "sure" there are other "paragraphs pertaining to [his] opinions in this case that were copied from prior reports or declarations"); *see also id.* 30:8-30:18, 84:13-85:10, 240:16-241:18, 273:24-274:13, 274:21-275:9.)

**B.    Even Assuming Market Efficiency, the Challenged
Disclosures Had No Impact on NIO's ADS Price**

In any event, the alleged misstatements did not impact NIO's ADS price.  As the Supreme Court recently emphasized, the price impact analysis is flexible and holistic, and "courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960 (citations omitted) (emphasis in original).  While the Court need not decide loss causation at this stage, it must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963.

Here, Plaintiffs contend that NIO's ADS price was impacted (specifically, artificially inflated) by the Offering Documents' statements that construction *had begun* on the Shanghai Facility.  Direct evidence of such a price impact would be an increase in NIO's ADS price after the challenged statements were made.  (Sabry Decl. ¶ 55.)  As Dr. Werner concedes, however, there is no such "front-end" evidence here because the Offering Documents were issued before NIO went public and thus there are no before-and-after prices to compare.  (Werner Tr. 158:4-20; Sabry Decl. ¶ 55.)  While Plaintiffs try to infer a front-end price impact based on a back-end price drop when the "truth" supposedly was revealed, this fails for at least four independent reasons.

First, no purported corrective disclosure could have revealed the "truth" about construction of the Shanghai Facility because the construction status was already public.  (Sabry Decl. ¶¶ 61-62.)  The construction site itself was public (Ex. Y) and thus whether construction had begun was inherently publicly available information.  Anyone in Shanghai could have walked by the site and have seen that construction was in fact underway.  (Ex. D; *see also* Werner Tr. 40:3-21, 44:12-18.)  As Dr. Werner explains, in an efficient market, "*all* publicly available information is incorporated in the security price." (Werner Decl. ¶ 15 (emphasis added); *see also* SAC ¶ 151.)  Accordingly, in

14

an efficient market, to the extent the status of construction of the Shanghai Facility was material at all, it would have been reflected in NIO's ADS price on day one, independent of any statements in the Offering Documents.  *See IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (securities defendants proved no price impact by showing the alleged misstatements "added nothing to what was already public").

Second, in any event, the purported corrective disclosure—the Q4/FY18 Earnings Announcements—did not actually reveal any misstatement in the Offering Documents.  (Sabry Decl. ¶¶ 56-60.)  The inference "that the back-end price drop equals front-end inflation[] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961.  Plaintiffs claim that the Offering Documents "falsely state that construction had already begun on the Shanghai Facility," when in fact (accordingly to Plaintiffs) "construction was never started on the Shanghai Facility."  (Mot. at 4.)  Plaintiffs claim the "truth" was revealed in NIO's Q4/FY18 Earnings Announcements (*id.*), but those announcements merely disclosed that NIO was ***terminating*** Shanghai Facility project going forward, not that construction ***never began***.  (Ex. E at 4-5; Ex. F at 4, 8-9.)[8]  Nor did any analyst or media outlet.  Simply put, there was no corrective disclosure revealing any prior misstatement about construction of the Shanghai Facility.[9]

---

[8]  In addressing the purported corrective disclosure at the pleading stage, the Court did not address the mismatch between its content and the alleged misrepresentation.  (Dkt. 79 at 22.)

[9]  To the extent Plaintiffs claim the Offering Documents "did not warn investors that construction of the Shanghai Facility was dependent on NIO having sufficient cash and meeting sales expectations" (Mot. at 4), the Q4/FY18 Earnings Announcements also do not say that NIO terminated the Shanghai Facility because it did not have sufficient cash and was not meeting sales expectations.  (*See supra* pp. 6-8.)  In any event, the Offering Documents ***did*** disclose that (i) NIO expected to "incur substantial costs in setting up, equipping and improving [its] future manufacturing plant in Shanghai, which could potentially face cost overruns"; (ii)  the "level of capital expenditures will be significantly affected by user demand for [NIO's] products and services"; and (iii) "If [NIO is] unable to raise sufficient funds, [it] will have to significantly reduce [its] spending, [or], delay or cancel [its] planned activities."  (Ex. A at 26-27.)

