UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                          :

In re NIO, Inc. Securities Litigation        :        Case No. 1:19-cv-01424-NGG-VMS

                                            :
-------------------------------------------------------------------x

## DECLARATION OF FATEN SABRY, PH.D.

### October 17, 2022

TABLE OF CONTENTS

Table of Contents ............................................................................................................... i

List of Exhibits ................................................................................................................ iii

I.    Assignment and Summary of Opinions ................................................................. 1

II.   Qualifications and Materials Relied Upon ............................................................ 6

      A.  Qualifications ............................................................................................ 6

      B.  Materials Relied Upon .............................................................................. 7

      C.  Remuneration ........................................................................................... 7

III.  Overview of Plaintiffs' Allegations ...................................................................... 7

      A.  Alleged Misstatements ............................................................................. 7

      B.  Alleged Corrective Disclosure ................................................................. 7

IV.   Dr. Werner's Opinion on Market Efficiency Is Based Primarily on a Flawed Event Study ................................................................................................................... 8

      A.  Prices React Quickly to All Publicly Available Relevant Information in an Efficient Market .................................................................................... 8

      B.  Dr. Werner's Event Study Regression Is Flawed ..................................... 11

          1.  Dr. Werner's Selection of News Dates to Test Whether NIO's ADS Reacts to News Is Subjective and Arbitrary ............................................ 13

          2.  Only One of the Three Events During the Relevant Period (October 8, 2018 to March 5, 2019) in Dr. Werner's Event Study Was Significant ............................. 15

          3.  Dr. Werner's Model Exhibits Autocorrelation Over His Estimation Period Which Could Indicate Market Inefficiency ............................................ 17

          4.  Dr. Werner Used a Flawed Industry Index .......................................... 20

      C.  Dr. Werner Erroneously Stated That NIO Was Eligible to File Form S-3 During the Relevant Period ..................................................................... 22

      D.  Dr. Werner Did Not Provide Evidence of Market Efficiency of NIO's ADS During the Period September 12, 2018 to October 8, 2018 ....................... 22

V.    The Alleged Misrepresentations About the Shanghai Facility Had No Price Impact ....... 23

A.    There Is No Direct Evidence of Price Impact at the Time the Alleged Misrepresentations Were Made ...................................................................24

B.    No Price Impact Can Be Inferred from the Price Decline Following the Q4/FY18 Earnings Announcement ...........................................................................24

1.    The Alleged Corrective Disclosure Does Not Match the Alleged Misstatements ...............................................................................................24

2.    Equity Analysts Viewed the Termination of the Shanghai Facility as a Positive or Neutral Development..........................................................................26

3.    Analysts Noted That New Government Policy Changes Would Allow NIO to Secure EV Tax Credits Without the Capital Expenditure of a New Facility.........31

4.    The Analysts' Reactions Following the Q4/FY18 Earnings Announcement Indicate the Price Drop Was Not Attributable to the Shanghai Facility................34

C.    NIO's Plan to Rely on an "Asset-Light" Joint Manufacturing Model Was Disclosed in January 2019 ......................................................................36

D.    Dr. Werner Did Not Evaluate the Reaction of Equity Analysts to the March 5, 2019 Alleged Corrective Disclosure ..........................................................37

VI.    Dr. Werner Failed To Provide a Reliable Method for Calculating Class-wide Damages in this Case ..........................................................................37

VII.    Plaintiff Huang Purchased More Than 97% of Her Holdings of NIO's ADS After the Class Period and Ultimately Made a Profit on Her NIO Investments ..............................40

VIII.    Miscellaneous ......................................................................................42

Appendix I: Curriculum Vitae of Faten Sabry, Ph.D................................................43

Appendix II: Materials Relied Upon...................................................................54

Appendix III: Replication of Dr. Werner's Event Study ............................................59

Appendix IV: NIO Predicted and Excess Returns....................................................60

Appendix V: Analyst Commentary ....................................................................63

## LIST OF EXHIBITS

Exhibit 1.    Dr. Werner's Arbitrary Selection of News Events .................................................15

Exhibit 2.    Proportion Test of News/No News Days Demonstrates No Significant Difference Between the Proportion of Significant News Days and Other Days During the Relevant Period.....................................................................................17

Exhibit 3.    Regression Tests of Current and Prior Day Returns As Implemented by Dr. Werner in Prior Reports Show Statistically Significant Autocorrelation ..............19

Exhibit 4.    Durbin-Watson and Breusch-Godfrey Tests Indicate Autocorrelation in Dr. Werner's Event Study Residuals ...........................................................................20

Exhibit 5.    Plaintiff Eva Huang's Profit on NIO Trades.........................................................41

## I.    ASSIGNMENT AND SUMMARY OF OPINIONS

1.    I have been retained by Counsel for NIO, Inc. ("NIO" or "Company") in connection with *In re NIO, Inc. Securities Litigation.* I have been asked to review and respond to certain opinions expressed in the Declaration of Dr. Adam Werner, dated June 21, 2022 ("Werner Declaration") and to opine on the price impact, if any, of the alleged misstatements. In particular, I was asked to assess Dr. Werner's opinions regarding the market efficiency of trading in NIO's American Depository Shares ("ADS"), and his proposed method of computing damages using a common methodology for all class members.[1]

2.    I understand that Lead Plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs") allege that they represent a putative class consisting of all others who are similarly situated. Plaintiffs assert securities claims against NIO, certain of its officers and directors as of its initial public offering ("IPO"), and the investment banks that served as underwriters for the IPO (collectively, "Defendants") and seek to certify: (i) a class of all persons and entities who purchased or otherwise acquired NIO's ADS pursuant and/or traceable to the Registration Statement and Prospectus (together, the "Offering Documents"[2]) issued in connection with NIO's IPO on September 12, 2018; and (ii) a "subclass" of those persons and entities who purchased or otherwise acquired NIO's ADS during the period from October 8, 2018 to March 5, 2019, inclusive (the "Class Period").[3]

3.    I understand that NIO is a designer, joint manufacturer, and marketer of electric vehicles ("EV"). It is incorporated in the Cayman Islands, with its primary operations in the People's Republic of China. According to the Offering Documents, NIO's business is to "design, jointly manufacture, and sell smart and connected premium electric vehicles, driving innovations in next generation technologies in connectivity, autonomous driving and artificial intelligence."[4] NIO launched its first volume manufactured EV, the ES8, in 2017.[5] NIO conducted an Initial

---

[1]    Werner Declaration, ¶¶ 15-89.

[2]    I refer to the Offering Documents to mean NIO's final amended Registration Statement on Form F-1, filed with the Securities and Exchange Commission ("SEC") on September 11, 2018, and/or its Prospectus on Form 424(b)(4), filed with the SEC on September 12, 2018.

[3]    Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, dated June 28, 2022, p. 1.

[4]    Prospectus, p. 1.

[5]    Prospectus, p. 1.

1

Public Offering ("IPO") of 184 million ADSs on September 12, 2018 at a price of $6.26 per ADS. NIO's ADS trade on the New York Stock Exchange ("NYSE") under the ticker "NIO."

4. In its Offering Documents, NIO stated that it manufactured its vehicles through a joint manufacturing agreement with Jianghuai Automobile Group Co. Ltd. ("JAC"). The Company also stated that it was developing a manufacturing facility in Shanghai that was scheduled to begin operations in 2020 ("Shanghai Facility").[6] Plaintiffs allege that Defendants misrepresented the status of construction of the Shanghai Facility by stating that the facility was already under construction.[7] Plaintiffs also allege that the Offering Documents failed to disclose that the construction depended on "NIO having sufficient cash flow and meeting its sales expectations."[8]

5. Plaintiffs further allege that the true status of the Shanghai Facility was revealed in NIO's announcement of its fourth quarter and full year 2018 financial results in a press release issued after the close of trading on March 5, 2019 and filed on Form 6-K with the SEC on March 6, 2019 (the "Q4/FY18 Earnings Announcement").[9] NIO announced that it had agreed in principle with the Shanghai government to terminate the plan for the Shanghai Facility and would instead focus on the joint manufacturing model in the long term, including its existing partnership with JAC. The Q4/FY18 Earning Announcement also reported the financial performance of the Company in 2018 and disclosed the preliminary sales results for the first two months of 2019, which were below expectations. Plaintiffs allege that as a result of the news about the termination of the Shanghai Facility, the price of NIO's ADS decreased over the following two trading days.[10] The price of NIO decreased from $10.16 at closing on March 5, 2019 to $8.01 at closing on March 6 and $7.09 at closing on March 7.

6. The Werner Declaration opined that NIO's ADS traded in an efficient market throughout the "Relevant Period" which he defined as October 8, 2018 to March 5, 2019. He

---

[6] Prospectus, p. 32.

[7] Second Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 67) ("Second Amended Complaint"), ¶ 10.

[8] Second Amended Complaint, ¶ 10.

[9] Second Amended Complaint, ¶ 11; NIO, Inc, "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," March 5, 2019.

[10] Second Amended Complaint, ¶ 11.

based his opinion on market efficiency in part on the fact that "at least 7 securities analysts covered NIO" and the results of his event study analysis.[11] Dr. Werner opined that the event study analysis demonstrated that there is a "cause-and-effect relationship" between the release of "new Company-specific information and movements in the price of NIO's ADS."[12]

7.     As part of my analysis of the opinions of Dr. Werner on market efficiency and alleged damages, I assessed Plaintiffs' Second Amended Complaint and other filings, SEC filings, the Werner Declaration, news articles, academic articles, and analysts' reports, among other documents about the various events at issue.

8.     My findings can be summarized as follows:

  a.  Dr. Werner's event study failed to establish a cause-and-effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period, which means the event study failed to provide a reliable basis for determining market efficiency. There are several conceptual flaws in Dr. Werner's event study analysis. First, Dr. Werner arbitrarily selected news dates for his event study and did not provide a rationale for excluding various dates on which NIO filed 6-K forms with the SEC, including sales updates. Second, Dr. Werner's conclusion that NIO's ADS had statistically significant responses to new information relied on one event out of three events that took place during the Relevant Period, as he selectively excluded certain news days of announcements during the Relevant Period without providing any rationale. A standard statistical test demonstrates no statistically significant difference between the proportion of significant news days and other days during the Relevant Period. Third, NIO's returns used in Dr. Werner's event study regression exhibited autocorrelation based on standard statistical tests, which could be a source of profitable trading strategies and evidence of market inefficiency. Fourth, Dr. Werner's event study used an industry index that

---

[11]    Werner Declaration, ¶ 8.

[12]    Werner Declaration, ¶ 8.

consisted of two American car manufacturers (General Motors and Ford) with limited to no presence in the premium EV market in China at the time, which would not be an appropriate measure of the economic conditions facing NIO. Fifth, Dr. Werner erroneously concluded that NIO was eligible to file F-3 forms during the Class Period, even though NIO had not been reporting financial statements for one year, as required to use F-3 forms. Finally, he did not provide a rationale for starting his "Relevant Period" on October 8, 2018 and for excluding the period before October 8 in his analysis (the excluded period is from the IPO date September 12 to October 7). *See* Section IV.

b.  There is no evidence of a price impact from the alleged misstatements in NIO's Offering Documents about the status of the construction of the Shanghai Facility.

i.  First, it is not possible to identify and measure the reaction, if any, of NIO's ADS at the time of the alleged misstatement because the Offering Documents were issued prior to NIO's IPO. *See* Section V.A.

ii.  Second, no price impact of the alleged misstatements can be inferred from the price reaction following the alleged corrective disclosure because there is a mismatch between the alleged misrepresentations (that construction was underway as of the IPO) and the purported corrective disclosure (that NIO was terminating the project). *See* Section V.B.1.

iii.  Third, equity analysts viewed the termination of the Shanghai Facility as positive or neutral news because they believed it would reduce costs, capital expenditures, and lead times, and would provide NIO a flexible manufacturing model while maintaining needed capacity. Analysts who lowered their recommendations, price targets, or forecasts after the Q4/FY18 Earnings Announcement attributed the downgrades to the lower than expected sales, not to the news about the

4

termination. *See* Sections V.B.2, V.B.4. Analysts also indicated that a new Chinese government policy would allow NIO to access EV manufacturer credits without directly owning a manufacturing facility. *See* Section V.B.3.

iv.   Fourth, an equity analyst reported in January 2019, prior to the Q4/FY18 Earnings Announcement, about NIO's desire to use an "asset-light" manufacturing model, and there is no significant price reaction to the news based on Dr. Werner's own event study model. *See* Section V.C.

v.   Fifth, Dr. Werner did not conduct an analysis to assess price impact of the alleged misstatements, even though he cited the coverage of a security by equity analysts as an indicator of market efficiency. He also incorrectly cited a Bloomberg article about analysts who viewed the news about the termination of the facility as a "negative surprise." The Bloomberg article includes no mention of the termination of the facility as a negative surprise and Dr. Werner acknowledged this fact in his deposition. *See* Section V.D.

c.   Dr. Werner fails to offer a viable model or methodology for calculating damages on a class-wide basis in this case. Plaintiffs claim damages based on the decline in NIO's ADS price following the Q4/FY18 Earnings Announcement, but Dr. Werner has not proposed a methodology to reliably determine the amount, if any, of that price decline that was attributable to the news about the Shanghai Facility as opposed to other confounding news about the financial performance and the less than expected sales of the NIO vehicles. *See* Section VI.

d.   Lastly, more than 97 percent of Plaintiff Eva Huang's trading in NIO's ADS occurred after the end of the proposed class period. Ms. Huang appears to have made more than $54,000 from her trading in NIO's ADS. *See* Section VII.

5

## II.    QUALIFICATIONS AND MATERIALS RELIED UPON

### A.  Qualifications

9.    I am a Managing Director in the Securities and Finance Practice at National Economic Research Associates, Inc. ("NERA") and Chair of the Global Securities and Finance Practice. I provide economic consulting and expert witness work in securities, class actions and bankruptcy matters. I have performed economic analyses of class certification, liability, materiality and damages. I have conducted event studies in numerous securities and commercial damages disputes to assess the impact of announcements such as earnings or takeover transactions on shareholders. I have conducted valuations of fixed income securities, illiquid assets, businesses and litigation settlements. I have testified as an expert in state and federal courts.

10.    I am the author of various articles on the credit crisis, the Supreme Court's decision in Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the impact of securitization on the cost and availability of credit to consumers, econometric analysis of mutual funds' advisory fees, and claiming behavior. My research has been published as a chapter in the latest edition of The Handbook of Mortgage-Backed Securities, edited by Dr. Frank J. Fabozzi. I am also the lead author of an econometric study on the impact of securitization on the costs and availability of credit for consumers and liquidity. My research has also been published in the Journal of Structured Finance, Journal of Real Estate Practice, Journal of Investment Compliance, Journal of Alternative Investments, Business Economics, International Trade Journal, and other periodicals.

11.    I am a member of the American Finance Association and the American Statistics Association. I have been accredited as a professional statistician by the American Statistics Association. I received my Ph.D. in Business from Stanford Business School and prior to joining NERA, I was a Post-Doctoral Fellow at the International Food Policy Research Institute and an assistant professor of economics at the American University, where I taught graduate and undergraduate economic courses.

12.    My curriculum vitae in Appendix I summarizes my qualifications and professional experience, testimony history, and publications I have authored.

## B.    Materials Relied Upon

13.    The materials relied upon in the preparation of this declaration are listed in Appendix II.

## C.    Remuneration

14.    NERA is being compensated for its time at standard billing rates and its out-of-pocket expenses at cost. NERA's compensation is not contingent upon the nature of my findings or on the outcome of this matter.

## III.    OVERVIEW OF PLAINTIFFS' ALLEGATIONS

### A.    Alleged Misstatements

15.    Plaintiffs contend that NIO's ADS price was artificially inflated due to the Offering Documents' representation that construction was underway on the Shanghai Facility, which Plaintiffs claim was false. Specifically, Plaintiffs allege the following statements from the Offering Documents were false: "Construction has started on our own manufacturing facility in Shanghai," "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities," and "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities."[13]

### B.    Alleged Corrective Disclosure

16.    Plaintiffs allege that the true status of the Shanghai Facility was revealed in the Q4/FY18 Earnings Announcement.[14] Plaintiffs allege that "NIO announced that it would not be building the Shanghai Facility after all, and instead would continue to rely on JAC Motors to manufacture NIO's EVs."[15]

---

[13]    Second Amended Complaint, ¶¶ 60-62.

[14]    Second Amended Complaint, ¶ 65.

[15]    Second Amended Complaint, ¶ 65.

7

17.     NIO explained its decision to terminate the Shanghai Facility in a conference call to equity analysts following the Q4/FY18 Earnings Announcement. The opening remarks of the investor call on March 6, 2019 addressed the status of the facility:

In 2017, we signed a framework agreement and memorandum with the government and related NDs in Jia Ding, Shanghai to build a manufacturing plant for NIO. Recently, we have agreed, in principle, that these contractual counterparties – with our contractual counterparties to terminate the plan of this manufacturing plant. These decisions are made based on 2 reasons. First, in 2018, a new policy was issued by the government authorities, which allow and encourage the entities that operate its vehicle research and development and design to work with vehicle manufacturing companies to manufacture vehicles cooperatively. This joint manufacturing model between NIO and JAC is endorsed and perceived as an innovative manufacturing model in China. Secondly, through an efficiency perspective, we can leverage the existing capacity of NIO's JAC plant and enjoy the flexibilities to expand the capacity to support NIO's market penetration and growth plans for the next 2 or 3 years. In the long run, we will still focus on the joint manufacturing model and continue improving the effectiveness of capital investments in manufacturing.[16]

## IV.   DR. WERNER'S OPINION ON MARKET EFFICIENCY IS BASED PRIMARILY ON A FLAWED EVENT STUDY

18.     Dr. Werner examined several factors to assess whether NIO's ADS traded in an efficient market, relying primarily on an event study. The Werner Declaration states that the "event study is the paramount tool for testing market efficiency."[17] Dr. Werner used an event study regression to analyze the reaction, if any, of NIO's ADS price to new information. However, his event study is flawed in several ways and does not provide a reliable basis to establish the market for NIO's ADS was efficient throughout the proposed class period.[18]

### A. Prices React Quickly to All Publicly Available Relevant Information in an Efficient Market

19.     Market efficiency has been a key concept in financial economics since the seminal work by Professor Eugene Fama in the 1960s.[19] The idea of an efficient market is that

---

[16]   Edited Transcript: NIO, Inc, "NIO Inc. Reports Unaudited Fourth Quarter and Full Year Q4 2018 Financial Results Nio Inc Earnings Call," March 6, 2019.

[17]   Werner Declaration, ¶ 44.

[18]   Werner Declaration, ¶ 42.

[19]   Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work." *The Journal of Finance* 25, no. 2 (May 1970): 383-417.

"[a] capital market is said to be efficient if it fully and correctly reflects all relevant information in determining security prices. Formally, the market is said to be efficient with respect to some information set …if security prices would be unaffected by revealing that information to all participants. Moreover, efficiency with respect to an information set…implies that it is impossible to make profits by trading on the basis of [that information set]."[20]

20.     Academics have divided the concept of market efficiency into three categories: "(1) weak-form tests (How well do past returns predict future returns?), (2) semi-strong-form tests (How quickly do security prices reflect public information announcements?), and (3) strong-form tests (Do any investors have private information that is not fully reflected in market prices?"[21] A stock generally cannot be semi-strong efficient if it is not weak-form efficient. In securities litigation, the focus is often on the semi-strong form of market efficiency and the question of whether the market price efficiently reflects all publicly available information. Event studies and other tests are usually used to test if the market is semi-strong efficient.

