# Exhibit L

**In the Matter Of:**

*In Re - Nio, Inc. Securities*

*MARK MUNDY*

*August 30, 2022*



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------)
                          )
In re NIO, Inc. Securities ) 19-cv-1424 (NGG)(JRC)
Litigation                )
                          )
--------------------------)

REMOTE VIDEOTAPED DEPOSITION OF MARK J. MUNDY

Tuesday, August 30, 2022; 9:46 a.m. EDT

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, California Shorthand Reporter #14409,

NYRCR, NYACR, Remote Counsel Reporter,

LiveDeposition Authorized Reporter

Job No. 2022-858474

Remote Videotaped Deposition of

MARK J. MUNDY, taken remotely before Cindy L. Sebo,

Registered Merit Court Reporter, Certified Real-Time

Reporter, Registered Professional Reporter,

Certified Shorthand Reporter, Certified Court

Reporter, Certified LiveNote Reporter, Real-Time

Systems Administrator, California Shorthand Reporter

#14409, New York Realtime Certified Reporter, New

York Association Certified Reporter, Remote Counsel

Reporter, LiveDeposition Authorized Reporter and

Notary Public, beginning at approximately 9:46 a.m.

EDT, when were present on behalf of the respective

parties:

                A P P E A R A N C E S :

        (All via Zoom Video Communications)

Attorney for Plaintiff and the witness:

      THE ROSEN LAW FIRM, P.A.

      LAURENCE ROSEN, ESQUIRE

      YU SHI, ESQUIRE

      275 Madison Avenue, 40th Floor

      New York, New York 10016

      212.686.1060

      lrosen@rosenlegal.com

      yshi@rosenlegal.com


Attorney for Defendants NIO Inc., Padmasree
Warrior, Bin Li, Louis Hsieh, Lihong Qin,
Yaqin Zhang, Tian Cheng, Hai Wu and Xiang Li:

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

      JUDITH A. FLUMENBAUM, ESQUIRE

      MICHAEL C. GRIFFIN, ESQUIRE

      ROBERT A. FUMERTON, ESQUIRE

      One Manhattan West

      New York, New York 10001

      212.735.2764

      judy.flumenbaum@skadden.com

      michael.griffin@skadden.com

      robert.fumerton@skadden.com

A P P E A R A N C E S (Continued):


Attorneys for Defendants Xiangping Zhong
and Zhaohui Li:

        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

        XINSHU SYLVIA SUI, ESQUIRE

        1285 Avenue of the Americas

        New York, New York 10019-6064

        212.373.3947

        xsui@paulweiss.com


Attorney for Defendants Morgan Stanley & Co. LLC,
Goldman Sachs (Asia) L.L.C, J.P Morgan Securities
LLC, Merrill Lynch,Pierce, Fenner & Smith Inc.,
Deutsche Bank Securities Inc., Citigroup Global
Markets Inc., Credit Suisse Securities (USA) LLC,
UBS Securities LLC, and WR Securities, LLC:

        MILBANK LLP

        ELVIRA RAZZANO, ESQUIRE

        55 Hudson Yards

        New York, New York 10001-2163

        212.530.5693

        erazzano@milbank.com



  ALSO PRESENT:

        ALLEN EDWARDS, Videographer

        DAVID ARANDA, Trial Consultant, Skadden,
        Arps, Slate, Meagher & Flom LLP and
        Affiliates

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

5

--oOo--

INDEX OF EXAMINATION

MARK J. MUNDY

--oOo--

In re: NIO, Inc. Securities Litigation

Tuesday, August 30, 2022

CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,
RSA, California Shorthand Reporter #14409,
NYRCR, NYACR, Remote Counsel Reporter,
LiveDeposition Authorized Reporter

--oOo--

EXAMINATION BY                                      PAGE

  Ms. Flumenbaum                                     12

CERTIFICATE OF REPORTER                             189

ERRATA                                              191

ACKNOWLEDGMENT OF WITNESS                           193

6

--oOo--

INDEX TO EXHIBITS

MARK J. MUNDY

In re: NIO, Inc. Securities Litigation

Tuesday, August 30, 2022

CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,
RSA, California Shorthand Reporter #14409,
NYRCR, NYACR, Remote Counsel Reporter,
LiveDeposition Authorized Reporter

--oOo--

(Exhibits Provided Electronically to Reporter.)

DEFENDANTS'
DEPOSITION
EXHIBIT NUMBER        DESCRIPTION                    PAGE

Exhibit 1          Résumé, Bates stamped

                   PLAINTIFFS429                     31


Exhibit 2          Vanguard Joint Brokerage

                   Account Statement, September

                   20, 2018, Bates stamped

                   PLAINTIFFS416 through

                   PLAINTIFFS418                     73


Exhibit 3          Vanguard Joint Brokerage

                   Account Statement, October

                   11, 2018, Bates stamped

                   PLAINTIFFS419 through

                   PLAINTIFFS421                     78

7

--oOo--

INDEX TO EXHIBITS

MARK J. MUNDY

In re: NIO, Inc. Securities Litigation

Tuesday, August 30, 2022

CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR, RSA, California Shorthand Reporter #14409, NYRCR, NYACR, Remote Counsel Reporter, LiveDeposition Authorized Reporter

--oOo--

DEFENDANTS'
DEPOSITION
EXHIBIT NUMBER          DESCRIPTION                          PAGE

Exhibit 4          Vanguard Joint Brokerage

                   Account Statement, February

                   27, 2019, Bates stamped

                   PLAINTIFFS422 through

                   PLAINTIFFS425                              82


Exhibit 5          Exhibit 2, Certification           90


Exhibit 6          Vanguard Joint Brokerage

                   Account Statement, April

                   15, 2019, Bates stamped

                   PLAINTIFFS426 through

                   PLAINTIFFS428                              93

8

--oOo--

INDEX TO EXHIBITS

MARK J. MUNDY

In re: NIO, Inc. Securities Litigation

Tuesday, August 30, 2022

CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,
RSA, California Shorthand Reporter #14409,
NYRCR, NYACR, Remote Counsel Reporter,
LiveDeposition Authorized Reporter

--oOo--

DEFENDANTS'
DEPOSITION
EXHIBIT NUMBER     DESCRIPTION                    PAGE

Exhibit 7        Retention Agreement, Bates

                 stamped PLAINTIFFS_084

                 through PLAINTIFFS_085           104


Exhibit 8        Class Action Complaint for

                 Violation of the Federal

                 Securities Laws                  117


Exhibit 9        The NIO Investor Group's

                 Memorandum of Law in

                 Opposition to Competing

                 Motions for Appointment as

                 Lead Plaintiff                   126

--oOo--

INDEX TO EXHIBITS

MARK J. MUNDY

In re: NIO, Inc. Securities Litigation

Tuesday, August 30, 2022

CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR, RSA, California Shorthand Reporter #14409, NYRCR, NYACR, Remote Counsel Reporter, LiveDeposition Authorized Reporter

--oOo--

DEFENDANTS'
DEPOSITION
EXHIBIT NUMBER      DESCRIPTION                    PAGE

Exhibit 10      Notice of Filing of Notice

                of Errata, DKT. Number 47

                in Sidoli v. NIO, Inc. et al.,

                Case No. 3:19-CV-01320

                (N.D. CAL.)                     130

Exhibit 11      Amended Class Action Complaint

                for Violation of the Federal

                Securities Laws                 134

Exhibit 12      Second Amended Class Action

                Complaint for Violation of the

                Federal Securities Laws         138

10

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel no party to the litigation will object to the remote deposition on the grounds that the certified stenographer may not have the legal authority to swear in the witness.

