# Exhibit S

**In the Matter Of:**

*In Re: NIO Inc. Securities Litigation*

*DR. ADAM WERNER*

*September 13, 2022*



1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CASE NO. 19-cv-1424 (NGG) (JRC)

------------------------------------------X

IN RE:

NIO, INC. SECURITIES LITIGATION

------------------------------------------X

REMOTE DEPOSITION OF DR. ADAM WERNER

Tuesday, September 13, 2022

8:39 a.m. (PT)

Reported by:

Joan Ferrara, RMR, FCRR

Job No. 2022-858476

2

September 13, 2022

8:39 a.m. (PT)

Videotaped Deposition of DR. ADAM WERNER, held remotely via Zoom, before Joan Ferrara, a Registered Merit Reporter, Federal Certified Realtime Reporter and Notary Public.

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 5 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2907    Dr. Adam Werner
September 13, 2022

3

REMOTE APPEARANCES:


THE ROSEN LAW FIRM, P.A.

Attorneys for Plaintiff and The Witness

      270 Madison Avenue

      40th Floor

      New York, New York 10016

BY:     YU SHI, ESQ.



SKADDEN ARPS SLATE MEAGHER & FLOM LLP

Attorneys for Defendants NIO, Inc., Padmasree

Warrior, Bin Li, Louis Hsieh, Lihong Qin,

Yaqin Zhang, Tian Cheng, Hai Wu and Xiang Li

      One Manhattan West

      New York, New York 10001

BY:     MICHAEL C. GRIFFIN, ESQ.

      JUDITH A. FLUMENBAUM, ESQ.

      ROBERT A. FUMERTON, ESQ.




          (Continued)

4

REMOTE APPEARANCES:  (Continued)


PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Attorneys for Defendants Xianping Zhong and

Zhaohui Li

           1285 Avenue of the Americas

           New York, New York 10019-6064

BY:      XINSHU SYLVIA SUI, ESQ.


MILBANK LLP

Attorneys for Defendants Morgan Stanley & Co.

LLC, Goldman Sachs (Asia) L.L.C., JPMorgan

Securities LLC, Merrill Lynch, Pierce, Fenner

& Smith Inc., Deutsche Bank Securities Inc.,

Citigroup Global Markets Inc., Credit Suisse

Securities (USA) LLC, UBS Securities LLC, and

WR Securities, LLC

           55 Hudson Yards

           New York, New York 10001-2163

BY:      ELVIRA RAZZANO, ESQ.


ALSO PRESENT:

           ADRIEL OLVERA, Videographer

5

--------------- I N D E X ---------------

WITNESS            EXAMINATION BY        PAGE

DR. ADAM WERNER   MR. GRIFFIN              8

                  MR. SHI                287

                  MR. GRIFFIN            287


--------------- EXHIBITS ---------------

DEFENDANTS'                          FOR ID.

   (PROVIDED ELECTRONICALLY TO REPORTER)

Exhibit 22   Declaration of Dr. Adam

             Werner, June 21, 2022         11

Exhibit 23   Fourth Quarter and Full Year

             2018 Financial Results Press

             Release                       168

Exhibit 24   Transcript from the 3/6/19

             Company's fourth quarter full

             year 2018 earnings            189

Exhibit 25   Article, "Chinese Electric

             Car Maker NIO Plunges Most

             Since Its IPO"                210




                              (Continued)

6

---------------- EXHIBITS ----------------

DEFENDANTS'                                FOR ID.

    (PROVIDED ELECTRONICALLY TO REPORTER)


Exhibit 26   Article, "Why Shares of

             Chinese Electric Car Maker

             NIO Fell 47 Percent in

             March"                        218

Exhibit 27   3/6/19 analyst report from

             JPMorgan                      220

Exhibit 28   3/7/19 analyst report from

             JPMorgan                      226

Exhibit 29   3/7/19 analyst report from

             Deutsche Bank report          228

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 9 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2911   Dr. Adam Werner
September 13, 2022

7

MR. SHI:  Are we taking transcript orders now?

THE COURT REPORTER:  Sure.

MR. SHI:  Okay.  So we represent the Plaintiffs and we are going to order a standard transcript.

THE COURT REPORTER:  Okay.

MR. GRIFFIN:  Joan, we'll take the expedited, like with the others.

THE COURT REPORTER:  Yes, we have that noted, Michael.  Thank you.

THE VIDEOGRAPHER:  We are now on the record.  Today's date is September 13, 2022 and the time is 8:39 a.m. Pacific Time.

This is the video deposition of Dr. Adam Werner, in the matter of In Re:  NIO Inc. Securities Litigation, filed in the United States District Court, Eastern District of New York, Case No. 19-CV-1424.

This deposition is taking place via web videoconference with all participants attending remotely.

8

My name is Adriel Olvera.  I am the videographer representing Lexitas.

All counsel will be listed on the stenographic record.

Our court reporter today is Joan Ferrara representing Lexitas.

The court reporter will now swear in the witness.

DR. ADAM WERNER,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. GRIFFIN:

Q.    Good morning, Doctor.

A.    Good morning.

Q.    Dr. Werner, is that your preferred, how you prefer I address you?

A.    Sure, that would be fine.

Q.    Excellent.

Can you state your full name for the record?

A.    Adam Davis Werner.

Q.    And home or business address?

18

DR. A. WERNER

Q.    And what did you mean by your obligations to the parties who have engaged you in paragraph 3?

A.    Well, I don't -- to the best of my knowledge, I mean, I don't have any specific obligations to the parties who have engaged me, but I suppose someone more cynical than myself could say that experts are sometimes hired to give opinions that are -- what's the right term -- shaded towards their client's best interests.

Again, this isn't -- I mean, look, I submit my report, it's an independently prepared report, no discussions with outside parties or the parties that have retained me have in any way affected the opinion that is presented here in my declaration.

Q.    Okay.  So to be clear, sitting here, you don't think you have any obligation to Plaintiff's counsel who hired you, correct?

A.    That is correct.

Q.    And you don't view any conflict

19

                DR. A. WERNER

between your duty to the Court and any

obligations you would have to any other

party?

        A.    Well, what other obligations

would I have to other parties?

        Q.    That's what I'm asking you,

Doctor, any obligation you have to any

other party.

        A.    Right, and I guess to the extent

that I can't think of any obligation that I

have to another party, the answer to your

question is -- well, could you reask the

question?

        Q.    Let me ask it differently.

            If you don't believe you have any

obligation to Plaintiff's counsel that

engaged you, why did you include paragraph

3 in your declaration?

        A.    It's typically what I would

include in my reports.

        Q.    Did you personally write

paragraph 3?

        A.    At some point in my life, yes.

        Q.    You didn't personally write

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 13 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2915   Dr. Adam Werner
September 13, 2022

20

DR. A. WERNER

paragraph 3 for this case in particular?

     A.     Well, I may have cut and pasted this from a previous report into this paragraph.

     Q.     Do you --

     A.     I don't know if that falls under the guise of preparing it separately for this report.

     Q.     Do you recall when you first drafted the language in paragraph 3?

     A.     I do not.

     Q.     Do you recall from what report you copied it for this declaration?

     A.     I do not.

     Q.     Are there other portions of your declaration in this case that are copied from prior reports or declarations?

     A.     Well, maybe "copied" is the wrong term, but yes, there are other sections such as -- if you look at paragraph 4, right, I don't write that paragraph from scratch every time I prepare a report. It's just the common description of my background.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 14 of 110
In Re: NIO Inc. Securities Litigation      PageID #: 2916
Dr. Adam Werner
September 13, 2022

21

DR. A. WERNER

Q.    Are there any paragraphs pertaining to your opinions in this case that were copied from prior reports or declarations?

A.    I'm sure there were.

Q.    Can you identify any?

A.    Well, certainly to the extent that I'm discussing a general methodology at the end of my report, that's probably been presented in other reports.  I may have tweaked it a little bit for this report.

Some might have discussions about, you know, the tenets of market efficiency, how courts have thought about market efficiency in the past, those have probably been use in other reports.

Q.    Did you receive assistance in preparing this report?

A.    I did.

Q.    Who assisted you in the preparation of this report?

A.    Alex Huang -- let me spell that last name for you, H-U-A-N-G.  Drew

22

DR. A. WERNER

Guardano -- and I'm not going to try spelling that, but I believe if you just sound it out, you should get the spelling correctly.

And then Miguel Villanueva, again just to the extent that Villanueva is a common name, just use the common spelling.

Q.    And who are Alex, Drew and Miguel?

A.    They are employees of Crowinshield Financial Research.

Q.    Have they assisted you on creating reports and declarations in securities litigations prior to this case?

A.    They have.

Q.    That's true for all three?

A.    Yes.

Q.    Did Plaintiff's counsel here review your report before it was submitted?

A.    They certainly, to the best of my knowledge, yes.

Q.    Did they give you any feedback or comments on it?

A.    I believe they made some

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 16 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2918
Dr. Adam Werner
September 13, 2022

29

DR. A. WERNER

than the class period that was alleged in

Plaintiff's Complaint?

A.      To the best of my understanding,

yes.

Q.      Do you have any idea why the

relevant period you were asked to use is

different than the class period that was

alleged in the Complaint?

A.      I do not.

Q.      Do you know what the significance

of the starting date for the relevant

period, October 8, 2018, is?

A.      I do not.

Q.      Do you know what the significance

of the end date for the relevant period,

which is March 5, 2019, is?

A.      I believe that was the end of the

class period.

Q.      And do you know if any

significant events are alleged to have

occurred at that time?

A.      March 5, 2019?

Q.      Correct.

A.      Right.  So I think what I read

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 17 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2919

Dr. Adam Werner
September 13, 2022

30

DR. A. WERNER

from this when I was reading from my summary when you were asking about Plaintiff's allegations -- so right, Plaintiffs allege the truth about NIO's Shanghai facility was revealed on March 6, 2019.

