**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re NIO, Inc. Securities Litigation* | Case No: 1:19-cv-01424-NGG-JRC |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   THE STATUTE OF REPOSE DOES NOT BAR CLASS CERTIFICATION ....................... 2

III.  DEFENDANTS DO NOT CREDIBLY CHALLENGE MARKET EFFICIENCY ............... 4

      A.  Dr. Werner Designed an Appropriate Event Study ...................................... 4

      B.  A Proper News/No News Test Shows Market Efficiency .............................. 6

      C.  The S&P 500 Automotive Manufacturers Index Is an Appropriate Index ........... 8

      D.  Dr. Sabry's Autocorrelation Test was Not Conducted on the Subclass Period, Rendering Its Results Irrelevant ................................................................. 9

      E.  NIO Satisfied the Fourth *Cammer* Factor: Ability to File a Form S-3 ............. 9

      F.  Demonstrating the Fifth *Cammer* Factor, Cause and Effect, Is Not Required When Other *Cammer* and *Krogman* Factors are Satisfied .................................. 10

IV.   DEFENDANTS DO NOT CARRY THEIR BURDEN TO PROVE NO PRICE IMPACT .. 11

      A.  Dr. Sabry Did Not Evaluate Whether the Misrepresentations and Omissions Had an Impact on NIO's Share Price Valuation in the IPO ......................................... 11

      B.  Defendants Cannot Sever the Link Between Their Misrepresentations and Omissions and NIO's Corrective Disclosure That it Is Terminating Its Plans for the Shanghai Facility .... 13

      1.  Construction status was not readily available to the public. ........................... 13

      2.  The March 5 "termination" of the factory plan was a corrective disclosure ........... 14

      3.  The analyst reports cited by Dr. Sabry are not persuasive evidence that NIO's price decline was unrelated to the Shanghai Facility termination ........................... 16

      4.  Tainted by conflict of interest, the analyst reports must be discounted ............... 17

      5.  Dr. Werner's Rebuttal Report shows that NIO's termination announcement caused a price decline, demonstrating price impact. .............................................. 20

V.    DR. WERNER'S PRELIMINARY MODEL OF §10(b) DAMAGES SATISFIES *COMCAST'S* MODEST REQUIREMENTS ........................................................... 20

VI.   MUNDY AND HUANG ARE ADEQUATE CLASS REPRESENTATIVES ................... 22

i

VII. MUNDY AND HUANG ARE TYPICAL OF THE INVESTORS THEY SEEK TO REPRESENT ................................................................................................................ 23

VIII. CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
2022 WL 3597200 (E.D. Pa. Aug. 23, 2022) ........................................................... 6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................................................................................... 16, 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) ............................................................................. 22

*Bell v. Ascendant Sols., Inc.*,
422 F.3d 307 (5th Cir. 2005) .......................................................................... 6

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .................................................................... 4

*Boston Ret. Sys. v. Uber Techs., Inc.*,
2022 WL 2954937 (N.D. Cal. July 26, 2022) ................................................. 21

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
198 L. Ed. 2d 584, 137 S. Ct. 2042 (2017) .................................................... 3

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................... 9, 10

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................... 11

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014) ............................................................................................ 3

*Fogarazzao v. Lehman Bros.*,
341 F. Supp. 2d 274 (S.D.N.Y. 2004) ............................................................ 20

*Första AP-Fonden v. St. Jude Med., Inc.*,
312 F.R.D. 511 (D. Minn. 2015) ................................................................... 4, 5

*Garfinkel v. Memory Metals, Inc.*,
695 F. Supp. 1397 (D. Conn. 1988) ............................................................... 25

*George v. China Auto. Sys., Inc.*,
2013 WL 3357170 & n.12 (S.D.N.Y. July 3, 2013) ........................................ 6

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
210 L. Ed. 2d 347, 141 S. Ct. 1951 (2021) ........................................................... 11, 15

*Gould v. Winstar Commc'ns, Inc.*,
692 F.3d 148 (2d Cir. 2012) .................................................................................. 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .............................................................................................. 11

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ........................................................ 10, 11

*In re Allied-Signal, Inc.*,
915 F.2d 190 (6th Cir. 1990) .................................................................................. 3

*In re AMF Bowling Sec. Litig.*,
2002 WL 461513 (S.D.N.Y. Mar. 26, 2002) .......................................................... 24

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020) ............................................................................ 16

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ........................................................ 17

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 3620590 (S.D. Tex. Aug. 23, 2017) ....................................................... 3

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) .......................................................................... 9

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .......................................................................... 21

*In re Glob. Brokerage, Inc.*,
2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ....................................................... 21

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
579 F. Supp. 3d 520 (S.D.N.Y. 2021) ................................................................... 15

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009) .......................................................................... 24

*In re Indep. Energy Holdings PLC Sec. Litig.*,
210 F.R.D. 476 (S.D.N.Y. 2002) .......................................................................... 23

*In re NIO, Inc. Sec. Litig.*,
   2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021) ................................................................. 15

*In re Parmalat Sec. Litig.*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ................................................................. 24

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................................. 22, 25

*In re PolyMedica Corp. Sec. Litig.*,
   453 F. Supp. 2d 260 (D. Mass. 2006) ........................................................................... 6, 9

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
   571 F. Supp. 2d 1315 (N.D. Ga. 2007) ............................................................................. 4

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ..................................................... 10, 15, 17

*In re SunEdison, Inc. Sec. Litig.*,
   329 F.R.D. 124 (S.D.N.Y. 2019) ...................................................................................... 3

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ....................................................................... 5

*In re Vale S.A. Sec. Litig.*,
   2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ................................................................ 15

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ................................................................... 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) ........................................................................................... 22

*In re Winstar Comm'ns. Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ...................................................................................... 5

*In re: Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) .................................................................................... 22

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ....................................................................... 17, 18

*Li v. Aeterna Zentaris, Inc.*,
   324 F.R.D. 331 (D.N.J. 2018) ........................................................................................ 24

v

*Loritz v. Exide Techs*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ............................................................. 24

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) .............................................................. 4, 5

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) .......................................................................... 5

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ............................................................................... 21

*Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ..................................................................... 4, 8, 10

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016) ............................................................ 21

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................ 17, 25

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ....................................................................... 17, 21, 25

*Randle v. Spectran*,
  129 F.R.D. 386 (D. Mass. 1988) ............................................................................. 25

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) .................................................................................... 21

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................................... 15

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................. 9

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ............................................................ 4, 8

*Waggoner v. Barclays PLC,*
  875 F.3d 79 (2d Cir. 2017) ........................................................................... 10, 16, 21

*Wagner v. Barrick Gold Corp.*,
  251 F.R.D. 112 (S.D.N.Y. 2008) ............................................................................. 22

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ........................................................................... 4

**Statutes**

15 U.S.C. §77m ............................................................................................................................ 2

**Rules**

Fed. R. Civ. P. 7 .......................................................................................................................... 3

## I.     **INTRODUCTION**

NIO's Registration Statement[1] for its September 12, 2018 IPO falsely stated that its new manufacturing plant in Shanghai ("Shanghai Facility") "is currently being constructed by relevant Shanghai authorities."[2] On the strength of that representation, and the omission that the Shanghai Facility would not come to fruition unless NIO's revenues and cash flow was sufficient to support the full build out, NIO's IPO raised $1.1 billion in U.S. capital markets. Six months later, when NIO announced it was going to "terminate the plan" for the Shanghai Facility, its share price fell 30%. Defendants have all been caught in misrepresentations and omissions of their own making,[3] the proof of which is ideal for classwide determination.

