# EXHIBIT 8

**Page 1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

IN RE NIO, INC. SECURITIES LITIGATION,

Case No. 1:19-cv-01424-NGG-JRC

----------------------------------------x

                      (Via Zoom Videoconference)

                      November 11, 2022

                      9:37 a.m.

        Videoconference Deposition of

DR. FATEN SABRY, before Kristi Cruz, a

Stenographic Reporter and Notary Public of the

State of New York.

**Page 6**

- DR. SABRY -

expert report.  Is that the report that you submitted in connection with this litigation?

A.    Yes, it is.

Q.    And --

MR. GRIFFIN:  Larry, just a point of classification.  Her opinions are submitted in a declaration.  So if we can just be clear that if we refer to the report or the declaration, we're talking about the same document dated October 17, 2022.  Just for the record.

MR. ROSEN:  Yeah, I think that's accurate.  That's fine.

Q.    So, Dr. Sabry, is it your opinion that the market for NIO stock was not efficient during the period from October 8, 2018 through March 5, 2019?

A.    That's not my opinion.

Q.    All right.  Now I'd like to mark as Exhibit 31 the Prospectus that NIO issued for its IPO.  Let's see the date of that Prospectus.  The date of that Prospectus looks to be September 11, 2018, at least on the face of the Prospectus.  I don't know if that's the

- DR. SABRY -

don't know how companies determine which news to be filed in there or not.  The idea is, going back to my concern about the selection process, the selection has to be objective and from an ex ante perspective so that the researcher would not be using hindsight bias to select certain dates and not others.

And if the researcher select certain dates and not others, there should be an objective criteria for why certain events were included in the study and others were not, and there is nothing -- and Dr. Werner has not provided that in his report.

Q.    So is it your opinion that in selecting event dates for a market efficiency study, the economist cannot simply review all of the news during the relevant period and select those dates the economist believes should -- those dates that have new, unexpected news that is reasonably expected to elicit a security price reaction?

MR. GRIFFIN:  Object to form.

A.    I don't -- I don't know how the economist can do what you have just described

Page 77

- DR. SABRY -

S-3 Registration Statement, correct?

A.    That's my understanding, yes.

Q.    And these requirements are meant -- so why do they have these requirements?  Is that so that in order to use an S-3 filing day, the SEC wants to make sure that there's sufficient information in the market for investors to be able to evaluate the quality of the securities being offered?

MR. GRIFFIN:  Objection.

A.    That's my understanding, yes.

Q.    And why is the ability to file an S-3 relevant to market efficiency?

A.    Well, from an economic perspective, this is not an issue that economists look at when they assess or examine market efficiency. I understand it is one of the Cammer factors.

Q.    So why is S-3 eligibility one of the Cammer factors?

MR. GRIFFIN:  Objection.

A.    That was a legal decision.  It was deemed as one of the factors.

Q.    So is it correct that NIO met all of the requirements for S-3 eligibility except

- DR. SABRY -

for the fact that its stock hasn't been traded for 12 months?

A.    That is my understanding, yes.

Q.    Now, paragraph -- why did you add paragraph 51 to your report?  What's the relevance of that in this litigation?

A.    The relevance is that the, as I state in Exhibit 51, the original proposed class period as defined in the Second Amended Complaint, was September 12th through March 5th, which would include the period -- it's a sort of longer period than the period that Dr. Werner defined or used as a relevant period.

Q.    Well, you understand there's Section 10b claims and Section 11 claims in this case; is that right?

A.    That's right.

Q.    And you understand that the complaint defines the class period for the Section 10 claims to begin on October 8, 2018 and end March 5, 2019?

MR. GRIFFIN:  Objection.

Mischaracterizes the complaint.

- DR. SABRY -

prior -- after the alleged misstatements were made.

Q.    So the only thing you did to evaluate price impact was to evaluate the alleged corrective disclosure to see if that indicated price impact?

A.    That's not exactly what I said, no.

Q.    Well, okay.  So explain to me what you did to evaluate price impact, other than looking at the corrective disclosure?

A.    I examined whether any of the reaction by market participants, primarily the analysts, whether they linked the alleged misstatement to -- in the reaction to the alleged corrective disclosure, and I've established that actually the equity analysts following the disclosure on March 5th viewed the termination of the facility as positive or neutral development.  That's a component of my analysis.  And in examining, assessing the analyst reports, I recognize that this is a -- that they are the sophisticated market participants whose job it is to evaluate and focus on particular companies and industries

- DR. SABRY -

and provide relevant information to investors. That's a component of my analysis.

