# EXHIBIT 10

Case 3:21-cv-00058-WHO Document 183 Filed 12/23/22 Page 2 of 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH MALRIAT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> QUANTUMSCAPE CORPORATION, et al., <br><br> Defendants. | Case No. 3:21-cv-00058-WHO <br><br> **ORDER CERTIFYING CLASS AND APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL** <br><br> Re: Dkt. No. 169 |

The plaintiffs in this putative securities class action allege that defendants QuantumScape Corporation, Jagdeep Singh, Timothy Holme, and Kevin Hettrich (collectively, "QuantumScape") misled investors about the progress and effectiveness of their "solid-state batteries." Solid-state batteries are an aspiring competitor to conventional lithium-ion batteries for use in electric vehicles. They have never been successfully commercialized due, in part, to a well-known set of challenges. The plaintiffs contend that the defendants repeatedly represented that their batteries had overcome those challenges and were comparable to or outperformed the conventional batteries on the market, but that those representations were false for a number of reasons. The purported truth was revealed to the market in two publications that allegedly caused QuantumScape's share price to fall.

The plaintiffs now move to certify a class of investors that purchased QuantumScape stock during the class period and who say they were injured based on the alleged misrepresentations and subsequent fall in stock prices. The plaintiffs also move to appoint class representatives and class counsel. For the reasons that follow, I grant the plaintiffs' motions.

**BACKGROUND**

My Order on the Motion to Dismiss, Dkt. No. 153, outlines much of the relevant factual

history of this case, including the claims made by the plaintiffs. This order incorporates those facts and assumes familiarity with the case. A few key facts are mentioned below, as outlined in the plaintiffs' Second Amended Complaint. ("SAC") [Dkt. No. 164].

QuantumScape is attempting to create and market a new, sustainable, and profitable technology that can serve as an alternative to lithium-ion batteries. *See* SAC ¶ 2. QuantumScape went public on the New York Stock Exchange ("NYSE") on November 25, 2020. *Id.* ¶ 7. Lead plaintiff Frank Fish and named plaintiffs Kathy Stark and Mary Cranny purchased QuantumScape stock in the following days and months. *Id.* ¶¶ 21-23. They allege that after going public, QuantumScape made several misleading or misrepresentative statements about the status of their technology, the hurdles it had yet to overcome, and the financial prospects of the company as a whole. *See, e.g.*, *id.* ¶¶ 7, 8, 11, 12.

According to the plaintiffs, the truth was partially revealed on January 4, 2021, when a website called Seeking Alpha published a research report critiquing QuantumScape's technology and determining it overstated its successes, which plaintiffs say caused the stock price to plummet. *See id.* ¶¶ 9, 10, 15, 99-107. On April 15, 2021, a research firm called Scorpion Capital published another report further critiquing QuantumScape's technology, testing, and potential success, which plaintiffs allege caused the stock to drop again. *Id.* ¶¶ 14-15, 114-46.

Plaintiffs sued QuantumScape on behalf of themselves and a putative class of investors, alleging violations of the Securities Exchange Act § 10(b), Rule 10b-5, and § 20(a). *Id.* ¶¶ 358-76. I denied QuantumScape's motion to dismiss on all but one limited ground, *see* Dkt. No. 153, the plaintiffs filed a second amended complaint that added two new named plaintiffs, *see* SAC, and the parties engaged in discovery.

The plaintiffs now move to certify a class ("Mot."), Dkt. No. 169, and submit with their motion several exhibits, including an expert report written by Dr. Matthew Cain ("Cain Rep."), *id.* Ex. 1. Defendants oppose certification ("Oppo."), Dkt. No. 175, and submit several exhibits, including an expert report written by Dr. Terrence Hendershott ("Hendershott Rep."), *id.* Ex. 7. Plaintiffs' reply ("Repl."), Dkt. No. 176, includes several exhibits, including a rebuttal report prepared by Dr. Cain ("Repl. Rep."), *id.* Ex. 6. I held a hearing on December 14, 2022, at which

United States District Court
Northern District of California

2

counsel for both parties appeared.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale Grocery*, No. 22-131, 2022 WL 16909174 (U.S. Nov. 14, 2022). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its putative class. *Olean*, 31 F.4th at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id.* (quoting Fed. R. Civ. Proc. 23(a)).[1] "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). In deciding this, courts consider:

---

[1] Rule 23(a) provides:
> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

3

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence.  In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence."  *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)).  While the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (internal citations and quotation marks omitted).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* (citation omitted).

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action."  *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010).

## DISCUSSION

The plaintiffs define their proposed class as:

> All persons or entities that purchased or otherwise acquired QuantumScape securities between November 27, 2020 and April 14, 2021, inclusive ("Class Period"), and were damaged thereby.  Excluded from the Class are QuantumScape and its subsidiaries and affiliates, the Individual Defendants, and any of the Defendants' or QuantumScape's respective offices and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which Defendants has or had a controlling interest.

Mot. 2:8-11.  The defendants do not oppose the class definition, nor do they contest most elements of the class certification analysis.  Rather, the defendants make only three arguments in

4

opposition to the plaintiffs' motion. First, they assert that the plaintiffs are not adequate representatives for the putative class. Oppo. 22-25. Second, they argue that the plaintiffs failed to show that common questions of law and fact predominate because they did not establish the fraud-on-the-market theory of reliance sufficient to entitle the plaintiffs to class wide reliance on the alleged misstatements. *Id.* 8-19. Third, the defendants contend that the plaintiffs failed to articulate a theory of class wide damages that is consistent with their theory of liability. *Id.* 19-22. Though the defendants do not challenge other elements of class certification, I address them each in this order as well.

