# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------

                           :

                           :

**In re NIO, Inc. Securities Litigation**    :

                           :

-------------------------------------------------------

**Case No 1:19-cv-01424-NGG-JRC**

**<u>CLASS ACTION</u>**

**EXPERT DECLARATION OF**
**WILLIAM H. PURCELL**

**December 23, 2022**

Case 1:19-cv-01424-NGG-JRC   Document 122-13   Filed 12/23/22   Page 2 of 82 PageID #: 3817

TABLE OF CONTENTS

Pages

I.    INTRODUCTION AND OVERVIEW OF ASSIGNMENT ....................................................1

II.   THE ALLEGATIONS .................................................................................................................5

III.  SUMMARY OF OPINIONS......................................................................................................6

IV.   PROFSSIONAL BACKGROUND AND QUALIFICATIONS OF
      WILLIAM H. PURCELL ..................................................................................................... 8-13

      A.  Educational Background .............................................................................................8

      B.  Work Experience in Investment Banking Industry.........................................................8

      C.  Expert Witness Experience.........................................................................................11

      D.  Additional Information................................................................................................12

V.    OPINIONS AND BASES FOR OPINIONS ........................................................................ 13-35

      Opinion 1.................................................................................................................13

      Opinion 2.................................................................................................................25

      Opinion 3.................................................................................................................30

VI.   SIGNATURE AND RIGHT TO SUPPLEMENT..................................................................36

**EXHIBITS**

1.  William Purcell CV

2.  Materials reviewed and considered

I, William H. Purcell, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief. If called to testify, I could and would testify competently to the following facts.

## I.    INTRODUCTION AND OVERVIEW OF ASSIGNMENT

1.    I have been retained by The Rosen Law Firm, P.A., counsel for the Plaintiffs and the Class,[1] to serve as an investment banking, financial and valuation expert in the class action against NIO Inc. ("NIO" or the "Company"),[2] certain officers and directors of NIO,[3] as well as the

---

[1] "Class" here includes both the Securities Act Class and the Exchange Act Subclass.

[2] NIO is a China-based company, founded in 2014 and headquartered in Shanghai, that develops electric vehicles (or "EVs"). NIO's aim was to fill a niche market in China by offering premium EVs at a lower price than premium import models (such as Tesla, Mercedes-Benz and Audi). According to NIO, as set forth in the Registration Statement, it is able to sell cars at lower prices than foreign models in China because all of NIO's manufacturing is done domestically in China. *In addition, NIO is able to take advantage of EV subsidies from the Chinese government to domestic EV companies. For additional information about the importance of subsidies for NIO at the time of the IPO, refer to some of the information set forth in footnote 6 herein*. NIO, however, unlike most other auto companies and its competitors, did not have its own manufacturing facility. Instead, NIO's EVs during 2018 were manufactured by a Chinese state-owned truck manufacturer name Jianghuai Automobile Group Co. Ltd. ("JAC Motors"). NIO's manufacturing cooperation agreement with JAC Motors, entered into during May 2016, requires NIO to pay JAC Motors for every vehicle it manufactures for NIO plus NIO is required to compensate JAC Motors for all operating losses, if any, associated with manufacturing NIO's EVs for the first 36 months of production. In its Registration Statement for the IPO, NIO stated that *building its own manufacturing facility* and *controlling production of its EVs was an important part of its business strategy*. Indeed, as stated in the Complaint, CNN Business in a televised discussion referred to NIO's arrangement with JAC Motors as an "unusual business model" and "a source of concern for investors". Also, even one of the Underwriters for the IPO, Morgan Stanley – the Lead Manager for the IPO, stated the following in its first analyst research report issued after the IPO (dated October 7, 2018): "Key Concerns: 1) Limited production experience and *heavy reliance* on partnership and outsourcing…" (page 1 of the analyst report) (emphases above are mine)

[3] The officer and director defendants ("Defendants") are (i) Bin Li (NIO's founder, CEO and Chairman. Prior to the IPO, Bin Li held 17.2% of NIO's stock and, immediately after the IPO, he held 48.3% of NIO's aggregate voting power through his beneficial ownership of all of NIO's Class C shares, each of which was entitled to eight votes; (ii) Louis T. Hsieh (or "Hsieh") was NIO's Chief Financial Officer ("CFO") at all relevant times. He resigned from his position at NIO on October 30, 2019. (iii) Lihong Qin ("Qin"), NIO's co-founder President, and a director of NIO at all relevant times; (iv) Padmasree Warrior ("Warrior"), NIO's Chief

1

underwriters for the IPO,[4] to rebut the Declaration of Dr. Faten Sabry rendered on October 17, 2022. Dr. Sabry's primary opinion, as set forth in paragraph 55 (page 24) of her Declaration, was that, although the price impact of an alleged misrepresentation can often be estimated by the ensuing price reaction at the time of the alleged misstatement, i.e., that one could identify and measure the alleged misstatement's price impact by comparing the stock price before and after the alleged misstatement was made, it is not possible in this matter because the alleged misstatements here were made before NIO went public. As Dr. Sabry stated: "There is no 'before' price to compare to the price after the alleged misstatements were made." Dr. Sabry then goes on to state in section B following paragraph 55 that: "No Price Impact can be Inferred from the Price Decline Following the Q4/FY18 Earnings Announcement."

2.     Accordingly, I have been asked to render certain opinions, among other things, in regard to the initial public offering ("IPO") by NIO on or about September 11-12, 2018. In that offering, NIO issued 184 million American Depository Shares (the "Shares" or "ADSs") at US

---

Development Officer from December 2015 until her resignation in November 2018. She was also the Chief Executive Officer of NIO USA as well as a director of NIO; (v) Tian Cheng ("Cheng"), a director of NIO at all relevant times; (vi) Xiang Li ("X Li"), a director of NIO at all relevant times; (vii) Hai Wu ("Wu"), a director of NIO at all relevant times; (viii) Yaqun Zhang ("Zhang"), a director NIO at all relevant times; (ix) Xiangping Zhong ("Zhong"), a director of NIO at all relevant times; and (x) Zhaohui Li ("Z Li"), a director of NIO at all relevant times.

[4] The underwriters (the "Underwriters" and "Underwriter Defendants") are Morgan Stanley & Co. LLC ("Morgan Stanley"), which served as the Lead Managing Underwriter for the IPO; Goldman Sachs (Asia) LLC ("Goldman Sachs"); J.P. Morgan Securities LLC ("JP Morgan"); Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch" or "Bank of America Merrill Lynch"); Deutsche Bank Securities ("Deutsche"); Citigroup Global Markets Inc. ("Citigroup"); Credit Suisse Securities (USA) LLC ("Credit Suisse"); UBS Securities LLC ("UBS"); and WR Securities, LLC ("WR").  In this declaration, all references to "Underwriters" include affiliates of the Underwriters in Asia and elsewhere all of whom worked seamlessly together to complete NIO's IPO.

2

$6.26 per share to raise net proceeds of approximately $1.095 billion after underwriting commissions and expenses were paid[5]

3.      Specifically, I have been asked, based on my investment banking experience including having participated in a number of IPO financings, (i) whether, from an investment banking, financial and valuation point of view, NIO's statements in the Registration Statement and Prospectus (together, the "Registration Statement") that  its own manufacturing facility in Shanghai (the "Shanghai Facility") is currently being constructed and that it was expected to be completed by the end of 2020, was an important event for investors and therefore had a meaningful positive impact on the finalized initial offering price of the Shares set by the Underwriters for the IPO; (ii) whether, when NIO announced on March 5, 2019 (approximately six months after the IPO) that it was "terminating construction" of the Shanghai Facility, an unexpected event in the view of the investment community[6] – with the result that its shares then declined by approximately 30 percent

---

[5] The Lead Managing Underwriter for the offering was Morgan Stanley, with co-managers being Goldman Sachs (Asia) and J.P. Morgan. Other Underwriters included Merrill Lynch (or Bank of America Merrill Lynch), Deutsche Bank, Citigroup, Credit Suisse, UBS, and WR.

[6] It is my understanding that Defendant Bin Li told investors on or about March 5, 2019 that NIO had decided not to build the Shanghai Facility because in November 2018 (approximately 3-4 months earlier, and only about two months after the IPO) the Chinese government had issued a new policy directive that endorsed cooperation between automobile "research and development" companies like NIO and third-party manufacturers like JAC Motors – and that the Chinese government would issue additional details about this endorsement at a future date. *NIO, however, had already been acting in this manner prior to the IPO, i.e. benefitting from favorable government policies regarding subsidies, before it told investors in the Registration Statement that it was building its own Shanghai Facility.* Refer to the emphasized information in footnote 2 herein as well as the NIO Registration Statement at page 3 where the following is stated: "*The Chinese NEV Market [i.e., new energy vehicle market] benefits* [at this time] *from favorable policies and strong government support. Also, the subsidies given within China at the time of the IPO were an important part of research analysts positive investment points well before the March 5, 2019 Company announcement.* For example, Morgan Stanley, the Lead Manager for the IPO, stated in its October 7, 2018 research report (issued about 3 weeks after the IPO) the following: (a) NIO currently has a lower price among 'premium EV's currently on the market, "partly due *to local manufacturing subsidies…*" (at page 1 of the report, SABRY-0000211) and (b) "Favorable policies have been issued [by the Chinese government] to push

3

over the next two days,[7] was the reversal of the alleged material misrepresentations in the

Registration Statement about having begun construction of the Shanghai Facility,[8] which was

expected to be completed by the end of 2020, a significant reason for that decline;[9] and (iii) did the

---

NEV penetration." (at page 5 of the report, SABRY-0000215) In addition, Wolfe Research (Wolfe also being one of the Underwriters for the IPO) issued a research report dated October 8, 2018, with one of its "Key Investment Takeways" labeled "*China government support for EVs is a tremendous tailwind.*" (at page 2 of the report, SABRY-0000245) Other Underwriters in their research reports made similar comments. In addition, based on the Complaint (at paragraphs 13 and 14), in the days following NIO's announcement of abandoning construction of the Shanghai Facility, certain investors, analysts, and media outlets, including a former NIO employee, stated that *the real reason* for NIO's decision about not going forward with the Shanghai Facility was its cash shortage and less than expected EV sales.

[7] The shares continued to decline, so that the decline over four days from the March 5, 2019 announcement was 37.1 percent.

[8] The alleged material misleading statements and omissions are set forth in the following Section II of this report.

[9] Information about the price and volume activity of NIO's Shares during the Class period, which Shares were traded on the New York Stock Exchange under the symbol "NIO", are as follows: (i) The day after the IPO, on September 13, 2018, NIO's Shares closed at $11.60 per Share on volume of 158.35 million Shares – *an increase of 85.3 percent over the IPO price* of $6.26. Based on Bank of America Merrill Lynch's research report dated March 6, 2019, the 52 week high price for NIO's Shares was $13.80; (ii) By October 2, 2018, however, only about 3 weeks after the IPO, the NIO shares had *declined* significantly, closing below the offering price, i.e., at $5.93 per Share. The volume of trading on that day was 19.4 million Shares; (iii) At about 5 pm on October 9, 2018, it was publicly disclosed that the Scottish investment fund, Baille Gifford & Co., one of Tesla's biggest investors, had become an 11.4 percent holder of NIO's Shares, based on a regulatory filing. Baille announced that it had purchased 85.3 million NIO Shares valued at about $515 million, or at an average price of about $6.04 per share. As stated in an article by the publication TC, **"**the filing pushed shares of NIO to close at $7.38, up [19.2 percent] from its opening of $6.19 this morning. Shares are up another 7 percent in after-hours trading and are continuing to climb." (iv)At year-end 2018 (on December 31, 2018), the NIO Shares closed at $6.37 per share on volume of 8.67 million Shares; (v) By January 31, 2019, the NIO Shares had increased to $7.88 per Share on volume of 21.23 million Shares; (vi) By February 28, 2019, the NIO Shares had increased to $9.57 per Share on volume of 26.51 million Shares as NIO had completed a $750 million convertible bond financing in early February; (vii) On Friday, March 1, 2019, the NIO shares closed at $10.06 per Share on volume of 32.41 million Shares; (viii) On Monday, March 4, 2019, the NIO Shares closed slightly lower at $9.78 per Share on volume of 43.75 million Shares; (ix) On Tuesday, March 5, 2019, the NIO Shares increased somewhat and closed at $10.16 per Share on volume of 53.68 million Shares; (x) *On Wednesday, March 6, 2019, after the Company's announcement* once the market had closed on March 5, the NIO Shares *declined significantly* to $8.01 per

4

analyst reports, all issued after the March 5, 2019 announcement by NIO mostly by employees of the Underwriters of the IPO, involve potential conflicts of interest. These analyst reports in fact appear to be the primary evidence and basis that Defendants rely on in support of the view that the reversal of the alleged material misrepresentations about the Shanghai Facility as set forth by the Plaintiffs were not the cause of a portion of the significant decline in the price of NIO Shares – as compared, in Defendants' opinion, that the reason for most or all of the decline in NIO's Shares was the disclosed slowing of the demand for NIO cars as set forth in the March 5, 2019 announcement.

II.     **THE ALLEGATIONS**[10]

4.      As stated in the Second Amended Class Action Complaint filed on September 18, 2020, Plaintiffs bring claims on behalf of the Class based on (I) Sections 11 and 15 under the Securities Act for all purchasers of NIO ADSs pursuant and/or traceable to the Registration Statement in connection with NIO's September 12, 2018 IPO; and (II) Sections 10(b) and 20(a) claims under the Securities Exchange Act of 1934 for all purchases of NIO ADSs during the Sub-Class Period, except persons who purchased directly from the Underwriters.

---

Share on increased volume of 73.52 million Shares – a decline of $2.15 per Share of 21.2 percent for that day; (xi) On Thursday, March 7, 2019, the NIO Shares *declined further* to $7.09 per Share on volume of 52.47 million Shares, as investors continued to digest the Company's announcement on March 5, 2019 after the close of trading – a decline now of 30.2 percent in the two days after the March 5 closing price of $10.16 per Share. On the following trading days, the NIO Shares *continued to decline* – to $7.06 per Share on March 8, on volume of 32.04 million Shares; to $6.59 on Monday, March 11, on volume of 62.54 million Shares; and to $6.39 per Share on March 12, 2019 on volume 41.62 million. *The decline in price for the NIO Shares from the March 5 close of $10.16 per Share through March 12, 2019 was now 37.1 percent*. The NIO Shares *continued to decline* to $5.10 per Share by the end of March 2019 (i.e., March 29) and to $4.85 per Share by the end of April 2019 (i.e., April 30). At the end of May 2019, the NIO Shares closed at $3.05 per Share (on May 31); and, by the end of June 2019, the NIO Shares closed at $2.55 per Share (on June 28). By October 31, 2019, *just over a year from the IPO*, the NIO Shares had declined to close at $1.45 per Share – a *decline of 76.8%* from the IPO price of $6.26 per Share.

[10] It is noted that any emphasis herein is mine unless expressly indicated otherwise.

5.      Plaintiffs allege that the Registration Statement was materially misleading. *First*, it is alleged by Plaintiffs that the construction on the Shanghai Facility was *not* underway at the time of the IPO, contrary to the disclosures in the Registration Statement. In fact, Plaintiffs allege that construction on the Shanghai Facility *never started*. As stated in the Complaint (at paragraph 10), "Construction of the Shanghai Facility would have required a construction planning permit from the Shanghai government, but the website of the Shanghai Municipal Planning and Natural Resources Bureau *shows that no construction planning permit was ever issued for NIO's Shanghai Facility*. Furthermore, the Shanghai Facility would have needed to pass an environmental impact assessment prior to commencing construction, but the Shanghai Environmental Impact Assessment For Construction Projects Publication Platform *does not show that an environmental impact approval was ever issued for the Shanghai Facility*." *Second*, the Registration Statement failed to warn investors, as a risk factor or otherwise, that the construction of the Shanghai Facility *depended on* NIO having sufficient cash flow as well as its EV sales meeting planned expectations. The Registration Statement also did not disclose to investors the risk – which ended up being very real – that NIO might decide to abandon plans to build the Shanghai Facility after the IPO.[11]

## III.    SUMMARY OF OPINIONS

6.      A summary of my opinions, with the bases for the opinions discussed later herein, is as follows:

(i) NIO's statements in the Registration Statement that it had begun construction of the Shanghai Facility, and that the Shanghai Facility was expected to be completed by the end of 2020, did have from an investment banking, financial and valuation point of view a meaningful positive impact on the finalized IPO price set by the Underwriters for the Shares,[12] i.e., a higher offering price than possible if investors had

---

[11] The Registration Statement, in addition to the risk factors listed in the important "box" section of the Prospectus, and discussed later herein, also listed other numerous risk factors in over 45 pages of various generalized risk factors – which are discussed later herein.

[12] Having read Dr. Sabry's Declaration dated October 17, 2022 and her deposition taken on November 11, 2022, in my opinion her analysis is not persuasive evidence of "No Price

6

alternatively been told that NIO did not plan to build its own manufacturing facility, but instead was going to continue to rely on the existing joint partnership manufacturing arrangement with JAC – a situation about which the Underwriters and certain analysts had concerns at the time of the IPO as well as shortly after the IPO.

(ii) Although more discovery evidence would be required than is now available in order to be more precise in determining the potential dollar per share estimate or range of the magnitude of the meaningful positive impact on the finalized IPO price set by the Underwriters, it is my opinion that the positive impact would be significant. Indeed, it is highly likely in my opinion from an investment banking, financial and valuation point of view that, without the disclosure in the Registration Statement of the important event that construction of the Shanghai Facility was underway (and which was expected to be completed by the end of 2020), NIO could not have raised anything close to $1 billion from investors, including at a pre-money valuation of

---

Impact." The only thing that Dr. Sabry appears to have done, in order to assess whether the corrective disclosure on March 5, 2019 had a price impact, was to examine the reaction of published research reports by analysts dated shortly after NIO's March 5, 2019 announcement, most of which analysts were employed by the investment banks that underwrote the NIO IPO. (Sabry Deposition, at pages 90-91 and 120-122) As discussed in this report, the analyst reports, issued shortly after the September 2018 IPO to investors by the same firms that issued research reports after March 5, 2019, emphasized the importance of the Shanghai Facility to NIO and its expected completion by the end of 2020. Also, in pre-IPO meetings with potential investors, Morgan Stanley learned about various major concerns that investors had about NIO's reliance on JAC to manufacture high quality vehicles rather than NIO having its own factory. (See UW_MS_0008278; UW_MS_00078962; UW_MS_00078980; and UW_MS_00079140). Indeed, after a series of 7 pre-IPO meetings and 20 calls, Morgan Stanley analyst, Alan Jones stated: "investor skepticism is extremely high and nearly universally shared across meetings." (UW_MS_00079207-28; and US_MS_00086744, where it is stated that "outsourced production entails higher execution risk." It is also noted that Dr. Sabry, testified, when asked if she knew how IPO's were priced by underwriters: "I do not have an opinion on that. That's not part of the scope of the work I was asked to do." (Sabry Deposition taken on November 11, 2022, at pages 83-84) She also testified, however, that "I have a general understanding" of IPOs (Id, at page 84). In addition, Dr. Sabry testified that, although she had read the NIO Registration Statement, (a) "I can't speak for what investors thought" about any aspects set forth in the NIO Registration Statement. (Id, at page 16), and (b) she was not asked to analyze whether the building of the Shanghai Facility and the allocation of approximately $276 million of the IPO proceeds towards the Facility and its equipment had any effect on the pricing of the IPO. (Id, at pages 84-85) Given these statements by Dr. Sabry, it seems somewhat unusual from an investment banking, financial and valuation point of view that Dr. Sabry could then conclude, without having any opinion or knowledge about the factors that could determine the finalized IPO price and valuation of NIO as set by the Underwriters, that "there is no 'before' price to compare to the price after the alleged misstatements were made" and therefore "No Price Impact can be Inferred from the Price Decline Following the Q4/FY18 Earnings Announcement."

7

NIO of over $5 billion, as of September 2018 – or that it could have raised any new equity capital at this same pre-money valuation of the Company of over $5 billion at the time of the IPO without investors knowing the important fact that NIO now could and would build its own manufacturing facility – and not in the future be totally dependent on an existing joint partnership manufacturing arrangement.

(iii) In my opinion from an investment banking, financial and valuation point of view, because nine of the ten analyst reports issued after NIO's March 5, 2019 announcement were written by employees of the IPO Underwriters, this demonstrates the analysts had a conflict-of-interest that should be considered in analyzing the reasons for the decline in NIO's Shares after NIO's March 5, 2019 announcement. One can reasonably conclude that the analysts' published views that NIO's termination of the construction of its Shanghai Facility was a positive event for NIO (based on potential capital expenditure savings) were tainted by this conflict-of-interest.

## IV.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

7.    My experience as an investment banker, including having participated in numerous financial transactions (including IPOs), is set forth below.

### A.  Educational Background

8.    I graduated from Princeton University *cum laude* with a B.A. in Economics in 1964. I earned an MBA with honors from New York University Graduate School of Business in 1966. A copy of my Curriculum Vitae ("CV") is attached as Exhibit 1.[13]

### B.  Work Experience in the Investment Banking Industry

9.    I have been an investment banker for over 50 years.

10.    I began my career in 1966 at Dillion, Read & Co. Inc. ("Dillon Read"), a privately held investment banking firm founded in 1932 and headquartered in New York City. I was elected a Managing Director of Dillon Read in 1982 and continued to be a Managing Director until I left in November 1990. After I left Dillon Read, it ultimately became part of UBS, an investment bank and financial services company.

