# EXHIBIT 32

**In the Matter Of:**

*In Re - Nio, Inc. Securities*

*MARK MUNDY*

*August 30, 2022*



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


--------------------------)
                          )
In re NIO, Inc. Securities ) 19-cv-1424 (NGG)(JRC)
Litigation                )
                          )
--------------------------)


REMOTE VIDEOTAPED DEPOSITION OF MARK J. MUNDY

Tuesday, August 30, 2022; 9:46 a.m. EDT


Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, California Shorthand Reporter #14409,

NYRCR, NYACR, Remote Counsel Reporter,

LiveDeposition Authorized Reporter

Job No. 2022-858474

MARK J. MUNDY

BY MS. FLUMENBAUM:

Q.   Okay.  And if I refer to "shares" or "ADS," will you understand that to mean NIO's American depository [sic] shares?

A.   I -- I do understand, sure.

Q.   Great.  Thank you.

A.   Thank you.

Q.   Now, you mentioned that you have some notes in front of you --

A.   Yes.

Q.   -- do you intend to rely on those notes in your deposition today?

A.   Yes.

Q.   What is on those -- what -- what's in those notes?

A.   Information that I've gleaned from reading the various complaints, primarily, and discussions with my attorney.

Q.   Okay.  Well, you know, we reserve the right to request a copy of those notes at the end of the deposition.

A.   Okay.

Q.   And did you prepare these notes yourself?

MARK J. MUNDY

A.    I did.

Q.    And were you instructed to read those particular documents?

A.    I was not.

Q.    Okay.  How did you determine what documents to read?

A.    Primarily the drafts and then, I think -- which resulted in a final Complaint. I'm not sure what the legal language is.

Q.    When you say "the drafts," do you mean drafts of complaints?

A.    Yes.

Q.    How did you receive the drafts of those complaints?

A.    From the attorneys.

Q.    When did you receive those?

A.    I don't have any specific dates, but over the last couple of years.

Q.    So prior to the filing of the Complaint, you received drafts from your counsel?

A.    I received drafts of the complaints.  I don't know the time sequence.

Q.    Okay.  So let me go over a few

24

MARK J. MUNDY

A.   I think so.  I came down to Florida somewhere in that early part of October, so my best guess is I was probably in Florida.

Q.   Okay.  And were you all -- did you also reside in Florida when you sold your NIO shares on April 15th, 2019?

A.   Probably, yes, because I come home somewhere around the end of April or May -- or back to New York, rather.

Q.   And where did you live when this law -- when the lawsuit was originally filed in March 2019?

A.   In Florida.

Q.   Okay.  You are not currently employed, correct?

A.   I am not.

Q.   When did you retire?

A.   December 2016.

Q.   What did you do before you retired?

A.   I was the president and CEO of New York Methodist Hospital in Brooklyn.

Q.   How long -- how long were you

MARK J. MUNDY

the president and CEO of New York Methodist?

A.    February 1990 until I retired in December of 2016.

Q.    What did you do beforehand?

A.    Before that job?

Q.    Yes.

A.    I was the CEO of the Quincy Hospital in Quincy, Massachusetts.

Q.    And how long were you in that role?

A.    Roughly, March or April of 1983 to, I guess, the beginning of 1990, when I went to Methodist.

Q.    And could you provide a brief history of your employment history prior to the Quincy Hospital?

A.    I was the chief operating officer at New York Infirmary Beekman Downtown Hospital in Lower Manhattan for roughly two-and-a-half years.  And prior to that, I was the associate administrator of Winthrop University Hospital, which is now NYU Langone, in Mineola, New York for approximately eight years.  And before that, I was assistant

113

MARK J. MUNDY

room alone?

A.   I am, yeah.

Q.   Great.

So before the break, you were generally describing the allegations in this lawsuit.

Could you generally describe the misrepresentations that you are alleging?

A.   Yeah.

From my reading of the Complaint and talking with the lawyers, there was supposed to be a plant -- and please jump in if I'm saying something that isn't exactly fitting -- built in Shanghai by NIO, which was in the registration statement.  And I think that was a very important part of the registration statement because it would show that they were on their way to being very successful.  And I think my further reading has said that, in fact, the plant was not under construction, as represented, and was not going to be built.

Is that what you asked me?

Q.   I was asking for the

114

MARK J. MUNDY

misrepresentations here.

A.    I think that's basically my understanding.

Q.    So in your answer, you just indicated your further reading.

What do you mean by "further reading"?

A.    Basically, the Complaint.

Q.    Okay.  And do you know what allegedly revealed, quote/unquote, those misstatements?

A.    I do not.

Q.    And for "further reading," just to go back, nothing else is included in that further reading that you did besides the Complaint?

A.    Correct.

Q.    Okay.

Who are the Defendants in this action?

