UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE NIO, INC. SECURITIES LITIGATION.

**MEMORANDUM & ORDER**
**19-CV-1424 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is Plaintiffs' Motion for Class Certification. (Mot. for Class Cert. (Dkt. 120).) For the following reasons, the Motion is GRANTED.

## I.  BACKGROUND

The following facts are drawn from the Second Amended Complaint (Second Amended Class Action Complaint ("SAC") (Dkt. 67)) unless otherwise noted.

### A.  Factual Background

Defendant NIO, Inc. ("NIO") is a Chinese company that designs and produces electric vehicles. (SAC ¶ 23.) In September 2018, NIO filed its final Form F-1/A registration statement with the SEC and, upon approval, its prospectus (together the "Filing Documents"), and conducted an initial public offering ("IPO") on the New York Stock Exchange (the "NYSE") selling American Depositary Shares ("ADS"), a mechanism which allows foreign companies to list equity on a United States stock exchange. (*Id.* ¶¶ 1, 54-55); *see also In re Petrobras Secs.*, 862 F.3d 250, 258 n.6 (2d Cir. 2017) ("American Depository Shares represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank. ADS allow U.S. investors to invest in non-U.S. companies and also give non-U.S. companies easier access to the U.S. capital markets. Many non-U.S. issuers use ADS as a means of raising capital or establishing a trading presence in the U.S.").

The IPO raised approximately $1.095 billion from the sale of 184,000,000 ADS at $6.26 per ADS. (*Id.* ¶ 55.)

In May 2016, NIO entered into an agreement with Jianghuai Automobile Group Co. Ltd. ("JAC Motors"), a Chinese truck manufacturer. (*Id.* ¶¶ 5, 52.) Under the terms of this agreement, JAC Motors would manufacture NIO's automobiles in exchange for a per-vehicle fee. (*Id.* ¶ 52.) NIO did not have independent manufacturing capabilities. (*Id.* ¶ 51.)

In the Filing Documents, NIO represented that it was "developing its own manufacturing facility in Shanghai" and that such facility was already under construction. (*Id.* ¶¶ 60-62.) This facility would "complement[] our JAC manufacturing alliance" and allow for expansion of NIO's manufacturing capacity once completed, but faced significant risks. (Ex. A to Fumerton Decl. (the "Prospectus") (Dkt. 121-3) at 32, 122 ("The construction and operation of our own manufacturing plant in Shanghai or other manufacturing facilities are subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits.").) Specifically, NIO disclosed that the construction process was handled "by relevant Shanghai authorities" and "largely outside of our control," and further faced potential funding, regulatory and other hurdles or possible delays. (*Id.* at 32.)

On March 6, 2019, before the open of trading, NIO filed a Form 6-K which announced its fourth quarter 2018 and fiscal year 2018 results. (SAC ¶ 65; *see also* Ex. E to Fumerton Decl. ("March 2019 6-K") (Dkt. 121-7).) The Form 6-K disclosed that deliveries had declined more than expected during the first two months of 2019 and fiscal year 2018 had concluded with a net loss of approximately $1.4 billion. (Mar. 2019 6-K at 4-5, 9.) NIO also disclosed that the Shanghai construction project had been terminated: "[r]ecently, the Company has agreed in principle with these contractual counterparties [the government and related

entities] to terminate the plan for this manufacturing plant, pending signing of definitive termination agreement." (*Id.* at 4.) In a conference call later that day, Defendant Bin Li, NIO's founder and CEO, (SAC ¶ 24), told analysts covering the company that this decision was based on a November 2018 Chinese government policy directive encouraging relationships between "R&D companies [and] . . . existing manufacturing companies," such as the relationship between NIO and JAC Motors. (*Id.* ¶ 67.) Some investors and observers believed that termination of the project was due to NIO's lack of sufficient cash. (*Id.* ¶¶ 71-72.) In a subsequent investigation, Plaintiffs allege that they found no evidence that construction on the Shanghai facility had been authorized by the Chinese government or otherwise had begun, despite building permits and environmental impact assessments in Shanghai typically being publicly available. (*Id.* ¶¶ 77-85.)

On March 5, 2019, NIO's ADS closed at $10.16 per ADS. (*Id.* ¶ 146.) On March 7, 2019, the day after the Form 6-K, NIO's ADS closed at a price of $7.09. (*Id.*)

## B. Procedural History

This case was initially filed on March 12, 2019 by Mark Mundy and Eva Huang. (*See* Complaint (Dkt. 1).) On May 13, 2019, various plaintiffs filed competing motions to consolidate several securities actions and appoint lead plaintiff and class counsel. (*See* Dkts. 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27.) On March 3, 2020, the court granted the motion to consolidate, appointed Mundy as lead plaintiff, and appointed The Rosen Law Firm as class counsel. (Mar. 3, 2020 M&O (Dkt. 44) at 2.)

Following the resolution of the motion to consolidate and appoint lead plaintiff, Mundy filed an amended complaint on May 18, 2020 (Dkt. 48) and ultimately the operative Second Amended Complaint on September 18, 2020. (*See* SAC.) The

Second Amended Complaint brought claims on behalf of a puta-
tive class for violations of Sections 11 and 15 of the Securities Act
of 1933 (the "Securities Act"), as well as Sections 10(b) and
20(a) of the Securities Exchange Act of 1934 (the "Exchange
Act") and Rule 10b-5 thereunder. (*Id.* at ¶¶ 22, 123-168.) The
Second Amended Complaint included as Defendants: NIO (*id.* ¶
23); various individual Defendants who were executives or direc-
tors at NIO, including Li (*id.* ¶¶ 24-35); and the financial
institutions that served as underwriters for the IPO (*id.* ¶¶ 36-45)
(collectively, the "Defendants"). The Plaintiffs allege violations of
the aforementioned statutes and rules on the basis that NIO mis-
represented that construction on the Shanghai facility had
already begun, and misrepresented that such construction was
not contingent on raising sufficient capital. (*See generally id.*)

On December 23, 2022, Plaintiffs filed the fully briefed Motion,
including the Defendants' opposition to the Motion ("Opp.")
(Dkt. 121), and Plaintiffs' reply in further support of the Motion
("Reply") (Dkt. 122). Both parties requested oral argument. (*See*
Dec. 23, 2022 Letter from Plaintiffs (Dkt. 123); *see also* Opp. at
ECF 1.) On January 26, 2023, Defendants filed a motion for leave
to file a sur-reply (Dkt. 124), attaching a draft of the proposed
sur-reply ("Sur-Reply") (Dkt. 124-1).

## II.  LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure
23. All class actions must meet the four requirements of Rule
23(a):

> (1) the class is so numerous that joinder of all members
> is impracticable;
>
> (2) there are questions of law or fact common to the
> class;

4

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, any class action must also satisfy the requirements of one of the provisions of Rule 23(b), which sets out prerequisites for each of three different types of class actions. *Id.* at 23(b). Here, the Plaintiffs seek to certify a monetary damages class pursuant to Rule 23(b)(3), which requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 23(b)(3).

In determining whether the requirements of Rule 23 are met, "the plaintiff's pleadings are assumed to be true, [but] the court must nevertheless conduct a rigorous analysis to determine whether a class action is appropriate, considering materials outside of the pleadings and weighing conflicting evidence as necessary." *Jackson v. Bloomberg, L.P.*, 298 F.R.D 152, 159 (S.D.N.Y. 2014).[1] "[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). In evaluating these requirements, "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

## III. DISCUSSION

Plaintiffs seek to certify a class under Rule 23(b)(3) that they refer to as the "Securities Act Class," as well as a subclass referred to as the "Exchange Act Subclass." (Mot. at 1.) The Securities Act Class is defined as: "All persons and entities who purchased or otherwise acquired the [ADS] of NIO Inc. pursuant and/or traceable to the [Filing Statements] issued in connection with NIO's September 12, 2018 [IPO]." (*Id.*) The Exchange Act Subclass is defined as: "[T]hose persons and entities who purchased or otherwise acquired NIO ADS[] during the period from October 8, 2018 to March 5, 2019, inclusive." (*Id.*) They also seek to appoint lead plaintiff Mundy and named plaintiff Huang as Class Representatives of both the Securities Act Class and the Exchange Act Subclass, and lead counsel The Rosen Law Firm as class counsel. (*Id.*)

Defendants argue that the Securities Act Class claims are barred by the statute of repose; that the proposed class representatives are atypical and inadequate for either class in violation of Rule 23(a); that individual issues predominate the Exchange Act Subclass, in violation of Rule 23(b)(3); and that the failure to put forward a proposed method for calculating classwide damages further undermines a finding of predominance, in violation of Rule 23(b)(3). (*See generally* Opp.) In addition to addressing these issues, the court will address all of the requirements of Rule 23(a) in turn.

