

Laurence Rosen
lrosen@rosenlegal.com

July 3, 2025

**VIA ECF**

The Honorable James R. Cho
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *In re NIO, Inc. Securities Litigation,* Case No. 1:19-cv-01424-NGG-JRC

**Plaintiffs' Renewed Motion to Compel Defendant NIO's Production of Documents Withheld under PRC Blocking Statutes**

Dear Judge Cho:

Pursuant to Judge Garaufis' ECF order dated May 23, 2025, and in accordance with Rule F.2. of Your Honor's Individual Practices, Class Representatives Mark Mundy and Eva Huang ("Plaintiffs") respectfully submit this renewed motion to compel Defendant NIO Inc. ("NIO") to produce certain documents that it has withheld under PRC blocking statutes.

Specifically, Plaintiffs move to compel documents in Categories 1 to 7 of NIO's Categorical Log of Documents Withheld Pursuant to PRC Regulations ("Withholding Log") (Ex. 2). While the Withholding Log states that certain of the documents were created as early as October 2017, Plaintiffs seek production only of those documents created on or after March 1, 2018.

### I.      Procedural background of this renewed motion to compel

On February 26, 2025, Plaintiffs - in a joint submission with NIO - moved to compel NIO to produce documents that it has withheld under PRC blocking statutes. (ECF No. 152; the "First Motion"). Following a hearing on May 2, 2025, Your Honor denied the First Motion without prejudice, stating that: "[Y]ou are welcome to renew your motion. I am finding that you likely

1

could obtain this information from alternative sources. But if you're unable to for whatever reason, you are allowed to renew your motion." (Ex. 17, at 20:19-20:23).[1]

On May 15, 2025, Plaintiffs moved to adjourn the parties' summary judgment schedule so that Plaintiffs could make a renewed motion to compel the documents that NIO has withheld under PRC blocking statutes, as the withheld documents are of critical importance to Plaintiffs' claims and the summary judgment motions. (ECF No. 166). Over Defendants' opposition, Judge Garaufis granted Plaintiffs' request for adjournment, and ordered that Plaintiffs file their renewed motion to compel by July 3, 2025.[2] (ECF Text Order, May 23, 2023).

## II.    Factual background relevant to this motion

NIO is a Shanghai-based electric vehicles company that raised approximately $1.1 billion USD in its initial public offering ("IPO") on the New York Stock Exchange on September 12, 2018. ¶9.[3] NIO, which did not have its own manufacturing plant and outsourced its vehicle production to a Chinese state-owned company (¶51), was able to raise this sum on the strength of a Registration Statement that told investors that Shanghai government authorities were ***currently*** building NIO's own manufacturing plant in Shanghai (the "Shanghai Facility"). Specifically, the Registration Statement made the following representations that Plaintiffs allege to be false and misleading:

- "Construction has started on our own manufacturing facility in Shanghai[.]" ¶61.
- "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities." ¶62.
- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities." ¶62.

The Registration Statement also stated that the Shanghai government was responsible for purchasing the land and paying for the costs of constructing the factory building. ¶64, n. 5. The Shanghai government was to pay approximately 2.43 billion RMB – or about $337 million USD – for the land and building. (Ex. 3 at NIO0000000006, Article 4). Less than six months after the IPO, NIO revealed that it was not going to build the Shanghai Facility after all and would continue to employ its contract-manufacturing model. ¶65.[4]

---

[1] All citations to "Ex. _" refer to exhibits attached to the Declaration of Laurence Rosen, filed herewith.

[2] *I.e.,* approximately two weeks after the last fact deposition in this case, which was completed on June 20, 2025.

[3] Citations to ¶ refer to paragraphs of the Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint," ECF No. 67).

[4] Plaintiffs allege that the reasons NIO provided for this abrupt cancellation of the Shanghai Facility project were bogus. ¶¶ 67-72.

