# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NIO INC. SECURITIES LITIGATION | Case No. 1:19-cv-01424-NGG-JRC <br><br> <u>CLASS ACTION</u> |

### <u>Declaration of Professor Zhang Hong</u>

I, Zhang Hong, hereby declare and state that under the penalty of perjury, the following information is based on my knowledge, understanding, and belief that it is true and correct. If required to testify, I am able and will provide competent testimony regarding the following facts.

1.     I am a Professor at the School of Law, Beijing Normal University, a PhD supervisor, and hold a PhD in Law. My primary research areas include Administrative Law, Administrative Litigation Law, State Compensation Law, and securities regulations. My curriculum vitae is attached.

2.     The Rosen Law Firm, P.A. (hereinafter referred to as Rosen Law Firm), on behalf of the plaintiff class, retained me to provide an opinion on the application of Chinese laws in support of the plaintiffs' request for NIO Inc. ("NIO") to produce certain documents and information. Specifically, I was asked to provide an expert opinion regarding whether PRC laws prohibit NIO from disclosing certain documents and communications related to a cancelled construction project with a "government partner."

3.      In the process of forming my opinions, I reviewed and considered the following information:

   a.  On October 14, 2024, NIO produced the "Categorized Records of Withheld Documents in Accordance with Chinese Laws", which documented the date ranges of the information that NIO refused to provide, the key personnel involved, the category description, and the applicable Chinese legal provisions;

   b.  Shanghai International Automobile City (Group) Co., Ltd. and Shanghai NIO Automotive Co., Ltd. executed the "Framework Agreement on the NIO Pure Electric Vehicle Manufacturing Plant Project" in November 2017.

   c.  The second amended class action lawsuit complaint against NIO and other defendants filed on September 18, 2020.

4.      My hourly rate for this engagement is USD700 per hour. My fees are not contingent upon the outcome of this case or any opinions expressed herein.

5.      I reserve the right to revise, refine or supplement my analysis and opinions upon becoming aware of any additional information, evidence, arguments or analyses that may impact my work on this case.

**Summary of Opinions**

6.      **Opinion One:** Government information shall be disclosed as a general principle, with non-disclosure being the exception. It can be withheld

2

from public disclosure only when a government organ designates or classifies information as secret or confidential.

7.    **Opinion Two:** There are strict and clear definitions and processes in place by which government information is defined as "secret", "work secret", "intelligence", "sensitive information", "internal" or otherwise non-public.    A government organ must designate or classify the information as such. This determination must be made or presented in writing. NIO's assertion that it received "guidance" concerning the withheld information from the government is insufficient to demonstrate the information is classified as secret or non-public unless written evidence is presented. Moreover, that guidance itself is not secret or confidential. If it exists in writing, NIO can and should produce it to demonstrate that the production of the information would violate Chinese law.    To date, NIO has not offered any valid evidence to prove that the relevant Chinese governmental departments have determined in writing that the documents and information that NIO refused to provide are state secrets or other information that should be kept confidential, nor is there any evidence that it has explicitly been prohibited in writing from disclosing them.

8.    **Opinion Three:**    The nature of the withheld documents makes it highly unlikely that a government organ would designate or classify them as secret or non-public or otherwise prohibit their disclosure. The documents are correspondence and related information concerning a transaction – which was later cancelled – to acquire land use rights and build a factory for a private

3

company to produce electric vehicles.    None of these documents are the type that would ordinarily be designated or classified as "secret", "work secret", "intelligence", "sensitive information", "internal" or otherwise non-public.

9.    **Opinion Four**:   NIO cannot violate Article 5 of Article 111 of the Criminal Law if the documents have not been designated or classified in writing as non-public.

10.    **Opinion Five**: Assuming *arguendo* the government instructed NIO not to produce the information, there is a formal process by which NIO may request that the government de-designate or declassify information that has been designated or classified as "secret", "work secret", "intelligence", "sensitive information", "internal" or otherwise non-public so as to allow NIO to produce the documents in this litigation.   There is no evidence that NIO made any effort to obtain permission to produce the requested documents.

11.    **Opinion Six**: The Data Security Law (DSL) Does not Bar Production of the Withheld Documents. Because the withheld documents are not "Important Data" as defined by the DSL, NIO need not obtain government approval to transfer the documents to plaintiffs in this private litigation.

12.    **Opinion Seven**: No Chinese company has been subject to penalties or other punishments by the Chinese government for transmitting documents overseas in the litigation context.

13.    **Opinion Eight**: Plaintiffs are unlikely to obtain the documents through the Hague Convention.

**Detailed Opinions**

**I.     Chinese Law Presumes that Government Information Should be Publicly Available Unless a Government Organ Designates or Classifies the Information as Secret, Intelligence or Non-public.**

14.    The disclosure of government information is an important aspect of China's efforts to build a law-based government. The "Opinions on Comprehensively Promoting Open Government Affairs" issued by the General Office of the CPC Central Committee and the General Office of the State Council in 2016[1], the "Notice of the State Council on Printing and Distributing the Outline for Comprehensively Promoting Administration according to Law" (GF [2004] No.10)[2], the "Outline for the Implementation of Building a Law-Based Government (2021-2025)" issued by the CPC Central Committee and the State Council[3], the Administrative Punishment Law[4], the Regulations on the Disclosure of Government Information[5], the Regulations on Procedures for Handling Administrative Cases by Public Security Organs amended in 2018[6], among other important laws, regulations and normative documents, all stipulate the principles, scope, methods, procedures, and requirements for government information disclosure. Among them, Article 5 of the Regulations on the Disclosure of Government Information explicitly stipulates: "When disclosing government information, administrative organs should adhere to the principle of openness as the norm and non-disclosure as the exception, and

follow the principles of impartiality, fairness, legality, and convenience for the people."

15.   In February 2024, during the "Q&A session with the responsible person of the State Secrets Administration on the 'Law on the Protection of State Secrets of the People's Republic of China'", when addressing the question regarding "the relationship between information disclosure and state secret protection", the responsible person of the State Secrets Administration responded, "Information disclosure and state secret protection represent two aspects of the same issue, and they are dialectically unified and both aim to safeguard the interests of the nation and its people". Failing to disclose what should be disclosed and disclosing what should not be disclosed will both harm the interests of the country and the people."

16.   From the perspective of authoritative scholars, Professor Zhou Youyong, **currently** a full-time member of the Social Construction Committee of the 14th National People's Congress and formerly **the director of the Political and Legal Teaching and Research Department of the Central Party School** , believed that: "Administrative organs shall disclose the basis, process, and results of administrative actions to citizens, legal persons, and other organizations, while disclose government information to the public. Exceptions apply to information that should not be disclosed according to law."[7]

17. In practice, Chinese government agencies regularly release government affairs information to the public, including the China Securities Regulatory Commission's "Government Affairs Information" [8] page and the Ministry of Industry and Information Technology's "Government Affairs Disclosure" [9] page contain a large amount of public government information. Moreover, the website of the Ministry of Industry and Information Technology has an information inquiry system, through which anyone can inquire about information such as announcements on new energy vehicle enterprises and products. Since 2009, under the guidance of the Ministry of Science and Technology, the Ministry of Finance, the National Development and Reform Commission, and the Ministry of Industry and Information Technology, the China Automotive Technology and Research Center has organized the compilation and publication of the "Yearbook of Energy-Saving and New Energy Vehicles" annually, which yearbook "is based on the domestic situation and oriented towards the international arena to comprehensively track and evaluate the development of the industry from an expert perspective and with authoritative data, and comprehensively collect relevant information from the government and enterprises" [10].

18. In summary, just because the withheld documents constitute "government information", that does not mean it cannot be made public. In fact, a considerable portion of government information needs to be proactively

7

disclosed in accordance with the provisions of China's "Regulations on the Disclosure of Government Information".

**II.   There is a Strict and well-defined process for designating or classifying information as secret or non-public. The information that NIO refuses to produce are not "state secrets" as defined in Articles 2 and 13 of the Law on the Protection of State Secrets, nor does it fall under the category of "work secrets" as defined in Article 64 of the Law on the Protection of State Secrets to the extent that there is No Written Evidence that a Government Organ has designated or Classified them as such.**

a.   "State secrets" as stipulated in Articles 2 and 13 of the Law on the Protection of State Secrets [11]

19.   In practice, NIO has cited the provisions of Articles 2 and 13 of the Law on the Protection of State Secrets, claiming that the relevant information constitutes "state secrets" and thus refusing to disclose it.

20.   Under Chinese laws, defining specific information as "state secrets" requires a specific approval process conducted by designated authorities, and there must be a written confirmation before such a designation can be made. However, as of now, I have not seen NIO provide any such evidence.

21. According to Chinese laws, state secrets are at the highest level of undisclosed information; and for a piece of information to be classified as a state secret, it needs to meet strict requirements in terms of substance, procedure, and time-space. Only when the specific content involved has undergone the statutory classification procedure for state secrets, and simultaneously meets the substantive, procedural, and time-space requirements, *i.e.,* possessing attributes of national security and interests, and being determined by a legally authorized classification authority and classification responsible person [12], does the relevant information constitute a state secret. This has been specifically confirmed by Hou Xiangdong, Director of the Government Information and Open Government Affairs Office of the General Office of the State Council.

22. In summary, a matter related to national security or national interests can only be classified as a state secret after it has been determined by an authorized authority in accordance with legal procedures. [13], [14]

b. <u>"Work secrets of government organs" or "sensitive government information" as stipulated in Article 64 of the Law on the Protection of State Secrets</u> [15]

23. NIO cites Article 64 of the Law on the Protection of State Secrets, contending that the relevant information constitutes "sensitive government information". However, Article 64 of the Law on the Protection of State Secrets pertains to "government work secrets".

24. Article 64 of the Law on the Protection of State Secrets "work secrets of government organs" require specific approval procedures and written approval from relevant government organs before they can be recognized as such.[16]

25. Further, for information to be a "work secret," the relevant government organization must formally designate the information as a work secret, specifying its scope of access, and apply a work secret label on the corresponding carrier, and submit it for approval to the person responsible for determining state secrets within their organization. The determination of work secrets must be documented in writing, indicating person making the designation, the person responsible for classification, and the basis or reasons for the determination. The government organization must mark or label the documents as "Internal" or "Internal Matters, Handle with Care"

26. In summary, the information withheld by NIO does not constitute work secrets because there is no evidence that a government organ has designated them as such or that the documents, bear the markings of work secrets such as "Internal" or "Internal Matters, Handle with Care".

     c. NIO has produced no evidence that any of the withheld documents are designated as "secret," "work secret", "intelligence" or otherwise non-public; NIO would have written confirmation of any such designation

27.   Under Chinese laws, the determination of which government information falls into "state secrets", "work secrets", "sensitive information", "internal information", "intelligence", etc. can only be made by government organs and their authorized organs and units, as well as other statutory subjects. This determination is made in writing. The state secret classification authorities primarily refer to specific entities that legally possess the power to determine, modify and declassify state secrets. According to China's Law on the Protection of State Secrets and relevant regulations, organs and units with state secret classification authority mainly include central and state organs, provincial-level organs, and municipal-level organs with districts.

28.   Generally, enterprises do not possess state secret classification authority. However, under specific circumstances, if an enterprise undertakes confidential scientific research, production or other confidential tasks and receives classification authorization from a competent authority, it may conduct derivative classification work within the scope of authorization. Meanwhile, the enterprise must strictly adhere to the Law on the Protection of State Secrets and the scope and conditions of authorization it has received when conducting derivative classification.

29.   To date, NIO has not provided any evidence that the relevant Chinese governmental departments have determined in writing that the documents and information that NIO refused to provide are state secrets or other information that should be kept confidential, nor has it explicitly been

11

prohibited in writing from disclosing them, meanwhile, no evidence has been provided to prove that NIO or Shanghai International Automobile City falls under the category of entities authorized by competent authorities to engage in derivative classification.

30.    In the trial practice of Chinese courts, if one party claims that certain evidence it holds constitutes state secrets and thus requires confidentiality and cannot be disclosed, it must submit proof to the other party and the court that the evidence indeed qualifies as state secrets. This could be in the form of documents marked as "state secrets" or "internal information" (the content of which is not disclosed to the court or the parties), or a written confirmation and explanation from an authority with the power to classify information as secret. Only then can the evidence be recognized as state secrets, thereby exempting the party from the obligation to submit it.

31.    The lack of a written determination by a PRC government agency establishing that the withheld documents are state secrets or information to be kept confidential is particularly notable here, where the vast majority of the documents being withheld involve correspondences between NIO and two independently-registered companies neither of which is a government department or agency.

32.    Shanghai International Automobile City (Group) Co. Ltd. is an independently registered limited liability company. Although it is state-owned, it is not a government agency or a government department.

33.   Century 3 is a private construction management company with no government affiliation.

34.   If a government organ had provided a written confirmation that the withheld documents are state secrets, intelligence, or otherwise non-public, such written confirmation itself would not be non-public and NIO could disclose it in this litigation.

35.   If the government had truly designated any of the withheld documents as state secret, intelligence, or otherwise non-public, NIO could and should produce such confirmation in this litigation.

**III.   The Descriptions of the Withheld Documents Indicate they are not the Types of Information that a Government Organ would Designate as Secret, Intelligence or Non-Public.**

36.   NIO has categorized the documents and information it refuses to provide to the plaintiffs into two types in the PRC Withholding Log. One type is information related to the "government", including: "memoranda, agreements, and documents related to sensitive information concluded with government partners" (Categories 1 and 2), "exchange of non-public information related to government documents, including government approval applications, government decisions, and feedback" (Category 3), "exchange of non-public information related to government licenses and their accompanying documents" (Category 4), "exchange of non-public information related to government subsidies and their accompanying documents" (Category 6), and

"exchange of government policies and their accompanying documents" (Category 7); and another type is other "non-public" information concerning "geographical mapping information and related email communications" (Category 5).

