SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST
NEW YORK, NY 10001
———
TEL: (212) 735-3000
FAX: (212) 735-2000
**www.skadden.com**

DIRECT DIAL
(212) 735-3902
DIRECT FAX
(917) 777-3902
EMAIL ADDRESS
ROBERT.FUMERTON@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

August 21, 2025

<u>**VIA ECF**</u>
The Honorable James R. Cho
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    RE:  *In re NIO Inc. Sec. Litig.*, No. 19-cv-01424 (NGG) (JRC)

Dear Judge Cho:

  NIO Inc. ("NIO") respectfully submits that Plaintiffs' renewed motion to compel (ECF No. 170; "Motion" or "Mot.") should be denied. Plaintiffs now seek all documents created after March 1, 2018, from Categories 1-7 ("PRC Log Documents") on NIO's Categorical Log of Documents Withheld Pursuant to the People's Republic of China ("PRC") Regulations ("PRC Log"). Your Honor denied a version of this motion just three months ago and nothing in Plaintiffs' renewed Motion warrants a different outcome.

  Plaintiffs' current Motion claims the PRC Log Documents are "critical" to Plaintiffs' case to support an entirely new theory of falsity that appears nowhere in their pleading, summary judgment motion or prior motion to compel heard in front of Your Honor in May. Their new theory—that NIO was aware prior to the IPO that the Shanghai government pulled out of the project—is not only meritless, but also time-barred, as Plaintiffs' deadline to amend was more than three years ago.

  In any event, the international comity factors also warrant denial of Plaintiffs' motion, especially because nothing in the PRC Log Documents can contradict the overwhelming evidence confirming that construction began on the Shanghai Facility prior to the IPO. Indeed, all documents Plaintiffs cite in support of their motion post-date the IPO entirely. More broadly, Plaintiffs' failure, after years of discovery, to adduce any evidence supporting the claims they

The Honorable James R. Cho
August 21, 2025
Page 2

pled is no basis to allow them to change their whole case at the eleventh hour or to compel certain documents while they fish for evidence.

Ultimately, Plaintiffs' attempt to seek documents in hopes of pivoting to a new theory after receiving 100,000 documents and taking eight fact depositions only highlights the weakness of their case. Their desire for a belated fishing expedition is no basis to reverse the denial of the prior motion to compel.

## I.      BACKGROUND

### A.      Plaintiffs' Allegations

NIO is a leading electric car developer that designs, jointly manufactures and sells smart electric vehicles ("EVs") in China, the world's largest car market. (Second Amended Class Action Complaint (Dkt. 67) ("SAC") ¶ 3; Ex. A, Prospectus at 1-2.) NIO, alongside its government partners, began developing its own EV factory in Shanghai (the "Shanghai Facility") in 2017 and started construction as of March 2018. (Pls. Ex. 5 at ¶¶ 8-9, 18-19, 29-30, 33.)

Plaintiffs, however, allege the following statements in NIO's offering documents for its September 12, 2018 IPO were false or misleading because, as they contend, construction of the Shanghai Facility never began at all:

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities." (SAC ¶ 62; Ex. A, Prospectus at 32.)

- "Construction has started on our own manufacturing facility in Shanghai . . . ." (SAC ¶ 61; Ex. A, Prospectus at 122.)

- "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities." (SAC ¶ 62; Ex. A, Prospectus at 137.)

The SAC also alleges that NIO failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations. (*See* SAC ¶ 93.)

Over the last six years, Plaintiffs have had an opportunity to probe these allegations in discovery. NIO has participated fully in the discovery process. Defendants have produced over 100,000 documents, and NIO even agreed to produce additional documents requested in March 2025, five months after the substantial completion deadline for document discovery. NIO also identified and educated a 30(b)(6) witness, who sat for a seven-hour deposition. When Plaintiffs complained about the preparedness of that witness, NIO agreed to submit answers to thirty written 30(b)(6) questions. In addition, Plaintiffs have taken eight fact depositions, including the depositions of NIO's current Chairman of the Board of Directors and CEO William Li, former Chief Financial Officer Louis Hsieh and Industrial Planning Manager Colliven Ke. For the PRC

The Honorable James R. Cho
August 21, 2025
Page 3

Log Documents specifically, NIO has offered that Plaintiffs' PRC counsel review those documents in the PRC in the first instance to narrow the documents at issue. But Plaintiffs have refused to agree to a protocol for doing so that would comply with PRC law.

