

Laurence Rosen<br>
lrosen@rosenlegal.com

August 28, 2025

**VIA ECF**

The Honorable James R. Cho
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   *In re NIO, Inc. Securities Litigation,* Case No. 1:19-cv-01424-NGG-JRC

**Plaintiffs' Reply in Further Support of Renewed Motion to Compel Defendant NIO Inc.'s Production of Documents Withheld under PRC Blocking Statutes**

Dear Judge Cho:

      Class Representatives Mark Mundy and Eva Huang ("Plaintiffs") respectfully submit this reply in further support of Plaintiffs' renewed motion to compel Defendant NIO Inc. ("NIO") to produce certain documents that it has withheld under PRC blocking statutes. (ECF No. 170).

      NIO's papers in opposition to Plaintiffs' motion to compel try to obfuscate the specific facts and law pertaining to the withheld documents with a story about a defendant that bent over backwards to provide multiple forms of discovery to plaintiffs, who are now desperate for a new theory of the case because the evidence marshalled by the defendant will carry the day on summary judgment. ECF 173. It is not just a story; it is a fairy tale. For the reasons stated below, the Court should grant Plaintiffs' renewed motion to compel the production of documents from NIO's Categorical Log of Documents Withheld Pursuant to the People's Republic of China Regulations ("Withholding Log").

      A.    **NIO's Production of Documents Has Been Marked by Delay and Obfuscation**

      The Withholding Log, created after years of discovery and the receipt of guidance from two PRC government agencies, the Ministry of Justice ("MOJ") and the Cyberspace Administration of China ("CAC"), contains 900+ documents but does not list each document separately. Instead NIO has grouped the documents into eight subject matter categories, listing only the "key" individuals who authored or received the documents, as well as the overall date range and number of documents in each category. Although some of the broad descriptions clearly

suggest that key documents are being withheld,[1] NIO's failure to provide individual, detailed entries for each document withheld deprives Plaintiffs and the Court with the best information to determine the importance of the documents to the litigation. *See In re DiDi Global, Inc. Secs. Litig.*, 2025 WL 743964, at *1, 3 (S.D.N.Y. Mar. 7, 2025)[2] (requiring defendant to amend logs already containing individual entries for more than 1,000 documents with even more information). NIO's opposition touts its offer to have a PRC lawyer hired by Plaintiffs review the documents in the PRC to determine which ones are "relevant" to the litigation. This is a non-offer intended only to waste more time. First, all of the withheld documents are relevant to the litigation, which is why NIO marked them as responsive to Plaintiffs' requests for production in the first place. Second, NIO refused to allow Plaintiffs' PRC counsel to provide *any* substantive information concerning the documents' content to Plaintiffs, precluding NIO's stated goal of having "an informed discussion about specific documents."[3] ECF 173 at 9.[4] Third, NIO would not even commit to producing the documents identified as important by Plaintiffs' PRC counsel, pointlessly wasting even more time. NIO's cataloguing of withheld documents in more informative logs would have accomplished just that and more quickly ripened this dispute for decision. But such an offer was never made.

By muddling the picture for Plaintiffs and the Court, NIO then uses the evidence it marshalled to support its version of events on summary judgment to argue that documents not comporting with NIO's characterization of the material facts could not possibly exist. *Id.* at 3. Not so. The documents at issue were located and deemed responsive using the parties' agreed-upon search terms. Far from trying to "fish" for documents in support of a purported new theory of the case, *id.* at 2, evidence that NIO's government partners pulled financing from the Shanghai Facility construction project prior to the IPO would be direct proof that the Registration Statement's representations that Shanghai government entities were constructing the manufacturing facility for NIO are false. *Id.* at 2 (citing two such representations from ¶62 of the operative complaint).

### B. NIO Has Not Submitted Evidence Sufficient to Demonstrate a Conflict of Law

NIO fails to meet its burden of proof (*see* cases cited in opening brief, ECF 170 at 5) to demonstrate that production of the documents at issue – pertaining to a private company's failed project to construct an automobile plant in 2018 – would violate PRC blocking statutes. Instead of presenting *evidence* from PRC authorities, NIO has only presented a declaration from its PRC discovery counsel whose description of the mandates of the PRC authorities evokes childhood

---

[1] For example, Category 3 opaquely includes "applications for government's approvals[,] government's decisions and feedbacks thereto" (ECF 170-3 at 4), which could refer to applications for construction permits and the government's response to such applications. Whereas the commencement of construction is hotly contested on summary judgment, with NIO denying that permits were needed, evidence which contradicts NIO's position is very important to the case.