Third, the termination of the Shanghai Facility was not negative news at all and thus could not have caused NIO's ADS price to decline in an efficient market. (Sabry Decl. ¶¶ 67-84, 91-93.) As Dr. Werner admits, analyst coverage is an important source of market information. (Werner Decl. ¶¶ 18, 28-29.) Indeed, Dr. Werner relied on analyst reactions to determine whether events were positive, negative or neutral for NIO. (*Id.* ¶¶ 65, 68; Werner Tr. 69:12-16, 112:18-113:9, 120:8-14.) Deutsche Bank analysts reported that termination of the Shanghai Facility was a "positive development," explaining that "NIO's current production business model will not hinder the original sales outlook," "this as a more flexible option with potentially lower capex outlay," and "[t]he advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency." (Ex. G at 1, 3-4.) Indeed, the Deutsche Bank analysts "raise[d] [their] price target from USD8.6 to USD10.2 mainly on lower overall capex estimate given the termination of the [Shanghai Facility] and hence better free cash flow." (*Id.* at 5.) Morgan Stanley analysts similarly "view the joint manufacturing mode as [a] positive" that "could save on capex while keeping sufficient capacity." (Ex. H at 1.) Likewise, J.P. Morgan analysts placed the termination "on the positive side" of the Q4/FY18 Earnings Announcements and highlighted that it will allow NIO to "leverag[e] JAC's existing capacity" and "implies cost savings and better investment returns" that could "translate to higher ROIC [return on invested capital] in the long-run." (Ex. I at 1, 3.) The fact that the market reacted positively to the termination of the Shanghai Facility belies any inference that the Offering Documents had artificially inflated NIO's ADS price by stating that construction was underway. (Sabry Decl. ¶ 63.) *See Basic*, 485 U.S. at 248 (defendant may rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price

16

received (or paid) by the plaintiff"); *accord Goldman*, 141 S. Ct. at 1958.[10]

Fourth, and finally, any suggestion that the price decline following the Q4/FY18 Earnings Announcements shows a price impact regarding the Shanghai Facility is further undermined by the obvious alternative explanation for that decline. (Sabry Decl. ¶¶ 85-90.) In the same announcements, NIO reported, among other things, "a greater than anticipated slowdown in monthly deliveries" for January and February due to "accelerated deliveries made at the end of last year in anticipation of EV subsidy reductions in China in 2019, the seasonal slowdowns surrounding the January 1st and Chinese New Year holidays, as well as the current slowdown of macro-economic conditions in China, particularly in the automotive sector." (Ex. E at 4-5; *see* Ex. F at 4-5, 8.) Worse still, NIO warned this weak demand likely would continue. (Ex. E at 5; Ex. F at 3.) It was this news—not termination of the Shanghai Facility—that sparked strong negative reactions from analysts and the market. (*See* Sabry Decl. ¶¶ 85-90 (summarizing reactions).) The simultaneous disclosure of a significant and ongoing drop in demand is strong evidence that the termination of the Shanghai Facility, which was heralded as a positive development likely to benefit the Company, had no adverse impact on the price of NIO's ADS price. *See Goldman*, 141 S. Ct. at 1960.

## II.    THE SECURITIES ACT CLASS IS BARRED BY THE STATUTE OF REPOSE

Separately, no Securities Act class can be certified because the statute of repose expired. Securities Act claims are subject to a three-year statute of repose that runs from the date of the offering at issue. *See* 15 U.S.C. § 77m. NIO's IPO was on September 12, 2018, meaning the

---

[10]    Dr. Werner's Declaration claims that "[a]nalysts and market participants noted . . . that the termination of the plan to construct the Shanghai facility was a negative surprise." (Werner Decl. ¶¶ 52(d), 71.) At his deposition, however, he admitted that he never reviewed any analyst reports following the termination and that the two articles he cited do not characterize the termination as a negative surprise. (Werner Tr. 64:23-65:11, 127:19-128:3, 216:20-217:4, 219:2-23; Ex. T; Ex. U.) He admitted that he "should have been more accurate." (Werner Tr. 125:14-126:8, 128:11-18.) When shown the analyst reports, Dr. Werner conceded that they characterize the termination as a positive. (*Id.* 222:20-224:10, 227:13-228:19, 229:25-231:11.)