21.     An efficient market is one where trading activities cause the prices to adjust quickly to reflect all relevant and available information, and as a result, price changes at any given time are due to the arrival of new information or due to unpredictable random movements. In other words, "[i]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on cash flows…and the opportunity cost of capital."[22]

22.     The academic literature addresses how information affects stock prices. Studies have shown that in an efficient market, market forces and the competition between investors cause new information to be incorporated rapidly into stock prices.[23] For example, if there is new

---

[20]   Campbell, John Y, Andrew W. Lo, and A. Craig MacKinlay, The Econometrics of Financial Markets, pp. 20-21.

[21]   Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* no. 46, no. 5, December 1991.

[22]   Brealey, Richard A., Franklin Allen, and Stewart C. Myers. "13-3 The Evidence Against Market Efficiency," In Principles of Corporate Finance, 11th ed., 321. Maidenhead: McGraw-Hill, 2014.

[23]   *See, e.g.*, Richard A. Brealey, Stewart C. Myers and Franklin Allen, Principles of Corporate Finance (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330, and Jonathan Berk and Peter DeMarzo, Corporate Finance (Pearson: Boston, MA, 3rd ed., 2014), pp. 295-296 ("The idea that markets aggregate the information of many investors, and that this information is reflected in security prices, is a natural consequence of investor competition.").

9

information indicating that a stock is underpriced, investors will attempt to profit by buying the stock. This will increase price of the stock until the price reaches an appropriate level and the mispricing is corrected. Investors, therefore, have an incentive to review public information such as company filings, news stories, and analyst reports as they are released to identify new information that has not yet been incorporated into the stock price.[24] After the information is publicly disclosed and reflected in the price, the reiteration of previously disclosed information will not impact the stock price in an efficient market.[25]

23.     Academic research has also found that stock prices react quickly to incorporate new information, with the reaction timing becoming even quicker with technological advancements.[26] For example, Patell and Wolfson (1984) examined the price reaction to earnings announcements in the 1970s and concluded that, "by far the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure."[27] By 2000, a company's stock price began to react within seconds of live discussions of analyst reports on television.[28]

24.     One of the standard academic tests of whether the market responds to news is to test whether yesterday's stock returns can be used to predict today's returns. If the stock price incorporates new information in the markets quickly, then there would be no arbitrage opportunities. Academics have developed various tests of this phenomenon which are referred to as autocorrelation tests. Autocorrelation (or serial correlation) is the tendency of stock returns to

---

[24]   *See, e.g.*, Jonathan Berk and Peter DeMarzo, Corporate Finance (Pearson: Boston, MA, 3rd ed., 2014), p. 296 ("Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or in other public data sources. If the impact of this information on the firm's future cash flows can be readily ascertained, then all investors can determine the effect of this information on the firm's value. In this situation, we expect competition between investors to be fierce and the stock price to react nearly instantaneously to such news.").

[25]   *See, e.g.*, Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments (McGraw-Hill: New York, NY, 10th ed., 2014), p. 351, and Stephen A. Ross, Randolph Westerfield, and Jeffrey F. Jaffe, Corporate Finance (McGraw-Hill/Irwin: Boston, MA, 6th ed., 2002), p. 351 ("According to the efficient-market hypothesis, a stock's abnormal return […] should reflect the release of information at the same time[.] Any information released before then, though, should have no effect on abnormal returns in this period, because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices.").

[26]   *See, e.g.*, Bradford Cornell, Corporate Valuation (McGraw-Hill: New York, NY, 1993), pp. 38, 41-42.

[27]   Patell, James M., and Mark A. Wolfson. "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements." *Journal of Financial Economics* 13, no. 2 (June 1984): 223–52.

[28]   Busse, Jeffrey A., and T. Clifton Green. "Market efficiency in real time." *Journal of Financial Economics* 65, no. 3 (2002): 415-437.

be explained by past stock returns.[29] Tests for autocorrelation are often used as tests for weak-from market efficiency, because the presence of autocorrelation means that past market movements (which is public information) can predict future price movements.[30]

## B.  Dr. Werner's Event Study Regression Is Flawed

25.      "An event study is a statistical technique that estimates the stock price impact of occurrences such as mergers, earning announcements, and so forth. The basic notion is to disentangle the effects of two types of information on stock prices information that is specific to the firm under question…and information that is likely to affect stock prices market wide (e.g., change in interest rate.)"[31]

26.      An event study starts with the identification of a specific event or announcement, its exact timing, and the appropriate event window.[32] The event window is the time period over which one would estimate the behavior of the stock. For example, an earnings announcement is usually measured over a period of one day. After establishing the framework for determining the event window, the next step is to calculate the relation between the company's stock price and the market. This relation is established using a regression analysis of the returns of the stock price of the company in question on the returns of the relevant market indices. The purpose of this estimation procedure is to quantify the expected returns of stock price after considering general market and industry conditions. One would then use the estimated relation between the stock price in question and the market factors to predict the returns on the event date. The predicted return is then compared to the actual return with the difference representing the

---

[29]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Fourth Edition, 2001, p. 276.

[30]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Fourth Edition, 2001, p. 276.

[31]    Mitchell, Mark L., and Jeffry M. Netter. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission." *The Business Lawyer* 49, no. 2 (February 1994): 545–90.

[32]    Event study analysis and other financial research use data from third-party service providers including Bloomberg LP, FactSet Research, and Factiva. Bloomberg L.P. is a financial, software, data, and media company. Bloomberg provides financial software tools such as an analytics and equity trading platform, data services, and news to financial companies and organizations. FactSet Research Systems Inc. is a global provider of integrated financial information, analytical applications and services for the investment and corporate communities. Factiva is a news service that includes content from more than 20,000 news sources, including newspapers, TV transcripts, newswires, and business magazines.

abnormal or excess return. This return, multiplied by the company stock price, provides an estimate of the per share dollar effect of the event in question.[33]

27.    The Werner Declaration states that the "event study is the paramount tool for testing market efficiency."[34] Dr. Werner conducted an event study to test whether NIO's ADS price reacts to material company-specific news. To do so, he ran a regression model to estimate the relationship between NIO's ADS returns and the returns of the market as represented by the Center for Research in Security Prices (CRSP) NYSE/AMEX/NASDQA/ARCA Index.[35] He also included the returns of the S&P 500 Automobile Manufacturers Index to purportedly control for industry peers.[36] In addition to the market and industry indices, Dr. Werner selected specific events dates to include in his market model (as indicators or dummy variables) in order to test whether NIO's ADS reacted to news that he deemed to be "important," "relevant," or "material" to the company.[37] He opined that "significant price reactions to such events would demonstrate market efficiency, not only generally, but also specifically with respect to the information at issue in this case."[38] Dr. Werner did not provide any criteria for how he identified "important", "relevant" or "material" news and he excluded various SEC filings by NIO during the regression period without an explanation.[39]

28.    The estimation period that Dr. Werner used in his event study regressions is October 8, 2018 to October 8, 2019 ("regression period"). This differs from Dr. Werner's Relevant Period (October 8, 2018 to March 5, 2019) and his Declaration does not provide a rationale for the selection of the regression estimation period. Based on instructions from

---

[33]    Weil, Roman, Michael Wagner, and Peter Frank, *Litigation Services Handbook*, pp. 19-1-17.

[34]    Werner Declaration, ¶ 44.

[35]    Returns of NIO's ADS means the daily change in the price of NIO's ADS, expressed in natural logarithmic form. In other words, if the closing price on Monday is $10.00, and the closing price on Tuesday is $10.10, the daily return is equal to ln($10.10/$10.00) or 0.0100.

[36]    Werner Declaration, ¶¶ 57-58.

[37]    Werner Declaration, ¶ 52.

[38]    Werner Declaration, ¶ 43.

[39]    Five of the indicators correspond to four earnings announcements on November 6, 2018, March 5, 2019, May 28, 2019, and September 24, 2019, where both March 6, 2019 and March 7, 2019 were included as indicator variables pertaining to the March 5, 2019 after-hours earnings announcement. October 9, 2018 corresponds to the news announcement of an investor in NIO, and November 30, 2018 corresponds to the November 29, 2018 after-hours announcement of a management change.

Plaintiffs' counsel, he defined the period from October 5, 2018 to March 5, 2019 as the "Relevant Period."[40]

29.     The estimated coefficients on market, industry indices, and indicators for specific news events from Dr. Werner's regressions quantify the impact on NIO's ADS returns. The difference between the observed returns to NIO's ADS and explained returns for a given day is the portion that cannot be explained by the industry or market index and is referred to as residual return or abnormal return.[41] The t-statistic reported by Dr. Werner in Exhibit 9 of his Declaration provides his measure of statistical significance.[42]

### 1. Dr. Werner's Selection of News Dates to Test Whether NIO's ADS Reacts to News Is Subjective and Arbitrary

30.     In his market model, Dr. Werner selected three event dates during the class period of October 8, 2018 to March 5, 2019 to test if NIO's ADS reacts to news on these dates. These event dates are: (1) Baillie Gifford & Co. acquisition of an 11% stake in NIO on October 9, 2018; 2) NIO's announcement of its third quarter financial results on November 6, 2018; and 3) the resignation of NIO's Chief Development Officer on November 30, 2018. In addition, he included in his market model two indicators for additional events that took place after the class period on March 6, 2019 and March 7, 2019 following the Q4/FY18 Earnings Announcement on March 5, 2019.[43]

31.     Dr. Werner did not provide any criteria or analysis for how he identified "important," "relevant," or "material" news.[44]

32.     Also, Dr. Werner's reliance on a select subset of news dates in his event study to try to demonstrate a cause-and-effect relationship between the release of new information and

---

[40]    Werner Declaration, ¶ 1.

[41]    Werner Declaration, ¶ 46.

[42]    Werner Declaration, Exhibit 9.

[43]    Werner Declaration, ¶ 52.

[44]    Five of the indicators correspond to four earnings announcements on November 6, 2018, March 5, 2019, May 8, 2019 and September 24, 2019, where both March 6, 2019 and March 7, 2019 were included as indicator variables pertaining to the March 5, 2019 after-hours earnings announcement. October 9, 2018 corresponds to the news announcement of an investor in NIO and November 30, 2018 corresponds to the November 29, 2018 after-hours announcement of a management change.

NIO's ADS price is arbitrary and circular. Dr. Werner sought to test if NIO's ADS price reacted in a statistically significant way to news during the Relevant Period (October 8, 2018 to March 5, 2019). However, he selected only three news days during the Relevant Period, which he classified as relevant or important to NIO without providing any rationale (and only one of the three dates is significant according to his analysis).[45] He also tested the reaction of NIO's ADS on March 6, 2018 and March 7, 2018, even though these dates took place after the Relevant Period.

33.    During the time period that Dr. Werner used in his event study analysis (October 8, 2018 to October 8, 2019), there are numerous events that NIO disclosed in Form 6-K and Schedule 13 filings to the SEC. Foreign issuers are required to submit Forms 6-K for material business events pursuant to Rule 13a-16 or 15d-16 under the Securities Exchange Act of 1934 and Schedule 13 for certain ownership changes.[46] Exhibit 1, below, presents the events that could have been selected by Dr. Werner for the time period of his regression period of October 8, 2018 to October 8, 2019. Of the events during the regression period, there are fourteen news events during the Relevant Period, but Dr. Werner decided to use three events in his regression out of the fourteen events during the "Relevant Period" of October 8, 2018 to March 5, 2019 without an explanation for his selections. *See* Appendix III and Appendix IV.

---

[45]    "Significant" days are those on which there was a statistically significant abnormal return for NIO's ADS.

[46]    SEC, "Form 6-K: Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 under the Securities Exchange Act of 1934."

Exhibit 1.  *Dr. Werner's Arbitrary Selection of News Events*

| Number | Announcement Date | News | Event Identified in Dr. Werner's Event Study |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| 1. | 10/9/2018 | Baillie Gifford & Co. Takes Stake in NIO | Yes |
| 2. | 10/15/2018 | Q3 2018 Sales Update | No |
| 3. | 11/6/2018 | Q3 2018 Earnings Announcement | Yes |
| 4. | 11/29/2018 [1] | Resignation of Chief Development Officer | Yes |
| 5. | 12/3/2018 | November 2018 Sales Update | No |
| 6. | 12/17/2018 | Announced Launch of the ES6 Model | No |
| 7. | 1/10/2019 | December 2018 Sales Update | No |
| 8. | 1/23/2019 | CEO Transfers Shares to a Trust | No |
| 9. | 1/29/2019 | Proposed Offering of Convertible Notes | No |
| 10. | 1/30/2019 [2] | Pricing of Convertible Notes | No |
| 11. | 2/1/2019 | Tencent and Others Take Stake in NIO | No |
| 12. | 2/4/2019 | Closing of Convertible Notes | No |
| 13. | 2/5/2019 | Baillie Gifford & Co. Amends Reported Ownership Stake | No |
| 14. | 2/14/2019 | Temasek Holdings and Others Take Stake in NIO | No |
| 15. | 3/5/2019 [3] | Q4 2018 Earnings Announcement | Yes |
| 16. | 4/2/2019 | Q1 2019 Sales Update and Annual Report | No |
| 17. | 5/28/2019 | Q1 2019 Earnings Announcement | Yes |
| 18. | 6/4/2019 | May 2019 Sales Update | No |
| 19. | 6/27/2019 | Battery Recall for Safety Concerns | No |
| 20. | 7/10/2019 | Q2 2019 Sales Update | No |
| 21. | 8/12/2019 | July 2019 Sales Update | No |
| 22. | 9/5/2019 | Announced Private Placement of Convertible Notes | No |
| 23. | 9/17/2019 | Retirement of EVP of NIO XPT | No |
| 24. | 9/24/2019 | Q2 2019 Earnings Announcement | Yes |
| 25. | 10/8/2019 [4] | Q3 2019 Sales Update | No |

**Notes and Sources:**

- Data are from the Securities and Exchange Commission and GlobeNewswire.

[1] This news became public on November 29, 2018 but the 6-K was not filed until November 30, 2018.

[2] This news became public on January 30, 2019 but the 6-K was not filed until January 31, 2019.

[3] This news became public on March 5, 2019 but the 6-K was not filed until March 6, 2019.

[4] This news became public on October 8, 2019 but the 6-K was not filed until October 10, 2019.

### 2. Only One of the Three Events During the Relevant Period (October 8, 2018 to March 5, 2019) in Dr. Werner's Event Study Was Significant

34.    Dr. Werner's event study shows a statistically significant price reaction on only one of the three event days that he tested during the Relevant Period: the Baillie Gifford acquisition of an 11% stake in NIO on October 9, 2018. He concluded that there was no statistically significant abnormal return in response to the news released on November 6, 2018 (the Q3 2018 earnings announcements) or November 29, 2018 (the resignation of NIO's Chief

15

Development Officer).[47] As demonstrated below, Dr. Werner's single significant day out of the news days in the Relevant Period is just as statistically likely to have occurred during non-news days.

35.      If the proportion of statistically significant abnormal returns on "news days" is statistically significantly greater than on no-news days, this could be evidence of a cause-and-effect relationship between the release of new information and excess returns of the stock price.[48] This is not the case here. As shown in Exhibit 1 above, there are fourteen events that took place over thirteen days during the Relevant Period.[49] My analysis demonstrated no significant difference between the proportion of abnormal returns on news days and no-news days during the Relevant Period.[50] This means that Dr. Werner's event study failed to demonstrate a cause and effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period. *See* Exhibit 2.

---

[47]    Werner Declaration, ¶ 52 b and c.

[48]    I define "news days" as the first trading day following the announcements of filings by NIO.

[49]    There were 14 SEC Form 6-K and Schedule 13 filings during the Relevant Period. The Form 6-K filing on February 4, 2019 occurred after hours. As such the market would have reacted to the news on February 5, 2019. There was also a Schedule 13 filed on February 5, 2019. As such, both filings correspond to a single news day.

[50]    Dr. Werner conducted news/no news tests in other cases such as, *In Re CytRx Corporation Securities Litigation*, No. CV-05519-SJO-SK (C.D. Cal. Nov. 17, 2017).

16

Exhibit 2.    *Proportion Test of News/No News Days Demonstrates No Significant Difference Between the Proportion of Significant News Days and Other Days During the Relevant Period*

| Item | Formula | Number |
|---|---|---|
| (1) | (2) | (3) |
| Total Number of Trading Days in Class Period | [A] | 101 |
| Total Number of Statistically Significant Days | [B] | 6 |
| Proportion of Statistically Significant Days | [C] = [B]/[A] | 5.94% |
| Number of News Days in Class Period | [D] | 13 |
| Total Number of Statistically Significant News Days | [E] | 1 |
| Proportion of Statistically Significant News Days | [F] = [E]/[D] | 7.69% |
| Number of Non-News Days in Class Period | [G] = [A] - [D] | 88 |
| Total Number of Statistically Significant Non-News Days | [H] = [B] - [E] | 5 |
| Proportion of Statistically Significant Non-News Days | [I] = [H]/[G] | 5.68% |
| **Z-Score for Difference in Proportions** | | **0.2862** |
| **P-Value** | | **77.47%** |
| **Is the Difference in Proportions Statistically Significant?** | | **No** |

**Notes and Sources**
- Data are from Declaration of Dr. Adam Werner, dated June 21, 2022, the Securities and Exchange Commission and GlobeNewswire.

36.     Dr. Werner also relied on the change in NIO's ADS price over the two days (March 6 and 7, 2018) following the alleged corrective disclosure in the Q4/FY18 Earnings Announcement. However, these dates are outside the Relevant Period. In addition, relying on such dates is circular as the alleged corrective disclosure was presumably chosen at least in part because of an associated price decline (that is, Plaintiffs would not have filed a lawsuit if NIO's stock price had not declined following some news).

### 3.    Dr. Werner's Model Exhibits Autocorrelation Over His Estimation Period Which Could Indicate Market Inefficiency

37.     In addition, Dr. Werner's event study exhibits autocorrelation over his regression period, which could be a source of profitable trading strategies and evidence of market inefficiency. Under weak form market efficiency, stock prices should reflect all information

contained in historical prices, including past performance.[51] As such, a company's past stock price returns should not be able to systematically predict future returns in an efficient market.

38.    Weak-form market efficiency requires that stock prices reflect all information that can be derived from previous market trading data such as prior prices or volume data. This implies that identifying trends in the price history does not predict future performance. If any trends did exist that could be used to develop profitable trading strategies, they would be quickly identified by investors and the market price would soon reflect the information.[52]

39.    Autocorrelation (or serial correlations) means that past price performance can predict future price movements.[53] Positive autocorrelation is a tendency for positive (negative) returns to be followed by additional positive (negative) returns. Negative autocorrelation is the tendency for positive (negative) returns to be followed by additional negative (positive) returns.[54]

40.    In other words, in an efficient market, one should not be able to predict a stock's future performance based on its past performance. I examined the autocorrelation in NIO's ADS daily returns and demonstrated that past returns predicted future returns over Dr. Werner's regression estimation period. If investors could develop profitable strategies using this relationship, then it would indicate the lack of efficient trading in this market.

41.    There is statistical evidence of positive autocorrelation in NIO's ADS returns that Dr. Werner used in his event study which violates the weak-form market efficiency. That is, during Dr. Werner's event study regression period, days with positive excess returns are often followed by positive excess returns. If a market does not demonstrate weak-form efficiency, it is also not semi-strong efficient as is the focus in securities litigation.[55]

42.    Dr. Werner testified at deposition that he has not used autocorrelation in many years and generally people stopped looking at autocorrelation coefficients to establish market

---

[51]    Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work." *The Journal of Finance* 25, no. 2 (May 1970): 383-417.