FURTHER STIPULATED AND AGREED that in lieu of the oath administered in person, the witness declares the testimony in this matter under the penalty of perjury.

FURTHER STIPULATED AND AGREED that the certified stenographer is not physically present in the deposition room and will be reporting this deposition remotely.

FURTHER STIPULATED AND AGREED all parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

MARK J. MUNDY

--oOo--

P R O C E E D I N G S

--oOo--

--oOo--

Tuesday, August 30, 2022; 9:46 a.m. EDT

--oOo--


THE VIDEOGRAPHER:  We are now on the record.

Today's date is August 30th, 2022, and the time is currently 9:46 a.m. Eastern Time.

This is the video deposition of Mark Mundy, in the matter of the NIO, Incorporated Securities Litigation.  This case is filed in the United States District Court for the Eastern District of New York, and it's taking place via Web videoconference, with all participants attending remotely.

My name is Allen Edwards.  I'm the videographer, representing Lexitas.

                            MARK J. MUNDY

                    All counsel will be noted on

                the stenographic record.

                        And our court reporter today is

                Cindy Sebo, who will now swear in

                the witness.  And we'll begin.

                            --oOo--

                            MARK J. MUNDY,

        after having been first duly sworn remotely

        by the certified stenographer, was examined

            and testified remotely as follows:

                            --oOo--

                            --oOo--

            EXAMINATION BY COUNSEL FOR DEFENDANTS

    NIO INC., PADMASREE WARRIOR, BIN LI, LOUIS HSIEH,

        LIHONG QIN, YAQIN ZHANG, TIAN CHENG, HAI WU

                        AND XIANG LI

                            --oOo--

    BY MS. FLUMENBAUM:

            Q.   Good morning, Mr. Mundy.  My

    name is Judy Flumenbaum.  I'm here on behalf

    of Defendants today.

                Can you hear me okay?

            A.   I can.  Good morning to you.

            Q.   Good.

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

13

MARK J. MUNDY

Can you state your full name and address for the record, please?

A.    Mark, middle initial J., Mundy, M-U-N-D-Y; 4607 Sanderling, S-A-N-D-E-R-L-I-N-G; new word, Circle, C-I-R-C-L-E; new word, West; Boynton Beach, B-O-Y-N-T-O-N; new word, Beach Florida 33436.

Q.    And as this deposition is being conducted remotely, where are you currently located?

A.    Number 2 Garden Street, Garden City, New York 11530.

Q.    And is anyone in the room with you today?

A.    No one is in the room with me today.

Q.    And do you have any notes in front of you today?

A.    I do.

Q.    What kind of notes are in front of you?

A.    Notes based on discussions with my attorneys.

Q.    What is the -- anything that the

14

MARK J. MUNDY

counsel refreshed your recollection on?

    A.   Other than -- I met with my
counsel yesterday, and we had a general
overview and update --

        MR. SHI:  Mr. Mundy, I would
        just say you can say that we met
        yesterday, but do not discuss the
        substance of what we spoke about.

        MS. FLUMENBAUM:  Well, I can
        surely ask if anything has
        refresh -- refreshed his
        recollection.

        MR. SHI:  Yes.  Yes.  You may
        ask that.

        THE WITNESS:  We met yesterday
        and discussed the case.

BY MS. FLUMENBAUM:

    Q.   Okay.  Do you understand that
you have sued a number of defendants in this
case?

    A.   I do.

    Q.   If I refer to them as
"Defendants," will you understand what I mean?

    A.   I will.

15

MARK J. MUNDY

Q.    And if I refer to the "offering documents," will you understand that to refer to NIO's prospectus and registration statement filed with the SEC at the time of its IPO?

A.    I will.

THE WITNESS:  Excuse me.  The background is my wife, Caryl.

I'm sorry.  She just came in.

Off the record.

I'm involved in something.

Can you just --

CERTIFIED STENOGRAPHER:  Off the record.

THE VIDEOGRAPHER:  We're going off the record.  The time is --

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  -- 9:51 a.m.

THE WITNESS:  We're back on.  I spoke to Caryl.

CERTIFIED STENOGRAPHER:  Okay.  All right.  We're back on.

THE WITNESS:  Thank you.

Sorry.

16

MARK J. MUNDY

BY MS. FLUMENBAUM:

Q.    Okay.  And if I refer to "shares" or "ADS," will you understand that to mean NIO's American depository [sic] shares?

A.    I -- I do understand, sure.

Q.    Great.  Thank you.

A.    Thank you.

Q.    Now, you mentioned that you have some notes in front of you --

A.    Yes.

Q.    -- do you intend to rely on those notes in your deposition today?

A.    Yes.

Q.    What is on those -- what -- what's in those notes?

A.    Information that I've gleaned from reading the various complaints, primarily, and discussions with my attorney.

Q.    Okay.  Well, you know, we reserve the right to request a copy of those notes at the end of the deposition.

A.    Okay.

Q.    And did you prepare these notes yourself?

MARK J. MUNDY

A.   I did.

Q.   And were you instructed to read those particular documents?

A.   I was not.

Q.   Okay.  How did you determine what documents to read?

A.   Primarily the drafts and then, I think -- which resulted in a final Complaint. I'm not sure what the legal language is.

Q.   When you say "the drafts," do you mean drafts of complaints?

A.   Yes.

Q.   How did you receive the drafts of those complaints?

A.   From the attorneys.

Q.   When did you receive those?

A.   I don't have any specific dates, but over the last couple of years.

Q.   So prior to the filing of the Complaint, you received drafts from your counsel?

A.   I received drafts of the complaints.  I don't know the time sequence.

Q.   Okay.  So let me go over a few

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 20 of 82
In Re - Nio, Inc. Securities              PageID #: 2760                    Mark Mundy
                                                                      August 30, 2022

18

MARK J. MUNDY

ground rules today.

A.    Sure.

Q.    As you can see, we have a court reporter here.  In order to make sure that we have a clear record, please provide verbal answers to all the questions --

A.    Okay.

Q.    -- so no nodding or hand gestures.

Okay?

A.    Okay.

Q.    And please wait until I finish asking my question to begin answering, and I will attempt to do the same --

A.    Okay.

Q.    -- so in order -- if -- if your lawyer objects to a question, you still have to answer it to the best of your ability.  It is okay to say "I don't know," if that's the honest answer.

Does that make sense?

A.    Sure.  Thank you.

Q.    And we can take a break at any time.  Just let me know.

29

MARK J. MUNDY

A.    The last project?

Q.    Sure.

A.    $450 million project in Park Slope, Brooklyn; ambulatory care facility of approximately 400,000 square feet located between 6th and 7th Street, between 7th and 8th Avenues in Park Slope; mostly operating rooms for ambulatory surgery; diagnostic divisions; a few offices; primarily to treat several hundred thousand ambulatory care visits a year.

Q.    Did you also work for or with banks?

A.    From the hospital, the CFO did all the work with the banks.

Q.    Okay.  Did you graduate high school?

A.    I did.

Q.    Where did you go?

A.    Manasquan High School, Manasquan, New Jersey.

Q.    Did you graduate from college?

A.    I did.

Q.    What college?

30

MARK J. MUNDY

A.   Murray State University in Kentucky.

Q.   And what was your degree in?

A.   History and business.

Q.   Do you have any advanced degrees?

A.   I do.  I have a Master of Science in hospital administration from Columbia.

Q.   When did you receive that degree?

A.   1970.

Q.   Any other schooling or training?

A.   No; only professional education courses.

Q.   Do you speak any Chinese?

A.   I do not.

Q.   And have you ever been to China?

A.   I have not.

MS. FLUMENBAUM:  Now I'm going to introduce Bates Stamp PLAINTIFFS429 as Defendants' Exhibit 1.