To the best of my -- best of my recollection, that is correct. But the actual disclosure was on March 5, 2019. This should have probably said that rather than revealed on March 6, 2019, it should have said revealed on March 5, 2019 after the markets closed and, thus, if you were looking for a stock price reaction with respect to whether or not this information had any impact on the stock, you'd want to look at the March 6th price change.

Q.    Would you like to amend this paragraph of your declaration?

A.    If that helps clarify the record, I'm happy to do it.

Q.    Well, I'm asking you, Doctor.

A.    Well, I guess my question to you is, is it causing confusion? Because to me

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 18 of 110
In Re: NIO Inc. Securities Litigation          PageID #: 2920          Dr. Adam Werner
September 13, 2022

31

DR. A. WERNER

it's not causing confusion.  If it's

causing confusion for the record, I'm happy

to amend it.

Q.    What disclosure that was issued

aftermarket on March 5th are you referring

to?

A.    I believe it was the -- well,

again, let's be specific.  Right, so

looking at paragraph 52 of my report, on

March 5th, 2019, after the close of

trading, NIO announced its Q4 and fiscal

year 2018 financial results press release

that it had terminated its plans for

constructing the Shanghai facility.

During the conference call with

investors, NIO explained that the reason

for the plan's termination due to new

policies introduced by the Chinese --

excuse me -- that the reason for the plan's

termination -- it should say "was" -- due

to new policies introduced by Chinese

Government authorities.

Q.    So the disclosures that you are

referencing are the company's Q4 and fiscal

39

DR. A. WERNER

situation.  I'm being specific about this because I've seen companies, let's say in Brazil, right, and some article comes out on a chat board in Brazil that no one really sees and then, you know, a day or two later that news is translated and people have a reaction to it.

So it's really a question of dispersion of that information and how vast the dispersion is.

Q.    Are you drawing a distinction between information that's publicly available in the U.S. versus other countries?

A.    No.  I was just using that as an example of something where it may take time to digest information for the market.

Q.    And, similarly, are you drawing any distinction between information that's publicly available in English as opposed to another language?

A.    I'm not, no.

Q.    So with respect to NIO, for example, NIO is based in China, correct?

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 20 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2922        Dr. Adam Werner
September 13, 2022

40

DR. A. WERNER

A.    To the best of my knowledge, yes.

Q.    So you would consider information that is publicly available in China about NIO to be reflected in its stock price?

A.    A large corporation like that, yes.

Q.    What about physical information? Like, for example, a construction site.  Do you consider that to be public?

A.    That's something I would have to think about.  I mean, I have no reason to think people wouldn't be aware of construction of a facility, but you know, if you're talking about hypothetical examples or situations -- I mean, can people be building something and people be unaware of it?  Sure.  I mean, if I'm building something in an underground bunker, people may not be aware of my construction.

Q.    And if they were building it on Fifth Avenue in Manhattan, they probably would be aware of it, right?

A.    I assume that's correct.  Now

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 21 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2923   Dr. Adam Werner
September 13, 2022

41

DR. A. WERNER

again, to the extent there might be scaffolding on it, they might not know what they're constructing, but I think generally your statement is correct.

Q.   Notwithstanding the scaffolding, they could see construction underway, correct?

A.   Correct.

Q.   Setting aside the hypotheticals, the issue in this case is whether the Shanghai facility was under construction.

Do you believe the status of that construction is publicly available information?

A.   Well, clearly, to the best of my understanding, that's what Plaintiffs are alleging, but I have an independent --

Q.   Sorry, I didn't mean to cut you off.

A.   I haven't independently verified that.

Q.   You haven't independently verified whether construction was, in fact, underway?

42

DR. A. WERNER

A.    To the extent I'm in the U.S. and I wasn't in China, no, I don't know one way or the other.

Q.    I understand.  But my question is slightly different, not whether construction was, in fact, underway, but whether the fact of construction being underway or not was publicly available.

Do you have an opinion on that question?

A.    I don't believe that's something I've looked at as of today.

Q.    Sitting here today, do you have an opinion on it?  I'm now asking you to consider it.

A.    Right.

Q.    The status of a construction site in Shanghai is publicly available information?

A.    I believe that's what Plaintiffs are alleging.  I have not independently verified that.

Q.    Again, I just want to be clear, Doctor.  I apologize for belaboring this.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 23 of 110
In Re: NIO Inc. Securities Litigation          PageID #: 2925
Dr. Adam Werner
September 13, 2022

43

DR. A. WERNER

I'm not asking you whether or not construction was underway or whether any new construction was underway.

My question simply is whether or not a construction site had begun publicly available information?

A.   Right, and so again, it's going to depend on the situation.

Q.   Well, I'm asking you about this situation here, in this case.

A.   So for this particular -- so you're talking about the Shanghai facility?

Q.   Correct.

A.   I have no knowledge, one way or the other, whether or not that was publicly available information.

Q.   Presumably anyone in Shanghai could have walked past the site and seen whether or not construction was underway, correct?

MR. SHI:  Objection.  Form.

A.   Right.  I mean, I have no idea where the construction was being done.  So could someone walk by it?  I don't know.  I

44

DR. A. WERNER

haven't been to Shanghai before.  I'm not
familiar with the terrain and the layout.

So, you know, it's like if you
came to Pismo Beach and I said, hey,
there's some construction going on, you
know, at the tip of some beach that's
cordoned off by the government, people may
not -- people obviously can't walk by there
and see the construction, but the
construction is occurring.

Q.   Do you have any reason to believe
that whether or not construction was
underway at the Shanghai facility was not
publicly available to people physically
located in Shanghai?

A.   I have no opinion one way or the
other.

Q.   Okay.  Now as part of your
analysis, you address the Cammer factors,
correct?

A.   That is correct.

Q.   And the first Cammer factor deals
with average trading volume?

A.   Correct.

45

DR. A. WERNER

Q.    And in your opinion, average trading volume above 1 or 2 percent of a stock's total outstanding shares is indicative of an efficient market, correct?

A.    Well, I think that's the Court's opinion, yes.

Q.    And do you agree with that standard?

A.    Generally, yes.

Q.    Have you ever --

A.    It's the one I -- sorry.

Q.    Go ahead.

A.    It's the one I've adopted for the purposes of testing market efficiency across, you know, hundreds of cases.

Q.    And that's the standard you applied in this case, correct?

A.    That is correct.

Q.    Now, you state that the average trading volume of NIO's ADS during the relevant period was 45.68 percent of total outstanding shares, correct?

A.    Let me get to that section of my report.  That sounds accurate.  I'm sorry,

52

DR. A. WERNER

companies?

A.    In this case, yes.

Q.    And analysts gather and independently generate information about companies and disseminate such information to their clients, right?

A.    That sounds like something I've written.

Q.    Good ear.

The more analysts covering a security, the more likely it is that the market will timely incorporate any new information, right?

A.    Well, so, I'm not quite -- if that's what I've stated, I'm not quite sure that that's correct.  I mean, if you're talking about, you know, 20 versus 30 analysts, there's going to be a marginal difference in how quickly the information is incorporated in the stock price -- you know, probably not.

Q.    So you're saying that the marginal impact can vary depending on exactly how many analysts we're talking

53

DR. A. WERNER

about?

    A.    Right, as well as the analyst's
reputation.

    Q.    Could you take a look at page 8,
paragraph 19 of your report.  That's the
paragraph I was referring to.

          In paragraph 19 you state, "Put
another way, the more analysts covering a
security, the more likely it is that the
market for that security will timely
incorporate new information in that
security's price."

          You agree with that statement,
right?

    A.    Again, I mean, I should probably
put some qualifiers on that, again using
the example that I referred to earlier, but
generally that's true.

    Q.    Do you believe the statement in
paragraph 19 is inaccurate?

    A.    I don't believe it's inaccurate.
I just don't think there is necessarily a
linear relationship between the market's
incorporation of information and the number

54

DR. A. WERNER

of analysts.

And again, so right, if I'm looking at two versus three analysts, the marginal contribution of that third analyst might be different than a marginal contribution of the 29th analyst.

Q.    Do you believe paragraph 19 is misleading as currently written without the caveats that you've added today?

A.    I don't think so.

Q.    Okay.

A.    I think generally that's true.

Q.    You mentioned the quality of the analysts being relevant, right?

A.    I did.

Q.    Do you think that, generally speaking, analyst reports are accurate and reliable?

MR. SHI:  Objection to form.

A.    Generally speaking?

MR. SHI:  Objection to form.

A.    That's not something I've ever thought about.

Q.    Sitting here today, and you could

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 29 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2931

Dr. Adam Werner
September 13, 2022

63

DR. A. WERNER

A.    As I sit here today, I don't recall.

Q.    You don't recall one way or the other?

A.    That is correct.

Q.    Would you expect to recall that information if they did say that?

A.    In this day and age, it's very possible that I -- the answer to that question is no.

Q.    Well, whether or not the Shanghai facility is under construction is the central issue in this case, correct?

A.    I mean, I don't know if it's the central issue.  It's certainly an issue.

Q.    An important issue?

A.    Sure.

Q.    But you wouldn't remember, one way or the other, if you had read an analyst reporting that, in fact, it was not under construction?

A.    Again, as I sit here today, I don't recall.

Q.    Do you recall if any of the

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 30 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2932                    Dr. Adam Werner
September 13, 2022

64

DR. A. WERNER

analyst reports you reviewed claimed that NIO terminated the Shanghai facility project because it did not have sufficient revenue or cash flows?

A.    As I sit here today, I don't recall.

Q.    Did any of the analyst reports you reviewed claim that NIO did not, in fact, have sufficient revenue or cash flows to complete the Shanghai facility?

A.    As I sit here today, I don't recall.

Q.    Now, all of the --

A.    Actually, so if you're talking about -- so let me make a distinction.

So if you're talking about these particular analyst reports, I don't recall.