Defendants oppose class certification by: (1) raising a spurious statute of repose argument to the §11 claim because class certification will not occur within three years of NIO's IPO; (2)

---

[1] Unless otherwise indicated, all capitalized terms have the same meaning as defined in the Second Amended Complaint for Violation of the Federal Securities Laws ("Complaint," ECF No. 67) and in Plaintiffs' opening brief (ECF No. 120-1).

[2] The "evidence" that construction began on March 28, 2018, six months before the IPO, is a ceremonial groundbreaking photo (created with Adobe Photoshop and timestamped 6:12 a.m.), with smiling people in hard hats standing together – many in suits – each with a shovel full of dirt, with a few pieces of construction equipment behind them. Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Br.") at 5; Ex. D to Declaration of Robert A. Fumerton in Support of Defendants' Opposition ("Def. Ex."). However, a March 2019 environmental impact report stated that the Shanghai Facility site was vacant and agricultural land, and that construction was scheduled to begin in July 2019. Declaration of Laurence Rosen in Further Support of Plaintiffs' Motion for Class Certification ("Rosen Decl."), Ex. 1.

[3] An earlier draft of the strategies section of the Registration Statement stated: "We also **plan to build** our own manufacturing facility in Shanghai…" Rosen Decl. Ex. 2 at UW_MS_00000007 and UW_MS_00000015(emphasis added). Aware of the importance to investors of NIO not relying on a small company, JAC Motors, for its car production, a Citigroup investment banker asked: "Can we provide more clarity on timing, regulatory approvals obtained, Government subsidies for plant (any information that gives investors more comfort on progress)." *Id.* Ex. 3 at UW_MS_00001666 (Mar. 10, 2018, email quoting Citigroup inquiry). Morgan Stanley's Angel Chen replied: "Arthur's comment is just 'Agree, we should say started to build.' So **I changed the wording to 'started to build' instead of plan to build**. But for the clarity on regulatory approvals obtained, subsidies for plant, etc., I don't think we have relevant information to provide here." *Id.* (emphasis added).

1

disputing market efficiency on the §10(b) claim despite satisfaction of the *Cammer* and *Krogman* factors; and (3) claiming no price impact when NIO announced termination of its Shanghai Facility project because (a) it was not a mirror image correction, to wit, "construction never started in the first place," and (b) the abandonment of the Shanghai Facility – for which $239 million of the IPO funds was committed to outfitting – was actually good news because analysts employed by NIO's underwriters noted that not opening the touted factory allowed NIO to keep costs down. If investors did not care about scrapping the Shanghai Facility, NIO would not have falsely claimed it was due to a new government policy recognizing the joint manufacturing model.[4] NIO was already collaborating with JAC Motors, and the new policy by no means prohibited NIO from building its own factory, while also maintaining its joint manufacturing relationship with JAC Motors as originally planned.

Unable to wish away class certification on the §11 claim as time-barred or seriously attack Rule 23(b)(3) predominance on the §10(b) claim, Defendants take tired pot shots at the proposed class representatives, even cynically suggesting that two people with different native tongues cannot coordinate management of the case. None of their shots are even close to fatal.

## II.    THE STATUTE OF REPOSE DOES NOT BAR CLASS CERTIFICATION

Defendants' argument that the statute of repose bars certification of a Securities Act Class (Def. Br. 17-19) is a nonstarter: There is no authority holding that a class must be certified, or that a motion for class certification must be made, prior to the expiration of the statute of repose.

---

[4] Prior to the IPO, CFO Hsieh told the Underwriters that NIO was considering postponing building the Shanghai Facility. Rosen Decl., Ex. 5. But the Underwriters knew that NIO's reliance on JAC was a major obstacle to a successful IPO, (Rosen Decl., Ex. 6); therefore, in road show meetings with investors, NIO touted the new factory to assuage investors' concerns about JAC. *Id.* Ex. 7 at pg. 7,8, 19-21. In fact, despite raising $239 million in the IPO to equip the government-built Shanghai Facility, analysts, the media and NIO employees indicated NIO did not have the money to follow through and open the plant. Complaint at ¶¶69-74.

15 U.S.C. §77m provides: "In no event shall any…***action be brought*** to enforce a liability…more than three years after the security was bona fide offered to the public[.]" (emphasis supplied). As the Supreme Court has clearly explained, "[a] statute of repose…puts an outer limit on the right to bring a civil action" and "[s]tatutes of repose…encourage plaintiffs to bring actions in a timely manner." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8-9 (2014). "Of course, it need hardly be stated here that under Rule 7 of the Federal Rules of Civil Procedure, an action is commenced with the filing of a complaint rather than a motion." *In re Allied-Signal, Inc.*, 915 F.2d 190, 192 (6th Cir. 1990). This action was commenced within the three-year statute of repose.

Defendants' argument is based upon a flawed reading of *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 198 L. Ed. 2d 584, 137 S. Ct. 2042, 2047 (2017) ("*CalPERS*"), wherein an opt-out plaintiff was barred from bringing a new action against the defendants after the statute of repose had lapsed. An effort to extend *CalPERS* to the class certification motion in a timely filed putative class action was flatly rejected in *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 145 (S.D.N.Y. 2019): "That the timeliness of an absent class member's claim is measured from the date that the class representative filed suit, rather than, for example, the date of the Court's certification order, does no offense to the three-year repose period." The *SunEdison* court further held that *CalPERS* did not "disturb *American Pipe*'s holding that 'the filing of a timely class action complaint commences the action for all members of the class as subsequently determined.'" *Id.*

The court in *In re Cobalt Int'l Energy, Inc. Sec. Litig.,* 2017 WL 3620590, at \*3 (S.D. Tex. Aug. 23, 2017) reached a similar conclusion:

> In *CalPERS*….the majority and dissenting opinions both rely on a presumption that the plaintiff was a proper class member and could have pursued his claims as a member of the class even though the class was not certified within the statute of repose. As a result, there is nothing in the *CalPERS* decision that suggests a timely-filed class "action" does not satisfy the statute of repose for class members who do not opt out…[or] that suggests class certification in a timely-filed putative class action is precluded once the statute of repose expires.

3

Defendants' statute of repose argument has no merit and should be summarily rejected.[5]

## III.    <u>DEFENDANTS DO NOT CREDIBLY CHALLENGE MARKET EFFICIENCY</u>

Where a defendant's expert "does not opine that the market...was not efficient..., the Court affords his affidavit little weight." *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340 (N.D. Ga. 2007).[6] Here, Dr. Sabry did not conclude that NIO ADSs traded in an inefficient market. *See* Rosen Decl., Ex. 8, transcript excerpts from the deposition of Faten Sabry, at 6:15-19 ("Sabry Tr."). This is not surprising as Defendants contest only two of eight factors used to assess market efficiency. *See* Pls.' Opening Br. at 12-17 (showing compliance with *Cammer* and *Krogman* factors). Neither their challenge of NIO share price's responsiveness to news nor NIO's purported ineligibility to file a Form F-3 from October 8, 2018, to March 5, 2019, the §10(b) subclass period ("Subclass Period") has merit.