Q. But you were solely focused on the corrective disclosures. You didn't look at anything else other than the corrective disclosures and the analyst reports discussing the corrective disclosures; is that right?

A. Well, again, not exactly. I understand what the alleged misrepresentations were as presented by the plaintiffs, and I assessed the analyst reactions to the corrective disclosure to see if, in their reaction, they linked their reaction to the disclosure to any of the alleged misstatements, and they -- and I demonstrate that that's not the case.

Q. Okay. And you didn't evaluate the IPO, or the Registration Statement, or the pricing of the IPO by the underwriters to determine if the alleged misrepresentations and omissions had an impact on NIO's share price in the IPO?

MR. GRIFFIN: Objection. Larry, are you talking about the predefined IPO

- DR. SABRY -

question, let's see.

(Record read.)

MR. GRIFFIN:  Just to clarify, NIO, Larry?

MR. ROSEN:  Let's start with NIO.

Q.    Did you think that the company believed that the credits increased NEV or electric vehicle credits would outweigh the benefits of higher profit margins and controlling their production?  Is that why you believe NIO terminated it?

MR. GRIFFIN:  Sorry.  Objection. Larry, are you asking her what she believes or what NIO believed?  I heard them both throughout that question.  Or maybe could you ask the question again?

MR. ROSEN:  Okay, okay.

Q.    Did you, Dr. Sabry, conduct any investigation to determine whether or not the IPO price was impacted by the alleged misrepresentations or omissions in this case?

A.    That was beyond the scope of my opinion.

Q.    In your opinion, when did the market

- DR. SABRY -

investors using very advanced tools and technologies to evaluate and monitor economic activities.  And so to the extent that the status, again, and this is based on paragraph 62, to the extent that the status of the construction was public knowledge under the efficient theory, sophisticated institutional investors would have or could have reflected the status of the plant in the price.

Q.    I see.  And is it possible to get satellite imagery of locations in Shanghai if you live in the United States?

A.    This is beyond the scope of my opinion.

Q.    And what were the geographical coordinates of the factory?  Because I want to take a look on Google Maps and just see if it's possible.  Do you know what the coordinates were for the factory?

A.    Again, this is beyond the scope of my opinion.

Q.    Well, it's not really beyond because you say that institutional investors would have gotten satellite imagery and discovered

                              - DR. SABRY -

this fraud, and I'm just trying to figure out

how they would possibly have known the

coordinates of the factory.

          MR. GRIFFIN:  Objection.  It

     mischaracterizes the report.

     A.     That's not what I said.

     Q.     So you agree that institutional

investors in the United States wouldn't

necessarily be able to know the coordinates of

the factory site, and therefore would not have

been able to check on the status of the

construction, right?

     A.     I have no basis to opine on what

institutional investors in NIO could have or

would have done.

          MR. ROSEN:  Why don't we break for

     lunch.  I don't have too much more, but I

     think we all need a break.  You want to

     come back in like an hour?  Is that all

     right?

          MR. GRIFFIN:  Yes.  2:15?

          MR. ROSEN:  Yes.

          MR. GRIFFIN:  Sounds good.

          (Lunch recess taken at 1:15 p.m.)

- DR. SABRY -

Q.    So you said that -- as I understand it, you said that your determination that there was no price impact from the misrepresentations and omissions was based on your view of the analyst reports following the March 5th disclosure.  Did I get that correct?

A.    That is correct.

Q.    And I'm just trying to figure out: What evidence can you point to besides analyst reports to support your opinion that the alleged misrepresentations and omissions had no price impact?

A.    The analysis -- or my views and the analysis on price impact is based on my assessment of the analyst reports.  And not just what they said, but also the changes in their price targets, which is based on their own valuation of -- their own valuation of NIO.

Q.    Right.  So other than the analyst reports and what's contained in the analyst reports, you're not relying on any other evidence to assess price impact here; is that correct?

- DR. SABRY -

A.    That's the basis of my opinion on price impact.

Q.    Okay.  Let's move to a new topic. You have an opinion -- let's go to your opinion in paragraph 96 of your report.  How would you define the proper measure of damages in the case under Section 10b of the Securities Exchange Act?