## I. Rule 23(a)

### a. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "As the Supreme Court has explained, this 'numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" *A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 835 (9th Cir. 2022) (quoting *Gen. Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members. *See Villalpando v. Exel Direct Inc*., 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig*., 282 F.R.D. 446, 452 (N.D. Cal. 2012). And courts "'may infer that, when a corporation has millions of shares trading on a national exchange,' the numerosity requirement is met." *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (quoting *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009)).

Plaintiffs contend that "QuantumScape's number of shares outstanding ranged from 189.5 million shares to 233.6 million shares during the Class period." Cain Rep. ¶ 64. This is sufficient to show the number of putative class members is so numerous that joinder would be impracticable, *see In Re Twitter Inc. Sec. Litig.*, 326 F.R.D. at 626, and QuantumScape does not contest numerosity. Plaintiffs have satisfied their burden for this element.

### b. Commonality

"The commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class

certification to show that their claims 'depend upon a common contention' that 'is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *A. B.*, 30 F.4th at 839 (quoting *Wal-Mart*, 564 U.S. at 350). "In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial. While such an analysis may 'entail some overlap with the merits of the plaintiff's underlying claim,' the '[m]erits questions may be considered [only] to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Olean*, 31 F.4th at 666-67 (first quoting *Wal-Mart*, 564 U.S. at 351; then quoting *Amgen*, 568 U.S. at 466; and then citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

Plaintiffs contend, and QuantumScape does not dispute, that the questions of law or fact common to the putative class are: (1) "[w]hether Defendants violated the Securities Exchange Act of 1934"; (2) "[w]hether Defendants omitted or misrepresented material facts"; (3) "[w]hether Defendants knowingly or recklessly disregarded that their statements and omissions were false and misleading when made"; (4) "[w]hether the prices of QuantumScape's securities were artificially inflated as a result of Defendant's false and misleading statements and/or omissions"; and (5) "[w]hether and to what extent disclosure of the truth of Defendants' false and misleading statements and/or omissions caused Class members to suffer economic loss and damages." Mot. 9:12-19. These questions depend on common contentions that are capable of class wide resolution and so satisfy commonality. *Cf. In re Twitter Inc. Secs. Litig.*, 326 F.R.D. at 626 (establishing commonality requirement where plaintiffs alleged that the "investors were defrauded by the same misleading statements over the same period of time, and suffered similar losses as a result" (quoting *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017)).

### c. Typicality

"To establish typicality, as required by Rule 23(a)(3), plaintiffs must show that 'the claims

United States District Court
Northern District of California

or defenses of the representative parties are typical of the claims or defenses of the class.'" *A. B.*, 30 F.4th at 839 (quoting Fed. R. Civ. Proc. 23(a)(3)). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Under the rule's permissive standards, representative claims are 'typical' if they are *reasonably co-extensive* with those of absent class members; they need not be substantially identical." *Amey v. Cinemark USA Inc.*, No. 13-CV-05669-WHO, 2018 WL 3956326, at *4 (N.D. Cal. Aug. 17, 2018) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)) (emphasis in *Amey*). "Unique defenses against a class representative 'counsel against class certification only where they threaten to become the focus of the litigation.'" *Id.* (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)). And "[b]ecause the considerations underlying the two requirements overlap considerably, the Supreme Court has noted that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *A. B.*, 30 F.4th at 839 (quoting *Falcon*, 457 U.S. at 157 n.13).

Plaintiffs contend, and I agree, that typicality is satisfied because each putative class member was allegedly "uniformly damaged as a result of acquiring QuantumScape securities at artificially inflated prices which was revealed when the stock price fell following the corrective disclosures." Mot. 10:9-12. Though the defendants contest the merits of this claim, they do not contest that typicality is satisfied; nor does it appear that any class representatives are subject to "[u]nique defenses." *See Amey*, 2018 WL 3956326, at *4. The typicality requirement is met in this purported securities class action.

### d. Adequacy

Rule 23(a)(4) requires that the named parties are able to "fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a)(4). "The adequacy inquiry turns on: (i) whether the named plaintiff and class counsel have any conflicts of interest with other class members; and (ii) whether the named plaintiff and class counsel can vigorously prosecute the action on behalf of the class." *Amey*, 2018 WL 3956326, at *6 (citing *Ellis*, 657 F.3d at 985).

A class representative is adequate where her "claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157. As explained, the plaintiffs are typical of their class, and their individual claims are identical to those they bring on behalf of the class. The plaintiffs are adequate class representatives, and they have no conflicts of interest with other class members. *See* Mot. 2:21-22; 11:3-4.

Defendants argue that none of the plaintiffs is an adequate class representative because they failed to coherently define the claims or defenses in the case during their depositions, Oppo. 24:1-13, their deposition testimony conflicted with their sworn statements because they testified they did not read all of the legal documents, *id.* 24:14-24, and they said they would defer to counsel to direct litigation, *id.* 24:25-25:19. But "the Supreme Court expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance, noting that in complex securities litigation such as this case, the named plaintiff need not have specific knowledge of the material facts in support of his claim." *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 583 (N.D. Cal. 2021) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-76 (1966) ("affirming class certification where the named plaintiff knew nothing about the content of the suit but knew she was not getting her stock dividends")). And as the plaintiffs correctly note, "particularly in a complex case like" this securities class action, "it is hardly a badge of inadequacy" to rely heavily on the expertise of attorneys. *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 543 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 62 (2d Cir. 2000)).