---

[13] My CV includes cases in which I have testified as an expert witness at trial and/or by deposition, as well as merger and acquisition transactions and various financing transactions in which I have participated during my career.

8

11.     From October 1993 through February 1995, I was asked to be the Chief Executive Officer and Director of a company going through bankruptcy proceedings, Gulf USA and its wholly-owned but somewhat independent subsidiary not in bankruptcy, Gulf New Zealand – on which board I was also a Director. During the 1990's, I also acted as a senior advisor investment banker to the corporate finance department of Gruntal Capital Markets and a Senior Consultant, as well as a Director, to AmBase Corporation.

12.     Since 2001, I have been a Senior Director of Seale & Associates ("Seale"), an investment banking firm in the Washington DC area. With Seale, I provided advise and assistance to companies and organizations and their senior executives (including chief executive officers and chief financial officers) with respect to, among other things, M&A issues, financing issues, valuations, fairness opinions, and general financial planning matters. I also occasionally consult for and work with certain other investment banking firms.

13.     During my career, I have worked in many areas of corporate finance and investment banking, including public and private corporate financings of many types; various M&A related transactions on both the Buy and Sell side; reorganizations and recapitalizations, spin-off transactions; and a number of investment-related activities, including joint venture transactions and leveraged buyouts.

14.     I served for a period of time as a co-head of the Dillon Read private-placement department. There I worked on a variety of private placements, including complex ones that involved transactions such as joint venture financings. Together with counsel, I was responsible for drafting many of the engagement agreements, as well as the private-placement memorandums, for various private-placement financings.

15.     As a result of my experience in the investment banking industry, I have worked with almost all of the leading investment banks in the United States, a number of regional investment

9

banks, and various commercial banks. Accordingly, I am familiar with the important principles and standards relating to the investment banking industry and the financial community, including most aspects of the capital markets.

16. I have been a Director of various companies during my career, and I have as an investment banker represented more than twenty Special Committees of Boards of Directors. I have consulted with those Boards regarding issues as varied as mergers and acquisitions, corporate financings, fiduciary duties, conflicts of interests, valuations, and corporate fairness. I am therefore familiar with the duties and responsibilities of a board member, including his/her fiduciary duties and basic principles or corporate governance, full disclosure, and due diligence.

17. In the area of corporate financing, I have worked on more than 100 equity and debt issuances as an investment banker, including both public offerings (including initial public offerings) and private placements.[14] These financings have included new equity issues, secondary equity offerings, issues with debt (credit) ratings of investment grade and below investment grade, subordinated debt issues, convertible debt, debt with warrants, convertible preferred issues, mezzanine debt, commercial bank loans, bridge financings, and off-balance sheet debt, including lease financings and joint venture financings.

18. In my professional capacity as an investment banker, I have worked on more than 100 M&A transactions involving both publicly traded and privately owned companies, including mergers, divestitures, leveraged buyouts, going-private transactions, reorganizations and recapitalization, joint ventures, and private investments. I am thus familiar with the M&A process of merging companies and/or selling and buying companies, strategic M&A considerations, M&A due diligence and disclosure issues, and the standards of care and procedures that should be followed in

---

[14] I have worked with counsel on both the preparation of public prospectuses and private placement memorandums, as well as the engagement agreements relating to such financings.

regard to both M&A and financing transactions.[15] I have also performed valuations on numerous companies and their securities, both public and private, in many different industries and contexts.

19.     In all the financing transactions I have been involved with during my career, I have been responsible for and/or have participated in the due diligence investigation of the companies undertaking a financing, both in the public offerings and private placement financings.

### A. Expert Witness Experience

20.     Starting in 1976, I have been retained as an investment banking expert witness by over 180 law firms in over 220 litigation matters. I have also been retained by various government regulatory agencies, including the United States Securities and Exchange Commission; the United States Department of Justice; the United States Attorney's Office, District of South Carolina; and the Internal Revenue Service.

21.     I have testified in over 40 federal and state courts and before various arbitration tribunals.[16] My testimony has encompassed a wide range of investment banking matters, including M&A process issues and M&A-related disputes regarding both completed and non-completed

---

[15] I have worked with counsel in preparing M&A proxy statements as well as M&A financing documents, including the engagement agreements relating to the various projects.

[16] Courts in which I have testified as an expert witness include the following federal and state courts: The United States District Court for the Southern District of New York; the United States District Court for the Eastern District of New York; the United States Bankruptcy Court for the Southern District of New York; the United States Bankruptcy Court for the District of Massachusetts (Eastern Division); the United States Bankruptcy Court for the District of Colorado; the United States District Court for the Eastern District of Virginia (Norfolk Division); the United States Tax Court in both Washington, D.C. and Atlanta; the Federal Court of Claims, the Supreme Court of the State of New York; the Delaware Court of Chancery (many times); the Judicial Circuit Superior Court of New Jersey Law Division, Morris County; the Circuit Court of the 17th Judicial Circuit in and for Broward County Florida; the Circuit Court of the 11th Judicial Circuit Miami-Dade County, Florida; the Superior Court of the State of California, in both Los Angeles County and Orange County; the Cuyahoga County Court of Common Pleas, Ohio; and the Circuit Court of Pulaski County, Arkansas, I have also testified before FINRA and other arbitration forums, including before the American Arbitration Association, JAMS, the International Institute for Conflict Prevention and Resolution, and the National Hockey League Players Association.

transactions. I have also testified in numerous cases involving the adequacy of the due diligence performed in M&A transactions as well as in financing transactions, both public and private issues, including "IPOs". In addition, I have testified regarding M&A entire fairness issues, numerous cases involving issues of director and officer fiduciary duties, Special Committee M&A issues as well as Special Committee financing issues, valuation issues, solvency issues, material adverse change issues, and fee disputes in both financing and M&A transactions.

22.     I have also been retained as an expert in a number of complex corporate situations involving the failures of Enron, Refco, and Indy Mac.

23.     In connection with the due diligence and disclosure matters, I have testified in numerous cases as an investment banking expert witness regarding disclosure issues as well as the due diligence investigations undertaken by both underwriters and directors for transactions involving the sale of securities (either equity or debt-related) to investors. My personal knowledge regarding investment banking industry standards, customs and practice, as well as the standards expected in regard to both the full disclosure of material issues and through and adequate due diligence investigations for securities transactions by underwriters and directors, is derived not only from my actual underwriting and due diligence experience, but also knowledge based on certain industry texts and various court opinions that discuss the required and appropriate disclosure and due diligence standards expected of underwriters and directors in the sale of securities to investors.

**B.  Additional Information**

24.     My compensation in this matter is based on my standard hourly rate of $695 per hour.

25.     My opinions, which are stated within a reasonable degree of professional certainty, are based on documents referred to in this Report, the documents referred to in Exhibit 2 of this Report, as well as my experience as an investment banker. I reserve the right to amend and/or

12

supplement my opinions in the future if additional information comes to my attention that may affect the views and opinions expressed herein.

## V.    OPINIONS AND BASES FOR OPINIONS

Opinion 1:    NIO's statements in the Registration Statement that it had begun construction of the Shanghai Facility, and that the Shanghai Facility was expected to be completed by the end of 2020, did have from an investment banking, financial and valuation point of view a meaningful positive impact on the finalized IPO price set by the Underwriters for the Shares, i.e., a higher offering price than possible if investors had alternatively been told that NIO did not plan to build its own manufacturing facility, but instead was going to continue to rely on the existing joint partnership manufacturing arrangement with JAC – a situation about which the Underwriters and certain analysts had concerns at the time of the IPO as well as shortly after the IPO.

### BASES FOR THE OPINION

(a) For a developing EV automobile company, believing that the potential demand for its vehicles warrants building its own manufacturing facility, is generally considered by investors to be a very positive and important event. Indeed, NIO admitted in its Registration Statement disclosures, as discussed later herein, that building its own manufacturing facility and controlling its production in the future was an important part of its business strategy – *indeed it was NIO's number 2 strategy out of 5 basic strategies – especially since manufacturing jointly with partners was listed in the Registration Statement as a significant risk factor*,[17] as well as being a concern to a number of analysts, including analysts employed by the Underwriters.

---

[17] In fact, NIO listed the following as its fourth "risk factor" on page 16 of the Registration Statement: "Manufacturing *in collaboration with partners* is subject to risks. We have entered into an arrangement with … JAC for the manufacture of the ES8 for five years. The ES8 is manufactured in partnership with JAC… Collaboration with third parties for the manufacturing of vehicles is *subject to risks* with respect to operations that are outside our control. We could experience delays to the extent our partners do not meet agreed upon timelines or experience capacity constraints. There is risk of potential disputes with partners, and we could be affected by adverse publicity related to our partners whether or not such publicity is related to their collaboration with us. Our ability to successfully build a *premium brand* [NIO's primary focus] could also be adversely affected by perceptions about the quality of our partners' vehicles…" Based on NIO's "corporate values", as described in some detail in a "Letter from Bin Li"

13

(b) In addition, Morgan Stanley, the Lead Manager of the IPO, [18] issued a research report shortly after the IPO (i.e., on October 7, 2018) that stated the following in the section of the report called "Key risks". In this section, 5 risks were listed:[19]

1) "Limited production experience and *reliance on partnerships*[20] *and outsourcing could lead to a loss of control in the supply chain, harming production capabilities*;[21]

---

(NIO's Founder, Chairman, and Chief Executive Officer) in the NIO Registration Statement (at pages ii and iii), i.e., "Honesty ("We value truthfulness, integrity and clarity in everything we do"); Care; Vision; [and] Action", investors would generally be impressed by both the letter and the disclosures in the Registration Statement, and thus likely would have no reason to believe that the Registration Statement included any material misleading statements, misrepresentations or omissions.

[18] It is noted that, prior to the IPO, the Morgan Stanley team (primarily the senior bankers, George Taylor, Arthur Schuetz, and David Lau) hosted "a well-received global non-deal roadshow [for NIO] with over 40 high-quality investor accounts in July 2017. Morgan Stanley team has maintained regular dialogue with the Company and invited them to attend various corporate events and conferences including 2017 Asia Pacific Summit. In November 2017, China sales team arranged over 30 investors to visit the NIO Shanghai headquarter and view the [NIO] car in person. The event was very well received and the feedback was highly positive (see UW_MS_00024019, part of Morgan Stanley's April 26, 2018 Asia Equity Commitment Committee Memorandum). As part of the same document, it was stated that: "Company has verbally promised [to Morgan Stanley] 4% underwriter fee, of which no less than 20% economics is to MS [as the Lead Manager for the IPO]. We would expect to receive gross fees of US $20-$25 mm [million] from the [IPO] Offering" (*Id*)

[19] The Morgan Stanley report at page 6 (SABRY-0000216).

[20] In terms of NIO's joint manufacturing arrangement with JAC, it is noted, in addition to the concerns that analysts had about NIO's dependence on manufacturing only through JAC without having its own manufacturing facility, that: (i) JAC manufactured its own EV vehicle under its JAC brand and could thus become a competitor to NIO, and (ii) JAC also had a joint venture agreement with Volkswagen with an exclusivity clause that could limit future cooperation between JAC and NIO. ], based on a report by Kroll dated April 18, 2018, commissioned by the Underwriters. In this report, the following was stated: "According to this report [an April 2018 China Business Newspaper article], a joint-venture business contract between JAC and Volkswagen Group includes an exclusive agreement that could limit future cooperation between JAC and NIO." (UW_MS_00017979)

[21] The Morgan Stanley Asian Equity Commitment Committee Memorandum dated August 28, 2018, prior to the September 2018 IPO, also set forth this concern regarding the arrangement with JAC, as expressed by one of its own equity research analysts, Jack Yeung: "limited production experience and heavily relying on partnership [with JAC] and outsourcing." (UW_MS_00084142). As discussed later herein, this concern about relying on JAC was constantly mentioned by potential investors.

14

2) uncertainty about the [timing of] construction and operation of NIO's own manufacturing facilities due to time, budget and government regulations;[22]

3) profitability concerns due to operational and production capacity;

4) competition in China's automotive market; and

5) current NEV profit margins are closely linked to *favorable* [China] *policies.* Potential policy changes may diminish the current advantages of NEVs over ICE vehicles."

(c) As to the above, Morgan Stanley, the Lead Manager for the IPO, specifically stated in its October 7, 2018 research report (at page 15): "NIO's own factory [the Shanghai Facility] may not start production on schedule. *NIO expects* [however] *its own manufacturing facility in Shanghai to be ready by the end of 2020.* However, it was possible that construction could be delayed and costs might exceed expectations. Furthermore, the Chinese government has broad and strict supervision and regulations about NEV manufacturing approvals. Therefore, success in obtaining an EV manufacturing license is not guaranteed." [23]

(d) In addition, J.P. Morgan, also one of the IPO Joint Managing Underwriters, in its research report dated October 9, 2018 made similar comments about the NIO Shanghai Facility being built, as follows;

(i) "The next steps in NIO's history are expected to include the debut of additional models (the ES6, ET7, and a 4th as yet unnamed model), and *the construction of its first wholly-owned final assembly plant*";[24]

(ii) "We expect the [NIO] ET7 to be built in a *still to be constructed wholly-owned manufacturing plant in Shanghai* that will also assemble a 4th as yet unnamed model *beginning in 2021*";[25]

(iii) Under the "Company Description" section of the report: "Beyond this, [NIO] plans include *to construct the firm's first wholly-owned final assembly plant in Shanghai* to manufacture additional models… *by the end of 2020*:"[26] and

---

[22] The uncertainty discussed in the Morgan Stanley report involved the timing of construction, *not* whether the Shanghai Facility would be built. As Morgan Stanley stated later in its report, and discussed later herein, Morgan Stanley expected the Shanghai Facility *to be completed and ready* by the end of 2020.

[23] SABRY-00000225.

[24] Page 20 of the J.P. Morgan report (SABRY-0000182).

[25] *Id.*

[26] Page 19 of the J.P. Morgan report (SABRY-0000181).

(iv)    "We expect that the ETT *will be manufactured in NIO's own manufacturing facility expected to be constructed in Shanghai.*:[27]

(e)    The Underwriters created an "Investor Q&A" memorandum dated June 2018, which had the following responses to possible questions that could be asked:[28] The following possible questions and responses are noted:

(i)    As to the existing arrangement with JAC: "Our reliance on JAC will decrease in the next 3-5 years with our owned plant [the Shanghai Facility] built":[29] and

(ii)    As to the most recent progress on the Shanghai plant and expected completion time: "The facility will be ready by 2020; NIO has entered into an MOU with Shanghai Jiading Government where the government has agreed to facilitate NIO on communication with NDRC and MIIT, and thus facilitate helping NIO to obtain the license; and Shanghai government will invest RMB 3 bn [billion] on plant construction and provide 1.5 bn [billion] financing facilities to NIO."[30]

(f)    Given all of the above, as well as other information provided in this report, it would be reasonably clear that, at the time of the IPO, most potential investors contemplating the possible purchase of NIO's Shares would have considered as an important factor in making a fully informed decision that the Shanghai Facility was already under construction and scheduled to be completed by the end of 2020.[31]

(g)    As for a similar and important comparable example to NIO for comparison purposes, when Tesla undertook its IPO on or about June 27, 2010,[32] an important aspect of the offering, as disclosed in the Registration Statement, was the fact that earlier in 2010 (i.e., as of January 2010), Tesla had entered into a $465.0 million long-term loan agreement with the United States government Department Energy's Advanced Technology Vehicles Manufacturing Incentive Program "which will be used *to finance the development of our planned integrated*

---

[27] Page 25 of the J.P. Morgan report (SABRY-0000187).

[28] UW_ML_0025711 to 742

[29] UW_ML_0025718

[30] *Id.*

[31] Indeed, the NIO Registration Statement stated, at page 32, the following: "We are developing our own manufacturing facility in Shanghai, which we expect to be ready by the end of 2020. Such manufacturing facility *is currently being constructed by relevant Shanghai authorities.*

[32] The lead underwriters for the Tesla IPO were Morgan Stanley and Goldman Sachs, with J.P. Morgan, and Deutsche Bank Securities being co-managers – basically the same lead underwriters as for the NIO IPO.

16

*manufacturing facility for the Model S as well as our electric powertrain production facility.*"[33]
Also stated in the Tesla Prospectus as one of Tesla's "Competitive Strengths"
was "Capital Efficiency", stating the following: "We believe our rapid product
development process… our plan to design and manufacture multiple product
types [having our own manufacturing plant]… will help to reduce the capital
required to reach operating efficiencies…:[34]

(h) It is also noted that Tesla included in its Registration Statement and Prospectus
as one of its "risk factors": "we may experience significant *delays*… including in
the build out of *our planned Model S manufacturing facility.*"[35]

(i) Indeed, based on the evidence in regard to this matter, it is noted that *NIO and
the Underwriting team focused heavily on the Tesla Registration Statement as a guide in both
drafting the language in the NIO Registration Statement language,[36] as well as forming their
views in regard to the important issue of the proper valuation of NIO on a pre-money basis for
the IPO.* For example, the following is noted:

- In terms of the valuation of NIO for the purpose of determining the offering
  price for the IPO, the evidence indicates that Tesla *was analyzed in detail* as a
  model used by the Underwriters in deciding the range for that important
  factor. As of May 2018, Morgan Stanley's "Valuation Consideration
  Materials" memorandum regarding NIO[37] analyzed "Tesla's Trading
  Multiples Overtime" from August 2010 through May 2018 based on the
  average of 3-year estimated forward sales as well as the 3-year average of
  estimated forward EBITDA.[38] During July 2018, an updated version of this
  memorandum was prepared by Morgan Stanley,[39] again analyzing Tesla's
  valuation in terms of "The Tesla Top-Down Approach,[40] plus an exhibit

---

[33] Page 3 of the Tesla IPO Prospectus. Tesla raised approximately $225 million by selling shares
at $17 per share. The Co-Lead Managing Underwriters for the Tesla IPO were Goldman Sachs
and Morgan Stanley with J.P, Morgan Securities and Deutsche Bank Securities being
participating managers for the IPO. In addition to the funds from the IPO, Toyota made a $50
million private investment in Tesla. The Tesla shares after its IPO increased very quickly by
approximately 41 percent.

[34] Page 7 of the Tesla Prospectus.

[35] Page 8 of the Tesla Prospectus. Delays in building any major facility is generally a common
occurrence.

[36] In drafting NIO's "strategy" section, the Underwriters reviewed Tesla's strategies as set forth
in the Tesla IPO Prospectus. UW_MS_00000010.

[37] UW_MS_00037177-182

[38] UW_MS_00037178-179

[39] UW_MS_00053694 to 704

[40] UW_MS_00053697. Additional discussion about NIO's pre-money valuation is discussed
later herein.

titled "How Do We Benchmark Against Tesla?"[41] As of August 8, 2018, yet another updated memorandum with the same title was prepared[42] - again tracking "Tesla's Trading Multiples Overtime",[43] in addition to "Tesla's Valuation Metrics at IPO",[44] Tesla's estimated WACC (weighted average cost of capital),[45] and finally a multiple and other metric comparisons of Tesla (as a "Pure EV Player", including as well other automobile companies and EV Battery Suppliers.[46]

(j) As a general statement, automobile manufacturers do not usually rely on other companies to manufacture their vehicles. This would be especially true for premium EVs made by Tesla, Mercedes- Benz, and Audi. NIO's existing reliance on JAC Motors, a third-tier state-owned manufacturer that specialized primarily in truck manufacturing, could be, and likely was, viewed by investors, as well as certain analysts, as a major weakness for NIO at the time of the IPO.[47] Indeed, as previously discussed, Morgan Stanley (the Lead Manager for the NIO IPO) stated the following in its analyst research report issued shortly after the IPO (i.e., on October 7, 2018:[48] *"Key Concerns: 1) Limited production experience and heavy reliance on partnership and outsourcing…"*

(k) The NIO Registration Statement made it quite clear, and thus demonstrated the importance to investors, that the Company believed having the new Shanghai Facility was an important and positive event for investors to consider, amongst other information in its Registration Statement, in deciding whether or not to purchase the NIO Shares. For example:

---

[41] UW_MS_00053698

[42] UW_MS_00067805 to 817

[43] UW_MS_00067806

[44] UW_MS_00067810

[45] UW_MS_00067815-816

[46] UW_MS_00067815-816

[47] One research firm, JL Warren Capital LLC, which specialized in researching Chinese companies, stated in one of its research reports that JAC Motors was a "third tier" Chinese truck manufacturer with "limited experience in manufacturing passenger vehicles." In addition, it was pointed out by analysts that JAC could actually become a competitor to NIO. JL Warren Capital, based on Bloomberg's description, operates as an equity research firm that focuses on Chinese companies and listed multinationals in China. The founder and CEO of JL Warren Capital is Ms. Junheng Li. On its website, J. Warren Capital states: "Through investigative due diligence including channel surveys and interviews, our research helps clients to pinpoint the dislocations in the market."

[48] Page one of the Morgan Stanley report; SABRY-0000211.