A.    NIO, the officers and directors, the CEO, I think the CFO and the underwriters.

Q.    And can you name any of those individuals?

134

MARK J. MUNDY

Q.    And that impression hasn't changed?

A.    Correct.

Q.    Okay.  So you did file the Amended Complaint in this action, correct?

A.    Correct.

MS. FLUMENBAUM:  Let's introduce Docket Number 48 as Defendants' Exhibit 11, I believe.

--oOo--

(Defendants' Exhibit Number 11, Amended Class Action Complaint for Violation of the Federal Securities Laws, marked for identification, as of this date.)

--oOo--

BY MS. FLUMENBAUM:

Q.    And -- and you've read the Amended Complaint, correct?

A.    I have.

Q.    Did you help draft the Amended Complaint?

A.    I did not.

Q.    Did you review drafts of the

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

135

MARK J. MUNDY

Amended Complaint?

A.   I did.

Q.   How many drafts?

A.   I think there's the original, then there's the First Amended and the Second Amended Complaint.

Q.   Do you know what drafts -- how many drafts you reviewed of this Complaint?

A.   Several, but not that many.

Q.   Did you approve the filing of the Amended Complaint?

A.   I did.

Q.   How did you approve the filing?

A.   Phone conversations.

Q.   Did you, personally, investigate any of the allegations in the Amended Complaint?

A.   I did not.

Q.   Did you discuss the Amended Complaint with anyone outside of counsel?

A.   Absolutely not.

Q.   So now if we take a look at the first sentence, who is Eva Huang?

A.   My understanding is she's

140

MARK J. MUNDY

A.   I did not.

Q.   Did you discuss the Second Amended Complaint with anyone outside of counsel?

A.   I did not.

Q.   Okay.  So if you turn to Page 7, the Second Amended Complaint lists each Defendant in the action.

A.   Okay.  Each Defendant.

Q.   Who is the -- what is the first Defendant listed here?

A.   I just had cataract surgery, so . . .

Q.   I'm sorry about that.

A.   Now, are you saying I'm supposed to read to you . . .

Q.   So you know what?  I'll go through the Defendants listed.

A.   Sure.  That would be helpful.

Q.   Okay.  The first Defendant listed is NIO, the company.

A.   Okay.  Yeah.

Q.   What is your understanding of what the company did wrong here?

141

MARK J. MUNDY

A.   I think they misrepresented what their plans were in regard to building a new factory.

Q.   Okay.  And now we're going to go to the second Defendant, Bin Li, who is the founder.

What is your understanding of what he did -- what he did wrong here?

A.   He was the CEO and responsible for leading the way to build the new factory and basically informing many people, firms involved about the plans and the company's success.

Q.   What's your basis for that belief?

A.   Common sense.

Q.   Anything else?

MR. SHI:  Again, only -- only answer if you can do so without revealing attorney-client communications.

BY MS. FLUMENBAUM:

Q.   Anything else, you know, not including attorney-client communications?

144

MARK J. MUNDY

Tian Cheng.

Do you have any sense what Tian Cheng did wrong here?

A.   Good question.

No.

Q.   Do you have any sense what Defendant Xiang Li did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Hai Wu did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Yaqin Zhang did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Xiangping Zhong did wrong here?

A.   No.

Q.   Do you have any sense what Defendant Zhaohui Li did wrong here?

A.   Other than I would say what I said earlier that these Defendants were in positions of significant responsibility and assumably were well aware of what the plans of the company were and what happened and what

Case 1:19-cv-01424-NGG-JRC    Document 122-33    Filed 12/23/22    Page 15 of 28
In Re - Nio, Inc. Securities              PageID #: 4190                              Mark Mundy
August 30, 2022

145

MARK J. MUNDY

did not happen.

Q.   Sorry.  It keeps going on mute by accident.

You -- you also included a number of underwriters as Defendants here, correct?

A.   Correct.

Q.   Do you have a sense of what they did wrong?

A.   I think it's a classic example of not fulfilling their due diligence responsibilities, being knowledgeable about the project, being knowledgeable about the company's prospects, doing a wonderful job in raising a lot of money to help the company succeed, but regretfully, not checking out on the ground whether or not the company was actually doing what it was proposing or stating in its registration statement.

And that's very surprising to me, because these are absolutely wonderful companies, and I'm, I have to tell you, shocked that they did not do something very simple like showing up and taking a physical

Case 1:19-cv-01424-NGG-JRC   Document 122-33   Filed 12/23/22   Page 16 of 28
PageID #: 4191

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

146

MARK J. MUNDY

look, in my opinion, as to what was going on

with their investment.

Sorry to talk so long on that.

Q.   No.  No.

What's your basis for you saying

that the underwriters didn't fulfill their due

diligence responsibilities?