### A.   Statute of Repose

Under the Securities Act, cases to enforce liability for statements made in the registration statement or prospectus for a security must be brought no "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. Defendants argue that, although this case was brought within that three-year

6

period, putative class members' claims are not brought until certification, and the three-year period commencing with NIO's September 12, 2018 IPO has lapsed prior to the bringing or resolution of this class certification motion. (Opp. at 17-19.)

Defendants rely on *California Public Employees' Retirement System v. ANZ Securities, Inc.* ("*CalPERS*"), 582 U.S. 497 (2017). In that case, the plaintiff filed an individual suit under § 11 of the Securities Act in February 2011, "more than three years after the relevant transactions occurred," and then opted out of an ongoing class action (of which it otherwise would have been a member) which had reached a proposed settlement. *Id.* at 502-503. In opposing a motion to dismiss, the plaintiff argued that the three-year statute of repose under § 13 of the Securities Act was tolled during the pendency of the class action under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and that therefore the three-year period had not yet expired. *CalPERS*, 582 U.S. at 508. But the Supreme Court differentiated between the statute of limitations addressed in *American Pipe* and the statute of repose at issue in *CalPERS*, which intends to "grant complete peace to defendants" and supersedes the equitable principles underlying *American Pipe*. *Id.* at 510-11. As the Court explained, "[t]he purpose of a statute of repose is to create an absolute bar on a defendant's temporal liability. . . . In light of the purpose of a statute of repose, the provision is in general not subject to tolling." *Id.* at 507.

But no tolling of the statute of repose is necessary here, as it is undisputed that this case was filed within the statute of repose and has continued uninterrupted, without prior denial of class certification (as in *American Pipe*), individual opt-outs (as in *CalPERS*), or other disruption. "[T]he filing of a timely class action complaint commences the action for all members of the class *as subsequently determined*," *Am. Pipe*, 414 U.S. at 550, meaning the unnamed class members have already brought their claims

unless they are excluded from any class definition or opt out of the class. Unlike here, both *American Pipe* and *CalPERS* involved claims brought by individual plaintiffs separate from the applicable class action. *See Am. Pipe*, 414 U.S. at 542-44 (explaining that plaintiffs sought to intervene in case after denial of class action status for failure to show numerosity); *CalPERS*, 582 U.S. at 502-03 (stating that plaintiff filed individual action and opted out of class after proposed settlement). Defendants' attempt to extend *CalPERS* to this new context, barring the claims of the unnamed class members who choose to remain members of the ongoing class action, therefore fails.

Not only does *CalPERS* not compel this result, but the conclusion urged by Defendants would also create significant procedural and logistical difficulties and injure all absent class members who declined to file individual actions in reliance on the normal function of putative class action complaints filed under Rule 23. Longstanding precedent holds that "[m]embers of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class[.]" *In re WorldCom Secs. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007); *see also Am. Pipe*, 414 U.S. at 550 & n.20 (citing cases). Under Defendants' approach, either plaintiffs bringing putative class actions would be obligated to file immediately after the transactions at issue to guarantee sufficient time to conduct needed discovery and file a motion for class certification, or all unnamed class members who would otherwise simply participate as class members would be forced to file individual cases to preserve their claims.[2]

Several courts have already declined to adopt Defendants' argument. *See In re SunEdison, Inc. Secs. Litig.*, 329 F.R.D. 124, 145

---

[2] Even in the former context, enterprising defendants could seek to delay discovery and the schedule for class certification to preempt the majority of the class's claims.

(S.D.N.Y. 2019) ("Upon certification of the class, the claims of the class members are deemed to have been asserted on the date that the individual plaintiff commenced the action. That the timeliness of an absent class member's claim is measured from the date that the class representative filed suit, rather than, for example, the date of the Court's certification order, does no offense to the three-year repose period."); *In re Snap Inc. Secs. Litig.*, 334 F.R.D. 209, 222-23 (C.D. Cal. 2019) (allowing lead plaintiffs to newly participate in litigation and move for class certification after expiry of statute of limitations where prior class representative withdrew from case for medical reasons). The Third Circuit expressed similar practical concerns in rejecting a similar argument regarding whether a plaintiff's proposed amended complaint may relate back to the date of suit's inception when the amendment would occur after expiry of the statute of repose. *Se. Penn. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 346 (3d Cir. 2021) ("At the outset, the rule Defendants propose would present enormous practical difficulties."). And Defendants point to no cases that have extended *CalPERS* as they urge.[3]

Accordingly, the statute of repose does not bar class certification.

---

[3] Defendants quote *Smith v. Bayer Corp.*, in which the Supreme Court stated that it is "surely erroneous" to argue "that a nonnamed class member is a party to the class-action litigation before the class is certified." 564 U.S. 299, 313 (2011). That case addressed the question of whether, as a matter of *res judicata*, a denial of class certification prevented individuals who would have been a member of the class had it been approved from pursuing a similar class action in state court. *Id.* at 302. The issue presented here deals with when the *action* was commenced, rather than who the parties to the action were at its inception.

### B.   Rule 23(a)

#### 1.   Numerosity

"Numerosity requires that the proposed class be so large that joinder of individual members would be inconvenient or difficult." *N.J. Carpenters Health Fund v. Residential Cap., LLC,* 272 F.R.D. 160, 163 (S.D.N.Y. 2011). Precise calculation of the number of potential class members is not required. *In re Vivendi Univ., S.A. Sec. Litig.,* 242 F.R.D. 76, 83 (S.D.N.Y. 2007). In this Circuit, "[n]umerosity is presumed for classes larger than forty members." *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.,* 772 F.3d 111, 120 (2d Cir. 2014). As Plaintiffs argue, courts have acknowledged that numerosity in securities actions may be premised on "a showing that a large number of shares were outstanding and traded during the relevant period." *In re Alstom SA Sec. Litig.,* 253 F.R.D. 266, 275 (S.D.N.Y. 2008); *see also McIntire v. China MediaExpress Holdings, Inc.,* 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014).

Millions of ADS were sold in the IPO. (SAC ¶¶ 36-44.) During the Exchange Act Subclass class period, millions of ADS were also traded on average each week. (*See* Ex. 1 to Rosen Decl. ("Werner Decl.") (Dkt. 120-3) ¶ 27.) Defendants do not contest these facts or that numerosity is established. (*See generally* Opp.) The court finds that the Plaintiffs have shown the Securities Act Class and Exchange Act Subclass would each have sufficient members that joinder would be impracticable, and therefore meet the requirement of numerosity.

#### 2.   Common Questions of Law or Fact

Commonality, the requirement that there be "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), entails that "plaintiffs' grievances" share common questions of law or fact. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC,* 504 F.3d 229, 245 (2d Cir. 2007). This is a

"low hurdle" that "requires only a showing that Plaintiff's claims 'depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 522 (S.D.N.Y. 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The standard is particularly permissive in the context of securities fraud litigation. *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 312 F.R.D. 332, 341 (S.D.N.Y. 2015). Because of the low bar—"even a single common question will do," *Dukes*, 564 U.S. at 359—disputes regarding predominance, like those raised here by Defendants, do not contest commonality. *Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir. 1972) (stating that questions regarding reliance were relevant to analysis of predominance pursuant to Rule 23(b)(3)); *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 61-62 (E.D.N.Y. 2015).

"Common questions of law and fact are present where the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls." *In re Facebook*, 312 F.R.D. at 341. Such is the case here. Plaintiffs put forward, among other options, the common questions of "[w]hether the Registration Statement misrepresented or omitted facts" and "[w]hether the facts misrepresented or omitted were material." (Mot. at 7.) The court agrees that such questions are common across the proposed Class and Subclass, and therefore determines that commonality has been established.

### 3. Typicality

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the

defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936-37.