While Plaintiffs' Complaint focused on the falsity of NIO's representation that construction of the Shanghai Facility *had started*, discovery to date shows that the same statements are false for two ***additional*** reasons: (1) the Shanghai government had withdrawn its 2.43 billion RMB of funding for the Shanghai Facility and was no longer planning to finance or construct the factory building for NIO, and (2) with the project halted due to the Shanghai government's withdrawal and NIO needing to secure alternative sources of funding, the Shanghai Facility – if it was going to be built at all - was not going to be completed by the end of 2020.  For example:

- On September 30, 2018 (approximately two weeks after the IPO), an internal NIO email chain stated that certain approval documents would need to be modified because "the construction entity is no longer Jiawei Auto Parts Co, Ltd., and the new entity has not yet been confirmed." (Ex. 4 at NIO0000168028).  Jiawei Auto Parts ("Jiawei") was the project company that the Shanghai Jiading District government, through its wholly owned limited liability company Shanghai International Automobile City (Group) Co., Ltd. ("Shanghai Autocity"), established to acquire the land and construct the Shanghai Facility for NIO.[5] (Ex. 5 at ¶¶4-5).

- That the Shanghai government had pulled out of the project was further confirmed in an October 10, 2018 email, in which two NIO employees circulated a spreadsheet spelling out alternative funding options for the Shanghai Facility. (Ex. 6).  According to the spreadsheet, the "base case" now featured GLP[6] as the major investor paying for the land and construction, with NIO noting that non-monetary considerations for this option included whether the Shanghai government would consider GLP, as well as "SEC disclosure risks." *Id.* The original scenario with the Shanghai government as financier appears in the spreadsheet as the third alternative - "Alt 3," with NIO noting: "Will the government ***reconsider***?" *Id.* (emphasis added). Of course, there would be no need for the government to "reconsider" if it had not pulled out of the project. Moreover, if the Shanghai government was still in the deal, this original scenario would be listed as the "base case" not as "Alt 3". Notably, for this option, NIO does not mention "SEC disclosure risks" as a non-monetary consideration.  Also

---

[5] For simplicity purposes and for the sake of consistency with the language in the Registration Statement, Plaintiffs shall use the term "Shanghai government" herein to refer to the Shanghai Jiading District government, Shanghai Autocity, and Jiawei.  But it is important to note that Shanghai Autocity and Jiawei are not government agencies or organs.  For example, Shanghai Autocity is an independently registered limited liability company, and the shareholder (Jiading District State-owned Assets Supervision and Administration Commission) is liable to the company only to the extent of its capital contribution. (Ex. 1, at ¶41).

[6] Global Logistic Properties is a major Singaporean industrial real estate developer.  Alt 2 listed Shanghai Electric Group, a large PRC state-owned enterprise, as the new source of financing.

**THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686- 1060 ♦ FAX: (212) 202 - 3827**

notable is that for each of the scenarios, the earliest construction start date is listed as December 30, 2018 (*i.e. **more than three months *after* the IPO***).

- On October 25, 2018, an internal NIO email chain circulated a list of contracts that Jiawei had entered into for the Shanghai Facility project, with the suggestion that NIO take over all of the contracts from Jiawei.  (Ex. 7 at NIO0000171567).  That NIO was taking over Jiawei's contracts indicated that Jiawei was no longer going to be involved in this project.

- The next day, on October 26, 2018, a NIO employee circulated a draft letter of intent to be sent to Century 3 (Shanghai) Inc., a project management company that Jiawei had hired to manage the Shanghai Facility construction project, stating that Century 3's project management service contract with Jiawei was suspended, and that Shanghai NIO (NIO's operating entity in China) would replace Jiawei in the original project management contract and pay the cost of the project manager.  (Ex. 8).  In short, NIO was stepping into the shoes of the Shanghai government's project company and paying the costs of the construction.

- Subsequently, during a NIO board meeting that took place on November 5, 2018, the board authorized NIO management to work on a "most optimal solution" regarding the Shanghai Facility – one that would require as little cash investment as possible by NIO.  (Ex. 9 at NIO0000171391, Paragraph 10).  The need to work on a "solution" indicates that a problem had arisen with the original plan.

- The draft of a convertible bond prospectus dated January 18, 2019, for a $650 million convertible bond offering by NIO stated "As of the date of this offering memorandum, the construction of such manufacturing facility has come to a halt, and we are considering commercially reasonable alternatives. We may build a new manufacturing plant in Shanghai or elsewhere, or manufacture the ET7 through partnership with JAC by expanding our existing production capacity at JAC." (Ex. 10, at NIO0000029764-65). This is consistent with the above documents showing the Shanghai government had withdrawn from the factory project and NIO was seeking alternative financing partners.