37.    While NIO's descriptions of the categories of documents are abstract and cursory, none of these descriptions suggest that the documents in those categories are state secrets, intelligence or otherwise non-public information under Law on the Protection of State Secrets (Articles 2, 13, and 64)

38.    Articles 2 and 13 of the Law on the Protection of State Secrets and Chapter II of the Regulations for the Implementation of the Law on the Protection of State Secrets define "state secrets" in terms of substance, procedure, and time-space. Specifically, it refers to "important matters determined according to legal procedures that, if disclosed, may harm national security and interests in the political, economic, national defense, and diplomatic fields, and that are only known to a limited number of people within a certain period".

39.    State secrets require "absolute confidentiality", work secrets require "relative confidentiality" but the information must also meet a strict test demonstrating a need for their confidentiality. See Article 3 of the Interim Measures for the Management of Work Secrets.

40.  According to the information I have obtained, the so-called "government" entity referred to by NIO in its PRC Withholding Log is Shanghai International Automobile City (Group) Co., Ltd. ("Shanghai Auto City").

41.  Shanghai International Automobile City is a wholly state-owned limited liability company with independent legal status in Shanghai's Jiading District, undertaking functions such as partial development, construction, and operation of the Shanghai International Automobile City industrial base, and whose shareholder (Jiading District State-owned Assets Supervision and Administration Commission) is liable for the company only to the extent of its capital contribution.

42.  Shanghai International Automobile City is an enterprise, but not a government department. Therefore, in principle, the information related to Shanghai International Automobile City and the Shanghai International Automobile City industrial base does not constitute government information. Even if its operations partially involve government regulatory affairs, it cannot possibly be "state secrets" or "work secrets" in general circumstances, unless it provides contrary evidence to prove otherwise. Consequently, the provisions of the Law on the Protection of State Secrets and Article 5 of the Interpretation of the Supreme People's Court on Several Issues Concerning the Concrete Application of Law in Handling Cases of Stealing, Probing into, Buying, and Illegally Providing State Secrets and Intelligence for Overseas Entities do not

15

apply. Meanwhile, Shanghai International Automobile City is also not a "critical information infrastructure".

43. Accordingly, correspondence between NIO and Shanghai Auto City regarding factory financing and construction (Categories 1-3), do not constitute "state secrets", "work secrets", or "intelligence". Likewise, internal correspondence between NIO employees regarding the planned factory project, involving public policies such as government subsidies (Categories 6 and 7), are about public information and are not "state secrets", "work secrets", or "intelligence".

44. With regards to "communications regarding non-public information related to government licenses and their accompanying documents" and "communications regarding non-public information related to government subsidies and their accompanying documents" (Categories 4 and 6), Article 2 of the Regulations on the Disclosure of Government Information states: "Government information, as referred to in this regulation, means the information that is created or acquired by administrative organs in the course of performing their administrative management functions, and is recorded and preserved in a certain form". According to Article 5 of the same regulation, "when administrative organs disclose government information, *they shall adhere to the principle of disclosure as the norm* and non-disclosure as the exception, following the principles of impartiality, fairness, legality, and convenience for the public."

16

45. For administrative licenses and government subsidies, the principle of disclosure is the basic norm. For example, Paragraphs 1 and 2 under Article 5 of the Administrative Licensing Law stipulate that: "(Paragraph 1) The establishment and implementation of administrative licensing shall adhere to the principles of openness, fairness, impartiality, and non-discrimination. (Paragraph 2) **The provisions on administrative licensing shall be made public, and those that have not been made public shall not serve as the basis for implementing administrative licensing. The implementation and results of administrative licensing shall be made public, except for those involving state secrets, trade secrets, or personal privacy.** Without the consent of the applicant, administrative organs and their staffs, as well as personnel involved in expert reviews, etc., shall not disclose the trade secrets, undisclosed information, or confidential business information submitted by the applicant, unless otherwise provided by law or involving national security or major public interests; and if administrative organs disclose the aforementioned information of the applicant in accordance with the law, the applicant shall be allowed to raise objections within a reasonable period. " In other words, as long as they do not involve state secrets, trade secrets, personal privacy, etc., relevant government information should be disclosed.

46. The aforementioned information also does not constitute "trade secrets". According to Paragraph 4 under Article 9 of China's Anti-Unfair Competition Law, trade secrets refer to technical information, business

17

information, and other commercial information that is not known to the public, has commercial value, and has been protected by corresponding confidentiality measures taken by the obligees.

47.    The definition of "trade secret" includes the following core elements: One is that it is not known to the public (secret), the other is that it has commercial value (value), and the third is that the obligee takes corresponding confidentiality measures (confidentiality), including concluding non-disclosure agreements (such as employee confidentiality clauses, and confidentiality contracts with partners), physically isolating confidential information (such as encrypting files, and restricting access permissions), establishing confidentiality systems (such as management systems for confidential areas, and file classification labeling), and providing confidentiality training for personnel who come into contact with confidential information. However, information about administrative licenses and government subsidies are publicly-available and lacks secret, value, and confidentiality.

48.    Additionally, one of the individuals from NIO who was part of the correspondences about government licenses was Louis Hsieh (see Category 4, "Key Individual Involved). I understand that Hsieh is an American citizen.[1] That an American citizen was part of these correspondences further

---

[1] UW_MS_00146032 (Louis Hsieh's American passport).

18

undermines the proposition that these correspondences implicate state secrets or state intelligence.

49.    Furthermore, as previously mentioned, for an item to constitute a "state secret", it must also meet the "temporal-spatial element", meaning "it must be known only to a limited number of people within a certain timeframe". Additionally, according to Item (3) under Article 7 of the Regulations on State Secrets Evaluation, items that have been lawfully disclosed or whose scope of knowledge could not be controlled prior to disclosure shall not be classified as state secrets. [17]These documents, due to the inability to control their scope of knowledge, are generally not recognized as "state secrets".

50.    I also note that the counterparty for the correspondences in Category 4 is Century 3, a private construction project management company. The correspondence between a private construction management company and NIO regarding factory construction does not, in principle, constitute government information. If any information involves "state secrets", "work secrets", "important data", "core data", etc., and cannot be provided, the written proof that the information falls into these categories should be provided.

51.    Lastly, there is no valid reason for NIO to withhold "geographical mapping information" (Category 5) concerning its planned factory in Shanghai because the location of this factory was already publicly-disclosed.

52.    In summary, based on NIO's description of the documents, there is no reason to think that the documents being withheld are the types of

documents that would implicate Chinese state secrecy laws such that their disclosure would be barred. Communications with Shanghai International Automobile City, an independently-registered limited liability company, and Century 3, a privately-owned construction management company, about the construction and financing of a factory for a private company should be presumptively not government information. Information regarding administrative licenses and subsidies are public information, particularly so here when they have already been disclosed to NIO's CFO Louis Hsieh, who is an American citizen. Finally, there is no valid reason to withhold geographical mapping information concerning NIO's planned factory because the location of the factory was publicly disclosed and known.

**IV.    The information that NIO refuses to provide does not violate Criminal Law Because it doesn't fall under the category of "state secrets or intelligence" ("specific intelligence") as stipulated in Article 5 [18] of the Interpretation of the Supreme People's Court on Several Issues Concerning the Concrete Application of Law in the Trial of Cases Involving Stealing, Probing into, Buying, and Illegal Provision of State Secrets or Intelligence for Foreign Institutions, Organizations or Individuals**

53.    NIO's production of the withheld information does not fall under the category of "state secrets or intelligence" (generally referred to as "specific

intelligence") as defined in Article 111 of the Criminal Law or the judicial interpretation thereof in Article 5 [19] of the Interpretation of the Supreme People's Court on Several Issues Concerning the Concrete Application of Law in the Trial of Cases Involving Stealing, Probing into, Buying, and Illegal Provision of State Secrets or Intelligence for Foreign Institutions, Organizations or Individuals.

54.    Article 5 of the judicial interpretation stipulates that "those who steal, probe into, buy, or illegally provide... for overseas entities shall be convicted and punished for the crime of stealing, probing into, buying, or illegally providing state secrets for overseas entities". However, presenting evidence in a lawsuit is inherently a lawful activity and does not constitute the so-called "stealing, probing into, buying, or illegally providing" that could violate the law.

55.    For an individual to be prosecuted for violating Article 5 of this judicial interpretation, the prerequisite is that the leaked information must have been officially designated as a "state secret" by a government authority, and that such designation has been clearly marked on the document or other carrier containing the information.

56.    <u>That is to say, classification is a necessary procedure and essential element for constituting this crime</u>. State secrets must be marked with state secret logos on their carriers. [20] Director Li Weiguo of the State Secrets Administration said in a publicly published article: One of the core roles of

21

classification is to enable participants in state secret activities to reasonably anticipate the legal consequences of their actions." [21]

57.    In principle, only when a matter has been determined as a state secret through the classification process but for some reason has not been "marked as confidential", and the perpetrator knows or ought to know, can it constitute a crime. A matter that, although "related to national security and interests", has not been determined as a state secret through the classification process cannot constitute the object of the "crime of disclosing state secrets". [22]

58.    The "intelligence" referred to in Article 111 of China's Criminal Law, concerning the crime of "stealing, probing into, buying, or illegally providing state secrets or intelligence for overseas entities", refers to "specific intelligence", which is a very narrow concept. The purpose of intelligence identification is to identify and recognize information or matters beyond the scope of state secrets but with the attribute of "intelligence" whose disclosure may violate criminal laws.

59.    To subject a person to criminal liability, the "specific intelligence" must meet the following 3 conditions: (i) arise from activities of government departments, (ii) their disclosure must jeopardize national security, public safety, economic security or social stability, and (iii) must have been maintained as confidential by the government department.[23]

60. If NIO claims that the information it refuses to produce constitutes state secrets or intelligence, even though it is not marked or classified as such, under Article 111 of the Criminal Law and Article 5, it must submit the information for appraisal and confirmation to the state confidentiality administrative department at or above the provincial level before NIO can make such a claim. However, there is no evidence that NIO has done so.

61. In practice, there is an extremely rare category of cases where information that has not been confirmed or marked as a "state secret" is leaked. Such information may require post-classification evaluation (i.e., "post-hoc classification") in the review process. However, Chinese laws and regulations are very stringent regarding post-hoc classification. [24], [25] In principle, if information related to national security and interests is not promptly determined as a state secret in accordance with legal procedures, once it is leaked, the classification procedure cannot be retroactively completed, and then the responsible person for leakage cannot be held liable for disclosing state secrets. [26] Based on my professional judgment, it is highly unlikely that the documents and information NIO refused to provide fall under this special category.

62. Therefore, I believe that the documents and information that NIO refuses to produce do not constitute intelligence as defined in Article 111 of the Criminal Law. NIO's invocation of Article 5 of the aforementioned judicial

interpretation to argue that disclosure would constitute the crime of "stealing, probing into, buying, or illegally providing state secrets or intelligence to overseas entities" is unfounded.

**V.    Assuming arguendo the materials are classified, NIO has produced no evidence that it utilized the formal processes available under Chinese law to request the Chinese government declassify them so NIO can produce them in this litigation**

63. Under Chinese law, there exists formal processes to request permission to disclose information that is classified as state secret, intelligence or is otherwise non-public. This is the declassification procedure. According to China's Law on the Protection of State Secrets, [27] Regulations for the Implementation of the Law on the Protection of State Secrets[28] and Interim Measures for the Declassification of State Secrets[29], declassification can be divided into two scenarios, i.e., automatic declassification and review declassification: (1) Automatic declassification: Confidential materials that have clearly marked confidentiality periods and have not been extended upon expiration will be automatically declassified. For example, if a confidential document is marked "confidential for 20 years", it can be made public after 20 years without additional procedures. (2) Review declassification: Even if the confidentiality period has not expired, the original classification authority (i.e., the organ or unit that initially classified the material as confidential) may proactively declassify it if the following conditions are met: After adjustments

to confidentiality laws and regulations, or the scope of confidential matters, the material no longer qualifies as a state secret; and disclosure would not harm national security and interests, and complies with current legal disclosure requirements.

64. In practice, the usual path for enterprises to apply for declassification is to submit an application to the original classification authority. In this case, as the holder or associated party of the materials, NIO may directly submit a written declassification application to the original classification authority. If the materials involve joint classification by multiple organs, the lead organ shall coordinate the handling. The conditions are: The application must specify the materials' name, classification level, confidentiality period, and reasons for declassification (e.g., evidentiary needs in litigation), and include supporting documents such as the case acceptance notice. The original classification authority shall initiate an internal review process upon receiving the application, including preparation by the undertaker, approval by the personnel responsible for classification, and written notification to organs or personnel within the scope of knowledge.

65. I have not seen any evidence that NIO underwent any of these formal processes for the information listed in PRC Withholding Log.

**VI.   The information that NIO refuses to provide does not fall under the category of "data" as stipulated in Article 36 of the Data Security Law [30]**

25

66.    NIO has cited Article 36 of the Data Security Law "(DSL")" as another reason to refuse to provide relevant information.

67.    There are two types of data covered by the DSL.   The first is "important data".   The second is all other data that is not classified as "important data" ("Ordinary Data").

68.    Firstly, Article 36 of the DSL cannot be invoked to support NIO's refusal to provide "Ordinary Data". This is because the article stipulates that "without the approval of the competent authorities of the People's Republic of China, organizations and individuals within the territory of China shall not provide data stored within the territory of the People's Republic of China to foreign judicial or law enforcement agencies", which prohibits parties from providing Ordinary data within China to US courts or law enforcement agencies. But, the party requesting the documents in this case is a private plaintiff, not a U.S. judicial or law enforcement agency.