**B.     The Shanghai Facility**

As discovery has confirmed, significant work occurred on- and off-site for the Shanghai Facility. In November 2017, NIO entered into an agreement with the Shanghai government for construction of its own manufacturing facility. (Ex. A, Prospectus at 137; Ex. B.) In January 2018, the Shanghai government announced that a site had been selected for the Shanghai Facility and that NIO and the government "communicated thoroughly [o]n aspects of factory construction, plan design, environmental assessment formulation and approval" to complete the project as quickly as possible. (Ex. C.) While government entities handled construction, NIO obtained financing, tax incentives and other support for the Shanghai Facility. (Ex. A, Prospectus at 137; SAC ¶ 64; Ex. D at 2 (Q&A #2.5).) Plaintiffs agree that substantial on-site activity was underway months before NIO's IPO, including (a) putting up temporary fences and gates to close off the construction site, (b) digging a temporary trench for drainage, (c) backfilling and ground leveling and (d) load testing of trial piles. (Pls. Ex. 5 at ¶¶ 33-37.) Indeed, photographs indicate on-site construction was clearly underway in March 2018. (Ex. E.)

Testimony from NIO witnesses has only further demonstrated that construction work occurred on-site. Mr. Li testified to the extensive work that occurred at the Shanghai Facility site, including, among other things, land flattening, trial piling, building roads and connecting the site to electricity and water. (Ex. F, Li Tr. at 112:6-120:17.) Mr. Hsieh testified to the same. (Ex. G, Hsieh Tr. at 34:1-18.) Ms. Ke also described the work that occurred on site and confirmed that Century 3, the construction management company, continued work long after the September IPO. (*See* Ex. H, Ke Tr. 51:18-20, 53:13-19.) Ms. Ke's testimony is consistent with Century 3's daily, weekly and monthly progress reports, which all demonstrate that construction began by at least March 2018 and continued past NIO's IPO. (Pls. Ex. 5 at ¶¶ 29, 32-33.)

**C.     Plaintiffs Move for Partial Summary Judgment During Discovery**

On April 16, 2024, Plaintiffs filed a pre-motion letter asking Judge Garaufis for permission to move for partial summary judgment. (ECF No. 134.) Since discovery was still ongoing, Judge Garaufis explicitly asked Plaintiffs why they did not "wait until all of the discovery ha[d] been completed" to "address all the issues on summary judgment at the same time." Judge Garaufis stated he was "concerned about piecemeal motion practice." (ECF No. 136 at 4:24-5:2, 6:5-15.) Plaintiffs insisted on pressing ahead with summary judgment, notwithstanding outstanding discovery, to "move this litigation along." (*Id.* at 4:15-20, 6:18-21.) Particularly relevant here, Plaintiffs expressly acknowledged that NIO had withheld hundreds of documents under PRC law and "there [was] no indication whether NIO would ever or when NIO would get the Chinese government's approval to produce those documents." (*Id.* at 5:4-14.) Plaintiffs decided to move ahead with their motion anyway. These are the same documents

The Honorable James R. Cho
August 21, 2025
Page 4

Plaintiffs now claim are of "*critical importance* to Plaintiffs' claims and the summary judgment motions." (Mot. at 2 (emphasis added).)

Plaintiffs served their motion for partial summary judgment on September 30, 2024. Defendants served their opposition and cross-motion for summary judgment on all claims on January 30, 2025.

**D.    Plaintiffs' Original Motion to Compel**

On February 26, 2025, Plaintiffs moved to compel NIO to produce Categories 1-4 from the PRC Log. (ECF No. 152.) On May 2, 2025, this Court held a telephonic hearing and denied Plaintiffs' motion to compel without prejudice. (*See* Pls. Ex. 17.) Your Honor explained that your "primary concern" was "that the PRC government ha[d] indicated that disclosure of these privileged materials would be prohibited" by PRC regulations and that forcing NIO to produce the PRC Log Documents would "violat[e] Chinese law." (*Id.* at 19:6-18.) Your Honor further observed that the PRC Log Documents appear to be of "limited relevance," and Plaintiffs "likely could obtain this information from alternative sources." (*Id.* at 19:6-18, 20:20-21.) Plaintiffs asked permission to renew their motion if, during a deposition, "a witness refuse[d] to answer a question citing the same [PRC law] issue," and Your Honor agreed. (*Id.* at 20:12-23.)

Between May 7 and June 20, 2025, Plaintiffs finished fact depositions. ***Not a single witness declined to answer a single question based on PRC law.*** Even so, on May 15, 2025, Plaintiffs filed a motion seeking to suspend summary judgment briefing while they renewed their motion to compel. (ECF No. 166.) On May 23, 2025, the summary judgment briefing schedule was adjourned indefinitely and remains suspended. (May 23, 2025 Minute Order.)