[2] References to various decisions in this action are to "*In re DiDi*" followed by the applicable citation.

[3] As discussed in greater detail below, Plaintiffs did not decline the offer. Instead, Plaintiffs proposed a different protocol. NIO refused and filed its opposition instead.

[4] All citations to pages within an ECF document are to the stamped pagination at the top of the document, not to internal pagination, if any.

2

memories of the game "Telephone." *See* Declaration of Yanhua Lin ("Lin Decl.") ¶24 (ECF 173-1 at 8) (Lin's description of the discovery process is based upon "materials and information provided to me by NIO, including correspondence between NIO and its PRC co-counsel Han Kun Law Offices ("Han Kun"), relevant reports from Han Kun to NIO about Han Kun's communication to the MOJ on behalf of NIO").

That said, NIO's PRC discovery counsel makes several startling admissions that undercut the notion that production of the documents at issue would violate PRC Law. *First*, the MOJ did not make a document-by-document assessment of 1,400 documents submitted to the MOJ in January 2023; rather, *NIO decided* which documents to withhold based upon the MOJ's general guidance. Second, the guidance itself did not set a particularly restrictive bar: (i) do not produce documents containing personally identifying information; (ii) do not produce documents "containing sensitive government information that were not sufficiently related to the litigation." Lin Decl., ¶26 (ECF 173-1 at 9). The latter instruction reveals that *sensitive government documents can be produced*, as long as they are sufficiently relevant to the litigation. But NIO has already determined that the documents are relevant to the litigation when it marked them as responsive to Plaintiffs' requests for production. In any event, what is "sufficiently related" to this litigation is a matter for this Court to determine, not the Chinese government or NIO's PRC counsel. Additionally, NIO applied this broad guidance prospectively to documents - perhaps even whole categories of documents - never even seen by the MOJ, including documents NIO located *after* the MOJ provided guidance concerning the 1,400-document submission and *after* the MOJ indicated that it would no longer review documents for production. Lin Decl., ¶¶26, 29 (ECF 173-1 at 9-10). For the reasons set forth below, NIO's showing is legally insufficient for the Court to find that a conflict of law exists as to any particular document or set of documents.

In *In re DiDi*, cited by NIO (ECF 173 at 5), the court credited a declaration by the defendant's general counsel, who averred that "DiDi has submitted the documents responsive to plaintiffs' discovery requests to Chinese authorities and requested their permission to produce them to plaintiffs. He further states that the Chinese authorities allowed the majority of documents to be produced and required redaction or withholding of certain documents." On that basis, the Court found a conflict of laws existed with respect to the 3,600 documents that the defendant was told to redact or withhold. 2025 WL 743964, at *1-2. Although not first-hand information, the description of NIO's *initial* submission of 64 documents, for which "the MOJ approved in writing" the production of 49 documents, and instructed NIO to submit the remaining 15 documents to other agencies for approval, Lin Decl., ¶25 (ECF 173-1 at 8), is similar to the facts in *In re DiDi*. In contrast, here NIO's PRC counsel acknowledges that no PRC governmental agency engaged in a document-by-document review for either the second submission to the MOJ in January 2023 or the process by which the CAC suddenly gave verbal approval of the production of 10,000 documents in mid- to late 2024. *Compare* Lin Decl., ¶25, *with* ¶¶26-30.

In other cases, parties have also submitted official documents from foreign authorities stating that country's position on disclosure. *See Doubleline Capital LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561, at *6 (S.D.N.Y. Oct. 6, 2021) (letter from the Brazilian Federal Prosecutor's Office attesting: "The information and documents … are kept confidentially and can only be accessed to support investigations conducted by competent authorities, including to avoid jeopardizing ongoing investigations, in Brazil and abroad."). Although NIO's PRC discovery counsel claims that written instructions NIO received from PRC government authorities cannot themselves be disclosed to the Court without violating PRC laws (Lin Decl. at 8 n.6, ECF 173-1

at 8), that is not the case. Indeed, in *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 249 (S.D.N.Y. 2010) a letter from the MOJ was provided to the court by the defendant that had (unsuccessfully) resisted discovery; *see also In re DiDi*, 2025 WL 1735412, at *3 (S.D.N.Y. June 23, 2025) (defendant submitted CAC's official response to a request for clearance to produce documents to plaintiffs).