repose period expired on September 12, 2021.  For repose purposes, absent class members' claims are not "brought" until class certification.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (it is "surely erroneous" to suggest "that a nonnamed class member is a party to the class-action litigation before the class is certified" (citation omitted)).  "[U]ntil certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs." *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002).  Thus, any shareholders who did not bring a claim before September 12, 2021 (*i.e.*, all absent class members) cannot do so now through class certification.  *See CalPERS*, 137 S. Ct. at 2055.[11]

The statute of repose is not subject to any equitable tolling, including under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), which tolls only statutes of **limitations** during putative class actions.  *See CalPERS*, 137 S. Ct. at 2055.[12]  Indeed, the very existence of the *American Pipe* doctrine confirms that absent class members' claims are not "brought" when a putative class action is filed: "if it were true that a putative class member's claims were essentially 'filed' in the putative class complaint, there would be no need for *American Pipe* tolling at all; any putative class complaint would count as a legitimate 'filing' of all putative class members' claims within the limitations period." *In re Lehman Bros. Sec. & ERISA Litig.*, 655 F. App'x 13, 15 (2d Cir. 2016), *aff'd sub nom. Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017).

The statute of repose reflects a "legislative decisio[n] that as a matter of policy there should be a specific time beyond which a defendant should no longer be subjected to protracted

---

[11]    Additionally, Plaintiffs' proposed Securities Act Class has no time limitation.  At the very least, the Securities Act Class should be limited to those who acquired shares pursuant or traceable to the Offering Documents between September 12, 2018 (the IPO) and March 5, 2019 (the last day before the alleged corrective disclosure).  *See, e.g.*, *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 58–59 (S.D.N.Y. 2013).

[12]    *See also Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 140 (2d Cir. 2013) (statutes of repose "run without interruption . . . even if equitable considerations would warrant tolling" (citation omitted)).

liability." *CalPERS*, 137 S. Ct. at 2051 (citation omitted). "The unqualified nature of that determination supersedes the courts' residual authority and forecloses the extension of the statutory period based on equitable principles." *Id.* Allowing a Securities Act class to be certified—thereby exponentially increasing Defendants' potential liability—after the repose period would thwart Congress's careful balancing of interests. While precluding class certification after the repose period might seem harsh, it actually helps ***protect*** absent class members by ensuring they have an opportunity to exercise their constitutional right to opt out while still able to bring an individual action (which they cannot do after the repose period).[13]

## III.   NEITHER CLASS CAN BE CERTIFIED BECAUSE PLAINTIFFS FAIL TO PROVIDE A CLASSWIDE DAMAGES MODEL

Class certification also should be denied because Plaintiffs have not shown that damages for either class can be calculated on a classwide basis that "isolate[s]" and measures "***only*** those damages attributable" to their theory of liability. *Comcast*, 569 U.S. at 32, 35 (emphasis added). Plaintiffs vaguely assert, without citing any evidence, that classwide damages can be calculated "using an event study." (Mot. at 17-18.) While Dr. Werner briefly addresses the topic (Werner Decl. ¶¶ 91-301), he does not even attempt to show how damages can be calculated on a classwide basis in this case, as opposed to in securities cases generally. (Sabry Decl. ¶¶ 96-101.)

For example, Dr. Werner asserts that step one of any damages calculation would entail using an event study "to establish that the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of NIO ADSs to fall." (Werner Decl. ¶ 92(i).) But, as shown above, there was no corrective disclosure here—*i.e.*, any revelation that construction of the

---

[13]   Two district courts have certified a Securities Act class after the statute of repose expired. *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 145-46 (S.D.N.Y. 2019); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 3620590, at *2-3 (S.D. Tex. Aug. 23, 2017). In *Cobalt*, the Fifth Circuit heard argument on the issue in a Rule 23(f) appeal, but the case settled before the court issued an opinion. *See St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Bryant*, No. 17-20503 (5th Cir.). Unlike here, however, the plaintiffs in *SunEdison* and *Cobalt* moved for class certification ***before*** the repose period expired.