[52]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Fourth Edition, 2001, p. 270.

[53]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Fourth Edition, 2001, p. 276.

[54]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Fourth Edition, 2001, p. 276.

[55]    Zvi Bodie, Alex Kane, and Alan J Marcus, Investments, Eleventh Edition, 2018, p. 338.

efficiency.[56] However, recent academic studies continue to use autocorrelation tests of efficiency and I understand that courts have also used analysis of autocorrelation to inform whether markets are efficient.[57]

43.    I examined whether NIO's ADS exhibit autocorrelation using various tests including the ones that Dr. Werner used in his previous expert reports. Similar to Dr. Werner's methodology in prior matters, I estimated three regressions specifications using prior day returns and excess returns.[58] I ran the regression using data from the time period October 8, 2018 to October 8, 2019 and using the same indicators for news days as in his event study. The results are presented in Exhibit 3, below. The estimated coefficients on prior day returns and prior day excess returns are statistically significant at the 5% level. This means that autocorrelation is present in NIO's ADS using the same statistical tests that Dr. Werner used in prior reports.

Exhibit 3.    *Regression Tests of Current and Prior Day Returns As Implemented by Dr. Werner in Prior Reports Show Statistically Significant Autocorrelation*

| Dependent Variable [1] | Independent Variable | Independent Variable | | Nr. Obs. | Root Mean Square Error | R-Squared | Adjusted R-Squared |
|---|---|---|---|---|---|---|---|
| | | Coefficient | t-statistic | | | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Current Day Return | Prior Day Returns | 0.17 | 2.75 * | 251 | 0.05 | 0.03 | 0.03 |
| Current Day Excess Return | Prior Day Returns | 0.14 | 2.66 * | 251 | 0.04 | 0.03 | 0.02 |
| Current Day Excess Return | Prior Day Excess Returns | 0.15 | 2.33 * | 251 | 0.04 | 0.02 | 0.02 |

**Notes and Sources:**
- Data are from FactSet.
* Indicates statistical significance at the 5% level.

44.    In addition, I conducted standard tests of autocorrelation which confirm the presence of significant autocorrelation in NIO's ADS during the regression period.[59] Both test the hypothesis that there is no autocorrelation for NIO's ADS excess returns. For the Durbin-Watson test, a test statistic that is greater or less than 2 suggests that there is autocorrelation. For

---

[56]    Deposition of Dr. Adam Werner, September 13, 2022 ("Werner Deposition"), pp. 236:22-237:15.

[57]    *See* Lim, Kian-Ping, Weiwei Luo, and Jae H. Kim. "Are US stock index returns predictable? Evidence from automatic autocorrelation-based tests." *Applied Economics* 45, no. 8 (2013): 953-962. and Huang, Dashan, Jiangyuan Li, Liyao Wang, and Guofu Zhou. "Time series momentum: Is it there?." *Journal of Financial Economics* 135, no. 3 (2020): 774-794.

[58]    *See, e.g.*, *In re CytRx Corporation Securities Litigation*, No. CV-05519-SJO-SK (C.D. Cal. Nov. 17, 2017); *In re Hi-Crush Partners L.P.*, No. Civ-8557 (S.D.N.Y. Apr. 15, 2014).

[59]    Greene, William H., *Econometric Analysis*, Prentice Hall, 7th Ed, pp. 922-923.

the Breusch-Godfrey test, larger values of the test statistic would be evidence of autocorrelation. The results in Exhibit 4 below show that the Durbin-Watson statistic is 1.68, with a significance level of 1% and the Breusch-Godfrey test statistic is 5.59, with a significance level of 2%. Both tests show significance level below 5%. Both tests show statistically significant results of autocorrelation.

Exhibit 4.   *Durbin-Watson and Breusch-Godfrey Tests Indicate Autocorrelation in Dr. Werner's Event Study Residuals*

| Autocorrelation Test | Test Statistic | P-Value |
|---|---|---|
| (1) | (2) | (3) |
| Durbin-Watson | 1.68 * | 0.01 |
| Breusch-Godfrey | 5.59 * | 0.02 |

**Notes and Sources:**
- Data are from FactSet.
- The autocorrelation tests were conducted on the replication of Dr. Werner's event study.
- The p-value for the Durbin-Watson statistic is based on the empirical distribution over 10,000 sets of resampled residuals.
- Statistical significance at the 5% level is denoted with an asterisk.

### 4.  Dr. Werner Used a Flawed Industry Index

45.      Dr. Werner selected the S&P 500 Automotive Manufacturers Index to control for potential industry effects.[60] The constituents of this index during the Relevant Period were General Motors and Ford Motors.[61] Dr. Werner provided no economic basis for his selection of this industry index and ignored that his industry index does not control for factors affecting the market for premium electric vehicles and market conditions for electric vehicles in China.

46.      Dr. Werner's use of the S&P 500 Automotive Manufacturers index ignores the fact that the index was composed of General Motors and Ford Motor Company in 2018, two American manufacturers that generated most of their sales outside of China and whose sales

---

[60]    Werner Declaration, ¶ 57.

[61]    Bloomberg, L.P., S&P 500 Automobile Manufacturers Sub Industry GICS Level l4 Index.

were primarily vehicles powered by internal combustion engines, not electric vehicles. The index therefore does not reflect the demand for premium electric vehicle in China, which is the market segment in which NIO operated.

47.    The analyst reports covering NIO highlight the economics of EV and Chinese markets as key to quantifying the valuation of NIO. Credit Suisse described NIO as "a pioneer in China's premium electric vehicle market with well-established branding, technology leadership and redefined car owners' experience."[62] JP Morgan stated that NIO was an "EV manufacturer targeting China's fast growing and largely untapped premium EV market through its competitive SUV line-ups. We are optimistic on China's EV demand and Nio's top-line opportunity."[63] Similarly, Morgan Stanley stated, "NIO's first mass-produced vehicle, ES8, has the best-in-class specifications among the premium EVs currently available in the market."[64] Morgan Stanley also discussed the impact of Chinese policies on NIO, stating, "current NEV profit margins are closely linked to favorable policies. Potential policy changes may diminish the current advantages of NEVs over ICE vehicles."[65] Also, Wolfe Research highlighted the Chinese EV market as central to NIO's economics, stating "China government support for EVs is a tremendous tailwind: New Energy Vehicles (NEV), including Battery Electric Vehicles (BEV), Plug-in Hybrid (PHEV), and fuel-cell vehicles are a critical aspect of China's plan to improve air quality."[66]

48.    Dr. Werner did not provide an economic rationale for his choice of GM and Ford as comparable companies, and his selection of that index is flawed as it fails to reflect the underlying economic factors affecting the valuation of premium electric vehicles in China.

---

[62]  Wang, Bin, Nick Li and Carrie Jiang, "Nio Inc: The next generation car company," Credit Suisse, October 22, 2018.

[63]  Lai, Nick, Ryan Brinkman, Rebecca Y Wen, "NIO: Blue Sky Future, but unproven path there: Initiate with Neutral." JP Morgan, October 9, 2019, 1.

[64]  Yeung Jack et al., "China's Premium EV Pioneer; Initiate at Overweight" Morgan Stanley, October 7, 2018, 5.

[65]  Yeung Jack et al., "China's Premium EV Pioneer; Initiate at Overweight" Morgan Stanley, October 7, 2018, 6.

[66]  Galves, Dan, Rod Lache, and Shreyas Patil, "Unique Opportunity to ride China EV Wave," Wolfe Research, October 8, 2018, 2.

21

**C.  Dr. Werner Erroneously Stated That NIO Was Eligible to File Form S-3 During the Relevant Period**

49.      Dr. Werner identified the ability to file an F-3 Registration Statement as an indication of market efficiency because the requirements for F-3 eligibility "ensured that financial data are available to market participants."[67] Dr. Werner opined that "NIO was eligible for F-3 registration for all Relevant Period trading days."[68]

50.      However, NIO was not eligible to use Form F-3. According to the SEC, a company must have "filed all the material required to be filed pursuant to Section 13, 14 or 15(d) for a period of at least twelve calendar months immediately preceding the filing of the registration statement on this Form."[69] NIO had not filed its financial statements publicly for twelve months as of the Relevant Period, which covers five of NIO's first six months as a public company.

**D.  Dr. Werner Did Not Provide Evidence of Market Efficiency of NIO's ADS During the Period September 12, 2018 to October 8, 2018**

51.      Dr. Werner defined the "Relevant Period" as from October 8, 2018 through March 5, 2019.[70] The Relevant Period excludes the first 25 calendar days following NIO's IPO on September 12, 2018. The Relevant Period matches the Class Period proposed in Plaintiffs' Motion for Class Certification.[71] However, it differs from the original proposed class period as defined in the Second Amended Complaint (September 12, 2018 through March 5, 2019, inclusive).[72] Dr. Werner did not provide a rationale in his report or his deposition testimony for excluding September 12, 2018 through October 7, 2018 from his Relevant Period, except that it was at the request of Plaintiffs' counsel.[73]

---

[67]   Werner Declaration, ¶¶ 39-41.

[68]   Werner Declaration, ¶ 41.

[69]   SEC, Form S-3 "Registration Statement Under the Securities Act of 1933" OMB Number 3235-0073, Paragraph 3 (a).

[70]   Werner Declaration, ¶ 1.

[71]   Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, dated June 28, 2022, p. 1.

[72]   Second Amended Complaint, ¶ 1.

[73]   Werner Declaration, ¶ 1 and Werner Deposition, pp: 28:1-29:14.

22

52.     One possible explanation, to which Dr. Werner alluded at his deposition, is that "stocks post-IPO or immediately post-IPO might not necessarily be efficient."[74] There is extensive academic evidence that IPOs are commonly mispriced. The IPO mispricing phenomenon continues to be documented in various academic studies.[75] Academic studies also document that the market adjusted returns during the quiet period imply that markets are inefficient.[76] Further research finds that a trading strategy based on the mispricing in the offering price generates long-run abnormal returns, indicating persistent mispricing extending years following the IPO.[77] The long-run mispricing of IPO stocks has been demonstrated in the more recent time periods.[78]

## V.    THE ALLEGED MISREPRESENTATIONS ABOUT THE SHANGHAI FACILITY HAD NO PRICE IMPACT

53.     There is no evidence that the alleged misrepresentations regarding the Shanghai Facility (i.e., that construction was underway as of the IPO) had an impact on NIO's ADS price. There is no direct evidence of price impact at time the alleged misrepresentations were made because they were made in the Offering Documents before NIO's ADS started publicly trading. Assuming the construction site itself was visible to the public, the status of construction would have been reflected in NIO's ADS price in an efficient market. The Q4/FY18 Earnings

---

[74]    Werner Deposition, p. 102: 4-14.

[75]    *See* Switzer, Lorne N., Nabil El Meslmani, and Xinkai Zhai. "IPO Performance and the Size Effect: Evidence for the US and Canada." *The North American Journal of Economics and Finance* 62 (2022) and Chambers, David, and Elroy Dimson. "IPO underpricing over the very long run." *The Journal of Finance* 64, no. 3 (2009): 1407-1443.

[76]    Ritter, J.G. and Welch, I. (2002), "A Review of IPO Activity, Pricing and Allocations." The Journal of Finance 57(4), 1795-1828 and Bradley, Daniel J., Bradford D. Jordan, and Jay R. Ritter. "The quiet period goes out with a bang." The Journal of Finance 58, no. 1 (2003): 1-36. Quiet period is the time surrounding the filing of a registration statement during which an issuer of securities must ensure that its offering-related communications comply with the federal securities laws. This period lasts, at a minimum, from the time an issuer files a registration statement with the SEC to the time that SEC staff declare the registration statement "effective." https://www.investor.gov/introduction-investing/investing-basics/glossary/quiet-period. Also, around a firm's IPO, the SEC limits a firm's communications with market participants by restricting firms from disseminating information outside of the prospectus. Colloquially, this time period is referred to as the "quiet period." Bushee, Brian, Matthew Cedergren, and Jeremy Michels. "Does the media help or hurt retail investors during the IPO quiet period?." *Journal of Accounting and Economics* 69, no. 1 (2020): 101261.

[77]    *See* Ritter, Jay R. "The long‐run performance of initial public offerings." *The Journal of Finance* 46, no. 1 (1991): 3-27 and Krigman, Laurie, Wayne H. Shaw, and Kent L. Womack. "The persistence of IPO mispricing and the predictive power of flipping." *The Journal of Finance* 54, no. 3 (1999): 1015-1044.

[78]    Dong, Ming, Jean‐Sébastien Michel, and J. Ari Pandes. "Underwriter quality and long‐run IPO performance." *Financial Management* 40, no. 1 (2011): 219-251.

23

Announcement that Plaintiffs cite as a corrective disclosure does not claim that construction of the Shanghai Facility was not underway as of the IPO. The Q4/FY18 Earnings Announcement's disclosure that NIO agreed to terminate the Shanghai Facility does not necessarily mean that construction never began and was not underway as of the IPO. There is therefore a mismatch between the contents of the alleged misstatements in the Offering Documents and the alleged corrective disclosure.

54.    In addition, analysts viewed the termination of the Shanghai Facility as positive or neutral news. Analysts' reactions suggest that the decline in NIO's ADS price following the Q4/FY18 Earnings Announcement was related to the disclosure of weaker-than-expected demand and other headwinds. There is therefore no support for the Plaintiffs' claim that the statements in the Offering Documents about construction of the Shanghai Facility had any price impact.

## A. There Is No Direct Evidence of Price Impact at the Time the Alleged Misrepresentations Were Made

55.    The price impact of an alleged misrepresentation can often be estimated by the ensuing price reaction at the time of the alleged misstatement. In other words, one could identify and measure the alleged misstatement's price impact by comparing the stock price before and after the alleged misstatement was made. However, that is not possible here because the alleged misstatements were made before NIO went public. There is no "before" price to compare to the price after the alleged misstatements were made.

## B. No Price Impact Can Be Inferred from the Price Decline Following the Q4/FY18 Earnings Announcement

### 1. The Alleged Corrective Disclosure Does Not Match the Alleged Misstatements

56.    I understand that in the absence of direct evidence, a price impact can sometimes be inferred based on the price reaction following a corrective disclosure. However, I understand that the Supreme Court has recognized, the inference that a back-end price drop equals front-end

24

inflation (and thus evidences a price impact) breaks down when the alleged corrective disclosure does not actually correct the alleged misrepresentation.[79]

57.    Again, Plaintiffs allege the following statements in the Offering Documents were false or misleading: "Construction has started on our own manufacturing facility in Shanghai"; "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities"; and "Such manufacturing facility is currently being constructed by relevant Shanghai authorities."[80] Plaintiffs claim that these statements were false and misleading because "construction on the Shanghai Facility was not underway at the time of the IPO. In fact, construction never started."[81]

58.    However, neither the Second Amended Complaint nor the Werner Declaration identifies any corrective disclosure of the alleged misrepresentations—i.e., any public disclosure revealing that construction on the Shanghai Facility was not underway at the time of the IPO.

59.    Plaintiffs appear to suggest that the Q4/FY18 Earnings Announcement was a corrective disclosure.[82] However, that announcement did not state that construction of the Shanghai Facility never began or was not underway at the time of the IPO. It only stated that, months after the IPO, NIO agreed to terminate the project:

> In 2017, NIO signed framework agreements and memorandums with the government and related entities in Jia Ding, Shanghai, to build a manufacturing plant for NIO. Recently, the Company has signed in principle with these contractual counterparties to terminate the plan for this manufacturing plant, pending signing of definitive termination agreement. The new initiative allows NIO to focus on the joint manufacturing model in the long term. The Company believes that the existing NIO/JAC plant in Hefei will give it capacity to support its market penetration and growth plans for the next two to three years.[83]

---

[79]    *Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).

[80]    Second Amended Complaint, ¶¶ 60-62.

[81]    Second Amended Complaint, ¶ 10.

[82]    Second Amended Complaint, ¶ 11.

[83]    NIO, Inc, "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," March 5, 2019.

60.     NIO's executives repeated this news on the company's conference call with analysts on March 6, 2019, again without specifically discussing whether construction had started or was underway at the time of the IPO.[84]

61.     Assuming that the construction site was known and visible to the public, the status of construction would be public knowledge. The semi-strong version of efficient market theory, which plaintiffs rely on here, holds that all public information is reflected in a securities price. If the status of construction of the Shanghai Facility was as important as claimed by Plaintiffs, its status would be inspected regularly by Shanghai-based investors and others, and investment decisions to buy or sell NIO's ADS would be informed by its status.

62.     Financial publications document how institutional investors use advanced tools such as satellite imagery to monitor economic activity. For example, investors use satellite imagery to monitor the number of vehicles in the parking lots of major retailers to estimate sales.[85] To the extent that the status of construction of the was public knowledge, under efficient market theory, the status would have been reflected in NIO's ADS price.

## 2.    Equity Analysts Viewed the Termination of the Shanghai Facility as a Positive or Neutral Development

63.     Another indication of the lack of price impact is the contemporaneous reaction of equity analysts, who characterized the termination of the Shanghai Facility as a positive or neutral development. One analyst (at Deutsche Bank) upgraded the price target because of the termination. No analyst cited the termination of the planned facility as a reason for downgrading recommendations, price targets, or financial projections as discussed below.

### a)    Analyst Reactions Are an Important Reflection of Market Sentiment

64.     Equity analyst reports are issued by professional financial analysts who perform research and analysis on specific industries and companies. They evaluate companies by analyzing financial information about a company and its stock, such as SEC filings and news

---

[84]    Edited Transcript: "NIO.N Q4 2018 Nio Inc Earnings Call," March 6, 2019 / 12:00 am GMT, Thomson Reuters Streetevents, pp. 9-11.

[85]    Laura Counts, "How hedge funds use satellite images to beat Wall Street—and Main Street," Berkeley Haas Newsroom, May 28, 2019.

26

reports, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts then evaluate companies, develop financial projections, and often estimate the value of the company using standard valuation methods such as discounted cash flow analysis and valuation multiples. Equity analyst reports often include price targets (i.e., what price they expect the stock of a company to be in a certain time period) derived from their fundamental evaluation of the company, and give recommendations to buy, hold, or sell the stock.[86]

65.     Analysts covering a company typically issue reports after news about the company that could impact the stock price is released and are an important source of information on market knowledge and sentiment at the time as to how sophisticated financial actors interpret company news. The absence of coverage of an event in analyst reports suggests that the information released was not important to market participants.[87]

66.     Dr. Werner considered the analysts' coverage of NIO in his market efficiency analysis, including to determine whether developments affecting NIO were positive, negative, or neutral.[88] Despite highlighting the importance of equity analysts in interpreting financial news, Dr. Werner did not assess how equity analysts reacted to termination of the Shanghai Facility or to the Q4/FY18 Earnings Announcement generally.

---

[86]    *See, e.g.*, Jonathan Berk and Peter DeMarzo, Corporate Finance (Pearson: Boston, MA, 4th ed., 2017), p. 997 ("Securities analysts produce independent valuations of the firms they cover so that they can make buy and sell recommendations to clients. They collect as much information as they can, becoming an expert on the firm and its competitors by poring over a company's financial statements and filings. As a result, they are in a position to uncover irregularities first. Analysts often ask difficult and probing questions of CEOs and CFOs during quarterly earnings releases. Anyone can listen to these conference calls, which are typically simulcast on the company's investor relations Web site.").