31

MARK J. MUNDY

--oOo--

(Defendants' Exhibit Number 1,

Résumé, Bates stamped PLAINTIFFS429,

marked for identification, as of this

date.)

--oOo--

BY MS. FLUMENBAUM:

Q.   Mr. Mundy, you should be able to
see this on the screen.

A.   Sure.

Q.   Okay.  What is this document?

A.   My résumé.

Q.   Great.

And it generally describes what
we've been discussing so far, correct?

A.   Correct.

Q.   Now, on the bottom section, it
says Other.  And the second-to-last bullet
says, Who's Who in Finance and Industry 1987
to 1988.

Can you describe what that
means?

A.   I'm not sure exactly what it
means because the only way I was aware of it

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 24 of 82
In Re - Nio, Inc. Securities                    PageID #: 2764                              Mark Mundy
                                                                                       August 30, 2022

37

MARK J. MUNDY

So the money market gives you a low rate of return, but it protects the principal.

Q.   Do you think the market is currently behaving rationally?

A.   I think -- I am not qualified to say that.  There are people who are a lot more expert than me.  And in my personal opinion, I think it's difficult to predict.

Q.   So in your opinion, the market is difficult to predict?

A.   Correct; it is.

Q.   So in your opinion, you'd believe the market is behaving irrationally?

A.   I can't say that.  I think there -- half of the people think it's rational, and I think the other think it's irrational; so --

Q.   And I'm just --

A.   -- I mean --

Q.   Go ahead.

A.   -- if you knew the answer to that question, you'd be a multimillionaire.

Q.   I'm just asking, in your

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 25 of 82
In Re - Nio, Inc. Securities                    PageID #: 2765                    Mark Mundy
August 30, 2022

38

MARK J. MUNDY

opinion, which half are you in?  Do you believe it's rational, or do you believe it's irrational?

A.   I think it's in a rational direction, based on what Chairman Powell said last week, which basically says we have to get inflation under control; it's going to be a bumpy road, but we will achieve it.

That's rational.

Q.   So prior to Powell's statements last week, did you find you would have believed the market irrational?

A.   I would consider the market troubling because of a lack of clarity.  But it's clear now.  I think it's clear to me, at least, that -- it's very clear that they're not going to have any of these soft landings in between hard landings, that they're going to just proceed straight forward to getting inflation down; so, I guess, where it was at some point a year or two ago, about 2 percent.

Q.   And -- and how would you -- would you say the market was acting rationally in the last few years?

39

MARK J. MUNDY

A.   Based upon its explosive growth, I guess a lot of people thought it was rational; but based on the last seven or eight months, I think people have been terribly disappointed and are terribly concerned.

Q.   Do you think the explosive growth was rational?

A.   Probably, in retrospect, no.  I think it was probably greed.  But when you're winning, a lot of people just rode it out, and if they were smart enough to preserve capital, that was excellent; and if not, they've suffered tremendous losses.

Q.   Do you think greed was driving the market during the explosive growth?

A.   To a certain degree, I think so.

Q.   And -- and what factors do you think are driving the market now?

A.   Fear.

Q.   Any other factors?

A.   I think that there is a certain calmness.  If you look at the amount being invested in the market today compared to a

40

                    MARK J. MUNDY

year ago, people are, I think, sitting on the

sidelines, waiting and watching and hoping.

          Q.   Do you think company-specific

factors are having an impact?

               MR. ROSEN:  Counsel, he's not

          here to provide economic analysis

          for you about the future.  You've

          had about 10 minutes of that.

               Could you move into something a

          little more relevant to our case,

          please?

               MS. FLUMENBAUM:  I'm just

          asking his opinion on the

          market with --

               MR. ROSEN:  It's -- it's not

          relevant, and you're wasting our

          time.  So could you please just keep

          to the subject matter?

               Thank you.

               MS. FLUMENBAUM:  Are you

          objecting -- are you objecting?

               MR. ROSEN:  Yeah, I'm objecting

          to -- to the irrelevance, economic

          analysis you're asking Mr. Mundy.

41

MARK J. MUNDY

Now, he's -- you know, he's been kind enough to give you his --

MS. FLUMENBAUM:  Mr. Rosen --

MR. ROSEN:  -- his prognostications, but try -- try to keep it relevant to the case because we all have work to do today.

Thank you.

MS. FLUMENBAUM:  Thank you. I'm going to continue asking questions that I find relevant, and, as you know, your client has to answer them.  So unless you have an objection or are objecting on privilege grounds, I -- I'm going to keep asking.

And are -- are you defending this deposition?

MR. ROSEN:  No.  Yu Shi is defending.  I'm just sitting here listening to you waste all our time. So could you please keep this relevant?  That's all.

Thank you.

Case 1:19-cv-01424-NGG-JRC     Document 121-14     Filed 12/23/22     Page 29 of 82
In Re - Nio, Inc. Securities                    PageID #: 2769                              Mark Mundy
August 30, 2022

58

MARK J. MUNDY

A.   I invested in a company called Apron, made a few pennies on that.

Q.   What does that company do?

A.   It's in, I think, the food service industry --

Q.   Okay.

A.   -- but it's a momentum stock.

Q.   What is a momentum stock?

A.   People are playing, so, you know, you're not going to wind up where there is no activity, which can impact the stock.

Q.   Any other companies you can think of that you were a day trader for -- or in?

Sorry.

A.   Not really.

I played ChartPoint [sic] a few times.  I might have played Marathon Oil, kind of on an in-and-out basis, but I don't remember.

Q.   And for ChartPoint [sic], you said it was a few times.

Were those all in the last few months?

59

MARK J. MUNDY

A.   Yeah, yeah.  Probably in the last four to six weeks.

MS. FLUMENBAUM:  Okay, Yu, we can take a break now, if that's good for you guys.

MR. SHI:  Yeah.

THE VIDEOGRAPHER:  Okay.  We're going off --

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  -- the record.  The time is 10:44 a.m.

--oOo--

(Whereupon, a recess was taken from 10:44 a.m. EDT to 10:57 a.m. EDT.)

--oOo--

THE VIDEOGRAPHER:  The time is 10:57 a.m.  We're back on the record.

BY MS. FLUMENBAUM:

Q.   Hi, Mr. Mundy.

Are you back in the room alone?

A.   I am, yeah.

Q.   Great.

So when did you first hear about

60

MARK J. MUNDY

NIO?

A.    I probably read about it in one
of the sources that we earlier discussed --

Q.    Did you have any --

A.    -- timewise, I guess in -- when
I bought the stock, which was in September of
2018.

Q.    And are you referring to your
notes right now, just so I'm aware?

A.    I'm looking at the
certification.

Q.    So you have documents in front
of you as well?

A.    I have documents:  The
Complaint -- yeah, the certification, the
Complaint, the judge's opinion on the summary
judgment -- is that what you call it?

I think so.

Q.    The motion to dismiss?

A.    Correct, yeah.

Sorry.  I don't know the lingo.

Q.    That's okay.

Do you have any additional
documents in front of you, any other --

MARK J. MUNDY

A.    Pretty much it.

Q.    Is that actually -- is that all the documents you have in front of you?

A.    Correct.

Q.    And, also, just as I indicated before, we're going to ask for a copy of all the documents you have with you at this deposition.