Let's turn to.

Q.    Try 50 to 51.  Are you looking for the list of documents you considered?

A.    No.

Q.    Doctor, let me ask you this.  The 26 analyst reports that you listed in Exhibit 4 and reviewed and relied on here,

65

DR. A. WERNER

all occurred before the alleged corrective disclosure, correct?

A.    That is correct.

Q.    Did you review any analyst reports after the alleged corrective disclosure?

A.    I certainly asked for them.  And we did not have access to them, so I relied on a news article to garner analyst opinions about that.

Q.    Who did you ask for the analyst reports following the corrective disclosure?

A.    The people at Crowninshield.

Q.    And what did they tell you in response to that request?

A.    That they didn't have access to them.

Q.    Where did you obtain the 26 analyst reports that you did review and rely on?

A.    To the best of my knowledge, Thomson Eikon.

Q.    And did you discuss with Thomas

66

DR. A. WERNER

Icon on the additional analyst reports after the corrective disclosure?

A.    That's where they would have looked.

Q.    Do you have any idea why the analyst reports after the corrective disclosure allegedly were not available?

A.    Well, they may have been available.  Look, to the extent we were talking about your client NIO, I'm sure Plaintiff's counsel could subpoena them. So does that make them available?  I don't know.  They weren't available, to the best of my knowledge, through Thomas Icon.

But, since we were talking about, you know, investment bank is talking about things like the construction of the facility, so if I'm looking at paragraph 71, we see that analyst and market participants noted that the companies reported financial results were disappointing and that the termination of the plan to construct the Shanghai facility was a negative surprise.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 33 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2935

Dr. Adam Werner
September 13, 2022

67

DR. A. WERNER

Q.   I understand, Doctor, and we're going to get to paragraph 71, but for now I just want to focus on these analyst reports.

You said that you asked for the analyst reports after the corrective disclosure, right?

A.   Well, from the last report through the corrective disclosure, that is correct.  I believe the last analyst report was for February 15th.

Q.   Correct.  And you wanted to review the analyst reports after the corrective disclosure, right?

MR. SHI:  Objection.  Form.

A.   That is correct.  I'm sorry, I didn't hear the objection.

MR. SHI:  Form.

Q.   So I'll ask you again.  You wanted to review the analyst reports that followed the alleged corrective disclosure here, right?

A.   I asked if we had additional analyst reports that covered that time

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 34 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2936
Dr. Adam Werner
September 13, 2022

68

DR. A. WERNER

period.

Q.    Did you want to review those analyst reports?

A.    To the extent we had access to them, yes.

Q.    Why did you want to review the analyst reports that followed the corrective disclosure here, alleged corrective disclosure?

A.    Well, again, because I wanted to verify things like these statements in paragraph 71 were accurate.  I have no reason to think they're inaccurate and they come from reliable data sources.  You know, if I can go to source material, I guess normally I'd prefer to go to source material than repetition of source material or analysis of source material.

Q.    Was the securities analyst reaction it news regarding NIO relevant to your analysis here?

A.    It certainly informed my opinion.

Q.    In what way did it inform your opinion?

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 35 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2937    Dr. Adam Werner
September 13, 2022

69

DR. A. WERNER

A.    Well, again, so we're talking about -- let's go back to paragraph 71. The question -- I mean, for market efficiency, the question is really does news move the stock.  And so to the extent that there was news being presented by, among other people, analysts, that would inform my opinion as to whether or not the stock was efficient -- or this particular stock traded in an efficient market.

Q.    And the opinion of the securities analyst as to the favorability of that news is also relevant to your analysis, right?

A.    Well, again, it informs my opinion.

Q.    You also mentioned, and I'm looking at paragraph 31 on page 12 --

A.    Actually, can we -- so we've been going for about an hour and 15, minutes. Can we take a break?

Q.    Sure.

A.    I mean, if you're like going to ask me one more question on this, I'm happy to continue, but otherwise --

70

DR. A. WERNER

Q.    Yeah, give me five more minutes.

A.    Okay.  All right.  So reask your question, please.

Q.    Sure.  Page 12, paragraph 31.

A.    Okay.

Q.    In paragraph 31 you reference, "Over 109 news stories, press releases and SEC filings featuring NIO."

That appeared in financial publications during the relevant period, correct?

A.    That is correct.

Q.    Did you review all of those 109 news stories, press releases and SEC filings?

A.    I don't believe I reviewed every single one of those.

Q.    Did someone on your team review them?

A.    Yes.

Q.    So at least one of the three individuals we mentioned earlier would have reviewed all 109 of those press releases, news stories and SEC filings?

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 37 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2939    Dr. Adam Werner
September 13, 2022

83

DR. A. WERNER

that was announced, I would expect to have an impact on the stock price. When I say "expect," I should say ex-ante.

Q. So you expected ex-ante each of the four events you chose to have a statistically significant impact on the stock price?

A. No. Those are pieces of news that often times impact a securities, a stock price. I had no expectation, one way or the other, whether or not it would actually move the stock price.

Q. Okay. So walk me through your process for selecting these four particular events.

A. Right. So we had our 109 articles or whatever it was, we had our analyst reports, we went through them and I looked at days where you would normally expect some type of stock price movement.

So, for instance, you know, often times we'll look at earnings reports. So in this case I looked at the earnings announcements associated with November 6th,

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 38 of 110
In Re: NIO Inc. Securities Litigation          PageID #: 2940          Dr. Adam Werner
September 13, 2022

84

DR. A. WERNER

right.  Often times that is a news -- what someone would consider a news day.

To the extent that that news met expectations, the fact that there was not a statistically significant stock price movement is consistent with market efficiency.

Q.   Did you consider using any other events besides the four that you ultimately selected for your study?

A.   I did not.

Q.   Now, you claim to have focused your event study on disclosures of information related to allegations in the Complaint, and that's in paragraph 50, is that correct?

A.   Well, it should say on a disclosure of information related to the allegations in the Complaint is the only event with regards to allegation of Complaint with the alleged corrective disclosure.

Q.   Sorry, what should paragraph 50 say?

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 39 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2941
Dr. Adam Werner
September 13, 2022

85

DR. A. WERNER

A.   By focusing an event study on a disclosure of information related to the allegations in the Complaint, since there was only one disclosure in this case.

Q.   And so the other three, the first three events in your event study are not related to the allegations in the Complaint, correct?

A.   I believe that's correct.

Q.   Now, as part of your event study, you created a regression model, right?

A.   Correct.

Q.   And part of that model was dependent on what you termed a market model, right?

A.   Just let me get there as long as we're going to talk about this.  The answer to your question is that is correct.

Q.   And you used a market model to help control for market wide and industry wide factors affecting the stock price, correct?

A.   That is correct.

Q.   And so to do this you chose a

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 40 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2942    Dr. Adam Werner
September 13, 2022

86

DR. A. WERNER

market index and an industry index, right?

A.    That is correct.

Q.    How do you go about choosing a particular market index?

A.    Generally use the same market index, what's generally accepted as the market index in academic literature.

Q.    And that's the index you used here?

A.    Correct.

Q.    That's referenced in paragraph 57?

A.    Correct.

Q.    And what about for the industry index, how do you go about selecting an appropriate industry index?

A.    Well, to the extent that NIO was an automobile manufacturer, its performance was likely affected by sector news -- or maybe more generally electric vehicles.

Q.    Well, just stepping back for a second before we get to NIO, just in general when you're conducting an event study you have to choose an industry index,

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 41 of 110
In Re: NIO Inc. Securities Litigation          PageID #: 2943                    Dr. Adam Werner
September 13, 2022

87

DR. A. WERNER

what are the factors you're considering

when choosing an industry index, generally

speaking?

     A.   What the company does.

     Q.   So you're just looking for any

industry index that overlaps with what the

company does?

     A.   It's a little bit more involved

than that.

     Q.   How so?

     A.   Well, so often times companies

will, you know, say -- in their financial

filings will compare themselves to other

companies.  So often times I'll construct

an index based on those comparisons or

they'll compare their performance to

certain indices, so often times I will

select those indices.

     Q.   And here you said you were

looking for an industry index that involved

automobiles and in particular electric

vehicles?

     A.   Correct.

     Q.   And the index you chose is the

88

DR. A. WERNER

S&P 500 Automobile Manufacturers Index,

correct?

    A.    Correct.

    Q.    As you cite in paragraph 57?

    A.    Correct.

    Q.    What companies make up the S&P

500 Automobile Manufacturers Index?

    A.    As I sit here today, I don't

recall.

    Q.    Did you recall at the time --

excuse me, did you know at the time you

drafted your report?

    A.    At some point I reviewed the

index.

    Q.    Do you have any idea what

companies are included in that index?

    A.    I mean, as I sit here today, it

would be speculation on my part.

    Q.    Can you name a single company

that's included in that index?

    A.    Well, I assume like Ford and GM

would probably be in it.

    Q.    Anyone else?

    A.    Again, beyond that, I'd be

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 43 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2945    Dr. Adam Werner
September 13, 2022

89

DR. A. WERNER

speculating.

Q.   Do you know if the composition of that index has changed over time?

A.   I would not be surprised if the composition of that index has changed over time.

Q.   Well, I guess more specifically, do you know if it's different today than it was during of the relevant period?

A.   It's personally possible that it's different today than it was during the relevant period.

Q.   You don't know, one way or the other?

A.   No.

Q.   And you mentioned you selected this index because it was related first to automobile, right, is that correct?

A.   Well, electric vehicles, yes.

Q.   Which electric vehicle companies are included in this index?

A.   As I sit here today, I don't recall.

Q.   But for purposes of your model it

90

DR. A. WERNER

was important to you that electric vehicle

companies were included in this index,

right?

    A.    Was it important that electric

vehicles as opposed to gas-powered

automobiles?

    Q.    Right.

    A.    It was certainly a factor that I

took into consideration.