### A.    Dr. Werner Designed an Appropriate Event Study

Defendants attack Dr. Werner's selection of four news events for his Subclass Period event study as "arbitrary."  Def. Br. at 11. However, "whether or not a particular day in the Class Period was a 'news' day … [is an] aspect of an event study [that] necessarily requires a researcher to make an independent determination." *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 163 (S.D.N.Y. 2012). An analysis of "events on which company-specific information was released that is new, unexpected, not confounded by major countervailing news, and is of such import as to

---

[5] Defendants try to distinguish *SunEdison* and *Cobalt* by arguing that those motions for class certification were filed before the expiration of the statute of repose. Def. Br. at 19 n.13. But what matters is when the ***action*** was brought.

[6] *See also Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 387 (N.D. Ga. 2019); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016) (expert did not "tr[y] to show that the market for DFC Global stock was inefficient."); *cf. Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 521 (D. Minn. 2015) ("Notably, Defendants' expert did not opine that Dr. Tabak's analyses proved inefficiency").

reasonably be expected to elicit a security price reaction over the threshold for statistical significance" (Werner Decl. ¶48),[7] is an appropriate selection method, *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at \*15-16 (S.D.N.Y. Feb. 3, 2022), even if other potential event dates are excluded. *See Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at \*14 (S.D.N.Y. Aug. 13, 2018). Consequently, Dr. Werner's examining the Subclass Period and classifying news dates as potentially material for inclusion in an event study "was sufficiently reliable, objective, and consistent with scientific principles." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014).

Defendants incorrectly complain that only one of three events studied caused a statistically significant share price change. Def. Br. at 11. Dr. Sabry excludes the March 5, 2019 corrective disclosure that is clearly within the Subclass Period. Thus, two of the four events had a statistically-significant price reaction. Werner Rebuttal ¶¶31-3.[8] Moreover, because NIO's financial results were consistent with analysts' expectations, the November 6, 2018 earnings release (appropriately) did not cause a statistically significant price reaction. Werner Decl. at ¶¶47-48, 65-67. For that reason courts often find market efficiency where less than half of the study's event dates have statistically- significant price movements. *St. Jude Med.*, *supra id.* (efficiency found where company's stock responded to news on 36.4% of dates); *In re Winstar Comm'ns. Sec. Litig.*, 290 F.R.D. 437, 448-49 (S.D.N.Y. 2013) (movement on two of five days sufficient).[9]

Nor was it necessary for Dr. Werner to select more than four event dates. "Defendants fail

---

[7] "Werner Decl." refers to the Declaration of Dr. Werner, dated June 21, 2022, filed with Plaintiffs' opening papers (ECF No. 120-3).

[8] "Werner Rebuttal" refers to the Rebuttal Declaration of Dr. Adam Werner, dated December 23, 2022, filed herewith as Ex. 9 to the Rosen Decl.

[9] Cherry-picking dates to ensure a high percentage of statistically-significant days is not scientific. As Dr. Sabry testified, "[t]he selection has to be objective and from an *ex ante* perspective" to avoid "using hindsight bias to select certain dates and not others." Sabry Tr. 37:7-8

to identify any authority holding that an event study must evaluate a minimum number of dates to be reliable (or even probative), and the Court decline[] to adopt such a baseline." *Martinek* at \*16 (three event dates, including final corrective disclosure, held adequate). That two of the four event dates Dr. Werner selected were earnings announcements, one of which was the March 5 corrective disclosure, is an accepted practice. Werner Decl. ¶50. *See  In re Teva Sec. Litig*., 2021 WL 872156, at \*33 (D. Conn. Mar. 9, 2021). Thus, criticism of selection of the earnings announcement on the last day of the Subclass Period (Sabry Decl. at ¶36)[10] is not well taken. Nor is the related complaint that Dr. Werner analyzed the market reaction to the March 5 news on both March 6 and 7, dates outside the Relevant Period. *Id.* Not only was the news released after close of trading on March 5 but, as one court in the 3rd  Circuit explained: "Courts in other circuits have also allowed plaintiffs to show price impact beyond a one-day or same-day window.  *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 2022 WL 3597200, at \*5 (E.D. Pa. Aug. 23, 2022) (courts in 1st, 2nd, 3rd, 6th, 9th and 11th Circuits allow several-day reaction windows).

### B.      A Proper News/No News Test Shows Market Efficiency

Dr. Sabry made several serious errors in her news/no news test.  Correction of these errors results in the test showing a statistically-significant cause-and-effect relationship between news and NIO's share price movements.[11]  Dr. Werner explains:

---

[10] "Sabry Decl." refers to the Declaration of Faten Sabry submitted with Defendants' opposition.
[11] The news/no news cases cited by Defendants (Def. Br. at 11) are inapposite.  In *George v. China Auto. Sys., Inc.,* 2013 WL 3357170, at \*11-12 & n.12 (S.D.N.Y. July 3, 2013), investors' expert did not investigate the days which did not have statistically-significant returns to insure they were, in fact, "no news" days and thus no statistically-significant price movement was consistent with his opinion.  Here, Dr. Werner evaluated whether it was reasonable to conclude the news was not material enough on two days to cause a statistically-significant price movement. Werner Decl. ¶¶65-70 (Nov. 6 earnings in line with market expectations; Nov. 30 announcement of division head's resignation "did not affect the market's perception of the Company's ability to operate and deliver on its goals"). In *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005), the court found news/no news analysis flawed and that the single share price decline on the corrective disclosure was "plainly insufficient by itself to show market efficiency." Here, multiple days were

6

First, Dr. Sabry erroneously excludes the March 5, 2019 (after the close of trading) news event from her collective test. That day, NIO issued a press release in which it announced its Q4 and FY 2018 financial results, as well as information that it had terminated its plan for constructing the Shanghai Facility. Dr. Sabry makes clear that her selection criteria is the filing of a Form 6-K where the information is made public during the Relevant Period…. She further agrees that the appropriate testing date for information that is released after the close of trading, is the following trading day. Had she followed her own test design, Dr. Sabry should have included the March 5, 2019, information event in her collective test.

Dr. Sabry's event selection criteria also ignores other "news" dates during the Relevant Period … . For example, on Sunday, February 24, 2019, CBS's 60 Minutes program ran a feature on NIO, in which it described NIO as the "Tesla Killer." The segment was accompanied by a favorable article from CBS. The following day, news media noted that this favorable coverage was a positive development for NIO, and stated that this feature impacted NIO's stock price.

Werner Rebuttal at ¶¶23-24. If Dr. Sabry had included these "news" dates in her Z-test, it would have demonstrated a [statistically significant] "cause and effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period." Werner Rebuttal at ¶24. Dr. Sabry also erred in categorizing several other days as non-news days when in fact material news about NIO was released, such as: (a) November 1, 2018, when media reported on additional information and technical specifications of one of NIO's recently submitted patent applications; (b) November 19, 2018, when Citron Research issued a research report on NIO titled "NIO Short is a Tesla Deva Vu – Path to $12 Should Have Little Resistance." That day, news media attributed the NIO price reaction to the new information and analysis included in the Citron Research Report. "Both of these events, which Dr. Sabry described as containing 'no-news,' were accompanied by statistically significant price reactions. Had these events been included in the 'news' selection of

---

analyzed. *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006) did not involve a scientific event study. Defendants' expert argued: "All you did was went and picked the largest stock price drops." *Id.* at 269. Defendants do not accuse Dr. Werner of cherry-picking the largest price drops.