MR. GRIFFIN:  Objection.  Are you asking in this case or generally?

MR. ROSEN:  Well, we could start generally.

MR. GRIFFIN:  Okay.

A.    Generally, my understanding is that damages would be losses to shareholders that is attributable to a particular misrepresentation.  That is that the expert would estimate after accounting for or taking -- or excluding market or industry factors.

Q.    In determining compensable loss, does one take into account the purchase price of the stock?

A.    Yes.

Q.    So what's the formula that you would

- DR. SABRY -

as belonging to?

MR. GRIFFIN:  Object to the form.

A.    Again, in selecting an industry, a relevant industry index, the expert would usually explain how they chose this index and why is it reflective of the specific subsector in which the particular company in question, here NIO, is operating.  What I'm saying in this paragraph is that Dr. Werner did not do that.

Q.    Are you able to identify any industry index that you think is more appropriate?

MR. GRIFFIN:  Objection.  Outside the scope.

MR. ROSEN:  It's not outside the scope, Mike.  It's directly within the scope, and I'd like an answer.

MR. GRIFFIN:  She hasn't opined on what the correct index is.  She's opined on the --

MR. ROSEN:  By saying the index he selected is wrong, she's got to tell me, okay, what's better.  She can't just --

- DR. SABRY -

MR. GRIFFIN:  That's not true.

MR. ROSEN:  -- and not have any answers.

MR. GRIFFIN:  Of course she can and that is what she said.  Her opinion is very limited.

MR. ROSEN:  That's not outside the scope.  The fact that she didn't do the work doesn't make it outside the scope, it just means she didn't do the work.

MR. GRIFFIN:  It's outside the scope of what the work she was asked to do.  She could say that.

MR. ROSEN:  That's a disagreement and that's just your objection, and she has to answer the question.

So, Ms. Reporter, could you please repeat the question?

(Record read.)

A.    I identified the criteria with which one could select a more appropriate industry index in paragraph 47.

Q.    But you are unable to tell me that there does exist a better index than the one

Page 165

- DR. SABRY -

he found, right?

A.    That's not what I said.

Q.    Well, are you able, sitting here today, to identify a more appropriate index? Yes or no?

MR. GRIFFIN:  Object to the form.

A.    I did not identify or it's not in the scope of what I was asked to do to come up with an industry index.  But I identified the criteria with which Dr. Werner could have considered alternative ways to construct an industry index.

Q.    So you can't -- so as far as you know, there does not exist a better index than the one he used, correct?

A.    I disagree.

MR. GRIFFIN:  Object to the form.

Q.    Well, if you think there's a better index, tell me which one it is.

MR. GRIFFIN:  Object to the form.

A.    As I said in my prior answer, it is not uncommon for an economist doing an event study for market efficiency to construct their own industry index based on the review of the

Page 166

- DR. SABRY -

specific subsector the industry is in, the analyst reports, and choosing a select set of comparable companies and construct an index, a special index to reflect the demand or reflect the economic factors for EV cars in China, which is the subsector in which NIO operates.

Q.   So other than creating his own special index, you can't identify any industry index that would have been more appropriate than the one Dr. Werner used here, correct?

MR. GRIFFIN:  Objection.  Outside the scope.

A.   This is not what I was asked to do.

Q.   So the answer is no, you can't identify a better index, right?

MR. GRIFFIN:  Objection.  Outside the scope.

A.   That's not what I said.

Q.   Well, identify the better index, if you can do it.  But if you can't do it, you can't do it.

MR. GRIFFIN:  Objection.  Outside the scope.  Asked and answered.

Q.   Either do it or don't do it.  Which

**Page 169**

- DR. SABRY -

A.    Not necessarily, no.

Q.    What's the objective way to do it?

A.    An objective way to do it begins with a review of the company's own filings and the entities that the company describes as their closest competitors or closest comparables, the review of the analyst reports at the time describing the industry or the subsector that the company is in, and then selecting the sets of companies that would fit in this criteria and demonstrate and test, you know, using various different indices, whether there's a goodness of fit or not, and be very clear as to how the expert went about constructing that index or selecting an index.

Q.    Is it your opinion that it's impossible to measure the price impact of the alleged misrepresentations and omissions on NIO's IPO price?

MR. GRIFFIN:  Object to the form.

A.    No, that's not what I said.

Q.    Did you review any of the emails or documents that were produced in discovery in this case?