At any rate, the defendants' assertions are unfounded. Lead plaintiff Fish testified in his deposition that he understood that the case was about "[s]ecurities fraud," Oppo. Ex. U ("Fish Depo.") 156:22, and that "the overall technology" of the defendants' "solid-state battery, lithium better, was not up to par, as [the defendants] said it was," *id.* 40:7-12. Named plaintiff Cranny testified at her deposition that the case involved "[c]laims about where they were—where QuantumScape was at when I purchased the stock with its testing and ability to roll out a battery

United States District Court
Northern District of California

that was not ready" and that QuantumScape's "[s]tatements about its readiness for cars" were misleading. Oppo. Ex. V ("Cranny Depo.") 52:9-19. Cranny also said the case was about batteries and "suspicious" testing, *id.* 35:6-9, and "[o]verinflated price[s]," *id.* 39:23-24, and that the defendants allegedly made misrepresentations about "efficacy, safety, cost, commercial prospects, and technical capabilities," *id.* 51:20-22. She also knew my name as the presiding judge, that the motion to dismiss had been denied, and that the case was in discovery. *Id.* 39:5-17. Finally, named plaintiff Stark testified that she understood the case as QuantumScape "or its chief officers misrepresented . . . the company, in terms of how far along it was technically, and the viability of the whole project, causing the price to be overinflated for people who were investors or wanted to invest." Oppo. Ex. W ("Stark Depo.") 31:11-16. Each of these is accurate and sufficiently comprehensive and each rebuts the defendants' assertions that the plaintiffs do not understand the case or rely too heavily on lawyers to tell them about it.[2]

Second, defendants do not contest that class counsel is adequate. To make this determination, I look to: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. Proc. 23(g)(1)(A). Class counsel are experienced class action litigators who have dedicated a substantial amount of time and resources to this case and intend to continue to do so. *See* Mot. 25:9-16. Counsel are competent and qualified, and have no conflicts of interest with any class members.

Accordingly, the adequacy requirements of Rule 23(a)(4) are met.

---

[2] It is true that defense counsel repeatedly asked each plaintiff to identify specific misleading statements made by QuantumScape and that at least Fish did not do so. *See* Fish Depo. 47-51. But that does not mean Fish is an inadequate lead plaintiff, "particularly in a complex case like" this, and particulary because he knew that the defendants made (alleged) misrepresentations concerning the technology that affected the stock price. *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. at 543. It also is worth noting that plaintiffs' counsel objected to nearly every question during this section of Fish's deposition, including an objection that defense counsel's questions were "argumentative, harassing, and borderline improper." Fish Depo. 50:19-20; *see also id.* at 74:7-8 (objecting that the questions were "[a]rgumentative [and] harassing").

United States District Court
Northern District of California

Case 3:21-cv-24058-JHC Document 183-1 Filed 12/19/23 Page 10 of 25
Case 3:21-cv-24058-JHC Document 183-1 Filed 12/19/23 Page 11 of 26
PageID #: 3795

United States District Court
Northern District of California

## II.     Rule 23(b)(3)

Under Rule 23(b)(3),[3] "for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665 (citing *Wal-Mart*, 564 U.S. at 349-50). "Therefore, '[c]onsidering whether "questions of law or fact common to class members predominate" begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (*"Halliburton I"*)).

Here the plaintiffs allege violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act, the elements of which are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton I*, 563 U.S. at 809-10 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).

The defendants' opposition focuses on reliance and damages.

### a.   Reliance

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. Though reliance can be established "by showing that [the plaintiff] was aware of a company's statement and engaged in as relevant transaction . . . based on that specific misrepresentation," plaintiffs in securities class actions often establish reliance through the "fraud on the market theory" articulated by the

---

[3] Rule 23(b)(3) provides:

> [T]hat the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

10

Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).  *See Halliburton I*, 563 U.S. at 810-11.

According to this theory, "[b]ecause most publicly available information is reflected in market price," investors "who buy[] or sell[] stock at the price set by the market do[] so in reliance on the integrity of that price."  *Basic*, 485 U.S. at 247.  Where the market for securities is "impersonal" and "well-developed," "an investor's reliance on any public material misrepresentations . . . may be presumed."  *Id.*; *see also Halliburton I*, 563 U.S. at 811 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." (quoting *Basic*, 485 U.S. at 246)).

Under the fraud on the market theory, plaintiffs are entitled to a rebuttable presumption of reliance if they show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (citations omitted).  Defendants can rebut the presumption by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price" including by showing the alleged misrepresentation "did not . . . actually affect the market price."  *Id.* at 269.  Where the presumption does not apply, "individualized issues of reliance ordinarily would defeat predominance and 'preclude certification' of a securities-fraud class action."  *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) (first citing *Amgen*, 568 U.S. at 462-63; and then citing *Halliburton II*, 573 U.S. at 281-82).

The only element of the fraud on the market theory that QuantumScape challenges is the third:[4] whether the market was efficient, *see* Oppo. 8:1-19:7, "meaning simply whether the stock prices reflect public information."  *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999); *see*

---

[4] It is undisputed that the misrepresentations were publicly known and that the plaintiffs traded stock during the relevant time period.  Proving materiality is "not a prerequisite to class certification," *Amgen*, 568 U.S. at 459-60, and the plaintiffs sufficiently allege materiality here.

United States District Court
Northern District of California

Herndershott Rep. ¶ 60 (contending the plaintiff's expert report "does not provide a reliable basis to conclude that QuantumScape's stock traded in an efficient market throughout the Putative Class Period").  To assess whether a market was efficient, the Ninth Circuit refers to the factors outlined *Cammer v. Bloom*, 711 F. Supp. 1264 (D. N.J. 1989).  *See Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102-03 (9th Cir. 2010); *Binder*, 184 F.3d at 1064-65.  These factors consider:

> [F]irst, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitrageurs; fourth, whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and fifth, whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

*Binder*, 184 F.3d at 1065 (quoting *Cammer*, 711 F. Supp. at 1286-87).  "The *Cammer* factors set a high bar and demand rigorous analysis."  *Purple Mountain Tr. v. Wells Fargo & Co.*, No. 18-CV-03948-JD, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022) (citing *Miller*, 615 F.3d at 1103).