18

i)   The *number 2 strategy* set forth in the Registration Statement amongst NIO's 5 basic strategies (i.e., "Our Strategies") was as follows: "*Build our own manufacturing capacity* [i.e., the Shanghai Facility] and continue to optimize manufacturing costs by leveraging a common platform and production flexibility."[49]

ii)  One of NIO's "Challenges", including the risks facing the Company, was: "Our ability to grow manufacturing in collaboration with partners [presumably JAC]."[50] Having its own Shanghai manufacturing facility would likely reduce this "Challenge".

iii) It also noted that, however, none of the risk factors listed on page 5 of the Registration Statement[51] (in the section titled "Our Challenges" and stating that "We [NIO] face risks and uncertainties…") included a risk that NIO *might decide not build the Shanghai Facility,[52]* because of a shortfall in its future cash flow[53] or otherwise.[54] Indeed, Morgan Stanley, in its

---

[49] Page 5 of the Registration Statement.

[50] *Id. As previously discussed, research analysts, including those from the IPO Underwriters, had a concern about NIO's existing partnership manufacturing arrangement.*

[51] The initial section of a Prospectus surrounded in black lines (pages 1 through 13 in the NIO Registration Statement) is generally referred to by underwriters as "the box". This section of the Registration Statement is generally considered to be the most important part of the Registration Statement and generally involves much time and effort by the underwriting team in drafting the specific language involved. Although the risk factors on page 5 would have been considered the most important risk factors as they were listed in the "box", there was also a lengthy additional risk factor section in the NIO Registration Statement, starting at page 14 of the Registration Statement and ending at page 61. As stated on page 1 of the Registration Statement (the first page of the "box"): "In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in our ADSs discussed under 'Risk Factors', before deciding whether to invest in our ADSs."

[52] Ten risks and uncertainties were listed in the Registration Statement on page 5, two of which related primarily to NIO manufacturing and NIO's new Shanghai Facility, as follows: (i) "Our ability to develop and manufacture a car of sufficient quality and appeal to customers on schedule and on a large scale is unproven and still evolving"; and (ii) "Our ability to grow manufacturing in collaboration with partners."

[53] In a separate section of the Registration Statement, starting at page 14 and ending on page 61, NIO and the Underwriters set forth 99 specific risk factors for investors to be aware of, only a few of which dealt with the Company's cash flow and *none of which implied in any way that the Shanghai Facility would not be built*; The second listed risk factor in this section stated: "We have negative cash flows from operations, have only recently started to generate revenues and have not been profitable, all of which may continue in the future… If we are unable to achieve profitability, we may have to reduce the scale of our operations…" (page 15); The fourth listed risk factor dealt with the risks of having a joint manufacturing arrangement with JAC (page 16); The 28th listed risk factor stated "Our business plans require a significant

19

amount of capital. In addition, our future capital needs may require us to sell additional equity or debt securities that may dilute are shareholders…" (page 26); The 36th listed risk factor stated: :We are or may be subject to risks associated with strategic alliances or acquisitions" (page 29); The 41st listed risk factor *did deal with the planned Shanghai Facility – but there was no mention of possibly cancelling or terminating the project.* The following was stated: "The construction and operation of our own manufacturing plant in Shanghai… are subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits. *We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities.* As a result, the construction is largely outside of our control and *could experience delays* or other difficulties… Furthermore, we expect *that the construction of our own manufacturing facility in Shanghai* will facilitate our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit." (page 32)

[54] Risk factors being accurately and fully disclosed to potential investors in a Registration Statement is considered by the SEC to be a very important part of the due diligence process. The risk factors relating to a company's business are an important part of an investor's decision-making process in deciding whether or not to purchase the securities being offered. Investment bankers, in underwriting securities, as well as company directors and management, all generally recognize and understand this importance. At the time of the Offering, 17 C.F.R. §229.503 (Item 503) governed requirements for risk factor disclosures for registrants of securities, and included the following: (c) Risk factors. Where appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make the offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply to any issuer or any offering. Explain how the risk affects the issuer or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. The risk factor discussion must immediately follow the summary section. If you do not include a summary section, the risk factor section must immediately follow the cover page of the prospectus or the pricing information section that immediately follows the cover page. Pricing information means price and price-related information that you may omit from the prospectus in an effective registration statement based on § 230.430A(a) of this chapter. (17C.F.R. §229.503 (effective Aug. 12, 2011 to Nov. 4, 2018). The SEC subsequently adopted amendments to the requirements for risk factor disclosure and the Item 503(c) requirements were moved to a new Item 105. *See* 17 C.F.R. §229.105; Fast Act Modernization & Simplification of Regul, S-K Release No 4791 (Oct 11, 2017), available at https://www.sec.gov/rules/proposed/2017/33-10425.pdf) In 2020, the Commission: provided additional clarity regarding expectations regarding risk factors disclosures, highlighting that risk factors should be specifically tailored to the registrant and should avoid boilerplate disclosures that could be used industry wide: "The inclusion of generic, boilerplate risks that could apply to any offering or registrant appears to contribute to the increased length of risk factor disclosure. Although Item 105 instructs registrants not to present risks that could apply generically to any registrant, and despite longstanding Commission and staff guidance stating that the risk factors should be focused on the "most significant" risks and should not be boilerplate, it is not uncommon for companies to include generic risks. *Registrants often disclose risk factors that are similar to those used by "others in their industry without tailoring the disclosure to their circumstances and particular risk profile*." (Modernization of

20

October 7, 2018 research report issued shortly after the IPO (at page 4 of the report, SABRY-0000214) estimated that NIO's revenues would grow significantly from 2018 through 2023 at an annual compound growth rate of over 100 percent, but that cash flow from operating activities and investing activities would be *significantly negative* through 2019 – but would, in its view, *be covered* by significant cash obtained from financing activities.

iv) While the Registration Statement listed certain risks outside NIO's control that might serve as obstacles to completion of the Shanghai Facility, it never suggested that NIO itself was not fully committed to building the Shanghai Facility, with the 25% of the IPO proceeds earmarked for the project. One of the claims in this case is that the Registration Statement failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash and its sales meeting expectations.

v) The Registration Statement never warned that NIO was actually considering abandoning its plans to build the Shanghai Facility if it didn't raise sufficient funds in the IPO. In truth, NIO was not committed to building the Shanghai Facility even before the IPO as evidenced by an April 22, 2018 email that Joyce Liu of BofA Merrill Lynch sent to various other bankers at BofA Merrill Lynch: "According to the latest MP circulated by GS [Goldman Sachs] yesterday, Shanghai plant will be ready (put into operation) by Q42019. The land is granted to NIO in 4Q2017 based on our meeting notes with Louis [Hsieh, the CFO of NIO] in November 2017, and NIO is in late stage discussion with Shanghai bank regarding the $1.5 bn [billion] project loan for the plant, but as Louis [Hsieh NIO's CFO] told us in the meeting last Monday , Company may consider holding the construction plan [if] the IPO does not go smoothly."

vi) The IPO did not raise the $2.0 billion or more (up to $3 billion) that NIO initially expected the Underwriters to raise.[55] And the finalized IPO valuation was less than half of what NIO initially hoped for in April 2018. This raises the question as to whether this is the reason NIO terminated construction of the Shanghai Facility.

vii) As discussed previously, in dealing with the disclosures listed in the Registration Statement regarding certain risk factors (see footnotes 51-54), it is important to note that NIO specifically stated in the Registration Statement that the Shanghai Facility was currently under construction and expected to be completed and ready by the end of 2020. *In addition to this important fact*, NIO stated that it believed that the construction of its

Regul. S-K Items 101, 103, & 105, SEC Release No. 10825 (Aug. 26, 2020), available at https://www.sec.gov/rules/final/2020/33-10825.pdf.)

[55] UW_MS_00024017

21

own manufacturing facility in Shanghai would be beneficial to it in facilitating its ability to obtain its own EV manufacturing license and in addition potentially benefit from the NEV credit.

viii) As for an important additional disclosure issue, i.e., the Use of Proceeds from the IPO, the Registration Statement specifically identified that "*25% of the net proceeds* (approximately $239 million) [will be used] for the development of *our manufacturing facilities* and the roll-out of our supply chain. We estimate that total capital expenditures in connection with the improvements and installation of equipment *at our Shanghai manufacturing facility* will be approximately US $650 million. Half of such expenditures are expected to be financed through net proceeds from this offering…"[56]

ix) In my opinion, *this disclosure about the Use of Proceeds, together with the other disclosures previously discussed about the construction and completion of the Shanghai Facility, would increase the likelihood that potential investors at the time of the IPO believed that construction of the important Shanghai Facility had begun and would be completed by the end of 2020.*

x) Adding to the above, the following is noted:

    i) Earlier during March 2018, as the Underwriter team[57] was drafting an early version of the Registration Statement – which then stated that NIO *was planning* to build the Shanghai Facility,[58] one of the investment bankers stated that it would be helpful to investors and give them comfort, if the Registration Statement

---

[56] Page 63 of the Registration Statement.

[57] Based on the Morgan Stanley Asian Equity Commitment Committee Memorandum dated April 26, 2018 (US_MS_00024017 to 24077), the senior Morgan Stanley investment bankers for the NIO IPO were George Taylor (Asia-Pacific Investment Banking Management); Arthur Schuetz (Asia-Pacific Industrial); Michael Vollmerich; Shirley Lin; and Angel Chen (all also from Asia-Pacific Industrial), as well as numerous others from Global Capital Markets, Global Equity Syndicate, Asia-Pacific Technology, China Coverage & Corporate Finance, and Legal. (UW_MS_0024017) In addition, the underwriting team included the Co-Managing Underwriters and other Underwriters, Issuer's PRC Counsel (Han Kun Law); Issuer's International Counsel (Skadden Arps); Underwriters' International Counsel (Latham & Watkins); Underwriters PRC Counsel (Grandall Law Firm); Company Auditor (PriceWaterhouseCopper Zhongtian); and Industry Consultant (Frost & Sullivan) (UW_MS_00024020).

[58] One of the comments next to the draft language "We also *plan to build* our own manufacturing facility in Shanghai to expand manufacturing capacity and complement our JAC manufacturing alliance" was as follows: "Can we provide more clarity on timing, regulatory approvals obtained, Government subsidiaries for plant (any information *that gives investors more comfort on progress*) (UW_MS_00000827). It is my understanding that this comment came from one of the investment bankers at Citigroup (UW_MS_00000822).

22

had more discussion about the actual progress of the Shanghai construction process, including permit approvals and other matters.[59]

ii)    In response to the request for information about regulatory approvals or other evidence that construction had started, Angel Chen of Morgan Stanley stated on March 9, 2018: "I think we don't have information related to this for now."[60]

iii)    Shortly thereafter, one of Morgan Stanley's managing director, Arthur Schuetz, suggested that the Underwriters change the language about the Shanghai Facility from "plan to build" to "started to build."[61]

iv)    In its April 26, 2018 Asian Equity Commitment Committee Memorandum, Morgan Stanley stated the following:[62]

"The Company *has started construction on its own manufacturing facility in Shanghai* in order to expand manufacturing capacity for the ET7 and future models, complementing JAC manufacturing alliance…"

v)    As discussed previously, in addition to the disclosures in the Registration Statement about the Shanghai Facility construction having started and expected to be completed by the end of 2020, as previously discussed, many of the research reports published by the IPO Underwriters shortly after the IPO, i.e., in early October 2018, continued to emphasize the importance of the soon to be built wholly-owned Shanghai Facility – and that it was expected to be completed by the end of 2020, or at the latest in early 2021.

vi)    In the Morgan Stanley Asian Equity Commitment Committee Memorandum, it is noted that the SEC had issued comments to NIO to provide more details evidencing the work done and funds expended in constructing the Shanghai Facility in the NIO Registration Statement, including the following:[63] "Include discussions on the costs incurred *with construction of manufacturing facility in Shanghai*, and sources of additional funds if IPO proceeds are not sufficient to cover the costs for construction",

---

[59] *Id.*

[60] UW_MS_00001662

[61] UW_MS_00001666

[62] UW_MS_00024031

[63] UW_MS_00072329

and (ii) "Include certain terms and how much the Company needs to pay to JAC."[64]

(l) About four months after the IPO, J.P. Morgan, one of the Underwriters for the IPO, issued a research report on NIO dated Monday, January 14, 2019 – after having hosted NIO CFO Louis Hsieh, as well as two other companies, at the J.P. Morgan Tech Forum conference in Las Vegas. The summary points made by J.P. Morgan in its report, based on Hsieh's presentation, were as follows:[65]

(i) J.P. Morgan rated NIO's shares as "Neutral" at this time even though its Shares closed on Friday, January 11, 2019 at only $6.59 – just 5.3 percent above the IPO price of $6.26.[66]

(ii) "NIO logged stronger than expected ES8 deliveries in Q4 [2018] but noted [that] December [2018] benefitted from some pull-ahead of sales, suggesting [that] January [2019] will likely be softer"[67] – which turned out to be an accurate prediction based on the Company's March 5, 2019 announcement.

(iii) NIO management feels good about its upcoming ES6 value proposition relative to the Tesla Model 3.[68]

(iv) Regarding its *new Shanghai Facility*, the following was stated in the report.[69] "NIO updated [J.P. Morgan] on the *prospect* of a wholly-owned assembly plant, *suggesting that new rules make it potentially easier to obtain a license, but it* [NIO] *is in no rush, given the ability to expand existing capacity and bevy of alternative options*, Management updated that a recent rules change means it now no longer needs to have a plant first in order to apply for a license for permission to manufacture new vehicles, *in our view easing the process and reducing associated risks of organic capacity expansion*. With that said, management noted that *expansion of the JAC plant* from its current [approx.] 120K units capacity to a higher [approx.] 170K units seems a more efficient use of capital *than opening a new plant*. And a number of

---

[64] One of "Concerns/Key Questions" in the Morgan Stanley Commitment Committee Memorandum was: "Limited track record of manufacturing and safety of the vehicle, *especially with regards to JAC* and the quality control NIO is able to exercise as it goes into mass production mode." (US_MS_0072332)

[65] The J.P. Morgan report, SABRY-0000152 to 162. Dr. Sabry referred to this report in her Declaration dated October 17, 2022.

[66] SABRY-0000152

[67] SABRY-0000156

[68] *Id.*

[69] *Id.*

automakers (and now even perhaps supplier Magna International) are interested in producing vehicles for NIO, again suggesting *less need for a wholly-owned plant* in the near-term." This above disclosure by NIO and J.P. Morgan, however, had *no mention* of whether NIO had started any construction activities in regard to the Shanghai Facility or the status of the construction of the Shanghai Facility.

(m) Given that the above revelation by J.P. Morgan based on its interview with NIO management, only four months after the September 2018 IPO, that NIO was in no rush to build the Shanghai Facility, it might be reasonable for one to question, or seriously think about from an investment banking, financial and valuation point of view, whether the important emphasis in the Registration Statement by NIO about its construction of its new Shanghai Facility and that it would be completed by the end of 2020 was in effect merely an inducement by NIO to further excite potential investors about the future prospects of the Company in order to be able to raise more cash equity capital through the IPO than NIO could otherwise have been able to raise *without this important representation* in the Registration Statement that it would be building and completing a new manufacturing facility.

Opinion 2:    Although more discovery evidence would be required than is now available in order to be more precise in determining the potential dollar per share estimate or range of the magnitude of the meaningful positive impact on the finalized IPO price set by the Underwriters, it is my opinion that the positive impact would be significant. Indeed, it is highly likely in my opinion from an investment banking, financial and valuation point of view that, without the disclosure in the Registration Statement of the important event that construction of the Shanghai Facility had begun (and which was expected to be completed by the end of 2020), NIO could not have raised anything close to $1 billion from investors, including at a pre-money valuation of NIO of over $5 billion, as of September 2018 – or that it could have raised any new equity capital at this same pre-money valuation of the Company of over $5 billion at the time of the IPO without investors knowing the important fact that NIO now could and would build, and was building, its own manufacturing facility – and not in the future be totally dependent on a joint partnership manufacturing arrangement.

25

**BASES FOR THE OPINION**

(a) NIO and the Underwriters had very high expectations for the value investors would place on its shares in the planned IPO. It had hoped to value NIO before selling shares in the IPO at between $10 billion and $15 billion or a per share value of $11.55 to $17.32 per share. The final offering price ended up being $6.26 per share at a pre-IPO value of approximately $5.42 billion, demonstrating how difficult it was for NIO and the Underwriters to address various investor concerns.

(b) During pre-IPO road shows initial investor reactions were not enthusiastic to assigning such a high pre-IPO value because NIO was a young company, with an unproven product, large losses, huge capital needs, and in addition, was relying on a third-tier vehicle manufacturer to build its cars. But for NIO's assurance that construction had begun on the new Shanghai Facility that would be completed by the end of 2020, the pre-IPO valuation of NIO could likely have been even lower.

(c) NIO and the Underwriters also initially expected to raise $2 billion to $3 billion in the IPO, but as discussed below, their hopes to raise such a large amount continually declined as pre-IPO investor meetings progressed.

(d) The pre-money valuation of NIO at the time of the IPO was approximately $5.4 billion.[70] The calculation for this figure would be as follows: Based on page 8 of the Registration Statement, after the completion of the IPO, there would be a total of 1,050,010,046 total Class A, Class B, and Class C Shares outstanding.[71] Since the Underwriters sold approximately 184 million Shares in the IPO, the number of Shares outstanding pre-money would be about 866.01 million. At US $6.26, the pre-money valuation of NIO would this be approximately $5.4 billion. The after IPO valuation would be about $6.5 billion.

(e) It is noted that as of the IPO when NIO was able to raise over $1 billion in new equity, NIO had zero revenue for the year ended December 31, 2017. However, NIO did have a net loss of US $758.8 million for the year 2017. NIO's year-end 2017 negative shareholders' equity position was $1.75 billion.[72]

---

[70] NIO's pre-money or pre-IPO value is simply the value prior to selling shares in the IPO. Post-money value of the company is the pre-money or pre-IPO value plus the amount of the funds raised in the IPO.

[71] As set forth in the Registration Statement, different classes of Shares had different voting rights per share.

[72] Pages 10-11 of the Registration Statement.

26

(f) For the six month's ended June 30, 2018, NIO's revenues were only $6.95 million, with a net loss of $502.56 million.[73]

(g) NIO's consolidated cash flow for the year 2017 was positive $1.138 billion as it obtained financing during the year of $1.945 billion. NIO's cash flow for the six month's ended June 30, 2018, however, was negative $461.1 million.[74]

(h) As of October 31,2019, about one year after the IPO, NIO's Shares closed at US $1.45 per Share – 76.8 percent below the September 2018 IPO price of US $6.26 per Share.[75]

(i) Three months prior to Morgan Stanley's July 2018 Memorandum, based on the Morgan Stanley Asian Equity Commitment Committee Memorandum dated April 26, 2018, the initial tentative offering size of the NIO IPO was expected to be as much as *US $2.5 billion to $3 billion.*[76]

(j) Based on the evidence, *even with the construction of the Shanghai Facility* and the Managing Underwriters' very positive views about the possible pre-money valuation of NIO, as discussed below, the Underwriters, based on internal emails, realized that investor interest was limited at high valuations given NIO's limited history and magnitude of reported losses, and thus *had to reduce the initially planned size of the IPO* from an earlier expected approximately US $2 billion to $3 billion range,[77] and/or to reduce the finalized Offering Price, in order to go forward with the IPO financing. In this regard, the following is noted:

(k) In terms of determining the pre-money valuation of NIO for the purpose of the IPO, Morgan Stanley during May 2018 had a circled valuation range for NIO of $8.0 billion to $10.0 billion based on multiples of forecasted Company sales and EBITDA,[78] as well as a second range of valuations for NIO based on different discounted cash flow models of $7.873 billion to $12.732 billion.[79] with a midpoint of $10.3 billion. At this time, NIO's forecasted revenue as used in the Morgan Stanley memorandum was $637

---

[73] *Id.*

[74] Page 13 of the Registration Statement For the first six months of 2016, NIO obtained financing of $286.8 million.

[75] See footnote 6 herein.

[76] UW_MS_00024019, the first paragraph of the page, as well as UW-MS-00024020.

[77] See UW_MS_00024019 and 24020 for a discussion of Morgan Stanley's expected cash raise of $2.5 to $3 million as of April 26, 2018.

[78] Morgan Stanley's May 2018 memorandum titled: "NIO, Valuation Consideration Materials" (UW_MS_00037177 to 182).