A.   Based on my experience and

dealing with underwriters over the years who,

at least in the projects that I've been

involved in in Massachusetts and New York, are

dogged in terms of fulfilling those

responsibilities.

Q.   But what's your basis for them

not having fulfilled their responsibilities

here?

MR. SHI:  Again, Mr. Mundy, if

you can answer this question without

revealing attorney-client

communications, then you may do so.

THE WITNESS:  I can't answer

this question, then.

BY MS. FLUMENBAUM:

Q.   You also indicated that they did

151

MARK J. MUNDY

Q.   Yes, we can.  So we're --

A.   Okay.

Q.   Sorry about that, Mr. Mundy.
That sounds painful.

A.   Yeah, so feel sorry for me and
my droopy eyelid but . . .

Q.   Okay.  So we're going to go to
the bottom of this page --

A.   Okay.

Q.   -- to go over some of the
statements that you allege later on in the
Complaint are misleading.

A.   Okay.

Q.   For instance, in 60 --

A.   Yes.

Q.   -- you take out the statement
that NIO is currently developing its own
manufacturing facility in Shanghai, which we
expect to be ready by the end of 2020.

So what is -- what is your
understanding of what's misleading in that
statement?

A.   That I don't think the
manufacturing facility was ever ready by 2020.

152

MARK J. MUNDY

Q.    When did you learn that statement was misleading?

A.    I think in talking with the lawyers.

Q.    And then in 61 --

A.    Right.

Q.    -- it says, Construction has started on our own manufacturing facility in Shanghai.

What's your understanding of what's inaccurate or misleading in that statement?

A.    That I don't think the construction was underway.

Q.    And what's your basis for believing that construction was not underway?

A.    Consultation with my attorneys.

Q.    So nothing else -- no -- you -- nothing outside of your communications with counsel led you to believe that construction had not started?

A.    Correct.

Q.    And then just to go back to 60 for one second --

153

MARK J. MUNDY

A.    Sure.

Q.    -- do you -- is your claim that -- that NIO was not developing its own manufacturing facility?

A.    I think that's the claim.

Q.    So you did not think at all they were developing any manufacturing facility?

A.    I think they said they were developing its own manufacturing facility, which you would take on their word.

Q.    And -- and so you're here claiming that they were not developing such a factory?

A.    I think they did not develop a factory.

Q.    But do you -- at this time that this was written, do you believe that they were not developing a factory?

A.    I don't remember.

Q.    So you can't answer one way or another?

A.    I can't answer one way or another.

Q.    Asking you today, do you have

154

MARK J. MUNDY

any sense of, at the time, whether they were

developing their own facility?

        A.    I do not.

        Q.    And -- and do you have any sense

of whether they expected a facility to be

ready by 2020?

        A.    I have no idea what they were

expecting.  I assume, if they put it out

there, that they probably hoped they would

have a facility.  But who knows?

        Q.    Okay.  And in 62, there are

similar --

        A.    Yes.

        Q.    -- statements --

        A.    Sure.

        Q.    -- Our own manufacturing

facility in Shanghai is currently under

construction by certain Shanghai government

entities.

              What is misleading about that

statement?

        A.    I think it's false.

        Q.    What's your basis for believing

it's false?

155

MARK J. MUNDY

A.   Because they did not have the facility under construction.

Q.   So the facility -- you believe the facility was not under construction at the time of the registration statement?

A.   Correct.

Whoa.

Q.   How do you define "under construction"?

A.   The computer is -- it came back on.  It went off -- the computer went off, and it just came back on through your magic touch.

Q.   Is -- is Mr. Rosen in the room with you again?

A.   He came in to correct what came up on the screen, which said the computer was going off.

Q.   Oh, okay.

It's all -- it's all okay now?

A.   It is --

Q.   Okay.

A.   -- yeah.  Some -- something jumped up on the screen that had -- I don't know --

156

MARK J. MUNDY

Q.   So just --

A.   -- anyway, we're back --

Q.   -- just to --

A.   -- to --

Q.   -- repeat my question.

How would you define whether a facility is under construction?

A.   Actual construction underway.

Q.   What do you mean by "actual construction"?

A.   Shovel in the ground.

Q.   So what would you consider the plans and the budgets and the time frames that you discussed earlier?

A.   Would I consider that under construction?

Q.   Yes.  That's the question.

A.   No.

Q.   Okay.

MR. SHI:  So, Judy, it's 1:00.

Do you anticipate going much longer?

If so, then we should break at some point for lunch.

157

MARK J. MUNDY

I assume nobody has had lunch yet.

THE WITNESS:  I don't eat lunch.

MR. ROSEN:  Let's go -- let's go straight through.

MR. SHI:  Okay.

MS. FLUMENBAUM:  I don't mind going straight through.