Plaintiffs urge the court to ignore defenses which may be applicable to the proposed class representatives in determining whether they are typical of and adequately represent the class. (*See* Mot. at 7-9.) Cases within this Circuit have repeatedly emphasized that "[t]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Trinidad v. Breakaway Courier Sys., Inc.*, No. 05-CV-4116 (RWS), 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007); *see also In re Facebook*, 312 F.R.D. at 343 ("Plaintiffs' papers adequately provide evidence of typicality by pointing to the identical claims of all Plaintiffs in both proposed subclasses. This is all the rule requires."). "[T]he focus must be on the defendants' behavior and not that of the plaintiffs." *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, No. 01-CV-11814 (LAP), 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004). But despite this general rule, "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

As discussed *infra* in Section III.C, reliance is central to classwide adjudication, and any defenses raised specific to whether Mundy or Huang individually relied on the alleged misstatements could

plausibly "become the focus of litigation." *Id.* But the actual defenses asserted by Defendants raise questions regarding whether Mundy and Huang in fact relied on the Filing Documents: as Mundy and Huang did not read the documents, and chose to invest on other bases (the 60 Minutes segment and a friend's recommendation, respectively), they cannot have actually relied on the alleged misstatements.[4] (Opp. at 21-23.) This misunderstands the logic of the presumption of reliance established in *Basic Inc. v. Levinson*, relied on by the Plaintiffs here. 485 U.S. 224 (1988). That case explained that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action." *Id.* at 242; *see also id.* at 245 ("Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted if omitted material information had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market."). In order to preserve the class action option preferred by the securities laws, the Court acknowledged that "[t]here is . . . more than one way to demonstrate the causal connection." *Id.* at 243. It therefore adopted the "fraud-on-the-market" theory, under which proof of an efficient market—where "[t]he market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price"—raises a rebuttable presumption of classwide reliance on the accuracy of the stock price and, therefore, all information incorporated therein. *Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)); *see also id.* at 245 (explaining that the presumption, as explained by the lower courts, operated because "persons who

---

[4] The Defendants also argue that Huang is subject to individual defenses because she continued to purchase NIO stock after the alleged corrective disclosure. (Opp. at 21.)

had traded Basic shares had done so in reliance on the integrity of the price set by the market, but because of petitioners' material misrepresentations that price had been fraudulently depressed").

In other words, where the presumption applies, the relevant reliance is on the accuracy of the share price at the time the aggrieved party purchased their shares, rather than reliance on the specific alleged misstatement or omission. *See id.* at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."). Illustratively, *Basic* explained what type of evidence could rebut the presumption: "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* at 248. For instance, the causal connection could be broken where sufficient volume of shares were traded by "market makers [who] were privy to the truth," or where "[accurate information] credibly entered the market and dissipated the effects of the misstatements"—both examples where the market price reflected the truth, notwithstanding the misrepresentations. *Id.* at 248-49. The available rebuttal to the *Basic* presumption relevant for the purposes of this case, therefore, is "direct evidence that an individual plaintiff did not rely on the integrity of the market price in trading stock" and "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud[.]" *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 56 (S.D.N.Y. 2019) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269, 276 (2014)).

*Basic*'s reasoning thus makes clear that, where the *Basic* presumption applies, a lack of individual reliance on the alleged misstatements or omissions is not a defense, as a plaintiff (whether a named representative or bringing claims solely as a class member) may rely either directly on the misstatement *or* on

the accuracy of the information underlying the market price. The individual defenses raised here—that neither Mundy nor Huang relied directly on the alleged misstatements in purchasing their NIO shares—are therefore irrelevant if the *Basic* presumption applies, and cannot defeat class certification on their own. *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) ("[W]here plaintiff's theory of liability is premised on the 'fraud on the market' presumption, Defendants' allegations that the lead plaintiffs investments were not made in reliance on alleged misstatements are largely irrelevant."). As discussed at greater length below, the *Basic* presumption does apply in this case.

Defendants cite only to *In re Frontier Insurance Group, Inc. Securities Litigation,* 172 F.R.D. 31 (E.D.N.Y. Apr. 16, 1997) in support of this individual defense against Mundy and Huang. (Opp. at 22.) But that case supports the opposite conclusion. *In re Frontier* explained that the *Basic* presumption can be rebutted "by showing that plaintiffs relied not on the market but on some source not dependent on the market." 172 F.R.D at 42. The court explicitly rejected Defendants' proffered reading of this line, holding that the named plaintiffs' choice to purchase shares on the advice of a broker did not defeat the presumption that they "relied on the integrity of the market." *Id.* at 42-43. Instead, the court noted that evidence "that plaintiffs' brokers got inside information" from the company might rebut the presumption, but as no evidence was presented to this effect, the court held that the plaintiffs' had demonstrated typicality and granted the motion for class certification. *Id.* at 42-43, 49. Defendants here cannot plausibly claim that Mundy gained non-public information from the 60 Minutes segment and have provided no reason to believe that Huang's friend recommended the investment on the basis of non-public knowledge regarding the Shanghai construction project. Absent such non-public

knowledge, any recommendation to purchase a stock at its current price necessarily relies on the accuracy of that price and the underlying public information, assuming the existence of an efficient market. Accordingly, these arguments fail to raise an individual defense defeating typicality.

Defendants' argument that Huang continued to purchase shares after the alleged corrective disclosure similarly pertains to her actual reliance on the Filing Documents, and therefore fares no better. (Opp. at 21-22.) *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017), the primary case on which Defendants rely, is wholly inapposite. There, the investments in question were fully-insured certificates of deposit paying a fixed interest rate, purchased in a private transaction with the defendant bank rather than on an open, exchange-traded market. *Id.* at 177-78. The *Basic* presumption and the efficiency of the certificate of deposit market were not referenced, as neither was relevant, and the plaintiffs' decision in that case to continue purchasing the investments *at the same price* after learning the truth rebutted the claim that the plaintiffs would not have made the purchases had they known. *Id.* (explaining that plaintiff "continued investing in Merrill's CD program: in August 1982 and in October 1982, it 'rolled over' a total of four CDs which it had purchased through Merrill"). Certain district court decisions have stated that "post-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on . . . the integrity of the market in making his or her purchases," *George v. China Auto. Sys., Inc.*, No. 11-CV-755 (KBF), 2013 WL 3357170, at *6 (collecting cases),[5] but this court respectfully disagrees.

---

[5] Many of the cases in question are also factually distinguishable. In *George*, the court also relied on the fact that the plaintiffs are "in-and-out traders" who both bought and sold the securities during the class period, raising

That Huang chose to purchase additional stock after the corrective disclosure and—assuming the NIO market was efficient—the related drop in stock price simply shows that with full information, Huang was willing to invest in NIO at a lower price, not that the fraud was irrelevant to her original decision to buy stock at the inflated price. To the contrary, this is the essence of the efficient market theory: the fraud artificially raises the price by concealing certain risks from the market, causing investors to pay more than they would with full knowledge. Once the truth is revealed and the price of shares drops to incorporate the newly disclosed facts, the same investors can choose to invest without undermining the claim that they would not have paid the earlier, higher price had they known.[6]

For exactly this reason, many cases have found typicality despite a plaintiff's post-corrective disclosure purchases. *See, e.g., Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060 (CM), 2021 WL 253453, at *9-10 (S.D.N.Y. Jan. 26, 2021) (collecting cases); *Wilson v. LSB Indus., Inc.*, No. 15-CV-7614 (RA) (GWG), 2018 WL

---

questions as to whether "the fraud was in fact irrelevant to their purchasing and sale decisions" and causing difficulties regarding damages calculations. 2013 WL 3357170, at *6-7. In *Rocco v. Nam Tai Electronics, Inc.*, the plaintiff bought stock after privately learning of the alleged fraud, but no corrective disclosure had occurred as of when he filed the complaint, raising an inference that he was willing to pay the inflated price despite knowing that the price incorporated the misrepresentations. 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("Absent a public disclosure of a correction . . . there [would] be no corresponding drop in stock price attributable to that correction. . . . The fact that [plaintiff] is alleging this second fraud and still made his post-class purchases while this ongoing issue was known to him makes him subject to potential unique defenses at trial.").

[6] Huang testified directly to this point, stating that she purchased additional shares "[b]ecause [NIO's] share price was low" and "I had shares that I bought at a higher price[,] [s]o I was hoping to average the purchase price out and then bring the purchase price lower, on average." (Ex. P to Fumerton Decl. (Dkt. 121-18) at ECF 36-37.)

3913115, at *6 (S.D.N.Y. Aug. 13, 2018) (R&R) (finding typicality despite later sales because, *inter alia*, a proposed class representative's post-class period sales do not provide a unique defense). One early decision explained that:

> [T]he fact that an investor purchased additional shares upon learning the new information does not mean that he or she did not rely on the integrity of the market in purchasing shares before the new information was known. The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.