- An internal email from underwriter Goldman Sachs dated January 18, 2019, in connection with the $650 million convertible bond financing, states: "Shanghai plant delay, per Piers' email – has company reference this at all in public statements?" (Ex. 11).

Accordingly, the documents show that by September 30, 2018 ***at the latest*** (*i.e.,* just 18 days after the IPO), NIO knew that the Shanghai government had pulled out of the Shanghai Facility project, withdrawing its funding for the land and construction of the factory. The critical question is *exactly when* the Shanghai government informed NIO that it was withdrawing from the project. The most reasonable inference is that the Shanghai government informed NIO of this decision much earlier, likely one or more months before the IPO.  For example, the type of detailed spreadsheet (Ex. 6) spelling out various alternative financing scenarios – including

4

precise dollar amounts of investments by specific third parties such as GLP and Shanghai Electric – was likely not prepared in a mere two weeks. Indeed, NIO had to have already been in discussions with these new investors to have prepared such detailed financing alternatives.  The truth is in the documents that NIO is withholding.

### III.    Argument

NIO must produce the documents it is withholding under PRC blocking statutes because: (1) NIO has not met its burden of showing that the disclosure of the information would violate PRC law, and (2) even if a conflict exists, the required comity analysis favors disclosure of the information.

### A.  NIO has not proved that disclosure of the withheld documents violates PRC law

To show that "foreign law stands as a bar to discovery, the party opposing production bears the burden of proving what that law is and demonstrating why it impedes production." *S.E.C. v. Gibraltar Glob. Sec., Inc.*, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015). "To satisfy this burden, 'the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.'" *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561, at *8 (S.D.N.Y. Oct. 6, 2021) (quoting *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 96 (S.D.N.Y. 2014)).

NIO has not come close to fulfilling its burden to show that the Chinese government prohibited it from producing the documents.

*First:* in the PRC, the determination of what information is "secret", "work secret", "intelligence", "sensitive information", "internal" or otherwise non-public can only be made by a government organ. Ex. 1 at ¶¶6-7, 27. The PRC government must make this determination in writing. *Id*. Without such a formal designation it is not secret or confidential. *Id*. NIO has not offered any evidence to prove that a government agency has determined in writing that the specific documents in question are state secrets or information that must be kept confidential, nor is there any evidence that NIO has explicitly been prohibited in writing from disclosing them.

In *Doubleline*, the court found a conflict existed because Brazilian courts had specifically ruled that disclosure of documents in a data system that provided the basis for a leniency agreement in an international bribery case could endanger negotiations with foreign governments. 2021 WL 4596561 at *4, 10.  NIO's bald assertion that it received "guidance" from the government prohibiting disclosure of the documents[7] is insufficient to meet the requirement that it provide information with "sufficient particularity and specificity" to establish that the PRC government did in fact prohibit disclosure. *In re DiDi Global Inc. Sec. Litig.*, 2025 WL 267893, at *3 (S.D.N.Y. Jan. 22, 2025) (holding that "there is no reliable evidence that the Chinese government has objected to disclosure of this information" just because the defendant

---

[7] *See* ECF No. 152 at PageID: 4476.

claimed that it reached out to the Chinese government for guidance and was told that it was not permitted to disclose the information being sought). NIO must present a document from the PRC government showing the specific documents at issue are state secrets. A written determination that something is a state secret is not *itself* a state secret.  Ex. 1 at ¶¶7, 34.

Indeed, the nature of the withheld documents makes it highly unlikely that a government organ would designate or classify them as secret or otherwise prohibit their disclosure. Ex. 1 at ¶¶8, 36-52. The documents are correspondence and related information concerning a transaction – which was later cancelled – to acquire land use rights and build a factory for a *private company* to produce electric vehicles. The documents are seven years old.  The primary counterparty in the withheld documents is Shanghai Autocity, which is a limited liability enterprise and not a government agency. *Id.* at ¶32. Accordingly, the documents are presumptively not secret unless specifically classified by a government agency in writing as such.  *Id.* at ¶¶6-7.

Furthermore, the documents in Category 4 have already been disclosed to NIO's CFO Louis Hsieh, ***who is an American citizen***. (*See* Ex. 2, Category 4, "Key Individual Involved").[8] That the information had already been disclosed to an American citizen further undermines that it is a state secret. Ex. 1 at ¶¶ 48-49.