69.    Under Chinese law, there is a fundamental difference between providing documents to a foreign plaintiff and providing documents to a foreign judicial authority. In terms of the nature of the act, providing documents to a foreign plaintiff falls under evidence exchange between civil entities, which is an act between civil entities; providing documents to a foreign judicial authority falls under judicial assistance within the scope of national sovereignty.

70.    In terms of procedural requirements, providing documents to a foreign plaintiff needs to comply with cross-border data flow rules, while

providing documents to a foreign judicial authority generally requires compliance with statutory judicial assistance procedures.

71. Therefore, as long as the relevant data is not "important data" and is not "provided to foreign judicial or law enforcement agencies", permission need not be obtained from government authorities and it can be provided to the plaintiff without violating the DSL.

72. Secondly, the DSL only requires permission to transfer overseas "important data".

73. Only when the information that NIO refuses to provide falls under the categories of "important data" does the provision of such information to overseas entities require the procedure of "obtaining approval from the competent authorities of the People's Republic of China".

74. Regarding which data constitutes "important data," the Measures for Security Assessment of Data Exits, issued by the Cyberspace Administration of China in 2022, defines "important data" as data that, once tampered with, damaged, disclosed, or illegally obtained or utilized, may *endanger national security, economic operations, social stability, public health and safety*."[31]

75. NIO has the obligation to provide corresponding evidence to prove that this information has been "submitted to the relevant confidentiality administrative departments in accordance with the law" and the data has been "determined by the relevant confidentiality administrative departments," to be

"important data" or has been "notified or publicly released as important data by relevant departments or regions." However, as of the date of this declaration, I have not seen NIO provide evidence showing that the withheld information is "important data".

76.   The identification and classification of "important data" is subject to relatively strict substantive standards and procedural rules.

77.   In my opinion, the information withheld by NIO – about a planned factory that never got built – does not meet the definitions and enumerations of "important data".   Information such as correspondence, environmental reports, licenses and approvals, contracts and other documents concerning a real estate transaction is not "important data".   The documents fail to meet the identification standards and will not "endanger national security, economic operation, social stability, public health, and safety. They do not fall into the category of "other data that may endanger national security, public interests, or the legitimate rights and interests of individuals or organizations, as <u>determined</u> by the national internet information departments, the National Development and Reform Commission, the Ministry of Industry and Information Technology, the Ministry of Public Security, the Ministry of Transport, and other relevant departments under the State Council". Instead, they mostly belong to "enterprise production and operation and internal management information" that is not classified as "important data".

78.    NIO should present corresponding evidence to prove that such information has been "submitted to the relevant confidentiality administrative department according to law" and has been "recognized by the relevant confidentiality administrative department", or that it has been "notified by relevant departments or regions or publicly announced as important data".

79.    However, as of now, I have not seen any evidence provided by NIO to prove that the information it has refused to provide has undergone the relevant procedures required by Chinese laws and regulations and have been formally identified as "state secrets", "intelligence", "work secrets of government organs", "important data", "core data", "other documents and materials that, once disclosed, may endanger national security or public interests".

## VII.    NIO will not be penalized for producing the documents it has withheld

a.    Neither NIO nor any other entity has ever been subjected to any penalties for sharing documents and information with overseas entities or individuals in the context of a litigation

80.    To my knowledge, following inquiry and research, there have been no cases in China where penalties have been imposed for violating the rules on cross-border transfer of litigation-related data and information. The article, which is a research result of the newly published 2024 ministerial-level scientific research project on "Countermeasures for China to Respond to the

29

Expansion of the Extraterritorial Application of European and American Data Laws" (Project Number: 24SFB4023) conducted by the Ministry of Justice, can also attest to this point. The article states: "There have been law enforcement cases of data breaches transmitted overseas in China, but there have been no penalty cases regarding violations of the rules for cross-border retrieval of litigation-related data". [32]

b.   Cases in China's judicial practice indicate that NIO will not face penalties for producing the documents that it is withholding on the basis of PRC law

81.   As mentioned earlier, the relevant information that NIO has refused to produce does not fall under the categories of "state secrets", "intelligence", "work secrets of government organs", "important data", "core data", or "other documents and materials whose disclosure may endanger national security or public interests" under Chinese laws, and therefore, NIO will not face penalties for providing them to the plaintiffs.

82.   A review of the cases published in the "Bulletin of the Supreme People's Court" show that Chinese courts do not consider a party to be "intentionally disclosing state secrets" when it does not "knowingly or ought to know" that certain information qualifies as "state secrets". The criminal offense related to state secrets already requires "knowingly or ought to know" as a subjective element, and this is even more the case for offenses involving "intelligence", "work secrets", "important data", "core data" and so forth. In

other words, in China, strict standards and elements must be met to constitute related crimes or violations, and NIO will not face penalties for producing the documents to the plaintiffs.

83.   For example, a case in Issue 2 of the "Bulletin of the Supreme People's Court" in 2004: In the case of "Xinyang People's Procuratorate of Henan Province vs. Yu Ping for Intentional Disclosure of State Secrets", the defense lawyer, through legal procedures, obtained case materials classified as "confidential state secrets." However, since the procuratorial organs did not indicate the confidentiality level and no one informed the lawyer that the case materials involved state secrets and could not be disclosed to others, the lawyer had no obligation to protect the case materials as state secrets, and there was no intentionality in the leakage of the case material content. The leakage of the case material content did not disrupt litigation activities to a serious extent. Therefore, the defense lawyer of the criminal defendant, who obtained confidential case materials through legal procedures and provided them for the relatives of the party involved to review, did not constitute the crime of intentional disclosure of state secrets.

84.   It is important to note that in this case there is no evidence that a government agency has classified any of the documents at issue as state secret, work secret or other protected category.

**IV.   <u>According to the 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, the</u>**

**feasibility of obtaining evidence in China through the "official-to-official" judicial assistance procedure is low,** and it cannot adequately protect a plaintiff's litigation rights and interests

85.   There is only one legally prescribed path for cross-border data evidence collection with the consent of China's competent authorities, namely the "government-to-government" mutual legal assistance procedure. This requires relevant foreign entities to submit requests for evidence collection to the Ministry of Justice through the channels stipulated in the treaty, or through diplomatic channels to the Ministry of Foreign Affairs. The requests, upon approval, will be executed by the people's courts.

86.   Foreign judicial authorities or individuals may apply for investigation and evidence collection through the people's courts, or, upon approval by the people's courts, through lawyers. No agency or individual is allowed to conduct evidence collection within China. That is, foreign judicial authorities or relevant individuals involved in litigation in foreign courts, even if they entrust lawyers or other agencies within China, cannot directly have their entrusted lawyers or other agencies interrogate witnesses or obtain evidentiary materials located within China. However, after their applications for investigation and evidence collection are approved, lawyers may then conduct investigations and collect evidence with warrants.

87.   PRC law mandates a lengthy processing and review procedure for obtaining permission for evidence exportation. The process can take years.

88.    According to online statistics, the assistance provided by the Chinese government to foreign parties in investigating and collecting evidence under the Hague Convention tends to have a relatively long processing time and a low success rate. [33], [34]  From January 2008 to September 2018, the Ministry of Justice of China received a total of 324 foreign evidence collection requests, of which 66 were executed, 156 were returned, and 81 were under execution. Additionally, 3 requests were voluntarily withdrawn by the foreign requesting authorities, and 18 cases could not be verified for execution due to incomplete record information. Of the 66 extraterritorial evidence collection requests that the Ministry of Justice executed between 2008 and 2018, 19 were completed within 6 months, 16 within 6 to 12 months, and 26 took more than 12 months, accounting for 28.8%, 24.2% and 39.4% of the executed requests, respectively.

89.    According to the latest data on the website of the Ministry of Justice of China, in the first quarter of 2024 the Ministry of Justice received a total of 722 foreign judicial assistance requests, including 50 requests for investigation and evidence collection as well as recognition and enforcement of judgments. It responded to a total of 501 foreign judicial assistance requests, including 13 requests for evidence collection. [35]  The proportion of responses to evidence collection requests is low. Moreover, "response" merely refers to procedural handling, and does not indicate a substantive response such as the execution of the request.

33

90.     Based on the above, I believe that it is unlikely for the plaintiffs in this case to be able to obtain evidence from the Chinese government through the Hague Convention.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: July 2, 2025, Beijing, China

Signature:

*[signature]*
Zhang Hong

[1]The "Opinions on Comprehensively Promoting Open Government Affairs" issued by the General Office of the CPC Central Committee and the General Office of the State Council in 2016 stated: "Openness and transparency are the basic characteristics of a government ruled by law. Comprehensively promoting open government affairs and allowing power to operate in the sunshine is of great significance for developing socialist democratic politics, enhancing national governance capabilities, strengthening government credibility and execution, and safeguarding people's rights to know, participate, express, and supervise."

[2]The "Notice of the State Council on Printing and Distributing the Outline for Comprehensively Promoting Administration according to Law" (GF [2004] No.10) stipulates: "Administrative management should be open, fair, impartial, convenient for the people, efficient, and honest". "Administrative organs, when implementing administrative management, should be open except for state secrets and legally protected trade secrets and personal privacy, and should pay attention to listening to the opinions of citizens, legal persons, and other organizations". "Improve the system for reviewing administrative law enforcement files. Administrative organs should establish files on administrative law enforcement such as administrative punishments, administrative permits, and administrative coercions. Records, evidence materials, and law enforcement documents related to the supervision and inspection of citizens, legal persons, and other organizations should be filed."

[3]The "Outline for the Implementation of Building a Law-Based Government (2021-2025)" issued by the CPC Central Committee and the State Council stipulates: "Fully and actively implement open government affairs. Adhere to the principle of openness as the norm and non-disclosure as the exception, and win more understanding, trust, and support from the people through a more open and transparent government. Vigorously promote openness in decision-making, execution, management, service, and results, ensuring that all legally required proactive disclosures are fully implemented. Strengthen the institutionalization, standardization, and informatization of openness, and improve the capacity and level of open government affairs. Comprehensively improve the quality of handling government information disclosure applications and legally safeguard the reasonable information needs of the people. Encourage the launch of themed activities such as Government Open Day and online politics inquiry to enhance interactive exchanges with the public. Accelerate the construction of a public utility enterprise information disclosure system with Chinese characteristics. Accelerate the construction of a national comprehensive administrative law enforcement supervision and management information system that integrates basic law enforcement data, law enforcement procedure circulation, and law enforcement information disclosure, and establish a national administrative law enforcement database."

[4] Paragraph 1 under Article 5 of the Administrative Punishment Law stipulates: "Administrative punishment follows the principle of fairness and openness", and Paragraph 1 under Article 48 stipulates: "Administrative punishment decisions with a certain social impact shall be publicly disclosed according to law.    If a publicly disclosed administrative punishment decision is legally changed, revoked, confirmed as illegal, or invalidated, the administrative organ shall withdraw the information on the administrative punishment decision within three days and publicly explain the reasons."

[5] Article 5 of the Regulations on the Disclosure of Government Information stipulates: "When disclosing government information, administrative organs should adhere to the principle of openness as the norm and non-disclosure as the exception, and follow the principles of impartiality, fairness, legality, and convenience for the people."

[6] Article 4 of the Regulations on Procedures for Handling Administrative Cases by Public Security Organs (Amended in 2018) stipulates: "Handling administrative cases should follow the principles of legality, impartiality, openness, and timeliness, respecting and safeguarding human rights, and protecting citizens' personal dignity."

[7]Zhou Youyong: "Legislative Construction of the Basic Principle System in the General Principles of Administrative Law", published in Issue 1 of 2021 of the "Administrative Law Research".

8. http://www.csrc.gov.cn/csrc/zwxx/index.shtml?channelid=d60512bc2c824021b21a088e3b2e3195.

9. https://wap.miit.gov.cn/zwgk/index.html.

10. "Yearbook of Energy-Saving and New Energy Vehicles" Annual Compilation — Statistical Yearbook Network, http://www.tjnjw.com/hangye/j/jienengyuxinnengyuanqiche-nianjian.html.

11. Article 2 of the Law on Guarding State Secrets: State secrets are matters concerning national security and interests, which are determined according to legal procedures, and are limited to be known by a certain scope of personnel within a certain period of time.

Article 13: The following matters involving national security and interests, the disclosure of which may harm the security and interests of the state in political, economic, national defense, diplomatic and other fields, shall be determined as state secrets: (1) confidential matters in major decisions on state affairs; (2) confidential matters in national defense construction and activities of the armed forces; (3) confidential matters in diplomatic and foreign affairs activities, and confidential matters undertaken to be kept secret in external relations; (4) confidential matters in national economic and social development; (5) confidential matters in science and technology; (6) confidential matters in activities for safeguarding national security and in criminal investigations; (7) other confidential matters determined by the national secrecy administrative authorities. Confidential matters of political parties that fall under the above provisions are considered state secrets.

12. CHENG Chunyan, "Disclosure of Government Information and Protection of State Secrets," published in China Legal Science, No. 1, 2014.

14. Article 14 of the Regulations on the Disclosure of Government Information and Article 13 of the Law on Guarding State Secrets have certain overlaps in defining the categories of government information not to be disclosed and the scope of state secrets, respectively: From the perspective of the Law on Guarding State Secrets, the "government information that may endanger national security, public security, economic security, or social stability if disclosed" as stipulated in Article 14 of the Regulations on the Disclosure of Government Information falls under the "matters that shall be determined as state secrets" as stipulated in Article 13 of the Law on Guarding State Secrets.

15. LI Zhaozong (Editor-in-Chief), TONG Weidong, ZHANG Yuxi (Deputy Editors-in-Chief), Interpretation of the Law of the People's Republic of China on Guarding State Secrets, Jincheng Publishing House & Law Press, 2024 edition, pp. 4–6.