**E.    Plaintiffs' Renewed Motion to Compel Relying on a New Theory of Falsity**

On July 3, 2025, Plaintiffs filed the instant renewed motion to compel, now seeking documents created after March 1, 2018 in Categories 1-7 of NIO's PRC Log. Plaintiffs claim for the first time after six years of litigation that they need the PRC Log Documents to probe "additional reasons" that NIO misled investors by supposedly omitting from its Registration Statement that: "(1) the Shanghai government had withdrawn its 2.43 billion RMB of funding for the Shanghai Facility and was no longer planning to finance or oversee construction of the factory for NIO, and (2) with the project halted due to the Shanghai government's withdrawal and NIO needing to secure alternative sources of funding, the Shanghai Facility—if it was going to be built at all—was not going to be completed by the end of 2020." (Mot. at 3.)

For the following reasons, this motion should be denied.

The Honorable James R. Cho
August 21, 2025
Page 5

### III.   ARGUMENT

#### A.   PRC Law Prevents Disclosure

Contrary to Plaintiffs' contentions, and as set forth in the accompanying declaration of PRC counsel Yanhua Lin ("Lin Decl."), the Chinese government has expressly prohibited NIO from producing the categories of documents on the PRC Log. (Mot. at 5-6.) As required by Article 36 of the PRC Data Security Law (the "DSL"), NIO submitted requests to produce documents to the relevant PRC authorities for approval. (Lin Decl. ¶¶ 23-28; 30.) While many were approved (resulting in NIO producing approximately 10,000 documents), the Ministry of Justice ("MOJ") gave explicit instructions or provided general guidance that prohibit NIO from producing the categories of documents on the PRC Log. (*See id.*) NIO received these instructions and guidance in writing and verbally.[1] (*See* Lin Decl. ¶¶ 25-27.) Each instruction, independently, is sufficient to establish that PRC law prohibits disclosure. *See In re DiDi Global Inc. Sec. Litig.*, No. 21-cv-5807 (LAK), 2025 WL 743964, at *2 (S.D.N.Y. Mar. 7, 2025) (holding Chinese law prohibits disclosure of documents based on declaration stating DiDi submitted the documents to the relevant PRC authorities, requested permission to produce them, and was told they could not be produced).[2]

Plaintiffs' Motion completely ignores this threshold DSL issue, which prohibits production of all the documents that Plaintiffs seek. Indeed, Plaintiffs do not even mention the DSL in their motion. Instead, they focus almost exclusively on arguing whether certain documents constitute state secrets. (Mot. at 5-6.) But the MOJ's prohibition pursuant to the DSL is dispositive without even considering the various other PRC laws and regulations implicated here.[3]

#### B.   International Comity Weighs Against Compulsion

In considering whether to compel information prohibited from disclosure by foreign law, courts in the Second Circuit conduct a comity analysis, consisting of seven factors, including

---

[1]   Producing the written MOJ instructions, which were confidential communications with the government, would violate relevant PRC regulations. (*See* Lin Decl. ¶ 25, n.6.)

[2]   Plaintiffs cite a different decision from the *DiDi* litigation that dealt with deposition testimony, not documents. (*See* Mot. at 5.) Moreover, DiDi did not provide any detail "about what the instruction [from the PRC authority] was or the legal basis for it," leading the court to conclude "[o]n this record, there is not sufficient indication that the Chinese government has expressed a view that the [deposition testimony] would violate Chinese law or threaten its national interests." *In re DiDi Global Inc. Sec. Litig.*, No. 21-cv-5807 (LAK), 2025 WL 267893, at *3 n.17 (S.D.N.Y. Jan. 22, 2025). In contrast, NIO provided a PRC Log listing the applicable legal bases and a sworn declaration from its PRC counsel detailing the instructions NIO received from the MOJ and Cyberspace Administration of China.

[3]   Though not mentioned or even cited in Plaintiffs' Motion, Professor Zhang briefly argues that the DSL does not apply here. (*See* Pls. Ex. 1, Zhang Decl. at ¶¶ 66-79.) But Professor Zhang misconstrues the statute, which on its face applies to **all data** stored in the PRC, regardless of importance, and requires approval from competent PRC authorities before it can be produced overseas. (*See* Lin Decl. ¶¶ 18, 20.)

The Honorable James R. Cho
August 21, 2025
Page 6

good faith and the hardship of compliance. *See Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013). Here, all factors weigh against production.