Short of a first-person declaration or an official government statement, a party may prove the existence of a conflict by submitting evidence that there have been prosecutions for disclosure. In *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143 (S.D.N.Y. 2011), the Court refused to enforce a third-party subpoena where the objector had provided PRC case law demonstrating that it could face enforcement action if it complied. *Id.* at 158-59 (distinguishing cases in which the party withholding documents provided no evidence of enforcement, making the threat of prosecution "speculative"); *see also Wultz v. Bank of China, Ltd.*, 298 F.R.D. 91, 97-98 (S.D.N.Y. 2014), (objecting party did not provide evidence of actual prosecutions under Israeli laws cited to block Rule 30(b)(6) deposition).[5]

Here, NIO fails to provide any PRC case law demonstrating prosecution. NIO's counsel baselessly suggests that the reason such cases do not exist is the "strong deterrent effect" of the Data Security Law itself. Lin Decl., ¶34 (ECF 173 at 11). More likely is the fact that the law simply does not apply to civil discovery between private parties. Specifically, NIO's PRC discovery counsel claims that the Data Security Law's ("DSL") express provision limiting its scope to requests for information made by "foreign judicial or law enforcement organizations," also applies to requests made by private parties in civil litigation. Lin Decl., ¶17 (quoting Art. 36 of the DSL) and ¶21 (claiming that excluding private parties' discovery would do an "end-run around seeking the necessary approvals"). ECF 173-1 at 5-7. Again, not so. "As courts have uniformly held Article 36 'is inapplicable to … any information produced in response to an FRCP discovery request." *Intex Recreation Corp. v. Bestway (USA), Inc.*, 2023 WL 11964260, at *3 (C.D. Cal. Oct. 30, 2023) (quoting *In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*, 2021 WL 6010575 at *10 (D.N.J. Dec. 20, 2021) and citing *Philips Med. Sys. (Cleveland), Inc. v. Buan*, 2022 WL 602485, at *6 (N.D. Ill. Mar. 1, 2022) and *Motorola Solutions Inc., v. Hytera Comm'ns Corp. Ltd.*, 2023 WL 5956992, at *4-5 (N.D. Ill. Sept. 12, 2023)). As the *Philips* court explained:

> Unlike in civil law jurisdictions where the judge takes a leading role in collecting evidence, discovery requests and responses thereto in the American common law system are traded between the parties. *See* Fed. R. Civ. P. 26(b); Geoffrey C. Hazard, Jr., *Discovery and the Role of the Judge in Civil Law Jurisdictions*, 73 Notre Dame L. Rev. 1017 (1998). While the court oversees the process, it does not make the request and is not involved in the stewardship or use of the exchanged information—in other words, the data is not provided "to the U.S. court."

---

[5] Although the courts in both *Tiffany* and *Wultz* performed a comity analysis, which only occurs after an actual conflict is found to exist, in *Wultz*, defendant bank, which had issued the subpoena, did not provide "counter-statements of Israeli law," to contest the third-party's assertion of a conflict, 298 F.R.D. at 96, and in *Tiffany*, the plaintiff seeking bank records did not contest the existence of an actual conflict. 276 F.R.D. at 151. Here, in contrast, Plaintiffs dispute the existence of an actual conflict of law.

4

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202 - 3827

2022 WL 602485, at *6.

Having submitted no proof of a conflict, NIO should be ordered to produce all documents.

### C. Comity Weighs in Favor of Compelling Production

#### 1. The Withheld Documents are Important to this Litigation[6]

NIO told investors ahead of its IPO that the Shanghai government had begun, and was currently, constructing NIO's Shanghai Facility. The best evidence NIO could trot out in support of its version of the story is a picture, created using Adobe Photoshop,[7] of a load testing ceremony, as well as various "proof" that conflates construction of the factory with preparing the site for construction. But no number of ceremonies or site-preparation work changes the truth that construction of the Shanghai Facility had not yet begun at the time of the IPO, a truth that NIO admitted on multiple occasions. Indeed, at his deposition, NIO's CEO Bin Li confirmed that "the purchase of the land and the actual building or construction of the factory building" had not started even as late as January 2019 – four months after the IPO.[8] This is consistent with NIO's admission to Goldman Sachs during its private bond offering, conducted approximately five months after the IPO, that NIO's "Shanghai plant has not broken ground yet."[9]