19

Shanghai Facility never began.  (*See supra* § I.B.)  Dr. Werner ignores this fatal fact.  Even assuming *arguendo* that Plaintiffs could use the Q4/FY18 Earnings Announcements as corrective disclosures (and they cannot), Dr. Werner does not even suggest how he could isolate the effect of the Shanghai Facility announcement as opposed to the earnings results themselves and the negative surprise that demand had slowed dramatically.  Dr. Werner concedes that he would have to "control[] for potentially confounding non-fraud-related information," (Werner Decl. ¶ 92(i)), but he offers no proposal for how to do so here.  (*Id.*; Werner Tr. 246:6-247:10.)[14]

Dr. Werner attempts to excuse this failing by suggesting these issues "relate to the merits of the damages model – not whether damages can be calculated on a classwide basis pursuant to a common methodology for the Class."  (Werner Decl. ¶ 94.)  But the Supreme Court rejected that exact argument, holding it "flatly contradicts our cases requiring a determination that Rule 23 is satisfied, ***even when that requires inquiry into the merits of the claim***."  *Comcast*, 569 U.S. at 35 (emphasis added). The Court reiterated that:

> a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).  Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a "plaintiff's damages case must be consistent with its liability case . . . ." And for purposes of Rule 23, courts must conduct a "'rigorous analysis'" to determine whether that is so.

*Id.* (citations omitted).  In other words, although Plaintiffs do not need to calculate damages at this stage, they must offer evidence that establishes it is ***possible*** to determine the damages attributable only to their specific theory of liability.  Their wholesale failure

---

[14] Notably, the original complaint claimed NIO also misrepresented that "reductions in government subsidies for electric cars would materially impact NIO's sales" and cited this as a basis for the class's alleged damages following the Q4/FY18 Earnings Announcements. (Dkt. 1 ¶¶ 21-24.)  Plaintiffs have since abandoned that claim, but it still highlights the same problem as in *Comcast*, where plaintiffs' proposed damages model was inadequate at the class certification stage because it failed to disaggregate the effects of plaintiffs' lone remaining theory of antitrust liability from their others that were dismissed.  *Comcast*, 569 U.S. at 36-37.

to do so precludes certification. *See Comcast*, 569 U.S. at 35; *see also Loritz v. Exide Techs.*, No. 2:13-CV-02607-SVW-E, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (damages model insufficient to support class certification where expert "discusses general techniques for computing damages in securities fraud cases," but "fails to tie these theories to the facts of this case"); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (similar).[15]

## IV.   NEITHER CLASS CAN BE CERTIFIED BECAUSE PLAINTIFFS ARE ATYPICAL AND INADEQUATE REPRESENTATIVES

### A.   Plaintiffs' Claims Are Atypical and Subject to Unique Defenses

"[W]here a putative class representative is subject to unique defenses which threaten to become the focus of the litigation[,] certification for the class is improper because he or she can no longer act in the best interest of the class." *Rocco v. Nam Tai Elecs.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007); *see also Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 237-41 (E.D.N.Y. 2011). Whether these unique defenses will ultimately succeed is irrelevant: the mere fact that Plaintiffs will be subject to such defenses renders their claims atypical. *Blank v. Jacobs*, No. 03-CV2111 (JS)(MLO), 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30, 2009).

As to Huang, she purchased virtually all her shares after the purported corrective disclosure and made a substantial profit. (Sabry Decl. ¶ 103.) Investors who purchased stock after a corrective disclosures are subject to unique defenses because such purchases rebut the presumption that the plaintiff relied on the alleged misrepresentations or on the integrity of the market price in making his or her purchases. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990) (affirming district court's

---

[15]   *Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) (cited in Mot. at 18) is confirms that "a model for determining classwide damages . . . must actually measure damages that result from the class's asserted theory of injury . . . ." *Id.* at 405-07.

denial of class certification where plaintiff continued purchasing the securities despite having notice of the alleged fraud), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017).  Here, Huang made at least 21 purchases—acquiring approximately 33,000 shares of NIO ADSs—after the alleged corrective disclosure.  (Sabry Decl. ¶ 103.)  In other words, she purchased **97%** of her total shares ***after*** she claims the purported fraud was revealed.  Huang admits that she continued to think NIO was a good investment, despite the purported fraud. (Huang Tr. 96:24-109:5.)  And for her it was a good investment, netting her approximately $54,000 in profit—the largest she can recall.  (*Id.* 111:9-14, 112:2-16.)  Huang's continued substantial investments in NIO after the purported corrective disclosure severely undermines her claims here and renders her subject to unique defenses atypical of the class.  *See Gary Plastic*, 903 F.2d at 179-80; *China Auto.*, 2013 WL 3357170, at *6; *Rocco*, 245 F.R.D. at 136.