[87]    I understand that Courts have relied on analyst reports to help evaluate what information is important to the market in valuing a stock and the cause of stock price movements. *See, e.g.*, *In re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. Mar. 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions."); *Barrie v. Intervoice-Brite, Inc.*, 2009 U.S. Dist. LEXIS 99253 (N.D. Tex. Oct. 26, 2009) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.").

[88]    Werner Declaration, ¶ 28.

27

**b) Analysts Reacted Positively or Neutrally to the News that NIO Terminated the Shanghai Facility**

67.    I examined the reports of equity analysts that issued reports following the disclosure on March 5, 2019 (Bank of America/Merrill Lynch, Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, UBS, Wolfe Research, Citi, Goldman Sachs, and CICC).[89] I compiled the recommendations, price targets, and financial projections from the analysts before and after the Q4/FY18 Earnings Announcement, if available. An analyst's recommendation is their assessment of whether investors should, buy, sell, or hold the shares of the company at issue.[90] A price target is an analyst's estimate of what they think the price of the security will be over a defined time frame, and is often based on a valuation analysis such as a discounted cash flow analysis or a valuation multiple analysis.[91] Financial projections are the analysts' estimates of the company's future financial performance.

68.    Several analysts described the termination of the Shanghai Facility as a positive development because the change to manufacturing strategy would result in "cost savings," "capex savings," "better investment returns," "[shortened] lead times" providing NIO a "more

---

[89]    I identified and examined the equity analyst reports that were publicly available during the time period using Refinitiv Eikon as well as additional reports provided by counsel.

[90]    *See, e.g.*, Jonathan Berk and Peter DeMarzo, Corporate Finance (Pearson: Boston, MA, 4th ed., 2017), p. 997 ("Securities analysts produce independent valuations of the firms they cover so that they can make buy and sell recommendations to clients. They collect as much information as they can, becoming an expert on the firm and its competitors by poring over a company's financial statements and filings. As a result, they are in a position to uncover irregularities first. Analysts often ask difficult and probing questions of CEOs and CFOs during quarterly earnings releases. Anyone can listen to these conference calls, which are typically simulcast on the company's investor relations Web site."). Analysts also express recommendations in terms such as "overweight", "market weight", or "under weight." Wolfe Research, LLC uses "Outperform (OP): The security is projected to outperform analyst's industry coverage universe over the next 12 months; Peer Perform (PP): The security is projected to perform approximately in line with analyst's industry coverage universe over the next 12 months; and Underperform (UP): The security is projected to underperform analyst's industry coverage universe over the next 12 months." Wolfe Research, Dan Galves, Rod Lache, and Shreyas Patil, "Demand questions will likely linger.," Wolfe Research, March 6, 2019.

[91]    Gleason, Cristi A., W. Bruce Johnson, and Haidan Li. "Valuation model use and the price target performance of sell side equity analysts." *Contemporary Accounting Research* 30, no. 1 (2013): 80-115. See also, Bradshaw, Mark T., Lawrence D. Brown, and Kelly Huang. "Do sell-side analysts exhibit differential target price forecasting ability?." *Review of Accounting Studies* 18, no. 4 (2013): 930-955.

28

flexible option" while enabling NIO to maintain sufficient manufacturing capacity which "will not hinder the original sales outlook."[92]

69.     Deutsche Bank increased its price target for NIO to $10.20 in a report dated March 7, 2019, while reducing expected sales, and EBITDA.[93] It maintained a "Buy" recommendation and considered the news about the termination of the plant as a positive development. Deutsche Bank increased its price target to $10.20 because of the termination of the Shanghai Facility, stating, "We raise our price target from USD8.6 to USD10.2 mainly on lower overall capex estimate given the termination of the Jiading plant development and hence better free cash flow."[94] It also stated, "Sticking to joint manufacturing model will help cash flow. In the results announcement, NIO stated that it will no longer seek to build its own vehicle manufacturing plant in Shanghai and will further rely on the joint manufacturing operation with Jianghuai. Considering the successful ramp-up of ES8 production in FY18, we think that NIO's current production business model will not hinder the original sales outlook. Indeed, we view this as a more flexible option with potentially lower capex outlay for the company in the next few years."[95]

70.     JP Morgan considered the termination of the plant as a positive development in its report dated March 6, 2019. It stated, "we see two important developments per mgmt guidance in 2019 that will lead the company's stock price performance and profitability: 1) on the positive side, potential termination of building a new wholly owned Shanghai plant and simply leveraging JAC's existing capacity. This implies cost savings and better investment returns. On the flip side, 2) 2019 starts with soft delivery due to potential brought-forward demand into 4Q18 before NEV subsidy cuts and slow China macro. Of the two, we believe the share price will be

---

[92]    Nick Lai, Ryan Brinkman, and Rebecca Wen, "A Soft Start in 2019 But Expect A Meaningful Rebound in 2H," JP Morgan, March 6, 2019; Jack Yeung et al., "FY18 Earnings Call Takeaways," Morgan Stanley, March 7, 2019; Bin Wang, Nick Li, and Carrie Jiang, "4Q18 gross profit turned positive for the first time," Credit Suisse, March 6, 2019; Vincent Ha and Yan Lin, "Recent sales headwind should be mitigated by improved cash flow," Deutsche Bank, March 7, 2019.

[93]    Vincent Ha and Yan Lin, "Recent sales headwind should be mitigated by improved cash flow," Deutsche Bank, March 7, 2019.

[94]    Vincent Ha and Yan Lin, "Recent sales headwind should be mitigated by improved cash flow," Deutsche Bank, March 7, 2019.

[95]    Vincent Ha and Yan Lin, "Recent sales headwind should be mitigated by improved cash flow," Deutsche Bank, March 7, 2019.

more sensitive to quarterly delivery, and also order flow of ES6 after the Shanghai auto show in April."[96] It added, "Thanks to termination of Shanghai plant, there will be short-term and mid-term capex savings and translate to higher ROIC in the long-run."[97]

71.    Morgan Stanley maintained its "Overweight" recommendation in its report dated March 7, 2019 because it believed that the cost savings from the cancellation of the Shanghai Facility helped offset any concern about reduced growth expectations. It stated, "We remain OW in view of solid 2019 guidance, capex savings from suspension of factory construction, and the ramp-up of ES6. The NEV subsidy cut could be a near-term risk factor." It added, "We view the joint manufacturing mode as a positive – it could save on capex while keeping sufficient capacity." [98]

72.    Credit Suisse also commented favorably upon the termination of the plans to build the Shanghai Facility in its report dated March 6, 2019, stating, "[NIO] declared to terminate the plan of in-house plant in Shanghai; focus on joint manufacturing model in future. This is because government will allow auto R&D companies to gain manufacturing license, thus, NIO could soon get NEV subsidy and NEV credit directly." [99] It added "the joint manufacturing model could improve NIO's cash flow with less capex required, despite its margin being partially hurt. The production lead time will also be shortened, as it takes 20 months to adjust the production line in an existing factory versus 24 months taken to build a new factory."[100]

73.    Citi concluded from the Q4/FY2018 Earnings Announcement in its report dated March 6, 2019 that it would retain a price target of HK$7.2 and maintain a risk rating of Neutral

---

[96]   Nick Lai, Ryan Brinkman, and Rebecca Wen, "A Soft Start in 2019 But Expect A Meaningful Rebound in 2H," JP Morgan, March 6, 2019.

[97]   Nick Lai, Ryan Brinkman, and Rebecca Wen, "A Soft Start in 2019 But Expect A Meaningful Rebound in 2H," JP Morgan, March 6, 2019.

[98]   Jack Yeung et al., "FY18 Earnings Call Takeaways," Morgan Stanley, March 7, 2019.

[99]   Bin Wang, Nick Li, and Carrie Jiang, "4Q18 gross profit turned positive for the first time," Credit Suisse, March 6, 2019.

[100]  Bin Wang, Nick Li, and Carrie Jiang, "4Q18 gross profit turned positive for the first time," Credit Suisse, March 6, 2019.

to High Risk. The report also stated that NIO's termination of plans to build the Shanghai factory "will translate to some Capex savings for sure and ease the pressure on cash flow."[101]

74.     Goldman Sachs stated its reaction in a report dated March 7, 2019 that "[a] light business model" is one of the "drivers [which] should structurally move NIO in the positive direction."[102] The report further elaborates that "NIO's growing dependence on joint manufacturing model implies a focus shift from building cars to building brands. The latter is far more profitable: a premium consumer brand typically operates at 30-40% net margin, while a premium car maker is capped at 15%. By keeping the business model light, NIO is growing its opportunity to generate long-term returns on invested capital." Goldman Sachs also stated, "We believe NIO has the bargaining power over its supply chain partners, hence the profit potential."[103]

75.     Finally, CICC maintained a hold rating and a price target of US$8.5. It commented in a report dated March 8, 2019 that, "Contract manufacturing in line with policy guidance and corporate business model, and good for controlling capex. NIO has abandoned its plan to build a manufacturing factory in Shanghai and would continue to cooperate with JAC Motors. This allows NIO to focus on high-end brand marketing and technological development."[104] *See* Appendix V.

### 3. Analysts Noted That New Government Policy Changes Would Allow NIO to Secure EV Tax Credits Without the Capital Expenditure of a New Facility

76.     The Offering Documents stated that an important reason for developing the planned Shanghai Facility was to allow NIO to receive EV manufacturer credits.[105] On the conference call with equity analysts following the Q4/FY18 Earnings Announcement, NIO management reported that NIO and the Chinese government were about to reach an agreement to

---

[101]   Jeff Chung, Beatrice Lam, and Andy Li, "Results: In-line FY 18 Results with Lower 1Q19 Guidance," Citi, March 6, 2019.

[102]   Fang, Fei et al, "NIO Inc.: Reinstate at Buy," Goldman Sachs, March 7, 2019.

[103]   Fang, Fei et al., "Reinstate at Buy," Goldman Sachs, March 7, 2019.

[104]   Wang, Lei and Wei Feng, "ES6 a more mass-market model, but orders limited for now," CICC, March 8, 2019.

[105]   Prospectus, p. 122. See also similar statements on pages 32-33, 137, and 149 of the Prospectus.

allow NIO to receive EV manufacturer credits, without owning a manufacturing facility. Equity analysts cited this positive development in their assessment of the cancellation of the Shanghai Facility. This is an additional reason why that the termination of the Shanghai Facility was not negative news, according to the analysts' assessments.

77.     NIO's Offering Documents informed investors that qualifying for China's EV tax credit system was an important consideration for the planned Shanghai Facility. For example, the Offering Documents said, "We expect that this facility will also facilitate our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit score system in the future. We aim to obtain our EV manufacturing license within two to three years following the date of this prospectus."[106]

78.     In its call with equity analysts following the Q4/FY18 Earnings Announcement, NIO executives explained that the termination of the planned Shanghai Facility was attributable to a change in Chinese governmental policy that would allow NIO to apply for EV credits directly without owning a manufacturing facility.[107]

> [I]n 2018, a new policy was issued by the government authorities, which allow and encourage the entities that operate its vehicle research and development and design to work with vehicle manufacturing companies to manufacture vehicles cooperatively….
>
> And the advantages for NIO is that, first off, we don't need to apply for the subsidies or carbon emission credit via JAC. We can directly apply this from the government. And secondly, for NIO, as an independent car company, we can manage our product very well, and this will be helping us with our long-term strategic funding.

79.     Many equity analysts reacted favorably to the change of the status of NIO's EV credit, further demonstrating that the termination of the Shanghai Facility did not impact the price.

80.     For example, JP Morgan stated in its report dated March 6, 2019, "NIO is planning to terminate the construction of its wholly owned Shanghai plant based on two reasons: 1) new policy released by government in 2018 encourages the joint manufacturing model

---

[106]   Prospectus, p. 132. See also similar statements on pages 32-33, 137, and 149 of the Prospectus.

[107]   NIO, "Edited Transcript: NIO.N Q4 2018 Nio Inc Earnings Call," March 6, 2019 / 12:00 am GMT, Thomson Reuters Streetevents, pp. 5-9.

adopted by NIO and JAC, 2) NIO can leverage its existing Nio-JAC plant and the company plans to increase production capacity at this plant from the current 100k units to 150k units in 2-3 years with three models (ES8, ES6 and the 3rd model.) Nio highlighted that subsidy or NEV credit from the JV plant will all belong to Nio."[108]

81.　Bank of America/Merrill Lynch stated in its report dated March 6, 2019, "NIO originally signed framework agreements and memorandums with the government and related parties for the construction of a new plant in Shanghai in 2017. At the conference call, NIO announced that it has terminated the construction of its plant in Shanghai recently, pending a definitive termination agreement. NIO will focus on jointly manufacturing model in the long term. NIO will continue to invest in the NIO-JAC (JV) plant in Hefei, given (1) the Chinese government has announced a new policy and has encouraged auto start-ups to cooperate with the existing auto OEMs on R&D and manufacturing; and (2) the NIO-JAC plant seems to be sufficient to support its growth over the next 2-3 years. Currently, the NIO-JAC plant has 100k units capacity per annum, and will expand to 150k units capacity by 2020."[109]

82.　Deutsche Bank stated in its report dated March 7, 2019, "NIO has decided to terminate the plan to build its own manufacturing plant in Jiading District and to focus on the joint manufacturing model. The decision was made after the government allowed vehicle R&D enterprises to work together with OEMs to set up independent auto production/sales entities, similar to what NIO and Jianghuai have been doing. While the detailed policy is not yet in place, formal application will start in June. The advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency."[110]

83.　Credit Suisse stated in its report dated March 6, 2019, "NIO declared that it will not build its own plant in Jiading District Shanghai and focus on the joint manufacturing model

---

[108]　Nick Lai, Ryan Brinkman, and Rebecca Wen, "A Soft Start in 2019 But Expect A Meaningful Rebound in 2H," JP Morgan, March 6, 2019.

[109]　Ming Hsun Lee et al., "Downgrade to U/P: Shipment and ASP likely to see downside risks," Bank of America/Merrill Lynch, March 6, 2019.

[110]　Vincent Ha and Yan Lin, "Recent sales headwind should be mitigated by improved cash flow," Deutsche Bank, March 7, 2019.

33

in the future." [111] It added "[t]his is because government will allow auto R&D companies to gain manufacturing license, thus, NIO could soon get NEV subsidy and NEV credit directly."[112]

84.    Citi stated in its report dated March 6, 2019, "In Nov-18, the MIIT released a policy that endorses collaboration between auto technology R&D firms like NIO with auto OEMs like JAC. NIO and JAC are eligible for this. The company expects this policy to be finalized in June-19 and open for applications. This would allow NIO to bypass many approval procedures regarding emissions. This kind of manufacturing cooperation method allows high efficiency in manufacturing and planning."[113]

### 4.    The Analysts' Reactions Following the Q4/FY18 Earnings Announcement Indicate the Price Drop Was Not Attributable to the Shanghai Facility

85.    In addition to the decision to terminate the Shanghai Facility, the Q4/FY18 Earnings Announcement included information about the fourth quarter 2018 earnings of NIO, deliveries for January and February 2019, and vehicle production levels. Notably, NIO reported that deliveries in January and February 2019 "reflect a greater than anticipated slowdown in monthly deliveries compared to December 2018. The sequential slowdown in deliveries in January and February was mainly caused by accelerated deliveries made at the end of last year in anticipation of EV subsidy reductions in China in 2019, the seasonal slowdowns surrounding the January 1st and Chinese New Year holidays, as well as the current slowdown of macro-economic conditions in China, particularly in the automotive sector."[114]

86.    Equity analysts who reduced either their recommendations, price targets, or financial projections of the Company following the Q4/FY18 Earnings Announcement attributed the downgrade to the reduced sales outlook due to the "greater than anticipated slowdown in

---

[111]    Bin Wang, Nick Li, and Carrie Jiang, "4Q18 gross profit turned positive for the first time," Credit Suisse, March 6, 2019.

[112]    Bin Wang, Nick Li, and Carrie Jiang, "4Q18 gross profit turned positive for the first time," Credit Suisse, March 6, 2019.

[113]    Jeff Chung, Beatrice Lam, and Andy Li, "Results: In-line FY 18 Results with Lower 1Q19 Guidance," Citi, March 6, 2019.

[114]    NIO, Inc, "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," March 5, 2019.

monthly deliveries."[115] None of the analysts attributed their decision to the termination of the plan to build the Shanghai Facility and none of the analysts linked the drop in NIO's ADS price to the termination of the Shanghai facility.

87.    UBS directly attributed the price decrease in NIO's ADS to the soft revenue results, stating, "Management gave Q1 delivery guidance of 3.5—3.8k units, which is below market expectation in our view. We foresee multiple challenges the company will face, and expect share price to react negatively on this earnings."[116]

88.    Bank of America/Merrill Lynch reduced its recommendation after the Q4/FY18 Earnings Announcement from "Neutral" to "Underperform", its price target from $8.00 to $6.80, and its 2019-2020 projected revenue and EBITDA. It attributed the decrease to reduced expectations of sales and profitability. More specifically, it stated, "We downgrade NIO from Neutral to Underperform, given: (1) ES8's volume sales growth should be lower than our expectation; (2) reduced profitability on more incentives offer to customers, post Tesla's recent price cut in China, and the upcoming EV purchase subsidy cut in 2019; and (3) rich valuation (2.2X 2020E EV/ Sales). We lower our 2019/20 shipment forecast by 10%/13% to 39K/77K, 13% / 23% lower than guidance. Our new PO of US$6.8 (earlier US$8) is based on the average of EV/sales and DCF…."[117]

89.    Wolfe Research reduced its financial projections for NIO's 2019 revenue, and 2019-2022 EBITDA and operating income. It maintained its recommendation at "Outperform" and its price target at $9.00. It stated, "While mgmt. had signaled a decline from nearly 8k units in Q4, the 3,500-3,800 Q1 guidance was weaker-than-expected and showed negative trajectory (Jan is high-point of qtr), with weakness expected to continue in Q2." And, "[w]e have lowered our 2019/2020 EPS forecasts, to -10.45 / -4.81 RMB from -7.55 / -2.90. Near-term Vehicle gross margins should remain weak (we estimate breakeven in 1Q19 on 3.6k deliveries and +1.5% in

---

[115]    NIO, Inc, "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," March 5, 2019.

[116]    Paul Gong and Yizhe Wang, "Navigating choppy waters," UBS, March 6, 2019.

[117]    Ming Hsun Lee et al., "NIO: Downgrade to U/P: Shipment and ASP likely to see downside risks," Bank of America/Merrill Lynch, March 6, 2019.

2Q19 on about 4.3k deliveries), with improvement towards high-teens margins in 2H19 as ES6 deliveries ramp and ES8 pricing increases…."[118]

90.    Credit Suisse reduced projected revenue, EBITDA, and operating income in its financial projections for NIO for 2019, 2020, and 2021. It maintained a recommendation of "Outperform" and its price target of $12.60. It did not provide a specific reason for the changes to its projections.

### C. NIO's Plan to Rely on an "Asset-Light" Joint Manufacturing Model Was Disclosed in January 2019

91.    An equity analyst report from January 2019, long before the alleged corrective disclosure on March 5, 2019, discussed NIO's goal of using an "asset-light" manufacturing model in January 2019, prior to the Q4/FY18 Earnings Announcement. There was no significant price reaction following the news.