A.    Okay.

Q.    We'll request that from your counsel afterwards.

A.    Okay.

Q.    And just for my knowledge, which -- which Complaint is in front of you?

A.    I think up to the Second Amended Complaint.

Q.    So you have all of the Complaints in front of you?

A.    Yeah, it's called the Second Amended Class Action Complaint.

Q.    Okay.

Okay.  So just for the record -- so the record is clear, when did you first learn about NIO?

MARK J. MUNDY

A.    Probably in that time frame of September 2018.

Q.    And you learned about it from one of the public sources we discussed earlier?

A.    Correct, yeah.

Q.    How does NIO generate revenue?

A.    Through selling cars.

Q.    Has NIO ever been profitable?

A.    I don't know.

Q.    Do you know how long it's been -- NIO has been in business?

A.    I don't think so.

Q.    Do you know where NIO is headquartered?

A.    In China, in Shanghai, I believe.

Q.    And did you know -- do you know when NIO had its initial public offering?

A.    I don't know the date.  I think it's sometime in that time frame of September 2018.

Q.    And did you know that at the time of your investment?

63

MARK J. MUNDY

A.   I don't think so.  I just knew that it was a high-quality company in the automobile business.

Q.   Can you describe NIO's business in as much detail as possible?

A.   Electric car manufacturer focusing on several levels of quality, with an emphasis on high quality, attempting to compete with a company like Tesla.

Q.   And how did you learn about NIO's business model?

A.   Again, through the public sources.

Q.   Any SEC filings?

A.   Oh, no.

Q.   How did NIO separate itself from its competitors?

A.   I don't think I thought about it in terms of separating itself other than the fact that it was a Chinese company; that it probably wouldn't have to pay some of the same duties that a company like Tesla -- Tesla might have to pay to get into China; that possibly the Government, to encourage Chinese

64

MARK J. MUNDY

automobile manufacturers, might support a

company like NIO, those kind of things.

Q.   Do you know anything about those duties that a company like Tesla would have to pay?

A.   I do not.

Q.   Do you know the names of any of NIO's car models?

A.   I do not.

Q.   Do you know who the CEO is?

A.   I think his name is Bin Li.

Q.   Did you know the name of the CEO at the time of your investment?

A.   I did not.

Q.   Did you research any of the management team?

A.   I did not.

Q.   Why not?

A.   I generally don't research any of the management team except when I've looked at investing in banks.

Q.   And -- and why is it important at the management team in banks and not in companies like NIO?

68

MARK J. MUNDY

cars?

        A.   On TV.

        Q.   When did you see one of NIO's cars?

        A.   On a 60 Minutes broadcast a few years ago.

        Q.   Do you remember when that broadcast was?

        A.   I think probably -- I want to say in the -- probably about the second time I bought it.  I'm not sure of the date, but . . .

        Q.   So in 2019?

        A.   I think so, yeah.

        Q.   And have you ever driven one of NIO's cars?

        A.   I have not.

        Q.   Any personal experience with the company or its cars whatsoever?

        A.   None.

        Q.   Did anyone advise you regarding purchase -- purchasing NIO shares?

        A.   No, hum-um.

        Q.   Do you have a financial advisor?

69

MARK J. MUNDY

A.   I do not.

Q.   So you make all your investment decisions on your own?

A.   I do.

Q.   And that was true at the time and is true today?

A.   Yes, that's correct.

Q.   Do you know what exchange NIO is listed on?

A.   No.

Q.   Do you know what NIO's ticker is?

A.   Is it NIO?

Q.   It is.

A.   Okay.

Q.   Good guess.

So besides the reasons we've discussed already, are there any additional reasons why you invested in NIO?

A.   I was excited to invest in NIO. And I was really excited after I saw that 60 Minutes report, which was terrific.  And good for them to get such great press.  So -- but, you know, things don't always work out as

MARK J. MUNDY

planned.  So . . .

Q.   And the 60 Minutes -- so that -- when you watched the 60 Minutes televised report, what do you remember about that report?

A.   One, it was fairly lengthy, 20 minutes; they sometimes have shorter reports -- that it, as I recall, showed beautiful cars in a beautiful setting.  They talked very positively about it.

And the takeaway for me was, wow.

Q.   And -- and did the 60 Minutes report -- is that one of the reasons why you purchased NIO shares again?

A.   I believe so, yeah.  I believe so.

Q.   Do you remember anything else the report focused on?

A.   I really don't.  I mean, it's three years ago.  I just don't have that good a memory.

Q.   So at the time you first purchased NIO --

                        MARK J. MUNDY

          A.    Yeah.

          Q.    -- did you research the company?

          A.    Just the public sources that we
chatted about.

          Q.    Did you read any analyst
reports?

          A.    I did not.

          Q.    Did you listen to any earnings
calls?

          A.    I did not.

          Q.    Did you review the offering
documents?

          A.    I did not.

          Q.    Did you review any press
releases by -- by the company?

          A.    I don't think so.

          Q.    Did you review any marketing
materials from NIO?

          A.    I did not.

          Q.    So when considering buying NIO
shares, what factors did you consider?

          A.    A new car company with a
high-quality product in a very large country
that had been doing very well economically,

72

MARK J. MUNDY

which means that there would be a large number

of purchasers who liked electric vehicles,

based on Tesla's success.  And they would be a

equal adversary and competitor in the electric

vehicle market in China.

Q.    And how did you determine it was

a high-quality product?

A.    One, based on the 60 Minutes

report; and, two, I think just things that I

had read prior to the 60 Minutes report that

were favorable.

Q.    How did you decide when to buy

NIO shares?

A.    I think when it -- when public

information first came out.  It sounded very

exciting.

Q.    How did you decide how many

shares to buy?

A.    I don't really remember.

Q.    Was it in line with other

purchases, size-wise, you were making at the

time?

A.    Consistent with.

Q.    How did you decide at what price

75

MARK J. MUNDY

with anyone at Vanguard to exercise the

transaction?

         A.    Only to place the trade, never

for advice.

         Q.    Okay.  And then at the bottom,

it includes notes.

               Do you see that?

         A.    Yeah.

         Q.    Yeah.

               If you look at Number 1, it

said, This trade was unsolicited.

               Do you have an understanding of

what that means?

         A.    Yeah.  It means I call them.

         Q.    And at the time, that was

typical of -- of all of your trades?

         A.    Exactly.

         Q.    And if you see Number 2, it

says, Prospectus delivered separately.

               Do you understand what that

means?

         A.    I don't.

         Q.    Do you know if they sent you a

copy of the company's prospectus and

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 42 of 82
PageID #: 2782
In Re - Nio, Inc. Securities                                                      Mark Mundy
                                                                                August 30, 2022

76

MARK J. MUNDY

registration -- or registration statement?

A.    I don't.

Q.    And you never reviewed -- you never reviewed the prospectus?

A.    No.

Q.    Number 3 says, Account Type: Margin.

A.    Correct.

Q.    Do you understand what that means?

A.    I do.

Q.    Can you explain?

A.    You borrow money from Vanguard.

Q.    And then 4 is Capacity: As agent only.

Can you explain what that means?

A.    I do not.

Q.    Okay.  Then, in the middle of the document, it indicates that you bought 100,000 NIO shares on September 20th, 2018, correct?