    Q.    What other factors did you take

into consideration?

    A.    Well, that we're dealing with a

billion dollar automobile manufacturer.

    Q.    Did the geographic market factor

into your selection of industry index?

    A.    It did not.

    Q.    Why not?

    A.    No reason.  I doubt -- well, I

would be shocked if adding a

country-specific component to this, to my

model would alter the model results

significantly.

    Q.    Why?

    A.    Based on experience.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 45 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2947   Dr. Adam Werner
September 13, 2022

91

DR. A. WERNER

Q.   What experience?

A.   Well, let's see, I'm 52.  So running event studies since, about 30 years.

Q.   What, specifically, Doctor, in your 30 years of experience leads you to believe that adding a geographic market specific index would not change the results of your analysis in this case?

A.   Well, I didn't say it wouldn't change my results.  I said it would not change my results significantly.  Correct?

Q.   Okay.  What in your 30 years of experience leads you to believe that adding a geographic market specific index in this case would not significantly change your results?

A.   Again, if you're looking at a billion dollar corporation with a global company, it's selling cars all over the world, generally that's not going to have a big impact on a market model based on looking at -- look, I've looked at, I don't know how many Chinese corporations I've

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 46 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2948    Dr. Adam Werner
September 13, 2022

92

DR. A. WERNER

looked at with regards to this and generally with the larger companies -- again, we're talking about a billion dollar company -- a country-specific index doesn't normally have a large impact on -- a significant impact on a market model.

I mean, if you want me to -- I'm happy to look at it if your expert is going to go ahead and add an industry index, I'm happy to review it and say, you know what, this actually does make a significant difference. But, you know, as I sit here today, you know, I did what I did, I believe what I did is correct.

Q. When you reference a billion dollar company, what metric are you referring to there?

A. Market cap.

Q. Is it your understanding that NIO sells its electric vehicles globally?

A. Well, I certainly know they sell them in the U.S.

Q. And would you expect the U.S. auto industry to affect sales of NIO's

93

                    DR. A. WERNER

vehicles in China?

    A.    Would I expect -- well, to the

extent that U.S. automobile manufacturers

sell cars in China, yes.

    Q.    Do you know if any of the

companies in the S&P 500 automobile

manufacturers index sold electric vehicles

in China?

    A.    Sold electric vehicles in China?

Not as I sit here today.

    Q.    How about sold any vehicles in

China?

    A.    Again, I mean, general knowledge,

my understanding is companies like Ford and

GM sell vehicles in China.  But do I

specifically know that for a fact, no, not

as I sit here today.

    Q.    But in general, you would expect

industry factors that affect GM and Ford to

also affect NIO?

    A.    To the extent they sell

automobiles in the U.S., yes -- well, in

general, yes.

    Q.    Did you consider using any other

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 48 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2950

Dr. Adam Werner
September 13, 2022

108

DR. A. WERNER

the trading day and right before the trading day.  As I sit here, I don't recall.  And the stock price moved.

Q.    And so any subsequent movements on future days were not relevant to this particular announcement?

A.    To this particular announcement? For the purposes of market efficiency?  No.

Q.    Okay.  That's all I'm trying to understand.

Here you used a single day to gauge the price reaction to this particular event, right?

A.    That is correct.

Q.    Okay.  Can we flip to page 65? It's Exhibit 9 of your report.

A.    I'm there.

Q.    Exhibit 9 of your declaration presents the results of your event study, correct?

A.    That is correct.

Q.    And it lists the residual return, among other things, and T-statistic for each day during the relevant period, is

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 49 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2951

Dr. Adam Werner
September 13, 2022

109

DR. A. WERNER

that right?

A. That is correct.

Q. So if we look at the second line of your chart, for October 9th, that's the date of the Bailey Gifford announcement, correct?

A. Correct.

Q. We see the 20.17 percent logarithmic return, right?

A. Correct.

Q. And the T-statistic there is 5.13, right?

A. Correct.

Q. Because that is greater than 1.96, you deem this to be statistically significant, right?

A. Correct.

Q. And that's what that little asterisk at the end of the row indicates, right?

A. Correct.

Q. The line right below that for October 10th also indicates that there was a statistically significant abnormal

110

DR. A. WERNER

return, correct?

A.    It does.

Q.    Do you have any idea what caused that statistically significant abnormal return?

A.    As I sit here today, no.

Q.    But the fact that there was a statistically significant abnormal return based on your model indicates to you that there was some company-specific news that day, is that right?

A.    95 percent of the time, yes.  I mean, 5 percent of -- we're going to observe 5 percent statistically significant days.  But as I sit here today, I don't know one way or the other.

Q.    If you look midway down the page, November 1st also indicates a statistically significant abnormal return, correct?

A.    That is correct.

Q.    Are you aware of any significant company news regarding NIO on November 1st?

A.    I don't believe that -- well, let me --

Dr. Adam Werner
September 13, 2022

111

DR. A. WERNER

Q.    It's not one of the four event dates that you chose, I could tell you.

A.    Okay.  So then no, as I sit here today, no.

Q.    Same for November 19th, which also indicates a statistically significant abnormal return?

A.    November 19th.  Can we agree that if you're going to do this, we can stipulate where you tell me whether or not these are days I reviewed?

Q.    Yes.  The four you reviewed are October 9th, November 6th for the Q3 earnings, November 30th for the resignation, and then March 6th for the alleged corrective disclosure.

A.    Thank you.

Q.    It's not a memory test.

A.    Okay.  I appreciate that.  You'd be surprised how many lawyers think it is.

Q.    Fair enough.

Let me ask you the question this way:  Other than those four days, are you aware of any company-specific information

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 52 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2954   Dr. Adam Werner
September 13, 2022

112

DR. A. WERNER

that caused any statistically significant abnormal returns on any other date?

A.    During the relevant period?

Q.    Correct.

A.    I am not.

Q.    Okay.  All right.  Let's talk about the second event then that you chose. That was the Q3 -- excuse me, third quarter earnings announcement on November 6th, 2018, correct?

A.    I'm sorry, I need to just correct what page are we on?

Q.    Paragraph 65.

A.    Paragraph 65.  Okay.

Q.    Are you there?

A.    I am.

Q.    And you deemed this to be neutral news for the company, right?

A.    Ex-post, yes.

Q.    And that was based on the securities analyst's reactions to the results, in particular their characterization that the results were in line with expectations?

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 53 of 110
In Re: NIO Inc. Securities Litigation         PageID #: 2955
Dr. Adam Werner
September 13, 2022

113

DR. A. WERNER

A.    That certainly informed my opinion, yes.

Q.    Did anything else inform your opinion?

A.    I'm sure I looked at some additional news articles around that period of time that expressed similar sentiment, but these were the things that stuck out.

Q.    And so the three sources that you cite in this paragraph are the Deutsche Bank analyst report, JP Morgan analyst report, and Morgan Stanley analyst report, correct?

A.    That is correct.

Q.    And again, you deemed the reaction of these analysts to be relevant to determining the significance of that quarterly announcement, whether it was positive, negative or neutral?

A.    I don't think the statement as you've -- the question as you've stated it is correct.

Q.    What do you disagree with in what I asked?

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 54 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2956
Dr. Adam Werner
September 13, 2022

114

DR. A. WERNER

A. Reread the -- could you have the question reread, please?

Q. Sure.

You deemed the reaction of these analysts to be relevant to determining the significance of that quarterly announcement, will it was positive, negative or neutral?

A. Ex-post, that is correct. Ex-ante that is incorrect.

Q. And why is that incorrect ex-ante?

A. Because I didn't -- you know, I commonly look at news earnings days. So it's an earnings announcement, so I looked at it. Oftentimes that's something that will move a stock price.

Q. And setting aside the securities analyst's reports, do you have any independent view of whether the third quarter earnings were a positive, negative or neutral development?

A. Beyond those reports and presumably additional news articles I may

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 55 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2957

Dr. Adam Werner
September 13, 2022

119

DR. A. WERNER

Do you see that?

A.    I do see that.

Q.    What is your basis for that assertion?

A.    Well, among other things, the Deutsche Bank report.

Q.    Again, you looked to one of the analysts reports' characterization of this event to judge whether it was significant?

A.    So when you use the word "significant," that has a loaded meaning.

Q.    What do you understand it to mean when I say "significant"?

A.    Well, so normally when we talk about significance in a securities class action context, we're usually talking about statistically significant.

Q.    Okay.

A.    I'm sorry, I'm uncomfortable using the term "significant."  If you want to say important, something people normally pay attention to, what might change the overall information.

Q.    I'll ask the question again more

120

DR. A. WERNER

specifically.  But in general, what I'm trying to get at is good, bad, or neutral.  So we're getting hung up on the word.  I'm not trying to trick you.  I don't know of a better word to describe that inquiry, but I'll just ask it that way.

You relied on the Deutsche Bank analyst report to gauge whether Ms. Warrior's resignation was a positive, negative, or neutral news event for the company?

A.    That certainly informed my opinion, yes.

Q.    Okay.  I'll try and stick with that going forward, that formulation.

A.    Okay.

Q.    Sorry, so you also write here that it did not affect the market's perception of the company's ability to operate and deliver on its goals.

Is that a general standard that you would apply to evaluating company-specific news?

Let me ask it this way:  Would

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 57 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2959

Dr. Adam Werner
September 13, 2022

121

DR. A. WERNER

you consider events that do not affect the company's ability to operate and deliver on its goals to be neutral?

A.    Not necessarily.

Q.    Why not?

A.    Well, it's going to depend on the situation.  Again, I have no understanding whatsoever about the, you know, Tim Cook's individual or Apple's ability to continue to manufacture its products, but I would not be surprised that if Tim Cook resigns out of nowhere, Apple's stock price is going to move.

Q.    How about this way, would you consider an event that hinders the company's ability to operate and deliver on its goals to be a negative news event?