Dr. Sabry's collective test, they would have also shown that the NIO ADSs were responding to information during the Relevant Period."[12] Werner Rebuttal at ¶26.

### C.    The S&P 500 Automotive Manufacturers Index Is an Appropriate Index

Dr. Sabry's criticism of Dr. Werner's use of the S&P 500 Automotive Manufacturers Index in his market model (Sabry Decl., at ¶¶45-48) is baseless.[13] Dr. Werner's selection of Industry Index was proper based on the Global Industry Classification Standard ("GICS") designated to NIO during the Subclass Period which, when searched through the Bloomberg database, yields the S&P 500 Automotive Manufacturers Index as an applicable industry benchmark. Werner Rebuttal at ¶37. Using an index based on the industry code reported in SEC filings is an appropriate choice. *Southern Co.*, 2019 WL 2482399, at *4. Dr. Sabry was unable to identify a more suitable industry index; the best she could offer was that Dr. Werner could have created his own industry index. Sabry Tr. at 165:4-166:7. Such amorphous criticism is not persuasive. *DFC Glob.*, 2016 WL 4138613, at *13 (opposing expert did not offer an alternative peer index or a suggestion as to what "peers" he would have added or eliminated from expert's peer index leave court "with a vague and unsubstantiated critique of the peer index.").

Because Dr. Sabry was critical of using an index with U.S. peers for a U.S.-traded company based in China, Dr. Werner reran the regression replacing the S&P 500 Automobile Manufacturers Index with the Refinitiv Global Automobiles and Auto Parts Index, a peer index

---

[12] Dr. Sabry also improperly included as news the announcement that NIO CEO Bin Li transferred some NIO shares to a trust. This event was clearly not material, biasing the test, because the planned transfer was previously disclosed in the Registration Statement. Removing this inappropriate event from Dr. Sabry's Z-test also corrects the test such that it identifies a statistically-significant difference between news and no-news dates. Werner Rebuttal at ¶¶27-29.

[13] Dr. Sabry claimed that Dr. Werner did not explain why he selected that index. Sabry Decl. at ¶48). But he did. Werner Decl. at ¶57 n.75 (explaining that index tracks publicly-traded U.S. electric vehicle companies). Because "at times, experts will disagree as to the best index to use in an event study," a jury can decide what weight to give the experts' choices. *Southern Co., supra*, 2019 WL 2482399, at *4 (N.D. Ga. June 12, 2019).

that includes not just companies selling cars in the U.S. There was no effect on the statistical significance of the test results or the findings of market efficiency. Werner Rebuttal at ¶39.

**D.      Dr. Sabry's Autocorrelation Test was Not Conducted on the Subclass Period, Rendering Its Results Irrelevant**

Dr. Sabry opines that Dr. Werner's "event study regression exhibited autocorrelation based on standard statistical tests, which could be a source of profitable trading strategies and evidence of market inefficiency."  Sabry Decl. ¶8a. Autocorrelation is not one of the *Cammer* or *Krogman* factors courts consider in evaluating market efficiency. "[T]he presence of serial correlation is not itself determinative of inefficiency."[14] *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 615 (C.D. Cal. 2009); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019) ("the returns of more than a quarter of the companies making up the Dow Jones Industrial Average were serially correlated during the class period.") .

Most importantly, Dr. Sabry conducted her autocorrelation test over a one-year period extending *seven months* beyond the *five month* Subclass Period (Oct. 8, 2018 - Oct. 8, 2019).[15] Sabry Decl. at ¶43. Dr. Werner ran the autocorrelation test on the Subclass Period (Oct. 8, 2018, to March 5, 2019) and the results showed no evidence of autocorrelation.  Werner Rebuttal ¶33. This test negates Dr. Sabry's criticism and supports a finding of market efficiency.

**E.      NIO Satisfied the Fourth *Cammer* Factor: Ability to File a Form S-3**[16]

NIO satisfied this *Cammer* factor even though it had not been filing periodic reports with the SEC for a full 12 months. Werner Rebuttal ¶¶42-46. The *Cammer* court explained that if the

---

[14] Indeed, economists no longer consider autocorrelation as evidence of a lack of market efficiency. Werner Rebuttal ¶35 (citing "Efficient Capital Markets: A Review of Theory and Empirical Work," by Eugene F. Fama, *Journal of Finance*, 1970, p. 395).

[15] In *PolyMedica*, 453 F. Supp. 2d at 277, the expert "tested for the presence of serial correlation in daily returns during the Contested Period," not during a much longer period, as Dr. Sabry did.

[16]   A Form F-3 is the same as a Form S-3 except it is used for foreign company filers.

9

only reason the company was not eligible to file an S-3 was because it had not yet been an SEC reporting company for a full 12 months, it would still satisfy this factor. *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989) ("or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements."), *accord Malriat v. Quantumscape Corp.*, 3:21-cv-00058-WHO,  (N.D. Cal. Dec. 19, 2022) (Rosen Decl., Ex. 10).  Dr. Sabry conceded the only basis for ineligibility was that NIO had only been filing SEC reports for a month, as NIO greatly exceeded the minimum $75 million stock float. Sabry Decl. ¶50; Sabry Tr. at 77:24-78:4. Werner Decl. ¶¶39-41 (float ranged from 0.93 to 1.81 billion shares).[17]

**F.  Demonstrating the Fifth *Cammer* Factor, Cause and Effect, Is Not Required When Other *Cammer* and *Krogman* Factors are Satisfied**

NIO's ADSs readily satisfied all of the other *Cammer* and *Krogman* factors. Opening Br. at 12-17. Even if the Court credits Defendants' attacks on Dr. Werner's event study, the Second, First, Third, Fourth, Fifth and Eleventh Circuits, and many district courts around the country, hold that the fifth *Cammer* factor is not a prerequisite to a finding of market efficiency. *Waggoner v. Barclays PLC,* 875 F.3d 79, 97 (2d Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 1702 (2018); *Southern Co.*, 332 F.R.D. at 384 (citing cases). "The Second Circuit has explained that if the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider— and a plaintiff need not submit—evidence supporting *Cammer* factor 5, namely the demonstration of direct price impact resulting from news about the security." *In re Vale S.A. Sec. Litig*., 2022 WL 122593, at *8 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).[18]

---

[17]  The *Cammer* court explained why courts should eschew bright line rules:  "[T]here may be a company whose stock trades in an efficient market, but which just missed or recently failed to meet the qualifications for Form S–3 registrants."  711 F. Supp. at 1287.