### 1. Weekly Volume

The plaintiffs point out—and the defendants do not contest[5]—that the stock traded at a high weekly volume during the class period.  *See* Mot. 16:7-15.  QuantumScape's Class A common stock "traded on the NYSE with an average weekly trading volume of 89.79 million shares, or 43.61% of [its] outstanding shares" and "QuantumScape had an average weekly trading volume of ~149,000 call option contracts and ~62,000 put option contracts."  *Id.*; *see also* Cain Rep. Ex. 2.  Accordingly, this *Cammer* factor favors the plaintiffs.  *Cf. Purple Mountain Tr.*, 2022 WL 3357835, at *4 (finding average weekly trading volume of 2% of outstanding shares satisfied *Cammer*); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) (finding the weekly trading volume of 18.2 percent "was much higher than the two percent of a company's outstanding shares that *Cammer* suggested would justify a strong presumption that the market for the security is an efficient one").

---

[5] Defendants' only argument concerning trading volume is that Cain determined this number favored market efficiency by improperly comparing it to a study that covered 1984-2008. *See* Oppo. 18:26-19:5; *see also* Hendershott Rep. ¶ 61.  But they do not contest the volume itself or that courts find similar volumes favor market efficiency.

**2. Coverage by Analysts**

The defendants challenge the plaintiffs' assertion that there was "a substantial degree of analyst coverage" during the class period. Cain Rep. ¶ 34; *see* Mot. 16:16-17:2; Oppo. 13:19-26. Exhibit 3 of Cain's expert report lists seventeen "publications" that purportedly show QuantumScape's research analyst coverage during the relevant class period. *See* Cain Rep. Ex. 3. Cain includes reports from Bernstein on November 30, 2020, and from GlobalData on December 14, 2020. *See* Cain Rep. Ex. 3. Between February 4 and April 6, 2021, Cain lists coverage from GoldmanSachs, Morgan Stanley, Robert W. Baird, Cowen & Co., GlobalData, and ValuEngine. *Id.* The defendants challenge some of these reports as covering Volkswagen, an investor in QuantumScape, rather than QuantumScape itself, and challenge others as insufficient. *See* Oppo. 13:19-26.

Failing to plead that *any* analysts followed or reported on a stock counsels against finding an efficient market. *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1254 (C.D. Cal. 2015). But there appears to be "no case that identifies a threshold number of analysts" necessary for this factor to favor market efficiency. *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *5 (N.D. Cal. Dec. 22, 2016). Courts have found this factor supports market efficiency with as few as four to seven analysts covering a particular stock. *See id.*; *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (six analysts); *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (four analysts); *see also In re Diamond Foods, Inc.*, 295 F.R.D. at 248 (thirteen analysts).

The plaintiffs meet their burden, at the class certification stage, to prove by a preponderance of the evidence that sufficient analysts covered QuantumScape for this factor to favor finding an efficient market. *See Olean*, 31 F.4th at 665 (noting plaintiffs have the burden to prove facts that establish FRCP 23(b)(3) factors by a preponderance of the evidence). The plaintiffs show seventeen analyst reports and at least seven firms that covered QuantumScape during the class period. Defendants assert that Cain improperly counts a December 9, 2020 report from Deutsche Bank that covered Volkswagen, an investor in QuantumScape, *see* Oppo. 13:24-

13

26; Hendershott Rep. ¶ 65, but Cain does not include that in his list of analysts covering QuantumScape, *see* Cain Rep. Ex. 3. And even if the earnings call does not constitute an analyst report, at least seven other firms issued reports on QuantumScape during that period. That is sufficient to support market efficiency when compared to other cases. *See, e.g.*, *Todd*, 2017 WL 821662, at *7.

The defendants argue that only one analyst covered the stock for the first two months of the class period, but it is not clear this is factually correct. QuantumScape listed coverage by two analysts during this time—Bernstein and GlobalData—but defendants dispute that GlobalData constitutes an analyst because its report presented different analyses from other reports. *See* Oppo. 13:20-26; Hendershott Rep. ¶ 64 & n.126. In rebuttal, Cain calls this interpretation "simply wrong" and notes that Hendershott did not determine that the level of analyst coverage rendered the market inefficient. *See* Repl Rep. ¶¶ 21-22. At this class certification stage, Cain's initial analysis and rebuttal are persuasive and indicate that two analysts covered the stock for the first two months, particularly because the defendants point to no cases that purport to limit the definition of "analyst coverage" in the way the defendants seek. Additionally, even if the GlobalData report did not count as an analyst under *Cammer*, defendants do not point to a case that says the number of analysts covering the stock must stay above a certain level throughout the class period, nor could I find one. In fact in *Hayes*, a court in this district found analyst coverage supported market efficiency where over 300 analysts reported on the stock for much of the class period, but only seven analysts remained at the end of the class period. 2016 WL 7406418, at *5. While those numbers differed from the number of analysts covering QuantumScape—there are no allegations here that 300 analysts ever covered this stock—the case shows that the number of analysts can vary throughout the class period and still support market efficiency.

Finally, the defendants argue that the first analyst report issued an "underperform" rating. Hendershott Rep. ¶¶ 64-65. But they point to no case law that says an analyst should not be counted because of the substance of its assessment of the stock. *See* Oppo. 14:17-19.