[79] UW_MS_00037181

million for 2018; $2.869 billion for 2019; $6.511 billion for 2020; $9.814 billion for 2021; and $12.525 billion in 2022.[80] NIO's estimated EBITDA for 2022 was $1.107 billion.[81]

(l) During July 2018, Morgan Stanley prepared an updated the "NIO, Valuation Consideration Materials Memorandum."[82] Using two different valuation models, the NIO pre-money IPO valuation ranges were now $8.7 billion to $19.6 billion, and $12.3 billion to $15.7 billion. The mid-point of each range would be $14.1 billion and $14.0 billion.[83]

(m) In the same July 2018 memorandum, *Morgan Stanley had the "IPO Offering" amount shown as high as $2.0 billion, but no longer as high as $3 billion,*[84] with a boxed pre-money valuation range for NIO as high as $13 billion to $15 billion.[85] Plus, NIO's forecasted revenue had now been held level *or increased* for the next five years – now being slightly lower revenue of $2.765 billion estimated of $2.869 billion – but an increased revenue estimate for 2022, now being at $14.561 billion versus the earlier figure of $12.525 billion. Estimated EBITDA had also been *significantly increased* to $1.682 billion for 2022 versus the earlier figure of $1.107 billion.[86]

---

[80] UW_MS_00037180

[81] *Id.*

[82] UW_MS_00053694 to 704

[83] UW_MS_00053699

[84] Bank of America Merrill Lynch, in its Equity Commitment Council Long-Form Memorandum dated August 10, 2018 (UW_ML_0049961 to 0050013) *had the size of the IPO listed as "Approx. US $2.0 bn [billion]* (at UW_ML_0049962). The expected IPO size of the IPO was repeated later in the Memorandum as follows: "NIO Inc… *is contemplating a U.S. IPO with an offering size of approximately US $2 bn [billion].*" (at UW_ML_0049965). In addition, this Memorandum also stated the following: (i) That the "Use of proceeds [from the IPO] includes… *development of [NIO's] manufacturing facilities…*" (id) (ii) Also, set forth in the Memorandum: "Driven by strong customer demand *and favorable government support*, if is expected that electric vehicle start-ups and traditional OEMs would accelerate…" (UW_ML_0049971) and "*Chinese government's regulatory push has been one of the strongest drivers of EV penetration.*" (UW-ML-0049972; (iii) As for financing the Shanghai Facility, the Memorandum stated: "Firstly, the Company *has secured RMB 1.5 bn [billion] project-based loan for manufacturing facilities*, with a maturity date of December 15, 2025. The agreement of which *was signed* with Bank of Shanghai *on May 14, 2018.*" (UW_ML_0049973); and (iv) As for BofA Merrill Lynch's own estimated valuation range for NIO, the Memorandum stated US $8.5 billion to US $11.1 billion. (UW_ML_0049992)

[85] UW_MS_00053700

[86] UW_MS_00053701

(n) Another updated "NIO Valuation Consideration Materials" memorandum was prepared by Morgan Stanley dated as of August 8, 2018.[87] This memorandum now showed a *lower* pre-money valuation range for NIO of $6.49 billion – indicating a lowered IPO price of $7.00 per share – to $8.38 billion, indicating a high-end IPO price of $9.00 per share.[88] The estimated net proceeds to NIO, assuming that the Underwriters' green-shoe option was utilized, were shown to be $1.463 billion at the low end and $1.883 billion at the high end.[89] The Company's estimated 2022 revenue and EBITDA were not changed from that in Morgan Stanley's July 2018 memorandum.[90]

(o) By August 13, 2018, based on its Commitment Committee Memorandum of that date, Morgan Stanley had lowered the expected cash raise for the NIO IPO to $1.3 billion to $2.0 billion.[91]

(p) By August 28, 2018, in an updated Commitment Committee Memorandum, Morgan Stanley had lowered again the expected cash raise for the NIO IPO to "approximately US $1.150 billion - $1.50 billion."[92]

(q) Yet, another updated memorandum was prepared by Morgan Stanley dated August 28, 2018, titled "Price Range Discussion."[93] This memorandum now, once again, indicated lower NIO pre-money valuations. The pre-money valuation range for NIO was now $5.196 billion at the low end, assuming a $6.00 per share IPO price – to a high-end pre-money valuation of NIO at $8.227 billion, with an assumed IPO price per share of $9.50.[94]

(r) However, despite the above internal Morgan Stanley high valuations of NIO, the marketing effort for the NIO shares was confirming the need for a lower valuation in order for the IPO to be successful.

(s) Based on an internal Morgan Stanley email dated August 21, 2018 from Alma Choy, Executive Director of Morgan Stanley/Global Capital Markets,[95] the following was stated about NIO's valuation: "3 regions [are] looking at this [IPO financing] and Europe [has] actually shown the most interest – 1) Asia, i.e., Helen's team, *think valuation should be below 5bn [billion]*; 2) Europe – 3

---

[87] UW_MS_00067805 to 817

[88] US_MS_00067808

[89] *Id.*

[90] UW_MS_00067812

[91] UW_MS_0072325 and 2327

[92] UW_MS_000841135

[93] This memorandum has no bates numbers.

[94] Page 6 of the memorandum. The Underwriters also had different views about NIO's estimated 2019 revenues as set forth in the memorandum. Morgan Stanley's 2019 revenue estimate was $14.689 billion, whereas the Citi, Credit Suisse, and Deutsche Bank estimates were all over $18 billion., as shown at page 8 of the memorandum.

[95] US_MS_00079047

teams in Europe… but haven't provided valuation views yet…"; 3) U.S. –
feedback from Tony Kim of Blackrock… "*So company forecasts are unreliable…
valuation cannot use P/Sales comparison to Tesla* because NIO's margins [with its
joint manufacturing model] are so much lower… Using 9X EV/gross profit.
*Gives you 6bb[billion] mkt cap.* Since half of subsidy… goes away in 2021 would
need to discount gross profit and the multiple. *Probably 5bb [billion] mkt cap.*[96]
Last round [of financing] was $4.9bb [billion].[97]

(t) All of the above information demonstrates in my opinion the apparent lack
of investor interest in the planned NIO IPO as the Underwriters undertook
their marketing efforts, even with the knowledge that NIO would no longer
be totally dependent on the JAC joint partnership manufacturing
arrangement given the planned building of NIO's wholly-owned Shanghai
Facility. *From a planned $2 billion IPO as of July 2018 valuing NIO on a pre-money
basis range of $13 to $15 billion,[98] and a hoped for IPO price of up to $9.00 per share
(which would have raised net proceeds of about $1.6 billion), the IPO price ended up
during September 2018 at only $6.26 per Share, raising only $1.1 billion* – and valuing
NIO on a pre-money basis at approximately $5.4 billion.

(u) Without investors knowing at the time of the IPO that NIO had begun
construction of the Shanghai Facility with an expected finishing date by the
end of 2020 – and thus would not be depending in the future solely on the
joint manufacturing arrangement with JAC, an actual potential competitor
with NIO, the IPO offering price and the net proceeds raised could have
likely been lower by a meaningful amount. Indeed, with NIO's history of
very low revenues and large operating losses, the new planned Shanghai
Facility was one of the important selling points for NIO to emphasize to
potential investors.

Opinion 3:    In my opinion from an investment banking, financial and valuation point of view,

because nine of the ten analyst reports issued after NIO's March 5, 2019

announcement were written by employees of the IPO Underwriters,[99] this

---

[96] In addition, on August 21, 2018, Amada Soon, Vice President of Morgan Stanley/Global
Capital Markets, informed a number of others at Morgan Stanley that, given NIO's current
cash burn rate, a $1.5 billion in IPO proceeds would last only another 10 to 12 months before
NIO would have to undertake another financing transaction. (UW_MS_00079045)

[97] NIO would have most likely been quite unhappy if a pre-money valuation below its last
financing transaction valuation had to be decided upon.

[98] UW_MS_00053700.

[99] For example, the Morgan Stanley research report dated March 7, 2019 was written by a
number of Morgan Stanley analysts, including Tim Hsiao (SABRY-0000080). As disclosed in
Morgan Stanley's Asian Equity Commitment Committee Memorandum dated August 28,

30

demonstrates the analysts had a conflict-of-interest that should be considered in analyzing the reasons for the decline in NIO's Shares after NIO's March 5, 2019 announcement. One can reasonably conclude that the analysts' published views that NIO's termination of the construction of its Shanghai Facility was a positive event for NIO (based on potential capital expenditure savings) were tainted by this conflict-of-interest.

## BASES FOR OPINION

(a) It is generally well recognized in the investment and financial communities that research analysts at firms, which have underwritten equity securities for a client company, can often be influenced by this fact in how they draft their research reports and recommendations in regard to such companies.[100] This could be particularly relevant to a situation similar to NIO whereby the Company's Shares had jumped to a significant premium (about double the IPO price) after an IPO, *but now within six months after the IPO the Company Shares had declined to almost the level of the initial IPO offering price.*[101]

(b) Given an existing close client relationship, between Morgan Stanley and NIO, as well as the Underwriting firms having a reputational concern as an Underwriter of the IPO that the newly issued Shares perform well in the market, there could often be a cautious position taken by the firm's research analysts in how they

---

2018, Tim Hsiao had "met with 198 investors in Hong Kong, Singapore, and US in the form of 1x1 meeting, group meeting and conference calls during PDIE process" (UW_MS_00084181)

[100] An investment letter written by Henrik Alex on March 6, 2019 had the following comment: "While a majority of analysts will… *be reluctant to outright downgrade the [NIO] stock just six months after the Company's IPO*, expect material price target reductions across the board over the next couple of days." (page 4 of the report). Also stated in the report: "…the Company reported cash and short-term investments of $1.2 billion at the end of Q4 [2018] and raised an additional $650 million in a convertible bond offering in late January [2019], so NIO is not in danger of running out of funds anytime soon." (available at https://seekingalpha.com/article/4246619-nio-chinese-ev-shooting-star-shocks-investors-weak-outlook-cancels-shanghai-factory-plans)

[101] The initial IPO offering price for the NIO Shares on or about September 11, 2018 was US $6.26. Shortly after the IPO, the NIO Shares traded above $11 per Share to over $13 per Share. As of March 7, 2019, after the Company's March 5, 2019 announcement about terminating construction of its Shanghai Facility, the NIO Shares had declined to $7.09 per Share, and continued to decline after that date.

31

positioned their report language after a significant price decline in the client's Shares.[102]

(c) It was considered by most analysts that NIO within the next year, or year plus, would undertake another significant equity offering – which Morgan Stanley and the other Underwriters would most likely want to participate in and certain emails among the Underwriters suggest as much.[103]

(d) Based on my experience, the Underwriters' wealth management divisions (of which Morgan Stanley had a very large division) would want to seek business from NIO's management team. In fact, the discovery materials show that the Morgan Stanley Wealth Management division was reaching out to NIO in this regard during September 2018.[104]

(e) JP Morgan disclosed it beneficially owned 1.0% or more of the common stock of NIO (valued at about $100 million as of March 5, 2019),[105] providing a strong incentive to support the stock price.[106] JP Morgan also admitted it owned over $1.0 mm of NIO's debt securities.[107]

(f) The research analyst reports issued after NIO's March 5, 2019 announcement were by the following firms or their affiliates: (i) On March 6, 2019, 5 research reports were issued by: Bank of America Merrill Lynch, Credit Suisse, Citi, UBS, and Wolfe Research – *all Underwriters for the IPO.* (ii) On March 7, 2019, 3 research reports were issued by: Morgan Stanley (*the Lead Manager for the IPO,* Goldman Sachs (*one of two Co-Managers for the IPO*) and Deutsche Bank (an Underwriter for the IPO);[108] and (iii) On March 8, 2019, 1 research report was issued by CICC[109] (which firm was *not* an underwriter for the IPO).[110]

---

[102] As discussed in footnote 9 herein, after NIO's announcement on March 5, 2019 after the market had closed about terminating construction of its Shanghai Facility, NIO's shares declined by 30.2 percent in the next 2 days after the announcement and by 37.1 percent by the end of four days after the announcement.

[103] UW_MS_00096094; UW_MS_00086744

[104] UW_MS_00096112-114

[105] There were approximately 1 billion NIO Shares outstanding as of March 5, 2019. 1% of 1 billion Shares is approximately 10 million Shares. The approximate closing price of NIO Shares was $10 per share on March 5, 2019. 10 million Shares at $10 per Share is $100 million. (According to the Registration Statement, one Share was equivalent to one ordinary share).

[106] JP Morgan Report dated 10/9/2018 (SABRY-000207).

[107] SABRY-0000158.

[108] Dr. Sabry at her deposition was not sure whether or not various research analysts were employees of the Underwriters of the IPO. (Sabry Deposition, at page 94)

[109] CICC is China International Capital Corporation Hong Kong Securities Limited.

[110] CICC did disclose in its research report, however, the following about possible conflicts-or-interest: "CICC does and seeks to do business with companies covered by CICC Research. As a result, investors should be aware that CICC and/or its associated persons *may have a conflict of interest* that could affect the objectivity of this report." (Last page of the report)

(g) In regard to possible conflicts-of-interest by research analysts employed by the Underwriters of the NIO IPO, it is noted that, based on my experience as an investment banker having participated in a number of IPO's (including as an investment banking expert witness in connection with IPO financings), research analysts employed by the Underwriters very often participate in the IPO process by attending analyst meetings arranged by the Underwriters prior to the IPO in order to better understand the company and its equity securities being offered to investors.[111] *These analysts are thus important to the IPO sales process* as they are one of the primary contacts with institutional investors considering the purchase of the IPO equity securities.

(h) The evidence in this matter indicates that 9 of the 10 analysts who issued research reports after March 5, 2019 commenting on the termination of the Shanghai Facility were employed by the Underwriters of the IPO, and these analysts had previously participated in analyst meetings arranged by the Underwriters prior to the IPO, as well as roadshow presentations for potential institutional investors and testing-the-waters meetings with potential institutional investors. In addition, it is my understanding that some of the analysts for the Underwriters were able to undertake marketing efforts in Asia and not be bound by U.S. regulations in regard to "over the wall" issues. For example, a J.P. Morgan email dated August 11, 2018 from Alice Takhtajan to Louis Hsieh, the CFO of NIO, stated the following: "Louis, Please note that per our policy, J.P. Morgan's research analysts *can speak to* all investors internationally (ex US). With respect to US based investors, J.P. Morgan's research analysts can engage on a reverse inquiry basis with the investors that met with you during TTW [testing the-waters] meetings. *We will ensure* these US investors have the contact details for our research analysts and [thus] reach out to them for further information."[112]

(i) It is also importantly noted, in regard to the SEC's concerns about potential conflict-of-interest issues between research analysts and their investment bank employers, that the SEC's "Fact Sheet: Commission Approval of SRO [Self Regulatory Organizations] Rule Amendments Addressing *Research Analyst Conflicts of Interest* (modified as of July 29, 2003)" states the following, among other things[113] - all of which statements demonstrate the *serious concerns* the SEC has about research – investment banking conflicts of interest: For example:

- The adoption of Regulation AC (Analyst Certification), which requires analysts to certify that their research reports accurately reflect their

---

[111] These analyst meetings are held in accordance with existing compliance rules and regulations relating to analysts not "going over the wall" in regard to confidential information and other matters. It is my understanding, however, that the Underwriters' analysts located in Asia were not subject to various U.S. and SEC regulations.

[112] UW_MS_00071208

[113] https://www.sec.gov/news/extra/sroanalysts-facts.htm

personal views and disclose whether they received compensation for their specific recommendations.

- The joint inquiry between the SEC and other regulators culminated in an agreement to settle *an existing enforcement action involving ten major investment banking firms.*

- Various amendments to certain rules and regulations included the following: (i) "Separation of Research Analyst Compensation from investment Banking Influence." This rule requires firms to establish a compensation committee to review and approve the compensation of its research analysts that are primarily responsible for the preparation of the substance of research reports. The committee would report to the Board of Directors of the firm and may *not* have representation from the firm's investment banking department; (ii) The rule changes prohibit analysts from issuing positive research reports or reiterating a "buy" recommendation around the expiration of a lock-up agreement; (iii) The amendments extend the current quiet periods for the issuance of written research reports to public appearances by managers and co-managers of initial and secondary [equity] offerings; (iv) The rules further insulate research analysts from investment banking interests by prohibiting analysts from participating in "pitches" or other communications for the purpose of soliciting investment banking business; and (v) Among other rules, the amendments prohibited firms engaged in investment banking activities from directly or indirectly retaliating, or threatening to retaliate, against a research analyst who publishes a research report or makes a public appearance that may adversely affect the member's present or prospective investment banking relationship.

(j) The following is noted about the research reports that were issued on March 6, 2019 through March 8, 2019:

    (i)    <u>Bank of America Merrill Lunch Research Report dated March 6, 2019</u>[114]

- Bank of America Merrill Lynch made the following five potential conflict-of interest statements in the report:

(a) "BofA Merrill Lynch does and sees to do business with issuers covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report" (page 1 of the report);
(b) "MLPF&S or an affiliate was a manager of a public offering of securities of this issuer [NIO] within the last 12 months" (page 14 of report);

---

[114] SABRY-0000002 to SABRY-0000017

(c) "The issuer [NIO] is or was within the last 12 months an investment banking client of MLPF&S and/or one of its affiliates" (*id.*);

(d) "MLPF&S or an affiliate has received compensation for investment banking services from this issuer [NIO] within the past twelve months" (*id.*); and

(e) "BofA Merrill Lynch Research Personnel (including the analysts responsible for this report) receive compensation based upon, among other factors, the overall profitability of Bank of America Corporation, including profits derived from investment banking." (*id.*)

- The other Underwriters that issued research reports after March 5, 2019 made similar possible conflict-of-interest statements in their reports.

## VI.     SIGNATURE AND RIGHT TO SUPPLEMENT

If any additional information becomes known and/or available, I expressly reserve the

right to amend and/or supplement this Report.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing are true and correct to the best of my knowledge.

Dated:     _December 23, 2022_

By:     _William H. Purcell_
         WILLIAM H. PURCELL
         Executed in New York, NY  10016

36

**Exhibit 1**


**William H. Purcell**


Office:    225 Cedar Ridge Road
               Bedminster, NJ  07921

             908-781-1803(office) (cell phone:  908-581-1203)
             email:   williampurcellconsulting@gmail.com
             website: www.purcellbanking.com

*Index:*                                                                                                    *Page*

(I)      Personal Short-Form Resume  ...................................................................2-4

(II)     Selected M&A, Financing, and Advisory Transactions

     1)  Dillon Read 1966-1990.........................................................................4-7

     2)  Since Dillon Read...........................................................................7-12

(III)    Expert Testimony Work

     1)  Dillon Read clients:  1976-1990.......................................................12-13

     2)  Other:  1992-2022 .........................................................................13-41

     3)  Courts Accepting as Expert.............................................................41-42

     4)  Corporate Executive Positions ..............................................................42

**EDUCATION:**

Boston Latin School - 1960

Princeton University - 1964 B.A. Degree, graduated with honors in Economics

New York University Graduate School of Business - 1966 MBA (graduated at top of class)

Pace University Law School (Night Program, 1996, one year)


**BUSINESS CAREER:**

Present    Managing Director of William H. Purcell Consulting, Inc. as well as a Senior Advisor and Senior Director of Seale & Associates, an Investment Bank in the Washington, DC area; 2000 – 2022

Research & Innovation Co., a Strategy and Dispute Resolution firm, Charleston, SC; Senior Advisor: 2020-2021.

Expert witness work and testimony for law firms and litigation support firms in various litigation cases: over 220 cases from 1976-2022, including retention by government agencies such as the SEC, the DOJ, the U.S. Attorney's Office, and the IRS.

Additional investment bank working relationships: M.M. Dillon & Co (CT) and Gordian Group (NYC)

Member, Securities Expert Roundtable, 2020-2022

Member of Independent Franchise Advisory Committee of Eggland's Best, Inc.: 2005 – 2022

Financial advisor to South American Homes, the managing participant of a coalition of companies providing government supported low-income housing in the Philippines and Brazil: 2007-2016

Director and financial advisor, previously Vice Chairman, Business Talk Radio Network (Blue Star Media): 2001-Oct. 2009

Member of Independent Committee of Bedminster, NJ Township re: Sewerage Authority: 2005-2006

Special Advisor to Board of Directors and the CEO of Magnitude Information Systems, 2003

Taylor Strategic Divestitures, Managing Director: 1997-2000

Board of Directors of AMDG, Inc. (a diabetes biochem company) as well as SDG, Inc.: 1997 - 2000

AmBase Corporation, Senior Consultant: 1991-2001; Director 1993-1995

Gruntal Capital Markets, Senior Advisor to Corporate Finance Department on project basis: 1991-1998

Senior Advisor on project basis to corporate finance departments of smaller-medium sized investment banks

Occasional guest lecturer on investment banking and finance (George Washington University Graduate School of Business and Monmouth University)

Gulf USA Corporation (Nasdaq), President and Chief Executive Officer, Director and Director of Gulf Resources Pacific (New Zealand) from October 1993 through February 1995

Member (1991-1992) of Governor Florio's N.J. Economic Development Task Force

Vice Chairman of Whitehill Capital (NASD member firm) from November 1990 through May 1991


Resigned from the investment banking firm, Dillon, Read & Co. Inc. during November 1990 after 25 years to initiate and to organize a 13D group to put a new management team into AmBase Corporation and Carteret Savings Bank,, a subsidiary of AmBase. The 13D group included an ex Senior Managing Director of Dillon Read, the Chairman of NAC Re Insurance Company, Augustine Asset Management, Inc, Lindner Management Corp., and others.

1966 – Nov. 1990    Investment Banker at Dillon, Read & Co. Inc., NY, NY

- Joined as an Associate in June 1966; elected Vice President in January 1973; elected Senior Vice President in January 1979; elected Managing Director in January 1982. Securities Licenses: 7, 24, and 63.