THE WITNESS:  Thank you, Judy.

Is it "Judy"?

BY MS. FLUMENBAUM:

Q.   It is Judy, yes.

A.   All right.  Thank you.

I just -- thank you.

MS. FLUMENBAUM:  I'm happy if someone needs a bathroom break, or something, but we don't need to stop for lunch over here.

BY MS. FLUMENBAUM:

Q.   Okay.  The next sentence is, We are developing our own manufacturing facility in Shanghai, which we expect to be ready by the end of 2020.  Such manufacturing facility

Case 1:19-cv-01424-NGG-JRC    Document 122-33    Filed 12/23/22    Page 24 of 28
In Re - Nio, Inc. Securities                    PageID #: 4199                    Mark Mundy
August 30, 2022

158

MARK J. MUNDY

is currently being constructed by relevant

Shanghai authorities.

So it's fairly similar to the

ones you mentioned before, but is there

anything additional about that statement that

you think to be misleading?

A.   One sounds actual, and the

other -- I guess "currently being constructed"

is actual also.

I thought the facility, quite

honestly, was under construction.  And reading

this statement, I can't imagine why somebody

would think otherwise, other than the

underwriters, who might have made that site

visit we checked about.

Q.   So as of the IPO -- and some of

this we've gone over before.

A.   Okay.

Q.   As of the IPO, you knew nothing

about the Shanghai facility, correct?

A.   Correct.

Q.   And you did not learn about the

Shanghai facility until you read the

Complaint, correct?

172

MARK J. MUNDY

A.    Lots and lots of people.  My guess --

Q.    Any ballpark?

A.    -- thousands.

Q.    How are you supervising this lawsuit?

A.    I'm in frequent contact with the attorneys, who have been very forthcoming, and taking all the time that I needed to probably ask some questions about its progress; whether or not this is a priority to them; do they have the resources to handle a suit of this magnitude, which is big, to me -- it may not be big to anybody else -- whether or not they have and were preparing good documents to submit, making at least a good case on behalf of the stockholders; and, again, a broad assessment as -- at least based on my experience, they knew what they were doing.

Q.    How frequently do you communicate with them?

A.    I would say probably, over the course, several times a year.  Part of it I think I was just being nosy to see if things

173

MARK J. MUNDY

moved along, because this is all a snail's pace to me.

Q.   And you mentioned that you asked them whether this case was a priority for them.

Did you have any specific concerns about it not being a priority for them?

A.   Of course I had concerns just based on life.

Q.   An -- anything more specific than that?

A.   No.  I mean, you -- at least in my opinion, I could tell whether or not I was getting a runaround or whether or not these people clearly were involved, advocating, taking it very seriously and I was not one of many, many cases that they might be involved in.

You know, my interest here is basically to protect my interest as well as potential other people involved in the Class action.

Q.   And you were satisfied with

Case 1:19-cv-01424-NGG-JRC    Document 122-33    Filed 12/23/22    Page 27 of 28
In Re - Nio, Inc. Securities                    PageID #: 4202                                  Mark Mundy
                                                                                      August 30, 2022

174

                            MARK J. MUNDY

their answers to your questions?

        A.    Oh, absolutely, yeah.   These --

these people get my highest grade, which I

call "an equal adversary."

        Q.    So who makes the decisions

regarding the litigation?

        A.    I think, ultimately, if I were

appointed as the Class representative, I would

have to say yes to whatever the final

settlement was.   If it seemed to me like it

was inadequate, if it comes down to an

agreed-upon settlement, I think I would have

the ability to say I don't think that's

enough.

                Or, on the other hand, if it

sounded fair and reasonable, then I would be

more than happy to say, thank you very much

for your hard work and approve it.

        Q.    And -- and up until today, you

know, barring sort of any --

        A.    Sure, yeah.

        Q.    -- Class certification, who --

who has made the decisions regarding the

litigation?

In Re - Nio, Inc. Securities

Mark Mundy
August 30, 2022

175

MARK J. MUNDY

A.   Well, the technical work is done by the lawyers.  You know, I read it.  I'm not a lawyer.  So I think all I can do is just apply my business sense to those documents and see if they seem truthful, good, in terms of advocating for this potential Class and is it receiving their attention.  And I've been, I think, more than pleased that this is a hard-working law firm.

Q.   Do you know if Eva Huang reads the documents as well?

A.   I don't know anything about Ms. Huang's involvement.

Q.   If you and Ms. Huang disagreed, do you know who would decide which way the litigation would go?

A.   Hold on one second.

THE WITNESS:  Caryl?

MS. MUNDY:  Yeah.

THE WITNESS:  Yeah.

CERTIFIED STENOGRAPHER:  So, yeah, we should go off the record.

THE WITNESS:  We're involved in a conference call --