*In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (quoting *In re Salomon Analyst Metromedia*, 236 F.R.D. 208, 216 (S.D.N.Y. 2006), *vacated and remanded on other grounds by* 544 F.3d 474 (2d Cir. 2008)). Accordingly, the court determines that Huang's post-class period trading does not give rise to a unique defense, let alone one that would distract from the trial.

### 4.   Adequacy of Representation

Defendants also argue that Mundy and Huang are inadequate class representatives because of their purported failures, to this point, to supervise the litigation. According to Defendants, neither Mundy nor Huang reviewed the Filing Documents before the Complaint was filed or before being deposed.[7] (Opp. at 23.) Neither knew the basis for the claim that the construction project never began. (*Id.* at 23-24.) And neither Plaintiff meaningfully

---

[7] Defendants also imply that the named plaintiffs are less adequate to represent the interests of the absent class members than the institutional investors that are often class representatives in securities cases. (Opp. at 1.) Class representatives by no means must be institutional investors.

supervised the action, as evidenced by Huang's lack of recollection of reviewing any briefing or decisions in the case and Mundy's failure to notice that his motion to be appointed lead plaintiff accidentally included the incorrect statement that he had served time in prison for a fraud conviction.[8] (*Id.* at 24-25.)

"Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60; *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 237 (S.D.N.Y. 2015) (holding that adequacy of representation requires a showing that proposed class counsel is "qualified, experienced, and generally able to conduct the proposed litigation"). The Supreme Court has advised that "the commonality and typicality requirements of Rule 23(a) tend to merge" and "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Dukes*, 564 U.S. at 349 n.5 (noting that both commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").

Based on the Rule 23(a)(4) requirement that the class representatives "fairly and adequately protect the interests of the class," courts have added that certification may be denied "where the class representatives have so little knowledge of and involvement

---

[8] Mundy's counsel (proposed class counsel) represented that the statements were inadvertently included from "template motion papers from [a] different . . . filing" and was "concerning a different client." (Not. of Errata (Dkt. 34-1) at ECF 3.)

in the class action that they would be unable or unwilling to pro-
tect the interests of the class against the possibly competing
interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum
Co.,* 67 F.3d 1072, 1077-78 (2d Cir. 1995). In addition, "the mo-
tivation behind requiring representative plaintiffs to demonstrate
great familiarity with the case is a fear that the representatives,
during pretrial discovery and at trial, will give misleading and
contradictory testimony with regard to basic issues in the case
that might make their claims subject to unique defenses." *Baffa,*
222 F.3d at 61 (quoting *In re TCW/DW N. Am. Gov't Income Tr.
Sec. Litig.,* 941 F. Supp. 326, 340 (S.D.N.Y. 1996)). Nonetheless,
"attacks on the adequacy of a class representative based on the
representative's ignorance are generally disfavored," *MF Glob.,*
310 F.R.D. at 237 (quoting *Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29, 42 (2d Cir. 2009)), in light of the understanding
that "named plaintiffs are not expected to possess expert
knowledge of the details of the case and must be expected to rely
on expert counsel." *Baffa,* 222 F.3d at 61.

Defendants' complaints regarding Mundy and Huang's
knowledge are not tailored to the risk of conflicts between
Mundy and Huang and the absent class members. But whether
Mundy and Huang have exhibited the ability to adequately su-
pervise class counsel is a closer question, as Defendants'
characterization of Mundy and Huang's statements at their dep-
ositions raise serious concerns. The deposition transcripts present
a somewhat different picture, though. Mundy explained that he
has read the documents in the case, applying his "business sense
to those documents and see if they seem truthful, good, in terms
of advocating for this potential Class, and is it receiving their at-
tention." (Ex. 32 to Rosen Decl. (Dkt. 122-33) at ECF 28.) He has
had regular conversations with the attorneys regarding the pro-
gress and timing of the case. (*Id.* at ECF 25.) With respect to the
erroneous statement that Mundy had previously been convicted
of fraud, Mundy stated that he read the motion before filing but

"didn't, I think, go over it with a fine-tooth comb." (Ex. L to Fumerton Decl. (Dkt. 121-14) at ECF 61.) Huang, meanwhile, received and reviewed translated versions of "documents pertaining to the complaint or filing the lawsuit," including spending half a day reviewing the translated SAC, and otherwise discussed (through an interpreter) the briefs filed on motions. (Ex. P to Fumerton Decl. (Dkt. 121-18) at ECF 14-15; Ex. 33 to Rosen Decl. (Dkt. 122-34) at ECF 13.)

These statements show active involvement in the litigation at the level to be reasonably expected from a non-expert plaintiff. Mundy and Huang are supervising the action by reviewing and discussing filings, determining whether decisions make common sense, and monitoring their attorneys' conduct to ensure counsel is prioritizing and diligently pursuing the action. Defendants have pointed to no potential conflicts between the proposed class representatives and the absent class members, and have not responded to or challenged The Rosen Law Firm's stated qualifications. (*See* Ex. 4 to Rosen Decl. (Dkt. 120-6).) Accordingly, the Plaintiffs have established adequacy of representation.

### C.   Rule 23(b)

Under Federal Rule of Civil Procedure 23(b)(3), Plaintiffs must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The only dispute between the parties regarding the Rule 23(b) requirements is whether Plaintiffs have adequately demonstrated that common issues predominate for members of the Exchange Act Subclass. (*See* Opp. at 10-17.)

#### 1.   Predominance of Issues in the Securities Act Class

Section 11 of the Securities Act imposes civil liability for misstatements in a registration statement. *See* 15 U.S.C. § 77k. To prove

such a claim, a plaintiff must show that "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010). "Issuers are subject to virtually absolute liability under section 11, while the remaining potential defendants . . . may be held liable for mere negligence." *Id.* at 359. Such claims have no requirements of "scienter, reliance, or loss causation." *Id.*

Excepting the damages methodology discussed below, Defendants do not dispute that common issues predominate with respect to the Securities Act Subclass. As discussed above, the central issue of Securities Act claims---whether Defendants' registration statement "contained an untrue statement of a material fact" or omission giving rise to liability—is common across class members. *See Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013) ("As to materiality, therefore, the class is entirely cohesive: it will prevail or fall in unison. In no event will the individual circumstances of particular class members bear on the inquiry.").

Accordingly, taking into consideration the court's conclusion regarding damages discussed below, the Plaintiffs have established predominance for the Securities Act Class.

22

2.   Predominance Issues in the Exchange Act Subclass: Reliance

a.   *The* Basic *Presumption*

Claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267. As discussed above, the commonality of several of these issues (such as the existence and materiality of alleged misrepresentations or scienter) is not disputed.

Defendants argue that individual issues of reliance predominate in the Exchange Act Subclass. (Opp. at 1-3.) As discussed briefly above, "reliance is an element of a Rule 10b-5 cause of action." *Basic*, 485 U.S. at 243. "The traditional (and most direct) way for a plaintiff to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction based on that specific misrepresentation." *Amgen*, 568 U.S. at 461. As this direct proof of reliance requires a factual showing regarding individual stock purchasers, it is an individual issue not amenable to class adjudication. *See Basic*, 485 U.S. at 242 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."). The Supreme Court resolved this tension in *Basic*, acknowledging that a plaintiff could alternately show reliance under the "fraud-on-the-market" theory, which is "the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business [and]

[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241-42. Accordingly, plaintiffs are entitled to a presumption of reliance on misrepresentations where they make the following showings: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton*, 573 U.S. at 268. This presumption would be common across the class, satisfying Rule 23(b)(3)'s requirement that common issues predominate.