*Second:* To the extent that any document has been classified as state secret, intelligence or is otherwise non-public, PRC law places the burden on NIO to attempt to declassify them so as to produce them in this litigation.  Ex. 1 at ¶¶10, 63-65.  NIO has not shown that it made any attempt to declassify the documents that it is withholding.

*Third:* No company has been subject to penalties or other punishments by the PRC government for transmitting documents overseas in the civil litigation context. Ex. 1 at ¶¶12, 80. This is particularly so where, as here, there is no evidence that the PRC government has even classified the withheld documents as secrets.  Indeed, in a recent ruling on a motion to compel information withheld by Didi Global Inc., a China-based company, under PRC blocking statutes, Judge Kaplan held: "While DiDi argues that disclosure would subject it and its deponent to severe criminal sanctions in China, each of the examples cited by their experts involves military-related secrets, collaboration with foreign intelligence services, provision of sensitive information to foreign entities in exchange for money, and/or documents expressly designated as confidential by the Chinese government. None of these circumstances applies here." *In re DiDi*, 2025 WL 267893, at *4.

---

[8] Louis Hsieh's American passport (ID and signature page) was produced in this litigation as UW_MS_00146032. The passport was issued in 2011, indicating that he was an American citizen during the time period covered by the documents.  In light of the amount of sensitive personal information on a passport, Plaintiffs will not attach Hsieh's passport to this filing. Plaintiffs will file Hsieh's passport should the Court require it or if any defendant disputes that Hsieh was an American citizen when he was employed at NIO.

**THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827**

### B. A comity analysis favors disclosure of the withheld documents

Should NIO provide the Court with written evidence that a PRC government agency has classified the withheld documents as state secrets or otherwise prohibited their disclosure, their production must still be ordered because of their importance to the case, the inability for Plaintiffs to obtain the information via alternative means, and the strong U.S. national interest in upholding its securities and discovery laws. "It is well settled that [foreign blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 & n.29 (1987). The Supreme Court has established five factors for courts to consider when conducting a comity analysis. "The fifth factor - the balancing of national interests - is the most important, as it directly addresses the relations between sovereign nations." *Gibraltar*, 2015 WL 1514746, at *5. The relevant factors weigh strongly in favor of disclosure.

### i. Factor 1: Importance of the information to the litigation

The documents NIO is withholding (the bulk of which are communications and agreements with Shanghai Autocity) will reveal, among things, when exactly NIO learned that the Shanghai government was pulling out of the Shanghai Facility construction project. The proximity of this development to NIO's IPO date (*i.e.* September 12, 2018) makes this a critical fact for the case and for the summary judgment motions that are currently being briefed pending a final adjudication on the instant motion to compel. If the Shanghai government had informed NIO before September 12, 2018 that it would no longer fund and construct the Shanghai Facility, then NIO's representation in the Registration Statement that the Shanghai Facility was under construction by Shanghai government authorities is false. It also calls into substantial doubt the Shanghai factory's expected 2020 completion date. And if the Shanghai government had pulled out of the project by the IPO date, NIO's risk warnings and disclosures under SEC Regulation S-K (which NIO relies on as part of its defense) would be false and misleading, and NIO would have been required to make entirely new risk factor disclosures warning investors that, for example, it may not be able to secure an alternative investor to fund the Shanghai Facility, as NIO now had a 2.43 RMB billion hole in its financing plan for the factory, *and* that all progress on development of the project had been halted.

The withheld documents are also critical to the issue of whether construction began. Plaintiffs argue in their opening motion for partial summary judgment that construction did not begin because the Shanghai Facility construction project had not obtained any of the necessary permits and approvals for starting construction, including a Construction Work Commencement Permit. Defendants argue in their cross-motion, among other things, that permits were not necessary for construction to begin. However, if the withheld documents show that Shanghai Autocity, Jiawei or NIO were unable to obtain those permits, or urged the relevant Shanghai authorities to expedite those permits so that construction may commence, that would seriously undermine Defendants' argument that no permits were necessary to begin construction. Indeed, one of the categories of documents being withheld are communications regarding "government documents, including applications for government's approvals and government's decisions and feedbacks thereto." (Ex. 2 at Page 3).