16. Article 64 of the Law on Guarding State Secrets: "Organs and units shall, for matters generated or obtained in the course of performing their functions that do not constitute state secrets but would cause certain adverse effects if disclosed, apply the management measures for work secrets and take necessary protective measures. The specific measures for managing work secrets shall be prescribed separately."

[16] Notice of the Central Confidentiality Committee of the CPC on Issuing the Interim Measures for the Administration of Work Secrets (Zhong Bao Wei Fa [2019] No. 6).

[17] Article 7 of the Regulations on State Secrets Evaluation stipulates: "The following items shall not be classified as state secrets: (1) Items that require widespread public knowledge or participation; (2) Items falling under work secrets, trade secrets, or personal privacy; (3) [Omitted]; (4) Items required to be disclosed by laws, regulations, or relevant state provisions; (5) Other items whose disclosure would not harm national security and interests."

19. Article 5 of the Interpretation of the Supreme People's Court on Several Issues Concerning the Application of Law in the Trial of Cases of Stealing, Spying, Purchasing, or Illegally Providing State Secrets or Intelligence for Overseas Entities: "If a person knows or should know that a matter not marked with a secrecy level relates to national security and interests, and steals, spies on, purchases, or illegally provides it for overseas entities, he or she shall be convicted and punished for the crime of stealing, spying on, purchasing, or illegally providing state secrets for overseas entities in accordance with Article 111 of the Criminal Law."

[19] Article 5 of the Interpretation of the Supreme People's Court on Several Issues Concerning the Concrete Application of Law in the Trial of Cases Involving Stealing, Probing into, Buy, and Illegal Provision of State Secrets or Intelligence for Foreign Institutions, Organizations or Individuals" stipulates: "If a perpetrator knows or ought to know that matters without classified markings are related to national security and interests, and still steals, probing into, buys, or illegally provides them for overseas entities, they shall be punished for the crime of stealing, probing into, buying, and illegally providing state secrets for overseas entities according to the provisions of Article 111 of the Criminal Law."

[20] Article 22 of the Law on the Protection of State Secrets: "Organs and units shall mark state secrets on these carriers bearing state secrets, such as paper, optical and electromagnetic media (hereinafter referred to as state secret carriers), as well as on equipment and products belonging to state secrets. Electronic documents involving state secrets shall be marked as state secrets in accordance with relevant national regulations. Items that do not qualify as state secrets shall not be marked as such."

22. AI Si, "What Is a State Secret," published in Confidentiality Work, No. 4, 2019; LI Weiguo, "Discussion on the Legal Nature of Secrecy Level Appraisal," published in Collected Papers on Confidentiality Work, 2020 Volume, First Issue.

23. LI Weiguo, "Discussion on the Legal Nature of Secrecy Level Appraisal," published in Collected Papers on Confidentiality Work, 2020 Volume, First Issue.

[25]Textbook Compilation Group of the State Secrets Administration: "Introduction to Secrecy Work", published by Jincheng Press in 2013, Page 338.

[26]Li Weiguo: "Research on Confidentiality Law and Governance in Contemporary China", published by Jincheng Press in 2020, Pages 1970-198.

27Paragraph 4 under Article 20 of the Law on the Protection of State Secrets stipulates: "If an organ or unit determines during the decision-making and handling of relevant matters that certain items need to be kept confidential but later decides to disclose them based on work requirements, they shall be deemed declassified upon formal announcement." Article 24 stipulates: "Organs and units shall review the state secrets determined by them annually. When the confidentiality period of a state secret has expired, it shall be declassified spontaneously. If, during the confidentiality period, the material no longer qualifies as a state secret due to adjustments to the scope of confidential matters or if disclosure would not harm national security and interests and does not require continued confidentiality, it shall be promptly declassified; and if the confidentiality period needs to be extended, the classification level, confidentiality period, and scope of knowledge shall be redetermined before the original confidentiality period expires. Early declassification or extension of confidentiality period shall be decided by the original classification authority or its superior organ."

28 Article 22 of the Regulations for the Implementation of the Law on the Protection of State Secrets stipulates: "If an organ or unit determines that a state secret it has classified meets the provisions for declassification or modification under the confidentiality law, it shall promptly declassify or modify it. If an organ or unit determines that a state secret not classified by itself meets the provisions for declassification or modification under the confidentiality law, it may make declassification or modification suggestions to the original classification authority or its superior organ or unit. State secret archives that have been lawfully transferred to national archives at all levels shall be subject to declassification review by the original classification authority in accordance with relevant state provisions."

29 Paragraph 1 under Article 7 of the Interim Provisions on the Declassification of State Secrets stipulates: "Declassification of state secrets shall be the responsibility of the organ or unit that classified the item as a state secret (hereinafter referred to as the original classification authority). Other organs or units may propose declassification suggestions to the original classification authority."

31. Article 36 of the Data Security Law: "The competent authorities of the People's Republic of China shall handle requests from foreign judicial or law enforcement authorities for the provision of data in accordance with relevant laws, or international treaties and agreements concluded or acceded to by the People's Republic of China, or under the principle of equality and reciprocity. Without the approval of the competent authorities of the People's Republic of China, no organization or individual within the territory of the People's Republic of China may provide data stored within the territory of the People's Republic of China to foreign judicial or law enforcement authorities."

32. Article 19 of the Measures for Security Assessment of Data Export: "The 'important data' referred to in these Measures means data that, once tampered with, destroyed, leaked, or illegally acquired or used, may endanger national security, economic operations, social stability, public health, and safety, among others."

[32]See Li Xiansen: "Conflicts and Responses between Extraterritorial Collection of Civil Evidence and Data Export Regulation", published in 2025 Issue 1 of the Comparative Law Studies, Page 205. This article is a research result of the 2024 ministerial-level scientific research project on "Countermeasures for China to Respond to the Expansion of the Extraterritorial Application of European and American Data Laws" (Project Number: 24SFB4023) funded by the Ministry of Justice.

34. http://ilr.whu.edu.cn/d/file/zxqk/dqml/2023-11-06/d4c0df334c186b552f0cbbc075b45799.pdf

35. https://www.kwm.com/cn/zh/insights/latest-thinking/exit-of-foreign-related-civil-and-commercial-evidence.html

36. https://www.moj.gov.cn/pub/sfbgw/jgsz/jgszzsdw/zsdwsfxzjlzx/sfxzjlzxxwdt/202404/t20240408_497186.html

# Resume

Zhang Hong

Professor and Doctoral Supervisor at the School of Law, Beijing Normal University, holding a Doctorate in Law. My expertise spans Administrative Law, Administrative Procedure Law, State Compensation Law, and Securities Regulation.



Executive Director and Deputy Secretary-General of the Administrative Law Research Association, China Law Society

Deputy Director and Secretary-General of the Government Regulatory Affairs Committee, Administrative Law Research Association, China Law Society

Executive Director of the Association of Cross-Strait Legal Exchange

Deputy Chairperson of the Legal Work Committee, China Society of Emergency Management

Member of the Administrative Litigation Theory Committee, Judicial Theory Research Association, China Law Society

Advisor to the Beijing Enterprise Legal Risk Prevention and Control Research Association

Member of the Expert Panel for the National Rule-of-Law Government Construction, Office of the Commission for Overall Law-Based Governance of the CPC Central Committee

1

Member of the Advisory Group on Administrative Approval System Reform, State Council General Office

Member of the Expert Committee for the Review of Regulatory Filing and Documentation, Ministry of Justice of the PRC

Member of the Expert Group on Business Environment Optimization, State Administration for Market Regulation

Member of the Legal Expert Pool, Beijing Municipal Committee of the CPC

Legal Advisor to the Chengdu Municipal Government and the Chengdu Municipal CPC Committee

Legal Advisor to the Ordos Municipal Government

Expert Advisor to the Legal Affairs Department, China Securities Regulatory Commission

Non-Permanent Member of the Fifth Administrative Reconsideration Committee, Beijing Municipal Government

Expert Member of the Expert Advisory Committee, Beijing Financial Court

Legal Expert of the Beijing Municipal Planning and Natural Resources Commission

I have been consistently invited to provide legislative and policy advice to key government bodies, including the Publicity Department of the Central Committee of the CPC, the Office of the Central Cybersecurity Affairs Commission, the National Development and Reform Commission, the Ministry of Finance, the Ministry of Justice, the State Administration for Market Regulation, the Compensation Committee Office of the Supreme People's

2

Court, the Legal Department of the China Securities Regulatory Commission, the Ministry of Science and Technology, the Ministry of Agriculture and Rural Affairs, and the National Natural Science Foundation of China.

I have contributed to the revision of critical laws, including the *State Compensation Law*, the *Administrative Procedure Law*, and the *Administrative Reconsideration Law*. I have also played a key role in revising the *Administrative Penalty Law*. I have participated multiple times in seminars on the *Administrative Penalty Law*, organized by the China Law Society and the Legislative Affairs Commission of the Standing Committee of the National People's Congress. During these seminars, I submitted written proposals on issues such as the classification of administrative penalties and the link between administrative and criminal penalties, some of which have been adopted.

## Appendix: Key Academic Contributions Over the Last Decade

1)    Publications

1.  *Securities Administrative Law: Selected Issues* (Sole Author), China University of Political Science and Law Press, 2017.

2.  *Legal Regulation of Systemic Risk in Capital Markets* (Compiler), China University of Political Science and Law Press, 2016.

3.  *Handbook on the Interpretation and Application of the Administrative Procedure Law of the People's Republic of China*(Chief Editor), China Legal Publishing House, 2023.

4.  *Research Report on Securities Administrative Penalties in China* (Deputy Editor-in-Chief), National Academy of Administration Press, 2020.

5.  *Annual Report on the Rule of Law in Emergency Management in China* (2021–2011), China University of Political Science and Law Press, 2023.

2)    Research Papers

1.  *Scientific Setting of Administrative Fines to Achieve Proportionality Between Penalty and Offense*, published in *Chinese Rule of Law*, Issue 3, 2024.

2.  *The History and Prospects of China's Antitrust Law Enforcement*, published in the *Annual Report on China's Law-Based Government* (2023), Social Sciences Academic Press, 2024.

3.  *Implementing the Interim Measures for After-School Tutoring Regulation and Penalties to Advance Legal Governance*, published in *People's Education*, Issue 23, 2023.

4.  *Implementation of Administrative Filing in China and Legislative Considerations*, published in the *Annual Report on China's Law-Based Government* (2021), Social Sciences Academic Press, 2022.

5.  *Issues and Prospects of Earthquake Safety Evaluation System Reform*, published in *Technology for Earthquake Disaster Prevention* (CSSCI), Issue 1, 2022.

6.  *The "First Offense No Penalty" System in Administrative Penalties and Its Improvement*, published in *Business and Economic Law Review*, Issue 3, 2021.

7.  *The Current Status and Development of Theories on Administrative Penalties in China*, published in the *Annual Report on China's Law-Based Government* (2020), Social Sciences Academic Press, 2021.

8.  *Issues in Administrative Filing and Legislative Considerations*, published in the *Social Sciences in Guangdong* (CSSCI), Issue 4, 2021.

4

9. *The Bidirectional Link Between Administrative and Criminal Penalties*, published in *China Law Review* (CSSCI), Issue 5, 2020.

10. *Research on the Way of Setting Administrative Fines*, published in *China Legal Science* (a top legal journal), Issue 5, 2020.

11. *Let Administrative Matters Be Handled by the Administration and Judicial Matters by the Judiciary: Legislative Link Between Administrative and Criminal Penalties*, published in *ECUPL Journal* (CSSCI), Issue 4, 2020.

12. *Judicial Review Standards for Self-Regulatory Actions by Stock Exchanges: A Case Review of Ye Weigang v. Singapore Exchange*, published in *Law and Economy* (CSSCI), Issue 2, 2020.

13. *Practical Challenges and Solutions to Exemptions from Administrative Penalties*, published in *Justice of China*, Issue 4, 2020.

14. *Implementing "No Penalty for Minor Violations" to Enforce Exemptions from Penalties*, published in *Market Supervision and Management*, Issue 6, 2020.

15. *Research on the Procedural Link Between Administrative and Criminal Penalties in the Context of Limited Law Enforcement Resources*, published in *Administration Reform*, Issue 2, 2019.

16. *The Key Points of Compensation for Wrongful Supervisory Acts*, published in *Administrative Law Review* (CSSCI), Issue 6, 2018.

17. *Legal Status and Remedies of the Taiwan Stock Exchange*, published in *Administration Reform*, Issue 1, 2018.

18. *The "Regulatory Sandbox" and Its Compatibility with China's Administrative Law System*, published in *Zhejiang Academic Journal* (CSSCI), Issue 6, 2017.

19. *Toward Smart Securities Regulation*, published in *China Legal Science* (a top legal journal), Issue 6, 2017.

20. *Legal Issues in the Regulations on the National Natural Science Fund*, published in the *Bulletin of National Natural Science Foundation of China* (CSSCI), Issue 1, 2016.

21. *Research on the Administrative Law Enforcement System for Counterterrorism in Contemporary China*, published in the *Journal of Beijing Normal University (Social Sciences)* (CSSCI), Issue 3, 2016.

22. *On the Boundaries of Administrative Filing*, published in the *Journal of Chinese Academy of Governance* (CSSCI), Issue 3, 2016.

5

23. *Research on Administrative Filing in Securities Regulation: Analysis of Reporting and Filing by Securities Companies with CSRC Branches*, published in *Securities Market Herald* (CSSCI), Issue 3, 2016.

24. *Tackling Challenges in Administrative Law Enforcement Settlements: An Observation on Settlements in Administrative Law Enforcement for the Securities Market*, published in *Administrative Law Review* (CSSCI), Issue 2, 2015, reprinted in *Chinese Social Science Digest*, Issue 8, 2015.