### 1.      Importance of Information to Litigation

Plaintiffs argue that the PRC Log Documents are (1) "critical to the issue of whether construction began;" and (2) will reveal "when exactly NIO learned that the Shanghai government was pulling out of the Shanghai Facility construction project." (Mot. at 7.) Neither of these arguments is persuasive.

### a.      The PRC Log Documents Cannot Negate the Overwhelming Evidence That Construction on the Shanghai Facility Began Prior to the IPO

The PRC Log Documents are not important to this litigation because they have no bearing on Plaintiffs' claims. Whether or when "NIO learned that the Shanghai government was pulling out of the Shanghai Facility construction project" (Mot. at 7) is irrelevant. The PRC Log Documents would be pertinent only to the extent they show whether construction had begun on the Shanghai Facility as of the date of the IPO. This disconnect clearly weighs against production. *See Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 150 (E.D.N.Y. 2009) (finding "connection between the evidence sought and the litigation [wa]s . . . attenuated").

Contrary to Plaintiffs' contentions, nothing in the PRC Log Documents can alter the overwhelming evidence, reflected in contemporaneous progress reports and deposition testimony, that construction began on the Shanghai Facility prior to the IPO and was already underway in March 2018.[4] (*See supra* § I.B.) Even if documents bear on permitting issues, as Plaintiffs argue, that is a red herring. First, certain permits were in fact granted for the site. (Pls. Ex. 5 at ¶ 18.) Second, whether or not permits were granted, both parties admit construction work occurred on site. This fact alone is case dispositive and the basis for Defendants' pending motion for summary judgment on all claims.

### b.  In Any Event, the Shanghai Government Did Not Pull Out of the Project

The PRC Log Documents also cannot support Plaintiffs' new speculation that the Shanghai government pulled out of the project before the IPO.[5] This theory is directly

---

[4]     Accordingly, the PRC Log Documents cannot bear on any scienter or loss causation issues since if work occurred on site, there was no misstatement or corrective disclosure. Plaintiffs' cases are thus inapposite. *See SEC v. Collector's Coffee, Inc.*, No. 19 Civ. 4355 (VM), 2025 WL 752221 (S.D.N.Y. Mar. 10, 2025) (court found that, unlike here, defendants lied to investors, impeded an SEC investigation and fabricated contract and bank record evidence to conceal fraud).

[5]     Plaintiffs' new theory is not only meritless, but also time-barred as Plaintiffs' deadline to amend was more than three years ago. Moreover, despite Plaintiffs' claims to the contrary, the PRC Log Documents are not critical to the summary judgment motions. (Mot. at 7.) Plaintiffs moved for summary judgment solely on the issue of whether construction began at the Shanghai Facility; thus, whether the Shanghai government ever pulled out of the project has no bearing on the work completed on site. Moreover, Plaintiffs cannot rely on this argument in

The Honorable James R. Cho
August 21, 2025
Page 7

contradicted by testimony adduced in this case. Mr. Li repeatedly confirmed that the Shanghai government never pulled out of the project, let alone before or around the time of the IPO. (Ex. F, Li Tr. at 152:24-153:15 ("*[w]e did not get such a notification*" that the Shanghai government pulled out of the project); *see also id.* at 123:17-22, 157:2-14.) Mr. Hsieh testified similarly. When asked whether "the Shanghai government was still involved in constructing the Shanghai factory" as of a November 5, 2018 board meeting, Mr. Hsieh answered: "Absolutely." (Ex. G, Hsieh Tr. at 48:16-19; *see also id.* at 48:20-21.) When asked if the Shanghai Government "pull[ed] out of the agreement to build the Shanghai facility," Mr. Hsieh testified "No, not that I'm aware." (*Id.* at 44:7-9.)

The documentary evidence also confirms that the Shanghai government did not pull out of the project before the IPO. Management presentations from November 2018 and December 2018 characterize the Shanghai Facility as enjoying "strong government support." (Ex. I at 27; Ex. J at 27.) On January 21, 2019, Fang Liu, the then-General Counsel of NIO, confirmed in comments to a draft offering memorandum that there had been "no change" to the framework agreement with the Shanghai government and legal arrangements described therein. (Ex. K at NIO0000031104, NIO0000031149.)