Among the evidence that Plaintiffs submitted in support Plaintiffs' motion for partial summary judgment was that none of the government permits and approvals needed for construction to begin had been issued for the Shanghai Facility. NIO argues in its cross motion that Plaintiffs' expert did not perform a thorough search of permits and overlooked certain approvals that were obtained, and that in any event, permits weren't necessary to begin construction.[10] Yet, two of the categories of documents that NIO is refusing to produce are about government approvals and licenses, including the government's "feedback" regarding applications for approvals.[11] A material issue that is the subject of vigorous dispute in a summary judgment motion is not so unimportant that NIO may withhold documents on the exact same issue.

The withheld documents are also important to the question of when the Shanghai government pulled out of the Shanghai Facility construction project. This is not a new theory of the case. Plaintiffs are not alleging any new false statements. Rather, discovery has revealed that the ***same statements already alleged to be false*** are false for an additional reason: the Shanghai government could not have been "currently" constructing the Shanghai Facility if it had already

---

[6] It is absurd for NIO's U.S. counsel to represent to the Court that the withheld documents are unimportant when they have never seen any of them. *See* 5/2/2025 Hearing Transcript at 16:5-6 (ECF No. 170-18, at 17) (Ms. Flumenbaum: "… I haven't seen these documents. The U.S. attorneys haven't.")

[7] ECF No. 121-6 at 4.

[8] Ex. 18, Bin Li 5/12/2025 Deposition Transcript at 167:18 - 168:10. All citations to "Ex." are to exhibits of the Declaration of Laurence Rosen in Further Support of Plaintiffs' Motion to Compel, filed herewith.

[9] Ex. 19, at pg. 19.

[10] Ex. 20, at pg. 20.

[11] ECF No. 170-3 at 4-5.

pulled out of the project. As discussed in Plaintiffs' opening papers, there is no question that the Shanghai government pulled out of the project, the critical issue is *when* – and the withheld documents, which included "cooperation memorandum" and "agreements" with the government and related documents – will answer that question.

Notably, NIO in its opposition does not even attempt to argue that the withheld documents are unimportant to the question of when the Shanghai government withdrew from the project (*i.e.* that it was no longer going to be financing the purchase of the land and the construction of the Shanghai Facility). Instead, NIO baldly asserts that the Shanghai government never withdrew. NIO's fervent denial is belied by the documentary evidence. For example, NIO in its opposition tries to explain away the spreadsheet of alternative funding scenarios for the factory (Ex. 6; ECF No. 170-7) by asserting, without any basis, that the spreadsheet was prepared because NIO wanted to expand the project. This is pure fabrication.[12] In several of the scenarios (*e.g.,* Alt 5a and Alt 6a), the size of the project – as measured by total capital investment - actually contracted instead of expanded.[13]  Critically, for each scenario that contemplated the Shanghai government funding the originally agreed-to amount (*i.e.* RMB 2.43 billion) for the acquisition of the land and construction of the factory,[14] NIO's spreadsheet notes: "**will the government reconsider?**" (*See* Alt 3, 4, and 5(b)). That these scenarios required the government to "reconsider" means that the government had withdrawn from the project.[15] And that this detailed funding spreadsheet – with precise amounts of investments by major investors across eleven different scenarios – was created *less than a month* after the IPO strongly suggests that the Shanghai government had already exited the project at the time of the IPO. *In re DiDi*, 2024 WL 1119483, at *14 (S.D.N.Y. Mar. 14, 2024) (holding that because "Didi was not in material compliance in early July, it was more than likely not in compliance in late June, when the registration statement [for Didi's IPO] became effective.').[16]

Moreover, faced with incontrovertible evidence that the Shanghai government's project company, Jiawei, withdrew from the construction project, NIO now tries to make a distinction

---

[12] The spreadsheet also shows that the planned "Factory construction start time" is from 4.5 months to 10 months *after* the IPO for each of the eleven scenarios. This is further evidence that construction hadn't started at the time of the IPO.

[13] The Framework Agreement estimated the total investment for the project to be RMB 6.13 billion.  *See* Framework Agreement, Article 4 (ECF No. 170-4 at 4).  Alt 5a and Alt 6a contemplate total investments of RMB 5.6 billion.