Moreover, Huang admits she did not rely on the alleged misrepresentations.  She never even read the Offering Documents that she challenges.  (Huang Tr. 71:6-8.)  Instead, she relied on the advice of a "friend" to invest in NIO.  (*Id.* 33:12-36:11.)  This too subjects Huang to unique defenses regarding her reliance (and whatever information her friend relied on).  *See In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 42 (E.D.N.Y. 1997) (plaintiffs may be subject to unique defenses if they relied on "some source not dependent on the market").

Similarly, Mundy also admits he did not rely on the alleged misrepresentations regarding the Shanghai Facility.  (Mundy Tr. 70:24-71:14.)  Indeed, Mundy first learned of the Shanghai Facility reading the complaint.  (*Id.* 96:23-97:5.)  Mundy admits that his only purchase during the Class Period was based on a *60 Minutes* report, which did not mention the Shanghai Facility and in fact featured NIO's existing manufacturing facility with JAC, which it described as a "spotless, automated, high-tech factory dominated by a corps of whirring robots."  (Ex. V, 60

22

Minutes Tr. at 6.)  Regarding the episode, Mundy testified: "[*60 Minutes*] showed beautiful cars in a beautiful setting.  They talked very positively about it.  And the takeaway for me was, wow." (Mundy Tr. 70:3-13.)[16]

### B.      Plaintiffs Are Inadequate To Represent the Class

In addition to being atypical, Plaintiffs also have failed to demonstrate that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Proposed representatives cannot "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000)).  That is the case here.

Plaintiffs' deposition testimony shows they lack basic knowledge about this litigation. For example, in addition to not reviewing the Offering Documents before investing in NIO, Plaintiffs also did not read them before claiming that they were materially false and misleading in violation of the federal securities laws.  (Mundy Tr. 76:4-6, 77:22-24; Huang Tr. 71:6-8.)  Nor did Plaintiffs review them in preparation for their depositions or at any other point in the three-year history of this litigation.  (*Id.*)  However "adequate representation" is defined, it at least requires Plaintiffs to read the documents that form the basis of their (and the class's) claims.  *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 147 (N.D. Tex. 2014) (denying class certification where plaintiff had never seen the registration statement underlying her claims).

Similarly, neither Plaintiff had any basis for their claim that construction of the Shanghai Facility never began.  (Mundy Tr. 151:8-152:23; Huang Tr. 60:7-14.)  Further, when asked if he

---

[16]   Additionally, Mundy suggested the market was not behaving rationally (Mundy Tr. 38:23-40:3), which further undermines any fraud-on-the-market argument.  *See Rocco*, 245 F.R.D. at 136.

23

knew what certain Defendants allegedly did wrong, Mundy replied: "Good question. No." (Mundy Tr. 144:3-145:2.) When Mundy did provide substantive answers, he relied on notes from discussions with his attorneys and on case documents he had in front of him. (*See, e.g.*, Mundy Tr. 13:18-17:2, 59:25-60:23, 114:20-115:7.) Plaintiffs' lack of knowledge renders them inadequate to represent any class here. *See In re Monster*, 251 F.R.D. at 135; *Russell v. Forster & Garbus, LLP*, No. 17-CV-4274(JS)(AYS), 2020 WL 1244804, at *5 (E.D.N.Y. Mar. 16, 2020); *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987).

Additionally, other than a single conclusory assertion in their declarations, Plaintiffs offer no evidence that they have meaningfully supervised this action. A proposed class representative "must not simply lend his name to a suit controlled entirely by the class attorney." *In re Monster*, 251 F.R.D. at 135. A class is entitled to representatives who will "check the otherwise unfettered discretion of counsel in prosecuting the suit and who will provide [their] personal knowledge of the facts." *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978). Accordingly, class representatives are inadequate if their "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987); *see also In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM)(GWG), 2020 WL 5796763, at *6 (S.D.N.Y. Sept. 29, 2020).