92.    A JP Morgan analyst report dated January 14, 2019 stated that NIO was in "no rush" to build a manufacturing facility, and that, "expansion of the JAC plant from its current ~120K units capacity to a higher ~170K units seems a more efficient use of capital than opening a new plant. And a number of automakers (and now even perhaps supplier Magna International) are interested in producing vehicles for NIO, again suggesting less need for a wholly-owned plant in the near-term. Management instead plans to allocate capital toward R&D, increasing consumer satisfaction, and boosting sales. Management also intends to expand overseas in an asset-light way, for example through distribution partners instead of via a system of NIO."[119]

93.    The January 14, 2019 report by JP Morgan reported NIO's intention to deprioritize construction of manufacturing facility and it was not followed by a statistically significant stock price reaction. NIO's stock price closed at $6.59 on January 11, the trading day prior to January 14. NIO's ADS increased closing close to $6.80 on January 14 and to $6.82 on

---

[118]    Dan Galves, Rod Lache, and Shreyas Patil, "Demand questions will likely linger.," Wolfe Research, March 6, 2019.

[119]    Ryan Brinkman et al., "Takeaways from JPM's CES Auto Tech Conference for Aptiv, NIO, & Veneoneer," JP Morgan, January 14, 2019.

January 15. Dr. Werner's event study analysis demonstrates that these price movements were not statistically significantly different from zero.[120]

### D. Dr. Werner Did Not Evaluate the Reaction of Equity Analysts to the March 5, 2019 Alleged Corrective Disclosure

94.    Dr. Werner did not assess how equity analysts reacted to the March 5Q4/FY18 Earnings Announcement despite highlighting the important role that equity analysts perform in interpreting financial news. He listed the coverage of NIO's ADS by equity analyst as one of the indicators of market efficiency.[121] He also stated that if equity analysts are "closely monitoring a firm's information and subsequently making buy/sell recommendations," then the market price would be bid up or down to reflect its value and "the more analysts who followed a security, the greater the likelihood that a security traded in an efficient market."[122]

95.    However, Dr. Werner did not cite to any analysts' reports to support his opinion that "[a]nalysts and market participants noted that the Company's reported financial results were disappointing and that the termination of the plan to construct the Shanghai Facility was a negative surprise."[123] The Bloomberg News article he cited to support the claim that the "Shanghai Facility was a negative surprise" did not include any such opinions.[124] Dr. Werner incorrectly stated that analysts believed that the termination of the facility was a "negative surprise" based on a misreading of a Bloomberg News article and he acknowledged this error in his deposition.[125]

## VI.    DR. WERNER FAILED TO PROVIDE A RELIABLE METHOD FOR CALCULATING CLASS-WIDE DAMAGES IN THIS CASE

96.    Dr. Werner states that "class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiffs can be calculated in a

---

[120]   Werner Declaration, Exhibit 9.

[121]   Werner Declaration, ¶¶ 28-32.

[122]   Werner Declaration, ¶ 28.

[123]   Werner Declaration, ¶ 71.

[124]   Esha Dey and Ryan Vlastelica, "Chinese Electric Car Maker NIO Plunges Most Since Its IPO," Bloomberg News, March 6, 2019.

[125]   Werner Deposition, pp: 209:13-217:4.

straightforward manner."[126] However, Dr. Werner does not provide a reliable economic approach to how damages would be estimated. First, his description of a damages approach is generic and does not address any of the specific factors in this litigation. Second, his description of the hypothetical damages does not account for the fact that NIO's interest in maintaining an asset-light business model was previously known, and the termination of the Shanghai Facility was viewed as a positive to neutral factor by equity analysts, and equity analysts attributed downgrades or price target reduction to the simultaneously released earnings news, rather than the termination of the Shanghai Facility. Therefore, there is no evidence that NIO's ADS price was inflated. However, even assuming that NIO's ADS price was inflated by the alleged misstatement about the status of construction at the Shanghai Facility, Dr. Werner has not demonstrated how to disaggregate the price reaction following the Q4/FY18 Earnings Announcement between the price reaction due to the disappointing sales result or other factors and the price reaction that can be attributed to the termination of the Shanghai Facility.

97.    Dr. Werner stated that damages can be estimated using an "event study analysis" and "potentially other empirical analyses if necessary."[127] This process would be used to construct an "inflation ribbon" which can used to estimate damages for all class members. However, this is a generic description that could be applied to almost any securities litigation. That is, it fails to address what "potentially other empirical analysis" might be necessary in this situation.

98.    Damages are often estimated by using corrective disclosures to estimate the artificial price inflation in a security. This approach is based on the ability of efficient markets to quickly incorporate the value of information as it is disseminated to the market. The corrective disclosure must change the market's understanding of the misstatements or omissions. For the approach to work properly, the news during the interval that the price change is estimated must be related only to the alleged corrective disclosures. Alternatively, the price movements attributable to other unrelated news must be separated from the price movements.

---

[126]   Werner Declaration, ¶ 91.

[127]   Werner Declaration, ¶ 92.

99.    NIO's ADS price decreased following the Q4/FY18 Earnings Announcement. Dr. Werner stated that "Analysts and market participants noted that the Company's reported financial results were disappointing and that the termination of the plan to construct the Shanghai Facility was a negative surprise."[128] However, even if the termination of the facility contributed to the NIO stock price decline on March 6, 2019, Dr. Werner has not proposed a methodology for reliably determining the amount of the March 6, 2019 price movement that was attributable to the alleged corrective disclosures to the regarding the Shanghai Facility as opposed to other confounding information released in the Q4/FY18 Earnings Announcement.

100.    For example, any estimate of inflation attributable to the alleged misstatements would need to account for at least two confounding factors. First, the Q4/FY18 Earnings Announcement reported that January and February deliveries were below expectations. As discussed above, several analysts attributed recommendation, price target, or financial projections downgrades to this information. Second, any portion of NIO's ADS price reaction attributable to the termination of the facility must be further disaggregated to account for only that part of attributable to the misstatements. Plaintiffs' theory is that investors were disappointed by NIO's termination of the Shanghai Facility. However, under Plaintiffs' theory, if NIO had not made any of the alleged misstatements about the status of the Shanghai Facility, investors still would have been disappointed by NIO's termination of the Shanghai Facility. Dr. Werner has not provided a method for estimating whether the price reaction to the alleged misstatement was somehow greater because of the alleged misstatement, and if so, how to measure the portion of the price reaction attributable only to the alleged misstatements, and not to general disappointment regarding the decision to terminate the facility.

101.    Dr. Werner's proposed damages approach has not provided a reliable methodology to quantify any of the confounding factors discussed above.

---

[128]    Werner Declaration, ¶ 71.

39

## VII.   PLAINTIFF HUANG PURCHASED MORE THAN 97% OF HER HOLDINGS OF NIO'S ADS AFTER THE CLASS PERIOD AND ULTIMATELY MADE A PROFIT ON HER NIO INVESTMENTS

102.    Separately, I was also asked to analyze the trading records produced by Plaintiff Eva Huang. Plaintiff Huang bought and sold NIO's ADS between March 5, 2019 and March 15, 2021.

103.    Ms. Huang purchased 33,325 units of NIO's ADS in 22 transactions between March 5, 2019 and March 4, 2021 totaling $219,169.38 in purchase cost after accounting for fees. Of these, one transaction on March 5, 2019 was within the Class Period. On March 5, 2019, Ms. Huang bought 1,000 units of NIO's ADS at a price of $10.4 for a total of $10,404.95 after fees. The remaining purchases were after the Class Period, that is, after March 5, 2019. She also sold 33,325 units NIO's ADS in 14 transactions between August 6, 2019 and March 15, 2021 totaling $274,353.53 in sales proceeds after fees. All the sales were after the Class Period. Overall, Ms. Huang made a profit of $54,184.15 on NIO investments which were almost entirely after the Class Period. Specifically, using the volume of NIO's ADS, Ms. Huang traded 65,650 units out of a total of 66,650 units after the Class Period, that is 98.5% of Ms. Huang's NIO trades were after the Class Period that ends on March 5, 2019. Based on the dollar volume of Ms. Huang's trades, 97.9% of her NIO trades were after the Class Period. *See* Exhibit 5.

40

Exhibit 5.   *Plaintiff Eva Huang's Profit on NIO Trades*

| Trade Date (1) | Quantity (2) | | Price (3) | | Amount (4) |
|---|---|---|---|---|---|
| **Purchases** | | | | | |
| ***Purchases Within Class Period*** | | | | | |
| 3/5/2019 | 1,000 | $ | 10.4000 | $ | 10,404.95 |
| | | | | | |
| ***Purchases After Class Period*** | | | | | |
| 3/6/2019 | 1,000 | $ | 8.0900 | $ | 8,094.95 |
| 6/6/2019 | 1,000 | | 2.6000 | | 2,604.95 |
| 6/20/2019 | 1,000 | | 2.8300 | | 2,834.95 |
| 7/8/2019 | 3,000 | | 3.4178 | | 10,258.35 |
| 8/20/2019 | 2,000 | | 3.1376 | | 6,280.15 |
| 9/30/2019 | 10,000 | | 1.5650 | | 15,654.95 |
| 2/12/2020 | 3,000 | | 4.1238 | | 12,371.40 |
| 3/10/2020 | 5,000 | | 3.3688 | | 16,844.00 |
| 6/22/2020 | 1,000 | | 7.8158 | | 7,815.80 |
| 6/23/2020 | 700 | | 7.3150 | | 5,120.50 |
| 6/23/2020 | 300 | | 7.3158 | | 2,194.74 |
| 7/15/2020 | 1,000 | | 13.4406 | | 13,440.60 |
| 9/2/2020 | 900 | | 19.7030 | | 17,732.70 |
| 9/4/2020 | 180 | | 17.8658 | | 3,215.85 |
| 9/4/2020 | 100 | | 17.9400 | | 1,794.00 |
| 9/4/2020 | 100 | | 17.9350 | | 1,793.50 |
| 9/21/2020 | 530 | | 18.7250 | | 9,924.25 |
| 11/24/2020 | 500 | | 55.8000 | | 27,900.00 |
| 11/30/2020 | 50 | | 52.3113 | | 2,615.57 |
| 12/4/2020 | 500 | | 42.9950 | | 21,497.50 |
| 3/4/2021 | 465 | | 40.3779 | | 18,775.72 |
| **Total Purchase** | **33,325** | | | **$** | **219,169.38** |
| | | | | | |
| **Sales** | | | | | |
| ***Sales After Class Period*** | | | | | |
| 8/6/2019 | 2,000 | $ | 3.0600 | $ | 6,114.92 |
| 3/3/2020 | 15,000 | | 4.1300 | | 61,948.63 |
| 3/3/2020 | 5,000 | | 4.1436 | | 20,717.54 |
| 4/28/2020 | 2,500 | | 3.3900 | | 8,474.81 |
| 5/18/2020 | 2,500 | | 3.6200 | | 9,049.80 |
| 8/25/2020 | 3,000 | | 16.4413 | | 49,322.80 |
| 10/14/2020 | 600 | | 26.0367 | | 15,621.67 |
| 10/14/2020 | 500 | | 26.0000 | | 12,999.71 |
| 10/14/2020 | 399 | | 25.8450 | | 10,311.93 |
| 10/14/2020 | 310 | | 26.0783 | | 8,084.09 |
| 10/14/2020 | 1 | | 25.8441 | | 25.83 |
| 2/23/2021 | 500 | | 49.2301 | | 24,614.92 |
| 3/15/2021 | 600 | | 45.3900 | | 27,233.86 |
| 3/15/2021 | 415 | | 45.3810 | | 18,833.02 |
| **Total Sale** | **33,325** | | | **$** | **273,353.53** |

| | | |
|---|---|---|
| **Profit** | **$** | **54,184.15** |
| | | |
| **Total Trade Volume** | | **66,650** |
| **Trade Volume After March 5, 2019** | | **65,650** |
| **Fraction of Trade Volume After March 5, 2019** | | **98.5%** |
| | | |
| **Total Trade Dollar Volume** | **$** | **492,522.91** |
| **Trade Dollar Volume After March 5, 2019** | **$** | **482,117.96** |
| **Fraction of Trade Dollar Volume After March 5, 2019** | | **97.9%** |

**Notes and Sources:**
- Data are from Fidelity Investment Transaction Confirmations for plaintiff
  Eva Huang received from counsel.

41

## VIII.    MISCELLANEOUS

104.    My work is ongoing, and my opinions are subject to revision based on new information (including documentation, reports, or testimony by Dr. Werner), which subsequently may be provided to, or obtained by, me.

By:    _____

Faten Sabry, Ph.D.

42



Faten Sabry, Ph.D.
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
24th Floor
New York, NY 10036
+1 212 345 3285
faten.sabry@nera.com

## APPENDIX I: CURRICULUM VITAE OF FATEN SABRY, PH.D.

# FATEN SABRY
## MANAGING DIRECTOR
### CHAIR OF GLOBAL SECURITIES & FINANCE PRACTICE

I am a Managing Director in the Securities and Finance Practice at National Economic Research Associates, Inc. ("NERA") and Chair of the Global Securities and Finance Practice. I provide economic consulting and expert witness work in securities, class action, and bankruptcy matters. I have performed economic analyses of class certification, liability, materiality, and damages. I have conducted event studies in numerous securities and commercial damages disputes to assess the impact of announcements such as earnings or takeover transactions on shareholders. I have also conducted valuations of fixed income securities, illiquid assets, businesses, and litigation settlements. I have testified as an expert in state and federal courts.

I am the author of various articles on the credit crisis, the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the impact of securitization on the cost and availability of credit to consumers, econometric analysis of mutual funds' advisory fees, and claiming behavior. My research has been published as a chapter in the latest edition of The Handbook of Mortgage-Backed Securities, edited by Dr. Frank J. Fabozzi. I am also the lead author of an econometric study on the impact of securitization on the costs and availability of credit for consumers and liquidity. My research has also been published in the *Journal of Structured Finance*, *Journal of Real Estate Practice*, *Journal of Investment Compliance*, *Journal of Alternative Investments*, *Business Economics*, *International Trade Journal*, and other periodicals.

I am a member of the American Finance Association and the American Statistics Association. I have been accredited as a professional statistician by the American Statistics Association. I received my Ph.D. in Business from Stanford Business School and prior to joining NERA, I was a Post-Doctoral Fellow at the International Food Policy Research Institute and an assistant professor of economics at the American University, where I taught graduate and undergraduate economics courses.

**Faten Sabry, Ph.D.**

## Education

| | |
|---|---|
| **1996** | **Stanford University, Graduate School of Business**<br>Ph.D., Business |
| **1991** | **American University in Cairo, Egypt**<br>M.A., *magna cum laude*, Economics |
| **1988** | **American University in Cairo, Egypt**<br>B.A., *GPA 4.0*, Economics |

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| **2010 -** | *Managing Director* |
| 2002 – 2010 | *Vice President* |
| 2000 – 2002 | *Senior Consultant* |
| 1998 – 2000 | *Consultant* |

**1997 - 1998**  **American University in Cairo**
*Assistant Professor of Economics*
Taught graduate and undergraduate macroeconomics, economic development, and project valuation courses.

**1997 - 1998**  **International Food Policy Research Institute**
*Post-Doctoral Fellow*
Developed and estimated econometric almost ideal demand systems (AIDS) models for the demand for food commodities using a national survey data. Prepared a report on the subsidy system based on the results of the econometric analysis.

**1991 - 1996**  **Stanford University, Graduate School of Business**
*Research and Teaching Assistant*
Conducted statistical analysis for stochastic models of multi-party decision making. Designed a survey assessing moral responsibility of providing public goods in organizations. Developed case studies on the trade dispute between Fuji and Eastman Kodak. Also worked as a teaching assistant for graduate courses on negotiation and conflict resolution.

## Honors and Professional Activities

Post-Doctoral Fellow, International Food Policy Research, 1997.

J. M. Olin Research Fellowship, Stanford Law School, 1995.

Stanford University Graduate School of Business Fellowship, 1991-1996.

Ford Foundation Scholarship, 1990-1991.

## Expert Reports, Deposition and Testimony

Direct and Rebuttal Trial Testimony, before the Supreme Court of the State of New York for the County of New York, in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd,* on economic analysis of damages involving credit default swaps, 2022.

Deposition Testimony, Affirmative Report and Expert Rebuttal Report, before the Supreme Court of the State of New York for the County of New York, in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd,* on economic analysis of damages involving credit default swaps, 2021.

Expert Rebuttal Report, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *The Mangrove Partners Master Fund, Ltd. V. TransAlta Corporation, Brookfield BRP Holdings (Canada) Inc., Rona H. Ambrose, John P. Dielwart, Timothy W. Faithfull, Dawn L. Farrell, Alan J. Forrer, Gordon D. Griffin, Yakout Mansour, Georgia Nelson, Beverlee F. Park and Bryan D. Pinney*, on rebuttal analysis of damages related to a financial transaction with the option to convert debt to minority equity interest in hydro assets, 2021.

Trial Testimony, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *Duo Bank of Canada v. Fairstone Financial Holdings Inc., J.C. Flowers IV Coinvest Canada L.P., J.C. Flowers IV L.P. and VP Canada Acquisition, LP* and *Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, LP v. Duo Bank of Canada*, on economic analysis of roll rate models, loan loss reserves and amortization events for consumer loans collateral in asset-backed securities, 2020.

Rebuttal Report, Expert Report, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *Duo Bank of Canada v. Fairstone Financial Holdings Inc., J.C. Flowers IV Coinvest Canada L.P., J.C. Flowers IV L.P. and VP Canada Acquisition, LP / Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, LP v. Duo Bank of Canada*, on projections of losses on consumer loans and impact of macroeconomic factors, 2020.

Deposition Testimony, Expert Rebuttal Report, in the United States District Court for the Southern District of New York, in *Pacific Life Insurance Company et al v. The Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2020.

Declaration, in the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et. al. v. the Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2019.

Deposition, Expert Rebuttal Report and Expert report, in the United States District Court for the District Court of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico As A Representative of The Commonwealth of Puerto Rico, et al. Debtor and The Financial*

*Oversight and Management Board for Puerto Rico As A Representative of The Employees Retirement System of The Government of Puerto Rico, Debtor,* on evaluation of PR bonds, 2019.

Deposition, in the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et. al. v. the Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2019.

Expert Rebuttal Report, in the US District Court for the Southern District of New York, in *Phoenix Light SF Limited, et al. v The Bank of New York Mellon*, on causation and damages, 2018.

Trial Testimony, in the U.S. District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, related to the net benefits to bondholders from the debt exchanges and the impact of the exchanges on Windstream's leverage, 2018.

Affidavit, in the US District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC V. Aurelius Capital Master, Ltd.*, on the estimated net benefits provided to bondholders in a debt exchanged offered by the company, 2018.

Deposition, in the US District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, related to the net benefits to bondholders from the debt exchanges, 2018.

Expert Report and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *U.S. Bank National Association v. Windstream Services, LLC, v. Aurelius Capital Master, Ltd.* on the economic analysis of the net benefits received by Windstream bondholders in a purported debt exchange offered by the company, 2018.

Expert Report, In the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et al. v. The Bank of New York Mellon*, on a statistical analysis of the performance of mortgage-backed securities, 2018.

Report, "Final Expert Calculation of Settlement Payment Pursuant to Settlement Agreement dated November 15, 2013," prepared on behalf of *U.S. Bank National Association, Bank of New York Mellon, Wilmington Trust, Wells Fargo, HSBC and Deutsche Bank as Trustees*, 2017.

Rebuttal Expert Report, Deposition Testimony and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *Royal Park Investments SA/NV, et al. v. The Bank of New York Mellon, as Trustee* on economic analysis of class certification issues, 2016-2017.