A.    Correct.

Q.    And the price at that time was $9.10, correct?

MARK J. MUNDY

A.   Right.

Q.   So the total cost of this investment was 910,000, correct?

A.   Correct.

Q.   Do you need a minute, Mr. Mundy?

A.   No.  I'm trying to have my wife leave the area.

Q.   Do you need to go off the record?

A.   I think she's leaving.

Q.   Okay.  So after you made this purchase, what, if anything, did you do to follow the share price?

A.   I would look at it on a, I guess, daily basis to see how it was doing.

Q.   And -- and how would you look at the share price?

A.   It's available.

Q.   On the Internet?

A.   Yes.

Q.   And did you review any of NIO's public filings after you purchased?

A.   I did not.

Q.   Did you review any statements

78

MARK J. MUNDY

that NIO made after you purchased?

A.   I don't recall.

Q.   Did you review any articles
regarding NIO after you purchased?

A.   Oh, I -- I'm sure I followed it
on the Internet.

Q.   How did NIO shares perform after
your investment?

A.   Obviously, less well than I had
hoped for.

Q.   What do you think caused that
decline?

A.   I have no idea.

MS. FLUMENBAUM:  We're now
going to introduce Bates stamp
PLAINTIFFS419 as
Defendants' Exhibit 3.

--oOo--

(Defendants' Exhibit Number 3,
Vanguard Joint Brokerage Account
Statement, October 11, 2018, Bates
stamped PLAINTIFFS419 through
PLAINTIFFS421, marked for
identification, as of this date.)

In Re - Nio, Inc. Securities                          Mark Mundy
                                                      August 30, 2022

79

MARK J. MUNDY

--oOo--

BY MS. FLUMENBAUM:

Q.   Do you recognize this document?

A.   Similar to the other document.

Q.   What is it?

A.   It's the Vanguard transaction.

Q.   And this document indicates that you sold those 100,000 shares, correct?

A.   I did.

Q.   And you sold those shares on October 11th, 2018, correct?

A.   Correct, yes.

Q.   So less than a month after you purchased?

A.   Correct.

Q.   And you sold them at a price of $7.05, roughly, a share, correct?

A.   Correct.

Q.   So the total proceeds of this sale was $704,792.85, correct?

A.   I think it's 704,776.69.

Am I missing something?

Q.   I'm just reading the number on the screen from your trade records.

MARK J. MUNDY

What are you looking at?

A.   I'm looking -- I think the highlighted one that you pulled up -- it says 70 -- yeah, 704,776.69.

Q.   Oh, because of the transaction fee.  I'm sorry.  I was -- I was just looking at the -- without taking out any transaction fee.

A.   Okay.

Q.   So that was -- that was the proceeds minus any transaction fee?

A.   Correct, yeah.

Q.   So you lost approximately 205,000 on this investment?

A.   Approximately.

Q.   If you were offered that amount, would you drop out of this lawsuit?

A.   I don't know.

Q.   What further information would you need to come to a conclusion on that?

A.   I don't know at this time.

Q.   There's nothing you could think of that would dictate the answer to that question?

Case 1:19-cv-01424-NGG-JRC     Document 121-14     Filed 12/23/22     Page 47 of 82
In Re - Nio, Inc. Securities                    PageID #: 2787                    Mark Mundy
                                                                                August 30, 2022

81

                              MARK J. MUNDY

          A.    Not at this time.

          Q.    Why not at this time?

          A.    I would have to think about it.
I would have to talk with my attorneys.  It
would be a answer that would deserve some
consideration.

          Q.    And what factors would you
consider?

          A.    I would have to think about
that.

                Do we have an echo?

          Q.    I don't have one.

          A.    Okay.  Let's try again.

                Okay.  No echo.

                Thanks.

          Q.    Why did you decide to sell in
October 2018?

          A.    I think I had enough of a loss.

          Q.    Any other factors that you
considered at this time?

          A.    No.

          Q.    And no one directed you to sell
your shares, correct?

          A.    Correct.

93

MARK J. MUNDY

could cause the stock -- the share price to fall?

A.   No.

MS. FLUMENBAUM:  So now let's introduce PLAINTIFFS426, which will be Defendants' Exhibit 6.

--oOo--

(Defendants' Exhibit Number 6, Vanguard Joint Brokerage Account Statement, April 15, 2019, Bates stamped PLAINTIFFS426 through PLAINTIFFS428, marked for identification, as of this date.)

--oOo--

THE WITNESS:  Okay.

BY MS. FLUMENBAUM:

Q.   And so Page 2 -- do you recognize this document?

A.   Yes.  It's similar to the others.

Q.   Can you describe it?

A.   It's the transaction.

Q.   So this document indicates that you sold your remaining 100,000 shares,

94

MARK J. MUNDY

correct?

          A.   Correct.  Yep.

          Q.   And this time, this was on
April 15th?

          A.   Right.

          Q.   So eight days after you had
retained The Rosen Law Firm?

          A.   Correct.

          Q.   And here, it indicates you sold
your 100,000 shares at a price of roughly
$4.96?

          A.   Correct.  Right.

          Q.   And so the total proceeds of
this sale, without the commission, were 4 --
495,515.50?

          A.   Correct.  Yep.

          Q.   So on this sale, you lost
approximately 513,000 on your investment?

          A.   Correct.

          Q.   And, you know, besides retaining
Rosen and other -- other, you know, factors we
just discussed, what else -- why did you
decide to sell all of your shares at this
point in time?

95

MARK J. MUNDY

A.   The loss was too great.

Q.   Did you consider any other factors?

A.   Not really.

Q.   And no one directed you to sell your shares?

A.   No.

Q.   And you -- and you haven't purchased since this point, correct?

A.   I have not.

Q.   Do you still follow NIO?

A.   Only as it goes across the CNBC ticker.

Q.   So you don't research the company anymore?

A.   I do not.

Q.   And at this point, what do you believe was causing the downswing in price?

A.    I think the fact that the factory that was supposed to be built -- and I think that information was in the registration statement -- turned out to be untrue and that, apparently, there was information that was distributed that there was no factory, which I

96

                    MARK J. MUNDY

think caused a great deal of concern and

probably impacted the stock.

          I think especially since in the

IPO, they had raised a lot of money, which I

thought was a wonderful thing, from a number

of highly regarded financial institutions,

which gave them a solid basis, and a portion

of that money -- I believe the number is

somewhere around 25 percent, or

$270 million -- was to be used to build that

factory.  And it would allow them, of course,

to have greater gain since they did not have

to use a subcontractor, which obviously costs

more than if they were going to do themselves.

          So that was all, I think, very

exciting.  And then, apparently, it turned out

not to be true, and I think that probably

impacted the stock.  But I'm not an expert.

     Q.   So, sir, you said that the --

you referenced the registration statement

again.

          To reiterate, you did not read

the registration statement, correct?

     A.   I did not.

97

MARK J. MUNDY

Q.    So at what point did you learn about the factory?

A.    I think in the Complaint, the draft that I read, one of the Complaints.

Q.    So nothing about the factory impacted your decision to sell at this time?

A.    I don't know the answer to that question.

Q.    It certainly didn't impact any of your decisions to buy, which was prior to retaining Rosen, correct?

A.    Let me think about that.

Q.    Are you thinking now or . . .

A.    I'm not sure.

Q.    But you -- but you agree that you learned about the factory through the Complaint?

A.    Correct.  That's why I'm not sure.  I learned about it through the Complaint, correct.

Q.    So -- and then you indicated in your answer that statements about the factory were untrue.

What is your basis for saying

98

MARK J. MUNDY

that?

A.   Reading the Complaint.

Q.   And you also said that information was distributed, talking about the factory.

What information was distributed?