A.    Negative, but not necessarily statistically significant.

Q.    Sure.  No numbers here, so can't possibly gauge statistical significance. I'm just trying to understand why you use that particular phrase here.

A.    That's just what I chose to use.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 58 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2960   Dr. Adam Werner
September 13, 2022

124

DR. A. WERNER

A.    Correct.

Q.    And this was not statistically significant in your opinion, correct?

A.    Correct.

Q.    All right.

MR. GRIFFIN:  I think we've been going for about an hour.  Do you want to take another break before we go to the next event?

THE WITNESS:  Yeah, actually thank you so much for asking.  That's very kind of you.

MR. GRIFFIN:  Yep, sure.  Ten minutes again?

THE WITNESS:  Yeah, 10 minutes would be good.  Works for us.  So we'll be back around 2:10.

MR. GRIFFIN:  Yep.

THE VIDEOGRAPHER:  We are off the record at 10:59 a.m.

(Recess taken from 10:59 a.m. 11:12 a.m. PT)

THE VIDEOGRAPHER:  We are back on the record at 11:12 a.m.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 59 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2961
Dr. Adam Werner
September 13, 2022

125

DR. A. WERNER

BY MR. GRIFFIN:

Q.    Dr. Werner, turning to the fourth and final event in your event study, that was the March 5, 2019 disclosure of NIO's fourth quarter and fiscal year 2018 earnings results, correct?

A.    Correct.

Q.    And it was in connection with this earnings announcement that NIO also announced that it was terminating the Shanghai facility project, correct?

A.    Correct.

Q.    Now, looking at paragraph 71, which you referenced earlier, you state that, "Analysts and market participants noted that the company's reported financial results were disappointing and that the termination of the plan to construct the Shanghai facility was a negative surprise."

Do you see that?

A.    I do.

Q.    Who are the analysts that you're referring to in that sentence?

A.    Again, so these -- you know, I

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 60 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2962    Dr. Adam Werner
September 13, 2022

126

DR. A. WERNER

should have been -- I agree, I should have been more accurate -- these were analysts that showed up in terms of quotations from our literature review through the Lexis-Nexis search.  So things like -- before we looked at flyonthewall, so that would be one such source.

Q.    So when you refer to analysts in paragraph 71, you're not referring to the investment bank coverage analysts like Deutsche Bank and JPMorgan, Morgan Stanley, et cetera?

A.    Well, they may very well have been the sources of those.  The problem is, again, we, for whatever reason, Eikon, Thomson Eikon didn't supply us with -- analyst reports after that, after February 15th were not available on Thomson Eikon. And I don't know, I've asked my staff, they don't know.

Q.    So the sentence that you write, though, in paragraph 71 is not referring to those securities analysts that publish regular coverage after earnings

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 61 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2963                   Dr. Adam Werner
                                                                        September 13, 2022

127

DR. A. WERNER

announcements by Deutsche Bank, JPMorgan, et cetera, that we discussed earlier, right?

A.    No.  What I'm saying is, as I sit here, I don't recall.  It very well could have, right.  But to the extent that I didn't have access to the source, the actual reports, I didn't cite to the actual reports.

Q.    Okay, sorry.  I'm not sure I'm following entirely.  But are you saying that you may have reviewed sources, articles, news media, et cetera, that referenced the analyst coverage reports expressing these opinions and that's the basis for your sentence in 71?

A.    Correct.

Q.    But sitting here today, you don't recall any specific articles or any other source that you reviewed that referenced securities analysts describing the termination of the plan to construct the Shanghai facility as a negative surprise, right?

128

DR. A. WERNER

A.    I do not specifically remember that.

Q.    Do you recall generally that you saw that, even if you don't recall the particular source?

A.    Well, I wouldn't have written that sentence if I hadn't seen that.

Q.    All right.  But it's not a hypothetical or a conditional, Doctor.  You did write the sentence.  So I'm just trying to understand what your basis was for that sentence.

A.    Right.  And again, as I say, I should have been more specific.  I'll be happy to provide you with sources afterwards.  But news articles that I reviewed that quoted analysts.

Q.    Okay.

A.    Among other things.

Q.    What are the other things?

A.    As I sit here, I don't know.  I'm just trying to be as general as possible.

Q.    I would like you to be specific, if you can.

129

DR. A. WERNER

A.    Right.  What I meant to say was --

Q.    I'm just asking --

A.    Right, no, I meant to say -- I was trying to be as specific as possible and as accurate as possible.  So I know that I remember reading analyst, quotes from analysts.  You know, I don't have a full recollection of everything I saw.  So I'm trying to be as accurate as possible, how about that.

Q.    Okay.

Now, as before, right, setting aside the stuff that you reviewed, did you have -- well, let me strike it.  Let me reask the question.

Do you agree with the opinions that you read in the sources that you reviewed that the termination of the plan to construct the Shanghai facility was a negative surprise?

A.    For the purposes of market efficiency, that wasn't something I was asked to do.

157

DR. A. WERNER

Q.    And generally speaking --

A.    And you're -- sorry.  Usually in the context of price impact and loss causation, you're trying to measure the impact of that information.

Q.    And generally speaking, there is two ways you could go about measuring the price impact of an alleged misrepresentation, you could try and do it on the front end or on the back end, right?

A.    Those are certainly -- that just seems overly specific.  I mean, you can have price impact throughout a class period, right, so...

Q.    I could be more specific.  One way to measure price impact is to look at the amount by which the stock price increased when the alleged misrepresentation was made, right?

A.    Well, again, to the extent that there was an alleged misrepresentation, right, it could be an omissions case in which case I wouldn't necessarily expect any price impact.

158

DR. A. WERNER

Q.   Okay.  Let's focus --

A.   At the front end, the front end.

Q.   Yeah.  So for a misrepresentation case, one way to measure price impact would be to look at the change in stock price when the alleged misrepresentation was made, right?

A.   I've certainly seen people do that before.  That's certainly one way one could look at it.

Q.   Have you ever used that approach before?

A.   As I sit here today, I don't recall.

Q.   In any event, you couldn't do that in this case, right?

A.   You couldn't do that in this case -- I believe that statement is correct.

Q.   It's impossible to show any front-end impact at the time the alleged misrepresentation was made because it was contained in the company's IPO offering documents before the stock was publicly

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 66 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2968
Dr. Adam Werner
September 13, 2022

159

DR. A. WERNER

traded, right?

A.   I'm not sure.  That question doesn't make sense to me.

Q.   I'll take a step back.

A.   I guess you're now making a distinction between misrepresentation and an omission.  An omission can be a misrepresentation.

Q.   What if I say an affirmative misrepresentation as to distinguish it from an omission, does that help clarify the question?

A.   No.

Q.   How about the alleged or false or misleading statements in this case?

A.   Again, I haven't looked at price impact or loss causation in this case.  If your expert decides to make a price impact argument, that's something I will address in a rebuttal report.  But for the purposes of this report it's not something I looked at.

Q.   Do you have any view, one way or another, as to whether you could determine

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 67 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2969
Dr. Adam Werner
September 13, 2022

192

DR. A. WERNER

in there.

A.    Yes, yes.

Q.    But that's the gist of it, right?

That wasn't the only reason that the company cited for terminating the Shanghai facility project, right?

A.    As I sit here, I don't recall.

Q.    All right.  Let's take a look at the transcript again, Defendants' Exhibit 24.  If we look at page 4, at the bottom paragraph starts, "On a separate note," do you see that?

A.    Yes.

Q.    It says, "On a separate note we would like to give you an update on our plan for building the manufacturing facilities in Jia Ding, Shanghai.  In 2017, we signed a framework agreement and memorandum with the government and related NDs in Jia Ding, Shanghai to building a manufacturing plant for NIO.  Recently, we have agreed in principal that these contractual counterparties, with our contractual counterparties, to terminate

193

DR. A. WERNER

the plan of this manufacturing plant.

These decisions are made based on two

reasons."

Do you see where I've read so

far?

A.    I do.

Q.    So during the conference call,

the company actually explained there were

two separate reasons for their decision to

terminate the factory, correct?

A.    At least in this portion of the

conference call, yes.

Q.    So continuing with the bottom

paragraph on page 4, it says, "First, in

2018, a new policy was issued by government

authorities which allow and encourage the

entities that operate its vehicle research

and development and design to work with

vehicle manufacturing companies to

manufacture vehicles cooperatively.  This

joint" --

A.    I'm sorry, hold on.  Where are

you reading from?  I assume it's just the

next sentence, but for whatever reason I'm

194

DR. A. WERNER

not seeing it.

Q.    It was just the next sentence after, it says, "These decisions are made based on two reasons" -- and then it says "First."

Do you see that?

A.    First, yeah, okay.  Yep.  Do you want me to just go to "Secondly"?

Q.    Well, before we get to "Secondly," the first reason listed there designated first is the one you were referring to in your declaration, right?

A.    Yes, correct.

Q.    This is the new government policy that was introduced, right?

A.    Correct.

Q.    Okay.  So now you see where it says "Secondly" in the earnings transcript?

A.    I do.

Q.    And it says, "Secondly, through an efficiency perspective, we can leverage the existing capacity of NIO's JAC plant and enjoy the flexibility to expand the capacity to support NIO's market

195

DR. A. WERNER

penetration and growth plans for the next two or three years.  In the long run, we will still focus on the joint manufacturing model and continue improving the effectiveness of capital investments in manufacturing."

Do you see that?

A.    I do.

Q.    Why did you omit that second reason for terminating the plan from your declaration?

A.    I can't think of any specific reason as I sit here today.

Q.    Do you think it should have been included?

A.    Well, I mean, to the extent that this thing doesn't have to be comprehensive -- I mean, I'm just trying to determine whether or not this aggregate information with the stock price, right, for the purposes of this report should it have been included or not been included -- I don't have an opinion one way or the other.