[18]  *See also In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *13 (S.D.N.Y. July 10,

## IV.   DEFENDANTS DO NOT CARRY THEIR BURDEN TO PROVE NO PRICE IMPACT

*Halliburton II* held that a defendant can rebut the *Basic* presumption at class certification by proving that the "asserted misrepresentation (or its correction) did not affect the market price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94 (S.D.N.Y. 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014)). "The defendant bears the burden of persuasion to prove a lack of price impact" by a preponderance of the evidence, *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 210 L. Ed. 2d 347, 141 S. Ct. 1951, 1963 (2021), and must "'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff – and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat." 141 S. Ct. at 1962.  Defendant must prove the ***absence*** price impact, both on the "front-end," *i.e.*, when the statement was made, and on the "back-end," *i.e.*, no price decline upon a corrective disclosure. *Allergan*, 2021 WL 4077942 at *11.

### A.   Dr. Sabry Did Not Evaluate Whether the Misrepresentations and Omissions Had an Impact on NIO's Share Price Valuation in the IPO

Dr. Sabry initially claimed it is not possible to show "front-end" price impact because there is no "before" price to compare with prior to NIO's IPO. Sabry Decl. ¶55.[19] But she made no attempt to determine if NIO's misrepresentations and omissions had any effect on pricing NIO's ADSs *in* the IPO.[20] Ultimately, Dr. Sabry admitted that it is "not impossible to measure the price

---

2019) (if other *Cammer* and *Krogman* factors "all point toward market efficiency, a court can dispose of *Cammer*'s fifth factor completely"); *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942 at *10 (S.D.N.Y. Sept. 8, 2021).

[19] Defendants mischaracterize Dr. Werner's position. When asked if it is possible to measure price impact in this case by comparing a *pre-IPO price* – that did not exist – to the IPO price, Dr. Werner agreed one could not. Rosen Decl., Ex. 11, transcript excerpts from the deposition of Dr. Adam Werner at 158:4-20 ("Werner Tr."). But that is not a concession that is it not possible to measure front-end price impact in this case.

[20]   When asked if she "conduct[ed] any investigation to determine whether or not the IPO price was impacted by the alleged misrepresentations or omissions in this case?" Dr. Sabry responded:

11

impact of the misrepresentation on NIO's IPO price. Sabry Tr. 169:17-22.

To rebut Dr. Sabry, Plaintiffs retained William Purcell, an investment banker with expertise in initial public offerings.[21] Purcell opines that NIO's representation that construction had begun on the Shanghai Facility had "a positive impact on the finalized IPO price set by the Underwriters for the Shares, *i.e.,* a higher offering price than possible if investors had alternatively been told that" NIO would continue to rely on JAC Motors to build its cars. Purcell Decl.[22] Opinion 1 at p. 13. The bases for Purcell's opinion are: (a) for a developing vehicle manufacturer having its own factory is an important event, indeed it was NIO's number two business strategy listed in the Registration Statement; (b) NIO building its own factory signaled strong demand for its cars; (c) NIO's reliance on JAC Motors was identified by the Underwriters, NIO, investors and the financial media as one of the primary downside risks of investing in NIO; (d) to allay investors' fears, NIO and the Underwriters told investors in pre-IPO sales meetings: "Our reliance on JAC will decrease in the next 3-5 years with our own plant [the Shanghai Facility] built" and ready by 2020" and the government is providing land, financing and other assistance; (e) the Underwriters and potential investors often compared NIO to Tesla, a company that had made the construction of its first manufacturing facility an important aspect of Tesla's IPO; (f) 25% of NIO's IPO net proceeds (approximately $239 million) was to be spent for the development of the Shanghai Factory. *Id.*

Purcell also concluded that without the representation that construction on the Shanghai Facility had begun and that NIO would not be totally dependent on JAC Motors, NIO could not have raised anything close to $1 billion from investors, including at a pre-IPO valuation of NIO of

---

"That was beyond the scope of my opinion."  Sabry Tr. at 97:19-24.

[21] Dr. Werner was not asked to address price impact in his Opening Report because it is Defendants burden to prove a lack of price impact.  Werner Tr. at 159:17-23.

[22] "Purcell Decl." refers to the Expert Declaration of William H. Purcell, dated December 23, 2022, submitted herewith as Ex. 12 to the Rosen Decl.

over $5 billion. Purcell Decl. Opinion 2 at p. 25.  Purcell's opinion is based on evidence showing that prospective anchor investors told the Underwriters that NIO's reliance on JAC Motors was a major concern and that valuing the company much above the $5-$6 billion range was unrealistic.[23] Indeed, as pre-IPO meetings with investors continued, the size of the IPO and NIO's pre-IPO valuation kept shrinking as investor feedback gave the Underwriters and NIO a strong dose of reality. *Id.* NIO was a new company with little revenue, huge losses, and unproven cars manufactured by a third-tier truck maker. *Id.* at pg. 26-27.[24]  Having its own factory allowed NIO to control its supply of cars and ensure manufacturing quality control, thus providing great comfort to IPO investors.

The paramount importance of this fact to NIO's valuation is underscored by the email exchange among Underwriters, cited in n. 3, *supra*, which led to the insertion of the false statement in the Registration Statement: unable to provide Citigroup with "relevant information" "that gives investors more comfort on progress,"[25] Morgan Stanley's response was that it ***changed the wording*** to read that NIO ***"started to build"*** the Shanghai Facility, from the original wording that NIO ***"planned to build"*** the Shanghai Facility. *Id.* Purcell Decl. at pp. 22-23.

**B.      Defendants Cannot Sever the Link Between Their Misrepresentations and Omissions and NIO's Corrective Disclosure That it Is Terminating Its Plans for the Shanghai Facility**

1.      <u>Construction status was not readily available to the public.</u>

Defendants desperately try to break the direct connection between their misstatements and the corrective disclosure because, theoretically, there could be more than one reason that the Shanghai Facility plans would be abandoned – in addition to the fact that construction had never

---

[23] *Id., see also,* Rosen Decl., Ex. 14.

[24] *See also* Rosen Decl. Ex. 13 at pg. 3 of 6.

[25] Rosen Decl., Ex. 3.

begun. Indeed, admitting to a lack of funding would raise suspicions from investors who had been told that the buildings were being built at the local government's expense and would be outfitted for manufacturing with $239 million raised in the IPO, which is why NIO gave the flimsy excuse that it had been encouraged to work with existing manufacturers. NIO's attempted cover up does not change the facts that (1) the market was not aware that construction had never started and (2) prior to the March 5 announcement, the market did not know NIO would not have a Shanghai Facility.

Defendants' contention that the fact that construction had not started was priced into NIO's shares from the outset because construction takes place in the open and investors could inspect the site for themselves (Def. Br. at 14-15), is the incorrect assumption that underlies Dr. Sabry's efficiency opinion. Sabry Decl. at ¶61 ("Assuming that the construction site was known…"). But the exact location of the construction site was not made public. Indeed, Dr. Sabry did not know the location, nor did she have any idea how investors could have learned of the location. Sabry Tr. 111:16-112:16. Thus, it would be well-nigh impossible for an investor to either physically visit the site or view a satellite image of it – particularly if one does not read Chinese or live in Shanghai.

Prior to March 5, no analysts mention that construction had never begun or that NIO will terminate its plans for a proprietary facility. A January 14, 2019, JP Morgan report cited by Dr. Sabry only says NIO "is no rush" to begin production. Rosen Decl., Ex. 15 at 5 (SABRY-0000156). This is not corrective. At most, it *potentially delayed* the expected revenue and cost savings from the new factory; it didn't eliminate them. Werner Rebuttal ¶¶65-67.