Therefore, at this point, plaintiffs have provided sufficient facts to show by the preponderance of the evidence, *see* *Olean*, 31 F.4th at 665, that analyst coverage supports a

14

finding of market efficiency.

### 3. Market Makers and Arbitrageurs

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *Todd*, 2017 WL 821662, at *7 (quoting *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015)). More market makers makes it "more reasonable . . . to infer that the security is liquid, and, therefore, more likely the market for that security is efficient." *Id.* (quoting *Petrie*, 308 F.R.D. at 351). Though arbitrageurs are also discussed by *Cammer*, "most courts consider only the number of market makers." *Id.* (first quoting *Petrie*, 308 F.R.D. at 351; and then citing *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009)).

Defendants do not contest the plaintiffs' assertion that there were 107 market makers during the class period. Mot. 17:3-10. Accordingly, this element is met. *Cf. Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) (twenty market makers sufficient).

The plaintiffs also repeatedly point out that the defendants do not contest that QuantumScape traded on the NYSE, "a quintessentially efficient market." *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021). The plaintiffs' citations show that trading on the NYSE is considered when analyzing whether there were market makers and arbitrageurs. *See id.*; *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2022 WL 1459567, at *6 (N.D. Cal. May 9, 2022); *but see Todd*, 2017 WL 821662, at * 6 (analyzing trading on NASDAQ as a separate factor). Trading on the NYSE does not by itself establish that the market was efficient. *See In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) ("[T]he stock is traded on the NYSE, a fact that is not itself necessarily dispositive, but certainly weighs in favor of finding that the stock is traded in [an efficient market]."). Similarly, the market maker and arbitrageur "factor alone is insufficient as a matter of law to deem the market for [a particular] stock efficient." *Binder*, 184 F.3d at 1065. Therefore, while this factor favors the plaintiffs, it is not dispositive of efficiency.

15

### 4. SEC Registration

Both parties contend that the SEC registration factor favors their side.  Form S-3 is an "abbreviated" SEC filing, for which entities are eligible to file if they filed SEC reports for the previous 12 months consecutively and meet certain financial and minimum stock requirements.  Form S-3 Eligibility Requirements (I)(A)-(B).[6]  "[I]n assessing the importance of the status (or lack of it) as a Form S-3 issuer, focus is directed to the number of shareholders and market capitalization" and when a company is ineligible "only because of timing factors rather than because the minimum stock requirements . . . were not met," this factor can still support a finding of market efficiency.  *Cammer*, 711 F. Supp. at 1285.

The parties agree that QuantumScape was not eligible to file a Form S-3 because it had not been registered with the SEC for 12 consecutive months.  Cain Rep. ¶¶ 44-45; Oppo. 18:13-17.  But the plaintiffs assert, and the defendants do not contest, that QuantumScape met the other requirements and did file a Form S-3.  *See* Mot. 17:11-20; Cain Rep. ¶¶ 44-45.  Because *Cammer* provides that this factor supports market efficiency where a company is eligible to file based on financial qualifications, even if it has not met the requisite timing requirements, here I find that this factor favors market efficiency.

### 5. Cause-and-Effect Relationship

The weight of the defendants' briefing focuses on this fifth factor, whether there was a cause-and-effect relationship between the alleged misrepresentations and the stock prices.  To satisfy this factor, the plaintiffs' expert conducted an event study in which he used a regression model to determine the relationship between QuantumScape stock price returns, overall market factors in the S&P 500 Total Return Index, and industry specific factors in the S&P Composite 1500 Auto Components Total Return Index.  Cain Rep. ¶¶ 50-54.  He determined the predicted rate of return for the QuantumScape stock based on market and industry factors and compared that to the actual rate of return of the stock on twelve "Product Development and Earnings Announcement Dates" ("News Days")—defined as days when earnings or product development

---

[6] United States Securities and Exchange Commission, *Form S-3*, SEC, https://www.sec.gov/files/forms-3.pdf; *see also* Cain Rep. ¶ 44 & n.45; Oppo. 19:13-20.

updates were announced—finding four stock price movements on News Days were statistically significant at the 95% level, and six were at the 90% level. *Id.* ¶¶ 48-50, 55, 58. Cain also looked at "Least News Trading Days"—when there were "no Factiva headlines, SEC filings, or analysis reports"—and determined there were no statistically significant price movements on those days. *Id.* ¶¶ 48-50, 59 & n.53. Cain assessed the differences between the price movements, absolute values of stock prices, and daily trading volumes on News Days as compared to Least News Days, and determined each was statistically significant and "support[ed] a finding of a strong cause-and-effect relationship between information and QuantumScape Common Stock price movements." *Id.* ¶¶ 59-61. His ultimate conclusion was that the market was efficient during the class period. *Id.* ¶¶ 62, 88.

### i.          Merits of the Analysis

The defendants argue that Cain's methodology to test whether QuantumScape's stock responded to the defendants' statements was "fundamentally flawed and unreliable" for several reasons. *See* Oppo. 10:1-12:19. Some of those arguments are unconvincing. For example, the defendants repeatedly note that Cain should not have included November 27, 2020 as a "News Day" because no new information was released to the market, and since the model relies on that data point, removing it renders the model nonfunctional. Oppo. 11:14-23; Hendershott Rep. ¶¶ 39-40 & n.50. But including this date was consistent with my Order on the Motion to Dismiss, which noted that even if some of the information had previously been publicized, questions remain concerning how accessible that information was to the public, meaning information released on November 27 may have been "new."[7] And importantly, it is not clear at this stage that this contention is factually accurate—plaintiffs plead that QuantumScape stated on November 27, "[T]he fundamental science risk is behind us," and defendants' evidence does not contest that this was new information to the public. *See* SAC ¶¶ 7-8, 80. That seems sufficient to constitute a

---

[7] *See, e.g.*, Dkt. No. 153 at 18 ("If a reasonable investor heard, on the one hand, the unambiguous statements that other companies had used compromised conditions but QuantumScape did not and, on the other hand, the hyper-technical details of the testing performed, I cannot say that the "mixture" of this information would "discredit the [allegedly misleading statement] so obviously that the risk of real deception drops to nil." (citation omitted)).