Worked in all areas of Corporate Finance during the 25 year period, including mergers & acquisitions, public offerings of equity and debt in both the taxable and tax-exempt areas, private placements of both

debt and equity, lease financings, real estate financings, securitization and structured financings, limited partnership financings, venture capital and general financial advisory. Signed more fairness opinions than any other officer at Dillon Read. In addition, I acted as an expert witness for clients in litigation cases and I performed a number of firm administrative and coordinating functions, including the review and work allocation of Dillon, Read's 50 plus Corporate Finance Associates and Analysts. Client coverage of such companies as Anheuser-Busch, Hoechst Celanese, Volkswagen and Metropolitan Life. Projects of last two years at Dillon, Read and other interesting assignments are as follows:  Dow-Marion merger representing Mr. Kauffman, Healthcare International Special Committee of Board representation, Ausimont-Montedison Special Committee of Board, Quantum ReCap and Bridge Loan, workout of Federated Bridge Notes, Horsehead Industries Purchase of Minority Interest, Dillon Read Purchase of Viking Office Products and subsequent IPO, MacMillan situation representing the ESOT, Foodmaker Special Committee of Board, Owens Corning Fiberglass Board representation, Dreyfus Tax Exempt Fund Organization, Gates Learjet Special Committee of Board, Hilton Foundation, Tampa Bay - Steinbrenner race track sale, Sprint-United Telecommunications merger, Guilford-Southern Pacific negotiations, AT&T-Pacific Telephone Special Committee of Board, Twentieth Century Fox Special Committee of Board.

## CLUB AFFILIATIONS:

Baltusrol Golf Club, Springfield, New Jersey
Hamilton Farm Golf Club, Gladstone, New Jersey
Ocean Reef Club, Key Largo, Florida
Tiger Inn, Princeton, New Jersey
Princeton Club of New York

## AREAS OF EXPERT TESTIMONY  (Current hourly rate is $695)

- Due Diligence issues in regard to financings and M&A transactions
- Disclosure issues as well as misrepresentations and omissions of material information issues in financings as well as other transactions
- Securities issues generally
- Mergers & Acquisitions issues
- Merger process issues
- Fairness Opinions (while at Dillon Read I drafted and signed more opinions than any other officer of the firm)
- Entire Fairness M&A Issues (have testified in Delaware Chancery Court)
- Leveraged buyouts and recapitalizations
- Bankruptcy issues, including fraudulent conveyance
- Solvency opinions
- Valuations
- Advice to Special Committees of Boards
- Fiduciary duty issues
- Corporate governance issues, including having been a CEO and director of a number of companies
- Fee dispute issues and compensation issues
- Damage issues and analysis
- Lender liability and lending issues
- Venture capital
- Leasing and real estate financing
- Financing transactions of both debt and equity, both public and private (co-head of private placement dept. at Dillon Read), taxable and tax-exempt, including structured financings.
- MAC and MAE issues
- Structured finance, including a working relationship with an experienced lawyer specializing in this area
- Document interpretation from an investment banking point of view
- Criminal cases involving alleged securities violations, insider trading, and fraud issues.

- Retained as an expert by governmental agencies, the SEC, DOJ, U.S. Attorney's Office, and IRS.
- (continued on next page)
- Have been an expert in over 215 expert cases since 1976 and have been retained by over 180 law firms. I have testified at court trials, arbitration trials, or before regulatory agencies 42 times.

## **Certain Client Transactions and Testimony**

### **(II) M&A Transactions Listed (Various Financing Transactions were also completed for most of these and other Companies) (Fairness Opinions often also involved)**

1) <u>Dillon Read 1966-1990 / Managing Director</u>

- Anheuser Busch acquisition of Campbell Taggert.

- Anheuser Busch acquisition of Busch Stadium Inc. and Civic Center Redevelopment Corp.

- Anheuser Busch acquisition of Sea World.

- Anheuser Busch divestiture of its industrials products division.

- Hoechst divestiture of its Calbiochem subsidiary.  Also, divestiture of its stoolsoftening products.

- Hoechst acquisition of polyester film business of Celanese.

- Hoechst acquisition of Celanese Corp.

- Hoechst acquisition of Foster Grant.

- Hoechst valuation study of Marion Labs and Upjohn.

- Roussel Uclaf purchase of Foster Grant Sunglass Corp.

- Volkswagen divestiture of Triumph-Adler subsidiary.

- Volkswagen acquisition of major car manufacturing facility in Pennsylvania (first investment in U.S.A.).

- Volkswagen M&A discussions with Amdahl Corp., with final decision not to make a hostile offer.

- Metropolitan Life acquisition of Century 21 Real Estate.

- Dow Chemical acquisition of Marion Labs (representing largest independent shareholder).

- International General Industries acquisition of Kliklok Corp.

- International Bank acquisition of International General Industries.

- International Bank acquisition of outstanding minority interest of Globe Industries.

- Mergers of Hawkeye Insurance and Northeastern Insurance of Hartford into Financial Security Group, with International Bank as control shareholder.

- Merger of Bankers Security Life with United Services Life, with International Bank as control shareholder.

- Healthcare International reorganization, representation of Special Committee of the Board.

- Montedison acquisition of Ausimont, representation of Special Committee of the Board.

- Quantum Recapitalization and bridge loan, representation of Special Committee of the Board.

- Horsehead Industries, purchase by management group, representation of Special Committee of the Board.

- Dillon Read LBO Fund purchase of Viking Office Products.

- MacMillan Publishing, purchase by ESOT and management group, representation of Special Committee of the Board.

- Foodmaker, purchase by management group, representation of Special Committee of the Board.

- Grumman Corp. M&A defense vs. LTV

- Owens Corning Fiberglass, purchase by ESOT and management group, representation of Special Committee of the Board.

- Owens Illinois recapitalization, representation of Special Committee of the Board.

- Gates Learjet recapitalization, representation of Special Committee of the Board.

- Hilton Hotels and Hilton Foundation recapitalization and valuation of assets, representation of Special Committee of the Foundation.

- Issued back-up fairness opinion to that of Lehman Brothers to the Board of Directors of UOP in regard to the merger with Signal Corp.

- Sale of Tampa Bay racetrack for Steinbrenner family and Thayer family.

- Purchase of Pacific Telephone minority interest by AT&T, representation of Special Committee of the Board.

- Twentieth Century Fox, purchase by Marvin Davis and relative valuations, representation of Special Committee of the Board.

- The Hillman Co. acquisition of outstanding minority interest of Edgewater Corp, representation of Special Committee of the Board.

- MASCO Corp. acquisition of Evans-Aristocrat Industries.

- Purex Industries, purchase by management group, representation of Special Committee of the Board.

- United Telecommunications acquisition of Aero-Flow Dynamics, with simultaneous purchase of an Aero-Flow subsidiary by management, representation of Special Committee of the Board of Aero-Flow Dynamics.

- United Telecommunications acquisition of the 50% of Sprint not owned, from GTE Corp.

- Unocal Corp. M&A defense vs. Mesa Petroleum (Boone Pickens).

- Superior Oil acquisition of outstanding minority interest of Canadian Superior Oil Ltd, representation of Special Committee of the Board.

- Marcona Corp.'s purchase of Ocean Industries, a subsidiary of Dillingham Corp.

- 6 -

- Foremost McKesson's purchase of Provident Securities, the Crocker family holding company.

- The reorganization of Interpublic Advertising Co.

- The Henry B. Gilpin Co. acquisition of Mooney-Mueller-Ward Co. and Kiefer Stewart Co.

- SKW Trostberg AG purchase of Airco's silicon and manganese divisions.

- Cellu Craft Inc., purchase by management group, representation of Special Committee of the Board.

- Texaco/Bass Brothers M&A defense and fairness opinion regarding repurchased stock.

- Workout of Federated Department Stores bridge financing notes.

- General Mills divestiture of Izod Corp, Footjoy, Monet, and Chrystal Brands.

- Inmont Corp. merger into Carrier Corp.

- Issued back-up fairness opinion to that of Morgan Stanley to the Board of Directors of Texaco in regard to Bass takeover attempt of Texaco.

- Acquisition of Laura Scudder Snack Foods by Dillon Read LBO Group.

- Acquisition of Charleson Publishing Co. by Dillon Read LBO Group.

- Acquisition of Viking Office Products by Dillon Read LBO Group. (This acquisition, for $65 million, was initiated by Purcell and became Dillon Read's most profitable investment by a wide margin, going public and growing to a market capitalization of over $2 billion before being acquired.)

2) Since Dillon Read (1991 to present)

- Represented AmBase Corp. in 1992 in the purchase of Augustine Asset Management, and also in 1996 in the sale of Augustine Asset Management to management. Rendered fairness opinion to the AmBase Board of Directors in both cases.

- 7 -

- Represented AmBase Corp. in negotiations with the following companies: Freeman Securities (brokerage), Discount Corp. of New York (government bond trading), Eurobrokers (money brokerage), Fidelity Insurance (life insurance), U.S. Quotes, Specialty Meats Inc. and others.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed purchase of Imperial Premium Finance Corp. from Carteret Savings Bank.

- Rendered a fairness opinion to the AmBase Board of Directors regarding a proposed recapitalization of Carteret Savings Bank through an investment by AmBase and American Stock Transfer Corp.

- Participated in capital raising activities for Carteret Savings Bank/AmBase Corp., including decisions relating to real estate assets.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed acquisition of Marcus Schloss & Co., Inc.

- Represented AmBase Corp. in its in investments in two biotech companies, AMDG (diabetes) and SDG (asthma and hepatitis). Was a Director of AMDG.

- Rendered a valuation opinion to the Management Committee of Behringwerke AG in Germany (100% owned by Hoechst AG) in connection with PB Diagnostic Systems, Inc., a company owned 50% by Behringwerke AG and 50% by Polaroid Corp. Also helped to select a mediator/investment bank in regard to the above valuation.

- Rendered a fairness opinion to the Board of Directors of Community First Bank (Jacksonville, Florida) in connection with the sale of American Surety & Casualty Holding Co.

- Together with Shareholder Communications Corp., advised AmBase Corp. regarding a complex escheat program involving past acquisitions closed as far back as the late 1970's.

- Rendered a solvency opinion to the Board of Directors of C&W Acquisition Corp. and Meriwether Capital Corp. (a Rockefeller affiliated investment company) in connection with the leveraged acquisition of C&W Fabricators, Inc.

- 8 -

- As Managing Director of Taylor Strategic Divestitures, represented Moore Corporation in its sale of its business forms European subsidiaries.

- Rendered a valuation opinion to the Board of Directors of AMDG, Inc. in connection with a stock valuation.

- Represented AmBase from a financial point of view in U.S. Bankruptcy Court in connection with a reorganization of Home Holdings by Zurich Insurance.

- As Managing Director of Taylor Strategic Divestitures, represented Atlantic Richfield (ARCO) in the sale of its subsidiary, Union Texas Petrochemicals (ethylene), to the Williams Company.

- As Managing Director of Taylor Strategic Divestitures, represented Shell Chemicals (Shell Oil) in the restructuring and sale of its Polyketone/Carilon Polymers business.

- Advised 10% shareholder of NextHealth, Inc. about possible dissenting or appraisal positions and other alternatives regarding proposed management led going-private transaction.

- As Senior Advisor to Gruntal Capital Markets, oversaw various financings for clients and M&A related transactions.

- As Senior Director of Seale & Associates, advised an investment group about the possible purchase and financing of Belcher Foundry Company, a portfolio company and divestiture of Citicorp Venture Group.

- Advised certain outside Directors of Fisher Communications Inc. about the advantages and disadvantages of certain strategic alternatives proposed by the management of the Company.

- As Senior Director of Seale & Associates, advised Honeywell in regard to the divestiture of Honeywell Tensor (a provider of precise measuring tools) to GE.

- As Senior Director of Seale & Associates, advised American Standard on both the restructuring and subsequent sale of Wabco Braking Systems to the German company, Linnemann Schnetzer, and the sale of Cal-o-Rex (a leading manufacturer of water heaters) to Grupo Industrial Saltillo, a leading Mexican industrial company.

- Advised Board of Directors of Kliklok Corporation about a combination transaction between its English subsidiary and another related English company.

- As Senior Director of Seale & Associates, advised owners regarding the sale of a private nickel plating business, the Houston Plating Co.

- As Senior Director of Seale & Associates, advised a subsidiary of a large east coast utility company (Pepco Energy Services) regarding a possible acquisition of another utility's ESCO (energy services company).

- As Senior Director of Seale & Associates, advised Williams Companies regarding certain aspects of its divestiture program.

- Advised Best Access Systems about a tax-valuation issue and certain other strategy issues in connection with the auction sale of the Company. Sold to The Stanley Works Co. for $310 million.

- As Senior Director of Seale & Associates, advised about Groupo Industrial Saltillo's (Mexico) divestiture of a foundry tooling subsidiary (di Temsa) to a U.K. company (NPL Technologies).

- Advised PenneCom B.V. about certain M&A issues, including issues regarding its Polish Telecom investment.

- Was one of the finalist candidates considered for the Creditors Committee of United Airlines bankruptcy reorganization.

- As Senior Director of Seale & Associates, advised Special Committee of a Board regarding various business options available to the Company, i.e., going-private versus refinancing, etc.

- As Senior Director of Seale & Associates, advised buyout group about financing options, and obtained commitments (both debt, mezzanine, and equity), for the approximate $180 million purchase of certain Mid Atlantic gas stations of a major oil company.

- As Senior Director of Seale & Associates, acted as financial advisor to joint venture of large U.S. chemical company and large European chemical company (Basell Holdings) about project financing alternatives. Company sold in 2005 to a private equity group for $5.7 billion.

- As Senior Director of Seale & Associates, acted as a financial advisor to the City of Houston about a possible $4.5 billion electric utility rate increase and the City's dealings, i.e., adversary proceedings, with both CenterPoint Energy and Texas Genco.

- As Senior Director of Seale & Associates, part of the team that advised Tec-Lac Consultores, S.A. de C.V. (Mexico) about the divestiture of the cheese, yogurt, butter and dairy cream business of its subsidiary Grupo Chen to Sigma Alimentos, owned by Alfa, S.A. de C.V. (Mexico).

- As Senior Director of Seale & Associates, advised regarding the sale of Lockheed
  Martin's Commercial Flight Training Center (business) in Orlando, FL to a subsidiary of Boeing Company.

- As Senior Director of Seale & Associates, part of the team that advised the shareholders of Continental Fire Sprinkler Company and Continental Alarm & Detection Company (Omaha, Nebraska) regarding sale to Peter Kiewit Sons', Inc. (the seventh largest construction firm in the U.S.)

- As Senior Director of Seale & Associates, part of the team that advised Amkor Technology, Inc. on the divestiture of its Amkor Test Services business unit ("ATS") to Integra Technologies, LLC.  ATS, based in Wichita, Kansas, provides semiconductor test services for military, avionics, and commercial grade applications.

- As Senior Director of Seale & Associates, part of the team that advised WGL Holdings, Inc. (the parent company of Washington Gas) on the divestiture of American Combustion Industries, Inc., an HVAC installation and construction company, to Milestone Capital Management, LLC.

- As Senior Director of Seale & Associates, part of the team that advised Celanese Corporation on both the sale of its Pampa, Texas, facility to Babcock & Brown, and the sale of its AT Films business to British Polythene Industries.

- As Senior Director of Seale & Associates, advised Media General on various corporate finance issues, including dividend policy.

- Part of a team which formed and financed South American Homes, a consortium company to provide government-supported low-income housing in Brazil and Peru.

- Advised Business Talk Radio Inc. in regard to the purchase of radio stations in Boston, Pittsburgh, and Las Vegas. Also advised regarding the recapitalization of company and name change to Blue Star Media.

- As Senior Director of Seale & Associates, part of the team that advised Cryptologic Limited (Ireland) in regards to financial planning and defensive strategies regarding an activist shareholder and a potential proxy contest.

- As Senior Director of Seale & Associates, have advised on certain fairness opinions.

- As Senior Director of Seale & Associates, part of the team that (i) advised Triumph Group about the sale of Triumph Air Repair to The Gores Group; (ii) advised Lockheed Martin about the sale of its Commercial Flight Training Business to Alteon; (iii) advised AZZ Inc. in 2019 about the purchase of Preferred Industries; and (iv) advised AZZ Inc. in 2020 about the sale of its Nuclear Logistics Business to Paragon Energy.

## III) <u>Expert Testimony Work</u>

1) <u>Dillon Read clients: 1976-1990</u>

- Adolph Coors Co.: estate valuation for the IRS.

- Montana Power Co.: testimony before the Montana Public Utility Commission.

- Expert witness for Signal Corp. in <u>Weinberger v. UOP</u>, litigation in Delaware Chancery Court regarding Signal purchasing the minority interest in UOP and which important case established the basic guidelines for "fairness" in going-private transactions, i.e. the concept of entire fairness, encompassing both fair price and fair dealing. (1980 and 1984) Testified at court trial.

- Witness for International General Industries in <u>Tanzer v. International General Industries</u>, litigation in Delaware Chancery Court regarding IGI purchasing the minority interest in Kliklok Corp. and which important case established the basic guidelines for "business purpose". (1976) Testified at court trial.

- Testimony before the Department of Insurance in Conn. and Iowa in connection with the mergers of Hawkeye Insurance and Northeastern Insurance Co. into Financial Security Group.

- Expert witness for Metropolitan Life Ins. Co. in Arkansas State Court in connection with whether Met Life or Sun Life Guaranty Corp. should be allowed to buy the reorganized Baldwin United business in that state. (1986) Testified at court trial.

- Expert witness for Marathon Oil / U.S. Steel in Ohio Federal Court (Cincinnati) and in Ohio State Court (Findlay) in connection with shareholder litigation.  (1983)

- Expert witness for Pepsico (Friedman, Wang & Bleiberg) in Delaware State Court in connection with Pizza Hut franchise litigation.   (1987)

- Testimony before the California Public Utility Commission in connection with the purchase of the Pacific Telephone minority interest by AT&T.

- Other various fact witness testimony in connection with certain merger transaction litigation for which Dillon, Read & Co. Inc. served as investment banker.  (1970-1990)


2) Other: 1992 - 2021

- Witness for AmBase Corp. (Friedman, Wang & Bleiberg) in Bowne of New York City, Inc. v. AmBase Corp., in New York Federal Court (1992), in connection with missed mailing date for proxy statement litigation.

- Witness for AmBase Corp. (Wilentz, Goldman & Spitzer) in Richard L. Braun v. AmBase, in N.J. State Court (1993), in connection with employment litigation. Testified at court trial.

- Investment banking expert in rendering a solvency opinion to the Boards of Directors of C&W Acquisition Corp. and Meriwether Capital (counsel being Satterlee Stephens Burke & Burke) in connection with the leveraged acquisition of C&W Fabricators, Inc. (1996)

- Expert witness for Shared Technologies, Inc. (McCarter & English) in United States District Court, Southern District of New York in connection with merger fee litigation with the investment banking firm of Gerard Klauer Mattison & Co. LLC. (1997)

- Expert witness for NL Industries, Inc. and Harold C. Simmons (Bartlit Beck Herman Palenchar & Scott) in Superior Court of New Jersey, Chancery Division, in connection

with litigation about NL's 1991 stock repurchase and tender program (Plaintiff being Frank David Seinfeld). (1997 and 1998)

- Fact witness and expert witness in five subject areas for AmBase Corporation (Pryor, Cashman, Sherman & Flynn) in United States Bankruptcy Court, Southern District of New York, as creditor in connection with the Chapter 11 reorganization of Home Holdings Inc. (owner of Home Insurance Company, controlled by Zurich Insurance). (1998) Testified at court hearing.

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter of David Barr, Administrative Law Judge Hearing in Miami, Florida. (1998) Testified at SEC court trial.

- Expert witness for counsel of beneficiaries (Rucci, Burnham, Carta & Edelberg, LLP), Guardian ad litem for Trusts Under the Will of E. Cotton Rawls, Greenwich Probate Court, District of Greenwich, CT., in connection with trustee fiduciary responsibilities. (1998)

- Expert witness for Quickturn Design Systems, Inc. (Wilson Sonsini Goodrich & Rosati, and Morris, Nichols, Arsht, & Tunnell) in reviewing adequacy opinion rendered by Hambrecht & Quist to the Board of Directors of Quickturn in connection with a hostile tender offer made by Mentor Graphics Corporation; also rendered an independent adequacy opinion; Delaware State Chancery Court. (1998) Testified at court trial.

- Fact and expert witness for AmBase Corp. (Pryor, Cashman, Sherman & Flynn) in AmBase v. Zurich SF Holdings, Inc. in Supreme Court of New York in connection with a breach of contract and solvency issues. (1999-2000)

- Expert witness for Ernst & Young (Wiggin & Dana) in Share America, Inc. and Share America LP v. Ernst & Young in connection with a failed initial public offering; State of Connecticut, Superior Court. (1998 - 2001)

- Expert witness for Octavian, Inc. (Levin & Associates) in Octavian, Inc. et al. vs. McDonald & Company Investments, Inc. et al. in connection with a failed financing transaction and breach of "best efforts" undertaking; Cuyahoga County Court of Common Pleas, Ohio. (1999-2000) Testified at court trial.