The parties' primary dispute here centers on whether the market for NIO ADS was efficient. (Mot. at 11-17; Opp. at 10-13.) The Second Circuit has declined to adopt a particular test for market efficiency, but has noted that "the burden is not an onerous one." *See In re Petrobras Secs.*, 862 F.3d 250, 276, 278 (2d Cir. 2017). Instead, district courts are instructed to conduct "a holistic analysis based on the totality of the evidence presented." *Id.* at 277. To guide this analysis, the Circuit and many district courts within the Circuit have looked to the so-called *Cammer* and *Krogman* factors, named for the cases in which they were laid out. *See id.* at 276; *In re Aphria, Inc. Secs. Litig.*, 342 F.R.D. 199, 205-06 (S.D.N.Y. 2022); *see also In re Vale S.A. Secs. Litig.*, No. 19-CV-526 (RJD) (SJB), 2022 WL 969724, at *2 (E.D.N.Y. Mar. 31, 2022). As summarized in *Aphria*, the five *Cammer* factors are: "(1) the average weekly trading volume of the security; (2) the number of analysts following the security; (3) the extent to which market makers traded in the security; (4) the eligibility of the issuer to file an SEC Form S-3 or F-3; and (5) a demonstrated cause-and-effect relationship between unexpected, material disclosures about the company and changes in the security's price." 342 F.R.D. at 205 (citing *Cammer v. Bloom*, 711 F. Supp. 1264,

1286-87 (D.N.J. 1989)). The three *Krogman* factors are "(1) market capitalization of the company; (2) bid-ask spread of the security; and (3) percentage of the security not held by insiders," also known as the float. *Id.* at 205-06 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).

Plaintiffs' expert, Dr. Adam Werner, submitted an expert report addressing each of these factors and providing the results of an event study he designed for the fifth *Cammer* factor. (*See* Werner Decl.) Defendants do not dispute the first four *Cammer* factors or the *Krogman* factors, (*see generally* Opp.), which are "indirect indicia of market efficiency." *Petrobras*, 862 F.3d at 276; *see also Martínek v. AmTrust Fin. Servs., Inc.*, No. 19-CV-8030 (KPF), 2022 WL 326320, at *10 (S.D.N.Y. Feb. 3, 2022). Accordingly, the court will briefly address each before discussing the competing expert analyses of the fifth *Cammer* factor, direct evidence of efficiency by means of a cause-and-effect relationship between material disclosures and price movements.

The first *Cammer* factor asks whether there is a sufficient average weekly trading volume during the class period to suggest an efficient market. *Cammer*, 711 F. Supp. at 1286. A significant level of average weekly trading volume "implies significant investor interest in the company," which "in turn[] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Id. Cammer* cited a study which stated 2% of outstanding shares was a sufficient volume to establish a presumption of efficiency, *id.* (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)), and cases within this Circuit have found similar percentages imply efficiency. *See In re Allergan PLC Secs. Litig.*, No. 18-CV-12089 (CM) (GWG), 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021) (finding that average weekly trading volume during the class period of 3.9% indicated market

efficiency); *Villella*, 333 F.R.D. at 52 (concluding that 4.4% indicated market efficiency). The average weekly trading volume of NIO ADS during the class period was 45.68%. (*See* Werner Decl. at ¶ 27.) This far exceeds the amounts which have been sufficient in other cases, and therefore strongly supports a finding of market efficiency.

The second *Cammer* factor looks to the number of securities analysts reporting on the company's stock during the class period, because "[t]he existence of such analysts would imply, for example, the [disclosures] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors" and therefore cause the stock price to move in response to new information. *Cammer*, 711 F. Supp. at 1286. In one Southern District of New York case, as few as three analysts reporting directly on the security at issue (with "numerous" analysts reporting on the company as a whole) was sufficient to raise an inference of market efficiency. *In re Winstar Comms. Secs. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013). Plaintiffs have identified five analysts following NIO during the class period, publishing 26 reports and recommendations regarding the ADS. (Werner Decl. at ¶ 29.) Therefore, this factor also supports a finding of market efficiency.

The third *Cammer* factor turns on whether there were "numerous market makers," who "would ensure completion of the market mechanism" by "react[ing] swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. A market maker is

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; or (iii) is ready, willing and able to

> effect transactions in reasonable quantities at his quoted
> prices with other brokers or dealers.

*Bombardier,* 546 F. 3d at 206 (quoting 17 C.F.R. § 240.15c3-
1[c]8 (2006)). Cases reflect a wide range regarding the number
of market makers that are sufficient to raise an inference of mar-
ket efficiency. *See Wilson,* 2018 WL 3913115, at *10 (finding that
78 market makers are sufficient, and collecting cases that con-
cluded numbers as low as six were enough); *Carpenters Pension
Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 92 (S.D.N.Y.
2015) (noting that 51 active market makers supported a deter-
mination of an efficient market). In addition, courts have
concluded that this factor is met when the security in question
trades on the New York Stock Exchange. *In re Initial Pub. Offering
Secs. Litig.,* 260 F.R.D. 81, 100 (S.D.N.Y. 2009); *Martínek,* 2022
WL 326320, at *12. NIO ADS were traded on the New York Stock
Exchange, and Plaintiffs identified 77 market makers in the mar-
ket for NIO ADS. (Werner Decl. at ¶¶ 34-35.)

The fourth *Cammer* factor asks if the company was eligible to file
an S-3 or F-3 Registration Statement "or, if ineligible, such ineli-
gibility was only because of timing factors rather than because
the minimum stock requirements set forth in the instructions to
Form S-3 were not met." *Cammer,* 711 F. Supp. at 1287; *see also
Aphria,* 342 F.R.D. at 205 (discussing Form F-3 as equivalent to
S-3 for the *Cammer* analysis). NIO meets the "public float" re-
quirements for the Form F-3, which require $75 million or more
of non-restricted shares, because NIO's float "ranged in value
from $0.93 billion to $1.81 billion" during the relevant period
(approximately 96.69% of outstanding ADS), well above the

needed amount. (Werner Decl. at ¶¶ 39-41, 84.)[9] Accordingly, this factor also supports a finding of market efficiency.

The three *Krogman* factors similarly favor a finding of efficiency. *Krogman*, 202 F.R.D. at 478. NIO's average market capitalization—"calculated as the number of shares multiplied by the prevailing share price," *id.*—was $1.33 billion during the class period, higher than 69% of all publicly-traded United States companies. (Werner Decl. at ¶ 81.) This also falls well above market capitalizations that other courts have found sufficient. *See Wilson*, 2018 WL 3913115, at *15 (addressing market capitalization of $751.3 million); *McIntire*, 38 F. Supp. 3d at 433 (finding a range of $292 million to $585 million to be sufficient); *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 92 (noting that a market capitalization ranging from $0.5 to $3.2 billion weighed in favor of efficiency). A security's bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. During the class period, NIO's bid-ask spread, averaged 0.17%, as compared to 0.65% for other companies during the same timeframe. (Werner Decl. at ¶ 88.) This falls below bid-ask spreads which have shown efficiency in prior cases. *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154, 160 (S.D.N.Y. 2012) (spread of 0.198%). NIO's float, "the percentage of shares held by the public, rather than insiders," *Wilson*, 2018 WL 3913115, at *15, was already discussed above, as it is a consideration for eligibility to file a Form S-3 or F-3, and similarly supports a conclusion of efficiency.

---

[9] Defendants point out that NIO could not meet the Form F-3 requirement that the company have 12 months of SEC filings, as the IPO had occurred less than 12 months earlier. (Opp. at 13.) A failure to meet the timing requirements do not indicate inefficiency under the *Cammer* analysis. *See In re Initial Pub. Offering Secs. Litig.*, 260 F.R.D. 81, 101 (S.D.N.Y. 2009).

The court next turns to Dr. Werner's event study in assessing whether the fifth *Cammer* factor has been met. Event studies examine "how much a firm's security price rises or falls in response to new information" by developing a market model which calculates how the security "typically behaved in relation to the overall stock market and industry-specific factors," and then comparing the actual performance following the disclosure of newsworthy information to the model's predictions. (Werner Decl. at ¶¶ 46, 53.) If the study shows statistically significant movement from the market model on days with unexpected firm-specific releases, and statistically insignificant differences on days without firm-specific news (or with immaterial firm-specific news, such as an earnings release in line with expectations), the event study provides direct evidence of market efficiency. (*Id.* at ¶¶ 17, 47-48.)

Dr. Werner developed a market model and conducted an event study analysis using four dates—two on which information Dr. Werner identified as material was disclosed (including the alleged corrective disclosure), and two without—then examined whether the comparison with the market model indicated market efficiency. (*Id.* at ¶¶ 52-61.) The event study concluded that the movement in price of NIO's ADS was statistically significant on the two days in which material information was disclosed, and that NIO's ADS treated in an efficient market. (*Id.* at ¶¶ 64, 67, 70, 76-77.)