Accordingly, not only are the documents critical to the element of falsity, for which both Plaintiffs and Defendant seek summary judgment, the documents are also important for scienter and loss causation, elements for which Defendants have moved for summary judgment. The withheld documents will very likely show the real reason why NIO cancelled its plan to build the Shanghai Facility (*e.g.* because the Shanghai government was no longer going to fund the land and the construction), rendering as false exculpatory statements what NIO told investors were the reasons for terminating the project, which supports scienter. *SEC v. Collector's Coffee, Inc.* 2025 WL 752221, at *19 (S.D.N.Y. Mar. 10, 2025) ("This false exculpatory statement evidences consciousness of guilt and has independent probative value of scienter."). Moreover, these documents will provide important evidence relevant to loss causation. If NIO knew prior to the IPO that the Shanghai government was no longer paying for the land and construction of the Shanghai Facility, then there is an even stronger showing that NIO's March 6, 2019 disclosure that it was cancelling its plan to build the factory is the materialization of a concealed risk.

### ii.    Factor 2: Specificity of the requests

Plaintiffs' document requests were tailored to target relevant documents and further narrowed after meet-and-confers with NIO. The documents were searched for using agreed-upon parameters. There are a limited number of specifically identified documents NIO is withholding. There is no objection from NIO concerning overbreadth, only that their production purportedly violates PRC blocking statutes. Additionally, for the purposes of this motion to compel, Plaintiffs have further narrowed their request to only documents that were created on or after March 1, 2018.

Plaintiffs have chosen the March 1, 2018 date because there are indications that NIO might have known in March 2018 that the Shanghai government was not fully committed to building and financing the Shanghai Facility for NIO. For example, after the Framework Agreement was signed between NIO and Shanghai Autocity in November 2018, the two sides attempted to negotiate and exchanged drafts of a more detailed agreement in March 2018, but that agreement was never signed. Ex. 12 (with metadata showing that the document was created and last modified on March 1, 2018). Additionally, in April 2018, NIO's CFO Louis Hsieh told the underwriters of the IPO that NIO might put the Shanghai Facility project on hold if the IPO did not go well (Ex. 13), a curious admission given that Shanghai Autocity was the one responsible for purchasing the land and paying for the construction of the factory building.

### iii.    Factor 3: Origin of information

The withheld documents likely originated in China.

### iv.    Factor 4: Ability to obtain the information by alternative means

The only legally-prescribed method to obtain evidence from the PRC with the PRC government's consent is through the Hague Convention. But as Judge Kaplan held in *DiDi*: "First, the Supreme Court has declined to "require first resort to Convention procedures whenever discovery is sought from a foreign litigant." Second, ***courts in the second circuit repeatedly have held that proceeding via the Hague Convention is "not a viable alternative method" of securing discovery from China*.**"" (emphasis added and internal citation omitted). This is because the Chinese government routinely declines to respond to requests made under the Hague Convention, and even when it does, the process may take years. Ex. 1 at ¶¶13, 87.

8

Nor are depositions a viable method to obtain the information being withheld. It is axiomatic that information that NIO may be prohibited from disclosing in document form would also be prohibited from disclosure via depositions. In his most recent opinion granting the plaintiffs' motion to compel documents withheld under PRC blocking statutes, Judge Kaplan held that:

> There is no reason to conclude that information that DiDi is prohibited from producing in documentary form may be provided during a deposition or in interrogatory answers. Further, even if no such prohibition applied to depositions and interrogatory answers, they are a complement to — not a substitute for — document discovery. There are myriad reasons, from imperfect memory to intentional obfuscation, why written or oral answers are imperfect substitutes for document production.

*In re DiDi Global Inc. Sec. Litig.,* 21-CV-5807 (LAK), 2025 WL 1735412, at *5 (S.D.N.Y. June 23, 2025)

Fact depositions have concluded in this case, and whether due to "imperfect memory" or "intentional obfuscation," no NIO fact witness has been able or willing to testify to the information that is in all likelihood contained in the withheld documents.  This is not surprising: to admit that the Shanghai government withdrew from the Shanghai Facility project would be tantamount to admitting that NIO committed securities fraud.