25. *Challenges in and Responses to Securities Regulatory Measures*, published in *Tribune of Political Science and Law* (CSSCI), Issue 4, 2015.

26. *Analysis of Issues in Securities Administrative Enforcement Settlements*, published in *Administration Reform*, Issue 5, 2015.

27. *An Introduction to the Guide on Administrative Fines under the German Securities Trading Act*, published in *Securities Law Review*, Volume 14, 2015.

28. *The Evolution of State Responsibility: Distinguishing Between Criminal Compensation and Criminal Redress*, published in *Study & Exploration* (CSSCI), Issue 11, 2015.

29. *How Should We Protect State Responsibility from Being "Trampled"*, published in *Phoenix Weekly*, Issue 6, 2015.

3)    Projects

1. A scientific research and innovation talent development project supported by the Fundamental Research Funds for Universities from the Central Government: The Application and Regulation of Artificial Intelligence in the Development of Digital Rule of Law Governance (2024)

2. A project commissioned by the Publicity Department of the Central Committee of the CPC: Discretionary Issues in Administrative Penalties for the Film Industry (2024)

3. A project commissioned by the Administrative Enforcement Coordination and Supervision Bureau of the Ministry of Justice: Legislative Research on Administrative Filing Regulations (2024)

4. A project commissioned by the State Administration for Market Regulation: Consultation on Optimizing the Administrative Recommendations System to Eliminate Abuse of Administrative Power and Regulate Law Enforcement (2024)

5. A project commissioned by the Department of Price of the National Development and Reform Commission: Post-Implementation Evaluation of Government Pricing Policies (2024)

6. A project commissioned by the Department for Supervision of After-School Tutoring Institutions of the Ministry of Education: Research on Delegated Law Enforcement for After-School Tutoring (2024)

7. A project commissioned by the Department of Supervision, Evaluation, and Research Integrity of the Ministry of Science and Technology: The Development of Administrative Measures and Criminal Regulation for Addressing Academic Paper Mills (2024)

8. A project commissioned by the Department of Policy and Regulation of the Ministry of Agriculture and Rural Affairs: Fair Competition Review of Agricultural and Rural Policies and Regulations (2024)

9. A project commissioned by the State Administration for Market Regulation: Consultation on the Antitrust Consultation System (2023)

10. A project commissioned by China Financial Futures Exchange: Research on the Nature of Self-Regulatory Authority of Futures Exchanges (2023)

11. A project commissioned by the Department of Supervision, Evaluation, and Research Integrity of the Ministry of Science and Technology: Drafting of the *Measures for the Management of the Database of Severe Breaches of Research Integrity* (2022)

12. A project commissioned by the Department of Policy and Regulation of the Ministry of Education: Research on Government Regulation of Private Capital Investment in the After-School Tutoring Industry (2021)

13. A project commissioned by the China Earthquake Administration: Research on the Development of the Legal and Regulatory System for Earthquake Disaster Prevention and Mitigation (2021)

14. A project commissioned by the Zhengzhou Commodity Exchange: Research on Self-Regulation of Futures Exchanges (2021)

15. A project by the National Natural Science Foundation of China: Research on the Nature of Handling Academic Misconduct by Research Funding Agencies (national-level, 2020)

16. A project commissioned by the State Council General Office: Research on the Administrative Filing System (2020)

17. A project commissioned by the State Administration for Market Regulation: Research on the Revision of the *Provisions on Administrative Penalties for Price Violations* (2019)

18. A project commissioned by the Beijing Municipal Commission of Planning and Natural Resources:

Research on the Revision of the *Beijing Regulations on Prohibiting Illegal Construction* (2019)

19.  A project commissioned by the State Administration for Market Regulation: Research on Enhancing the Legal System for Administrative and Criminal Law Enforcement in Market Regulation (2019)

20.  A project by the National Natural Science Foundation of China: Research on the List of Powers and Responsibilities of the National Natural Science Foundation of China (national-level, 2018)



# TRANSLATION CERTIFICATION

Date: July 2, 2025

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese (PRC)

To:

- English (USA)

The documents are designated as:

- 张红教授的声明

Emily Paras, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of Emily Paras

QUESTEL CONFIDENTIAL

4001 S 700 East, Suite 500 #B17
Salt Lake City, UT 84107

**MORNINGSIDE**
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2025/07/02**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese (PRC)

To:

- English (USA)

The documents are designated as:

- 张红个人简历（2024-详细版)

Jordan Woodard, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

*Jordan Woodard*

Signature of **Jordan Woodard**, Project Manager

**QUESTEL CONFIDENTIAL**

**4001 S 700 East, Suite 500 #B17**
**Salt Lake City, UT 84107**

# 美国纽约东区
# 地方法院

| | |
|---|---|
| 关于蔚来汽车公司证券的<br><br>诉讼 | 案号 1:19-cv-01424-NGG-JRC<br><br>集体 |

## 张红教授的声明

我，张红，在此声明并陈述，在伪证罪的惩罚下，以下内容是基于我所知、所掌握的信息及我所相信的情况真实且正确的。如果被要求作证，我能够并且会就以下事实提供合格的证词。

1.　我是北京师范大学法学院教授、博士生导师、法学博士。主要研究领域为行政法、行政诉讼法、国家赔偿法、证券规制。我的简历见附件。

2.　原告集体代理律师美国罗森律师事务所（The Rosen Law Firm, P.A.，以下简称罗森律师事务所），聘用我就支持原告要求蔚来汽车公司（"蔚来"）出示某些文件和信息中涉及的中国法律的应用提供意见。具体来说，我被要求就中国法律是否禁止蔚来披露与"政府合作伙伴"合作开展的已取消的建设项目相关的某些文件和通讯。

3.　在形成我的意见的过程中，我审查并了解到以下信息：

a. 蔚来在 2024 年 10 月 14 日提供了《依照中国法律扣留文件的分类记录》，该记录记载了蔚来拒绝提供的信息的日期范围、主要涉及人员、类别描述和适用的中国法律条款；

b. 上海国际汽车城（集团）有限公司与上海蔚来汽车有限公司在 2017 年 11 月达成了《关于蔚来纯电动整车工厂项目框架协议》；

c. 罗森律师事务所于 2020 年 9 月 18 日提交了对于蔚来公司及其他被告的二次修订版集体诉讼的诉状。

4. 我此次聘用的小时费率为 700 美元/小时。我的费用不受本案的结果或我在此所表达的任何意见所影响。

5. 我保留在得知其他可能影响本案工作的信息、证据、论点或分析时，修订、完善或补充我分析和意见的权利。

**意见摘要**

6. **意见一**：政府信息以公开为原则，不公开为例外。只有当政府机关将信息指定或归类为秘密或机密时，才可以不公开。

7. **意见二**：对于政府信息是否被定义为"秘密"、"工作秘密"、"情报"、"敏感信息"、"内部"或其他非公开信息，有着严格明确的定义和流程。政府机关必须对此类信息进行指定或分类。此决定必须以书面形式作出或呈现。蔚来声称收到了政府关于隐瞒扣留信息的"指示"，但除非

2

出示书面形式的证据，否则不足以证明这些信息被列为机密或非公开信息。此外，该指示本身不是秘密或机密。如果以书面形式存在，蔚来可以而且应该提供指示文件，以证明提供相关信息将违反中国法律。截至目前，蔚来尚未提供任何有效证据证明中国政府相关部门已以书面形式将蔚来拒绝提供的文件及信息确定为国家秘密或其他应当保密的信息，也没有任何证据表明已明确以书面形式禁止其披露。

8. **观点三**：鉴于所扣留文件的性质，政府机关极不可能将其指定或归类为机密或非公开信息或以其他方式禁止其披露。这些文件是关于一项交易的通信和相关信息。该交易旨在为一家私人公司取得土地使用权并建造一座电动汽车生产工厂，后来被取消。所有这些文件均不属于通常被指定或归类为"机密"、"工作机密"、"情报"、"敏感信息"、"内部"或其他非公开信息的文件类型。

9. **观点四**：如果文件没有以书面形式指定或分类为非公开信息，蔚来汽车就不会违反《刑法》第 111 条第 5 款的规定。

10. **观点五**：假设*在辩论过程中*政府指示蔚来不要提供该信息，那么蔚来可以通过正式的流程请求政府取消指定或解密已被指定或归类为"机密"、"工作机密"、"情报"、"敏感信息"、"内部"或其他非公开信息的信息，以便蔚来提供本诉讼中的文件。没有证据表明蔚来曾付出任何努力来获得提供所要求文件的许可。

3

11.    **观点六：**《数据安全法》并不禁止提供被扣留的信息文件。由于被扣留的文件不属于《数据安全法》(DSL) 定义的"重要数据"，因此蔚来无需获得政府批准即可将这些文件转移给本私人诉讼中的原告。

12.    **观点七：**目前尚无任何中国公司因在诉讼中向海外传输文件而受到中国政府的罚款或其他惩罚。

13.    **观点八：**原告不太可能通过《海牙公约》获取这些文件。

<u>意见详述</u>

**I.    中国法律推定，除非政府机关将信息指定或归类为机密、情报或非公开信息，否则政府信息应当公开。**

14.    政府信息公开是中国法治政府建设的一项重要内容。中共中央办公厅、国务院办公厅《关于全面推进政务公开工作的意见》（2016年）[1]，《国务院关于印发全面推进依法行政实施纲要的通知》（国发〔2004〕10 号）[2]，中共中央、国务院《法治政府建设实施纲要（2021－2025 年）》[3]，《行政处罚法》[4]，《政府信息公开条例》[5]，2018 年修正的《公安机关办理行政案件程序规定》[6]等重要法律法规和规范性文件，都规定了政府信息公开的原则、范围、方式、程序与要求等内容。其中，《政府信息公开条例》第 5 条明确规定："行政机关公开政府信息，应当坚持以公开为常态、不公开为例外，遵循公正、公平、合法、便民的原则。"

15. 国家保密局负责人在 2024 年 2 月"国家保密局负责人就《中华人民共和国保守国家秘密法》答记者问"中，针对"信息公开与国家秘密保护的关系"问题，回答；"信息公开与国家秘密保护是一个问题的两个方面，是辩证统一的，都是为了维护国家和人民的利益。该公开的不公开，不该公开的公开，都会损害国家和人民的利益。"

16. 从权威学者的观点来看，周佑勇教授（现为第十四届全国人大社会建设委员会专职委员，原中央党校政治和法律教研部主任）认为："行政机关应当将实施行政行为的依据、过程和结果向公民、法人和其他组织公开，并将政府信息向社会公众公开。依法不应当公开的除外。" [7]

17. 实践中，中国政府机关定期或不定期发布的政务公开信息，包括中国证券监督管理委员会公开的"政务信息" [8]和工业和信息化部"政务公开" [9]页面上有大量公开的政府信息。此外，工业和信息部网站开通了信息查询系统，任何人均可查询新能源汽车企业及产品公告等信息。自 2009 年开始，在国家科技部、财政部、发改委、工信部四部委的指导下，中国汽车技术研究中心每年度组织编写《节能与新能源汽车年鉴》并公开出版，"立足国内面向国际，以专家视点和权威数据全面跟踪、评价行业发展，全面汇集政府、企业相关信息"[10]。

18.    总而言之，虽然被扣留的文件属于"政府信息"，但这并不意味着它们不能公开。事实上，相当一部分政府信息需要依照中国《政府信息公开条例》的规定主动公开。

**II.    关于信息是否被指定或归类为秘密或非公开有着严格且明确的流程。蔚来拒绝提供的信息不属于《保守国家秘密法》第 2 条和第 13 条所规定的"国家秘密"，也不属于《保守国家秘密法》第 64 条规定的"工作秘密"，至少没有书面证据表明政府机关已经将其指定或归类为此类。**

a.    《保守国家秘密法》第 2 条、第 13 条 [11] 规定中的"国家秘密"

19.    蔚来引用了《保守国家秘密法》第 2 条和第 13 条的规定，声称相关信息构成"国家秘密"，从而拒绝提供相关信息。

20.    在中国法下，将某特定信息定义为"国家秘密"需要由特定机关经过特定的审批程序，且必须有书面形式的确认，方能认定。可是截至目前，我还没有看到蔚来提供了任何此类证据。

21.    根据中国法律，国家秘密处于不公开信息中的最高级，且某一信息成为国家秘密需要满足严格的实体、程序、时空三方面要件。只有在其所涉及的具体内容已经经过法定定密程序，同时符合实质、程序和时空要件，即具备国家安全和利益属性、由法律授权的定密主体及定密责任人确定[12]的前提下，相关信息才构成国家秘密。国务院办公厅政府信息与政务公开办处长后向东专门证实了这一点。

6

22.    总之，一项关系国家安全或国家利益的事项，只有通过有权机关依照法定程序确定下来，才能成为国家秘密。[13], [14]

b.    《保守国家秘密法》第 64 条[15]中的规定的"政府机关的工作秘密"或"敏感政府信息"

23.    蔚来援引《保守国家秘密法》第 64 条，认为相关信息构成"敏感政府信息"。然而，《保守国家秘密法》第 64 条所涉及的是"政府工作秘密"。

24.    根据《保守国家秘密法》第 64 条的规定，"政府机关的工作秘密"需要经过特定的审批程序，并获得相关政府机关的书面审批核准，才能认定。[16]

25.    此外，相关政府机关应必须正式将信息指定为工作秘密并明确其知悉范围，在相应载体上作出工作秘密标志，并报其组织内负责确定国家秘密的定密责任人审核批准。确定工作秘密必须作出书面记录，注明指定人、定密责任人、确定依据或者理由等。政府机关必须在文件上标注"内部"或"内部事项，请谨慎处理"的字样。