The documents Plaintiffs rely on are not to the contrary. While NIO will not rebut here every factual contention in Plaintiffs' Motion, several points are worth highlighting. *First*, all of the documents Plaintiffs' rely on were created *after the IPO* and thus do not (and cannot) render statements as of the IPO false or misleading.[6] (Mot. at 3-4.) Even accepting *arguendo* Plaintiffs' characterizations of the documents (which are inaccurate), at most they would show that "18 days after the IPO," NIO knew that the Shanghai government had pulled out of the Shanghai Facility project. (Mot. at 4.) This cannot support Plaintiffs' claims that the IPO documents themselves were false or misleading.

*Second*, Plaintiffs admit they conflate entities—purportedly "[f]or simplicity purposes"—to imply that Jiawei Auto Parts Co, Ltd. ("Jiawei"), the project company of Shanghai Auto City, is a government agency when it is not. (Mot. at 3, n.5.) Thus, Plaintiffs' claim that Jiawei pulling out of the project is akin to the government pulling out is just wrong. As Mr. Li explained: "Jiawei was only a project company," and a change in the project company would not "lead or result in substantive changes in our relationship with Shanghai Auto City [the government partner]." (Ex. F, Li Tr. at 156:21-25.) Indeed, as Mr. Li indicated, "the name of the project company [did] not matter" because "[NIO] entered into the framework agreement with Shanghai

---

opposition to Defendants' motion for summary judgment as this new theory of falsity was never pled. *In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM)(GWG), 2022 WL 17584155, at *22 (S.D.N.Y. Dec. 12, 2022), *aff'd sub nom. DeKalb Cnty. Pension Fund v. Allergan PLC*, Nos. 23-59 (L), 23-117 (Con), 2024 WL 677081 (2d Cir. Feb. 20, 2024) ("A Plaintiff may not, in opposing a motion for summary judgment, rely on theories not set forth in the Complaint." (citation omitted)).

[6]   Plaintiffs also cite numerous drafts to support their new theory of falsity. (Pls. Exs. 8-10.) More recent or finalized versions of Plaintiffs' exhibits do not support (and in fact refute) Plaintiffs' theory that the Shanghai government pulled out of the project. (Ex. L at 1, 4.)

The Honorable James R. Cho
August 21, 2025
Page 8

Auto City." (*Id.* at 60:10-22, 135:8-14.) Moreover, Plaintiffs' allegations that NIO assumed Jiawei's contract in late October 2018 (Mot. at 7-8) only support that NIO was continuing to make progress on the Shanghai Facility and moving the project forward. Simply put, Jiawei's involvement did not matter and, as Ms. Ke confirmed at her deposition, the Shanghai Facility project could (and would) continue with or without Jiawei. (Ex. H, Ke Tr. at 55:25-56:3.)

*Third*, Plaintiffs' contention that NIO was seeking additional, non-governmental financing for the Shanghai Facility is unavailing. To support this contention, Plaintiffs rely on an internal spreadsheet (Pls. Ex. 6) that NIO's former CFO Mr. Hsieh had never even seen before. (Ex. G, Hsieh Tr. at 11:16-13:21.) Moreover, as Mr. Li noted, the spreadsheet did not represent a change to the Framework Agreement. (Ex. F, Li Tr. at 157:2-14, 151:19-23.) If anything, the spreadsheet shows that employees at NIO were exploring ways to *expand* the investment in the project as all the proposed funding is larger than that originally agreed upon. Critically, each potential option includes funding or subsidies from Jiading (the district in Shanghai where the Facility was being built).

All in all, the "evidence" in Plaintiffs' Motion cannot support compelled production here, as it is irrelevant to the only theory pled in the case—whether or not construction of the Shanghai Facility had begun—let alone Plaintiffs' belated and baseless claim that the Shanghai government withdrew from the project prior to the IPO.

### 2.    Specificity of Request

Far from narrowly tailored, Plaintiffs' Motion is a sweeping fishing expedition that seeks virtually every document created after March 1, 2018—regardless of subject matter—that has been withheld under any PRC law. Under these circumstances, "it [is] difficult to characterize the requests . . . as 'highly specific.'" *See In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, Nos. 14-MD-2548 (VEC), 14-MC-2548 (VEC), 2019 WL 1988525, at *5 (S.D.N.Y. May 6, 2019) (citation omitted).[7]

In fact, Plaintiffs' "renewed" Motion is even more expansive than their prior rejected motion to compel. Plaintiffs previously limited their request to only Categories 1-4 of NIO's PRC Log, but now seek Categories 1-7. Plaintiffs provide no justification—because there is none—for (i) why they now suddenly need the additional documents they are moving to compel for the first time; or (ii) why it is appropriate to do so in this "renewed" motion to compel the documents in Categories 1-4. Indeed, the newly sought documents are even less relevant than those previously sought. Category 5 covers "documents containing non-public geographical