[14] *See* Framework Agreement, Article 4 (ECF No. 170-4 at 4) (RMB 800 million for the land and RMB 1.63 billion for the construction of the factory, for a total of RMB 2.43 billion).

[15] NIO asserts that the Shanghai government did not withdraw from the project because in the scenarios where the Shanghai government was no longer financing the land and construction, it agreed to provide a "interest subsidy." This argument is a tacit admission that the Shanghai government had pulled its RMB 2.43 billion funding for the land and construction of the Shanghai Facility, leaving NIO to find other investors to pay for the land and construction costs.

[16] Indeed, in disputing that the Shanghai government withdrew, NIO is accentuating why the withheld documents – which includes agreements and related documents with Shanghai authorities regarding the Shanghai Facility – are important and must be produced: the withheld documents will provide additional conformation that the Shanghai government pulled out of the project.

between Jiawei and its parent company, Shanghai Auto City, and claims Jiawei's withdrawal had no impact on Shanghai Auto City's involvement. NIO's strained denial fails to explain why, if Shanghai Auto City was still constructing the factory, it did not establish a new project company to replace Jiawei, or why it was NIO (and not Shanghai Auto City or a new project company establish by Shanghai Auto City) that had to assume the financial obligations and contracts that Jiawei had entered into for the Shanghai Facility (*See* Plaintiffs' opening motion, ECF No. 170 at 3-4).

### 2. Specificity of the Requests

NIO does not, and cannot, dispute that the withheld documents were the result of searches ran on agreed-upon search terms and that NIO has determined the documents are responsive to Plaintiffs' requests for document production. NIO has already identified these documents as relevant, and NIO would have produced them but for NIO's claim that PRC blocking statutes prevented their disclosure. Plaintiffs' requests do not suddenly become overbroad just because NIO decided it was going to withhold them on PRC law grounds.

If NIO were to produce all 950 documents that it has withheld due to PRC blocking statutes, the total number of documents NIO would produce in this litigation would be approximately 11,000. This is an eminently reasonable number of documents in a complex securities class action stemming from a $1.1 billion IPO, and shows that Plaintiffs' discovery requests are not overbroad.

NIO is withholding documents because the PRC government supposedly instructed NIO to withhold documents that were not "sufficiently related to the litigation." Lin Decl., ¶26 (ECF 173-1 at 9). As previously stated, the PRC government cannot supplant this Court in deciding what documents are or are not "sufficiently related" to this litigation. Moreover, it was NIO's PRC counsel, not the MOJ, that made the actual determination as to whether a withheld document was "not sufficiently related to the litigation." *Id*. Indeed, as Judge Garaufis told NIO during a May 22, 2024 hearing: "A federal judge in New York does not wait for the Chinese government…to come up with the documents…if your documents are not provided in a timely way, the prejudice is to you, not to the plaintiff."[17] Likewise, this Court should not allow NIO's PRC counsel to oversee discovery in this action by dictating which documents, among those *already determined* to be relevant by NIO, are "sufficiently related" to this litigation.

NIO's "offer" to have Plaintiffs engage a lawyer in the PRC to review the documents at NIO's offices in Shanghai is illusory. Plaintiffs' PRC counsel would be prohibited from, for example, taking notes and bringing them away from the premises (even if it is merely a list of document numbers and the issues to which they pertain), or submitting any declaration about the documents (even if it is only to state, generally and without citing to any specific content, that a certain document is important to the litigation). Worse, even if Plaintiffs' PRC counsel identified important documents and NIO agreed to produce them, NIO insisted on the right to only produce redacted versions to supposedly comply with PRC law. NIO's offer is not a serious offer, and while Plaintiffs negotiated in good faith for weeks – including consenting to multiple extensions for NIO to file its opposition to the instant motion – in the hopes of reaching an agreement, NIO did not respond to Plaintiffs' last set of revisions.

---

[17] 5/22/2024 Hearing Transcript at 13:24 – 14:7 (ECF No. 136 at 13-14).

7

**THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827**

### 3. Origin of the Documents

While there is no dispute that the documents likely originated in the PRC, this factor can be "counterbalanced" by a finding with respect to the next factor in the comity analysis, *i.e.*, that the information cannot be easily obtained through alternative means, "thus favoring disclosure." *In re DiDi*, 2025 WL 267893, at *3 (S.D.N.Y. Jan. 22, 2025).