Here, Plaintiffs have not even monitored, much less meaningfully supervised this action. For example, Huang does not recall reading any briefing or decisions in this matter, which would have needed to be translated because she cannot read such documents in English. (Huang Tr. 16:14-18, 17:9-18:16.) Worse still, Mundy failed to notice that his motion to be appointed lead plaintiff falsely represented that he "was convicted of Bankruptcy Fraud" and "served 15 months in jail." (Dkt. 33 at Ex. A at 7.) After a competing movant argued the conviction rendered

24

Mundy inadequate, Mundy's counsel submitted an "errata," explaining "Mr. Mundy was never convicted of bankruptcy fraud and was not incarcerated" and those representations had been inadvertently copied from a draft motion for another client. (Dkt. 34-1 at 2.) The Court noted the error in its Opinion and Order appointing Mundy lead plaintiff. (Dkt. 44 at 11.) Mundy, however, was apparently unaware of the entire issue. When showed the filings at his deposition, Mundy was shocked and had "no idea where this c[ame] from." (Mundy Tr. 127:7-132:22.)

Finally, Plaintiffs have not demonstrated any ability to jointly manage the litigation. They have never spoken (nor is it clear they could do so effectively given the language barrier), and they know virtually nothing about one another. (Mundy Tr. 30:17-18, 137:5-22; Huang Tr. 8:8-25, 126:25-127:25.) They have conflicting views on how they would resolve any disagreements about the conduct of the litigation, and Huang says she would defer entirely to counsel. (Mundy Tr. 176:20-177:12; Huang Tr. 127:7-15.) Plaintiffs' lack of coordination and plan to manage the case going forward further shows their inadequacy. *See Chauhan v. Intercept Pharms.*, No. 21-CV-00036 (LJL), 2021 WL 235890, at *4-5 (S.D.N.Y. Jan. 25, 2021); *Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004).

Ultimately, "the adequacy standard must reflect . . . Congress's emphatic command that competent plaintiffs, rather than lawyers, direct [securities litigation]." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001). Plaintiffs' conduct and testimony demonstrates they have not and will not direct this litigation and instead will abdicate all responsibility to counsel. Absent adequate class representatives, class certification must be denied.

## CONCLUSION

For the reasons herein, Plaintiffs' Motion for Class Certification should be denied.

25

Dated: New York, New York
   October 17, 2022

Respectfully submitted,

 /s/ Scott Edelman
Scott Edelman
  (sedelman@milbank.com)
Jed Schwartz
  (jschwartz@milbank.com)
Elvira Razzano
  (erazzano@milbank.com)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001-2163
Tel: (212) 530-5000

*Counsel for Defendants Morgan Stanley &
Co. LLC, Goldman Sachs (Asia) L.L.C, J.P
Morgan Securities LLC, Merrill Lynch,
Pierce, Fenner & Smith Inc., Deutsche Bank
Securities Inc., Citigroup Global Markets Inc.,
Credit Suisse Securities (USA) LLC, UBS
Securities LLC, and WR Securities, LLC*


 /s/ Jane B. O'Brien
Andrew J. Ehrlich
  (aehrlich@paulweiss.com)
Xinshu Sui
  (xsui@paulweiss.com)
**PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000

Jane B. O'Brien
  (jobrien@paulweiss.com)
**PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300

*Counsel for Defendants Xiangping Zhong
 and Zhaohui Li*

 /s/ Robert A. Fumerton
Scott D. Musoff
  (scott.musoff@skadden.com)
Robert A. Fumerton
  (robert.fumerton@skadden.com)
Michael C. Griffin
  (michael.griffin@skadden.com)
Judith Flumenbaum
  (judy.flumenbaum@skadden.com)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Defendants NIO Inc., Bin Li,
Louis T. Hsieh, Lihong Qin, Yaqin Zhang,
Tian Cheng, Hai Wu, Xiang Li and Padmasree
Warrior*