Expert Report, In the State of Minnesota District Court for the County of Hennepin, Fourth Judicial District in *Connie L. Gretsch, et al. v. CitiMortgage, Inc.* on the economic analysis of class certification in a consumer finance litigation, 2017.

Testimony and Expert Report, In the United States Bankruptcy Court for the District of Maryland – Baltimore Division, *In re: Novation Companies, Inc., et al. (Debtors)* on the valuation of subprime RMBS overcollateralization and excess interest certificates with and without the exercise of optional termination, 2017.

Affidavit, In the Supreme Court of the State of New York for the County of New York in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd.* on economic analysis of damages involving credit default swaps, 2017.

Expert Reports, In the Superior Court of Justice for the Province of Ontario in *John M. McIntosh v. Takata Corporation, TK Holdings Inc., Toyota Motor Corporation, Toyota Motor Manufacturing Canada Inc. and Toyota Motor Manufacturing, Indiana, Inc. / Rick A. Des-Rosiers and Stephen Kominar v. Takata Corporation, TK Holdings Inc., Honda Motor Co., Ltd., Honda of America Manufacturing, Inc. and Honda Canada* on economic analysis of class certification issues, 2016.

Deposition Testimony and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *Fixed Income Shares: Series M, et al. v. Citibank N.A.* on estimation of damages in an RMBS matter, 2016.

Declaration, In the United States District Court for the Southern District of New York in *The State of New York and The City of New York v. United Parcel Service, Inc.* on statistical analysis and estimation of damages, 2016.

Expert Report, In the United States District Court for the Southern District of New York in *The State of New York and The City of New York v. United Parcel Service, Inc.*, 2016.

Report regarding the allocable shares of the settlement trusts pursuant to the Settlement Agreement between The Bank of New York as Trustee for 530 Countrywide Mortgage-backed Securities Trusts, on the one hand, and Bank of America Corporation, Countrywide Home Loans and Bank of America on the other, prepared on behalf of The Bank of New York, January 2016.

Deposition Testimony, Rebuttal Report and Expert Report, In the Superior Court of the State of California In and For the City and County of San Francisco in *Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities Inc., et al. / Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et al.*, on a statistical analysis of the performance of mortgage backed certificates, July-October-December 2015.

Testimony, Rebuttal Expert Report and Expert Report, In the Matter of the Arbitration Before JAMS in *Sonova Holding AG, et al. v. Alfred E. Mann, individually, on behalf of the Mann Trust, and as Seller Representative, et al.*, on estimation of damages in an acquisition dispute, August-September-November 2015.

Affidavit, In the United States Bankruptcy Court for the District of Delaware, *In re: AgFeed USA, LLC, et al. (Debtors)* on the structure of the proposed settlement allocation, October 2014.

47

Report, "Economic Analysis of the Impact of the Amendments to Rule G-23 on the Municipal Securities Market" on the impact of the amendments to Rule G-23 which prevents financial advisors from switching roles in competitive municipal sales on the cost of borrowing for municipal issues, with special emphasis on small issuers, September 2014.

Expert Report, *In re: Proposed RMBS Settlement Agreement – November 15, 2013* on analysis of reasonableness of the RMBS settlement for Rep and Warranty breaches involving 330 JP Morgan Trusts, July 2014.

Deposition Testimony and Report (with Chudozie Okongwu), In the United States Bankruptcy Court for the Middle District of Florida – Orlando Division, *In re: Sherwood Investments Overseas Limited, Inc. (Debtor) / Sherwood Investments Overseas Limited, Inc. v. The Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank, N.V.* on alleged causation and damages with regard to investments in certain equity derivative products, May-June 2014.

Deposition Testimony and Expert Report, In the United States District Court for the Western District of Wisconsin in *CMFG Life Insurance Company, CUMIS Insurance Society, Inc. and Members Life Insurance Company v. RBS Securities Inc.* on statistical analysis of materiality of alleged breaches in representations and warranties of several RMBS trusts in a repurchase litigation, November 2013 & March 2014.

Deposition Testimony and Declaration, In the United States District Court for the Central District of California in *Securities and Exchange Commission v. Aletheia Research and Management, Inc., and Peter J. Eichler, Jr.*, on analysis of options trading, damages and disgorgement, February 2014.

Testimony, in the Supreme Court of the State of New York, County of New York in *The Bank of New York Mellon, et al. v. Walnut Place LLC, et al.* on a proposed RMBS settlement by Bank of America, September 2013.

Declaration, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, August 2013.

Deposition Testimony, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, June 2013.

Expert Report, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, May 2013.

Expert Report, In the Superior Court of Justice for the Province of Ontario in *Edward Selmani, et al. v. Toyota Canada Inc. and Toyota Motor Corporation, et al.* on economic analysis of class certification and analysis of diminution of value in Toyota's product recall litigation, May 2013.

Affidavit and Declaration, in the matter of *Michael Melley v. Toyota Canada Inc. and Toyota Motor Corporation*, Superior Court of the Province of Québec, District of Montréal, on economic analysis of diminution of value and class certification issues, April 2013.

Testimony, in the Supreme Court of the State of New York, County of New York in *IDX Capital, LLC, et al. v. Phoenix Partners Group LLC, et al.* on the fair market value of a CDS inter-dealer broker firm, December 2012.

Deposition Testimony, in the Supreme Court of the State of New York, County of New York in *The Bank of New York Mellon, et al. v. Walnut Place LLC, et al.* on a proposed RMBS settlement by Bank of America, December 2012.

Testimony in a FINRA Disciplinary Proceeding, *Department of Enforcement v. Brookstone Securities, Inc., et al.*, regarding collateralized mortgage obligations, including inverse floating-rate and interest-only tranches, and the impact of changes in the yield curve during the period 2004 to 2007 on the value of the securities, February 2012.

Expert Report, in the matter of *Ryan Schachter v. Toyota Canada Inc. and Toyota Motor Corporation*, Superior Court of the Province of Québec, District of Montréal, on economic analysis of class certification, October 2011.

Trial Testimony in the Supreme Court of the State of New York, County of New York, in *Jet Acceptance Corporation v. Quest Mexicana, S.A. de C.V. and Lomas Group S.A. de C.V.*, on the estimation of damages and the use of discount rates, September 2011.

Rebuttal Affidavit on behalf of defendants, I*DX Capital LLC, et al. v. Phoenix Partners Group LLC, et al.* Index No. 102806-07 (Supreme Court of the State of New York). The rebuttal affidavit analyzed the revenue projections of a credit default swaps inter-dealer broker (IDB), January 2011.

Expert Report in a FINRA Disciplinary Proceeding, *Department of Enforcement v. Brookstone Securities, Inc., et al.*, on representations made to customers regarding CMOs, inverse floaters and IOs and examined the impact of changes in the interest rates environment and other market factors during the period 2004 to 2007, January 2011.

## Publications

"How Will the LIBOR Transition Affect Consumer Loans?" (with Ignacio Franceschelli and Ramisa Roya), NERA Working Paper, August 2022.

"The Role of Punitive Damages in Asbestos Litigation" (with Ignacio Franceschelli and Sungi Lee), *ABA Section of Litigation, Mass Torts Litigation newsletter*, April 22, 2021.

"Hey Google: When Did People Stop Going to Work?" (co-authored with Linh Nguyen, and Aakash Bhalothia), NERA Working Paper, May 2020.

"Manufactured Defaults and the Use of Credit Default Swaps," (co-authored with Ignacio Franceschelli and David Cen), NERA Working Paper, December 2019.

"What Does the CFPB Complaints Database Tell Us About the Quality of Servicing of Student Loans?" (with Ignacio Franceschelli and David Cen), NERA Working Paper, December 2017.

"Not All MBS Settlements Are Equal," (with Sungi Lee and Linh Nguyen), *NERA Insights: Subprime Lending Series, Part XII*, June 2017 (Republished in *Law360* as "Trends In Credit Crisis Settlements," September 18, 2017).

"Home Equity, Home Value, and Determinants of Mortgage Defaults During the Credit Crisis," (with Drew Claxton and Ignacio Franceschelli), *Journal of Real Estate Practice and Education*, Vol. 19, No. 2, 2016.

"Mortgage Defaults, Foreclosures and Modifications," (with Drew Claxton and Ignacio Franceschelli), in the *Handbook of Mortgage-Backed Securities, 7th Edition*, Frank J. Fabozzi (ed.), Oxford University Press, 2016.

"What do the new risk retention requirements of the Dodd-Frank Act mean for securitization?," *Financial Regulation International*, Issue 18.5, June 2015.

"Credit Crisis Litigation Update: Significant Settlement Activity in 2014 and New Cases against RMBS Trustees and Mortgage Lenders," (with Sungi Lee, Joseph Mani and Linh Nguyen), NERA Working Paper, February 2015.

"An Economist's View of Market Evidence in Valuation and Bankruptcy Litigation," (with William Hrycay), NERA Working Paper, May 2014 (Republished in *Law360* as "Market Evidence In Solvency Disputes–An Economist's View," July 1, 2014, and republished by Harvard Law School Forum on Corporate Governance and Financial Regulation; website link http://blogs.law.harvard.edu/corpgov/).

"The Use of ABX in Credit Crisis Litigation," *Journal of Structured Finance*, Vol. 19, No. 4, Winter 2014.

"Credit Crisis Litigation Update: It is Settlement Time," (with Eric Wang and Joseph Mani), NERA Working Paper, October 2013. (Republished by Harvard Law School Forum on Corporate Governance and Financial Regulation; website link http://blogs.law.harvard.edu/corpgov/).

"Comcast and Economic Analysis of Class Certification Issues," (with Drew Claxton), NERA Working Paper, July 2013.

"The Use of ABX Derivatives in the Credit Crisis Litigation," (with Ethan Cohen-Cole) *NERA Insights: Subprime Lending Series*, January 2012.

"What Do the New Risk Retention Requirements of the Dodd-Frank Act Mean for Securitization?" *NERA Insights: Impact of the New Financial Regulations Series, Part III*, December 2010.

"Credit Crisis Litigation Revisited: Litigating the Alphabet of Structured Products," (with Anmol Sinha, Jesse Mark, and Sungi Lee) *NERA Insights: Subprime Lending Series, Part VII*, June 2010.

"An Update on the Credit Crisis Litigation: A Turn Towards Structured Products and Asset Management Firms," (with Anmol Sinha and Sungi Lee) *NERA Insights: Subprime Lending Series, Part VI*, June 2009.

"How Did We Get Here? The Story of the Credit Crisis," (with Chudozie Okongwu), *Journal of Structured Finance*, Spring 2009.

"The Use of Economic Analysis in Predatory Lending Cases: Application to Subprime Loans," (with Denise Martin and Stephanie Plancich) *NERA Insights: Subprime Lending Series, Part IV*, June 2009.

"Trends in the Subprime Securities Litigation," (with Anmol Sinha and Sungi Lee), *Journal of Alternative Investments*, Fall 2008.

"Subprime Securities Litigation: Key Players, Rising Stakes, and Emerging Trends," (with Anmol Sinha and Sungi Lee), *NERA Insights: Subprime Lending Series, Part III*, July 2008.

"The Subprime Meltdown: A Primer," (with Tom Schopflocher), *US Subprime Market: Evolution, Growth and Crisis*, Icfai University Press, July 2008.

"When Do Breakpoints Give Mutual Fund Investors a Break?" (with Winai Wongsurawat), *Journal of Investment Compliance*, Volume 9, Issue 2, April 2008.

"Subprime Litigation: The Opening Salvo," (with Anmol Sinha and Sungi Lee), *Tort Source*, Vol. 10 Issue No. 3, Spring 2008.

"The Subprime Meltdown: Not Again!" (with Tom Schopflocher), *American Bankruptcy Institute Journal*, Vol. XXVI, No. 7, September 2007.

"The Propensity to Sue: Why Do People Seek Legal Actions?" (with SEC Economic Fellow Fred Dunbar), *Business Economics*, April 2007.

"The Subprime Meltdown: A Primer," (with Tom Schopflocher), *NERA Insights: Subprime Lending Series, Part I*, June 2007.

"Forecasting Claims in an Era of Tort Reform," (with SEC Economic Fellow Fred Dunbar), *LNJ's Product Liability Newsletter*, November/December 2004.

"The Development and Effectiveness of the WTO's Dispute Settlement Body," *MSU-Journal of International Law*, Volume 10, Issue #3, Fall 2001.

"An Analysis of the Decision to File, the Dumping Margin and the Outcome of Antidumping Petitions," *The International Trade Journal*, Volume XIV, No. 2, Summer 2000.

## Recent Presentations

"Two Sides of the Coin: Future Cryptocurrency Regulatory and Litigation Risks," panel discussion, NERA Insights Webinar, March 2021.

"A View of Bankruptcies on Both Sides of the Atlantic," panel discussion, NERA Insights Webinar, December 2020.

"Use of Credit Default Swaps in Valuation Disputes," presented at *American Bankruptcy Institute Conference*, New York, NY, May 2019.

"How Do Market Efficiency and Market Evidence Factor in Valuation Disputes?," presented at *VALCON 2019*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, February 2019.

"2018 Claim Trends and NERA Capabilities," presentation hosted by *FINPRO Global Advisory Board*, New York, NY, February 2019.

"Navigating Issues in Fraudulent Transfers," presented at *VALCON 2018: Cutting Edge Valuation Solutions*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, May 2018.

"Puerto Rico Restructuring Crisis as Compared to Detroit," ABA Section of Litigation Roundtable Webinar (moderator), November 2017.

"Economic Analysis of Plan Feasibility and Capital Adequacy," presented on Bankruptcy Litigation panel at *American Bankruptcy Institute New York City Bankruptcy Conference 2017*, New York, NY, May 2017.

"Shorting Credit Default Swaps," *NERA's 16th Securities & Finance Summer Seminar*, Park City, UT, July 2016.

"Use of Derivatives and Probabilistic Methods in Bankruptcy, Workouts and Insolvency Matters," presented at *VALCON 2016: Emerging Valuation Issues in Bankruptcy and Beyond*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, March 2016.

"Valuation Adjustment – The Economics of the Cost of Capital for Distressed Companies," *VALCON 2015: Emerging Valuation Issues in Bankruptcy and Beyond*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, February 2015.

"Economic Analysis of Risk Retention Under Dodd Frank," webcast hosted by *The Knowledge Group*, October 2014.

"Argentina Debt Litigation: Sovereign Debt Restructuring Going Forward," webcast hosted by Thomson Reuters, September 2014.

"Hot Topics in Bankruptcy Litigation," webcast hosted by West LegalEdcenter in conjunction with NERA Economic Consulting, April 2013.

"Valuation Issues in Bankruptcy Litigation," presented at the Practising Law Institute's Webcast on Valuation and Bankruptcy Litigation, New York, NY, December 2012.

"Asset-backed Securitizations–What Happened?," presented at *Understanding Mortgage-Backed Securities*, hosted by the Southern District of New York Chapter and Securities Law Section of the Federal Bar Association: New York, NY, March 2012.

"Mortgage-backed Securities Litigation," Strafford Webinar, January 5, 2012.

"The Economics of CDO Litigation," presented at *NERA's Financial Litigation, Disputes, and Enforcement Seminar*, London, United Kingdom, October 2011.

"The Impact of the New Risk Retention Rules on Securitization: Examining Economic Issues in Financial Regulation under Dodd-Frank," presented at the SEC Historical Society, July 2011.

"Mortgage-Backed Securities Litigation: Leveraging Latest Developments," a web seminar presented by Strafford Publishing, New York, NY, March 2011.

"Trends in the Credit Crisis Litigation," presented at *New York University Roundtable on the Securities Litigation in the Aftermath of the Crisis: What Happened in 2010 and What Lies Ahead?* Hosted by the New York University Vincent C. Ross Institute of Accounting Research and NERA: New York, NY, February 2011.

"The Causes and Effects of the Financial Crisis in the Context of the U.S. and Canadian Experience," presented at the Association of Canadian General Counsel, *2010 Fall Conference*, Chicago, IL, September 2010.

# APPENDIX II: MATERIALS RELIED UPON

**Case Filings and Discovery Materials**
- *In re NIO, Inc. Securities Litigation*, Second Amended Class Action Complaint for Violation of the Federal Securities Laws, United States District Court Eastern District of New York, Case No. 1:19-cv-01424-NGG-VMS, dated September 18, 2020.
- *In re NIO, Inc. Securities Litigation*, Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, United States District Court Eastern District of New York, Case No. 1:19-cv-01424-NGG-JRC, dated June 28, 2022.
- Declaration of Dr. Adam Werner, dated June 21, 2022.
- Deposition transcript of Dr. Adam Werner, dated September 13, 2022.

**Data**
- Bloomberg L.P.
- Factiva.
- FactSet Research.
- Fidelity Investment Transactions Confirmations for plaintiff Eva Huang, between March 5, 2019 and March 15, 2021.
- Refinitiv Eikon.

**Academic and Industry Literature**
- Berk, Jonathan, and Peter DeMarzo. *Corporate Finance*. 3rd ed. Boston, MA: Pearson, 2014.
- Berk, Jonathan, and Peter DeMarzo. *Corporate Finance*. 4th ed. Boston, MA: Pearson, 2017.
- Bodie, Zvi, Alex Kane, and Alan J. Marcus. *Essentials of Investments*. 4th ed. 2001.
- Bodie, Zvi, Alex Kane, and Alan J. Marcus. *Investments*. 10th ed. New York, NY: McGraw-Hill, 2014.
- Bodie, Zvi, Alex Kane, and Alan J. Marcus. *Investments*. 11th ed. New York, NY: McGraw-Hill, 2018.
- Bradley, Daniel J., Bradford D. Jordan, and Jay R. Ritter. "The Quiet Period Goes out with a Bang." *The Journal of Finance* 58, no. 1 (February 2003): 1–36.
- Bradshaw, Mark T., Lawrence D. Brown, and Kelly Huang. "Do Sell-Side Analysts Exhibit Differential Target Price Forecasting Ability?" *Review of Accounting Studies* 18, no. 4 (2013): 930–55.
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance*. 10th ed. New York, NY: McGraw-Hill, 2011.
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance*. 11th ed. Maidenhead: McGraw-Hill, 2014.
- Bushee, Brian, Matthew Cedergren, and Jeremy Michels. "Does the Media Help or Hurt Retail Investors during the IPO Quiet Period?" *Journal of Accounting and Economics* 69, no. 1 (February 2020): 1-19.
- Busse, Jeffrey A., and T. Clifton Green. "Market efficiency in real time." *Journal of Financial Economics* 65, no. 3 (September 2002): 415-37.
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay. *The Econometrics of Financial Markets*. 2nd ed. Princeton, NJ: Princeton University Press, 1997.
- Chambers, David, and Elroy Dimson. "IPO Underpricing over the Very Long Run." *The Journal of Finance* 64, no. 3 (June 2009): 1407–43.
- Cornell, Bradford. *Corporate Valuation*. New York, NY: McGraw-Hill, 1993.
- Dong, Ming, Jean-Sebastien Michel, and J. Ari Pandes. "Underwriter Quality and Long-Run IPO Performance." *Financial Management* 40, no. 1 (2011): 219–51.
- Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work." *The Journal of Finance* 25, no. 2 (May 1970): 383-417.
- Fama, Eugene F. "Efficient Capital Markets: II." *The Journal of Finance* XLVI, no. 5 (December 1991):1575-1617.
- Gleason, Cristi A., W. Bruce Johnson, and Haidan Li. "Valuation Model Use and the Price Target Performance of Sell-Side Equity Analysts." *Contemporary Accounting Research* 30, no. 1 (March 2013): 80–115.
- Greene, William H. *Econometric Analysis*. 7th ed. Pearson Education Limited, 2011.
- Huang, Dashan, Jiangyuan Li, Liyao Wang, and Guofu Zhou. "Time Series Momentum: Is It There?" *Journal of Financial Economics* 135, no. 3 (March 2020): 774–94.
- Krigman, Laurie, Wayne H. Shaw, and Kent L. Womack. "The Persistence of IPO Mispricing and the Predictive Power of Flipping." *The Journal of Finance* 54, no. 3 (June 1999): 1015–44.