A.   In the registration statement.

Q.   So was any -- was any information distributed about the factory at later points?

A.   Not that I am aware of.

Q.   And then why -- what's your basis for believing that the -- anything regarding the factory was concerning?

A.   I think the stock decreased in that period of time.  I don't specifically remember what -- if I read any particular information at that time relative to the factory.  And that's about, I think, all I can remember.

Q.   And you also indicated in your answer that using a subcontractor cost more money.

99

                         MARK J. MUNDY

              What's your basis for that
information?

         A.   Well, I think, based on my
experience, anything that I could always do
with my own employees was certainly a lot less
expensive than if I had to bring in an outside
contractor.

         Q.   Anything specific to NIO?

         A.   Nothing specific to NIO.

         Q.   Are there any potential
advantages to continuing with a subcontractor
versus a fact -- its own factory?

         A.   Not from my experience.

         Q.   So using a subcontractor
couldn't save capital?

         A.   I don't know the answer to that
question.  It would be situation-specific.

         Q.   But do you believe there are
situations in which a subcontractor could be
advantageous for a company?

         A.   I guess anything's possible.  In
my experience, using my own people always was
more advantageous to the hospital.

         Q.   And you never read anything

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 55 of 82
In Re - Nio, Inc. Securities              PageID #: 2795                    Mark Mundy
                                                                     August 30, 2022

113

MARK J. MUNDY

room alone?

A.   I am, yeah.

Q.   Great.

So before the break, you were generally describing the allegations in this lawsuit.

Could you generally describe the misrepresentations that you are alleging?

A.   Yeah.

From my reading of the Complaint and talking with the lawyers, there was supposed to be a plant -- and please jump in if I'm saying something that isn't exactly fitting -- built in Shanghai by NIO, which was in the registration statement.  And I think that was a very important part of the registration statement because it would show that they were on their way to being very successful.  And I think my further reading has said that, in fact, the plant was not under construction, as represented, and was not going to be built.

Is that what you asked me?

Q.   I was asking for the

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 56 of 82
In Re - Nio, Inc. Securities              PageID #: 2796                    Mark Mundy
August 30, 2022

114

MARK J. MUNDY

misrepresentations here.

A.   I think that's basically my understanding.

Q.   So in your answer, you just indicated your further reading.

What do you mean by "further reading"?

A.   Basically, the Complaint.

Q.   Okay.  And do you know what allegedly revealed, quote/unquote, those misstatements?

A.   I do not.

Q.   And for "further reading," just to go back, nothing else is included in that further reading that you did besides the Complaint?

A.   Correct.

Q.   Okay.

Who are the Defendants in this action?

A.   NIO, the officers and directors, the CEO, I think the CFO and the underwriters.

Q.   And can you name any of those individuals?

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 57 of 82
PageID #: 2797

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

115

MARK J. MUNDY

Not from reading the Complaint, but just from your general knowledge.

A.    From my notes, Bin Li.

Q.    Not from your notes, just what you actually know, not reading.

A.    Okay.

Q.    I'm just curious if you know any of them without reading, you know, the notes you took yesterday with -- you know, after you studied up.

A.    Sure.  Sure.

I think the names -- they're pretty easy to remember.  Bin Li and Louis -- I think it's Hsieh, but I'm not sure.  The spun -- it was like -- spelling was, like, H-S-E-I, or something like that.

Q.    And -- and you didn't know any of these people before reading the Complaint?

A.    Oh, I did not.

Q.    Okay.  How many complaints have been filed in this action?

A.    I think there's an original Complaint and a First Amended and a Second Amended Complaint.

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 58 of 82
PageID #: 2798
In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

116

MARK J. MUNDY

Q.   What's your understanding of the differences between the original Complaint and the Amended Complaint?

A.   I don't know that there are any great differences in the complaints.  I assume one is First Amended Complaint, and then the Second Amended Complaint contained additional and new information in this litigation to the original Complaint.

Q.   Are you aware of any other complaints filed against NIO?

A.   I am not.

Q.   And can you describe in as much detail as possible what has happened in this litigation since it began?

A.   I believe that the attorneys have primarily been working on the complaints. I've been involved in several conversation with the attorneys in terms of being updated as to what was happening with the case; whether or not there was any progress going forward; was there any timeline in terms of when all this would begin or end; and were the attorneys actively and hopefully aggressively

126

MARK J. MUNDY

THE WITNESS:  Okay.

MS. FLUMENBAUM:  -- Exhibit A.

--oOo--

(Defendants' Exhibit Number 9, The

NIO Investor Group's Memorandum of Law

in Opposition to Competing Motions for

Appointment as Lead Plaintiff, marked

for identification, as of this date.)

--oOo--

MS. FLUMENBAUM:  So if you want

to go to -- yeah, perfect.

BY MS. FLUMENBAUM:

Q.   So this is one of the motions

that your attorneys filed to consolidate the

actions and to appoint you as Lead Plaintiff

in the matter.

Do you see that?

A.   I do.

Q.   In this motion --

MS. FLUMENBAUM:  If you want to

go to Page 3, DJ.

Thank you.

BY MS. FLUMENBAUM:

Q.   So the attorneys included the

                    MARK J. MUNDY

bottom footnote -- no, not 3.  Excuse me.

          MS. FLUMENBAUM:  Page 7.

     Sorry.  Footnote 2.

          Great.

BY MS. FLUMENBAUM:

     Q.   Your attorneys included a

footnote stating, Movant -- which is you --

acknowledges that he was convicted of

bankruptcy fraud, a felony, in 2001.  He

served 15 months in jail, satisfied the terms

of his supervised release.  He has put the

past behind him and is ready to proceed as

Lead Plaintiff.

          Had you ever seen this footnote

before?

     A.   What is this?  Is -- is this

supposed to be about me?

     Q.   It is supposed to be about you.

     A.   Well, obviously, I have no idea

where this comes from.  So --

     Q.   So you've never seen this

footnote before?

     A.   Not that I recall.

     Q.   And you never spoke about this

128

MARK J. MUNDY

footnote with your attorneys?

A.    I never spoke about this footnote --

Q.    Had you --

A.    -- with the attorneys.

Q.    -- had you reviewed this motion before it was filed?

A.    I didn't, I think, go over it with a fine-tooth comb.  I think I generally read it, got the general idea of the motion, but --

Q.    But you didn't see this?

A.    No --

Q.    Because -- because you just --

A.    -- are you -- are you asking me if this is me?

Q.    Were you ever convicted of bankruptcy fraud?

A.    You have to be kidding.

Q.    You have to answer the question. I'm sorry.

A.    Emphatically no.

Q.    Do you know why this was included in the motion?

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 62 of 82
PageID #: 2802

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

129

MARK J. MUNDY

A.    I have no idea.

Q.    And so after this was filed, a competing Lead Plaintiff wrote to the Court opposing your appointment because of your fraud conviction.

MS. FLUMENBAUM:  So if you turn to Page 1 of the -- of the -- of this document, which is the NIO investor group's memo of law.

And if you turn to Page 1 in the second paragraph -- Page 1 of the full document, DJ, not just the -- yeah, perfect.

BY MS. FLUMENBAUM:

Q.    In the second full paragraph, the sentence that starts, Additionally -- it says, Additionally, Competing Movant, Mark Mundy, was admittedly convicted of bankruptcy fraud and served 15 months in jail for his dishonest -- dishonest acts, rendering him inadequate to serve in such an important representative capacity as a Lead Plaintiff.

Do you see that?