Q.    Do you think --

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 71 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2973

Dr. Adam Werner
September 13, 2022

196

DR. A. WERNER

A.    Let me put it another way. Reading that second sentence doesn't alter my opinions with regards to market efficiency and damages in this case.

Q.    Do you think it was inaccurate to state that NIO explained the reason for the plan's termination when there were, in fact, multiple reasons?

A.    I agree it should say "a" reason and not "the" reason.

Q.    I think we discussed earlier that after the company's prepared remarks on the earnings call there is often Q&A, right?

A.    Correct.

Q.    And that was the case for this particular earnings call, right?

A.    Yeah.  I don't remember that we've actually spoken directly about this topic, but generally that is the case.

Q.    We had talked earlier that securities analysts participated in earnings calls by asking questions sometimes.

        You recall that?

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 72 of 110
In Re: NIO Inc. Securities Litigation        PageID #: 2974                    Dr. Adam Werner
                                                                          September 13, 2022

197

DR. A. WERNER

A.    I do recall that.

Q.    That's what I was referring to.

So anyway, here there were questions by the securities analysts during this call, right?

A.    That is correct.

Q.    And so if we go to page 6, that's where the question and answer session begins.

Do you see that towards the bottom of page 6?

A.    I do.

Q.    And the first question there was from Daniel Galves, G-A-L-V-E-S, from Wolfe Research.

Do you see that?

A.    I do.

Q.    And that was about the plan government reduction in subsidies for electric vehicles, right?

A.    That is correct.

Q.    All right.  Let's jump ahead to the next question, which is on page 8 of the transcript.  So if you go to page 8 and

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 73 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2975
Dr. Adam Werner
September 13, 2022

215

DR. A. WERNER

Shanghai facility was a negative surprise.

Can you show me where in this article they describe that announcement as a negative surprise?

A.   As I sit here today, I don't recall.  I think it may have had something to do with the deliveries, but I don't recall as I sit here today.

Q.   Doctor, I'm not asking you for your recollection.  You just read the article.

Does it describe the termination of the plan to construct the Shanghai facility as a negative surprise?

A.   Well, they talk about lower utilization.  I don't remember if at the point when I wrote this I was thinking there was a connection between the non-construction of the factory and their ability to produce more cars.

Q.   Sitting here today, do you have any basis to claim that there is such a connection?

A.   As I sit here today, no.

216

DR. A. WERNER

Q.    Okay.  So just to be clear, nothing in this article actually says that the termination of the plan to construct the facility was a negative surprise?

A.    I mean, I think my answer speaks for itself.  I don't know if your summary is correct.

Q.    Well, I'm not trying to summarize the document or your answer.  I'm just asking the question.  Does this article say that?

A.    Yeah, I refer to my previous answer about how I arrived at my opinion regarding this.

Q.    Well, this isn't an opinion. This is a factual assertion about what was said or wasn't said.

A.    Okay.

Q.    So does the article say that the termination of the plan to construct the Shanghai facility was a negative surprise?

A.    Again, I can't, as I sit here today, I don't recall if I made a connection between those two things.  If

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 75 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2977   Dr. Adam Werner
September 13, 2022

217

DR. A. WERNER

you're asking about it as my reading today, and I think I stated this, the answer to your question is no.

Q. Okay. And then if we look at the next sentence in subparagraph D of your declaration, same sentence that was in paragraph 71 where you say that reactions from the market participants continued on to the next trading day, right, and you cite another article here?

A. I did.

Q. And this is from the Motley Fool?

A. It is.

Q. And are you familiar with that publication, that website?

A. Yes, I am.

Q. Can you describe that website?

A. It's a website -- it's a website that publishes opinions about stocks and stock performance.

Q. Okay. I just sent around that article. So let me know when it comes through. I'll send it in the chat as well. This will be DX-26.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 76 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2978
Dr. Adam Werner
September 13, 2022

218

DR. A. WERNER

(Defendants' Exhibit 26, Article, "Why Shares of Chinese Electric Car Maker NIO Fell 47 Percent in March", remotely introduced and provided electronically to the reporter, as of this date.)

Q.    As always, Dr. Werner, just let me know when you get it and it's open.

A.    Sure.

Okay.

Q.    So Defendants' Exhibit 26 is an article from the Motley Fool titled, "Why Shares of Chinese Electric Car Maker NIO Fell 47 Percent in March."

Do you see that?

A.    I do.

Q.    Do you recognize this article?

A.    I do.

Q.    You've reviewed it before?

A.    At some point, yes.

Q.    And this is the article that is referenced in Footnote 74 of your report, right?

A.    That is correct.

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 77 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2979    Dr. Adam Werner
September 13, 2022

219

DR. A. WERNER

Q.   Now, this article is several pages long.  At the risk of drawing this out, I'd like you to read that article and point me to where it discusses the Shanghai facility.

A.   Before reading it, I can stop you right there.  When I was talking about this additional news, I wasn't specifically referring to the Shanghai facility.  I was referring to the conference call on the earnings release.

Q.   So when you say they continued, you weren't talking about the reactions to the termination of the plant to construct the Shanghai facility from the prior sentence in D, right?

A.   Correct.  I was inarticulate.  I apologize.

Q.   You were just referring broadly to reactions to the quarterly press release and conference call?

A.   Correct.

Q.   Okay.  All right.  Then you don't have to read that.  You can put that one

220

DR. A. WERNER

away.

Now, give me a minute.  We're going to look at a few documents and I'm just going to send them to you all at once to hopefully speed this up.

All right.  It just went through on my end.  Give it a minute and it should come through on yours.  It should be three attachments?

MR. SHI:  Should be how many attachments?

MR. GRIFFIN:  Three.

This is going to be Exhibit 27 which is going to be labeled Tab 67 in the e-mail that you receive.

(Defendants' Exhibit 27, 3/6/19 analyst report from JPMorgan, remotely introduced and provided electronically to the reporter, as of this date.)

MR. SHI:  Did you say Tab 6?

MR. GRIFFIN:  Yes, it should be a JP Morgan analyst report.

A.    Okay, I've got it.

Q.    Open that up.  Defendants'

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 79 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2981

Dr. Adam Werner
September 13, 2022

221

DR. A. WERNER

Exhibit 27 is an analyst report from JPMorgan dated March 6, 2019.

Dr. Werner, you've never seen this particular analyst report before, is that right?

A.    That is correct.

Q.    This is one of the reports following the alleged corrective disclosure that you were not able to obtain, is that right?

A.    People at my direction were not able to obtain it.

Q.    I'll represent to you that this is one of those analyst reports following the alleged corrective disclosure on March 5th.

So I'd like to direct your attention to the first paragraph there that starts "NIO's 2018 result."

Do you see that?

A.    I do.

Q.    It says, "NIO's 2018 result was broadly in line with expectations."  Then there's a semicolon.

222

DR. A. WERNER

Do you see that?

A.    Why do I not see the semicolon. Maybe because I'm going blind.

Q.    It's small. You might want to zoom in there. It's the small print.

A.    After "profitability"?

Q.    No. Why don't I throw this one up. It may be easier for you to follow along.

All right. Can you see this?

A.    I can.

Q.    Is it big enough? It doesn't look the same to me as it does to you, so let me know.

A.    It's plenty big.

Q.    Good. I'm just going to go ahead and highlight the portion that I'm looking at here.

So it says, "NIO's 2018 result was broadly in line with expectations; we see two important developments per MGMT guidance in 2019 that will lead to the company's stock performance and profitability: 1, on the positive side,

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 81 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2983

Dr. Adam Werner
September 13, 2022

223

DR. A. WERNER

potential termination of building a new wholly owned Shanghai plant and simply leveraging JAC's existing capacity.  This implies cost savings and better investment returns."

Do you see that?

A.    I do.

Q.    So JPMorgan actually characterized the termination of the Shanghai facility as a positive event, is that right?

A.    In this sentence, yes.

Q.    And then if we look down -- sorry, I started too early, there I just want to scroll.

If we scroll down here to the first bullet, it again discusses the Shanghai plants and it says, "On the Shanghai plant, we welcome the move to terminate the Greenfield expansion plan and simply utilize/expand existing capacity at JAC, subject to final regulatory approval in June.  If it materializes, we believe this will save Capex requirements by 20 to

224

DR. A. WERNER

30 percent and drive better ROIC and cash flow."

Do you see that?

A.    I do.

Q.    But once again, JPMorgan is expressing a positive opinion of the announcement regarding the Shanghai plant, correct?

A.    In this sentence, yes.

Q.    And as you mentioned before, you did not take into account this analyst report in your event study because you didn't have it, right?

A.    That is correct.

Q.    Would this have had any impact on your analysis?

A.    Well, again, to the extent that I'm looking at market efficiency and not loss causation or price impact, I don't believe it would have any impact on my conclusions.

Q.    Does this suggest that the information about the Shanghai plant was countervailing news, positive news, as

225

DR. A. WERNER

opposed to the negative news about the

company's financial results and projections

for demand?

    A.    Just looking at these two

statements without reading the entire

report, it seems to suggest that they might

be a positive impact on the company's stock

price.

         But again, this is why I made

that distinction earlier when I was talking

about the choice of event studies for

marketed efficiency.  Generally you try to

use clean events, but to the extent you're

talking about corrective disclosures you

obviously can't just use clean events,

you've got to use the corrective

disclosures.

    Q.    Let's look at the next of those

analyst reports.  I'll send it in the chat.

We're going to mark this one as Defendants'

Exhibit 29, and I'll pull it up on the

screen since that seems to be easier for

you doctor but it's in your e-mail if you

want to open it up.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 84 of 110
In Re: NIO Inc. Securities Litigation      PageID #: 2986      Dr. Adam Werner
September 13, 2022

226

DR. A. WERNER

A.    This is Exhibit 7, right?

Q.    Tab 7 is going to be Defendants'
Exhibit 28.

A.    This is the JPMorgan, or no?

Q.    This should be Morgan Stanley.

So again, I will share this with
you so we are all on the same page.