2.     The March 5 "termination" of the factory plan was a corrective disclosure

When NIO announced on March 5, 2019, the termination of its plans for the Shanghai Facility the market reacted negatively to the news – with NIO's ADS price declining a statistically significant 32.4%. Werner Decl. ¶¶71-76. Pointing solely to statements issued by analysts

14

employed by the Underwriters, Defendants baldly assert: "The market reacted positively to NIO's decision to terminate the Shanghai Facility." Def. Br. at 7; Sabry Decl. ¶¶56-60. These analysts are employed by the Underwriters who earlier touted the Shanghai Factory to assuage investors' concerns in pre-IPO meetings. Purcell Decl. at p. 30.

That NIO did not squarely admit that construction had never started is irrelevant.[26] A corrective disclosure need not precisely mirror the substance of the prior misrepresentation: "The correction need not "take the form of a 'flashing neon light,' with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as corrective." [27] *Signet Jewelers*, 2019 WL 3001084, at \*14, *quoting, Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013); *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*29 (S.D.N.Y. Mar. 23, 2017).

Defendants point to their statements on March 5 that NIO was suffering weakened demand for its cars in the first two months of 2019 as evidence that something other than termination of the Shanghai Facility caused NIO's share price decline. Def. Br. at 17. But this was just a temporary slowdown of demand resulting from orders being pulled into Q4 2018 (to take

---

[26] Because there is no pre-IPO market price for NIO's shares, Defendants lean heavily on the statement "that the back-end price drop equals front-end inflation[] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 141 S. Ct. at 1961. Def. Br. at 15. The salient difference is that Goldman Sachs made generic representations about avoiding conflicts of interest. Here, NIO made specific misrepresentations about a specific factory on both the front-end and back-end. Moreover, on remand, the district court found Goldman's front-end statements were not sufficiently generic to negate price impact. *In re Goldman Sachs Grp., Inc. Sec. Litig.,* 579 F. Supp. 3d 520, 534-35 (S.D.N.Y. 2021).

[27] Moreover, the Court has already found that this sufficiently alleges loss causation. *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at \*10 (E.D.N.Y. Aug. 12, 2021) *citing, Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161-62 (2d Cir. 2012) (even where non-fraudulent developments may be responsible "for a portion of the collapse" in a company's stock price, "these facts, if established, hardly foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself.").

advantage of subsidies about to be cut), the holidays, and general macro-economic conditions. Def. Br.at 17; Def. Ex. E at 4-5; Ex. F at 3. But in those very same statements NIO bragged "We exceeded our production and delivery targets in 2018" (Def. Ex. E at 9), and CFO Hsieh made clear that NIO's *2019 full-year forecast had not changed* as he expected demand to "pick up" in March 2019. Def. Ex. F at 11-12. Because NIO' sales estimates for 2019 remained unchanged, the dip in demand did not have a significant effect on NIO's ADS price.  Moreover, "merely suggesting that another factor also contributed to an impact on a securities price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 211 (D. Minn. 2020) (*citing Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017)). Loss causation should be adjudicated on a class-wide basis at summary judgment or trial.  *See CenturyLink Sales*, 337 F.R.D. at 211 *citing Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013).

Defendants also assert that their disclosure that NIO was terminating its factory plans was not a corrective disclosure of their omission "to warn investors that construction of the Shanghai Facility was dependent on NIO having sufficient cash and meeting sales expectations" Def. Br. at 15, n. 9; Complaint ¶¶ 10, 92, 96. But the very analyst reports on which they rely to assert that terminating the Factory is positive news can only be read as such because of their conclusions that the cost savings will improve cash flow, revealing NIO's shortage of funds as the impetus for termination.[28]

3. The analyst reports cited by Dr. Sabry are not persuasive evidence that NIO's price decline was unrelated to the Shanghai Facility termination

Dr. Sabry's sole effort to assess whether the corrective disclosure had a price impact was

---

[28] Def. Ex. G at 1; Def. Ex. Ex. H at 1; Def. Ex. I at 1-2; *see also* Rosen Decl., Ex. 16 at 1; Ex. 17 at 2; Ex. 18 at 3.

to examine the reaction of analysts to the March 5 conference call. Sabry Tr. 90:9-91:17; 120:21-121:3. Where, as here, defendants "did not conduct, or submit, their own event study to show the absence of price impact; instead, they rely on, and criticize, the event study conducted by Plaintiffs' expert …. That alone would arguably support rejection of Defendants' arguments at this stage of the proceedings." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018), *quoted in Signet*, 2019 WL 3001084, at *13. Moreover, "the presence or absence of analyst commentary, while of interest, is not a scientifically accepted method of demonstrating price impact or its absence." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *36 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *21 (S.D.N.Y. Jan. 26, 2021).

>    4.    Tainted by conflict of interest, the analyst reports must be discounted

Nine out of ten of the research analysts were underwriters of NIO's IPO[29] and suffered a host of conflicts of interest. [30] *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 231-32 (S.D.N.Y. 2006) ("while people on Wall Street understand that '[a]nalysts make their living by being friendly and supportive.... The problem is that individual investors don't.'").  Mr. Purcell highlights these extensive conflicts. Purcell Decl. at pp. 30-36.

First, the Underwriters were responsible for NIO's recent IPO, enabling NIO to raise $1.1

---

[29]    One analyst that did not participate in underwriting the IPO is CICC. But CICC's report states that CICC "does and seeks to do business with" NIO and, as a result CICC and the analyst may have a conflict of interest that could affect their objectivity.  Rosen Decl., Ex. 18 at SABRY-0000027.

[30]    The some of the analysts work for Chinese subsidiaries or affiliates is no defense. The China-based analysts, along with the China-based investment bankers in the Chinese subsidiaries worked hand in hand with the US-based Underwriters to complete the IPO. The emails in show coordination of the efforts Underwriters' employees in the US and China. Rosen Decl., Ex. 19.

billion from investors. Because a decline in NIO's ADS price could reflect badly on them, their analysts would be cautious with criticism. Purcell Decl. at p. 31 (Opinion 3(a)-(b)). The Underwriters were actively seeking to underwrite another stock offering for NIO and earn substantial fees.[31] Purcell Decl. at pp. 30-36 (Opinion 3). Indeed, the problem of investment bank analysts giving companies favorable research coverage in exchange for investment banking business is so prevalent that analysts routinely disclose these conflicts of interest in the fine print at the end of their research reports.[32] Purcell Decl. at p. 34 (Opinion 3(j)); *Lapin*, 506 F. Supp. 2d at 231-32.

Here, the Underwriters' potential liability is an even more powerful conflict. The Underwriters learned, including through pre-IPO meetings with investors,[33] that NIO's complete reliance on JAC for manufacturing was a major concern for potential investors.[34] As a result, Morgan Stanley's Angel Chen edited a draft of the strategies section of the Registration Statement, describing NIO's "plan to build" the Shanghai Factory - apparently in an effort to provide comfort to potential investors - she admits: "So I changed the wording to 'started to build' instead of plan to build."[35] This edit does not to appear to be based on personal knowledge of the status of the

---

[31]Morgan Stanley managing director Arthur Schuetz was positioning the bank to underwrite a secondary offering for NIO. Rosen Decl., Ex. 20. Other Morgan Stanley executives were lining up to cross-sell financial products to NIO's executives such as wealth management and to assist in selling NIO executives' shares after the IPO. Rosen Decl., Ex. 21.