United States District Court
Northern District of California

17

product update and therefore a "News Day" in Cain's model.

Also, the defendants say that the plaintiffs' analysis of the "numerous put-call parity violations" is lacking and incorrect. *See* Oppo. 17:8-19:7. But in rebuttal, the plaintiffs say that Cain tested the put-call data that Hendershott analyzed "and found that their price movements were consistent with market efficiency." Repl. 14:11-13 (citing Repl. Rep. ¶ 62). I find this rebuttal analysis convincing, at least at this stage.

The defendants also assert that the plaintiffs failed to address that QuantumScape's stock was subject to a short squeeze. But the plaintiffs thoroughly respond to this criticism in their reply and rebuttal report and contend that short-selling does not affect the finding of market efficiency.[8] *See* Repl. 9:1-10:5; Repl. Rep. ¶¶ 31-35. Again I find this rebuttal convincing.

That said, several of the defendants' arguments seem persuasive. First, the plaintiffs fail to discuss the effect of the flood of new shares on the market on January 4, 2021. QuantumScape notes that when the market for trading QuantumScape stock first opened, $500 million of the funds raised were Private Investment in Public Equity ("PIPE") funds committed by private investors who purchased shares for $10 each—less than half the opening price of $24.80—and could not be traded until after December 31, 2020. Oppo. 3:17-26. Those 50 million shares were made available on the next day of trading: January 4, 2021, the same day the Seeking Alpha article was posted. *Id.* 4:20-26. The plaintiffs do not address whether the sudden decline in the stock price on January 4, 2021 was due to the Seeking Alpha article or due to the "sudden availability of 50 million shares" on the market. *See id.* On the other hand, defendants' assertion that the change in stock price was due to the PIPE funds is mere speculation without supporting analysis. Therefore, it is not clear at this stage that this argument counsels against finding market efficiency.

Second, defendants say that Cain's model improperly used dates outside the class period and so does not show whether the market was efficient *during* the class period. Hendershott Rep. ¶¶ 36, 38. Cain says this is because of the relatively short period and the small sample size of

---

[8] Plaintiffs say that the defendants "present a somewhat schizophrenic and contradictory theory regarding short selling." Repl. 9:1-2. It is worth reminding plaintiffs and plaintiffs' counsel that schizophrenia is a medical condition, not a legal description.

18

News and Least News Days. *See* Repl. 10:14-16; Repl. Rep ¶ 38. It seems Cain's approach of using dates outside the class period might be a best practice for statistical analysis, and he says the analysis still supports efficiency throughout the class period. *See* Repl. Rep. ¶ 38. But he does not fully analyze how using dates outside the class period affects his model and results, if at all.

Third, defendants argue that Cain does not opine on the market efficiency for each of QuantumScape's options, and "[m]arket efficiency cannot be merely presumed for each QuantumScape option series, without analysis." Hendershott Rep. ¶ 14. Cain counters that courts "presume[] that when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock." Cain Rep. ¶ 79. Again, at this stage, it is not clear which party has the stronger argument.

Fourth, defendants say the plaintiffs ignore "glaring indicia" of market inefficiency during the class period. Oppo. 12:22-13:2. Their discussion of analyst coverage is addressed above. *See id.* 13:2-26. Plaintiffs do provide an explanation in reply—that Apple expressed interest in electric vehicles at the time which contributed to the stock increased, *see* Repl. 13 n.2; Repl. Rep. ¶ 52; Repl. Exs. 7, 10, 11, 12; —but as discussed at the hearing, it is not clear that this explanation is convincing, in part because it is not clear that this conclusion is based on data rather than speculation. And the defendants are apparently correct that the plaintiffs do not analyze whether the direction of stock movements was consistent with the news reports. *See* Oppo. 14:16; Hendershott Rep. ¶¶ 43-44. But, while not required to do so, the defendants do not explain the stock price changes or the direction of the movements. *See, e.g.*, Hendershott Rep. ¶ 13. Cain says that the model is "not meant to explain all of QuantumScape's stock returns via the market and industry terms" because if that were the case, "it would indicate that QuantumScape's stock returns would only respond to general market and industry, [not] to any new company-specific information." Repl. Rep. ¶ 67. At this stage, I cannot say which expert has the more correct argument, though Cain's seems plausible.

### ii. Analysis at Class Certification

Despite the seeming persuasiveness of some of the defendants' arguments, and their

United States District Court
Northern District of California

contention that the plaintiffs' expert's report "should be disregarded in its entirety," defendants neither move to exclude the report nor raise a *Daubert* challenge. *Cf. In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14-CV-00722-SI, 2016 WL 1598666, at *1, 9-10 (N.D. Cal. Apr. 21, 2016) (defendants moved to exclude expert report pursuant to *Daubert*). AS they do not raise a *Daubert* challenge to the expert report, the question I address at this stage is only whether "the evidence is . . . capable of answering a common question on a class-wide basis." *Olean*, 31 F.4th at 665 (first citing *Comcast*, 569 U.S. at 32 n.4; and then citing *Tyson Foods*, 577 U.S. at 458-59). I am "limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 667. Based on the analysis above, and after thorough review of the expert reports, I determine that Cain's expert report is capable of answering on a class wide basis the question of the cause-and-effect relationship.