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter SEC v. Erdman; Southern District, Florida. (1999)

- Expert witness for defendants, Berlin et al. (Morris, James, Hitchens & Williams) in Emerald Partners v. Berlin, et al (Hall Real Estate Co. and May Petroleum); Delaware State Chancery Court, in connection with a merger fairness opinion of Bear Stearns and the updating thereof; also due diligence issues. (1999- 2000) (Remanded in 2002) Testified at court trial.

- Consulting expert for defendants, Arbor Drugs, Inc. et al. (Davis Polk & Wardwell) in Richard Nodel et al. v. Arbor Drugs, Inc. et al. in connection with reviewing a merger fairness opinion of Goldman Sachs; Circuit Court, Oakland County, Michigan. (1999 – 2000)

- Expert witness for defendants, Bally Entertainment, Hilton Hotels, Arthur Goldberg et al. (Cadwalader, Wickersham & Taft; and Latham & Watkins) in Linda Parnes v. Bally Entertainment Corp. et al in connection with reviewing aspects of the merger transaction and the fairness opinions of Goldman Sachs and Merrill Lynch; Delaware State Chancery Court. (2000) Testified at court trial.

- Expert witness for defendants Hambros PLC et al (Schulte Roth & Zabel) in Kevin D. Shea et al v. Hambros PLC et al in connection with reviewing valuation of the investment banking business and other matters; Supreme Court of the State of New York. (2001)

- Expert witness for defendants Del Monte Foods Company and Morgan Stanley & Co. Inc. (Cleary Gottlieb, and Shearman & Sterling) in PPI Enterprises (U.S.), Inc. versus the above in connection with the valuation of a preferred stock and proper disclosure during a corporate restructuring to a seller of that preferred stock security; United States District Court Southern District of New York. (2001)

- Expert witness for individual defendant (Curtis, Mallet-Prevost) in arbitration with an investment banking firm in connection with valuation issues and fee issues relating to the sale of a luxury goods company.; American Arbitration Association, State of New York. (2001)

- Expert witness for plaintiff Prison Acquisition Company L.L.C. (The Blackstone Group, L.P.; Fortress Investment Group, LLC; and Bank of America Corporation) (Skadden Arps) in Prison Acquisition Company L.L.C. versus Prison Realty Trust, Inc., Corrections Corporation of America et al in connection with a fee dispute and breach of contract; United States District Court Southern District of New York. (2001)

- Expert witness for plaintiff The Statutory Creditors' Committee on behalf of the Estates of Sabratek Corporation et al.  (The Bayard Firm and Weil, Gotshal & Manges) versus Ralin Medical, Inc. and versus LaSalle Bank N.A. in connection with valuation and solvency issues, and also due diligence issues; United States Bankruptcy Court for the District of Delaware.  (2001)

- Expert witness for defendants IKON Office Solutions, Inc. et al. (Harkins Cunningham) in Whetman versus the above in connection with the valuation and investment attractiveness of IKON; United States District Court for the Eastern District of Pennsylvania.  (2001)

- Expert witness for defendant Mead Johnson & Co. (Skadden Arps) in PBM Products, Inc. versus Mead Johnson & Co. in connection with valuation, projections, and damages issues; United States District Court of Virginia, Richmond Division.  (2001)

- Expert witness for certain defendants in an alleged criminal securities fraud matter (Lankler Siffert & Wohl; and Manatt, Phelps & Phillips) in United States v. Black, Gardell et al; United States District Court Southern District of New York.  (2001 - 2002) (Acquittal) Testified at court trial.

- Expert witness for individual plaintiff in severance agreement litigation (Skadden Arps and Lowey Dannenberg) in Rizzo v. The MacManus Group, Inc., et al in connection with valuation and disclosure issues; United States District Court Southern District of New York.  (2001 - 2002)

- Expert witness for defendants, Best Lock Corp., Best Universal Lock Co. and Frank E. Best, Inc. (Morris Nichols) in IN RE Best Lock Corporation Consolidated Shareholder Litigation in connection with valuation and fairness opinion issues; Delaware State Chancery Court.  (2002) Testified at court trial.

- Consulting expert for defendant K12, Inc. (Sandler and Rosen) in Thomas Weisel Partners, LLC vs. K12, Inc. in connection with a fee dispute; United States District Court Northern District of California.  (2002)

- Expert witness for defendant Ernst & Young (Skadden Arps) in ILM II Senior Living, Inc. et al versus Ernst & Young in connection with material adverse change termination of merger agreement; financing issues; and damage issues; American Arbitration Association, Washington, DC. (2002)

- Expert witness for defendant KPMG Consulting, Inc. (McKool Smith) in Equaterra, Inc. versus KPMG Consulting, Inc. and KPMG Consulting, LLC in connection with issues of good faith negotiations and valuation; District Court, Harris County, Texas.  (2002)

- Expert witness for plaintiff (cross defendant) (Paul Hastings and Lee, Goddard & Duffy) in Pacific Coin Management et al v. BR Telephony Partners, L.P. et al in connection with issues of disclosure, due diligence, valuation, financing and damages. Los Angeles County Superior Court, Central District, California.  (2002) Testified at court trial.

- Consulting expert for defendant Jefferies & Company, Inc. et al (Quinn Emanuel Urquhart Oliver & Hedges) in Kimberly Herring v. Jefferies & Company, Inc. et al in connection with employment termination issues.  San Francisco County Superior Court, California. (2002)

- Expert witness for certain defendant in an alleged criminal securities fraud matter (Law offices of Gerald L. Shargel and Law offices of Maurice Sercarz) in United States v. Ilan Arbel; United States District Court Eastern District of New York.  (2002 - 2003)  (Hearing to have bail re-instated; successful prison release; follow-up trial with agreement amongst parties during trial.) Testified at court trial.

- Expert witness for plaintiff (Cadwalader, Wickersham & Taft) in Techmer PM v. Poly One Corporation (as successor of M.A. Hanna Company) in connection with issues of valuation, projections, good faith, rescission issues, and damages.  American Arbitration Association, Chicago.  (2002)

- Consulting expert for defendant (cross plaintiff) (law offices of Ronald P. Mysliwiec, and of David J. Aronstam) in Markav, Inc. et al v. Mark Eisen in connection with issues of valuation, damages, and disclosure.  Supreme Court of the State of New York County of New York.  (2002 - 2003)

- Consulting expert for plaintiff (Fieldman Hay & Ullman) in a Telecom Co. v. an Investment Banking Firm et al in connection with issues of M&A termination, due diligence, disclosure and valuation.  United States District Court Southern District of New York.  (2002 - 2004)

- Expert witness for defendant (Cozen O'Connor) in Compex Legal Services, Inc. v. Uniscribe Professional Services, Inc. et al in connection with issues of disclosure, projections, due diligence, and valuation.  Superior Court of the State of California for the County of Los Angeles, Southwest District.  (2002 - 2003)

- Expert witness for defendant (Davis Polk & Wardwell) in In re Independent Energy Holdings PLC Securities Litigation (CSFB, DLJ et al) in connection with due diligence and disclosure issues.  United States District Court Southern District of New York. (2002 - 2003)

- Expert witness for plaintiff (Conrad & Scherer) in Ginsburg et al v. GAMBRO AB and Cobe Laboratories, Inc. in connection with issues of disclosure, fairness considerations, valuation, damages and Special Committee procedures. Circuit Court of the 17th Judicial Circuit In And For Broward County, Florida. (2002 - 2003) Testified at court trial.

- Consulting expert for defendant (law offices of Laura Brevetti, and Budoff & Ross) in an alleged criminal securities fraud matter in United States v. Ralph Jarson et al; United States District Court Southern District of New York. (2003)

- Expert witness for plaintiff (Lowey Dannenberg) in Doft & Co. et al v. Travelocity.Com Inc. et al in connection with valuation, fairness, and Special Committee issues; Delaware State Chancery Court. (2003-2004) Testified at court trial.

- Consulting expert for defendant Ernst & Young Corporate Finance Inc. (Dickinson Wright) in Groupe Deltec-Vespromar et al v. E&Y Corporate Finance in connection with

- M&A investment banking standards regarding a divestiture project. United States District Court Eastern District of Michigan Northern Division. (2003)

- Expert witness for plaintiff (Gary, Williams, Parenti et al; Bassman Mitchell & Alfano; law offices of Geoffrey Gitner) in DAG Enterprises, Inc. et al v. ExxonMobil Corp. et al in connection with issues of financing feasibility and credit rating analysis. United States District Court for the District of Columbia. (2003-2005)

- Expert witness for defendant (Miller & Wrubel) in EGW Partners, L.P. v. Prudential Insurance Company of America and Prudential Securities, Inc. in connection with investment banking industry standards regarding certain disclosures. The Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania Civil Trial Division. (2003)

- Expert witness for defendant (Cadwalader, Wickersham & Taft) in Chapter 11 Trustee of Molton Metal Technology, Inc. et al v. CBS Corporation (f/k/a Westinghouse Electric Corporation) et al in connection with valuation and solvency issues. United States Bankruptcy Court for the District of Massachusetts (Eastern Division). (20032004)

- Expert witness for plaintiff (Helms Mulliss & Wicker) in Banc of America Securities LLC v. Shoney's, Inc. in connection with a fee dispute. United States District Court for the Western District of North Carolina (Charlotte Division). (2003-2005)

- Consulting expert for individual defendant (Sills Cummis Zuckerman Radin Tischman Epstein & Gross) in an insider trading case. (2003)

- Expert witness for plaintiff (Sayles, Lidji & Werbner) in Harward et al v. PricewaterhouseCoopers L.L.P. and UBS Warburg L.L.C. in connection with IPO and M&A due diligence issues and other issues.  In the District Court of Dallas County, Texas; 44th Judicial District.  (2003-2004)

- Expert witness for defendant (Paul Hastings) in Robert Kahn v. Financial Management Advisors, Inc. in connection with the standard investment banking meaning of certain Agreement terms.  JAMS Arbitration in Los Angeles, CA. (2003) Testified at Arbitration trial.

- Expert witness for plaintiff (Kirby McInerney & Squire), In re AT&T Corp. Securities Litigation, AT&T Wireless Shareholder Litigation in connection with IPO issues, tracking stock issues, and disclosure issues.  In the United States District Court District of New Jersey.  (2003-2006)

- Expert witness for defendant (Dechert; and Lomurro Davison Eastman and Munoz) in Allison Williams Co. et al v. ViaSource Funding Group in connection with fee dispute and industry practices regarding engagement letters, indemnification, securitization and other issues.  In the United States District Court for the District of New Jersey. (2003-2006)

- Consulting expert for plaintiff (Conrad & Scherer) in Bank Atlantic Bancorp et al v. Henry Edward Asher et al in connection with certain damage issues.  Circuit Court of the 17th Judicial Circuit In And For Broward County, Florida.  (2003)

- Consulting expert for defendant (Powell Goldstein Frazer & Murphy) in United States of America v. John B. Torkelsen et al in connection with certain SBIC and SBA issues. Both civil and criminal proceedings.  In the United States District Court for the Eastern District of Pennsylvania.  (2004)

- Expert witness for plaintiff (Cleary Gottlieb) in Fresh Del Monte Produce Inc. et al v. Eastbrook Caribe et al in connection with certain damage issues.  Supreme Court of the State of New York County of New York.  (2004-2005) Testified at court trial.

- Expert witness for defendant (Jenner & Block) in VSI Holdings, Inc. et al v. SPX Corporation et al in connection with merger termination, material adverse change analysis, disclosure issues, and damage issues. In the United States District Court for the Eastern District of Michigan Southern Division. (2004-2006)

- Expert witness for City of Houston (Epstein Becker Green Wickliff & Hall) regarding application of CenterPoint Energy and Texas Genco to determine "stranded costs" and other true-up balances (potential $4 - $5 billion rate case), before the Public Utility

Commission of Texas; Many issues were involved, including valuation, fairness, and minority issues. PUC Docket No. 29526. (2004-2005) Testified before Public Utility Commission.

- Expert witness for plaintiff (Ogletree, Deakins, Nash, Smoak & Stewart) in Jim R. Sapp, individually and as trustee of various trusts, versus counsel that represented his company in a purchase transaction; in connection with securitization and refinancing issues. In the Marion County Superior Court State of Indiana. (2004-2005)

- Expert witness for defendants (Briggs and Morgan) in Steven Rupp et al v. L. Daniel Thompson et al in connection with fairness opinion issues and certain other issues. Lyon County District Court for the District of Minnesota. (2004-2005)

- Consulting expert for defendant (Law offices of Gerald B. Lefcourt) in an alleged criminal securities conspiracy matter in United States v. Paul Stark. United States District Court Southern District of New York. (2004-2005)

- Consulting expert for defendant (Wilson, Elser, Moskowitz, Edelman & Dicker) in Ashton v. Valley Brook Farms v. J.H. Reid Recycling in connection with damage and other issues. Superior Court of New Jersey, Law Division: Hunterdon County. (20042005)

- Expert witness for defendant (Dechert) in Cornell Capital Partners v. Eagle Broadband, Inc. in connection with convertible debenture terms and certain other issues. United States District Court for the District of New Jersey. (2004-2005)

- Consulting expert for plaintiff (Futterman & Howard) in Harry Berger et al v. Jasmine Ltd., et al in connection with issues of due diligence and insolvency. United States District Court for the District of New Jersey, Camden Vicinage. (2004-2005)

- Expert witness for defendant (Jenkens & Gilchrist; Troutman Sanders) in Highland Capital Management v. Leonard Schneider et al v. RBC Dominion Securities in connection with terms and standards of a certain private transaction and the authority of an advisor. United States District Court Southern District of New York. (2004-2008) Testified at court trial.

- Expert witness for third-party defendant, Banc of America Securities, in Bank of America et al v. J.P. Morgan (Chase) Securities et al in connection with due diligence, disclosure, securitization (Commercial Financial Services, Inc.) and good faith issues (Helms Mulliss and Day Edwards). In the District Court of Tulsa County, State of Oklahoma. (2004-2005)

- Expert witness for plaintiff (Padova & Lisi) in Joseph A. Robinson et al v. Berwind Financial Securities et al in connection with engagement contract, best efforts, proper advice and other issues.  In the Court of Common Pleas Philadelphia County.  (20042006)

- Expert witness for defendant (Skadden Arps and Kirkpatrick & Lockhart) in Baker et al v. SG Cowen et al in connection with M&A due diligence issues, M&A advisory issues and certain research issues.  United States District Court, District of Massachusetts.  (2005)

- Consulting expert for plaintiff (Clyde & Co., and Nixon Peabody) in Petrobras (Petroleo Brasileiro S.A.) v. El Paso Energy et al in connection with contract modifications.  The American Arbitration Association, The International Centre for Dispute Resolution, UNCITRAL Arbitration Rules.  (2005)

- Expert witness for defendant (Law office of Joel H. Holt, St. Croix, Virgin Islands) in Rural Telephone Finance Cooperative et al v. Jeffrey J. Prosser, Innovative Communication Corp., Virgin Islands Telephone Corp. et al in connection with certain financing issues, certain fiduciary duty issues, and certain damage issues. In the District Court of the Virgin Islands Division of St. Thomas and St. John.  (2005-2006)

- Expert witness for plaintiffs (Sonnenschein Nath & Rosenthal) in Triton Partners et al v. William E. Simon & Sons et al in connection with certain fee dispute issues.  In The Superior Court of the State of Delaware In And For New Castle County.  (2005)

- Expert witness for defendants (Turner Padget Graham & Laney) in Sun One Price v. C. Burt Duren et al in connection with due diligence and financial viability issues.  In the United States District Court for the Southern District of Florida.  (2005)

- Expert witness for defendants (Kirkpatrick & Lockhart) in Re: Philip Services Corp. Securities Litigation in connection with damage issues.  United States District Court Southern District of New York.  (2005-2006)

- Expert witness for defendants (Foley & Lardner) in John J. Aquino, Trustee for First Knowledge Partners v. Amadeus Capital Corp. et al in connection with fee issues, fair value and solvency issues.  United States Bankruptcy Court District of Massachusetts (Eastern Division).  (2005-2006)

- Expert witness for Petitioner (McKee Nelson) in GlaxoSmithKline Holdings (Americas) Inc. & Subsidiaries v. Commissioner of Internal Revenue in connection with tax and M&A issues.  United States Tax Court (Washington, D.C.).  (2005-2006)

- Expert witness for plaintiffs (Wollmuth Meyer & Deutsch and Sayles/Werbner) in State of Arkansas Teacher Retirement System et al v. Merrill Lynch & Co., Inc. et al in connection with due diligence and disclosure issues, among other things, regarding the placement of limited partnership interests of LJM 2 Co. Investments, L.P., a special purpose entity of Enron.  In the District Court of Dallas County, Texas; 193rd Judicial District.  (2006)

- Expert witness for plaintiffs (Spencer & Associates) in Kevin Lamkin et al v. UBS Paine Webber, Inc. et al and Samuel GianCarlo et al v. UBS Financial Services, Inc. et al in connection with due diligence and disclosure issues, among other things, regarding the placement of certain Enron securities.  In the United States District Court for the Southern District of Texas, Houston Division; Cause No. H-02-0851 and H-03-4359; (2006 - 2014)

- Expert witness for plaintiffs (Greer, Herz & Adams; Pepe & Hazard; Grant & Eisenhofer, and Cotchett, Pitre & McCarthy) in American National Insurance Company et al. v. Citigroup, JP Morgan Chase, Merrill Lynch, CSFB, and Deutsche Bank; In Re Enron Corp. Securities Litigation, Mark Newby et al (Consolidated); in connection with due diligence and disclosure issues and other matters.  In the United States District Court for the Southern District of Texas, Houston Division.  (2006 - 2008)

- Expert witness for defendants (Sullivan & Worcester) in Drulias et al. v. ADE Corp. et al.; in connection with fairness opinion issues, fees and merger procedure issues, and corporate governance issues.  In the United States District Court District of Massachusetts. (2006)

- Consulting expert for defendants (law offices of Gerald L. Shargel) in connection with possible indictment of a CEO by the United States alleging securities fraud and insider trading (United States District Court Eastern District of New York); and, in addition, in the matter of United States v. Robert McAllister alleging securities fraud (United States District Court Southern District of New York.) (2006 - 2007)

- Expert witness for plaintiffs (Catanzarite Law Corporation) in Kaiser et al v. Roth Capital Partners et al; in connection with due diligence and disclosure issues.  In the Superior Court of the State of California In and For the County of Orange, Central Justice Center. (2006 - 2007) Also, a separate arbitration proceeding. (2010) Testified at court trial.

- Expert witness for plaintiff (G.W. Merrick & Associates, LLC) in D.E. Frey Group, Inc. v. FAS Holdings, Inc.; in connection with valuation, disclosure and fairness issues.  In the United States Bankruptcy Court for the District of Colorado. (2006 - 2007)

- Expert witness for plaintiff (Kasowitz, Benson, Torres & Friendman) in Murray Capital Management, Inc. v. Deutsche Bank Securities, Inc. et al in connection with due diligence and disclosure issues regarding the placement of certain Exide Technologies securities. United States District Court Southern District of New York. (2006 - 2007)

- Consulting expert for plaintiff and law firm of Walter & Haverfield (Cleveland) regarding the review and analysis of certain client trusts. (2007 - 2009)

- Expert witness for plaintiff (Kasowitz, Benson, Torres & Friedman; Kelley Drye & Warren; and Goulston & Storrs) In re: Bank of New England Corporation, Debtor in connection with issue of payments due senior creditors v. junior creditors. In the United States Bankruptcy Court for the District of Massachusetts Eastern Division. (2007 - 2008) Testified at court trial.

- Expert witness for plaintiff (Smith, Chapman & Campbell; and Julander, Brown & Bollard) in Decision Warehouse Consultoria E Importacâo LTDA (Brazil) vs. Business Objects Americas et al in connection with issues of valuation, due diligence and breach of contract. Superior Court of the State of California County of Santa Clara. (2007)

- Expert witness for plaintiffs (law firms of Chimicles & Tikellis; Green Welling; The Rosen Law Firm; Catanzarite Law Corp., Gold Bennett Cera & Sidener; Abraham Fruchter & Twersky; Wolf Haldenstein Adler Freeman & Herz; Labaton Sucharow & Rudoff; and Glancy Binkow & Goldberg): In re Textainer Financial Services Corporation et al; Class Action; in connection with fiduciary issues and issues of fairness, disclosure, and valuation. In the Superior Court of California, San Francisco County. (2007 - 2009)

- Expert witness for defendant (Roemer Harnik & Nethery) in The Fansler Foundation vs. American Realty Investors, Inc. et al in connection with fairness and disclosure issues, including valuation and preferred dividend issues. United States District Court Eastern District of California Fresno Division. (2007)

- Expert witness for Commissioner of Internal Revenue, as Respondent, v. Santa Fe Pacific Gold Company and its successor in interest, Newmont USA Limited, as Petitioner, in connection with M&A process issues in regard to the 1997 transaction when Newmont outbid Homestake Mining; hostile vs. non-hostile transactions, termination fee and certain other issues. United States Tax Court. (2007) Testified at tax court trial.

- Expert witness for plaintiff (Catanzarite Law Corporation and The Rosen Law Firm) in Mike Alexandros et al vs. Kor Electronics, Inc. as derivative defendant and vs. New Enterprise Associates IV, L.P. as direct defendant in connection with fairness, disclosure, valuation and fiduciary issues. In the Superior Court of California for the County of Orange, Central Justice Center; Case No. 06-CC-07881. (2007 - 2010) Testified at court trial.