In response, Defendants submitted an expert declaration from Dr. Faten Sabry. (*See* Sabry Decl. (Dkt. 121-1).) Dr. Sabry raises a number of issues with the methodology of Dr. Werner's event study. *First*, Dr. Sabry states that Dr. Werner developed the market model by measuring NIO ADS's relationship to the market and industry indices over the course of a year, more than six months longer than the class period without explanation. (*Id.* at ¶ 28; *see also* Werner Decl. at ¶¶ 1, 59.) *Second*, Dr. Werner selected arbitrary event dates for the study, rather than using

criteria to guide the selection of material or relevant news, and he used too few analysis dates. (Sabry Decl. at ¶¶ 31-36.) *Third*, the event study shows autocorrelation—meaning past returns predict future returns—"which could indicate market inefficiency." (*Id.* at 17 & ¶ 37.) *Fourth*, in developing the market model, Dr. Werner used the S&P 500 Automotive Manufacturers Index to control for industry effects, but that index only included General Motors and Ford Motors during the relevant timeframe, calling into question whether this index was an appropriate estimation of NIO's industry. (*Id.* at ¶¶ 45-46.) *Fifth*, Dr. Werner's report generally includes other minor errors which undermine the credibility of its conclusions. (*See, e.g., id.* at ¶¶ 49-50.) And *sixth*, Plaintiffs' proposed class period (on which Dr. Werner relied in conducting his analysis) begins 25 days after NIO's IPO without explanation. (*Id.* at ¶ 51.) Dr. Werner responded to these criticisms in a rebuttal declaration. (*See* Ex. 9 to Rosen Decl. ("Werner Reply") (Dkt. 122-10).)

The Second Circuit has clearly and repeatedly instructed that, in ruling on market efficiency, district courts must conduct "a holistic analysis based on the totality of the evidence presented" rather than a check-the-box approach to the various factors. *Petrobras*, 862 F.3d at 277. The Circuit has "never suggested . . . that such [direct] evidence was the *only* way to prove market efficiency," *id.* at 278, and has held "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017). Direct evidence is particularly important when "a number of the indirect *Cammer* factors suggested the inefficiency of the market" or "are less compelling in showing an efficient market." *Id.* at 98. But where "indirect evidence of market efficiency—including that a stock trades in high volumes on a large national market and is followed by a large number of analysts[,] . . . . there is no need to demonstrate efficiency through a direct test[.]" *Strougo v. Barclays PLC*,

312 F.R.D. 307, 322-23 (S.D.N.Y. 2016). As the seven indirect factors addressed above all weigh in their favor—some significantly so—Plaintiffs have demonstrated an efficient market, even without considering the event study.

Further, Dr. Sabry's methodological objections are insufficient for the court to simply disregard Dr. Werner's event study.[10] Defendants chose not to submit an expert opinion that NIO's ADS traded in an *inefficient* market. *See Aphria*, 342 F.R.D. at 206. Without such an analysis, Defendants' identification of "deficiencies . . . and discrepancies," *id.*, in Dr. Werner's approach is less persuasive, particularly as Dr. Werner concluded that an event study modified to account for Dr. Sabry's complaints still showed an efficient market. (*See, e.g.*, Werner Reply at ¶ 39 ("In fact, using an alternative industry index to control for the impact of NIO's industry sector on NIO's ADS price shows that the empirical results of the Werner Declaration are robust to the selection of industry index."). In other instances, Dr. Werner replied to Dr.

---

[10] The Second Circuit's discussion of the use and benefit of event studies is informative in this case:

> Indirect evidence is particularly valuable in situations where direct evidence does *not* entirely resolve the question. Event studies offer the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses. Notably, small sample sizes may limit statistical power, meaning that only very large-impact events will be detectable. . . . These methodological challenges counsel against imposing a blanket rule requiring district courts to, at the class certification stage, rely on directional event studies and directional event studies alone.

*Petrobras*, 862 F.3d at 278-79. The "methodological challenges" inherent in event studies—including the difficulty in crafting a study with a sufficiently large sample from a limited period of time in a single security—are implicated by Dr. Sabry's objections. Were the court to disregard an event study solely on these bases, or require unassailable direct evidence of efficiency, it appears that generic issues with this type of study may leave many plaintiffs unable to invoke the *Basic* presumption at all.

Sabry's critiques or provided his own criticism of Dr. Sabry's an-
alytical approach. (*See, e.g., id.* at ¶¶ 37, 47.) In light of these
competing arguments—and particularly in consideration of the
fact that Defendants did not submit any expert opinion showing
an inefficient market—Dr. Werner's event study is worth afford-
ing at least some weight, and further supports a conclusion of
market efficiency. For all these reasons, the court determines that
Plaintiffs have shown an efficient market in NIO ADS.

### b. *Rebutting the* Basic *Presumption*

Defendants, however, challenge the *Basic* presumption on an-
other ground: that there was no price impact from the alleged
misrepresentation, (*see* Opp. at 14-17), which is relevant to the
"publicity, materiality, and market efficiency" requirements of
the *Basic* presumption. *Strougo*, 312 F.R.D. at 314 (citing *Halli-
burton*, 573 U.S. at 278). Price impact is the concept that a
misrepresentation, before corrected, resulted in a higher security
price than would have otherwise been available, thus injuring the
investors who purchased the security at this higher price. *See Hal-
liburton*, 573 U.S. at 263-64 (stating that the *Basic* presumption
may be rebutted "by showing that the alleged misrepresentation
did not actually affect the stock's price—that is, that the misrep-
resentation had no 'price impact'"). "In the absence of price
impact, *Basic*'s fraud-on-the-market theory and presumption of
reliance collapse." *Id.* at 278. If the misrepresentation was not
reflected in the market price of the security, "there is no ground-
ing for any contention that the investor indirectly relied on that
misrepresentation through his reliance on the integrity of the
market price." *Id.* An argument regarding a lack of price impact
is properly considered an attempt to rebut the *Basic* presumption
by "demonstrat[ing] that the misrepresentations did not affect
the stock's price[.]" *Waggoner*, 875 F.3d at 101; *see also Hallibur-
ton*, 573 U.S. at 264 (addressing whether defendants receive an
opportunity to rebut the *Basic* presumption with a showing of
lack of price impact). Defendants therefore bear the burden of

persuasion to show a lack of price impact, and must "sever the link between the misrepresentation and the price a plaintiff paid or received for a stock" by a preponderance of the evidence. *Id.* They attempt to do so with several distinct arguments.

Defendants first argue that the status of the Shanghai construction was public, since investors could independently visit the construction site and determine if construction had begun. (Opp. at 14-15.) Since all public information is incorporated into the efficient market price of a security, the misrepresentation therefore could not have been affected by the misrepresentation. (*Id.*) But nothing in the record reflects public disclosure of the site's address. (*See* Prospectus at 32 (stating simply that the construction would occur "in Shanghai"); *id.* at 122 (stating "[c]onstruction has started on our own manufacturing facility in Shanghai" without more); *see also* Ex. X to Fumerton Decl. (Dkt. 121-26) at ECF 4 (listing "[a]ddress of the engineering project" in translation of project description as "Jiading District, Shanghai").)[11] That a construction project was occurring in view of the public somewhere in Shanghai is an insufficient showing to meet Defendants' burden of persuasion to rebut the *Basic* presumption. *See Waggoner*, 875 F.3d at 101; *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1962 (2021).

---

[11] Defendants' citation for the claim that "[a]nyone in Shanghai could have walked by the site and have seen that construction was in fact underway," (Opp. at 14), is a photograph from March 28, 2018 of individuals holding shovels at a construction site. (Ex. D to Fumerton Decl. (Dkt. 121-6).) Nothing in the picture—other than arguably the fact that it is plainly taken outside—shows that it was visible to the public, or that the public knew the site's location.

Next, Defendants argue that the back-end price drop[12]—that is, the extent to which the NIO ADS's price decreased when the alleged corrective disclosure was made—cannot be equated to the amount the misrepresentation affected the stock because the corrective disclosure "did not actually reveal any misstatement in the [Filing Documents]." (Opp. at 15.) And Defendants are correct that the March 2019 6-K did not disclose that construction had never began, as Plaintiffs claim. (*See* March 2019 6-K at 4 ("Recently, the Company has agreed in principle with these contractual counterparties to terminate the plan for this manufacturing plant[.]").) Nonetheless, the Plaintiffs' theory is easy to follow: the fall in NIO ADS's price reflects the extent to which the market valued the construction project, and therefore is probative of a price impact from the initial misstatement, even if the March 2019 6-K did not reveal the full truth. "There is no requirement that the corrective disclosure take a particular form or be of a particular quality, such that it be a mirror image tantamount to a confession of fraud." *In re Signet Jewelers Ltd. Secs. Litig.*, No. 16-CV-6278 (CM) (RWL), 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019).