For example, NIO's CEO Bin Li testified at his deposition that he has no idea why NIO employees created the spreadsheet of alternative funding scenarios for the Shanghai Facility.[9] Ironically, when questioned whether the spreadsheet showed that the Shanghai government had withdrew from the project, Li *asked Plaintiffs* to show him the very documents that are being withheld: "did we produce any documents for this? If you have that in the production, perhaps you can show me." *Id.* at 161:2-161:4.

Likewise, Colliven Ke from NIO's Industrial Planning department, who was the main liaison between NIO and Jiawei, claimed to not know why Jiawei suspended its contract with Century 3 and never sought an explanation for it.[10]  Ke also testified that she never saw Jiawei's letter to Century 3 suspending cooperation, or knew whether anyone at NIO received a copy of that letter. *Id.* at 48:1-17.  Furthermore, Ke testified that she does not remember whether Jiawei informed her prior to sending the official suspension letter that it was going to suspend work

---

[9] Exhibit 14, at 147:2-4 ("I don't really know the details. I don't really know why they had such a consideration, or what details were considered.").

[10] Exhibit 15, at 55:6-55:23:
Q: So did Jiawei ever tell you why their service contract with C3 was suspended?
A: Based on what I remember, no.
Q: Did you ask Jiawei?
A: No.
Q: Were you curious about why the contract was suspended?
A: I was not curious.

9

with Century 3.  *Id*. at 56:9-13.  Ke also did not remember why she told her colleagues at NIO that Jiawei was "no longer the construction entity" for the Shanghai Facility. *Id*. at 60:20-61:23. Nor did Ke know whether Jiawei continued to pay the contractors and vendors that it had engaged for the Shanghai Facility project.  *Id*. at 77:9-17.

NIO's CFO Louis Hsieh was likewise unhelpful. Hsieh testified at his deposition that he "didn't have anything to do with the" Shanghai Facility project because "it was all in Chinese" and he cannot read or write Chinese.  Ex. 16 at 18:19-22.  Even for the category of withheld documents (Category 4) under which his name is listed, Hsieh claimed that he has no idea what those documents were.  *Id*. at 122:2-123:12.

While NIO fact witnesses, including Li and Ke, denied that the Shanghai government informed NIO that it was withdrawing from the Shanghai Facility project, their self-serving denials reveal nothing about the documents being withheld.  Indeed, their denials make it all the more important that the documents – where the truth lies – are produced.[11]

### v.        The balancing of national interests

The U.S. has an undeniably strong interest in regulating its securities markets. *See S.E.C. v. Euro Sec. Fund*, 1999 WL 182598, at *4 (S.D.N.Y. Apr. 2, 1999); *S.E.C. v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y. 1981) ("[t]he strength of the United States interest in enforcing its securities laws to ensure the integrity of its financial markets cannot seriously be doubted."). As Judge McMahon of the S.D.N.Y. stated: "If you want to raise money in the [U.S.], the only laws that matter to me are the laws of the United States of America." *Christine Asia Co. Ltd. et al v. Ma et al*, No. 1:15-MD-02631 (S.D.N.Y.), 1/12/18 Status Conf. Tr. at 11.  In obtaining $1.1 billion from selling stock to U.S. investors in its IPO, NIO was well aware it could be subject to litigation and related discovery obligations in the U.S. for claims arising from its IPO.  The U.S. has a strong interest in enforcing its securities laws in this case.

The PRC's interest in protecting this information is less compelling. In *Valsartan*, a case concerning similar PRC blocking statutes, the court held that "factor 5 tips heavily in favor of U.S. interests and disclosure" because the PRC's "broad flexibility in defining state secrets" "can serve to justify nondisclosure of any information a PRC governmental agency wants to keep out of U.S. litigation, especially if that prohibition helps to sidestep the liability of large and successful PRC defendants." *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2021 WL 6010575, at *13 (D.N.J. Dec. 20, 2021). S*ee also, Philips Medical Sys. (Cleveland), Inc. v. Buan, et al.,* 2022 WL 602485 (N.D. Ill. Mar. 1, 2022) (holding that a PRC defendants' interpretation of Chinese blocking statutes "would in essence permit the [Chinese government] to oversee discovery decisions made by American courts regarding the responsibilities of Chinese litigants." The PRC

---

[11] While NIO made much of the fact that approximately 100,000 documents have been produced in this matter, the vast majority (approximately 90,000) were produced by the Underwriters. NIO produced approximately 10,000 documents and withheld 950; in other words, the documents NIO withheld represents nearly 10% of its production.  In any event, the total number of documents produced has no bearing on whether NIO is entitled to withhold the documents that are at issue here.

blocking statute represents "an attempt to insert [the Chinese government] into the American legal process for the potential benefit of Chinese litigants. Not only would such a law infringe upon the sovereignty of the United States…but it would also severely disadvantage parties opposing Chinese litigants in American courts. As a result, the United States has a strong interest in not limiting discovery because of [the Chinese blocking statute]."