26.    综上所述，蔚来保留的信息不构成工作秘密，因为没有证据表明政府机关已将其指定为工作秘密，也没有证据表明这些文件带有"内部"或"内部事项，请谨慎处理"等工作秘密标记。

c. 蔚来没有提供任何证据表明任何扣留文件被指定为"机密"、"工作秘密"、"情报"或其他非公开内容；如有任何此类指定，蔚来会获得书面确认。

27. 中国法律上，对于哪些政府信息属于"国家秘密"、"工作秘密"、"敏感信息"、"内部信息"、"情报"等，只能由政府机关及其授权的机关、单位等法定主体来确定。此决定以书面形式作出。国家秘密的定密机关主要指依法拥有确定、变更和解除国家秘密权力的特定主体。根据中国《保守国家秘密法》及相关规定，具有定密权的机关、单位主要包括中央和国家机关、省级机关、设区的市级机关。

28. 对于企业而言，一般情况下并不拥有定密权。但在特定情形下，如果企业承担了涉密科研、生产或者其他涉密任务，且经有权机关的定密授权，可以在授权范围内进行派生定密工作。同时，企业开展派生定密，必须严格依据《保守国家秘密法》以及所获得的授权范围和条件进行。

29. 截至目前，蔚来尚未提供任何证据证明中国政府相关部门已以书面形式将蔚来拒绝提供的文件及信息确定为国家秘密或其他应当保密的信息，也未明确以书面形式禁止其披露，同时也未提供任何证据证明蔚来或者上海汽车城属于经有权机关定密授权的派生定密的主体。

30. 在中国法院审判实践中，如果一方当事人主张他持有的相关证据属于国家秘密而需要保密、不得公开，那么必须向对方当事人和法

8

院提交关于该证据属于国家秘密的证明，比如标记为"国家秘密"或"内部信息"的文件（文件内容不对法院和当事人公开），或者有权定密的机关的书面认定和说明，方能被认定为国家秘密从而豁免提交义务。

31. 缺乏中国政府机关的书面认定（证明扣留的文件是国家机密或需要保密的信息）这一点在本案中尤为突出，因为被扣留的绝大多数文件涉及蔚来与两家独立注册公司之间的通信，而这两家公司都不是政府部门或机构。

32. 上海国际汽车城（集团）有限公司是一家独立注册的有限责任公司，虽然属于国有企业，但并不是政府机构或政府部门。

33. Century 3 是一家与政府无任何关联的私营建筑管理公司。

34. 如果政府机关提供了书面确认，证明所扣留的文件属于国家机密、情报或其他非公开信息，则该书面确认本身并非非公开信息，蔚来可以在本次诉讼中披露该确认书。

35. 如果政府确实将任何扣留文件指定为国家机密、情报或其他非公开信息，蔚来可以并且应该在本诉讼中提供此类确认书。

**III.    扣留文件的描述表明其不属于政府机关指定的机密、情报或非公开信息类型。**

36. 蔚来在《中国扣留文件记录》中声明拒绝向原告提供的文件和信息可分为两类：一类是与"政府"相关的信息，包括"与政府合作方签署的备忘录、协议及涉及敏感信息的相关文件"（第 1 类和第 2 类）、"关

9

于政府文件相关非公开信息的交流，包括政府批准申请、政府决策及反馈意见"（第 3 类）、"涉及政府许可证及其附带文件的非公开信息的交流"（第 4 类）、"关于政府补贴及附带文件的非公开信息的交流"（第 6 类）、"关于政府政策及其附带文件的交流"（第 7 类），另一类是涉及"地理测绘信息及相关电子邮件通讯"的其他"非公开"信息（第 5 类）。

37.　虽然蔚来对文件类别的描述比较抽象和粗略，但这些描述均未表明这些类别的文件属于《保守国家秘密法》（第 2、13 和 64 条）规定的"国家秘密、情报或其他非公开信息"。

38.　《保守国家秘密法》第 2 条、第 13 条和《保守国家秘密法实施条例》第二章，从实体、程序、时空对"国家秘密"进行了界定。具体是指"依照法定的程序确定的，泄露后可能损害国家在政治、经济、国防、外交等领域的安全和利益的，一定时间内只限一定范围的人员知悉的重要事项"。

39.　国家秘密要求"绝对保密"，工作秘密则要求"相对保密"，但信息还必须通过严格的测试，以证明其保密的必要性。见 《工作秘密管理暂行办法》第 3 条。

40.　根据我获知的信息，蔚来在其《中国扣留文件记录》中所谓的"政府"主体是指上海国际汽车城（集团）有限公司（"上海汽车城"）。

41.　上海国际汽车城是上海市嘉定区国有独资有限责任公司，承担上海国际汽车城产业基地部分开发、建设、运营等职能，其股东（嘉定区国有资产管理委员会）以其出资额为限对公司承担责任。

42.　上海国际汽车城是企业而非政府部门。因此，原则上，与上海国际汽车城及上海国际汽车城产业基地相关的信息不构成政府信息。即使其经营部分涉及政府监管事务，一般情况下也不可能是"国家秘密"或"工作秘密"，除非它提供相反证据予以证明。因此，《保守国家秘密法》和《最高人民法院关于审理为境外窃取、刺探、收买、非法提供国家秘密、情报案件具体应用法律若干问题的解释》第 5 条的规定均不适用。同时，上海国际汽车城也不是"关键信息基础设施"。

43.　因此，蔚来与上海国际汽车城之间关于工厂融资和建设的往来函件（第 1-3 类），是公开信息，不属于"国家秘密"、"工作秘密"、"情报"。同样，蔚来员工之间关于原定工厂项目的内部函件，涉及电动汽车补贴等公共政策（第 6 类和第 7 类），是公开信息，不构成"国家秘密"、"工作秘密"、"情报"。

44.　就"涉及政府许可证及其附带文件的非公开信息的交流"和"关于政府补贴及附带文件的非公开信息的交流"（第 4 类和第 6 类）而言，《政府信息公开条例》第 2 条的规定："本条例所称政府信息，是指行政机关在履行行政管理职能过程中制作或者获取的，以一定形式记录、

11

保存的信息"。根据该条例第 5 条的规定"行政机关公开政府信息，*应当坚持以公开为常态*、不公开为例外，遵循公正、公平、合法、便民的原则。

45. 对于行政许可和政府补贴，也以公开为基本原则。例如，《行政许可法》第 5 条第 1 款、第 2 款规定："（第1款）设定和实施行政许可，应当遵循公开、公平、公正、非歧视的原则。（第 2 款）**有关行政许可的规定应当公布；未经公布的，不得作为实施行政许可的依据。行政许可的实施和结果，除涉及国家秘密、商业秘密或者个人隐私的外，应当公开。**未经申请人同意，行政机关及其工作人员、参与专家评审等的人员不得披露申请人提交的商业秘密、未披露信息或者保密商务信息，法律另有规定或者涉及国家安全、重大社会公共利益的除外；行政机关依法公开申请人前述信息的，允许申请人在合理期限内提出异议。"也就是说，只要不涉及国家秘密、商业秘密、个人隐私等，相关政府信息都应当予以公开。

46. 上述信息也不属于"商业秘密"。根据中国《反不正当竞争法》第 9 条第 4 款的规定，商业秘密是指不为公众所知悉、具有商业价值并经权利人采取相应保密措施的技术信息、经营信息等商业信息。

47. "商业秘密"的定义包含以下核心要素：一是不为公众所知悉（秘密性），二是具有商业价值（价值性），三是经权利人采取相应保密措施（保密性），包括签订保密协议（如员工保密条款、合作方保密合同）、对涉密信息进行物理隔离（如加密文件、限制访问权限）、设立保

密制度（如涉密区域管理制度、文件分级标识）、对接触涉密信息的人员进行保密培训等。然而，行政许可和政府补贴信息属于公开信息，不具有秘密性、价值性和保密性。

48. 此外，参与政府许可相关函件的蔚来人士之一是 Louis Hsieh（参见第 4 类"关键人物"参与）。我了解 Hsieh 是美国公民。[1]这些通信涉及一名美国公民，这进一步削弱了这些通信涉及国家机密或国家情报的主张。

49. 同时如前所述，构成"国家秘密"还需要满足"时空要件"，也就是在"一定时间内只限一定范围的人员知悉"。且根据《国家秘密鉴定工作规定》第 7 条第（三）项的规定，已经依法公开或者泄露前已经无法控制知悉范围的事项，不得鉴定为国家秘密。[17]这些函件因为已经无法控制知悉范围，一般不会被认定为"国家秘密"。

50. 我还注意到，第 4 类通信的对方是一家私营建筑项目管理公司 Century 3。原则上，一家私营建筑管理公司与蔚来之间关于工厂建设的通信不构成政府信息。如果其中涉及"国家秘密"、"工作秘密"、"重要数据"、"核心数据"等，不能提供的，应提供相关信息属于"国家秘密"、"工作秘密"、"重要数据"、"核心数据"等的书面证明。

---

[1] UW_MS_00146032（Louis Hsieh 的美国护照）。

51.　最后，蔚来没有正当理由隐瞒其计划在上海建厂的"地理测绘信息"（第 5 类），因为该工厂的位置已经公开。

52.　综上所述，根据蔚来对文件的描述，没有理由认为被扣留的文件属于触犯中国国家保密法而禁止披露的文件类型。与上海国际汽车城（一家独立注册的有限责任公司）和 Century 3（一家私营建筑管理公司）就一家私营公司工厂的建设和融资进行的沟通，应推定不属于政府信息。关于行政许可和补贴的信息属于公开信息，尤其是在这些信息已经披露给蔚来首席财务官 Louis Hsieh（美国公民）的情况下。最后，鉴于工厂位置已公开且为人所知，因此没有正当理由隐瞒有关蔚来计划工厂的地理测绘信息。

**IV.　蔚来拒绝提供的信息不违反《刑法》，因为这些信息不属于《最高人民法院关于审理为境外的机构、组织、人员窃取、刺探、购买、非法提供国家秘密或者情报案件具体应用法律若干问题的解释》第 5 条[18]规定中的"国家秘密情报"（"特定情报"）**

53.　蔚来提供的被扣留信息不属于《刑法》第 111 条或其司法解释《最高人民法院关于审理为境外的机构、组织、人员窃取、刺探、购买、非法提供国家秘密或者情报案件具体应用法律若干问题的解释》第 5 条[19]规定的"国家秘密情报"（一般被称为"特定情报"）。

54.　该司法解释第 5 条规定"为境外窃取、刺探、收买、非法提供的……以为境外窃取、刺探、收买、非法提供国家秘密罪定罪处罚"。

14

但在诉讼中进行举证本身是一项合法活动，而不是所谓的"窃取、刺探、非法提供"等违法行为。

55.　个人违反该司法解释第 5 条被起诉的前提是，泄露的是已经被政府机关确定为"国家秘密情报"的信息，且已在该信息的文件等载体上标注标识。

56.　也就是说，定密是构成该罪的必经程序和必备要件。国家秘密必须在其载体上标注国家秘密标识。[20]国家保密局李伟国处长在公开发表的文章中说："定密的核心作用之一就是使国家秘密活动的参与者能够合理地预期自己行为的法律后果。"[21]

57.　原则上只有某一事项经过定密程序确定为国家秘密，并且只是因为某种原因没有"标密"，而行为人知道或者应当知道这一事项属于国家秘密的，才构成该罪。某一事项虽然"与国家安全和国家利益有关"，但没有经过定密程序被确定为国家秘密，则不能构成"泄露国家秘密罪"的对象。[22]

58.　中国《刑法》第 111 条中的"情报"，涉及到"为境外窃取、刺探、收买、非法提供国家秘密、情报"罪，指的是"特定情报"，这是一个非常狭义的概念。情报鉴定的目的是识别和认定国家秘密范畴之外的具有刑事诉讼中"情报"属性的信息或事项，如果泄露，可能会违反刑事法律。

59.    要追究刑事责任，"特定情报"必须满足以下 3 个条件：(i) 源于政府部门的活动；(ii) 其泄露必然危及国家安全、公共安全、经济安全或者社会稳定，和 (iii) 必须由政府部门保密。[23]

60.    尽管未作标记或归类，但如果蔚来主张其拒绝提供的信息属于《刑法》第 111 条和《最高人民法院关于审理为境外窃取、刺探、收买、非法提供国家秘密、情报案件具体应用法律若干问题的解释》第 5 条规定的情报，那么蔚来必须向省级以上保密行政管理部门提请鉴定和确认，然后才能提出上述主张。然而，蔚来并没有提供任何证据。

61.    实践中还有极其特殊的一类情况，即泄露的是尚未经确认、也未标明属于"国家秘密信息"的信息。这类信息在审查过程中会被要求进行事后密级鉴定（即"事后定密"）。但对于事后定密，中国法律和制度等规定非常严谨。[24]，[25]原则上如果某一关系国家安全和利益的信息未及时被依照法定程序确定为国家秘密，一旦发生泄露，也不能在事后补办定密手续，然后再以泄露国家秘密为由对泄密责任人追究法律责任。[26]根据我的专业判断，蔚来拒绝提供的文件和信息极不可能属于这种特殊情况。

62.    因此我认为，蔚来拒绝提供的文件和信息不属于《刑法》第 111 条规定的情报，蔚来援引该司法解释第 5 条主张披露将构成"为境外窃取、刺探、收买、非法提供国家秘密、情报罪"，没有根据。