---

[7]    Merely excluding documents created before March 1, 2018 (six months before the IPO) does not make Plaintiffs' demand specific and narrowly tailored. In any event, contrary to Plaintiffs' suggestion, there are no "indications that NIO might have known in March 2018 that the Shanghai government was not fully committed to building and financing the Shanghai Facility." (Mot. at 8.) *First*, an unsigned draft agreement does not change the terms of the executed Framework Agreement; nor does it negate the construction work that continued on site. *Second*, as Mr. Hsieh explained, it is completely "logical" that if NIO did not raise money in its IPO, "the plant may be pushed back a little bit." (Ex. G, Hsieh Tr. at 22:3-6.) Nothing about that simple business proposition supports the contention that the Shanghai government pulled out of the project.

The Honorable James R. Cho
August 21, 2025
Page 9

mapping information and related email correspondence." (Pls. Ex. 2, PRC Log at 5.) Plaintiffs do not even try to argue how such documents are relevant, let alone of "critical importance" (Mot. at 2), to their claims. Nor do they attempt to explain how the documents in Category 6—a handful of internal NIO emails regarding government subsidies—would show whether construction of the Shanghai Facility began as of the IPO. Finally, all the documents in Category 7—internal NIO discussions about government policies—were created over a month *after* the IPO and thus could not bear on what NIO knew at the time of the IPO. Courts have denied motions to compel where, as here, "the wide scope of plaintiffs' requests . . . is very likely to yield much material that plaintiffs will not find useful in this litigation." *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. at 528 (S.D.N.Y. 1987).

Even setting aside the newly sought documents, Plaintiffs' indiscriminate demand for hundreds of documents in Categories 1-4 also is not sufficiently tailored. NIO tried to narrow the documents in dispute by offering to have Plaintiffs' PRC counsel review every one of the PRC Log Documents in China. While NIO does not believe any of the PRC Log Documents are important to the issues in this case, if Plaintiffs still disagreed after their counsel reviewed the documents, then the parties could at least have an informed discussion about specific documents, as opposed to Plaintiffs' current broadside motion. ***But Plaintiffs have refused to agree to a protocol that would comply with PRC law***, which only confirms that their goal is not to discover relevant information, but to force NIO into a Catch-22 of violating either PRC law or an order from this Court compelling production.

### 3.    Origin of Information

Plaintiffs concede the documents originated in China. (Mot. at 8.) Thus, this factor clearly weighs against production.

### 4.    Alternative Means

If the requested information can be obtained elsewhere, "there is little or no reason to require a party to violate foreign law." *CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*, No. 12-CV-08087 (CM) (SN), 2013 WL 2661037, at *10 (S.D.N.Y. June 12, 2013) (citation omitted). Here, Defendants' witnesses answered the "critical" questions that Plaintiffs posed to them (*supra* § I.D). *See Doubleline Cap. LP v. Odebrecht Fin. Ltd.*, No. 17-CV-4576 (GHW) (BCM), 2021 WL 4596561, at *13 (S.D.N.Y. Oct. 6, 2021) (testimony an adequate alternative means for production of documents). Indeed, none of the Defendants' witnesses refused to answer a single question posed during any deposition.[8] Moreover, Plaintiffs ***concede*** that "NIO fact witnesses, including Li and Ke, denied that the Shanghai government informed NIO that it

---

[8]   This distinguishes the *DiDi* decision that Plaintiffs cite (Mot. at 9), which was issued before depositions when there was uncertainty about whether they would be a viable alternative. *See In re DiDi Global Inc. Sec. Litig.*, No. 21-cv-5807 (LAK), 2025 WL 1735412, at *5 (S.D.N.Y. June 23, 2025). By contrast, here, fact depositions are complete and have already proved to be a viable alternative. (*See* Pls. Ex. 17 at 17:7-11, 20:19-23.)

The Honorable James R. Cho
August 21, 2025
Page 10

was withdrawing from the Shanghai Facility."[9] (Mot. at 10.) Mr. Hsieh testified similarly, stating "absolutely" when asked whether the Shanghai Government was still involved in November 2018—after the September IPO. (Ex. G, Hsieh Tr. at 48:16-19.) Plaintiffs' assertion that these are merely "self-serving denials" and "the truth lies" in the PRC Log Documents is rank speculation. Their wish that the record evidence was different does not support a fishing expedition, especially one that would require NIO to violate PRC law.