### 4. Alternative Means

NIO's suggested alternative means are: (1) defendants' own self-serving deposition testimony, (2) the Hague Convention – that courts in the Second Circuit have consistently held to not be a viable method for getting discovery out of the PRC, and (3) NIO's disingenuous "offer" to have Plaintiffs retain a PRC lawyer to review the documents in the PRC (but not be allowed to take notes with him, submit a declaration, or export a list of important documents and the issues to which they pertain).

That defendants are unlikely to self-incriminate and confess to committing fraud is why Judge Kaplan held that "written or oral answers are imperfect substitutes for document production." *In re DiDi*, 2025 WL 1735412, at *5. When Plaintiffs asked specifically about withheld documents for which he was listed as a "Key Individual Involved," Defendant Louis Hsieh – NIO's CFO at the time of the IPO – said he did not know what they were.[18] When asked about the "status and progress of negotiations with the Shanghai government regarding the new plant" discussed at NIO's November 2018 board meeting, NIO's CEO Bin Li responded: "I really don't recall this very detailed scenario or information clearly, and regarding the description or the text related to the board meeting here, did we produce any document for this? If you have that in the production, perhaps you can show me. That would help me remember."[19] Depositions did not provide an alternative means of obtaining critical evidence.

Courts in this circuit overwhelmingly hold that the Hague Convention is not a viable method for a litigant to obtain discovery from the PRC. *See, e.g., In re DiDi,* 2025 WL 267893, at *4; *Owen v. Elastos Found.*, 343 F.R.D. 268, 287 (S.D.N.Y. 2023); *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 338 (S.D.N.Y.); *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 557 (S.D.N.Y. 2012); *Gucci Am., Inc. v. Weixing Li*, 2011 WL 6156936, at *9 (S.D.N.Y. Aug. 23, 2011). NIO's sole in-circuit case, *Tiffany*, 276 F.R.D. at 156 (*see* ECF 173 at 10), does not help NIO and instead illustrates the futility of going through the Hague Convention to obtain discovery from the PRC: Nine months after being ordered to seek documents from via the Hague Convention, the plaintiffs there still could not obtain the documents they sought, as the Chinese government only "partly executed" the request. *Tiffany (NJ) LLC v. QI Andrew*, 2015 WL 3701602, at *1 n.1 (S.D.N.Y. June 15, 2015).

As discussed above, NIO's offer to have Plaintiffs' PRC counsel review the documents in Shanghai is rife with unacceptable conditions as to make the offer illusory, including the inability of Plaintiffs' PRC counsel to take notes out of the premises or use any information learned in a renewed motion to compel, and NIO's insistence on the right to produce documents in redacted form (if NIO agrees to produce any documents at all following such a review).

---

[18] Louis Hsieh 6/20/2025 Deposition Transcript at 122:2-123:12 (ECF No. 170-17 at 4-5).
[19] Bin Li 5/12/2025 Deposition Transcript at 159:21-161:4 (ECF No. 170-15 at 5-6).

### 5. Balance of National Interests

Having come to this country to raise $1.1 billion from U.S. investors, NIO cannot now hide behind its interpretation of PRC law to shield itself from liability. NIO's argument that the U.S. has a strong interest in upholding its securities laws only when the SEC is a plaintiff (ECF 173 at 11 n. 12), is pure nonsense. The Supreme Court has long described private securities litigation as a "most effective weapon in the enforcement" of the federal securities laws and a "necessary supplement" to public enforcement led by the SEC. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985). Here, NIO is thwarting the U.S.'s undeniably strong interest in upholding its securities and discovery laws by withholding key evidence – evidence that NIO has identified as relevant to this litigation, and the importance of which has only become more pronounced as the case progressed.

NIO suggests that the U.S.'s interests are not absolute, citing *Tiffany*'s refusal to compel compliance simply because the objectors "do business in the United States" because … [a]n entity's presence in the United States, without more, does not obviate the need" to balance the countries' respective interests. ECF 173 at 11. The language from *Tiffany* quoted by NIO underscored that the banks were not parties to the litigation, a fact which lessened the U.S.'s interest in enforcing its discovery laws. 276 F.R.D. at 158. Additionally, the banks provided case law evidencing likely prosecution under the conflicting PRC law. *Id.* at 158-59. Indeed, one of the banks indicated that it has been previously prosecuted for unintentional violations. *Id.* at 157.