- Lim, Kian-Ping, Weiwei Luo, and Jae H. Kim. "Are US Stock Index Returns Predictable? Evidence from Automatic Autocorrelation-Based Tests." *Applied Economics* 45, no. 8 (2013): 953–62.
- Mitchell, Mark L., and Jeffry M. Netter. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission." *The Business Lawyer* 49, no. 2 (February 1994): 545–90.
- Patell, James M., and Mark A. Wolfson. "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements." *Journal of Financial Economics* 13, no. 2 (June 1984): 223–52.
- "Quiet Period." Quiet Period | Investor.gov. United States Securities and Exchange Commission. Accessed October 16, 2022. https://www.investor.gov/introduction-investing/investing-basics/glossary/quiet-period.
- Ritter, Jay R. "The Long-Run Performance of Initial Public Offerings." *The Journal of Finance* 46, no. 1 (March 1991): 3–27.
- Ritter, Jay R., and Ivo Welch. "A Review of IPO Activity, Pricing, and Allocations." *The Journal of Finance* 57, no. 4 (August 2002): 1795–1828.
- Ross, Stephen A., Randolph Westerfield, and Jeffrey F. Jaffe. *Corporate Finance*. 6th ed. Boston, MA: McGraw-Hill/Irwin, 2002.
- Switzer, Lorne N., Nabil El Meslmani, and Xinkai Zhai. "IPO Performance and the Size Effect: Evidence for the US and Canada." *North American Journal of Economics and Finance* 62 (June 27, 2022).
- Weil, Roman L., Michael J. Wagner, and Peter B. Frank. *Litigation Services Handbook: The Role of the Financial Expert*. 3rd ed. New York, NY: John Wiley & Sons, Inc., 2001.

**SEC Filings**

- NIO Inc. Amendment No. 5 to Form F-1 Registration Statement Under the Securities Act of 1933. Filed September 11, 2018.
- NIO Inc. Form 20-F Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 For the fiscal year ended December 31, 2018. Filed April 2, 2019.
- NIO Inc. Form 424(b)(4) Prospectus. Filed September 12, 2018.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed April 2, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed August 12, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed December 17, 2018.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed December 3, 2018.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed February 4, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed January 10, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed January 29, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed January 31, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed July 10, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed June 27, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed June 4, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed March 6, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed May 28, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed November 30, 2018.

- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed November 6, 2018.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed October 10, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed October 15, 2018.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed September 17, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed September 24, 2019.
- NIO Inc. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934. Filed September 5, 2019.
- NIO Inc. Schedule 13G Amendment Under the Securities Exchange Act of 1934. Filed February 5, 2019.
- NIO Inc. Schedule 13G Under the Securities Exchange Act of 1934. Filed February 1, 2019.
- NIO Inc. Schedule 13G Under the Securities Exchange Act of 1934. Filed February 14, 2019.
- NIO Inc. Schedule 13G Under the Securities Exchange Act of 1934. Filed January 23, 2019.
- NIO Inc. Schedule 13G Under the Securities Exchange Act of 1934. Filed October 9, 2018.
- United States Securities and Exchange Commission. Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 Under the Securities Exchange Act of 1934: General Instructions. SEC website. https://www.sec.gov/about/forms/form6-k.pdf, accessed October 12, 2022.
- United States Securities and Exchange Commission. Form S-3 registration Statement Under the Securities Act of 1933: General Instructions. SEC website. https://www.sec.gov/files/forms-3.pdf, accessed October 12, 2022.

**Reports Issued by Analysts**

- Brinkman, Ryan, Rajat Gupta, Daniel J Won, Aayush Gupta, and Nick Lai. "Takeaways from JPM's CES Auto Tech Conference for Aptiv, NIO, & Veoneer." JP Morgan. January 14, 2019.
- Chung, Jeff, Beatrice Lam, and Andy Li. "Results: In-line FY18 Results with Lower 1Q19 Guidance." Citi. March 6, 2019.
- Fang, Fei, Tianhang Gao, Kota Yuzawa, and Yuqian Ding. "Reinstate at Buy." Goldman Sachs. March 7, 2019.
- Galves, Dan, Rod Lache, and Shreyas Patil. "Demand questions will likely linger." Wolfe Research. March 6, 2019.
- Galves, Dan, Rod Lache, and Shreyas Patil. "Unique Opportunity to Ride China EV Wave." Wolfe Research. October 8, 2018.
- Gong, Paul, and Yizhe Wang. "Navigating choppy waters." UBS. March 6, 2019.
- Ha, Vincent, and Yan Lin. "Recent sales headwind should be mitigated by improved cash flow." Deutsche Bank. March 7, 2019.
- Lai, Nick, Ryan Brinkman, and Rebecca Y Wen. "A soft start in 2019 but expect a meaningful rebound in 2H." JP Morgan. March 6, 2019.
- Lai, Nick, Ryan Brinkman, and Rebecca Y Wen. "Blue Sky Future, but unproven path there: Initiate with Neutral." JP Morgan. October 9, 2018.
- Lee, Ming Hsun, John Murphy, Fraser Hill, and Jessie Lo. "Downgrade to U/P: Shipment and ASP likely to see downside risks." Bank of America / Merrill Lynch. March 6, 2019.
- Wang, Bin, Nick Li, and Carrie Jiang. "4Q18 gross profit turned positive for the first time." Credit Suisse.
- Wang, Bin, Nick Li, and Carrie Jiang. "The next generation car company." Credit Suisse. October 22, 2018.
- Wang, Lei, and Wei Feng. "ES6 a more mass-market model, but orders limited for now." CICC. March 8, 2019.
- Yeung, Jack, Frank Wan, Eddy Wang, Tim Hsiao, and Shelley Wang. "FY18 Earnings Call Takeaways." Morgan Stanley. March 7, 2019.
- Yeung, Jack, Frank Wan, Tim Hsiao, Eddy Wang, and Vennie Kang. "China's Premium EV Pioneer; Inititate at Overweight." Morgan Stanley. October 7, 2018.

**News Articles and Press Releases**

- Counts, Laura. "How Hedge Funds Use Satellite Images to Beat Wall Street—and Main Street." Berkeley Haas Newsroom. Haas School of Business, University of California, Berkeley, May 28, 2019. https://newsroom.haas.berkeley.edu/how-hedge-funds-use-satellite-images-to-beat-wall-street-and-main-street/.
- Dey, Esha, and Ryan Vlastelica. "Chinese Electric Car Maker NIO Plunges Most Since Its IPO." *BNN Bloomberg*. March 6, 2019. https://www.bnnbloomberg.ca/chinese-electric-car-maker-nio-plunges-most-since-its-ipo-1.1224770.
- Hull, Dana. "Tesla's Top Outside Investor Takes 11% Stake in Challenger NIO." *Bloomberg*, October 9, 2018.
- "NIO Inc. Announces Closing of US$650 Million Convertible Senior Notes Offering." GlobeNewswire. Notified, February 4, 2019. NIO Inc. https://www.globenewswire.com/news-release/2019/02/04/1710164/0/en/NIO-Inc-Announces-Closing-of-US-650-Million-Convertible-Senior-Notes-Offering.html.
- "NIO Inc. Announces Management Change." *GlobeNewswire*. Notified, November 29, 2018. NIO Inc. https://www.globenewswire.com/en/news-release/2018/11/29/1659737/0/en/NIO-Inc-Announces-Management-Change.html.
- "NIO Inc. CEO Transferred 50 Million Shares to the Newly Established NIO User Trust." *GlobeNewswire.* Notified, January 24, 2019. NIO Inc. https://www.globenewswire.com/news-release/2019/01/24/1704645/0/en/NIO-Inc-CEO-Transferred-50-Million-Shares-to-the-Newly-Established-NIO-User-Trust.html.
- "NIO Inc. Provides November 2018 Monthly Delivery and Production Update, Announces NIO Day, December 15, 2018, as ES6 Launch Date." *GlobeNewswire*. Notified, December 3, 2018. NIO Inc. https://www.globenewswire.com/en/news-release/2018/12/03/1660507/0/en/NIO-Inc-Provides-November-2018-Monthly-Delivery-and-Production-Update-Announces-NIO-Day-December-15-2018-as-ES6-Launch-Date.html.
- "NIO Announces US$200 Million Private Placement of Convertible Notes." *GlobeNewswire*. Notified, September 5, 2019. NIO Inc. https://www.globenewswire.com/news-release/2019/09/05/1911316/0/en/NIO-Announces-US-200-Million-Private-Placement-of-Convertible-Notes.html.
- "NIO Announces Voluntary Recall of 4,803 ES8s for Battery Safety Concerns." *NIO*. NIO, June 27, 2019. NIO Inc. https://www.nio.com/news/nio-announces-voluntary-recall-4803-es8s-battery-safety-concerns.
- "NIO ES6 Launches at Pre-Subsidy Price Starting from 358,000 RMB with NEDC Range of up to 510 Kilometers." *BusinessWire*, December 17, 2018. NIO Inc. https://www.businesswire.com/news/home/20181217005492/en/.
- "NIO Inc. Announces Proposed Offering of US$650 Million Convertible Senior Notes." *GlobeNewswire*. Notified, January 29, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/01/29/1707211/0/en/NIO-Inc-Announces-Proposed-Offering-of-US-650-Million-Convertible-Senior-Notes.html.
- "NIO Inc. Announces Retirement of Hsien Tsong Cheng as Executive Vice President." MarketScreener, September 17, 2019. https://www.marketscreener.com/quote/stock/NIO-INC-45899628/news/NIO-Inc-Announces-Retirement-of-Hsien-Tsong-Cheng-as-Executive-Vice-President-34149271/.
- "NIO Inc. Delivered 1,766 ES8 Vehicles in the Month of September 2018 and 3,268 Vehicles for the Third Quarter of 2018." *GlobeNewswire*. Notified, October 15, 2018. NIO Inc. https://www.globenewswire.com/en/news-release/2018/10/15/1620943/0/en/NIO-Inc-Delivered-1-766-ES8-Vehicles-in-the-Month-of-September-2018-and-3-268-Vehicles-for-the-Third-Quarter-of-2018.html.
- "NIO Inc. Files Its Annual Report on Form 20-F." *GlobeNewswire*. Notified, April 2, 2019. NIO Inc. https://www.globenewswire.com/news-release/2019/04/02/1795327/0/en/NIO-Inc-Files-Its-Annual-Report-on-Form-20-F.html.
- "NIO Inc. Prices Offering of US$650 Million Convertible Senior Notes." *GlobeNewswire.* Notified, January 30, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/01/31/1708012/0/en/NIO-Inc-Prices-Offering-of-US-650-Million-Convertible-Senior-Notes.html.
- "NIO Inc. Provides December 2018 Monthly Delivery Update." *GlobeNewswire*. Notified, January 10, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/01/10/1685942/0/en/NIO-Inc-Provides-December-2018-Monthly-Delivery-Update.html.
- "NIO Inc. Provides First Quarter 2019 Delivery Update." *GlobeNewswire*. Notified, April 2, 2019. NIO Inc. https://www.globenewswire.com/news-release/2019/04/02/1794860/0/en/NIO-Inc-Provides-First-Quarter-2019-Delivery-Update.html.

57

- "NIO Inc. Provides July 2019 Monthly Delivery Update." *GlobeNewswire* . Notified, August 12, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/08/12/1900310/0/en/NIO-Inc-Provides-July-2019-Monthly-Delivery-Update.html.
- "NIO Inc. Provides May 2019 Monthly Delivery Update." *GlobeNewswire* . Notified, June 4, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/06/04/1863754/0/en/NIO-Inc-Provides-May-2019-Monthly-Delivery-Update.html.
- "NIO Inc. Provides Second Quarter 2019 Delivery Update." *GlobeNewswire* . Notified, July 10, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/07/10/1880665/0/en/NIO-Inc-Provides-Second-Quarter-2019-Delivery-Update.html.
- "NIO Inc. Provides Third Quarter 2019 Delivery Update." *GlobeNewswire* . Notified, October 8, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/10/08/1926249/0/en/NIO-Inc-Provides-Third-Quarter-2019-Delivery-Update.html.
- "NIO Inc. Reports Unaudited First Quarter 2019 Financial Results." *GlobeNewswire* . Notified, May 28, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/05/28/1851146/0/en/NIO-Inc-Reports-Unaudited-First-Quarter-2019-Financial-Results.html.
- "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results." *GlobeNewswire* . Notified, March 5, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/03/05/1748443/0/en/NIO-Inc-Reports-Unaudited-Fourth-Quarter-and-Full-Year-2018-Financial-Results.html.
- "NIO Inc. Reports Unaudited Second Quarter 2019 Financial Results." *GlobeNewswire* . Notified, September 24, 2019. NIO Inc. https://www.globenewswire.com/en/news-release/2019/09/24/1919667/0/en/NIO-Inc-Reports-Unaudited-Second-Quarter-2019-Financial-Results.html.
- "NIO Inc. Reports Unaudited Third Quarter 2018 Financial Results." *GlobeNewswire* . Notified, November 6, 2018. NIO Inc. https://www.globenewswire.com/en/news-release/2018/11/06/1645751/0/en/NIO-Inc-Reports-Unaudited-Third-Quarter-2018-Financial-Results.html.
- Thomson Reuters Streetevents. "Edited Transcript - Q4 2018 Nio Inc Earnings Call." March 6, 2019.

**Court Decisions**
- *In Re CytRx Corporation Securities Litigation.* , No. CV-05519-SJO-SK (C.D. Ca. November 17, 2017)
- *Barrie v. Intervoice-Brite, Inc.* , 2009 U.S. Dist. LEXIS 99253 (N.D. Tex., Oct. 26, 2009)
- *Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.,* 141 S. Ct. 1951, 1961 (2021).
- *In re TECO Energy Inc. Securities Litigation* , 2006 U.S. Dist. LEXIS 18101 (M.D. Fla., Mar. 30, 2006)
- *In re Hi-Crush Partners L.P.* , No. Civ-8557 (S.D. N.Y. Apr. 15, 2014)

## APPENDIX III: REPLICATION OF DR. WERNER'S EVENT STUDY

| Variable Number | Independent Variable | Dr. Werner | | | NERA | | |
|---|---|---|---|---|---|---|---|
| | | Coefficient | Standard Error | t-statistic | Coefficient | Standard Error | t-statistic |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 1. | Intercept | -0.39 % | 0.27 % | -1.45 | -0.40 % | 0.27 % | -1.45 |
| 2. | Market Index | 1.36 | 0.34 | 4.02 | 1.27 | 0.32 | 3.91 |
| 3. | Peer Index | 0.27 | 0.21 | 1.26 | 0.29 | 0.21 | 1.35 |
| 4. | 10/9/2018 | 21.92 % | 4.36 % | 5.03 | 21.98 % | 4.37 % | 5.03 |
| 5. | 11/6/2018 | -4.76 % | 4.28 % | -1.11 | -4.75 % | 4.29 % | -1.11 |
| 6. | 11/30/2018 | -2.10 % | 4.29 % | -0.49 | -2.24 % | 4.30 % | -0.52 |
| 7. | 3/6/2019 | -21.84 % | 4.29 % | -5.09 | -21.85 % | 4.30 % | -5.09 |
| 8. | 3/7/2019 | -10.56 % | 4.28 % | -2.46 | -10.58 % | 4.29 % | -2.47 |
| 9. | 5/28/2019 | 5.15 % | 4.28 % | 1.20 | 5.17 % | 4.29 % | 1.21 |
| 10. | 9/24/2019 | -20.69 % | 4.28 % | -4.83 | -20.73 % | 4.29 % | -4.83 |

| Description of Regression | Dr. Werner | NERA |
|---|---|---|
| Count of Observations | 252 | 252 |
| R-Squared | 0.348 | 0.346 |
| Adjusted R-Squared | 0.324 | 0.322 |
| Standard Error | 0.0427 | 0.0428 |

**Notes and Sources:**

- NERA's data obtained from FactSet exhibits greater than 99% correlation with Dr. Werner's return data as presented in Exhibit 6.

[1] Center for Research in Security Prices US Total Market Index.

[2] S&P 500 Automobile Manufacturers Index.