A.    I do.

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 63 of 82
PageID #: 2803

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

130

MARK J. MUNDY

Q.    But this is incorrect, correct?

A.    Emphatically incorrect.

Q.    And had you ever seen this competing Lead Plaintiff motion before?

A.    I may have seen it, but this . . .

Q.    So you never -- you've never -- you don't remember reading this sentence for sure?

A.    For sure.

Q.    And you would assume if you had read it, this is something you would remember?

A.    I think so.

Q.    Do you have any idea how The Rosen Law Firm remedied this error?

A.    I have no idea.

MS. FLUMENBAUM:  So if you want to introduce Docket Number 34-1 as Defendants' tab -- Defendants' Exhibit 10.

--oOo--

(Defendants' Exhibit Number 10, Notice of Filing of Notice of Errata, DKT. Number 47 in Sidoli v. NIO, Inc. et

131

MARK J. MUNDY

al., Case No. 3:19-CV-01320 (N.D. CAL),

marked for identification, as of this

date.)

--oOo--

BY MS. FLUMENBAUM:

Q.   And so Rosen filed a correction to the Court.  And on Page 2 of the errata, it should say --

MS. FLUMENBAUM:  Perfect.

BY MS. FLUMENBAUM:

Q.   -- In drafting this motion, we inadvertently used as a template motion papers from different Northern District of California filing that included this bankruptcy fraud footnote concerning a different client.

Do you see that?

A.   Okay.

Q.   And had you ever read this before?

A.   I don't believe so.

Q.   And so you never spoke to The Rosen Law Firm about this mistake?

MR. SHI:  Objection to the --

to the extent that this calls for

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 65 of 82
PageID #: 2805
In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

132

MARK J. MUNDY

attorney-client communications.

BY MS. FLUMENBAUM:

Q.   I'm just asking for a yes or no, not -- none of the substance of your conversation.

MR. SHI:  Objection to the extent it calls for attorney-client communications.

Mr. Mundy, if you're -- if you're able to answer --

MS. FLUMENBAUM:  I think, actually, he already --

MR. SHI:  -- the question without disclosing --

BY MS. FLUMENBAUM:

Q.   I think, actually, you already indicated that you hadn't spoken to him about it, so I think it's fair game.

But -- have you spoken to anyone about this error, Mr. Mundy?

A.   No.

Q.   And, you know, does this make you concerned about whether The Rosen Law Firm is able to represent you properly in this

133

MARK J. MUNDY

litigation?

A.   No.

Q.   Are you concerned that The Rosen Law Firm is not focused on this litigation if they're inadvertently including footnotes regarding you committing fraud to the Court?

A.   My -- my main concern now is whether or not The Rosen Law Firm is aggressively pursuing this action.

Q.   You -- you don't care that they filed a motion to the Court indicating that you were convicted of bankruptcy fraud?

A.   Not at this time.

Q.   If you had known at the time, would you have cared?

A.   Yes.

Q.   Would you have considered seeking new representation?

A.   No.

Q.   Why not?

A.   Based on my conversations with the attorneys at Rosen, I was very favorably impressed that they had a very good sense about this case and how to pursue it.

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 67 of 82
PageID #: 2807

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

136

MARK J. MUNDY

another Plaintiff who lives in the

San Francisco area in California, who I think

also suffered losses with her investment in

NIO.

Q.   And do you see in this first

sentence that you're referred to as Lead

Plaintiff and she as Named Plaintiff?

A.   I do see that.

Q.   What -- what is a named

plaintiff?

A.   I think that's a question that

an attorney would have to answer.

Q.   Okay.  Fair enough.

Do you have any sense of why she

isn't Lead Plaintiff?

A.   I think because my losses were

substantially in excess of hers.

Q.   So the difference between Lead

Plaintiff and Named Plaintiff has to do with

the amount of losses, from your understanding?

A.   I don't know if that's the

criterion.

Q.   Why are you filing this

Complaint together, as opposed to just on your

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 68 of 82
In Re - Nio, Inc. Securities                    PageID #: 2808                    Mark Mundy
August 30, 2022

137

MARK J. MUNDY

behalf?

A.   You would have to ask my attorneys.

Q.   Have you ever communicated with Eva?

A.   I have not.

Q.   And you know -- you said she lives in San Francisco.

Do you know anything else about her?

MR. SHI:  Objection -- objection.  I think he said San Francisco area, not San Francisco.

BY MS. FLUMENBAUM:

Q.   You indicated she lives in the -- the Bay Area.

A.   Correct.

Q.   Is there any other -- and do you know anything else about her?

A.   I do not.

MS. FLUMENBAUM:  Now I'd like to introduce Docket Number 67 --

THE WITNESS:  Okay.

138

                    MARK J. MUNDY

          MS. FLUMENBAUM:  -- as

     Defendants' Exhibit 12.

                    --oOo--

          (Defendants' Exhibit Number 12,

      Second Amended Class Action Complaint

       for Violation of the Federal Securities

       Laws, marked for identification, as of

       this date.)

                    --oOo--

BY MS. FLUMENBAUM:

     Q.   This is a copy of the Second

Amended Complaint, correct?

     A.   Correct.

     Q.   Did you help draft this

document?

     A.   I reviewed it.

     Q.   Do you know if Ms. Huang

reviewed it as well?

     A.   I do not.

     Q.   And as you indicated before,

you're not aware of any differences between

the Second Amended Complaint and the Amended

Complaint?

     A.   Specifically?

143

                    MARK J. MUNDY

            He?

      Q.    I believe, a he.

      A.    He.

            -- he was in a position of
responsibility and involved, I'm sure, in a
lot of the decisions/discussions.

      Q.    I'm sorry.  I was muted by
accident.

      A.    Oh, okay.

      Q.    The foils of the virtual
deposition.

      A.    Who are we up to?

            Qin?

      Q.    Any -- any idea what
Padmasree Warrior did wrong -- did wrong here?

      A.    I can tell you what a chief
development officer generally does, but I -- I
think other than probably being a major
participant in the plans of the company -- I
guess it's a she? -- yeah -- she was fully
knowledgeable as to what was happening
regarding the company's plans to build the new
facility.

      Q.    Next we have Defendant

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 71 of 82
In Re - Nio, Inc. Securities                PageID #: 2811                        Mark Mundy
August 30, 2022

144

MARK J. MUNDY

Tian Cheng.

Do you have any sense what Tian Cheng did wrong here?

A.   Good question.

No.

Q.   Do you have any sense what Defendant Xiang Li did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Hai Wu did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Yaqin Zhang did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Xiangping Zhong did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Zhaohui Li did wrong here?

A.   Other than I would say what I said earlier that these Defendants were in positions of significant responsibility and assumably were well aware of what the plans of the company were and what happened and what

145

MARK J. MUNDY

did not happen.

Q.    Sorry.  It keeps going on mute by accident.

You -- you also included a number of underwriters as Defendants here, correct?

A.    Correct.

Q.    Do you have a sense of what they did wrong?

A.    I think it's a classic example of not fulfilling their due diligence responsibilities, being knowledgeable about the project, being knowledgeable about the company's prospects, doing a wonderful job in raising a lot of money to help the company succeed, but regretfully, not checking out on the ground whether or not the company was actually doing what it was proposing or stating in its registration statement.

And that's very surprising to me, because these are absolutely wonderful companies, and I'm, I have to tell you, shocked that they did not do something very simple like showing up and taking a physical

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 73 of 82
In Re - Nio, Inc. Securities              PageID #: 2813                    Mark Mundy
                                                                      August 30, 2022

146

                        MARK J. MUNDY

look, in my opinion, as to what was going on

with their investment.