(Defendants' Exhibit 28, 3/7/19
analyst report from JPMorgan, remotely
introduced and provided electronically
to the reporter, as of this date.)

Q.    All right.  So we've marked as
Defendants' Exhibit 28 an analyst report
from Morgan Stanley dated March 7, 2019.

Again, you do not recognize this
analyst report, right?

A.    It is not something I reviewed
prior to seeing it now.

Q.    Okay.  I'm going to zoom out here
slightly.  Can you still read what's over
here?

A.    I'm looking at a Morgan Stanley
or JPMorgan -- let me focus on the screen
over here.

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 85 of 110
PageID #: 2987

In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

227

DR. A. WERNER

Q.    Fair enough.

Tab 7, if you open it up on your own but you can also just look on the screen here.

A.    Right.

Q.    So midway through the page, I'll highlight it again for you, it talks about the Shanghai factors.

Do you see that where I've highlighted?

A.    I do.

Q.    It says, "NIO has suspended its plan to build its own factory in Jia Ding, Shanghai.  Recent government policy encourages cooperation with JAC Motors. NIO plans to stick with the cooperation model for manufacturing and is open to seeking other partners.  Its current production base with JAC has 100K units of annual capacity and would be expanded to 150K after upgrades satisfying the need for its first three models in the next two to three years.  NIO believes it might still need to pay a small compensation to JAC in

228

DR. A. WERNER

1H-19 with relatively low delivery period.

We view the joint manufacturing mode as

positive.  It could save on Capex while

keeping sufficient capacity."

Do you see that?

A.    I do.

Q.    So like the JPMorgan analyst, the

Morgan Stanley analyst also viewed the

termination of the Shanghai facility plant

as a positive, correct?

A.    Well, again, without reading the

entire document, certainly that seems to be

the case with this particular sentence,

this particular paragraph.

Q.    Fair enough.  In this particular

paragraph they expressly say it was a

positive, right?

A.    Right.

Q.    All right.  We can put that one

down.  We've got one more here for you.

It's in the chat now labeled Tab 8,

Defendants' Exhibit 29.

(Defendants' Exhibit 29, 3/7/19

analyst report from Deutsche Bank

229

DR. A. WERNER

report, remotely introduced and

provided electronically to the

reporter, as of this date.)

A.    This is the Deutsche Bank report,

correct?

Q.    Exactly.  I have don't have to

share it if it's easier for you it look on

your screen, but I'm happy to.

A.    I think I'm okay.

Q.    Okay.  Then I will stop doing

that.  So Defendants' Exhibit 29 is an

analyst report from Deutsche Bank that's

dated March 7, 2019.  You do not recognize

this document, right?

A.    Correct, I have not seen this

document before.

Q.    Okay.  I'd like to direct your

attention to the second paragraph on the

first page that's titled, "Sticking To

Joint Manufacturing Model Will Help Cash

Flow."

Do you see that?

A.    I do.

Q.    Deutsche Bank writes, "In the

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 88 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 2990

Dr. Adam Werner
September 13, 2022

230

DR. A. WERNER

results announcement, NIO said it will no longer seek to build its own manufacturing plant in Shanghai and will further rely on the joint manufacturing operation with Jing Wei.  Considering the successful ramp-up of ESH production in FY-18, we think that NIO's current production business model will not hinder the original sales outlook. Indeed, we view this more flexible option with potentially lower Capex outlay for the company in the next few years."

Do you see that?

A.    I do.

Q.    So, again, this paragraph seems to indicate that Deutsche Bank viewed the termination of the Shanghai facility plan as a positive development, right?

A.    Well, at a minimum, it's expressing the opinion that it's not going to pose an impediment to previous estimates.

Q.    And, in fact, it says that it will be more flexible, will have lower potential Capex, capital expenditure, and

231

DR. A. WERNER

will help cash flow, right?

    A.    That is what it says, yes, correct.

    Q.    And all else being equal, those would generally be positive developments, right?

    A.    Generally, for corporate -- I mean, I can't speak to this particular example, but generally I think that could be thought of as a positive.

    Q.    Okay.  You could put that one down as well.

          Now, in addition to the Cammer factors, you also analyzed the so-called Unger/Krogman factors, correct?

    A.    Correct.

    Q.    U-N-G-E-R/K-R-O-G-M-A-N, correct?

    A.    Correct.

    Q.    What are the three Unger/Krogman factors?

    A.    So it's bid/ask spread, the float and market capitalization.

    Q.    And you indicated that -- or strike that.

232

DR. A. WERNER

It's your opinion in this case that each of those factors supports a finding of market efficiency for NIO's ADS, correct?

A.    That is correct.

Q.    Are any one of those factors independently sufficient to establish market efficiency?

A.    Independently sufficient?

Q.    Correct.

A.    So if I just -- if I knew nothing about a company and I saw that it was big, would that be sufficient to determine market efficiency?

MR. SHI:  Let me interpose an objection.  Objection to the extent that it calls for a legal conclusion.

Go ahead.

A.    Again, with all the caveats that I gave before, that's not something -- I mean, no one's actually ever asked me that question.  In general, do I see large corporations trading in efficient markets? Yeah, generally.  But again, it's not

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 91 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2993

Dr. Adam Werner
September 13, 2022

236

DR. A. WERNER

What is your understanding of an autocorrelation test in connection with assessing market efficiency?

A.    I would say it's something I've seen used before, but not in a long time.

Q.    But what is it?

A.    Well, it's basically asking the question if past stock price movements are correlated with future stock price movement.

Q.    And how is that relevant to the market efficiency assessment?

A.    How is that relevant or irrelevant?

Q.    Either.

A.    Which question do you want me to answer?

Q.    What effect, if any, does it have on your opinion as to whether a market is efficient?

A.    Well, again, so we see cases where stocks are efficient, but there is autocorrelation between -- or autocorrelation is found and often occurs

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 92 of 110
PageID #: 2994

In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

237

DR. A. WERNER

when you have multiple days with large

stock price movements.  That's generally

why people stopped looking at

autocorrelation coefficients in determining

market efficiency.

Q.    Have you ever looked at

autocorrelation to assess market

efficiency?

A.    Many years ago.

Q.    And you did not conduct an

autocorrelation test in this case, right?

A.    I did not.

Q.    Why not?

A.    For the reasons I just explained.

Q.    Can you explain them again

specifically why you didn't apply that test

in this case?

A.    Yeah, because autocorrelation is

not necessarily an indicator of

inefficiency.  And I'll refer back to the

other examples I gave you where a stock can

be efficient, but you'll have

autocorrelation.

Q.    Do you have any idea if there was

238

DR. A. WERNER

autocorrelation for NIO's ADS here?

A.     I do not.

MR. GRIFFIN:  All right.  I've got a bit more.  Do you want to take another break here?

THE WITNESS:  Sure.  Do you want to come back at, I guess, 5:05 your time?

MR. GRIFFIN:  Yeah, that works.

THE WITNESS:  All right.

MR. GRIFFIN:  Great.  Thank you.

THE VIDEOGRAPHER:  We are off the record at 1:55 p.m.

(Recess taken from 1:55 p.m. 2:10 p.m. PT)

THE VIDEOGRAPHER:  We are back on the record at 2:10 p.m.

BY MR. GRIFFIN:

Q.   All right.  Dr. Werner, let's turn to your second opinion.  You mentioned that your second opinion in this case, and I'm looking at paragraph 99 on page 37 of your report, your second opinion was that, "With expert assistance the finder of fact

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 94 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 2996
Dr. Adam Werner
September 13, 2022

239

DR. A. WERNER

in this matter will be able to compute

damages using a common class-wide

methodology that applies to the calculation

of damages for each and every class

member."  Correct?

    A.   I just got there, but it sounds

like what I wrote.

    Q.   And that is your opinion, right?

    A.   Well, okay.  Now that I have it

in front of me, why don't you reread it

so -- just to make sure we're on the same

page.

    Q.   Sure.  You say in paragraph 99,

"I also --"

    A.   Hold on.

    Q.   Page 37, not paragraph 37.  It's

the very end of your -- it's your

conclusions.

    A.   Okay, yes, yeah.

    Q.   So you list your second

conclusion in '99 as I also conclude that

with expert assistance the finder of fact

in this matter will be able to compute

damages using a common class-wide

240

DR. A. WERNER

methodology that applies to the calculation of damages for each and every member -- each and every class member, excuse me. Correct?

A.    Correct.

Q.    And that opinion applies to damages under Section 10b as well as Section 11, correct?

A.    Correct.

Q.    Now, if you turn to page 32, just a few back, your analysis of class-wide damages with respect to the 10b claim starts in paragraph 91, correct?

A.    That is correct.

Q.    And you start by saying, "Nonetheless, the methodology of financial economists can employ to calculate individual and class-wide damages stemming from various alleged misrepresentations and omissions will accommodate alternative potential determinations of liability."

Do you see that?

A.    I do.

Q.    What does "nonetheless" refer to

241

DR. A. WERNER

at the start of that paragraph?

A.    Yeah, that's an excellent question.  That should probably not -- as I sit here today, I don't know.  Probably shouldn't be there.

Q.    Is this one of those paragraphs that you would copy from a prior report or declaration?

A.    It's certainly similar to some of the things that appeared in my previous reports.

Q.    Do you know, one way or another, if you drafted this paragraph for this declaration or copied it from a prior?

A.    I don't.  I only say that because of the word "nonetheless."  So no, I don't know one way or the other.

Q.    Okay.  What do you mean when you reference alternative potential determinations of liability here?

A.    Well, I mean, I haven't looked at -- fact discovery is still ongoing in this case.  So, you know, if someone says or the Court finds that 100 percent of the

242

DR. A. WERNER

abnormal return is a result of the alleged

fraud or 50 percent based on the

information -- so that's -- I mean, I guess

that's what I mean by alternative potential

determination liability, the extent --

among other things, the extent of the

liability.