[32] J.P. Morgan also admitted that it owned over 1% of NIO's outstanding shares and over $1.0 mm of NIO's debt securities. Rosen Decl., Ex. 22 at SABRY-0000207.

[33] Morgan Stanley referred to these meetings as pre-deal investor education meetings ("PDIE") and testing the water meetings ("TTW"), which are then followed by formal roadshow meetings in the weeks leading up to the IPO.

[34] *See, e.g.,* Rosen Decl., Ex. 6 and Ex. 14. Financial media uniformly criticized NIO's reliance on JAC, with *Bloomberg* referring to NIO as a "dressed up parts assembler" (Rosen Decl., Ex. 23); *see also,* Ex. 24 at p. 8 (NIO heavily reliant on JAC and risk of Shanghai Factory not being completed on time).

[35] Rosen Decl., Ex. 3.

18

construction. None of the Underwriters visited the construction site during due diligence – even though 25% of the IPO proceeds was earmarked to equip the factory, and they did visit NIO's headquarters only about 20-25 minutes away from the purported construction site.[36]

These same research analysts aided the Underwriters to solicit investors at pre-IPO meetings. NIO CFO Hsieh told the Underwriters he wanted their top three analysts "unleashed" – to aggressively solicit institutional investors for the IPO.[37] One Morgan Stanley banker told a colleague to pressure Morgan Stanley analyst Adam Jonas to attend an investor presentation in person because he "could help address some of the concerns surrounding manufacturing." Rosen Decl., Ex. 27.

The March 2019 analyst reports upon which Defendants rely to argue that the termination of the Shanghai Facility was "good news" for investors contradict the very statements these same analysts made to investors (both when they solicited their investments in the IPO roadshows and immediately after the IPO) in presentations uniformly asserting that building the Shanghai Factory would complement NIO's relationship with JAC Motors while allowing NIO flexibility to expand its manufacturing capacity.[38] The analysts were in the thick of the misrepresentations, had tremendous conflicts of interest, and were highly motivated to sweep the whole episode under the

---

[36] Rosen Decl., Ex. 25; Complaint ¶145.

[37] Rosen Decl., Ex. 26 (Hsieh referred to Deutsch Bank's Rod Lache, J.P. Morgan's Ryan Brinkman and Morgan Stanley's Adam Jonas. There are the same three analysts upon whose reports Defendants rely in asserting their price impact defense).

[38] Rosen Decl. Ex. 7. Other examples of the Underwriters' contradictory positions include: a 10/7/2018 Morgan Stanley report highlighting as NIO's biggest investment concerns (i) its reliance on JAC to make its cars, (ii) the high costs NIO pays JAC for the cars, (iii) NIO's own factory may not be finished on schedule in 2020. (Rosen Decl., Ex. 28 at SABRY-0000225). Credit Suisse analyst wrote a 10/22/2018 report claiming that NIO's profitability hinged, in part, on its per unit manufacturing cost dropping RMB40,000 when the Shanghai Facility goes into production. (Rosen Decl., Ex. 29 at SABRY-0000121). The Credit Suisse report also listed as key investment risks its relationship with JAC and the risk that NIO relies on JAC and needs time to build its own factory. *Id.* at SABRY-0000141.

rug. Their statements that termination of the Shanghai Facility was a positive for NIO must be heavily discounted. *Cf. Fogarazzao v. Lehman Bros.*, 341 F. Supp. 2d 274, 295 (S.D.N.Y. 2004) ("analysts at each Bank were issuing recommendations that were contrary to their true evaluations of the relevant securities or were otherwise tainted by conflicts of interest").

          5.      Dr. Werner's Rebuttal Report shows that NIO's termination announcement <u>caused a price decline, demonstrating price impact.</u>

Not only is it clear that Defendants have not carried their burden to sever the link between their misstatements and omissions and NIO's ADS price decline, there is ample evidence that negative price impact occurred. Dr. Sabry ignored that the financial media overwhelmingly considered termination of the Shanghai Facility to be bad for NIO and linked the stock price decline, at least in part, to the termination. Werner Rebuttal ¶¶54-57 (citing Seeking Alpha, Business Insider and Dow Jones news articles).[39] Additionally, prior to the announcement, in creating valuation models for NIO, analysts included future revenue, cash flow, and costs savings coming from the Shanghai Facility. Werner Rebuttal at ¶¶58-64. These models showed a significant contribution to revenue as well as improving profit margins from lower costs, in part because NIO would not have to pay JAC Motors for building each car. *Id.* ¶¶59-64. When construction of the Shanghai Facility was abandoned, so too were the expected future revenue and costs savings,[40] and the price of NIO ADSs fell accordingly – demonstrating price impact. *Id.* at ¶¶58, 64.

## V.    DR. WERNER'S PRELIMINARY MODEL OF §10(b) DAMAGES SATISFIES *COMCAST'S* MODEST REQUIREMENTS

As an initial matter, *Comcast* does not apply to the class's §11 claim: "[N]umerous courts

---

[39] *See also,* Rosen Decl., Ex. 30.

[40] Even if replacement revenue could be generated by expanding JAC Motors' facilities, NIO would have lost the substantial manufacturing costs savings, reducing its expected profit margins.

in [the Southern District of New York] have held that. is simply inapposite in Section 11 actions, 'where damages reflect liability by statutory formula.'" *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 2016 WL 7409840, at \*10 (S.D.N.Y. Nov. 4, 2016); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015); *see also Boston Ret. Sys. v. Uber Techs., Inc.*, 2022 WL 2954937, at \*4 (N.D. Cal. July 26, 2022).

To comply with *Comcast*, at class certification, plaintiffs do not have to actually measure damages or provide a damages model that eliminates non-fraud factors:

> *Comcast* ... did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis. *Comcast*'s holding was narrower. *Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) ***must actually measure damages that result from the class's asserted theory of injury***; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance. (Emphasis added).

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citations omitted). Thus, Dr. Werner need only provide a model that measures Section 10b-5 damages.[41] At this time, he need not disaggregate the portion of NIO's stock price decline caused by non-fraud related factors.[42] *See In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 372 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ("Indeed, plaintiffs do not even

---

[41]  Dr. Werner's identical damages model was found sufficient at the class certification stage in a recent case. *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at \*20 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted sub nom. In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021). Although Defendants cite two cases to the contrary (Def. Br. at 21), 75 cases reject Defendants' interpretation of *Comcast*. Rosen Decl., Ex. 31 (listing cases).

[42] *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 99 (S.D.N.Y. 2018), c*iting Pirnik*, 2018 WL 3130596, at \*5 ("[Q]uestion of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors) ... '[is a] common question[ ] that need not be adjudicated before a class is certified.'" (*quoting Amgen*, 568 U.S. at 475); *see also Waggoner,* 875 F.3d at 106 ("The *Comcast* standard is met notwithstanding that some of the decline in the price of [the securities] may have been the result of the New York Attorney General's action and potential fines.").

have a burden to produce a classwide damages model at this time.").