The Ninth Circuit in *Olean* discussed competing expert reports submitted by the parties to establish or contest economic injury for class certification. 31 F.4th at 676. As here, the defendants' expert critiqued several elements and theories behind the regression model used by plaintiffs' expert. *Id.* The Ninth Circuit held that it was proper for the district court to consider and analyze those arguments at class certification but that even if "the defendants' critique . . . could be persuasive to a jury at trial . . . at this stage of the proceedings, [the court's] task was to determine whether [the expert report] was capable of showing class-wide impact, not to reach a conclusion on the merits of the [plaintiffs'] claims." *Olean*, 31 F.4th at 676. That is what I have done here.

Courts regularly accept experts' event studies to support market efficiency analyses at the class certification stage. *See, e.g.*, *In re Diamond Foods*, 295 F.R.D. at 248 ("The most common empirical test for a causal connection is an event study, which attmepts to calculate the effect of an event on the value of the stock of a company."); *Police Ret. Sys.*, 2021 WL 229310, at *6 (accepting use of event study to address cause and effect relationship); *see also In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003) (collecting cases and discussing the criticality of events studies in securities litigation). The defendants contest the

20

methods, but I find that Cain's events study, report, and findings are sufficiently grounded in reliable analytical methods and that his explanation of the analyses and findings is sufficiently supported; at this stage, his conclusion finding a cause-and-effect relationship is certainly possible. *See* Cain Rep. ¶¶ 48-62 & nn. 52-60 (describing the analysis and its support in academia and law). As in *Tyson Foods*, 577 U.S. at 456-57, had class members here pursued individual lawsuits, they would have been entitled to rely on Cain's expert report finding a cause-and-effect relationship, even though a jury may ultimately find the analysis unpersuasive; the evidence presented in the report is capable of answering the common question about market efficiency on a class wide basis. *See also Amgen*, 568 U.S. at 468-69 (applying rule to Rule 10b-5 action).

Additionally, I note that the cause-and-effect relationship is only one element of proving market efficiency, which is only one element of establishing the fraud on the market theory of reliance, which is only one element of plaintiffs' ultimate claim. Though I find some of defendants' arguments concerning this sub-sub-element persuasive, I "cannot decline certification merely because [I] consider[] plaintiffs' evidence" less persuasive or "unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean*, 31 F.4th at 667.

Defendants point out that Cain cited a case calling the cause-and-effect relationship the "most important factor" for determining whether the fraud on the market presumption applies, but that case is non-binding and also came before *Olean. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207 (2d Cir. 2008). Additionally, other courts have determined that "[p]laintiffs may prove market efficiency without satisfying" the cause-and-effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption. *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441–42 (D. Ariz. 2019); *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018); *see also Petrie*, 308 F.R.D. at 358; *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 437 (D. Ariz. 2013).

Accordingly, at this stage, I find that Cain's analysis is capable of showing a cause-and-effect relationship in support of market efficiency on a class wide basis.

### 6. Other Factors

The plaintiffs consider five additional factors in their assessment that the market is efficient. Three—market capitalization, bid-ask spread, and float—are from *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), a case cited by courts in this district when assessing market efficiency. *See, e.g.*, *Purple Mountain Tr.*, 2022 WL 3357835, at *5; *Junge v. Geron Corp.*, No. C 20-00547-WHA, 2022 WL 1002446, at *4 (N.D. Cal. Apr. 2, 2022); *Police Ret. Sys. of St. Louis*, 2021 WL 229310, at *6.

The plaintiffs easily meet two of *Krogman* factors. First, QuantumScape's market capitalization "averaged $11.8 billion." Mot. 18:24 (citing Cain Rep. ¶ 64). *Cf. Junge*, 2022 WL 1002446, at *4 (finding average market capitalization of $731.69 million with maximum capitalization of "more than one billion dollars" supports efficiency); *see also Police Ret. Sys. of St. Louis*, 2021 WL 229310, at *6 (finding "market capitalization greater than the majority of NYSE and NASDAQ stocks" supports efficiency). Second, QuantumScape's bid-ask spread— which "represents the cost to transact and indicates greater efficiency when the spread is 'narrow'"—was between 0.02% and 0.06% during the class period, Oppo. 19:7-8 (citing Cain Rep. ¶ 66), which is even narrower than the 0.034% to 0.078% range found sufficiently narrow in *Police Retirement Systems*, 2021 WL 229310, at *6. Defendants' only contention concerning market capitalization and bid-ask spread is that Cain determined this number favored market efficiency by improperly comparing it to a study that covered 1984-2008. *See* Oppo. 18:26-19:5; *see also* Hendershott Rep. ¶ 61. But they do not contest the numbers themselves or that courts find similar numbers favor market efficiency, and so their argument is unpersuasive.

The third *Krogman* factor counsels against market efficiency. QuantumScape's public float—"the percentage of shares not held by insiders," *Junge*, 2022 WL 1002446, at *4—averaged 66%. Other courts in this district find that public float favors efficiency when the number is much higher. *See Junge*, 2022 WL 1002446, at *4 (greater than 99% float); *Purple Mountain Tr.* 2022 WL 3357835, at *5 (approximately 90% float); *Police Ret. Sys. of St. Louis*, 2021 WL 229310, at *6 (99% float). The plaintiffs point to a case from New York that found public float of 31% to 43% "was consistent with a finding of market efficiency." *McIntire v. China MediaExpress*

22

*Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014); *but see Krogman*, 202 F.R.D. at 478 (46% float weighed against market efficiency). But courts within this circuit support a higher float level. *See also Di Donato*, 333 F.R.D. at 441 (87.2% public float).