- Expert witness for defendant and counter-claim plaintiff (Mintz Levin, Cozen O'Connor and Fox Rothschild) in Gemini Investors v. Ches-Mont Disposal in connection with duty of care issues, financing issues, damage issues and fee issues. In the United States District Court for the District of Massachusetts) (2007 – 2009)

- Expert witness for defendant (Stradling Yocca Carlson & Rauth) in Candlewood Partners, LLC v. Koosharem Corp. et al in connection with private placement financing issues, duty of care issues, and fee dispute issues. In the United States District Court, Central District of California Western Division (2008)

- Expert witness for plaintiff The Mafco Litigation Trust per the Marvel bankruptcy (Friedman Kaplan Seiler & Adelman) versus Ronald O. Perelman et al in connection with holding company financing issues and the importance of restrictive covenants on operating company in its debt financings and overall financing flexibility; also fiduciary issues and the issue of damages.  United States District Court for the District of Delaware. (2002-2008). This case was decided in favor of the defendant at the District Court level and was reversed by the Third Circuit Court of Appeals based almost solely on the expert report of Purcell, quoted in the Opinion. A major settlement followed.

- Expert witness for defendant (Cleary Gottlieb and Cadwalader Wickersham & Taft) in Calpine Corporation vs. Rosetta Resources Inc. in connection with solvency, financial condition, and valuation issues. United States Bankruptcy Court, Southern District of New York. (2007 - 2008)

- Expert witness for plaintiff (Sonnenschein; andCovington & Burling) in an American Arbitration Association Case (California) in connection with due diligence issues in an acquisition, contract issues, and asbestos claim issues; Confidential arbitration; American Arbitration Assoc. Case No. 74-489-Y-01220-07-JRJ. (2008-2010)

- Expert witness for plaintiff (Catanzarite Law Corporation and The Rosen Law Firm) in Meruelo Capital Partners 2, LLC vs. Dijji Corp. et al in connection with disclosure, due diligence, and damage issues. In the Superior Court of the State of California In the County of Los Angeles (2008-2009) Testified at court trial.

- Consulting expert for defendant (law offices of Gerald L. Shargel) in alleged securities fraud in United States v. Joseph Lando et al. In the United States District Court Eastern District of New York. (2008)

- Expert witness for plaintiffs (Donovan & Associates, Cahill & Associates, and Sills Cummis & Gross) in CC Investors III, L.P. et al v. Alfred C. Eckert III et al in connection with certain best interests duties and certain damage issues to limited partners in investment funds.  Superior Court of New Jersey, Law Division: Morris County. (20042008) Testified at court trial.

- Expert witness for defendant (Frost Brown Todd) in Friedman, Billings, Ramsey & Co., Inc. vs. Energy Coal Resources, Inc. in connection with financing and registration issues. In the Superior Court of the State of Delaware In and For New Castle County (2008)

- Expert witness for defendant (Thorp Reed & Armstrong) in Etkin & Company, Inc. vs. Winner Steel, Inc. in connection with retention letter contract and fee issues. American Arbitration Association, Pittsburg (2008-2009)

- Expert witness for defendant (Katsky Korins and Sonnenschein) in Coburn Group, LLC vs. Whitecap Advisors LLC in connection with third party marketing fee issues, contract issues, and damage issues. In the United States District Court Northern District of Illinois Eastern Division; Case No. 07CV2448; (2008-2010)

- Expert witness for defendant (Rubinstein & Corozzo) in alleged securities fraud in United States v. Andrew Caccioppoli. In the United States District Court Eastern District of New York. (2008-2010)

- Expert witness for plaintiff (Winget, Spadafora & Schwarzberg) in Gordon Levey vs. Brownstone Investment Group, LLC et al in connection with valuation and other issues. FINRA arbitration, NYC (2009). Testified at Arbitration trial.

- Expert witness for defendant (Law Offices of Herbert Beigel & Associates) in 1989 LLC v. Icahn et al in connection with damage issues, valuation issues, market effect issues, and certain other issues. In the Supreme Court of the State of New York, County of New York; Index No. 6004 24/08; (2009-2017)

- Consulting expert for defendant (Jones Day and Boies Schiller) in Reed Elsevier Inc. et al v. Henry E. Asher et al in connection with damage issues and counter-claim issues. In the Circuit Court of the Fifteenth Judicial Circuit, In And For Palm Beach County, Florida. (2009)

- Consulting expert for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) in Roughton v. Pouschine in connection with disclosure and damage issues. United States District Court for the District of New Jersey. (2009)

- Expert witness for defendant (Jacob, Medinger & Finnegan) in Oppenheimer & Co., Inc. v. Metal Management, Inc. in connection with fee issues, disclosure issues and M&A issues. United States District Court Southern District of New York; Index No. 08-CIV3697 (LTS)(FM); (2009-2010)

- Consulting expert for plaintiff (Law offices of A. Richard Golub) in regard to certain damage issues. (2009-2010)

- Expert witness for plaintiff (The Rosen Law Firm) in Apollo Capital Fund, LLC et al v. Roth Capital Partners et al in connection with disclosure and due diligence issues. Superior Court for the State of California Los Angeles County. (2009-2011) Testified at court trial.

- Consulting expert for defendant (Murchison & Cumming) in Convergence Ethanol, Inc. v. Daniel Moscaritolo in connection with proposed venture capital financing issues and damage issues. United States District Court for the Central District of California, Western Division. (2009)

- Expert witness for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) In the matter of Estate of Herman J. Koehler, III, Deceased, Sharon G. Koehler, Plaintiff v. Karovic & Rodriguez, Defendants in connection with fiduciary and damage issues. Superior Court of New Jersey Chancery Division – Probate Part Morris County; Docket No. MRS-P1894-96 and MRS-L-3264-03; (2009-2010)

- Expert witness for defendant (Curtis Mallet) in Charles Severs vs. CRT Capital Group in connection with certain compensation issues. FINRA arbitration, NYC; FINRA Case No 09-03923; (2010) Testified at Arbitration trial.

- Expert witness for plaintiff (The Rosen Law Firm) in Donna Press et al v. Delstaff LLC, Koosharem Corp. et al in connection with fiduciary issues, fairness issues and valuation issues. Superior Court of the State of California County of Contra Costa. (2009-2010) Expert witness for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) in Robert Nissen and Arthur Blumenthal v. Theodor Rozsa and TR Strategic Group in connection with M&A issues and fee issues. United States District Court for the District of New Jersey; Civil Action No. 08-5563 (JLL); (2010-2012)

- Consulting expert for defendant in criminal trial in connection with various securities issues. Superior Court of the State of California. (2010-2012)

- Expert witness for plaintiff (Kellogg, Huber, Hansen, Todd, Evans & Figel) in Thomas H. Lee Equity Fund V, L.P. et al v. Mayer Brown et al in connection with M&A issues and due diligence issues. United States District Court Southern District of New York; Case No. 07 CIV. 6767 (GEL); (2010-2011)

- Expert witness for plaintiff (Jenner & Block) in WRS Holding Company v. Jonathon Markoff, Edgewater Growth Capital Partners, L.P. et al in connection with MAE/MAC issues in M&A Purchase Agreement, disclosure issues, and reps and warranties issues. In Circuit Court of Cook County, Illinois County Department, Law Division; Case No. 2008L007973; (2010 - 2011)

- Expert witness for plaintiff (U.S. Department of Justice) in United States of American v. Wachovia Bank, N.A. as Personal Representative of the Estate of Ralph W. Hughes in connection with various financing and solvency issues. United States District Court for the Middle District of Florida, Tampa Division; Civil No 8: 09-CV-01443-EAKAEP; (2011-2013)

- Expert witness for plaintiff (Reed Smith) in Chrysalis Ventures, III, L.P. et al v. Mobile Armor, Inc. et al in connection with recapitalization financing issues, entire fairness issues, and damage issues. Court of Chancery of the State of Delaware; Arbitration, in fact first filed arbitration in Court of Chancery under new rules; Arbitration No. 001A2011-VCLASTER; (2011) Testified at court trial.

- Consulting expert for plaintiff (Robins, Kaplan, Miller & Ciresi) in DeMoulas Profit Sharing Plan & Trust DTD 3/27/63 et al v. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Fannie Mae. FINRA arbitration. (2011-2013)

- Expert witness for defendant (Curtis Mallet) in Charles Baltic vs. CRT Capital Group in connection with certain compensation issues. FINRA arbitration, NYC; FINRA Case No. 10-00221; (2011-2012) Testified at Arbitration trial.

- Expert witness for plaintiff (Robins, Kaplan, Miller & Ciresi) in Liberty Mutual Insurance Company et al vs. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Fannie Mae. United States District Court Southern District of New York; Case No. 09-MD-02013-PAC and Case No. 10-CV-09184-PAC; (2011-2013)

- Expert witness for plaintiff (Levin & Associates and Thomas C. Wagner, LLC) In Jaimini H. Mehta vs. Goldman, Sachs & Co. in connection with disclosure, investment, and fiduciary issues. FINRA arbitration, Miami; FINRA Case No. 11-03149;  (2011-2013)

- 27 -

- Expert witness for defendant (Cleary Gottlieb) in Bryanston Group, Inc. et al vs. Empire Resorts, Inc. in connection with certain financial issues and contract issues. Supreme Court of the State of New York, County of New York; Index No. 650881/2010;  (2011-2013)

- Expert Witness for plaintiff (Buckley Sandler) in In Re IndyMac Bancorp, Inc. in connection with officer and director issues of the duties of care, loyalty, and good faith and for corporate waste, financial planning issues and other matters on behalf of the Bankruptcy Trustee. United States Bankruptcy Court Central District of California Los Angeles Division; Case No. 2-08-BK-21752; (2011-2012)

- Expert Witness for plaintiff (The Rosen Law Firm) in Mike McGee et al vs. China Electric Motor, Inc., Westpark Capital, Inc., Roth Capital Partners et al in connection with due diligence and disclosure issues. United States District Court, Central District of California Western Division, Los Angeles; CV-11-2794R(AGRX); (2011-2013)

- Expert Witness for plaintiff (The Rosen Law Firm) in Dan Katz et al vs. China Century Dragon Media, Inc., Westpark Capital, Inc., Joseph Gunnar & Co. LLC, I-Bankers Securities, Inc., et al in connection with due diligence and disclosure issues. United State District Court, Central District of California Western Division, Los Angeles; No. 11-CV2769 (JAK) (SSX); (2011-2013)

- Expert Witness for plaintiff (Glancy Binkow & Goldberg, The Rosen Law Firm, and Pomerantz Haudek Grossman & Gross) in Salomon Querub et al vs. Puda Coal, Inc., Macquarie Capital (USA), Brean Murray, Carret & Co., Newbridge Securities et al in connection with due diligence and disclosure issues. United States District Court, Southern District of New York; (2012-2014)

- Expert Witness for plaintiff (The Rosen Law Firm) in Richard Yee et al vs. NIVS Intellimedia Technology Group, Inc., Westpark Capital, Inc. et al in connection with due diligence and disclosure issues. United States District Court, Central District of California; Case No. 11-CV-08472DMG-AJW; (2012-2013)

- Expert witness for defendant (Morris, Manning & Martin) in Scientific Consulting v. Serious Energy in connection with venture capital financing and valuation issues. In the Superior Court of Cobb County, State of Georgia (2012)

- Expert witness for plaintiff (Klafter Olsen & Lesser; Zwerling, Schachter & Zwerling; and Rosenthal Monhait & Goddess) in In Re IMH Secured Loan Fund Unitholders Litigation in connection with valuation and fairness issues. In the Court of Chancery of the State of Delaware; Consolidated Civil Action No. 5516-CS; (2012-2013) Testified at court hearing.

- Expert witness for plaintiff (Cleary Gottlieb) in Player v. Hockey Club in connection with contract and valuation issues in regard to a deferred compensation payment. National Hockey League Players Association Confidential Arbitration Proceeding (2012) Testified at Arbitration trial.

- Consulting expert for plaintiff (Klafter Olsen & Lesser; and Rosenthal Monhait & Goddess) in Craig Smith et al v. Living Independently Group, Inc, General Electric Company et al in connection with fiduciary issues and valuation issues. In the Court of Chancery of the State of Delaware (2012-2013)

- Expert witness for plaintiff (Reynolds APC and Solomon Ward Seidenwurm & Smith) in T&S Enterprises v. Sumitomo Corporation of America, Sumitomo Heavy Industries, Ltd et al in connection with retention issues, fee issues and/or quantum meruit issues. United States District Court Southern District of California; Case No. 3:11-CV01318BENMDD; (2012)

- Expert witness for defendant (Reilly Pozner) in Jefferies & Company v. Ascent Solar Technologies, Inc in connection with retention issues and fee issues. New York State Supreme Court; Index No. 652862/2011; (2012-2013)

- Expert witness for plaintiff (The Rosen Law Firm) in Vanleeuwen et al vs. Keyunan Petrochemicals, Inc. et al in connection with disclosure issues. United States District Court Central District of California; No: CV-11-09495-PSG (JCGX); (2012-2013)

- Expert witness for plaintiff (Torkin Manes) in Karmen Equities Limited vs. Globalive Communications Corp. et al in connection with fee dispute. Superior Court of Justice, Ontario, Canada; Court File No. CV-09-382551; (2012-2014)

- Expert witness for plaintiff (Rosenthal, Monhait and Goddess) in Gordian Group, LLC vs. North Atlantic Holding Company, Inc. et al in connection with retention issues, fee issues, and valuation issues. In the Superior Court of the State of Delaware In and For New Castle County; C.A. No. 12C-06-276(JRJ)-CCLD; (2012-2013)

- Expert witness for plaintiff (Robins, Kaplan, Miller & Ciresi) in Liberty Mutual Insurance Company et al v. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Freddie Mac. United States District Court Southern District of New York; Case No. 09-MD-02072-MGC-ECF case; also 11-CV-05484-MGC; (2013-2015)

- Expert witness for plaintiff (The Rosen Law Firm) in Ming Yang et al vs. Tibet Pharmaceuticals, Inc. et al in connection with due diligence issues. United States District Court of the Virgin Islands Division of St. Croix; Case No. 12-CV-0054-WALGWC; (2013)

- Consulting expert for defendants (Law offices of Gerald L. Shargel) in an alleged criminal securities fraud matter in United States vs. David Levy et al; United States District Court Southern District of New York (2013)

- Consulting expert for plaintiff (Canadian law firm) in contemplated litigation vs. Chinese company and underwriter in connection with due diligence and disclosure issues; Ontario Superior Court of Justice (2013)

- Expert witness for defendants (Barnes & Thornburg) in an alleged criminal bank fraud matter in United States vs. Edward J. Woodard, Stephen G. Fields et al; United States District Court for the Eastern District of Virginia Norfolk Division; Case No. 2:12 CR105-RAJ-DEM; (2013) Testified at court trial.

- Expert witness for plaintiff (Coti & Sugrue) in 220 Laundry LLC and Eliot Spitzer vs. B&M Linen, Miron Markus and Boris Markus in connection with breach of contract damage issues. United States Bankruptcy Court Southern District of New York; Case No. 12-11560(ALG), Adv. Pro No. 12-1885-ALG; (2013)

- Expert witness for defendant (Olshan Frome Wolosky) in Vector Capital Corporation vs. Ness Technologies, Inc. in connection with breach of contract M&A issues. United States District Court Southern District of New York; 11 Civ. 6259(PKC); (2013)

  Expert witness for plaintiff (J.T. Riker Co., L.P.A.) in Great Water Capital Partners vs. Down-Lite International, Inc. et al in connection with alleged fraud in the inducement and fee dispute. Court of Common Pleas Hamilton County, Ohio; Case No. A1300424; (2014-2016)

- 30 -

- Expert witness for defendant taxpayer (The Law Offices of Michael J. Desmond) in IRS Commissioner v. Michael Tricarichi in connection with M&A due diligence issues. United States Tax Court, Washington, DC; Docket No. 23630-12; (2014) Testified at tax court trial.

- Expert witness for plaintiff (Peters Berger Koshel & Goldberg and Law Office of Randolph T. Lovallo) in M.M. Dillon & Co. Group, LLC f/k/a IB Separation LLC d/b/a CRT Investment Banking LLC v. Ambre Energy Ltd et al in connection with a fee dispute. Supreme Court of the State of New York County of Kings; Index No. 13241/2011; (2014)

- Expert witness for defendant (Johnson Winter & Slattery, Australia) in Brosnan et al v. Katke, Metagenics Australia Pty Ltd., Metagenics, Inc. et al in connection with various financing and M&A issues. In The Federal Court of Australia, Queensland District, General Division; Case No. QUD 384-2012; (2014)

- Expert Witness for plaintiffs (The Rosen Law Firm and Lifshitz & Miller) in Berkowitz and Porretti et al v. Sino Gas International Holdings, Inc. et al in connection with process undertaken by Special Committee of Board of Directors and certain M&A issues. In The Third Judicial District Court, In And For Salt Lake County, State of Utah; Case No. 140902517 and 140902654; (2014)

- Expert Witness for plaintiff in Gulfco Holding Corp. vs. Prospect Capital Corporation et al in connection with lender liability and certain other issues. In the District Court of Jefferson County, Texas, 60th Judicial District; Cause No. B195691; (2014-2015)

- Expert witness for defendant taxpayer (McGuireWoods) in United States of America v. B&D Video, Inc. et al in connection with M&A due diligence and certain other issues. United States District Court for the Eastern District of Virginia, Richmond Division; Civil Action No. 3:13-CV-724. (2014)

- Expert witness for Class Action plaintiffs (Glancy Prongay & Murray, The Rosen Law Firm, Pomerantz, Kaplan Fox & Kilsheimer, and Kirby McInerney) in In Re: Puda Coal Securities Inc. et al Litigation in connection with due diligence and disclosure issues. In the United States District Court for the Southern District of New York; Case No. 1:11:CV-2598 (DLC); (2015-2016)

- Expert valuation opinion for IRS purposes for a shareholder placing his shares of a privately-owned company into a Trust (Fein, Such, Kahn & Shepard) (2015)

- Expert witness for plaintiff (Seiller Waterman) in Christopher Carmicle v. BJI Holdings, LLC, Brown Jordan International, Inc. et al in connection with M&A process issues, fiduciary issues, and certain other issues. In the United States District Court for the Southern District of Florida; Case No. 14-CV-61415-RLR (2015)

- Expert witness for defendant (Coppersmith Brockelman) in Armorworks Enterprises v. The Cavanagh Law Firm et al in connection with certain M&A issues. In the Superior Court of Arizona, Maricopa County; Case No. CV 2008-014160 and 014305, Consolidated (2015-2016)

- Expert witness for plaintiffs (Bryan Cave and McDermott Will & Emery) in Indian River County, Florida et al vs. Peter M. Rogoff et al and Martin County, Florida et al vs. US Department of Transportation in connection with certain financial planning and financing issues. In the United States District Court for the District of Columbia; Case Nos. 1:150cv-00460 (CRC) and 1:150-cv-00632 (CRC) (2016-2019)

- Consulting expert for plaintiff (Kasowitz, Benson, Torres & Friedman) in U.S. Bank National Association, as Trustee for Harborview Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc. (d/b/a Bank of America Home Loans), Bank of America Corporation et al in connection with various M&A issues. Supreme Court of the State of New York, County of New York; Index No. 652388/2011; (2016-2017)

- Consulting expert for defendant (Clayman & Rosenberg) in alleged securities fraud in United States v. Talman Harris. In the United States District Court for the Northern District of Ohio Eastern Division; Case No. 1:15CR335; (2016)

- Consulting expert for plaintiff (SEC) in Securities and Exchange Commission vs. Stiefel Laboratories, Inc. and Charles W. Stiefel in connection with valuation issues, M&A issues, and disclosure issues. United States District Court Southern District of Florida; Case No. 11-CV-24438-WJZ; (2012-2020, with a final judgment of $37 million against the Company and Charles Stiefel, approved by the Court as of June 5, 2020)

- Consulting Expert for plaintiff (Hogan Lovells) in Plummer et al v. Scharg et al in connection with various M&A issues. In The Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida; Case No.: CACE 15-001127 (2016-2018) Testified at court trial.

- Expert witness for defendant (Hogan Lovells and Robert B. Miller Law) in LaDove, Inc. v. Carolyn Plummer, It's A "10", Inc. et al and It's A "10", Inc, CounterclaimPlaintiff v. LaDove, Inc. in connection with various fiduciary issues and damage issues. In The Circuit Court of the 11th Judicial Circuit, In and For Miami-Dade County, Florida; Case No.: 2015-011239 CA-40 (2016-2017)

- Expert witness for plaintiff (Robbins Geller Rudman & Dowd) in Beaver County Employees Retirement Fund et al v. Cyan, Inc. et al in connection with due diligence issues. In the Superior Court of the State of California, County of San Francisco; Lead Case No.: CGC-14-538355 Class Action (2016-2018) This case went to the Supreme Court of the United States with unanimous March 2018 opinion affirming that State Courts have jurisdiction to hear Federal Securities Act Class Actions.