---

[12] Price impact is primarily concerned with "front-end" impact—that is, the extent to which the security's price was inflated by the misrepresentation—but can be inferred from a "back-end" impact, meaning the amount the price fell following a corrective disclosure. *See, e.g., In re Chi. Bridge & Iron Co. N.V. Secs. Litig.*, No. 17-CV-1590 (LGS), 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020) (explaining that the "two principal ways" to rebut price impact are (1) evidence of no front-end impact or (2) dislodging the connection between the alleged misrepresentation and any back-end price drop). Defendants focus on disconnecting the back-end price drop from the misrepresentation because, they argue, the Plaintiffs have failed to provide any direct evidence of a front-end price impact. (Opp. at 14.) The alleged misstatement was included in the Filing Documents which were filed immediately in advance of the IPO, and therefore no market for the NIO ADSs yet existed. But the Plaintiffs remain able to infer the front-end impact from a variety of other sources, as discussed herein.

*Goldman Sachs Group*, on which Defendants rely, is not to the contrary. In that case, the Supreme Court stated that the inference "that the back-end price drop equals front-end inflation[] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs Group*, 141 S. Ct. at 1961. But the misrepresentations on which that case was premised were "generic statements about [Goldman's] ability to manage conflicts"—for example, 'We have extensive procedures and controls that are designed to identify and address conflicts of interest.'" *Id.* at 1957. The Court explicitly premised its conclusion on the generic nature of the initial disclosure, because it is hard to infer front-end price inflation when "it is less likely that the specific disclosure actually corrected the generic misrepresentation." *Id.* at 1961. Although the corrective disclosure is not a perfect match, the alleged misrepresentation here is quite specific—"[c]onstruction has started on our own manufacturing facility in Shanghai," (Prospectus at 122)—making it easier to draw the inference urged by the Plaintiffs.

Next, Defendants urge the court to conclude that "the termination of the Shanghai Facility was not negative news at all and thus could not have caused NIO's ADS price to decline[.]" (Opp. at 16.) Defendants also argue that any showing of price impact is undermined by the "obvious alternative explanation" for the price decline—the simultaneous disclosure that revenue dropped significantly in the prior quarter. (Opp. at 17.) They (and Dr. Sabry) point to a number of analyst reports issued in the wake of the March 2019 6-K which "described the termination of the Shanghai Facility as a positive development[.]" (Sabry Decl. at ¶¶ 68-75; *see also* Opp. at 16.)

35

In response, Plaintiffs submit expert reports from Dr. Werner and William H. Purcell, each of whom opines that the misrepresentations had a price impact.[13] (*See* Werner Reply at ¶¶ 48-64; Ex. 12 to Rosen Decl. ("Purcell Decl.") (Dkt. 122-13).) Dr. Werner points to additional coverage of the March 2019 6-K which were more negative (or more equivocal[14]) regarding the construction project's cancellation. (Werner Reply at ¶¶ 54-57.) Dr. Werner also notes that investment analysts had previously modeled a positive impact of the Shanghai manufacturing facility in their revenue and cash flow projections, further illustrating a price impact from the misrepresentation and the negative impact of the corrective disclosure, notwithstanding the analysts' topline analysis. (*Id.* at ¶¶ 58-64.) Mr. Purcell concluded that the statements that NIO "had begun construction of the Shanghai Facility, and that the Shanghai Facility was expected to be completed by the end of 2020" had "a meaningful positive impact on the finalized IPO price"[15] on the basis of several pieces of evidence. (Purcell

[13] The court notes that Plaintiffs also argue that the analyst reports submitted by Defendants can be disregarded, because almost all of them were authored by investment analysts employed by the various underwriters. (Reply at 17-20.) Due to this conflict of interest and evidence that the underwriters sought to conduct other business with NIO (including providing wealth management services and conducting any secondary offerings), Plaintiffs argue that the analyst reports should be disregarded. (*Id.*)

[14] Defendants argue that certain statements in these articles can be interpreted to support their position—that the project's termination was a positive development for NIO. (Sur-Reply at 10.) As they bear the burden of proof on this point and solely rely on the purported consensus of analysts regarding the disclosure, the conflicting record works to their detriment on this motion.

[15] In a Sur-Reply, Defendants argue that the various statements preceding the IPO could only show impact on the IPO price, rather than the market price for NIO ADSs. (*See* Sur-Reply at 3-4.) They further argue that Purcell's opinion is improper and must be disregarded because it is an opinion on the "[u]nderwriters' motivations in setting the IPO price," which falls outside the proper bounds of expert testimony. (*Id.* at 5-7.) Although Mr.

36

Purcell's phrasing appears to limit the conclusions to the IPO price, both arguments misinterpret the import of Mr. Purcell's report for our purposes here.

A number of cases have pointed out that the IPO market—in which a price is set in negotiations between the issuer and the underwriters—cannot be efficient, because in an IPO—where the company sells shares to underwriters at a negotiated, fixed price—"there is no well-developed market." *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000); *see also In re Initial Public Offerings*, 471 F.3d at 42-43 (noting that the IPO market is not efficiently reflecting information due to a 25-day quiet period in which analysts cannot report about securities in an IPO). This conclusion is undoubtedly correct, but is irrelevant here because Mr. Purcell's expert opinion is helpful because these facts raise an inference that the misrepresentation had a price impact in the efficient market that began with the commencement of the Exchange Act Subclass class period on October 8, 2018, nearly a month after the IPO. If an alleged misrepresentation to the underwriters allows the issuer to raise the IPO price, that would not show price inflation, as the increase is occurring in a non-efficient market; but the underwriters' opinion that certain information is material to institutional investors during a road show is certainly relevant to a conclusion that the information, if not corrected in the interim, would impact the price once the shares are traded on the open market.

Prior to the IPO, certain employees of the underwriters expressed the opinion that the status of the construction project would matter to investors and therefore impact the price available to the underwriters when offering the ADSs to investors, and the text of an early version of the registration statement was changed to accommodate this belief. (*See* Ex. 2 to Rosen Decl. (Dkt. 122-3) at UW_MS_00000007, -15; Ex. 3 to Rosen Decl. (Dkt. 122-4) at UW_MS_00001666 ("In Citi's comments, they asked 'Can we provide more clarity on timing, regulatory approvals obtained, Government subsidies for plant (any information that gives investors more comfort on progress)'. . . . I changed the wording to 'started to build' instead of plan to build. But for the clarity on regulatory approvals obtained, subsidies for plant, etc., I don't think we have relevant information to provide here.").) Contrary to Defendants' arguments, it is not the employees' motivations that matter, but their written belief that the representations regarding the status of the construction project would impact the price that investors would be willing to pay. As the alleged misstatements remained public and unchanged throughout the proposed class period, Mr. Purcell is

Decl. at 6-7, 13.) First, Mr. Purcell points to NIO's own emphasis on and prominent placement of disclosures relating to the strategy of developing an independent manufacturing and production facility, as well as the risks of the partnership with JAC Motors, in the Filing Documents. (*Id.* at 13, 18-19.) Second, Mr. Purcell points to analyst reports issued around the time of the Filing Documents which considered the JAC Motors partnership a risk to NIO and the construction announcement (with its related reduction in reliance on an external manufacturing partner) a positive development. (*Id.* at 14-16.) Third, Mr. Purcell notes that members of the "[u]nderwriter team" discussed the importance of the construction project to investors and specifically revised the registration statement's language to affirmatively state that construction had already begun. (*Id.* at 22-23.)

On this basis, Plaintiffs make a reasonable argument that the initial alleged misrepresentation was material to investors and

---

simply drawing the reasonable inference that these claims—which the employees believed would be important to investors—*remained* important to investors and continued to impact the price as trading on the open market gained steam. The same inference is reasonable regarding the Prospectus's emphasis on the construction project and risks of the joint partnership disclosed in the Prospectus, as well as the discussions in early analyst reports, despite all of these preceding or immediately following the IPO.

Much like Defendants' argument that the *Basic* presumption cannot be invoked because the Plaintiffs failed to provide direct evidence of front-end price impact—an impossible proposition, since the ADSs were not yet trading when the alleged misrepresentation was made—this argument would leave securities plaintiffs unable to bring class action Exchange Act claims regarding misrepresentations and omissions included in registration statements. But it has long been the law that there is "no reason to carve out an exception to Section 10(b) for fraud occurring in a registration statement just because the same conduct may also be actionable under Section 11." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382-83 (1983). The court will not indirectly adopt an interpretation of the law that has been rejected directly by the Supreme Court.