Moreover, as discussed above, there is no evidence that the PRC government has even objected to the disclosure of the documents at issue here. *See, e.g., Gucci Am., Inc. v. Curveal Fashion*, 2010 WL 808639, at *6 (S.D.N.Y. Mar. 8, 2010) ("the Malaysian government has not voiced any objections to disclosure in this case, which the Second Circuit has found 'militates against a finding that strong national interests of the foreign country are at stake.'") (citing *U.S. v. Davis,* 767 F.2d 1025, 1035 (2d Cir.1985).  Indeed, the nature of the documents being withheld – about the financing and construction of a factory for a private company – is not the type that would implicate PRC national interests.  For example, "state secrets" is defined in the PRC as "important matters determined according to legal procedures that, if disclosed, may harm national security and interests in the political, economic, national defense, and diplomatic fields, and that are only known to a limited number of people within a certain period." It is difficult to fathom how documents concerning a cancelled factory for a private company that were created seven years ago harms PRC national security and interests – such that it overrides the U.S.'s strong interest in upholding its securities and discovery laws.

### vi.   Good faith and hardship are not relevant here because Plaintiffs are not seeking sanctions

The Second Circuit in *Linde v. Arab Bank, PLC,* 706 F.3d 92, 110 (2d Cir. 2013) stated that consideration of hardship and good faith was appropriate "when deciding whether to impose sanctions." But "[i]t did not endorse, much less require, district courts' consideration of those factors in analyzing whether to order production." *In re Didi Glob. Inc. Sec. Litig.*, No. 21-CV-5807 (LAK), 2025 WL 833437, at *3 (S.D.N.Y. Mar. 17, 2025).  Here, Plaintiffs are not seeking sanction at this time; accordingly, good faith and hardship are not relevant.[12] Nonetheless, NIO has not exhibited good faith because it has not produced any written evidence that the PRC government has classified these documents as secret or confidential – a prerequisite for a document to be secret or confidential. Ex. 1 at ¶¶ 7, 20-35. Nor has NIO produced evidence that the PRC government has prohibited disclosure in this litigation of the specific documents at issue.  Finally, producing the documents will not cause any hardship to NIO, as there is virtually no chance NIO will face any legal or regulatory consequences if it produces seven year old correspondence from a failed private real estate transaction.  *In re DiDi,* 2025 WL 267893, at *4. ("While DiDi argues that disclosure would subject it and its deponent to severe criminal sanctions in China, each of the examples cited by their experts involves military-related secrets, collaboration with foreign intelligence services, provision of sensitive information to foreign

---

[12] Similarly, the Supreme Court in *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197 (1958), which pre-dated *Aerospatiale,* discussed hardship and good faith, but "that decision analyzed those factors in determining the appropriate sanctions for failure to comply with an order requiring production — not in determining whether to order production in the first instance." *In re Didi,* 2025 WL 833437, at *3.

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

entities in exchange for money, and/or documents expressly designated as confidential by the Chinese government. None of these circumstances applies here."); *see also,* Ex. 1 at ¶¶12, 80-84. The only hardship here is to Plaintiffs as the withheld documents are critical evidence in support of Plaintiffs' claims.

**IV.    Conclusion**

Using PRC blocking statutes as a shield, NIO is withholding documents critical to determining liability in this case.  For the reasons discussed herein, Plaintiffs respectfully request that the Court order NIO to produce all documents in categories 1 to 7 of the Withholding Log that were created on or after March 1, 2018.

Respectfully submitted,

*/s/ Laurence Rosen*
Laurence Rosen

CC: all counsel of record via ECF

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686- 1060 ♦ FAX: (212) 202 - 3827