**V.** 假设这些材料属于机密，蔚来并未提供任何证据证明其已利用中国法律规定的正式程序请求中国政府解密，以便蔚来能够在本次诉讼中提供这些材料。

63. 在中国法律上，存在正式程序来请求披露被列为国家机密、情报或其他非公开信息，这就是解密程序。根据中国《保守国家秘密法》[27]《保守国家秘密法实施条例》[28]《国家秘密解密暂行办法》[29]的规定，解密分为自行解密和审查解密两种情形：（1）自行解密：机密材料已明确标注保密期限，且期限届满后未延长，将自动解密。例如，某份机密文件标注"机密★20 年"，则 20 年后无需额外程序即可公开。（2）审查解密：即使保密期限未满，若符合以下条件，原定密机关、单位（即最初确定该材料为机密的机关或单位）可主动解密：保密法律法规或保密事项范围调整后，该材料不再属于国家秘密；公开后不会损害国家安全和利益，且符合现行法律规定的公开要求。

64. 实践中，企业申请解密的通常路径是向原定密机关提出申请。本案中，蔚来作为材料的持有者或关联方，可直接向原定密机关提交书面解密申请。若材料涉及多个机关共同定密，需由牵头机关协调处理。条件是：需说明材料的具体名称、密级、保密期限、解密理由（如诉讼中举证需要），并附上案件受理通知书等证明文件。原定密机关需在收到申请后启动内部审核程序，包括承办人拟办、定密责任人审定，并书面通知知悉范围内的机关或人员。

65. 我没有看到任何证据表明蔚来针对《中国扣留文件记录》中列出的信息实施了上述任何正式程序。

## VI. 蔚来拒绝提供的信息不属于《数据安全法》第 36 条规定的"数据"[30]

66. 蔚来引用了《数据安全法》第 36 条来拒绝提供相关信息。

67. DSL 涵盖的数据分为两种类型。第一种是"重要数据"。二是除"重要数据"以外的所有数据（"普通数据"）。

68. 首先，《数据安全法》第 36 条不能用来支持蔚来拒绝提供相关信息。因为该条规定的是"非经中华人民共和国主管机关批准，境内的组织、个人不得向外国司法或者执法机构提供存储于中华人民共和国境内的普通数据"，即禁止当事人将中国境内的数据提供给美国法院或执法机构。但本案中请求提供文件的当事人是私人原告，而非美国司法或执法机构。

69. 根据中国法律，向外国原告提供文件与向外国司法机关提供文件有着根本区别。从行为性质上讲，向外国原告提供文件属于民事主体间的证据交换，是民事主体之间的行为；而向外国司法机关提供文件属于国家主权范围内的司法协助。

70. 在程序要求上，向外国原告提供文件需要遵守跨境数据流动规则，而向外国司法机关提供文件通常需要遵守法定的司法协助程序。

71. 因此，只要相关数据不属于"重要数据"，且不是"向外国司法或者执法机构提供"，就无需获得政府部门的许可，因此向原告提供相关数据不违反《数据保护法》。

72. 其次，《数据保护法》仅要求在将"重要数据"传输至境外时寻求许可。

73. 根据以上的规定，只有在蔚来拒绝提供的信息属于"重要数据"和"核心数据"的情况下，向境外提供这些信息才需要走"经中华人民共和国主管机关批准"的程序。

74. 至于哪些数据构成"重要数据"，国家网信办 2022 年发布的《数据出境安全评估办法》规定"重要数据，是指一旦遭到篡改、破坏、泄露或者非法获取、非法利用等，可能*危害国家安全、经济运行、社会稳定、公共健康和安全*的数据。[31]

75. 蔚来有义务举出相应证据来证明这些信息已"依法报送相关的保密行政管理部门"，且相关数据已"被相关保密行政管理部门确定为重要数据"或"被相关部门或地方作为重要数据通报或公开发布"。然而，截至本声明发布之日，我尚未看到蔚来提供证据来证明相关信息属于"重要数据"。

76. "重要数据"和"核心数据"的认定和分类有着相对严格的实体标准和程序规则。

77.    我认为，蔚来扣留的关于一座从未建成的计划中工厂的信息不符合"重要数据"的定义和列举事实。与房地产交易有关的信函、环保报告、证照审批、合同等文件等信息不属于"重要数据"。这些文件不符合认定标准，不会"危及国家安全、经济运行、社会稳定、公共健康和安全"，不属于"国家网信部门、国家发展改革委、工业和信息化部、公安部、交通运输部等国务院有关部门确定的其他可能危害国家安全、公共利益或者个人、组织合法权益的数据"。相反，这些文件大多属于"企业生产经营和内部管理信息"，不属于"重要数据"类别。

78.    因此，蔚来应当举出相应证据来证明这些信息已"依法报送有关的保密行政管理部门"并已被"相关保密行政管理部门"认定，或者已"作为重要数据被相关部门、地区告知或者公开发布"。

79.    然而截至目前为止，我还没有看到蔚来提供了相关证据，足以证明其拒绝提供的信息已经过中国法律法规所要求的相关程序，被正式认定为"国家秘密"、"情报"、"政府机构的工作秘密"、"重要数据"、"核心数据"、"一旦泄露可能危害国家安全或者社会公共利益的其他文件和资料"。

## VII.    蔚来不会因向原告提供其拒绝提供的信息而受到罚款

a. 蔚来或其他单位从未因向境外单位和人分享的文件和信息而受到任何罚款

80.    经过调查和研究后，据本人了解到的信息，目前中国尚未出现因违反涉诉数据信息跨境传输规则而受到处罚的案件。最新发表的、司法部 2024 年度法治建设与法学理论研究部级科研项目"我国应对欧美数据法域外适用扩张的对策研究"（项目编号：24SFB4023）的研究成果，也可以佐证这一点。文章指出："我国已经出现了数据泄漏被传输境外的执法案件，但是关于违反涉诉数据信息跨境调取规则的处罚案例尚未出现"。"[32]

b.    中国司法实践中的案例显示，蔚来因提供其根据中国法律扣留的文件而受到处罚。

81.    如前所述，蔚来拒绝提供的相关信息，不属于中国法下的"国家秘密"、"情报"、"政府机关的工作秘密"、"重要数据"、"核心数据"，或"其他如泄露可能危害国家安全或公共利益的文件和资料"，因此不会因为提供给原告而受到处罚。

82.    从《最高人民法院公报》公布的案例来看，在当事人"明知或者应当知道"某些信息属于"国家秘密"的情况下，中国法院并不认为该当事人"故意泄露国家秘密"。涉国家秘密犯罪尚且需要"明知或者应当知道"作为主观要件，涉及"情报"、"工作秘密"、"重要数据"、"核心数据"等的就更是如此。也就是说，在中国，认定构成相关犯罪或违法行为须满足严格的标准和要件，蔚来并不会因为向原告提供文件而受到处罚。

83. 例如 2004 年《最高人民法院公报》第 2 期中的一个案例："河南省沁阳市人民检察院诉于萍故意泄露国家秘密案"中，辩护律师通过合法手续获得的案件材料被列为"机密级国家秘密"，但由于检察机关没有标明密级，也无人告知案件材料中涉及国家秘密，不得泄露给他人，律师便没有将案件材料当作国家秘密加以保护的义务，对于案件材料内容泄漏的行为亦不存在主观上的故意。因案件材料内容的泄露导致诉讼活动的扰乱，也未达到情节严重的程度，因此刑事被告人的辩护律师，通过合法手续获得涉密的案件材料，提供给当事人亲属查阅的行为，不构成故意泄露国家秘密罪。

84. 值得注意的是，在本案中，没有证据表明政府机关将任何涉案文件列为国家机密、工作机密或其他受保护类别。

**IV.** **根据《1970 年关于从国外调取民事或商事证据的海牙公约》，通过"公对公"的司法互助程序在中国取证**的可行性不强，无法充分保护原告的诉讼权益。

85. 法律明确规定的获取中国主管机关同意的跨境数据取证路径只有一条，即"公对公"的司法互助程序。这就要求外国相关实体应通过条约规定途径向司法部，或通过外交途径向外交部提出取证请求，请求经审批后由人民法院执行。

86. 外国司法机关或个人申请调查取证可以通过人民法院，或由人民法院批准后由律师进行，任何机构或个人不得在中国境内进行取证。

22

即，外国司法机关或相关个人在外国法院进行诉讼，即使委托了中国境内的律师或其他机构，也不能直接由其委托的律师或其他机构对证人进行询问或调取位于中国境内的证据材料。但在其调查取证的申请获得批准后，则可以由律师持令进行调查取证。

87. 中国法律规定，获得证据出境许可需要经过漫长的处理和审查程序。这一过程可能耗时数年。

88. 根据网上的统计数据，中国政府根据海牙协议协助外国当事人调查取证的周期较长、取证成功率低。[33],[34] 从 2008 年 1 月至 2018 年 9 月，中国司法部共收到外国取证请求 324 件，其中执行 66 件、退回 156 件、正在执行的案件为 81 件。另外，外国请求机关主动撤回 3 件，因记录信息不完整无法核实是否执行的案件有 18 件。在司法部 2008 年至 2018 年期间执行的 66 项域外取证请求中，在 6 个月内完成取证的有 19 件，用时 6-12 个月完成取证的有 16 件，用时超过 12 个月的有 26 件，分别占比 28.8%、24.2%、39.4%。

89. 根据中国司法部网站最新数据，在 2024 年第一季度，司法协助交流中心代表司法部接收国外司法协助请求共 722 件，其中调查取证及判决承认与执行请求 50 件。答复外国各类司法协助请求执行结果共 501 件，其中取证请求 13 件。[35]答复取证请求的比例低。此外，"答复"仅指程序性处理，并不表示执行请求等实质性答复。

90. 综合上述，我认为，本案原告通过《海牙公约》从中国政府取证的可能性不高。

我根据美利坚合众国法律声明，据我所知，上述内容真实且正确，如有伪证，愿受伪证罪处罚。

日期：2025 年 7 月 2 日，北京，中国

签名：

张红

24

[1]2016 年中共中央办公厅、国务院办公厅印发的《关于全面推进政务公开工作的意见》指出："公开透明是法治政府的基本特征。全面推进政务公开，让权力在阳光下运行，对于发展社会主义民主政治，提升国家治理能力，增强政府公信力执行力，保障人民群众知情权、参与权、表达权、监督权具有重要意义。"

[2]《国务院关于印发全面推进依法行政实施纲要的通知》（国发〔2004〕10 号）规定："行政管理做到公开、公平、公正、便民、高效、诚信"，"行政机关实施行政管理，除涉及国家秘密和依法受到保护的商业秘密、个人隐私的外，应当公开，注意听取公民、法人和其他组织的意见"，"健全行政执法案卷评查制度。行政机关应当建立有关行政处罚、行政许可、行政强制等行政执法的案卷。对公民、法人和其他组织的有关监督检查记录、证据材料、执法文书应当立卷归档。"

[3]中共中央、国务院《法治政府建设实施纲要（2021－2025 年）》规定："全面主动落实政务公开。坚持以公开为常态、不公开为例外，用政府更加公开透明赢得人民群众更多理解、信任和支持。大力推进决策、执行、管理、服务和结果公开，做到法定主动公开内容全部公开到位。加强公开制度化、标准化、信息化建设，提高政务公开能力和水平。全面提升政府信息公开申请办理工作质量，依法保障人民群众合理信息需求。鼓励开展政府开放日、网络问政等主题活动，增进与公众的互动交流。加快构建具有中国特色的公共企事业单位信息公开制度。""加快建设全国行政执法综合管理监督信息系统，将执法基础数据、执法程序流转、执法信息公开等汇聚一体，建立全国行政执法数据库。"

[4]《行政处罚法》第 5 条第 1 款规定："行政处罚遵循公正、公开的原则"，第 48 条第 1 款规定："具有一定社会影响的行政处罚决定应当依法公开。公开的行政处罚决定被依法变更、撤销、确认违法或者确认无效的，行政机关应当在三日内撤回行政处罚决定信息并公开说明理由。"

[5]《政府信息公开条例》第 5 条规定："行政机关公开政府信息，应当坚持以公开为常态、不公开为例外，遵循公正、公平、合法、便民的原则。"

[6]《公安机关办理行政案件程序规定(2018 修正)》第 4 条规定："办理行政案件应当遵循合法、公正、公开、及时的原则，尊重和保障人权，保护公民的人格尊严。"

[7]周佑勇：《行政法总则中基本原则体系的立法构建》，载《行政法学研究》2021 年第 1 期。

8

http://www.csrc.gov.cn/csrc/zwxx/index.shtml?channelid=d60512bc2c824021b21a088e3b2e3195.

9 https://wap.miit.gov.cn/zwgk/index.html.

10 《节能与新能源汽车年鉴》历年汇总 – 统计年鉴网，http://www.tjnjw.com/hangye/j/jienengyuxinnengyuanqiche-nianjian.html.