Moreover, as another alternative, NIO offered to have Plaintiffs' PRC counsel review the PRC Log Documents in the PRC so they can see for themselves that no documents support their contentions. But despite weeks of negotiations, Plaintiffs have refused to agree to a review protocol that conforms with PRC law.

Finally, as yet another alternative, Plaintiffs can request documents through the Hague Convention—as they could have done at any point during discovery. (*See* Lin Decl. ¶¶ 35-36); *see Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 156 (S.D.N.Y. 2011) (ordering party seeking discovery prohibited from disclosure by Chinese law to go through Hague Convention), *aff'd sub nom. Tiffany (NJ) LLC v. Andrew*, No. 10 Civ. 9471(WHP), 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011); *Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp.*, No. 17-cv-02191-SK, 2019 WL 6134958, at *3 (N.D. Cal. 2019) (Hague Convention was a substantially equivalent alternative to seek documents from Chinese party despite "caus[ing] some delay"); *Nidec Motor Corp. v. Broad Ocean Motor, LLC*, No. 4:13-cv-01895-SEP, 2022 WL 4482431, at *6 (E.D. Mo. Sept. 27, 2022) (similar); *CE Int'l Res. Holdings*, 2013 WL 2661037, at *10 (if information is available elsewhere, "there is little or no reason to require a party to violate foreign law"). Even Professor Zhang concedes that dozens of foreign parties have successfully obtained evidence from the PRC through the Hague Convention. (Pls. Ex. 1, Zhang Decl. at ¶ 88.)[10]

### 5.   Balance of National Interests

It is indisputable that the PRC has a strong interest in enforcing its data privacy, state secrecy and criminal laws. *Tiffany (NJ) LLC*, 276 F.R.D. at 156-57 (limited exceptions to liability and multiple criminal and civil regulations on the same subject indicated strong foreign interest).

---

[9]   Plaintiffs misconstrue Mr. Li's comment asking if there were any documents supporting one of Plaintiffs' baseless theories based on a spreadsheet seemingly modeling financial situations related to the Shanghai Facility that never occurred. (Mot. at 9.) Mr. Li testified that he had never seen the spreadsheet and did not "recall this very detailed scenario." (Ex. F, Li Tr. at 140:19-22; 160:11-25.) He asked if Plaintiffs had any other documents that could possibly refresh his memory, but he was not suggesting that such documents exist or that NIO failed to produce them. In any event, Mr. Li *did answer* Plaintiffs' question: "I would think that [the spreadsheet] was just a simple brief on the situation. And there was nothing that would require the making of any substantive decision." (*Id.* at 161:9-12.)

[10]   Plaintiffs' citation to the *DiDi* court's holding that the Hague Convention was not a viable alternative to the Rule 30(b)(6) deposition testimony sought there is inapposite. *See In re DiDi,* 2025 WL 267893, at *4.

The Honorable James R. Cho
August 21, 2025
Page 11

Plaintiffs' assertion that "there is no evidence that the PRC government has even objected to the disclosure of the documents at issue here" is false. (Mot. at 11.) As we have repeatedly informed Plaintiffs, NIO received multiple rounds of feedback from the PRC MOJ and Cyberspace Administration of China, both orally and in writing, about what NIO can and cannot produce in this litigation. (Lin Decl. ¶¶ 23-28, 30.)[11]

Despite Plaintiffs' contentions (Mot. at 10), NIO is keenly aware of its U.S. discovery obligations. But that requirement is not absolute.[12] As the court in *Tiffany* held: "to the extent plaintiffs contend that because the Banks do business in the United States they should be compelled to produce the documents, their argument is unavailing. An entity's presence in the United States, without more, does not obviate the need for a comity analysis where compliance with a discovery request would violate foreign law." 276 F.R.D. at 159.

Finally, the strength of the U.S.'s interest in obtaining discovery turns on whether the substance of the discovery is "actually material to Plaintiffs' efforts to enforce this nation's . . . laws and, if so, whether that information can be obtained through alternative means." *In re Commodity Exch., Inc.*, 2019 WL 1988525, at *5; *see also Doubleline Cap. LP*, 2021 WL 4596561, at *13. As discussed, the PRC Log Documents are not "actually material to Plaintiffs' efforts" to pursue their remedy. (*See supra* § III.B.1.) Hence, China's interests predominate.