In contrast to the U.S.'s strong interest, NIO musters virtually no basis upon which the Court can conclude that the PRC has a strong interest in preventing disclosure. NIO cites a single case, *Tiffany*, for its proposition that "[i]t is indisputable that the PRC has a strong interest in enforcing its data privacy, state secrecy and criminal laws." ECF 173 at 10. But *Tiffany* involved a third-party invoking bank secrecy laws, not the laws NIO seeks to use as a shield to production. 276 F.R.D. at 150. While it is true that NIO lists the Law on Guarding State Secrets and the "Supreme People's Court's Judicial Interpretation on Several Issues concerning the Specific Application of the Law in the Trial of Cases of Stealing, Spying on, Purchasing or Illegally Providing State Secrets or Intelligence to Entities outside the PRC Territory," as bases for withholding documents, suggesting even more is at stake here, its PRC discovery counsel merely gives lip service to all but the DSL. Lin Decl., ¶¶15-21 (¶16: "Article 36 of the DSL is most relevant to the Plaintiffs' Motion"). Moreover, the mere invocation of laws relating to state secrets and espionage does not convert documents pertaining to the actions of Shanghai provincial authorities in relation to the construction of an automobile plant for a private company into top secret documents the disclosure of which could result in serious sanctions. *See In re DiDi*, 2025 WL 267893 at *4 (distinguishing civil discovery from the sale of military secrets).

Despite its PRC discovery counsel's focus on Article 36 of the DSL, NIO provides no instance of prosecution for its violation. This weighs against a finding of that the PRC has a strong national interest in enforcing the DSL with respect to civil discovery in this country. *See Concepts NREC, LLC v. Qiu*, 662 F. Supp. 3d 496, 532 (D. Vt. 2023) ("The Court has no information demonstrating that a Chinese individual or entity has been penalized under the DSL or other Chinese laws for compliance with a discovery demand in a U.S. court."); *In re DiDi*, 2025 WL 267893 at *4 (same). Indeed, without submission of any written instruction from the MOJ or CAC or a declaration by anyone who actually received either the written or oral instructions directly from either agency, "[t]he Court is left to rely on [NIO's] vague accounts of instructions purportedly issued by the Chinese government, devoid of any details from which the Court could

determine the strength of the interest at issue." *In re DiDi*, 2025 WL 1735412, at *4 (questioning strength of PRC's interest, *despite* production of written instructions from the CAC). Similarly, in *Milliken*, where the party resisting discovery presented a letter from the MOJ attesting to the PRC's interests in enforcing its laws, the court found that although the letter "refers obliquely to compliance with the Criminal Procedure Law of the PRC, the Ministry has not voiced any objections to disclosure *in this case,* which the Second Circuit has found militates against a finding that strong national interests of the foreign country are at stake." *Milliken*, 758 F. Supp. 2d at 249 (internal quotations omitted, emphasis in original). With the exception of the MOJ's written approval for the production of 49 documents from NIO's initial submission in February 2022, there is no evidence that the MOJ or the CAC applied any specified laws to approve or prohibit the disclosure of documents.[20] Rather, NIO admits that *its PRC counsel* applied the guidance given by the MOJ and CAC in deciding which documents from subsequent productions could be withheld. Lin Decl. at ¶¶26, 30. ECF 173-1 at 9, 10. It strains credulity that if the PRC had a strong national interest in these documents not leaving the country, they would trust attorneys in private practice to make such decisions.

Indeed, when it cared enough, the Chinese government has interjected in support of PRC defendants in U.S. litigation. In *In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 154 (2d Cir. 2021), the Chinese government "made four submissions to the District Court" to explain that a PRC defendant's alleged misconduct was actually in compliance with Chinese law. It is no surprise that the Chinese government did not do so here. It is absurd to think that disclosure of certain details of a factory construction project that never even got off the ground *seven* years ago will endanger PRC national security or place at risk any national interest. Common sense shows there is no important PRC national interest at stake.

For these reasons, the balance of national interests strongly weighs in favor of compelling production of the documents on the Withholding Log.