59

## APPENDIX IV: NIO PREDICTED AND EXCESS RETURNS

| Date | NIO Return | NIO Predicted Return | NIO Excess Return | t-statistic |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 10/8/2018 | -3.58% | -0.28% | -3.30% | -0.77 |
| 10/10/2018 | 4.76% | -4.76% | 9.52% | 2.23 |
| 10/11/2018 | -7.64% | -3.12% | -4.51% | -1.06 |
| 10/12/2018 | 3.83% | 0.73% | 3.10% | 0.72 |
| 10/15/2018 | 4.71% | -0.55% | 5.26% | 1.23 |
| 10/16/2018 | 2.77% | 2.48% | 0.29% | 0.07 |
| 10/17/2018 | -3.42% | -0.76% | -2.66% | -0.62 |
| 10/18/2018 | -3.54% | -3.06% | -0.47% | -0.11 |
| 10/19/2018 | -2.43% | -0.61% | -1.82% | -0.43 |
| 10/22/2018 | -4.04% | -0.76% | -3.29% | -0.77 |
| 10/23/2018 | -3.18% | -0.48% | -2.70% | -0.63 |
| 10/24/2018 | -9.87% | -5.86% | -4.01% | -0.94 |
| 10/25/2018 | 4.44% | 3.89% | 0.55% | 0.13 |
| 10/26/2018 | -1.56% | -2.21% | 0.64% | 0.15 |
| 10/29/2018 | -2.55% | -0.57% | -1.98% | -0.46 |
| 10/30/2018 | -3.95% | 2.09% | -6.04% | -1.41 |
| 10/31/2018 | -0.84% | 2.44% | -3.28% | -0.77 |
| 11/1/2018 | 11.51% | 0.76% | 10.76% | 2.52 |
| 11/2/2018 | -1.98% | -1.14% | -0.84% | -0.20 |
| 11/5/2018 | 2.89% | 0.50% | 2.39% | 0.56 |
| 11/7/2018 | 5.18% | 2.43% | 2.74% | 0.64 |
| 11/8/2018 | -0.74% | -1.02% | 0.28% | 0.07 |
| 11/9/2018 | 1.19% | -2.16% | 3.35% | 0.78 |
| 11/12/2018 | -1.79% | -2.75% | 0.96% | 0.22 |
| 11/13/2018 | 1.94% | -0.37% | 2.30% | 0.54 |
| 11/14/2018 | 4.61% | -1.65% | 6.26% | 1.46 |
| 11/15/2018 | 3.32% | 0.86% | 2.46% | 0.58 |
| 11/16/2018 | -2.06% | -0.37% | -1.69% | -0.40 |
| 11/19/2018 | 8.65% | -2.37% | 11.03% | 2.58 |
| 11/20/2018 | -2.19% | -3.17% | 0.98% | 0.23 |
| 11/21/2018 | 0.52% | 0.48% | 0.04% | 0.01 |
| 11/23/2018 | -3.30% | -0.88% | -2.41% | -0.56 |
| 11/26/2018 | -1.21% | 2.67% | -3.88% | -0.91 |
| 11/27/2018 | 1.48% | -0.81% | 2.29% | 0.54 |
| 11/28/2018 | 8.21% | 2.80% | 5.41% | 1.27 |
| 11/29/2018 | -4.15% | -0.77% | -3.38% | -0.79 |
| 12/3/2018 | -1.70% | 1.44% | -3.14% | -0.73 |
| 12/4/2018 | -6.82% | -6.06% | -0.76% | -0.18 |
| 12/6/2018 | 4.01% | -0.92% | 4.93% | 1.15 |
| 12/7/2018 | -5.29% | -4.07% | -1.23% | -0.29 |

60

| Date | NIO Return | NIO Predicted Return | NIO Excess Return | t-statistic |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 12/10/2018 | 0.57% | -0.83% | 1.40% | 0.33 |
| 12/11/2018 | 0.71% | -0.32% | 1.03% | 0.24 |
| 12/12/2018 | 6.29% | 0.96% | 5.34% | 1.25 |
| 12/13/2018 | 2.75% | -1.11% | 3.86% | 0.90 |
| 12/14/2018 | -0.65% | -2.68% | 2.04% | 0.48 |
| 12/17/2018 | -9.10% | -3.37% | -5.73% | -1.34 |
| 12/18/2018 | 0.57% | -0.31% | 0.88% | 0.21 |
| 12/19/2018 | -3.45% | -2.57% | -0.88% | -0.21 |
| 12/20/2018 | -4.65% | -2.85% | -1.79% | -0.42 |
| 12/21/2018 | -7.15% | -4.03% | -3.12% | -0.73 |
| 12/24/2018 | -2.50% | -4.72% | 2.21% | 0.52 |
| 12/26/2018 | 7.17% | 6.65% | 0.52% | 0.12 |
| 12/27/2018 | 1.09% | 0.83% | 0.27% | 0.06 |
| 12/28/2018 | 0.62% | -0.49% | 1.11% | 0.26 |
| 12/31/2018 | -1.56% | 0.23% | -1.79% | -0.42 |
| 1/2/2019 | -2.71% | 0.21% | -2.91% | -0.68 |
| 1/3/2019 | -2.45% | -4.25% | 1.80% | 0.42 |
| 1/4/2019 | 5.00% | 4.90% | 0.09% | 0.02 |
| 1/7/2019 | 2.18% | 1.52% | 0.66% | 0.15 |
| 1/8/2019 | -1.55% | 1.26% | -2.81% | -0.66 |
| 1/9/2019 | 3.53% | 0.92% | 2.61% | 0.61 |
| 1/10/2019 | 0.45% | -0.08% | 0.53% | 0.12 |
| 1/11/2019 | -1.06% | 0.95% | -2.00% | -0.47 |
| 1/14/2019 | 3.14% | -0.67% | 3.81% | 0.89 |
| 1/15/2019 | 0.29% | 0.67% | -0.38% | -0.09 |
| 1/16/2019 | -1.63% | -0.71% | -0.91% | -0.21 |
| 1/17/2019 | 1.48% | 0.96% | 0.52% | 0.12 |
| 1/18/2019 | -1.48% | 1.69% | -3.16% | -0.74 |
| 1/22/2019 | -2.11% | -2.54% | 0.43% | 0.10 |
| 1/23/2019 | -0.30% | -0.63% | 0.33% | 0.08 |
| 1/24/2019 | 0.46% | 0.49% | -0.03% | -0.01 |
| 1/25/2019 | 1.06% | 1.33% | -0.27% | -0.06 |
| 1/28/2019 | 0.30% | -1.66% | 1.96% | 0.46 |
| 1/29/2019 | 3.97% | -0.44% | 4.41% | 1.03 |
| 1/30/2019 | 7.23% | 1.89% | 5.34% | 1.25 |
| 1/31/2019 | 5.48% | 0.80% | 4.68% | 1.09 |
| 2/1/2019 | 0.25% | -0.41% | 0.66% | 0.15 |
| 2/4/2019 | -0.63% | 0.54% | -1.17% | -0.27 |
| 2/5/2019 | 0.38% | 0.40% | -0.02% | 0.00 |
| 2/6/2019 | 6.39% | -0.43% | 6.82% | 1.60 |

61

| Date | NIO Return | NIO Predicted Return | NIO Excess Return | t-statistic |
|------|-----------|----------------------|-------------------|-------------|
| (1) | (2) | (3) | (4) | (5) |
| 2/7/2019 | -4.38% | -2.60% | -1.78% | -0.42 |
| 2/8/2019 | -4.71% | -0.13% | -4.58% | -1.07 |
| 2/11/2019 | -2.78% | -0.30% | -2.47% | -0.58 |
| 2/12/2019 | -0.27% | 1.57% | -1.84% | -0.43 |
| 2/13/2019 | 0.67% | -0.09% | 0.76% | 0.18 |
| 2/14/2019 | -0.13% | -0.67% | 0.53% | 0.12 |
| 2/15/2019 | -0.94% | 1.26% | -2.20% | -0.51 |
| 2/19/2019 | -2.05% | 0.39% | -2.43% | -0.57 |
| 2/20/2019 | 4.84% | 0.17% | 4.67% | 1.09 |
| 2/21/2019 | 0.26% | -1.27% | 1.53% | 0.36 |
| 2/22/2019 | 6.71% | 0.64% | 6.07% | 1.42 |
| 2/25/2019 | 9.68% | -0.11% | 9.78% | 2.29 |
| 2/26/2019 | 8.41% | -0.46% | 8.87% | 2.07 |
| 2/27/2019 | 0.61% | -0.51% | 1.13% | 0.26 |
| 2/28/2019 | -2.88% | -0.98% | -1.90% | -0.45 |
| 3/1/2019 | 4.99% | 0.53% | 4.47% | 1.04 |
| 3/4/2019 | -2.82% | -1.08% | -1.74% | -0.41 |
| 3/5/2019 | 3.81% | -0.63% | 4.44% | 1.04 |

**Notes and Sources:**

- Data are from FactSet.
- Returns are in natural log.

62

## APPENDIX V: ANALYST COMMENTARY

| Row<br>(1) | Equity Analyst<br>(2) | Date[1]<br>(3) | Page<br>(4) | Selected Excerpts<br>(5) |
|---|---|---|---|---|
| 1 | Credit Suisse [2] | 3/6/2019 | 1 | It declared to terminate the plan of in-house plant in Shanghai; focus on joint manufacturing model in future. **This is because government will allow auto R&D companies to gain manufacturing license, thus, NIO could soon get NEV subsidy and NEV credit directly.** NIO declared that it will not build its own plant in Jiading District Shanghai and focus on the joint manufacturing model in future. Back in early 2018, the Shanghai Jiading district government announced that it would evaluate the NIO Shanghai plant construction project, which reflected NIO's decision to build its own plant rather than continuing its joint manufacturing strategy. NIO chose not to build its own plant mainly due to two reasons: First, the Ministry of Industrial and Information Technology introduced the revised Provisions on the Access Administration of On road Vehicle Manufacturers and Products in Nov-2018. In the document, it specified that auto R&D companies that meet certain conditions could leverage companies with manufacturing license to produce their own products. Thanks to this policy, NIO could directly get NEV subsidy and NEV credit from the government without going through JAC. **The operational efficiency of the joint manufacturing model would improve. Second, the joint manufacturing model could improve NIO's cash flow with less capex required, despite its margin being partially hurt. The production lead time will also be shortened, as it takes 20 months to adjust the production line in an existing factory versus 24 months taken to build a new factory.** In the long run, management said it does not exclude the possibility of cooperation with other automakers for joint manufacturing. |
| 2 | Credit Suisse [2] | 3/6/2019 | 3 | Downside risks that could impede achievement of our US$12.6 target price include (1) Execution risk on near-term milestones, such as inability to deliver vehicle products on time or capacity shortage (given it has to rely on a partner). |
| 3 | JP Morgan [3] | 3/6/2019 | 1 | **...on the positive side, potential termination of building a new wholly owned Shanghai plant and simply leveraging JAC's existing capacity. This implies cost savings and better investment returns.**<br>**On the Shanghai plant, we welcome the move to terminate the greenfield expansion plan and simply utilize/expand existing capacity at JAC, subject to final regulatory approval in June. If it materializes, we believe this will save capex requirements (by ~20-30%) and drive better ROIC and cash flow.** |

| Row | Equity Analyst | Date[1] | Page | Selected Excerpts |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 4 | JP Morgan [3] | 3/6/2019 | 3 | Nio is planning to terminate the construction of its wholly owned Shanghai plant based on two reasons: 1) new policy released by government in 2018 encourages the joint manufacturing model adopted by Nio and JAC, 2) **Nio can leverage its existing Nio-JAC plant and the company plans to increase production capacity at this plant from the current 100k units to 150k units in 2-3 years with three models (ES8, ES6 and the 3rd model). Nio highlighted that subsidy or NEV credit from the JV plant will all belong to Nio.** In the long-run, Nio will focus on joint-production model (currently with JAC but mgmt. does not rule out the possibility of having other manufacturing partners) and **continue to improve the effectiveness of capital investment and manufacturing. Thanks to termination of Shanghai plant, there will be short-term and mid-term capex savings and translate to higher ROIC in the long-run.** |
| 5 | Bank of America Merrill Lynch [4] | 3/6/2019 | 3 | Construction of Shanghai plant is likely to be cancelled NIO originally signed framework agreements and memorandums with the government and related parties for the construction of a new plant in Shanghai in 2017. At the conference call, NIO announced that it has terminated the construction of its plant in Shanghai recently, pending a definitive termination agreement. NIO will focus on jointly manufacturing model in the long term. NIO will continue to invest in the NIO-JAC (JV) plant in Hefei, given (1) the Chinese government has announced a new policy and has encouraged auto start-ups to cooperate with the existing auto OEMs on R&D and manufacturing; and (2) **the NIO-JAC plant seems to be sufficient to support its growth over the next 2-3 years. Currently, the NIO-JAC plant has 100k units capacity per annum, and will expand to 150k units capacity by 2020. While capex for the Shanghai plant should be very limited as of now, the capex guidance remains unchanged (2018-20E: I6US$1.5bn) given it still expects a higher R&D investment.** |
| 6 | Wolfe Research [5] | 3/6/2019 | 1 | Expect weakness beyond this week: The bottom-line is that **we still see NIO as a winner**, due to engineering capability, an innovative marketing strategy, **asset-light manufacturing**, potential favored-company status in China, and massive EV advantages inherent to the China market. But the stock will trade on confidence in revenue and questions will linger. |
| 7 | Wolfe Research [5] | 3/6/2019 | 2 | With NIO still poised to increase capex spending through 2019 & 2020 (**capex previously earmarked for Shanghai facility now expected to be redeployed for capacity increases at its existing JAC JV facility and to help build out NIO's Charging / Service networks**), we think the company will need to raise capital again in 2020 (we est 3.0 bn RMB, or $450 MM). That said, NIO has multiple funding options, so we do not view this as a major concern. |

64

| Row | Equity Analyst | Date[1] | Page | Selected Excerpts |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 8 | CITI [6] | 3/6/2019 | 2 | Implication of termination of Shanghai plant (timing of new model, ROIC etc.). In Nov-18, the MIIT released a policy that endorses collaboration between auto technology R&D firms like NIO with auto OEMs like JAC. NIO and JAC are eligible for this. The company expects this policy to be finalized in June-19 and open for applications. **This would allow NIO to bypass many approval procedures regarding emissions. This kind of manufacturing cooperation method allows high efficiency in manufacturing and planning**. In the long-term, the company does not rule out looking for additional partners to expand this business model. The company has modified its production lines at JAC and the current total capacity is 100k units. The company has decided to work with JAC on its third model, which will bring the capacity under this collaboration to 150k units (sufficient capacity for the company's scale in the near-term). The company points out that it only takes 20 months for planning and ramping up capacity to manufacture a new model under this collaboration with JAC so the company is not concerned about bottlenecks from the termination of the plant plan. **The change in the policy will translate to some Capex savings for sure and ease the pressure on cash flow**. |
| 9 | Deutsche Bank [7] | 3/7/2019 | 1 | **Sticking to joint manufacturing model will help cash flow.** In the results announcement, NIO stated that it will no longer seek to build its own vehicle manufacturing plant in Shanghai and will further rely on the joint manufacturing operation with Jianghuai. **Considering the successful ramp-up of ES8 production in FY18, we think that NIO's current production business model will not hinder the original sales outlook. Indeed, we view this as a more flexible option with potentially lower capex outlay for the company in the next few years. We slightly lower our FY19-20 revenue forecasts for NIO, mainly on a weaker macro backdrop, but raise our DCF-derived target price considering the improved free cash flow trend after the scrapping of its plans to construct its own plant.** |

65

| Row | Equity Analyst | Date[1] | Page | Selected Excerpts |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 10 | Deutsche Bank [7] | 3/7/2019 | 3 | Termination of the development of its own Shanghai plant: NIO has decided to terminate the plan to build its own manufacturing plant in Jiading District and to focus on the joint manufacturing model. **The decision was made after the government allowed vehicle R&D enterprises to work together with OEMs to set up independent auto production/sales entities, similar to what NIO and Jianghuai have been doing**. While the detailed policy is not yet in place, formal application will start in June. **The advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency. NIO believes the savings from the termination of the development of its own plant should allow it to reallocate resources to the capacity expansion at Jianghuai's Hefei plant and other R&D activities.** |
| 11 | Deutsche Bank [7] | 3/7/2019 | 4 | Scrapping of plan to build own capacity: With the termination of the Shanghai plant plan, **the near-term capex for starting plant construction will not be needed.** Although NIO mentioned that some of the money saved will be used for Jianghuai's plant expansion and for R&D, **we still see good potential for lower cash burn in the next few years.** |
| 12 | Deutsche Bank [7] | 3/7/2019 | 5 | We raise our target price from USD8.6 to USD10.2 mainly on **lower overall capex estimate given the termination of the Jiading plant development and hence better free cash flow. Key downside risks for NIO**: 1) failure to attract demand, 2) **major issues in product quality**, 3) **inability to ramp up production as planned, and 4) inability to contain expense growth.** |
| 13 | Morgan Stanley [8] | 3/7/2019 | 1 | Nio's 2018 losses were in line with our forecast. We remain OW in view of solid 2019 guidance, **capex savings from suspension of factory construction, and the ramp-up of ES6.** **Future Shanghai factory suspended:** Nio has suspended its plan to build its own factory in Jiading, Shanghai – recent government policy encouraged its cooperation with JAC Motors. Nio plans to stick with the cooperation mode for manufacturing and is open to seeking other partners. **Its current production base with JAC has 100k units of annual capacity, and would be expanded to 150k after upgrade, satisfying the need for its first three models in the next 2-3 years. Nio believes it might still need to pay a small compensation to JAC in 1H19 with relatively low delivery. We view the joint manufacturing mode as positive – it could save on capex while keeping sufficient capacity.** |
| 14 | Morgan Stanley [8] | 3/7/2019 | 2 | …**lower-than-expected production capability could increase customer waiting time, lower the turnover rate and lead to a decrease in purchasing willingness**. |

66

| Row (1) | Equity Analyst (2) | Date[1] (3) | Page (4) | Selected Excerpts (5) |
|---|---|---|---|---|
| 15 | Goldman Sachs [9] | 3/7/2019 | 1 | ...we reinstate our rating on NIO at Buy on four key drivers: **(1) Light business model NIO's forfeiture of building proprietary plant creates a new avenue for is to assess the company's investment value.** In Dec 2018, MIIT issues policies to 'encourage capacity partnership and outsourcing' among vehicle designers and manufacturers. **In 4Q2018 earnings release, the company announced to (a) terminate the plan to build the facility in Shanghai, and (b) focus on the joint manufacturing model in the long term. The release says that NIO/JAC plant in Hefei will ensure adequate capacity and flexibility to support the company's market penetration and growth plans for the next 2-3 years.** On the earnings call, management discussed the possibility of bringing in additional manufacturing partners over time. |
| 16 | Goldman Sachs [9] | 3/7/2019 | 2 | If we move past the near-term challenges, **we find the following drivers should structurally move NIO in the positive direction:  1. Light business model. NIO's growing dependence on joint manufacturing model implies a focus shift from building cars to building brands. The latter is far more profitable**: a premium consumer brand typically operates at 30-40% net margin, while a premium car maker is capped at 15%. By keeping the business model light, NIO is growing its opportunity to generate long-term returns on invested capital. China in our view will always have excess capacity for vehicle manufacturing (77% industry utilization by mid-2018 according to NBS), mostly distributed among local SOEs who cannot develop competitive models, but own facilities. Regulators' push for EV volume, in the form of NEV credits (i.e. penalty for not selling EV) and plate restrictions (penalty for not buying EV), makes NIO a desirable partner for such capacity. We believe NIO has the bargaining power over its supply chain partners, hence the profit potential. |
| 17 | CICC [10] | 3/8/2019 | 1 | Contract manufacturing in line with policy guidance and corporate business model, and good for controlling capex. **NIO has abandoned its plan to build a manufacturing factory in Shanghai, and would continue to cooperate with JAC Motors.** This allows NIO to focus on high-end brand marketing and technological development. |

67

| Row | Equity Analyst | Date[1] | Page | Selected Excerpts |
|-----|----------------|---------|------|-------------------|
| (1) | (2) | (3) | (4) | (5) |
| 18 | CICC [10] | 3/8/2019 | 3 | China in January 2019 announced a policy encouraging traditional-fuel vehicle manufacturers to optimize their capacity distribution, and increase sector concentration via capacity cooperation. Given the production and investment plans released by new EV manufacturers, we estimate that it costs Rmb3–8bn to build facilities with production capacity of 100,000–200,000 units. We estimate the NIO's original Shanghai factory may cost Rmb5–6bn. **Abandoning the plan should improve NIO's cash flow in the near term and enhance its return on assets in the long term. This is also in line with government policy guidance. In addition, considering that Tesla is building a BEV factory in Shanghai, we believe it might be difficult for NIO to gain regulatory approval for its production base in Shanghai as well.** **As a new EV manufacturer, NIO lacks expertise and experience in manufacturing. Abandoning the factory investment should allow NIO to focus on high-end brand marketing and technological development.** |

**Notes and Sources:**

[1] Date reflects the timing of report based on Eastern Standard Time or Eastern Daylight Time when specified on the report; otherwise, the date reflects that of the original report.

[2] Credit Suisse, "4Q18 Gross Profit Turned Positive for the First Time," released on 3/6/2019.

[3] JP Morgan, "A Soft Start in 2019 But Expect A Meaningful Rebound in 2H," released on 3/6/2019.

[4] Bank of America Merrill Lynch, "Downgrade to U/P: Shipment and ASP likely to see downside risks," released on 3/6/2019.

[5] Wolfe Research, "Demand Questions Will Likely Linger," released on 3/6/2019.

[6] CITI, "Results: In-line FY18 Results with Lower 1Q19 Guidance," released on 3/6/2019 EST.

[7] Deutsche Bank, "Recent Sales Headwind Should be Mitigated by Improved Cash Flow," released on 3/7/2019 EST.

[8] Morgan Stanley, "FY18 Earnings Call Takeaways," released on 3/7/2019 GMT.

[9] Goldman Sachs, "Reinstate at Buy," released on 3/7/2019 HKT.

[10] CICC, "ES6 a more mass-market model, but orders limited for now," released on 3/8/2019.

68