              Sorry to talk so long on that.

        Q.   No.  No.

              What's your basis for you saying

that the underwriters didn't fulfill their due

diligence responsibilities?

        A.   Based on my experience and

dealing with underwriters over the years who,

at least in the projects that I've been

involved in in Massachusetts and New York, are

dogged in terms of fulfilling those

responsibilities.

        Q.   But what's your basis for them

not having fulfilled their responsibilities

here?

              MR. SHI:  Again, Mr. Mundy, if

        you can answer this question without

        revealing attorney-client

        communications, then you may do so.

              THE WITNESS:  I can't answer

        this question, then.

BY MS. FLUMENBAUM:

        Q.   You also indicated that they did

150

MARK J. MUNDY

So, I mean, that's about all I can tell you in terms of my experience with these kinds of projects.

BY MS. FLUMENBAUM:

Q. And what's -- what's your basis for -- for knowing that, you know, those plans and time frames and budgets did not exist?

A. I have no basis to say they did not exist.

Q. Okay. So if we turn back to the Second Amended Complaint, on Page 12 --

A. Okay. Thanks.

Q. -- is -- and I do want to make sure you can see anything, so anytime you need to zoom, or anything, just let us know.

A. No, no --

Q. Okay.

A. -- what happened was that my eyelid, as a result of the cataract surgery -- I think the doctor pulled it too hard, and I now have a droopy eyelid, which has nothing to do with this, except I have to -- can you enlarge that a little?

151

MARK J. MUNDY

Q.   Yes, we can.  So we're --

A.   Okay.

Q.   Sorry about that, Mr. Mundy. That sounds painful.

A.   Yeah, so feel sorry for me and my droopy eyelid but . . .

Q.   Okay.  So we're going to go to the bottom of this page --

A.   Okay.

Q.   -- to go over some of the statements that you allege later on in the Complaint are misleading.

A.   Okay.

Q.   For instance, in 60 --

A.   Yes.

Q.   -- you take out the statement that NIO is currently developing its own manufacturing facility in Shanghai, which we expect to be ready by the end of 2020.

So what is -- what is your understanding of what's misleading in that statement?

A.   That I don't think the manufacturing facility was ever ready by 2020.

152

MARK J. MUNDY

Q.   When did you learn that statement was misleading?

A.   I think in talking with the lawyers.

Q.   And then in 61 --

A.   Right.

Q.   -- it says, Construction has started on our own manufacturing facility in Shanghai.

What's your understanding of what's inaccurate or misleading in that statement?

A.   That I don't think the construction was underway.

Q.   And what's your basis for believing that construction was not underway?

A.   Consultation with my attorneys.

Q.   So nothing else -- no -- you -- nothing outside of your communications with counsel led you to believe that construction had not started?

A.   Correct.

Q.   And then just to go back to 60 for one second --

153

MARK J. MUNDY

A.   Sure.

Q.   -- do you -- is your claim that -- that NIO was not developing its own manufacturing facility?

A.   I think that's the claim.

Q.   So you did not think at all they were developing any manufacturing facility?

A.   I think they said they were developing its own manufacturing facility, which you would take on their word.

Q.   And -- and so you're here claiming that they were not developing such a factory?

A.   I think they did not develop a factory.

Q.   But do you -- at this time that this was written, do you believe that they were not developing a factory?

A.   I don't remember.

Q.   So you can't answer one way or another?

A.   I can't answer one way or another.

Q.   Asking you today, do you have

175

                              MARK J. MUNDY

A.    Well, the technical work is done by the lawyers.  You know, I read it.  I'm not a lawyer.  So I think all I can do is just apply my business sense to those documents and see if they seem truthful, good, in terms of advocating for this potential Class and is it receiving their attention.  And I've been, I think, more than pleased that this is a hard-working law firm.

Q.    Do you know if Eva Huang reads the documents as well?

A.    I don't know anything about Ms. Huang's involvement.

Q.    If you and Ms. Huang disagreed, do you know who would decide which way the litigation would go?

A.    Hold on one second.

THE WITNESS:  Caryl?

MS. MUNDY:  Yeah.

THE WITNESS:  Yeah.

CERTIFIED STENOGRAPHER:  So, yeah, we should go off the record.

THE WITNESS:  We're involved in a conference call --

176

MARK J. MUNDY

CERTIFIED STENOGRAPHER:

Mr. Videographer --

THE WITNESS:  Okay.

CERTIFIED STENOGRAPHER:  --

hello, Mr. Videographer.

THE VIDEOGRAPHER:  We're going

off the record.  The -- we're going

off the record.  The time is

1:22 p.m.

(Pause.)

THE VIDEOGRAPHER:  Okay.  We're

back on the record.  The time is

1:20 p.m.

THE WITNESS:  Okay.  Sorry.

BY MS. FLUMENBAUM:

Q.   I'll repeat the question.

If you --

A.   Yes.  Please do.

Q.   -- so if you and Ms. Huang

disagreed about how to move forward in the

litigation, do you have a sense of who would

decide how the litigation moves forward?

A.   Well, you know, first consult

with the attorneys in terms of whether or not

Case 1:19-cv-01424-NGG-JRC    Document 121-14    Filed 12/23/22    Page 80 of 82
In Re - Nio, Inc. Securities                    PageID #: 2820                    Mark Mundy
August 30, 2022

177

MARK J. MUNDY

the proposed settlement, if it goes to a

settlement, was --

Q.    I'm not talking about --

A.    -- appropriate --

Q.    -- I'm just sort of talking

about now -- not -- and not just a

settlement --

A.    Oh, I'm sorry about that.

Q.    -- just any decision.

A.    Yes, I -- I think that I would

prevail -- I think that I would prevail.

Q.    Have you and Ms. Huang ever

disagreed before?

A.    I've never spoken to Ms. Huang.

Q.    Do you know what her alleged

losses are?

A.    I do not.

Q.    Do you know if she's still

purchasing NIO shares?

A.    I have no idea.

Q.    Would you be surprised if she

was?

A.    No.  I have no idea.

Q.    Do you have any sense of whether

Case 1:19-cv-01424-NGG-JRC   Document 121-14   Filed 12/23/22   Page 81 of 82
PageID #: 2821

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

178

MARK J. MUNDY

she's an adequate Class representative?

A. I would rely on my attorneys for making that judgment.

Q. So no reason to doubt that she's an adequate Class representative?

A. Correct.

Q. Do you think you're a better class representative?

A. Of course.

Q. Mr. Mundy, are you aware there's a state court action against NIO as well?

A. I'm aware, but I'm not aware of any of the substance.

Q. Have -- have you talked to any of the plaintiffs in that matter?

A. Oh, no --

Q. Did you --

A. -- not at all.

Q. -- ever talk to plaintiffs' counsel in that matter?

A. Oh, no. No.

Q. Did you consider seeking appointment as lead plaintiff in that matter -- in the state court matter?

189

C E R T I F I C A T E

I, Cindy L. Sebo, a Notary Public within and for the Jurisdiction of the State of Maryland, County of Prince George's, do hereby certify that the foregoing deposition of MARK J. MUNDY was taken before me remotely, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn remotely to tell the truth, the whole truth, and nothing but the truth under penalty of perjury; that the testimony of said deponent was correctly recorded remotely to the best of my ability in machine shorthand and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and accurate record of the testimony given remotely by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

_____

Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR, RSA, NYRCR, NYACR, Remote CA CSR #14409, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public