Q.    Okay.  And then if we look at --

same paragraph, but on the next page.  Do

you see the second line from the top begins

as such?

A.    Yes.

Q.    And you say, "Class-Wide damages

in response to the specific

misrepresentations and omissions ultimately

established by the Plaintiffs can be

calculated in a straightforward manner

common to all class members."  Correct?

A.    That's a correct reading, yes.

Q.    And it's your opinion that

calculating damages would be

straightforward in this case?

A.    I believe there's a framework

that's commonly used in these types of

245

DR. A. WERNER

A.     It's similar to the methodology that I've used in hundreds of cases to estimate damages in a securities class action.

Q.     Okay.  And you --

A.     I mean.

Q.     Go ahead.

A.     I mean, go to paragraph 92.  That lays out what I believe is a straightforward methodology in calculating 10b5 damages.

Q.     Okay.  And so the first step of this straightforward calculation is to determine whether the alleged misrepresentations and omissions had caused the security price to be artificially inflated, right?

A.     Where are you reading from?

Q.     Where you say first in little Romanette 1 in paragraph 92.

A.     Valuation tools, which would include an event study analysis such as that described herein, and potentially other empirical analyses, if necessary,

246

DR. A. WERNER

would be used to establish if the disclosures correcting the alleged misrepresentations and omissions caused the price of NIO's ADS to fall.

Q.   So step one is determining whether or not the disclosures correcting the alleged misrepresentations and omissions caused the price of NIO's ADS to fall, correct?

A.   Generally -- again, generally that is true.

Q.   And in order to do that, as you note here, you would have to control for potentially confounding non-fraud-related information, right?

A.   That is correct.

Q.   How would you do that in this case?

A.   That's not something as of this point in time I've been asked to do.  I mean certainly that's why you look at things like -- that's why I include an industry index, that's why I include a market index.  So that's certainly one way,

247

DR. A. WERNER

in general, that we do this type of thing.

But more specifically, that's not something I've been asked to opine upon or do at this point in time.

Q.   But this, generally, would involve disaggregating, you know, potential price impacts from various causes, right?

A.   That certainly could be one of the things you might have to do.

Q.   For example, you know, we discussed earlier that the alleged corrective disclosures here that press release and earnings call contained a variety of information that had nothing to do with the Shanghai facility, correct?

A.   I'm sorry, could you repeat the question?

Q.   Sure.  The two alleged corrective disclosures that we discussed earlier in this case are that press release and the conference call in connection with the fourth quarter full year 2018 earnings, right?

A.   I believe that's year.

Case 1:19-cv-01424-NGG-JRC    Document 121-21    Filed 12/23/22    Page 101 of 110
In Re: NIO Inc. Securities Litigation    PageID #: 3003    Dr. Adam Werner
September 13, 2022

248

DR. A. WERNER

Q.    And as we discussed earlier, both of those documents -- or excuse me, the transcript for the call and the press release discussed a variety of topics and information in addition to the Shanghai facility, right?

A.    I believe that's accurate.

Q.    And Plaintiffs in this case don't currently contend that any of that other information not pertaining to the Shanghai facility was a corrective disclosure, right?

A.    Again, for the purposes of this market efficiency report and providing a general damage methodology, that's not anything I've thought about up until this point.

Q.    Given your familiarity with Plaintiff's allegations in this case, you don't know, sitting here right now, whether they contend that any information in the fourth quarter 2018 press release and accompanying earnings call was a corrective disclosure other than that regarding the

272

DR. A. WERNER

What are you asking me about?

Q.     Have you reviewed Plaintiff's Motion for Class Certification?

A.     I refer to my previous answer and as of today, since the writing of this report, I don't know one way or the other.

Q.     You don't know if you have reviewed the motion for class certification since you wrote your report?

A.     That is correct.

Q.     Okay.  The next category of documents you list here are news articles and press releases, right, in Exhibit 2 to your declaration?

A.     Correct.

Q.     And this references 494 articles from September 12, 2018 to March 5, 2020, correct?

A.     That is correct.

Q.     That's a broader date range than the relevant period, right?

A.     That is correct.

Q.     And why did you use that particular time period?

273

DR. A. WERNER

A.    Well, typically regardless of what period or relevant period I'm looking at, I'll look at all articles, documentation from the beginning of the class period to the end of the class period.

So I guess the easier way to put it is what I commonly do.

Q.    Why you stop at March 5, 2020?

A.    If I remember correctly -- hold on one second, that's typically what I would do in this type of case.

Q.    You would always stop on March 5, 2020?

A.    No.

Q.    Sorry.  When you say this is what you would typically do, what did you mean by that?

A.    Well, typically, I'd go out a year out from the end of the class period in doing my news article search.

Q.    Okay, I understand.

Then, in the second bullet point you reference a particular Bloomberg news

Case 1:19-cv-01424-NGG-JRC   Document 121-21   Filed 12/23/22   Page 104 of 110
In Re: NIO Inc. Securities Litigation   PageID #: 3006

Dr. Adam Werner
September 13, 2022

274

DR. A. WERNER

article.  That's the article that we looked at earlier today, right?

A.    That is correct.

Q.    Why did you list that particular article by name here and no others?

A.    Because I referenced it in the report.

Q.    You referenced other articles directly in the report as well, right?

A.    I believe so.  Okay, so maybe the more accurate -- I don't recall as I sit here today.

Q.    Okay.  And then you list all of the analyst reports that you reviewed, which we discussed earlier, right?

A.    Correct.

Q.    And then you list SEC filings from NIO that you reviewed, right?

A.    Correct.

Q.    The Form 6K from March 6, 2019 that we reviewed earlier is not in this list, is that right?

A.    Let's see.  I don't see it, which is why I always include this other category

275

DR. A. WERNER

at the end of this exhibit, which says other documents cited in my report.  So obviously I've cited to that in my report.  So it's something that I considered.

Q.   So it was just an oversight to not list it specifically in the SEC filings list?

A.   Correct.

Q.   Okay.  Can you turn back to page 2 of your declaration?

A.   I'm sorry, page 2, correct?

Q.   Page 2, correct, paragraph 7, bottom of the page, talking about your comp.

A.   Okay.

Q.   You write that, "Crowninshield is currently being compensated at $675 per hour for my ongoing work on this matter."  Correct?

A.   Correct.

Q.   How much are you being compensated for your work on this matter?

A.   Based on that rate I think it's around 82 percent of that rate.  I don't

276

DR. A. WERNER

know the exact proportion.

Q.    Why did you list what Crowninshield is being compensated as opposed to what your being compensated?

A.    What I commonly do.

Q.    Did anyone instruct you to do that?

A.    Fifteen years ago did someone instruct me to do that?  I don't recall.

Q.    No one instructed you to do that?

A.    I'm sorry, what?

Q.    No one instructed you in this case specifically to list Crowninshield's compensation as opposed to your own, right?

A.    That is correct.

Q.    Okay.  And then you reference additional Crowninshield consultants.  Is that the three individuals we discussed earlier?

A.    It is.

Q.    Okay.  Do you know how much Crowninshield has been paid to date in connection with this matter?

A.    I do not.

286

DR. A. WERNER

that okay with you?

MR. GRIFFIN:  Yeah, whatever works for you.  Whatever you need to do, that's fine.

THE WITNESS:  Okay.  All right.

MR. GRIFFIN:  Thank you.

THE VIDEOGRAPHER:  We are off the record at 3:03 p.m.

(Recess taken from 3:03 p.m. to 3:13 p.m. PT)

THE VIDEOGRAPHER:  We are back on the record at 3:13 p.m.

MR. GRIFFIN:  We have no further questions at this time.

MR. SHI:  Okay.  So let us -- let me caucus with folks on my side for a bit and let's -- can you guys hear me?

MR. GRIFFIN:  Yes.

MR. SHI:  Yeah.  So give us five minutes or so and we'll be back.

MR. GRIFFIN:  Okay.

THE VIDEOGRAPHER:  One moment. We are off the record at 3:13 p.m.

(Recess taken from 3:13 p.m. to

287

DR. A. WERNER

3:19 p.m. PT)

THE VIDEOGRAPHER:  We are back on the record at 3:19 p.m.

EXAMINATION BY

MR. SHI:

Q.   Dr. Werner, I believe earlier today you testified that NIO sells cars in the U.S?

Do you remember that?

A.   I do believe I said that, yes.  I should have said my understanding is they intend to sell cars in the U.S.

MR. SHI:  Okay.  We have no further questions.

FURTHER EXAMINATION

BY MR. GRIFFIN:

Q.   Very briefly, Dr. Werner, it's your understanding that NIO did not sell any cars in the U.S. during the relevant period, is that right?

A.   That is correct.

Q.   Does that change at all your opinion as to whether the S&P 500 Automobile Manufacturers Index was an

288

DR. A. WERNER

appropriate industry index in this case?

   A.    It does not.

       MR. GRIFFIN:  Okay.  We have

   nothing further.

       MR. SHI:  We don't have anything

   further either.

       THE VIDEOGRAPHER:  Okay.  This

   concludes the video deposition of Adam

   Werner.  Going off the record at 3:20

   p.m. Pacific Time.

         (Time noted:  3:20 p.m. PT)




                    _____

                    DR. ADAM WERNER


Subscribed and sworn to before me

this ___ day of _____, 2022.


_____

289

C E R T I F I C A T E

STATE OF NEW YORK      )

                              : ss.

COUNTY OF NEW YORK     )


                I, Joan Ferrara, a Notary Public within and for the State of New York, do hereby certify:

                That DR. ADAM WERNER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition was taken remotely and is a true record of the testimony given by the witness.

                I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

                IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of September, 2022.

                                _____

                                Joan Ferrara