## VI.     MUNDY AND HUANG ARE ADEQUATE CLASS REPRESENTATIVES

"Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases[.] *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012). The two-pronged inquiry asks whether plaintiffs' interests are antagonistic to the interest of other members of the class and whether plaintiffs' attorneys are qualified to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "[T]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite ***must be fundamental*** … and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001), *abrogated on other grounds*, *In re IPO Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). In complex securities actions, "a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008). The Supreme Court "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa*, 222 F.3d at 61.

Mundy, a former U.S. Army Captain who served for 26 years as President and CEO of New York Methodist Hospital prior to his 2016 retirement (Mundy Tr. 24:16 – 25:4),[43] is an adequate class representative.[44] He reviewed drafts of the complaints (*id*. 134:19 – 135:7), knows

---

[43] Mundy's resume is attached as Def. Ex. J. "Mundy Tr." refers to transcript excerpts from the deposition of Mark Mundy, attached as Ex. 32 to the Rosen Decl.

[44] For some reason Defendants believe that Mundy's preparing and bringing notes to his deposition is a negative. This in fact reveals the opposite. Mundy prepared those notes himself (Mundy Tr. 16:9-17:2), showing that he is diligent and takes his role as class representative seriously.

22

what the lawsuit is about and who the defendants are (*id.* 113:5 – 114:23), knows why the alleged false statements are false (*id.* 151:8 – 158:16), knows what NIO did wrong (*id.* 140:24 – 141:4), what the Underwriters did wrong (*id.* 145:3 – 146:4), who Defendants Bin Li and Louis Hsieh are and, what they did wrong (*id.* 141:5-141:14; 146:3-146:19), and he is aware generally what the director defendants did wrong. *Id.* 144:21-145:2. Mundy is in frequent contact with and supervises counsel, and understands who makes the final decisions in the case. *Id.* 172:6 – 175:10.[45]

Huang is similarly an adequate class representative. She knows what the case is about (Huang Tr. 58:25-59:21)[46] and what each defendant group did wrong *Id.* at 131:14-133:10. She reviewed drafts of the amended and second amended complaint, spending more than half a day reviewing the amended complaint. *Id.* 128:2-128:19, 130:13-130:21.[47] She understands who the class consists of and the class period. *Id.* 136:20-137:5. She testified that it is her purpose to "monitor the attorneys' work and communicate with the attorneys" and to "try to obtain the maximum compensation that the other investors are entitled to." *Id.* 113:20-114:3.[48]

## VII.   MUNDY AND HUANG ARE TYPICAL OF THE INVESTORS THEY SEEK TO REPRESENT

---

[45] Defendants make much ado about Mundy not having noticed an erroneous footnote in a brief filed in support of his motion for lead plaintiff appointment. Glossing over a footnote in a complex legal brief is hardly disqualifying. This issue has already been addressed in the Court's order appointing Mundy as lead plaintiff. *See* ECF No. 44 at PageID 918-19.

[46] "Huang Tr." refers to transcript excerpts from the deposition of Mark Mundy, attached as Ex. 32 to the Rosen Decl.

[47] Huang, whose native language is Chinese, was provided translated copies of the complaints. Although she did not receive a translated copy of the motion to dismiss briefs, she discussed them over the phone with Chinese-speaking counsel. Huang Tr. 16:3-18:8, 130:3-130:5.

[48] Defendants fault Mundy and Huang for not having spoken to each other, but there is no requirement that proposed class representatives communicate with each other prior to moving to serve as class representatives. *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 485 (S.D.N.Y. 2002) (plaintiff adequate despite defendants' objections that he never met or spoke with other plaintiffs and was grouped by counsel); *Loritz v. Exide Techs*, 2015 WL 6790247, at *7 (C.D. Cal. July 21, 2015) (plaintiffs adequate where, among other things, they never communicated with the other before); *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 342 (D.N.J. 2018) (same).

Mundy and Huang are not subject to unique defenses that threaten to become the focus of the litigation. In fact, "a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members." *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008). Moreover, the "unique defense" rule, which is "not rigidly applied in this Circuit[,]…is intended to protect plaintiff class - not to shield defendants from a potentially meritorious suit." *Id.* Defendants' swipes at Mundy and Huang (Def. Br. at 21-23) should be rejected.

"[A] plaintiff in a Section 11 case does not need to prove reliance… ." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 647 (N.D. Ala. 2009). Hence, Mundy and Huang need not have read the Registration Statement to be deemed typical. *In re AMF Bowling Sec. Litig.*, 2002 WL 461513, at *2 (S.D.N.Y. Mar. 26, 2002) (so holding). As for the §10(b) claim, because the market for NIO ADSs was efficient during the Exchange Act Subclass Period, the information in the Registration Statement was incorporated into the price of NIO ADSs. *Parmalat*, 2008 WL 3895539, at *6 ("a person is ineligible to represent a class of securities purchasers only if he 'clearly did not rely upon either the allegedly misleading financials *or* on the integrity of the market price or information.'").[49]

Huang's post-class period purchases of NIO ADSs are irrelevant. "Numerous courts" in this Circuit have held that a putative class representative's purchase of additional stock after corrective events "has no bearing on whether or not [the representative] relied on the integrity of the market … before the information at issue was corrected or changed." *In re Pfizer*, 282 F.R.D. at 46; *see also, Pearlstein*, 2021 WL 253453, at *10 ("what [plaintiff] chose to do when he had

---

[49] That Mundy made his second purchase of NIO ADSs after viewing a positive *60-Minutes* feature on NIO is not relevant. In an efficient market, the price that day already incorporated the misleading statements in the Registration Statement. Defendants neglect to mention that Mundy also purchased 100,000 NIO ADSs five month earlier, on Sept. 20, 2018. *See* ECF No. 21-2.

complete information is not probative of why he did what he did … when the available information was incomplete or deficient"); *see also, Pirnik v. Fiat Chrysler Autos., N.V.*, 2018 WL 3130596, at *2 n.2 (S.D.N.Y. June 6, 2006) (purchase of more shares after the corrective disclosure "has no bearing on whether or not the representative relied on the integrity of the market during the class period [for purposes of Rule 23(a) typicality]"). Defendants point to no facts showing that such purchases would become the focus of the litigation.

The argument that Huang is an atypical investor because she learned of NIO through a friend also falls woefully short. *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1404 (D. Conn. 1988) ("Reliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the circumstances under which a substantial number of class members purchased their stock."); *Randle v. Spectran*, 129 F.R.D. 386, 391-92 (D. Mass. 1988) ("There will always be some individuals who read the financial statements directly, others who read the secondary analyses ... and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.").[50]

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be granted.[51]

Dated: December 23, 2022                 Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         By: /s/ *Laurence Rosen*

---

[50] Huang testified that her friend told her that NIO was building its own factory in Shanghai, and that the friend learned of this through reading public information. Huang Tr. 34:7-35:24.

[51] Plaintiffs do not object to ending the Securities Act Class Period on March 5, 2019, which is the same end date as the Exchange Act Subclass Period.

Laurence Rosen
Phillip Kim
Yu Shi
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        yshi@rosenlegal.com

*Lead Counsel for Plaintiffs and the Proposed Class*