Finally, plaintiffs present two additional factors that they say show market efficiency. First, 484 institutions held QuantumScape's Class A common stock at various points throughout the class period, holding between 32% and 40.6% of all shares. Oppo. 19:18-21; *see also* Cain Rep. ¶¶ 70-71; Cain Rep. Ex. 10. Some courts consider institutional investors when assessing market efficiency. *Petrie*, 308 F.R.D. at 357 (collecting cases); *see also City of Sunrise*, 2022 WL 1459567, at *6 (discussing institutional coverage in its market maker analysis). But the parties do not cite, and I could not find, binding authority using this factor, so I do not consider it here. At any rate, it does not appear to favor market efficiency here. *See id.* (noting that most cases showing market efficiency involve institutions holding over 70% of all shares).

Second, plaintiffs note that QuantumScape's "autocorrelation coefficient"—which "refers to an anomaly where stock returns over a given time predict future returns"—was "not statistically significant" and supported a finding of market efficiency. Oppo. 19:25-20:3 (citing Cain Rep. ¶¶ 72, 74). Again, this factor has not been applied by binding authority and so I do not consider it here.

* * *

In sum, four of the five *Cammer* factors and two of the three *Krogman* factors favor finding an efficient market, though the strength of each factor's support for market efficiency varies. The final *Crammer* factor, whether empirical facts show a sufficient cause-and-effect relationship, is hotly contested. The final *Krogman* factors counsels against finding market efficiency. But considering the analyses and data, I find that the plaintiffs have met their burden to show by a preponderance of the evidence, at class certification stage, that the Rule 23(b) predominance requirement is met because they showed by a preponderance of the evidence that their evidence is capable of answering on a class wide basis whether the market was efficient, so the fraud of the market presumption of reliance applies.

Finally, the defendants may defeat the fraud-on-the market presumption from *Basic* "at the

23

class certification stage through evidence that the misrepresentation did not in fact affect the stock price." *Halliburton II*, 573 U.S. at 279.  Here, defendants submitted evidence and analyses contending that the plaintiffs' expert's analysis was faulty and unconvincing, and presented the theory that the stock price change on January 4, 2021, was due to a flood of PIPE shares on the market rather than to the Seeking Alpha corrective disclosure.  But the defendants do not submit evidence that any of the misrepresentations alleged by the plaintiffs "did not *in fact* affect the stock price." *Id.* (emphasis added).  Accordingly, they fail to rebut the *Basic* presumption.

For those reasons, the plaintiffs have met their burden to establish the fraud on the market presumption of reliance.

### b.  Damages

QuantumScape contends that the plaintiffs failed to articulate a class wide damages calculation methodology consistent with their theory of liability.  Oppo. 19:8-22:17.  Defendants assert that the plaintiffs are required to provide specifics of their proposed methodology but failed to and cannot do so because there are no corrective disclosures from which to calculate damages, and even if the Seeking Alpha report and Scorpion Capital report constitute corrective disclosures, plaintiffs' expert failed to distinguish between losses caused by fraud as opposed to other market factors.

The defendants' arguments about corrective disclosures are essentially the same as ones I considered at length in my Order Denying the Motion to Dismiss.  As the plaintiffs note, Oppo. 21:20-21, the complaint sufficiently states that both articles are corrective disclosures because each had indicia of reliability and it is plausible that reasonable investors relied on them, Dkt. No. 153 at 15:19-27.  I also explained that while defendants may ultimately have a meritorious argument that the information in the articles was not newly revealed to the public, the plaintiffs presented sufficient evidence to show that the articles contained new information and so constituted corrective disclosures.  *See id.* 13:15-20:26.  And at this stage, because the plaintiffs sufficiently show corrective disclosures were made, they may use those disclosures to explain how they will calculate damages on a class wide basis.

After recognizing that I previously rejected these arguments, the defendants say that Cain's

24

calculation method fails to distinguish between stock price changes caused by their alleged misrepresentations and stock price changes caused by other market factors. *See* Oppo. 21:20-22:5. This is essentially an argument that the plaintiffs "must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Hallburton I*, 563 U.S. at 807. The Supreme Court has said that plaintiffs do not need to prove loss causation at the class certification stage, even where "intervening causes" beyond the alleged misrepresentation "such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events' . . . were responsible for the loss or part of it." *Id.* at 812-13 (citation omitted). Here Cain was not required to prove that the misrepresentations, or subsequent corrective disclosures, caused the plaintiffs' loss at this stage. He thoroughly explained how he would calculate damages using the corrective disclosures based on a "well-accepted methodology under Section 10(b) of the Exchange Act" that is sufficient to show by a preponderance of the evidence that loss causation and damages are capable of being established on a class wide basis. Cain Rep. ¶¶ 81-87. Therefore, while defendants may ultimately prevail on the merits with this argument, for the class certification stage the plaintiffs meet their burden.

Accordingly, the plaintiffs meet the predominance requirements of Rule 23(b). The defendants do not contest whether a class action is superior to other available methods of litigation. Here, the class members' interests in individually controlling the prosecution or defense of separate action, the extent that other similar litigation has begun, the desirability of concentrating the litigation in this forum, and the likely difficulties in managing a class action all favor class litigation here. *See* Fed. R. Civ. Proc. 23(b)(3)(A)-(D). This action meets the requirements of the federal rules.

**CONCLUSION**

For those reasons, I GRANT the plaintiffs motion to certify this class and to appoint class representatives and class counsel.

**IT IS SO ORDERED.**

Dated: December 19, 2022



William H. Orrick
United States District Judge

25

United States District Court
Northern District of California