- Expert witness for defendant (Foley & Lardner) in Saybrook Tax Exempt Investors, LLC et al v. Lac du Flambeau Band of Lake Superior Chippewa Indians et al, including Stifel Nicolaus & Co., Inc. and the law firm, Godfrey & Kahn, in connection with conflict of interest issues, disclosure issues and certain financing issues. State of Wisconsin, Circuit Court Civil Division, Waukesha County; Case No. 12CV00187 (2016-2017)

- Expert witness for plaintiff (Pomerantz; Glancy Prongay & Murray; and The Rosen Law Firm) in Keith Thomas, Oklahoma Police Pension & Retirement System et al v. Avenue Capital Management II, L.P. in connection with MagnaChip Semiconductor control shareholder issues, due diligence issues and insider trading issues. United States District Court Northern District of California; Class Action, Case No. 3:14-cv-01160JST (2016-2017)

- Expert witness for plaintiff (Shiner Law Group) in Karl Makovsky, as Personal Representative of the Estate of Jean Irene Makovsky, and as Agent for Keith Makovsky et al as Beneficiaries v. Bank of America, N.A. in connection with lost or misplaced certificate of deposit. In the Circuit Court of the 15th Judicial Circuit, In and For Palm Beach County, Florida; Case No: 2013 CA 018966 (2017-2018)

- Expert witness for plaintiff (Scott & Scott, Zwick Law Firm, and Glancy Prongay & Murray) in Benjamin Gross et al v. GFI Group, Inc., Colin Heffron, and Michael Gooch in connection with material misstatement issues and M&A process issues. United States District Court for the Southern District of New York; Case No. 1:14-cv-09438-WHP (2017-2018)

- Expert witness for defendants and counterclaim plaintiffs (Duane Morris and Blank Rome) in Rice Drilling B LLC v. International Assets Advisory LLC, HarborLight Capital Group, LLC, and Dean G. Tanella in connection with various fee dispute issues.
  In the Court of Common Pleas of Washington County, Pennsylvania, Civil Division; Case No. 2013-4153 (2017-2020)

- Expert witness for plaintiffs (Yetter Coleman and Halling & Cayo) in Stark Master Fund Ltd et al v. Credit Suisse Securities (USA) LLC in regard to M&A financing issues, commitment letter issues, and disclosure issues in connection with the planned acquisition of Huntsman Corp. by Hexion-Apollo. United States District Court For the Eastern District of Wisconsin; Case No. 14-CV-00689 (RTR) (2017-2020)

- Consulting Expert for plaintiff (Law offices of Herbert Beigel) in CVR Energy, Inc. (controlled by Carl Icahn and affiliated funds) vs Wachtell Lipton Rosen & Katz et al in connection with investment bank M&A engagement agreement issues, lack of proper advice issues, professional malpractice issues, materiality issues, and certain other issues. In the United States District Court for the Southern District of New York, C.A. No. 14 CV 06566 (RJS); (2014-2018)

- Expert witness for plaintiffs (Sperling & Slater) in Silvercreek Management, Inc. et al v. Citigroup et al (primarily Credit Suisse, Deutsche Bank and Merrill Lynch) in connection with due diligence and disclosure issues involving underwriting various security issues for Enron Corp. In the United States District Court for the Southern District of New York; Case No. 02-CV-8881(JPO); (2017-2018-2019)

- Consulting expert for defendants (Thorpe North and Western) in Aortech International PLC v Frank Maguire et al in connection with certain M&A issues and fiduciary issues. In the United States District Court for the District of Utah, Central Division, Civil No. 2:14-CV-00171-RJS; (2017)

- Expert witness for defendants (Archer &Greiner) in EHE Holdings, Inc. et al v. UM Equity Corp. et al in connection with certain M&A issues, Stock Purchase Agreement issues, disclosure issues, good faith issues, and "sandbagging" issues. In The Court of Chancery of the State of Delaware, Docket No. 2017-201; (2018)

- Expert witness for plaintiffs (claimants) (Levin & Associates) in Dahlke et al v. Wunderlich Securities, Inc. et al; FINRA Dispute Resolution Arbitration Number 17-00294 in connection with joint venture issues, breach of contract issues, fiduciary issues, due diligence issues, and good faith issues. (2018-2019)

- Consulting expert for plaintiffs (Hall & George and The Rosen Law Firm) In re Zillow Group, Inc. Securities Litigation in connection with due diligence issues. In the United States District Court for the Western District of Washington at Seattle; No. 2:17-CV01387-JCC. (2018)

- Expert witness for plaintiffs (Labaton Sucharow, Quinn Emanuel, and Friedman Oster & Tejtel) in H&N Management Group, Inc. and AFF Cos Frozen Money Purchase Plan v. AGNC Investment Corp., F/K/A, American Capital Agency Corp et al in connection with a derivative action involving director fiduciary duty issues, fairness issues, and valuation issues. In the Court of Chancery of the State of Delaware; C.A. No 12847VCMR; (2018-2019)

- Expert witness for plaintiffs (Reilly Pozner) in JoAnn Howard and Associates, P.C., Special Deputy Receiver in connection with Texas receivership proceedings for various state and health insurance guaranty associations vs. J. Douglas Cassity, National City Bank, PNC Bank et al - - in connection with certain M&A issues, disclosure issues, and stock market reaction issues. United States District Court, Eastern District of Missouri, Case No. 4:09CV01252 ERW; (2018)

- Consulting Expert for plaintiff (Hogan Lovells and Robert B. Miller Law) in Carolyn Plummer et al v. Scott Scharg, Michael Wilson et al; Joint Counterclaims by Scott Scharg, Michael Wilson and Wilson Bolyn Business Development, Inc. in connection with various damage issues. In The Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida; Case No: CACE-15-001127(13); (2018)

- Expert witness for Class Action plaintiffs (Robbins Geller) in In re American Realty Capital Properties, Inc. Litigation in connection with various underwriter and director due diligence issues. United States District Court Southern District of New York; Civil Action No. 1:15-mc-00040-AKH; (2018-2019)

- Expert witness for plaintiff (McCabe Rabin) in Carter A. Pottash v. Ability, Inc. and Benjamin Gordon et al in connection with due diligence issues and misrepresentations in the sale of securities. In the Circuit Court for the 15th Judicial Circuit In And For Palm Beach County, Florida; Case No.: 502016CA013823XXXXMB-AG; (2018-2019)

- Expert witness for the defendant (Koff, Mangan, Vullo & Gartley) in Slough v. Gerli & Co., Inc. et al in connection with employment termination issues and director fiduciary issues. In the Court of Common Pleas Montgomery County, PA; (2018-2019)

- Expert witness for the Class Action plaintiffs (Robbins Geller and The Rosen Law Firm) in Daniel Turocy et al vs. El Pollo Loco Holdings, Inc. et al in connection with Rule 144 issues, disclosure issues and insider trading issues. United States District Court Central District of California Southern Division; Case No. 8:15-cv-01343-DOCKES; (2018-2019)

- Expert witness for the Class Action plaintiffs (The Rosen Law Firm and Glancy Prongay & Murray) in In Re Alibaba Group Holding Limited Securities Litigation (Christine Asia Co., Ltd, et al v. Jack Ma et al) in connection with the non-disclosure of material information in a registration statement and prospectus as well as director due diligence issues. United States District Court Southern District of New York; Civil Action 1:15-md-02631 (CM); (2018-2019)

- Consulting expert for the plaintiff (Pomerantz) in LSI Design and Integration Corp. v. Tesaro, Inc. et al in connection with a material misleading statement in a Form 10-Q filed with the SEC. United States District Court District of Massachusetts; Case No. 18-12352 (2019-2020)

- Expert witness for the defendant, counter-claim plaintiff (Munck Wilson Mandala) in LightPath Capital, Inc. v Phoenix American Hospitality, LLC and William "Perch" Nelson in connection with fee dispute issues. In the District Court of Dallas County, Texas, 134th Judicial District; Cause No. DC-18-11171 (2019)

- Expert witness for the plaintiff (Goulston & Storrs) in Thomas Lapointe, Claimant against Third Avenue Holdings Delaware LLC et al, Respondents in connection with employment compensation issues, market condition issues, fiduciary duty issues, and insider trading issues. American Arbitration Association, New York City, Case No: 0118-0001-1925, (2019) Testified at Arbitration trial.

- Expert witness for plaintiff (Patterson Belknap Webb & Tyler) in Ambac Assurance Corporation et al v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp. and Bank of America in connection with various M&A and de facto merger issues. A final settlement in 2022 by Bank of America for $1.4 billion. Supreme Court of the State of New York, New York County; Index No. 651612/2010; (2014-2022)

- Expert witness for the defendants (Quinn Emanuel and Sills Cummins & Gross) in Ashland Inc.; International Specialty Products, Inc.; and ISP Environmental Services, Inc. v. G-I Holdings Inc.; GAF Materials Corporation et al in connection with whose responsibility for certain environmental liabilities as a result of an LBO – restructuring transaction and a subsequent acquisition. Superior Court of New Jersey, Morris County: Law Division; Docket No. MRS L-2331-15 (2019-2022)

- 36 -

- Expert witness for claimants (Mitts Law) in Mark Velicer et al v. Rita's Franchise Company et al in connection with disclosure issues and de facto merger issues. Before the American Arbitration Association in The Commonwealth of Pennsylvania, Case No. 01-19-0000-0256. (2019-2020) Testified at arbitration trial.

- Expert witness for the defendants as well as the counter-plaintiff and third-party plaintiffs (DLA Piper) in Stanislav Royzenshteyn and Roman Gerashenko v. Prashant Pathak, Onyx Enterprises Canada Inc. et al, and counter-plaintiff Onyx Enterprises Canada Inc., Derivatively and on Behalf of Onyx Enterprises Int'l Corp. v. Royzenshteyn and Gerashenko, counter-defendants and Onyx Enterprises Int'l Corp., nominal defendant in connection with equity capital raising issues, solvency issues and fiduciary duty issues. Superior Court of New Jersey, Chancery Division, Monmouth County; Docket No. C-45-18 (2019-2022)

- Expert witness for the plaintiff (Berchem Moses) in Lynn Sullivan, Trustee of Angelina J. Cuccaro Family Trust, Claimant, v. Raymond James & Associates, Respondent, in connection with interest amount due in regard to diverted funds by a trustee-broker of Raymond James as well as other issues; FINRA Arbitration Case No. (2019)

- Expert witness for the plaintiff (The Lipp Law Firm) in Christopher Shebby, Claimant, v. Stifel, Nicolaus & Co., Inc., et al, Respondents, in connection with compensation and certain other issues; FINRA Arbitration Case No. 19-00491 (2019-2021)

- Consulting expert for defendant in case of MaQuire v. Obermueller in Utah State Court (Barney McKenna & Olmstead) in regard to a buy-sell agreement and fee dispute. (2019-2020)

- Expert witness for the plaintiffs (Kahn Swick & Foti and Pomerantz) in In Re Chicago Bridge & Iron Company N.V. Securities Litigation in connection with the nondisclosure of material information in SEC filings as well as other issues. United States District Court Southern District of New York; Case No. 1:17-CV-1580 (2019-2022)

- Expert witness for defendant (Weil Gotshal) in James B. Sherwood, Claimant, v. Belmond Ltd, Respondent, in connection with amount of monies due pursuant to a Transaction Agreement; JAMS Arbitration Case No. 1425030457 (2019-2020) Testified at Arbitration trial.

- Expert witness for plaintiffs (Gordon Rees Scully Mansukhani, Joel Levin, Esq, and Ulmer Berne) in Tony Bosch and Chris Aymond, Claimants, v. Absolute Investment Advisors, Respondent, in connection with investment performance and damage issues; JAMS Arbitration (2020)

- Expert Witness in a $300 million plus financial fraud criminal case, retained by the U.S. Attorney's Office in Greenville, South Carolina. United States of America vs. Scott Kohn, Future Income Payments, LLC, Joseph P. Hipp, Kraig S. Aiken, and David N. Kenneally In the District Court of the United States for the District of South Carolina, Greenville Division; CR No 6:19239 (2020-2022)

- Expert witness for plaintiff and counterclaim defendant (Goldstine, Skrodzki, Russian, Nemec and Hoff) in PersonalizationMall.Com, LLC v. Neil Tolaney (and Tolaney v. PersonalizationMall.Com) in connection with M&A issues, fiduciary duty issue, and termination for cause issues. In the Circuit Court for the Eighteenth Judicial Circuit Dupage County Wheaton Illinois; Case No. 2015 MR001726 and 2017 MR000381 (2020-2022)

- Expert witness for plaintiff (Phillips Lytle) in Valtus Capital Group, LLC v. PARQ Equity Limited Partnership and other Parq entities in connection with the meaning of certain terms in a Private Placement Engagement Agreement as they related to a fee dispute. United States District Court Southern District of New York; 19 CIV. 4737 (DLC); (2020-2022)

- Expert witness for defendant (Evans Law and Armstrong Teasdale) in JM Smith Corporation v. The Bank of Missouri in connection with issues of whether a reasonable due diligence investigation was performed in regard to the financial condition and credit status of Family Pharmacy, an entity to which J.M. Smith (Smith Drug) lent money and advanced product. United States District Court for the Western District of Missouri Southern Division; Case No.: 19-CV-3176-SRB (2020-2021)

- Expert witness for the plaintiff (Pomerantz and Bernstein Litowitz Berger & Grossman) in Roofers' Pension Fund et al v. Perrigo Co., PLC, Joseph Papa et al in connection with misrepresentations and omissions made to investors by Perrigo during the Class Period, including while fighting a hostile tender offer during 2015 by Mylan, N.V. United States District Court District of New Jersey; Civil Action No. 16-2805 (2020-2022)

- Expert witness for the plaintiff-claimants (Brewer, Attorneys & Counselors) in Mark P. Hurley and JA Brookview, LLC v. EB Safe, LLC, Emigrant Bank, Howard Milstein et al in connection with M&A process issues and valuation issues in connection with the sale of a private company. Arbitration conducted by the International Institute for Conflict Prevention and Resolution; CPR File G-20-37-S-AA (2020-2021) Testified at Arbitration trial.

- 38 -

- Expert witness for the defendant/respondent (Norton Rose Fulbright) in Hedgebay Securities LLC v. OneMap Mineral Services LLC in connection with fee dispute issues regarding a proposed financing transaction. Arbitration conducted by The American Arbitration Association; Case No. 012000007310 (2020-2021) Testified at Arbitration trial.

- Consulting expert for the plaintiff (Bernstein Litowitz Berger & Grossman and Kessler Topaz Meltzer & Check) in In Re Luckin Coffee Inc. Securities Litigation in connection with various underwriter and director due diligence issues. United States District Court Southern District of New York; Case No. 1:20-cv-01293-LJL-JLC (2020-2021)

- Expert witness for the plaintiff (Miller Shah and Robbins Geller) in Hawaii Structural Ironworkers Pension Trust Fund, Individually and on Behalf of All Others Similarly Situated vs. AMC Entertainment Holdings, Inc. et al in connection with misrepresentations and omissions made to investors during the Class Period. United States District Court Southern District of New York; Case No. 1:18-cv-00299-AJN (2021)

- Expert witness for the defendant and counter-plaintiff (Benesch) in Ashland Global Holdings Inc. v. Valvoline Inc. in connection with various post Separation-Spin Off transaction issues. Supreme Court of the State of New York County of New York; Index No. 656085/2018 (2021-2022)

- Expert witness for the defendant and counter-plaintiff (Davis Wright Tremaine) in Eventbrite Inc. v. M.R.G. Concerts and Matthew Gibbons in connection with MAC (material adverse change) issues relating to a financing transaction. United States District Court Northern District of California San Francisco Division; Case No. 3:20-cv-04040-SI (2021-2022)

- Expert witness for the plaintiff (Jan Schlichtmann, Esq.) in John J. Acquino, Chapter 7 Trustee of the Inpellis, Inc. estate, by its assignee, Convergent Distributors of Texas, LLC v. Alexander Capital, LP, and its Managing Partners in connection with an investment bank having misrepresented its capacities and intentions to Inpellis management in regard to a planned, but failed, IPO transaction as well as a follow-up SEC investigation related to the transaction, all of which led to the bankruptcy of Inpellis and significant damages. United States District Court Southern District of New York; Case No. 1:21-cv-1355(JSR) (2021-2022)

- Expert witness for the plaintiff (Robbins Geller and Pomerantz) in Gabby Klein, Donald Sherbondy, Construction Laborers Pension Trust of Greater St. Louis et al v. Altria Group, Inc., JUUL Labs, Inc., Howard A. Willard III et al in connection with due diligence issues and the failure of defendants to disclose information during the Class Period that was known or knowable to them, which if disclosed would have presented to investors a more accurate reflection of the significant risk Altria was exposed to because of its $12.8 billion investment in JUUL. United States District Court Eastern District of Virginia (Richmond Division); Case No. 3:20-cv-00075-DJN (2021)

- Expert witness for the defendant (Baker & Hostetler) in James Ginzkey et al on behalf of the Class members v. National Securities Corporation in connection with the due diligence performed in connection with certain private placement financings as well as other issues relating to those financings. United States District Court Western District of Washington. Case No. 2:18-cv-1773 (2021-2022)

- Expert witness for the plaintiff (Wolf Popper) in Ronald L. Jackson, as Trustee, et al v. Microchip Technology, Inc. et al in connection with due diligence issues and materially misleading or knowingly false or deliberately reckless statements to investors during the Class Period after an acquisition. United States District Court District of Arizona; Case No. 2:18-cv-02914-ROS (2021-2022)

- Expert witness for the defendant directors of Three Shores Bancorporation, Inc. in Eric Emerson et al vs Gideon T. Haymaker, Charles E. Bailes, III; John D. Cochran, Brian P. Golson, Thomas J. O'Shane, and Richard J. Walsh in connection with alleged breaches of fiduciary duty and the issuance of a misleading Proxy Statement in connection with the acquisition of Three Shores Bancorporation, Inc. by United Community Banks, Inc. In The Circuit Court of the Ninth Judicial Circuit, In and For Orange County, Florida; Case No. 2021-CA-002479-0 (2022)

- Consulting expert for an opt-out plaintiff (Robbins Geller) in a private action relating to the settled Allergan Plc Class Action in the United States District Court District of New Jersey (2022)

- Expert Witness for plaintiff and counter-claim defendant (Cozen O'Connor) in Neumentum, Inc. vs. Ancoris Capital Partners, LLC in connection with a fee dispute for a non-registered financing. United States District Court Southern District of New York; Case No. 1:21-cv-09838 (2022)

- Expert Witness for the plaintiff (Robbins Geller) in Lewis Stein, Individually and on behalf of all others similarly situated vs. U.S. Xpress Enterprises, Inc. and certain directors and members of management in connection with material misleading statements and

omissions made to investors at the time of an IPO transaction and during the Class Period. United States District Court Eastern District of Tennessee; Case No. 1:19-cv-00098 (2022)

## IV) **Courts Accepting as Expert**

- Mr. Purcell has testified over 40 times at trials in various federal and state courts and before arbitration panels (for both plaintiffs and defendants) regarding a wide range of investment banking and capital markets issues. He has been accepted as an expert witness for the purpose of offering trial testimony in the courts set forth below. In addition, he has testified at the Federal Court of Claims (Washington, DC) and has testified before a number of mediation and arbitration panels, including FINRA Arbitration panels in New York City and Los Angeles; AAA and JAMS Arbitration panels as well as a tribunal for the International Institute for Conflict Prevention and Resolution and in an Arbitration with the National Hockey League Players Association. He has also been retained and testified as an expert on behalf of various regulatory agencies, including on behalf of the U.S. Securities and Exchange Commission, the U.S. Department of Justice, the U.S. Attorney's Office, and the Internal Revenue Service.

  - the United States District Court for the Southern District of New York;

  - the United States District Court for the Eastern District of New York;

  - the United States Bankruptcy Court for the Southern District of New York;

  - the United States Bankruptcy Court for the District of Massachusetts (Eastern Division);

  - the United States Bankruptcy Court for the District of Colorado;

  - the United States District Court for the Eastern District of Virginia (Norfolk Division);

  - the United States Tax Court (both Atlanta and Washington, DC);

  - the Court of Chancery of the State of Delaware (many times);

  - the Supreme Court of the State of New York, County of New York;

  - the Superior Court of New Jersey Law Division, Morris County;

  - the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida;

  - the Circuit Court of the 11th Judicial Circuit Miami-Dade County, Florida;

- the Superior Court of the State of California, in both Los Angeles and Orange County;

- the Cuyahoga County Court of Common Pleas, Cleveland, Ohio; and

- the Circuit Court of Pulaski County, Arkansas.

## V) **Corporate Executive Positions**

- From October 1993 through February 1995, served as President and CEO of Gulf USA Corporation, as it went through a reorganization process, and as a Director of Gulf Resources Pacific in New Zealand, a 90% owned subsidiary and one of the largest commercial real estate companies in New Zealand.

- Vice Chairman of the Board, and then Director and financial advisor for Business Talk Radio Inc., name change to Blue Star Media (2001 – October 2009)

- Directorships: Gulf USA, Gulf New Zealand, AmBase Corp, AMDG Biotech, SDG Biotech, Business Talk Radio, Independent Franchise Dispute Committee of Eggland's Best, Dillon Read & Co. Inc., and Seale & Associates

**Exhibit 2**

Materials Considered

All materials considered are set forth in the footnotes of this report or in the body of the report.