38

inflated the price received in the IPO. NIO's repeated emphasis on the risks of the partnership with JAC Motors and the plan to build a facility in the Filing Documents, the contemporaneous attention paid by analysts to the strategy (and the presence of at least some analysts who considered the cancellation of construction a negative), and particularly the internal discussions among analysts at the lead underwriter of the value of having already begun construction indicate that many different sources felt the Shanghai facility was important to the market. At the same time, though, Plaintiffs' arguments that the drastic reduction in NIO's revenue—also disclosed in the March 2019 6-K—had no role in the decline of NIO's value are simply not plausible. *Goldman Sachs Group*, 141 S. Ct. at 1960 (stating that courts reviewing a motion for class certification should use "a good dose of common sense").

Ultimately, at this stage of the proceedings it is the Defendants' burden to sever the link between the price impact and the misrepresentation, and the competing record before the court fails to do so. Accordingly, the court concludes that the *Basic* presumption applies, and individual reliance issues will not predominate.

### 3. Predominance of Issues in Both Classes: Damages

The final dispute between the parties relates to whether Plaintiffs have adequately defined a model of damages that can "be calculated on a classwide basis that 'isolate[s]' and measures 'only those damages attributable' to their theory of liability" for either class.[16] (Opp. at 19 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 32, 35 (2013).) This issue is connected to the dispute discussed above regarding whether the termination of the construction project, the earnings results, or both contributed to

---

[16] This issue can be understood as related either to predominance or superiority.

the decline in the value of NIO ADS following the March 2019 6-K, as Defendants argue that Plaintiffs must establish a methodology which can determine how much of the decline in value (if any) is attributable to the alleged misrepresentations. (*Id.* at 19-20.)

At the outset, the court notes that the Securities Act claims at issue here require the use of a statutory formula to calculate damages. *See* 15 U.S.C. § 77k(e). Suits under section 11 of the Securities Act allow recovery of damages in the amount of the difference between the price paid for the security and either the value of the security at the time the suit was brought, the price which the plaintiff received in disposing of the security before suit, or the price which the plaintiff received in disposing of the security later, if lower than when the suit was brought. *Id.*[17] This formula plainly cannot be calculated on a classwide basis, but class certification is nonetheless permitted if the common issues will predominate over the individual calculation of damages . *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015). Applying the statutory formula in Section 11 of the Securities Act to individual class member claims after liability is determined would not predominate, so this is an insufficient basis on which to deny class certification. *See, e.g., In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) ("Because the statutory formula applies, the individual damages questions are sufficiently reduced that predominance of the common questions, answers, and facts remains.").

Regarding the Exchange Act claims, "[i]ssues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases." *Strougo*, 312 F.R.D. at 313. A plaintiff seeking to certify a class action must show that

---

[17] Section 15 extends liability to any person who controls an entity which violates section 11, "to the same extent as such controlled person." 15 U.S.C. § 77o(a). Accordingly, the same damages formula applies.

"their theory of liability matches their theory of damages and individualized damages issues will not predominate," considered a "minimal" burden. *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 99; *In re Glob. Brokerage, Inc.*, No. 17-CV-916, (RA) (BCM), 2021 WL 1160056, at *20 (S.D.N.Y. Mar. 18, 2021) (finding that a similar description of a proposed damages methodology from Dr. Werner was sufficient for class certification's "minimal" burden). Through Dr. Werner, Plaintiffs make clear that damages will be limited only to those losses caused by the alleged misrepresentations and that such damages can be calculated on a classwide basis. (Werner Decl. at ¶ 92.) Specifically, Dr. Werner states that he would conduct empirical analyses to isolate the extent of the price impact attributable to the corrective disclosure, "controlling for potentially confounding non-fraud-related information," then construct "an inflation ribbon" which shows the impact of inflation on each day during the class period, to allow for measurement of impact during the period an investor held the ADS. (*Id.*) Although Defendants argue that Plaintiffs will be unable to separate losses attributable to the misrepresentations from other losses (such as those attributable to the poor earnings news)—which may undermine Plaintiffs' Exchange Act claims on the merits—they do not identify why this would result in individualized issues which predominate over the common issues identified above. (Opp. at 19-21.) Whether calculated on a classwide or individual basis, Plaintiffs will presumably have to prove concrete damages attributable specifically (and solely) to the conduct for which Defendants are liable, although this issue is not before the court today. Their ability to do so—or not—is therefore a question for the merits, and is not relevant to class certification.[18] *See Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class

---

[18] In *Comcast*, the Supreme Court addressed a damages model which included all losses attributable to any of four theories of antitrust liability,

predominate, not that those questions will be answered, on the merits, in favor of the class.").

###### 4.   Superiority

Rule 23(b)(3) finally requires a determination "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Securities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *MF Global Holdings Ltd.*, 310 F.R.D. at 239.

Having already determined that Plaintiffs have met their burden regarding the classwide damages methodology, and as Defendants do not otherwise contest superiority, the court concludes that this case, like many other securities actions, would be best adjudicated as a class action. Plaintiffs have therefore demonstrated superiority.

---

even though the district court had already determined that the plaintiff could only proceed on one such theory. 569 U.S. at 36-38. The damages methodology thus would include as losses amounts attributable to conduct for which the defendants were not liable. *Id.* at 38.

The Supreme Court and the Second Circuit have each made clear that issues at class certification often overlap with the merits of underlying claims, including in *Comcast* itself. *See* 569 U.S. at 33-34; *Initial Pub. Offerings Secs. Litig.*, 471 F.3d at 33. The court does not decline to reach the damages issue here because it overlaps with the merits, but rather concludes that—unlike in *Comcast*—the Defendants' fears regarding Plaintiffs' ability to develop a suitable methodology are irrelevant to the Rule 23 analysis. In *Comcast*, it was uncontested that the plaintiffs must devise a model capable of measuring damages on a classwide basis to show predominance, 569 U.S. at 30, so the failure to do so in a manner specific to the surviving theories of liability doomed the motion for class certification. As Defendants have identified no individual damages issues that would predominate, though, no similar concern is warranted in this case.

### D. Appointment of Class Counsel

Federal Rule of Civil Procedure 23(g) states that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). The relevant factors are "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* at 23(g)(1)(A). The court may also consider any other information relevant to whether counsel can "fairly and adequately represent the interests of the class." *Id.* at 23(g)(1)(B).

The Rosen Law Firm has served as lead counsel since the court's March 3, 2020 Memorandum & Order consolidating the various cases bringing securities claims against NIO. (*See* Mar. 3, 2020 M&O (Dkt. 44).) In that order, the court noted that The Rosen Law Firm has "considerable experience as lead counsel in [Private Securities Litigation Reform Act] actions generally (and against Chinese firms specifically) [and] appears well qualified." (*Id.* at 11.) There is no reason in the record to doubt this conclusion, and The Rosen Law Firm's depth of involvement as lead counsel throughout the discovery and litigation conducted over the past more than three years further supports this result. Accordingly, The Rosen Law Firm is appointed class counsel.

## IV. CONCLUSION

For the aforementioned reasons, Plaintiffs' motion for class certification is GRANTED. Pursuant to Federal Rule of Civil Procedure 23(c), the court hereby orders that:

- The Securities Act Class, which brings claims pursuant to Section 11 and Section 15 of the Securities Act, will consist of: "All persons and entities who purchased or otherwise acquired the ADS[] of NIO Inc. pursuant and/or traceable to the registration statement and prospectus issued in connection with NIO's September 12, 2018 Initial Public Offering."

- The Exchange Act Subclass, which brings claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 20(a) of the Exchange Act, consists of: "[T]hose persons and entities who purchased or otherwise acquired NIO ADS[] during the period from October 8, 2018 to March 5, 2019, inclusive."

- The Rosen Law Firm is appointed class counsel.

Defendants motion for leave to file a sur-reply is GRANTED, and the Sur-Reply attached to that motion is deemed the Defendants' sur-reply on this Motion. The court DENIES both parties' requests for oral argument as moot.

SO ORDERED.

Dated:    Brooklyn, New York
          August 8, 2023

                                        s/Nicholas G. Garaufis
                                        ⌐NICHOLAS G. GARAUFIS ⌐
                                        United States District Judge