11 《保守国家秘密法》第 2 条：国家秘密是关系国家安全和利益，依照法定程序确定，在一定时间内只限一定范围的人员知悉的事项。

第 13 条：下列涉及国家安全和利益的事项，泄露后可能损害国家在政治、经济、国防、外交等领域的安全和利益的，应当确定为国家秘密：（一）国家事务重大决策中的秘密事项；（二）国防建设和武装力量活动中的秘密事项；（三）外交和外事活动中的秘密事项以及对外承担保密义务的秘密事项；（四）国民经济和社会发展中的秘密事项；（五）科学技术中的秘密事项；（六）维护国家安全活动和追查刑事犯罪中的秘密事项；（七）经国家保密行政管理部门确定的其他秘密事项。政党的秘密事项中符合前款规定的，属于国家秘密。

12 郑春燕：《政府信息公开与国家秘密保护》，载《中国法学》2014 年第 1 期。

13 《政府信息公开条例》第 14 条对不予公开的政府信息的分类与《保守国家秘密法》第 13 条对国家秘密范围的界定存在一定的交叉重合：在《保守国家秘密法》的视域下，《政府信息公开条例》第 14 条所规定的"公开后可能危及国家安全、公共安全、经济安全、社会稳定的政府信息"属于《保守国家秘密法》第 13 条所规定的"应该确定为国家秘密的事项"。

14 李兆宗主编，童卫东、张予西副主编：《中华人民共和国保守国家秘密法释义》，金城出版社、法律出版社 2024 年版，第 4-6 页。

15 《保守国家秘密法》第 64 条："机关、单位对履行职能过程中产生或者获取的不属于国家秘密但泄露后会造成一定不利影响的事项，适用工作秘密管理办法采取必要的保护措施。工作秘密管理办法另行规定。"

16 《中共中央保密委员会关于印发〈工作秘密管理暂行办法〉的通知》（中保委发 [2019] 6 号）。

17 《国家秘密鉴定工作规定》第 7 条："下列事项不得鉴定为国家秘密：（一）需要公众广泛知晓或者参与的；（二）属于工作秘密、商业秘密、个人隐私的；（三）；（四）法律、法规或者国家有关规定要求公开的；（五）其他泄露后对国家安全和利益不会造成损害的。"

18 《最高人民法院关于审理为境外窃取、刺探、收买、非法提供国家秘密、情报案件具体应用法律若干问题的解释》第 5 条："行为人知道或者应当知道没有标明密级的事项关系国家安全和利益，而为境外窃取、刺探、收买、非法提供的，依照刑法第一百一十一条的规定以为境外窃取、刺探、收买、非法提供国家秘密罪定罪处罚。"

25

[19] 《最高人民法院关于审理为境外的机构、组织、人员窃取、刺探、购买、非法提供国家秘密或者情报案件具体应用法律若干问题的解释》第 5 条规定："行为人知道或者应当知道没有标明密级的事项关系国家安全和利益，而为境外窃取、刺探、收买、非法提供的，依照刑法第一百一十一条的规定以为境外窃取、刺探、收买、非法提供国家秘密罪定罪处罚。"

[20] 《保守国家秘密法》第 22 条："机关、单位对承载国家秘密的纸介质、光介质、电磁介质等载体（以下简称国家秘密载体）以及属于国家秘密的设备、产品，应当作出国家秘密标志。涉及国家秘密的电子文件应当按照国家有关规定作出国家秘密标志。不属于国家秘密的，不得作出国家秘密标志。"

[21] 艾思：《什么是国家秘密》，载《保密工作》2019 年第 4 期；李伟国：《密级鉴定之法律属性探讨》，载《保密工作论丛》2020 年卷第一辑。

[22] 李伟国：《密级鉴定之法律属性探讨》，载《保密工作论丛》2020 年卷第一辑。

[24] 艾思：《什么是国家秘密》，载《保密工作》2019 年第 4 期。

[25] 国家保密局培训教材编写组：《保密工作概论》，金城出版社 2013 年版，第 338 页。

[26] 李伟国：《当代中国保密法治研究》，金城出版社 2020 年版，第 1970-198 页。

[27] 《保守国家秘密法》第 20 条第 4 款规定："机关、单位对在决定和处理有关事项工作过程中确定需要保密的事项，根据工作需要决定公开的，正式公布时即视为解密。"第 24 条规定："机关、单位应当每年审核所确定的国家秘密。国家秘密的保密期限已满的，自行解密。在保密期限内因保密事项范围调整不再作为国家秘密，或者公开后不会损害国家安全和利益，不需要继续保密的，应当及时解密；需要延长保密期限的，应当在原保密期限届满前重新确定密级、保密期限和知悉范围。提前解密或者延长保密期限的，由原定密机关、单位决定，也可以由其上级机关决定。"

[28] 《保守国家秘密法实施条例》第 22 条规定："机关、单位对所确定的国家秘密，认为符合保密法有关解除或者变更规定的，应当及时解除或者变更。机关、单位对不属于本机关、本单位确定的国家秘密，认为符合保密法有关解除或者变更规定的，可以向原定密机关、单位或者其上级机关、单位提出建议。已经依法移交各级国家档案馆的属于国家秘密的档案，由原定密机关、单位按照国家有关规定进行解密审核。"

[29] 《国家秘密解密暂行规定》第 7 条第 1 款规定："第国家秘密解密由确定该事项为国家秘密的机关、单位（以下简称原定密机关、单位）负责。其他机关、单位可以向原定密机关、单位提出解密建议。"

[30] 《数据安全法》第 36 条："中华人民共和国主管机关根据有关法律和中华人民共和国缔结或者参加的国际条约、协定，或者按照平等互惠原则，处理外国司法或者执法机构关于提供数据的请求。非经中华人民共和国主管机关批准，境内的组织、个人不得向外国司法或者执法机构提供存储于中华人民共和国境内的数据。"

[31] 《数据出境安全评估评估办法》第 19 条："本办法所称重要数据，是指一旦遭到篡改、破坏、泄露或者非法获取、非法利用等，可能危害国家安全、经济运行、社会稳定、公共健康和安全等的数据。"

[32] 参见李贤森：《民事域外取证与数据出境监管的冲突及应对》，载《比较法研究》2025 年第 1 期，第 205 页。该文系司法部 2024 年度法治建设与法学理论研究部级科研项目"我国应对欧美数据法域外适用扩张的对策研究"（项目编号：24SFB4023）的研究成果，

[33] http://ilr.whu.edu.cn/d/file/zxqk/dqml/2023-11-06/d4c0df334c186b552f0cbbc075b45799.pdf

[34] https://www.kwm.com/cn/zh/insights/latest-thinking/exit-of-foreign-related-civil-and-commercial-evidence.html

[35] https://www.moj.gov.cn/pub/sfbgw/jgsz/jgszzsdw/zsdwsfxzjlzx/sfxzjlzxxwdt/202404/t20240408_497186.html

# 个人简历

张红，北京师范大学法学院教授、博士生导师、法学博士。主要研究领域为行政法、行政诉讼法、国家赔偿法、证券规制。

兼任中国法学会行政法学研究会常务理事、副秘书长，中国法学会行政法学研究会政府规制专业委员会副主任兼秘书长，海峡两岸法学交流促进会常务理事，中国应急管理学会法律工作委员会副主任委员，中国法学会审判理论研究会行政审判理论专业委员会委员，北京企业法律风险防控研究会顾问。

入选中央依法治国办全国法治政府建设评估专家库，兼任国务院办公厅行政审批制度改革业务指导组成员、司法部法规规章备案审查专家委员会专家，国家市场监督管理总局优化营商环境专家组成员，中共北京市委法律专家库成员，成都市委市政府法律专家顾问，鄂尔多斯市人民政府法律顾问，中国证监会法律部专家顾问，第五届北京市人民政府行政复议委员会非常任委员，北京金融法院专家咨询委员会专家委员，北京市规划和自然资源委员会法律专家。

长期受邀为中宣部、中央网信办、国家发展改革委员会、财政部、司法部、国家市场监管总局、最高人民法院国家赔偿办公

1

室、中国证监会法律部、科技部、农业农村部、国家自然科学基金委等部门提供行政立法、政策咨询意见。

曾参与《国家赔偿法》《行政诉讼法》《行政复议法》的修改。深度参与《行政处罚法》修改工作，多次参加全国人大法工委、中国法学会组织召开的《行政处罚法》专题研讨会，曾向全国人大法工委提交关于行政处罚种类设定、行政处罚与刑罚处罚衔接的书面建议，部分观点得到采纳。

2

## 附：近十年个人主要学术成果

（一）著作

1. 《证券行政法专论》（独著），中国政法大学出版社 2017 年版

2. 《资本市场系统性风险的法律规制》（编译），中国政法大学出版社 2016 年版

3. 《中华人民共和国行政诉讼法释义与适用手册》（主编），中国法制出版社 2023 年版

4. 《中国证券行政处罚研究报告》（副主编），国家行政管理出版社 2020 年版

5. 《中国应急管理法治年度报告(2021-2011)》，中国政法大学出版社 2023 年版

（二）论文

1. 《科学设定行政罚款 实现过罚相当》，载《中国法治》2024 年第 3 期

2. 《我国反垄断执法的历史与展望》，载《中国法治政府发展报告（2023）》，社会科学文献出版社 2024 年版

3. 《落实《校外培训监管行政处罚暂行办法》依法推进校外培训治理》，载《人民教育》2023 年第 23 期

4. 《我国行政备案实施情况及立法构想》，载《中国法治政府发展报告（2021）》，社会科学文献出版社 2022 年版

5. 《地震安全性评价制度改革的问题与展望》，载《震灾防御技术》(CSSCI) 2022 年第 1 期

6. 《行政处罚"首违免罚"制度及其完善》，载《经贸法律评论》2021 年第 3 期

7. 《中国行政处罚理论的现状与发展》，载《中国法治政府发展报告（2020）》，社会科学文献出版社 2021 年版

8. 《行政备案存在的问题与立法构想》，载《广东社会科学》(CSSCI) 2021 年第 4 期

9. 《行政处罚与刑罚处罚的双向衔接》，载《中国法律评论》(CSSCI) 2020

3

年第 5 期

10. 《行政罚款设定方式研究》，载《中国法学》（法学权威期刊）2020 年第 5 期

11. 《让行政的归行政，司法的归司法——行政处罚与刑罚处罚的立法衔接》，载《华东政法大学学报》（CSSCI）2020 年第 4 期

12. 《证券交易所自律管理行为的司法审查标准——评叶伟钢诉新加坡证券交易所案》，载《财经法学》（CSSCI）2020 年第 2 期

13. 《免予行政处罚制度的的现实困境与解决之道》，载《中国司法》2020 年第 4 期

14. 《行政处罚与刑罚处罚的双向衔接》，载《中国法律评论》（CSSCI）2020 年第 5 期

15. 《实施"轻微违法免罚" 激活免予处罚制度》，载《市场监督管理》2020 年第 6 期

16. 《执法资源有限视角下的行刑衔接程序研究》，载《行政管理改革》2019 年第 2 期

17. 《监察赔偿论要》，载《行政法学研究》（CSSCI）2018 年第 6 期

18. 《我国台湾地区证券交易所的法律地位及救济》，载《行政管理改革》2018 年第 1 期

19. 《"监管沙盒"及其与我国行政法学体系的兼容》，载《浙江学刊》（CSSCI）2017 年第 6 期

20. 《走向"精明"的证券监管》，载《中国法学》（法学权威期刊）2017 年第 6 期

21. 《«国家自然科学基金条例»中的几个法律问题》，载《中国科学基金》（CSSCI）2016 年第 1 期；

22. 《当代中国反恐怖主义行政执法体制研究》，载《北京师范大学学报》（社会科学版）（CSSCI）2016 年第 3 期；

23. 《论行政备案的边界》，载《国家行政学院学报》（CSSCI）2016 年第 3 期；

24. 《证券监管中的行政备案研究——基于证券公司向中国证监会派出机构报告及备案事项的分析》，载《证券市场导报》（CSSCI）2016 年第 3

4

期；

25. 《破解行政执法和解的难题 ——基于证券行政执法和解的观察》，载《行政法学研究》（CSSCI）2015 年第 2 期，《中国社会科学文摘》2015 年第 8 期转载；

26. 《证券监管措施：挑战与应对》，载《政法论坛》（CSSCI）2015 年第 4 期；

27. 《证券行政执法和解问题剖析》，载《行政管理改革》2015 年第 5 期；

28. 《德国有价证券交易法行政罚款指南简介》，载《证券法苑》2015 年第 14 卷；

29. 《国家责任的变迁：刑事赔偿与刑事补偿之区分》，载《学习与探索》（CSSCI）2015 年第 11 期；

30. 《如何避免国家责任被"踩踏"》，载《凤凰周刊》2015 年第 6 期；

（三）主持项目

1. 中央高校基本科研业务科研创新人才培育项目"人工智能在数字法治政府建设中的运用与规制"（2024 年）

2. 中央宣传部委托项目"电影行政处罚裁量权问题"（2024 年）

3. 司法部行政执法协调监督局委托项目"行政备案条例立法研究"（2024 年）

4. 国家市场监管总局委托项目"滥用行政权力排除、限制执法行政建议制度优化咨询项目"（2024 年）

5. 国家发改委价格司委托项目"政府制定价格相关政策后评估"（2024 年）

6. 教育部校外教育培训监管司委托项目"校外培训委托执法研究"（2024 年）

7. 科技部监督评估与科研诚信司委托项目"论文工厂治理的行政处置与刑事规制设计"（2024 年）

8. 农业农村部法规司委托项目"农业农村政策法规公平竞争审查"（2024 年）

9. 国家市场监管总局委托项目"反垄断约谈制度咨询"（2023 年）

10. 中国金融期货交易所股份有限公司委托项目"期货交易所自律管理权属

性研究"（2023 年）

11. 科技部监督评估与科研诚信司委托项目"《科研诚信严重失信行为数据库管理办法》起草"（2022 年）

12. 教育部法规司委托项目"社会资本进入校外培训行业的政府监管研究"（2021 年）

13. 中国地震局委托项目"防震减灾法律法规体系建设研究"（2021 年）

14. 郑州商品交易所委托项目"期货交易所自律监管问题研究"（2021 年）

15. 国家自然科学基金项目"科研资助机构对学术不端行为处理性质研究"（国家级，2020 年）

16. 国务院办公厅委托项目"行政备案制度研究"（2020 年）

17. 国家市场监管总局委托项目"《价格违法行为行政处罚规定》修订研究"（2019 年）

18. 北京市规划和自然资源委员会委托项目"《北京市禁止违法建设规定》修改研究"（2019 年）

19. 国家市场监管总局委托项目"市场监管行政执法与刑事司法法律制度完善研究"（2019 年）

20. 国家自然科学基金项目"国家自然科学基金委员会权力与责任清单研究"（国家级，2018 年）