**6.    Hardship of Compliance**

Even a "slight" risk of potential liability strongly weighs against production. *See Kashef v. BNP Paribas S.A.*, No. 16-CV-3228 (AKH) (JW), 2022 WL 1617489, at *4 (S.D.N.Y. May 23, 2022). Here, producing the PRC Log Documents would require NIO to violate PRC law, subjecting NIO to significant sanctions, including business suspension and even revocation of business licenses. (*See* Lin Decl. ¶¶ 32-34.) The severity of these potential consequences strongly weighs against production. *See, e.g., Tiffany (NJ) LLC*, 276 F.R.D. at 159 ("[B]ecause [PRC] regulations have been used to the detriment of banks in the past, and the potentially harsh sanctions are applicable to both the Banks and their personnel, the potential for hardship places this factor in favor of the Banks."). Plaintiffs have no basis to assert that "there is virtually no chance NIO will face any legal or regulatory consequences." (Mot. at 11.) They do not cite (and

---

11    Plaintiffs' cases are thus inapposite. *See Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639, at *6 (S.D.N.Y. Mar. 8, 2010) (foreign country did not oppose disclosure and foreign interest was undermined because law "provide[d] for an absolute waiver of its protections by the customer" even though "significant civil and criminal penalties . . . would ordinarily suggest that [a foreign country] ha[d] a strong interest"); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. MDL 2875 (RBK), 2021 WL 6010575, at *13 (D.N.J. Dec. 20, 2021) (documents "may" implicate PRC state secret law); *Philips Med. Sys., Inc. v. Buan*, No. 19-cv-2648, 2022 WL 602485, at *5 (N.D. Ill. Mar. 1, 2022) (defendants "ha[d] not actually identified any responsive documents for which production may be impacted by Chinese law").

12    Plaintiffs' cases about the U.S.'s interest in its securities markets are inapplicable. In both, the U.S. had a particularly strong interest because the plaintiff was the SEC. *See SEC v. Euro Sec. Fund*, No. 98 Civ. 7347 (DLC), 1999 WL 182598, at *4 (S.D.N.Y. Apr. 2, 1999); *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y. 1981).

The Honorable James R. Cho
August 21, 2025
Page 12

NIO is not aware of) a single example of a Chinese company successfully producing documents from the PRC in U.S. litigation after the DSL over the PRC government's objection.[13]

> **7.      Good Faith**

NIO has made every effort to cooperate with discovery in good faith. NIO (along with Plaintiffs) provided this Court regular updates on the discovery process, and fully informed the Court of issues with production of certain documents and the work the parties were doing together to solve those issues. (*See* ECF No. 98, March 1, 2022 Joint Status Report; ECF No. 105, June 8, 2022 Joint Status Report; ECF No. 113, September 8, 2022 Joint Status Report; ECF No. 126, March 1, 2023 Joint Status Report; ECF No. 127, June 15, 2023 Joint Status Report; ECF No. 130, September 18, 2023 Joint Status Report; ECF No. 132, December 20, 2023 Joint Status Report; ECF No. 133, March 29, 2024 Joint Status Report.)

Notwithstanding those issues, NIO worked diligently to produce documents and a privilege log with narrowly tailored categories. NIO also made every agreed upon witness available for deposition, including its Chairman of the Board of Directors and CEO Mr. Li, and provided a 30(b)(6) representative. When Plaintiffs requested written 30(b)(6) answers after the deposition, NIO obliged and answered 30 of Plaintiffs' questions. After NIO was informed that the MOJ was no longer reviewing Article 36 applications to approve documents for production, NIO's U.S.- and PRC-based counsel worked with Plaintiffs' U.S. and PRC counsel to try to come to a solution. (ECF No. 130.) NIO then (as it did again now) suggested Plaintiffs' PRC counsel review documents in person in the PRC. Plaintiffs refused this proposal in September 2023 outright, and now cannot agree to a stipulation compliant with PRC law.

Finally, Plaintiffs' assertion that "NIO has not exhibited good faith because it has not produced any written evidence that the PRC government has classified these documents as secret or confidential" is unavailing. (Mot. at 11.) As discussed above, producing confidential communications from the MOJ would violate relevant PRC regulations. NIO has made every attempt to provide information to Plaintiffs to the extent it is legally permitted to do so.

***

For at least these reasons, NIO respectfully submits that Plaintiffs' Motion be denied.

Respectfully submitted,

*/s/  Robert A. Fumerton*

Robert A. Fumerton

cc:      All counsel of record (via ECF)

---

[13]    Plaintiffs' citation to the *DiDi* deposition decision is again inapposite. (Mot. at 11.) Whatever the risks of deposition testimony (which are not at issue here), Article 48 of the DSL expressly prescribes the penalties for producing documents stored in the PRC without government approval. (Lin Decl. ¶ 32.)