### 6. Hardship and Good Faith

The Supreme Court in *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, (1987) did not consider hardship or good faith in its comity analysis. The Second Circuit in *Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013) made clear that hardship and good faith are relevant only when deciding whether to impose sanctions: "Cases from our Circuit counsel that, **when deciding whether to impose sanctions,** a district court should also examine the hardship of the party facing conflicting legal obligations and whether that party has demonstrated good faith in addressing its discovery obligations." *Id.,* 706 F.3d 92 at 110 (emphasis

---

[20] In April 2024 - more than a year after 1,400 documents were submitted to the MOJ for review and four months after the MOJ indicated that it was no longer accepting applications for review - the MOJ provided verbal approval for the production of 29 documents. Lin Decl., ¶27 (ECF 173-1 at 9). Indeed, if in response to the submission of 1,400 documents in January 2023, NIO's counsel had been given instructions in March 2023 to withhold two categories of documents, *id.* at ¶26, why did the MOJ suddenly reassert its authority? NIO's PRC discovery counsel provides no explanation for this action by the MOJ. This unexplained, belated production approval also weighs against a finding that the PRC has a strong interest with respect to nondisclosure of the documents at issue. *Cf. In re DiDi*, 2025 WL 1735412, at *3 (no explanation was given for belated authorization to produce previously withheld documents).

added). *See also In re DiDi*, 2025 WL 833437, at *3 (S.D.N.Y. Mar. 17, 2025) (holding that hardship and good faith are relevant to the issue of sanctions - not to determining whether a motion to compel should be granted in the first instance). Because Plaintiffs here are only seeking the production of documents, not sanctions, the Court need not consider hardship and good faith at this time.

In any event, NIO's claim of hardship is illusory. As Professor Zhang Hong stated in her expert declaration, *no company* has ever been prosecuted or otherwise penalized by the PRC government for transmitting documents overseas in the civil litigation context.[21] Judge Kaplan also declined to find hardship in a similar situation in an ongoing securities class action involving DiDi Global, a PRC-based ride-hailing company: "While DiDi argues that disclosure would subject it and its deponent to severe criminal sanctions in China, each of the examples cited by their experts involves military-related secrets, collaboration with foreign intelligence services, provision of sensitive information to foreign entities in exchange for money, and/or documents expressly designated as confidential by the Chinese government. None of these circumstances applies here." *In re DiDi,* 2025 WL 267893, at *4.

Nor has NIO acted in good faith. NIO's conduct during the entire course of discovery has been one of delay and obfuscation. For example, Plaintiffs served their first requests for production in September 2021; from September 2021 to January 2023 – a period of approximately 1.5 years – NIO only applied to PRC authorities to produce 64 documents. Lin Decl. ¶¶25-26 (ECF 173-1 at 8-9). For almost an entire year between February 2022 and January 2023, NIO did not make a single request to the PRC government to produce documents. *Id.* Plaintiffs asked for deposition dates in November 2024; NIO did not provide dates until February 2025 – and only after Plaintiffs filed a letter to Your Honor for an order requiring NIO to provide deposition dates. *See* ECF No. 147. NIO also refused to provide a log of documents it was withholding under PRC law until after the deadline to produce documents, supposedly because it could not determine which documents – if any – it would need to withhold. *See* 7/9/2024 Hearing Transcript at 20:16-20:18 (ECF No. 139 at 20) (NIO told the Court: "we're trying to produce the documents. So I am hoping to not have to log – we're hoping to not have to log them.").[22] Additionally, as discussed above, NIO is now claiming that it could not produce written determinations from the PRC government concerning what documents NIO was permitted to produce because such written determination is itself a secret, when multiple other Chinese defendants have produced such written document from the Chinese government – including from the same two PRC agencies that were involved here.

---

[21] Declaration of Professor Zhang Hong at ¶¶12, 80 (ECF No. 170-2 at 5, 30-31).

[22] In the same breath, NIO is asserting that Plaintiffs already knew, months earlier when the summary judgment schedule was entered, that NIO would withhold documents based on PRC law. How could Plaintiffs know that NIO was going to be withholding documents if NIO itself did not know? Indeed, at the same hearing, counsel for NIO admitted that Plaintiffs' counsel did not know what documents NIO was going to withhold. 7/9/2024 Hearing Transcript at 18:16-18:19 (ECF No. 139 at 18).

### D. Conclusion

For at least the reasons stated herein and in Plaintiffs' opening papers, NIO should be ordered to produce all documents from Categories 1 to 7 of its Withholding Log that were created on or after March 1, 2018.

Respectfully submitted,

*/s/ Laurence Rosen*
Laurence Rosen

CC: all counsel of record via ECF

**THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202 - 3827**