# EXHIBIT 20

Case 1:19-cv-01424-NGG-JRC    Document 174-4    Filed 08/28/25    Page 1 of 53 PageID #: 5560

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- x
                                                           :   Case No.: 19-cv-1424 (NGG) (JRC)
                                                           :
*In re NIO, Inc. Securities Litigation*                    :   **Oral Argument Requested**
                                                           :
                                                           :
                                                           :
---------------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**


Served on January 30, 2025

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. iv

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 6

      A.    Construction of the Shanghai Facility Began in March 2018 ................................. 6

      B.    NIO's IPO in September 2018 ............................................................................. 8

      C.    In March 2019, NIO Announced Poor Earnings Results, Lowered Guidance, and Called Off the Shanghai Facility (the Alleged Corrective Disclosure) ............................................................................................ 10

      D.    NIO Continued to Face Headwinds Throughout 2019 ....................................... 12

      E.    Procedural History of the Litigation ................................................................... 12

STANDARD OF REVIEW .................................................................................................... 13

ARGUMENT ........................................................................................................................ 14

I.      THE UNDISPUTED FACTS SHOW THAT THE CHALLENGED STATEMENTS IN THE OFFERING DOCUMENTS WERE ACCURATE ................. 14

      A.    The Offering Documents Accurately Disclosed That Construction on the Shanghai Facility Had Begun .......................................................................... 15

      B.    Plaintiffs Offer No Justification for Applying Hyper-Technical Definitions of Construction, Based on Chinese Law ............................................................. 18

      C.    In Any Event, Whether "Construction" Under Plaintiffs' Strained Definition Had Begun Is Immaterial ................................................................... 21

      D.    The Offering Documents Did Not Omit Any Risks ............................................ 25

II.      PLAINTIFFS CANNOT SHOW A GENUINE DISPUTE OF FACT AS TO LOSS CAUSATION ................................................................................................ 27

      A.    Plaintiffs' Alleged Corrective Disclosure Was Not Corrective ........................... 28

      B.    The Decline in NIO's ADS Price Was Caused by Other News ........................... 30

          1.    The Market Viewed the Termination of the Shanghai Facility as a Positive ................................................................................................ 32

2.    Any Drop in NIO's ADS Price Was Instead Entirely Attributable to Other, Unrelated Negative News. .................................................................34

C.    Any Revelation that Prior Construction Was Not Previously Underway Did Not Create Independent Loss ...........................................................37

III.    PLAINTIFFS CANNOT SHOW A GENUINE DISPUTE OF MATERIAL FACT AS TO SCIENTER ...............................................................................................39

IV.    PLAINTIFFS' CONTROL PERSON CLAIMS FAIL ......................................................42

V.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSITY SHOULD BE DENIED .................................................................................42

CONCLUSION ..........................................................................................................................43

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Akerman v. Oryx Communications, Inc.*,
     810 F.2d 336 (2d Cir. 1987)..................................................................................31

*In re American Express Anti-Steering Rules Antitrust Litigation*,
     361 F. Supp. 3d 324, 334 (E.D.N.Y. 2019) .........................................................14

*In re Barclays Bank PLC Securities Litigation*,
     No. 09 Civ. 1989 (PAC), 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756
     F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).............................32, 34

*In re Barclays Bank PLC Securities Litigation*,
     756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018)...........................29

*Boluka Garment Co. v. Canaan Inc.*,
     547 F. Supp. 3d 439 (S.D.N.Y. 2021)..................................................................37

*In re Canandaigua Securities Litigation*,
     944 F. Supp. 1202 (S.D.N.Y. 1996).....................................................................40

*Chill v. General Electric Co.*,
     101 F.3d 263 (2d Cir. 1996)..................................................................................40

*Dalberth v. Xerox Corp.*,
     766 F.3d 172 (2d Cir. 2014)............................................................................14, 39

*Dura Pharmaceuticals, Inc. v. Broudo*,
     544 U.S. 336 (2005)..............................................................................................31

*In re DVI, Inc. Securities Litigation*,
     No. 03 Civ. 05336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ........................38

*In re E-House Securities Litigation*,
     No. 20 Civ. 2943 (ER), 2021 WL 4461777 (S.D.N.Y. Sept. 29, 2021) ..............36

*Ellington Construction Corp. v. Zoning Board of Appeals of Inc. Village of New
     Hempstead*,
     77 N.Y.2d 114 (1990) ...........................................................................................16

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
     574 F.3d 29 (2d Cir. 2009).....................................................................................31

*Goldkrantz v. Griffin*,
No. 97 Civ. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999)..................................................................................33, 34

*Gross v. GFI Group, Inc.*,
310 F. Supp. 3d 384 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019)............39, 42

*Holbrook v. Trivago N.V.*,
No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) ..........................................18

*In re International Business Machines Corp. Securities Litigation*,
163 F.3d 102 (2d Cir. 1998)....................................................................................14

*Iowa Public Employees' Retirement System v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010)....................................................................................28

*Jaffer v. Hirji*,
887 F.3d 111 (2d Cir. 2018)................................................................................13, 14

*In re JP Morgan Chase Securities Litigation*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................22

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................................................................................28

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ..................................................................................20

*Lowe v. Salomon Smith Barney, Inc.*,
206 F. Supp. 2d 442 (W.D.N.Y. 2002) ....................................................................33

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024), *vacated and superseded on denial of rehearing*, No. 21-2524, 2024 WL 4356386 (2d Cir. Oct. 01, 2024)...........................................................25

*Madden v. Deloitte & Touche, LLP*,
118 F. App'x 150 (9th Cir. 2004) ............................................................................34

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022) ....................................................................................13

*In re Moody's Corp. Securities Litigation*,
No. 07 Civ. 8375 (GBD), 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) ................. *passim*

*Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010).....................................................................................42

*In re Northern Telecom Ltd. Securities Litigation*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)................................................................42

*In re NIO Inc. Securities Litigation*,
211 A.D.3d 464 (1st Dep't 2022) .......................................................................13

*In re NIO, Inc. Securities Litigation*,
No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023).....13, 32, 35

*In re NIO, Inc. Securities Litigation*,
No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)...13, 25, 27

*In re Omnicom Group, Inc. Securities Litigation*,
597 F.3d 501 (2d Cir. 2010)..........................................................................28, 29

*In re Omnicom Group, Inc. Securities Litigation*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) .......................28

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)................26

*In re ProShares Trust Securities Litigation*,
728 F.3d 96 (2d Cir. 2013)...........................................................................16, 22

*In re Puda Coal Securities Inc. Litigation*,
30 F. Supp. 3d 230 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F.
App'x 55 (2d Cir. 2016)................................................................................40, 41

*Ramirez v. Exxon Mobil Corp.*,
No. 16 Civ. 03111-K, 2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .............................38

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...........................................................................14

*Schoonmaker Homes--John Steinberg, Inc. v. Village of Maybrook*,
178 App. Div. 2d 722 (1991) ............................................................................17

*SEC v. AT&T, Inc.*,
626 F. Supp. 3d 703 (S.D.N.Y. 2022)................................................................35

*SEC v. GenAudio, Inc.*,
32 F.4th 902 (10th Cir. 2022) .........................................................................20

*Shanahan v. Vallat*,
No. 03 Civ. 3496(PAC), 2008 WL 4525452 (S.D.N.Y. Oct. 3, 2008)............................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).....................................................................................39

vi

*Town of Orangetown v. Magee*,
156 Misc. 2d 881 (N.Y. Sup. Ct. Rockland Cnty. 1992), *aff'd in part, rev'd in part and dismissed in part*, 215 App. Div. 2d 469 (1995) ...................................................17

*In re WorldCom, Inc. Securities Litigation*,
No. 02 Civ. 3288 DLC, 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005) ...............................28

## STATUTES

15 U.S.C. § 77k(a) ................................................................................................................14

15 U.S.C. § 77k(e) ................................................................................................................31

17 C.F.R. § 229.303 ..............................................................................................................26

17 C.F.R. § 229.503(c)..........................................................................................................27

## RULES

Fed. R. Civ. P. 56(a) .............................................................................................................13

## OTHER AUTHORITIES

Consolidated Class Action Complaint, *In re NIO Inc. Securities Litigation*,
No. 653422/2019 (Sup. Ct. N.Y. Cnty. filed Oct. 25, 2019), NYSCEF No. 37 ................12

Consolidated Amended Class Action Complaint, *In re NIO Inc. Securities Litigation*,
No. 653422/2019 (Sup. Ct. N.Y. Cnty. filed Apr. 2, 2021), NYSCEF No. 134................12

Decision & Order, *In re NIO Inc. Securities Litigation*,
No. 653422/2019 (Sup. Ct. N.Y. Cnty. Oct. 4, 2021), NYSCEF No. 170 ........................13

**PRELIMINARY STATEMENT**

Plaintiffs concede dispositive facts that warrant summary judgment for Defendants[1] on all claims and mandate denial of their own motion for partial summary judgment. This securities fraud action arises out of the September 12, 2018 initial public offering ("IPO") for NIO, a Shanghai-based electric vehicle ("EV") company that has been called "the Tesla of China." The registration statement and prospectus for NIO's IPO (the "Offering Documents") disclosed that construction had ***begun*** on a new manufacturing facility for the Company (the "Shanghai Facility"). Six months after the IPO, however, NIO announced that the Shanghai Facility project was ***terminated***, and that NIO would instead continue its partnership with a third-party manufacturer. While Plaintiffs' Second Amended Complaint ("SAC") claims that construction never actually started on the Shanghai Facility (which is the sole misstatement alleged), the undisputed evidence in this case, including Plaintiffs' own admissions, confirms that construction was underway and significant work had been done on the Shanghai Facility project as of NIO's IPO. Accordingly, as demonstrated below, the evidence in this case does not support Plaintiffs' claim that the Offering Documents contained a material misstatement, and Defendants are entitled to summary judgment on all claims for at least the following reasons:

***First***, the undisputed facts show that the challenged statements in the Offering Documents were accurate. The evidence shows that construction began months before the IPO, meaning the Offering Documents were not false or misleading (let alone materially so). There

---

[1]    NIO, Inc. ("NIO" or the "Company"); Tian Cheng, Louis T. Hsieh, Bin Li, Xiang Li, Lihong Qin, Padmasree Warrior, Hai Wu, Yaqin Zhang, Xiangping Zhong, and Zhaohui Li (the "Individual Defendants); and Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C, J.P Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, UBS Securities LLC, and WR Securities, LLC (the "Underwriter Defendants," and together with NIO and the Individual Defendants, "Defendants")

are even pictures, such as this one from March 2018—six months before the IPO in September 2018:



(56.1 ¶ 30; Ex. 51.)[2]  As can be seen, the Shanghai Facility had, prior to NIO's IPO, concrete piles, cranes, bulldozers, and personnel at the project site.  (Ex. 52.)  Undoubtedly, construction was underway well before the IPO.

As Lead Plaintiff Mark Mundy admitted during his deposition, a "shovel in the ground" means construction has started.  (56.1 ¶ 15; Underwriters 56.1 ¶ 18; Ex. 12, Mundy Tr. 156:7-12.)  Plaintiffs also conceded that various work was done on the Shanghai Facility before the IPO, including "(a) putting up temporary fences and gates to close off the construction site, (b) digging a temporary trench for drainage, (c) backfilling and ground leveling, and (d) load testing of trial piles."  (Plaintiffs' Motion for Partial Summary Judgment ("Pls. MSJ" or "Plaintiffs' Motion") at 6.)  This pre-IPO construction work is reflected in, among other things, contemporaneous progress reports from the third-party company that was in charge of the

---

[2]  Citations to "Ex. __" are exhibits attached to the Declaration of Robert A. Fumerton, dated January 30, 2025, and citations to "56.1 ¶ __" are to NIO's Local Rule 56.1 Statement of Undisputed Facts, both of which are submitted herewith.  Citations to "Underwriters 56.1 ¶ __" refer to the Underwriter Defendants' Counterstatement of Undisputed Material Facts.

2

construction, which included pictures akin to the above.  NIO's government partner also confirmed in due diligence for the IPO that the Shanghai Facility was "under construction" as of April 2018 (five months before the IPO).  (56.1 ¶ 39; Underwriters 56.1 ¶ 20; Ex. 66 at -21.)

Unable to dispute the pre-IPO work that was done, Plaintiffs are left to quibble about semantics.  They insist that the work that occurred at the Shanghai Facility was not *real* construction, it was merely "pre-construction," and argue that investors would have drawn a material distinction between the two.  But there is no evidence (or law) to support such hair-splitting.  To support this claim, Plaintiffs cite technical definitions of "construction" under arbitrary Chinese regulations and argue the work completed on the Shanghai Facility does not count, but the Offering Documents—US public disclosures issued in connection with the sale of American Depositary Shares ("ADS")—did not use "construction" as a Chinese legal term of art. They used it in the plain-English sense—"shovels in the ground"—just like Plaintiff admitted. Yet even under Plaintiffs' unsupportable and overly narrow interpretation of "construction," summary judgment for Defendants is still warranted.  Defendants' expert, Mr. Chuang Qiu—an architect, surveyor, and construction project manager who is currently the General Manager of United Construction Management (Beijing) Management Consulting Co. Limited and who has extensive educational and practical experience with Chinese construction projects—confirms that the activity on site was well within the definition of "construction" in China.[3]

Still, Plaintiffs complain that various permits had not yet been obtained (which NIO disclosed in the Offering Documents) and that NIO's lease for the Shanghai Facility had not yet been executed (which NIO also disclosed).  Regardless, that does not change the undisputed fact that construction had begun and remained ongoing before NIO publicly announced its change of

---

[3]    The Expert Declaration of Mr. Qiu's is attached as Ex. 1 to the Fumerton Declaration submitted herewith.

plans months after the IPO. And Plaintiffs ignore that certain permits were issued for the Shanghai Facility. Thus, NIO's statement that construction had begun at the time of the IPO was true at the time it was made. Plaintiffs' supposed expert does not move the needle, as he fails to provide a consistent or widely accepted definition for construction and instead relies on esoteric Chinese regulations that no reasonable U.S. investor would even know of, let alone care about.

Further, in light of the undisputed pre-IPO construction that occurred, no reasonable investor could have been misled by the Offering Documents' statement that "construction has started," and certainly not materially so. Any distinction between whether "construction" or "pre-construction" had begun would not materially change the total mix of information available to the market, particularly for an early stage project with a disclosed timeline for completion that Plaintiffs have not alleged was inaccurate. That is dispositive and warrants summary judgment for Defendants on all claims.

*Second*, Plaintiffs cannot show a genuine dispute of fact as to loss causation, and thus cannot plausibly show that the allegedly false statement that construction had started was the cause of their loss. Plaintiffs fail to point to any corrective disclosure stating construction had not started (because no such corrective statement exists). Instead, Plaintiffs rely on the announcement of the project's *termination*—a different issue entirely. Indeed, the market reacted favorably to this news, with multiple analysts citing it as a positive that would reduce capital expenditures, free up cash flow, and preserve the flexibility of NIO's existing third-party manufacturing model. Worse still for Plaintiffs, the termination was announced along with a bleak fourth quarter and full year 2018 earnings report. Among other things, NIO disclosed a 92% increase in net loss (approximately $1.4 billion for FY 2018), a sharp drop in demand due to the elimination of government subsidies for EVs, and its expectation that weak demand was

4

likely to persist through the second quarter of 2019.  It was this cavalcade of bad earnings news that caused the more than 30% drop in NIO's ADS price that Plaintiffs now want to recoup—not the termination of the Shanghai Facility (which was viewed by contemporaneous analyst reports as a net positive) or a revelation that construction never started (of which there was none). Defendants' expert Dr. Paul Gompers—an economics and finance professor at Harvard Business School who has extensive experience valuing public companies and opining on factors affecting public companies' securities prices—confirms that none of the reaction in NIO's ADS price following its March 6, 2019 disclosures was attributable to any revelation relating to the status of construction at the Shanghai Facility.[4]  Ultimately, Plaintiffs have not submitted any evidence in support of loss causation for their Section 10(b) claims and Defendants have more than carried the burden on their negative loss causation defense.

**Finally**, Plaintiffs cannot show a genuine dispute of material fact as to scienter.  Plaintiffs have marshalled no evidence whatsoever that any Exchange Act Defendant acted with intent to defraud.  To the contrary, Defendants received progress reports detailing the ongoing construction and were explicitly told by NIO's government partner that the site was "under construction" a few months prior to the IPO.

For each of these independent reasons, Defendants respectfully submit that their motion for summary judgment should be granted in its entirety and that Plaintiffs' partial motion should be denied.

---

[4]    The Expert Declaration of Dr. Gompers is attached as Ex. 2 to the Fumerton Declaration submitted herewith.

**STATEMENT OF FACTS**

**A.    Construction of the Shanghai Facility Began in March 2018**

NIO is a leading EV developer in China.  In the years leading up to its IPO, NIO partnered with Jianghuai Automobile Group Co., Ltd. ("JAC"), a state-owned manufacturer, to produce its EVs.  (56.1 ¶ 3; Ex. 3, Prospectus at 16.)  In November 2017 (approximately a year before the IPO), NIO entered an agreement with the Shanghai International Automobile City (Group) Co., Ltd. ("Shanghai Autocity"), an entity wholly owned by the Shanghai Jiading District government, for construction of its own manufacturing facility.  (56.1 ¶ 4; Underwriters 56.1 ¶ 1; Ex. 3, Prospectus at 137; Ex. 5, Framework Agreement.)  Pursuant to the agreement, the Shanghai government—*not NIO*—was responsible for constructing the Shanghai Facility, which would then be leased to and outfitted by NIO.  (56.1 ¶ 5; Underwriters 56.1 ¶ 2; Ex. 5, Framework Agreement at 2-4; Ex. 3, Prospectus at 137.)

In December 2017, a design plan was reached after communications with relevant government entities and Shanghai Autocity, and the business license for Shanghai NIO New Energy Automobile Co., Ltd. ("NIO New Energy")—which would operate the Shanghai Facility after completion of construction—was issued.  (56.1 ¶¶ 8, 19; Ex. 6 at -38-39; Ex. 13 at -73-83.)  On December 11, 2017, land use rights for construction purposes were granted for lots 1706 and 1707, where the Shanghai Facility was to be built.  (56.1 ¶ 18; Ex. 1, Qiu Decl. ¶ 28.)  Land use rights for industrial purposes were granted for lot 1705 on February 7, 2018, and notices showing approvals for "initial phase development" were published in February 2018 for lots 1706 and 1707 and May 2018 for lot 1705.  (56.1 ¶ 18; Ex. 1, Qiu Decl. ¶ 28.)  In January 2018, the Shanghai government announced that a site had been selected and that NIO and the government "communicated thoroughly [o]n aspects of factory construction, plan design, environmental assessment formulation and approval" to complete the project as quickly as possible.

6

(56.1 ¶¶ 23-24; Exs. 22-23.)  NIO's government partner, Shanghai Autocity, and its project company, Shanghai Jiawei Automobile Parts Co., Ltd. ("Shanghai Jiawei"), engaged Century 3 (Shanghai) Inc. ("Century 3"), an engineering project management company, to manage construction of the Shanghai Facility.  (56.1 ¶ 31; Underwriters 56.1 ¶ 6; Ex. 53, Transcript of December 14, 2022 Deposition of NIO's 30(b)(6) Representative ("Chen Tr.") 85:8-86:3.) Various other contractors were also engaged to carry out the construction, including Zhejiang Qinye Construction Group Co., Ltd., Zhong Chuan Surveying Design Institute Co., Ltd., and Shanghai Jiangong Machinery.  (56.1 ¶ 27; Ex. 27 at -63.)

Construction began well before the September 2018 IPO.  Photographs from as early as March 2018 show construction underway.  (56.1 ¶¶ 29-30; Underwriters 56.1 ¶¶ 8-10; *see, e.g.*, Exs. 50, 52.)  In April 2018, as part of the due diligence for the IPO, Shanghai Autocity confirmed that the Shanghai Facility was "under construction."  (56.1 ¶ 39; Underwriters 56.1 ¶ 20; Ex. 66 at -21; *see also* Ex. 53, Chen Tr. 85:8-86:20.)

Century 3 also provided NIO with periodic progress reports detailing the ongoing construction.  (56.1 ¶¶ 32-33; Underwriters 56.1 ¶ 7; *see, e.g.*, Ex. 50 at -72-79; Ex. 61 at -05-10; Ex. 62 at -24-29; Ex. 53, Chen Tr. 85:8-86:25, 87:16-22.)  The progress reports show that, before the IPO, (i) land filling and flattening were substantially complete; (ii) trenches for drainage had been dug; (iii) gates, a road, and temporary walls surrounding the construction site had been built; (iv) power and water supplies had been connected; and (iv) trial piling work had been done.  (56.1 ¶ 34; Underwriters 56.1 ¶ 11-15; *see* Ex. 51 at -57-71; Ex. 63 at -92-97; Ex. 64 at -61-62; Ex. 65 at -98.)  The progress reports even include pictures showing the trial piling and related equipment on site.  (56.1 ¶¶ 29-30, 32; Underwriters 56.1 ¶¶ 8-15; *see, e.g.*, Ex. 50 at -

7

78.)  Indeed, it is undisputed that at the time of the IPO, thousands of hours of construction work had been accomplished.  (Ex. 1, Qiu Decl. ¶ 23.)

Meanwhile, NIO began acquiring materials and equipment for outfitting the Shanghai Facility, negotiating contracts with suppliers and publicly accepting bids for equipment, which Plaintiffs acknowledge.  (56.1 ¶¶ 40-44; Ex. 69 at -60-69; Ex. 71 at -03-39; Ex. 72 at -40-74; Ex. 70, Gongcheng Article.)  Large equipment for the Shanghai Facility was purchased in March 2018.  (56.1 ¶ 42; Ex. 69 at -60-69; Ex. 70, Gongcheng Article.)  Additional construction-related tasks were also being carried out, including, but not limited to, designs for the factory layout, landscaping, and engagement of contractors for geotechnical investigation.  (56.1 ¶¶ 22, 25, 29, 44-45; Ex. 52 at -93-99; Ex. 16 at -01-09.)  Again, this was all before the IPO.

**B.     NIO's IPO in September 2018**

On September 12, 2018, NIO launched its IPO at $6.26 per ADS.  (56.1 ¶ 2; Ex. 3, Prospectus at 8.)  The Offering Documents disclosed various information about the Shanghai Facility, including (i) details of NIO's partnership with the Shanghai government; (ii) the project's estimated timeline; (iii) that construction had begun; (iv) that the myriad required approvals were still in process; (v) the significant capital expenditure required for the project (including 25% of the IPO proceeds); (vi) certain anticipated benefits and risks of the project, including the risks that the project could be subject to delays or not be completed at all; and (vii) NIO's ability to fund its portion of the project depended in part on sales of its EVs.  (*See, e.g.*, 56.1 ¶¶ 48-51; Underwriters 56.1 ¶¶ 21-24; Ex. 3, Prospectus at 26, 32-33, 63, 94, 121-22, 137, 151-52.)  Plaintiffs challenge three references to the Shanghai Facility underlined below:

- ***The construction and operation of our own manufacturing plant in Shanghai or other manufacturing facilities are subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits.***
  We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020.  Such manufacturing facility is currently being constructed

8

by relevant Shanghai authorities.  As a result, such construction is largely outside of our control and could experience delays or other difficulties.  We are also building phase two of our manufacturing facilities in Nanjing.  Construction projects of this scale are subject to risks and will require significant capital.  Any failure to complete these projects on schedule and within budget could adversely impact our financial condition, production capacity and results of operations.  Under PRC law, construction projects are subject to broad and strict government supervision and approval procedures, including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, the pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities.  Some of the construction projects being carried out by us are undergoing necessary approval procedures as required by law.  As a result, the relevant entities operating such construction projects may be subject to administrative uncertainty construction projects in question within a specified time frame, fines or the suspension of use of such projects.  Any of the foregoing could have a material adverse impact on our operations. . . .
(Ex. 3, Prospectus at 32-33.)

- **Our Strategies** . . .
  ***Build our own manufacturing capacity and continue to optimize manufacturing costs by leveraging a common platform and production flexibility***
  Construction has started on our own manufacturing facility in Shanghai in order to expand manufacturing capacity for the ET7 and future models, complementing our JAC manufacturing alliance supplying the ES8 and ES6.  We expect that this facility will also facilitate our ability to obtain our own EV manufacturing license and potentially benefit from the NEV credit score system in the future.  We aim to obtain our EV manufacturing license within two to three years following the date of this prospectus. . . .
  (*Id.* at 121-22.)

- ***Our Future Manufacturing Plant***
  Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities.  We expect that this facility will expand our manufacturing capacity for the ET7 and future models, complementing our JAC manufacturing alliance supplying the ES8 and ES6.  We expect that this facility will be ready by 2020 and will facilitate our ability to obtain our own EV manufacturing license.  To encourage and facilitate our establishment of this factory, we have entered into arrangements with the Shanghai governmental authority and an authorized investment entity pursuant to which such parties have agreed to provide us with certain financing, tax incentives and other support, including constructing the factory.
  Pursuant to such arrangements, we have entered into a framework agreement with relevant authorized investment entity of the Shanghai authority, under which we expect to obtain a leasehold interest in the property on which the facility is located and such lease is expected to have a term of no less than 10 years.  The first five years will be rent-free and the following five years will have a discounted rental fee with reference to local market rates, the construction cost of the factory and our contribution to the local economy each as determined by the Shanghai authority.  We expect to finalize

9

the terms of the leasehold interest, including any renewal terms and enter into the relevant lease agreement prior to completion of construction of the factory.

We expect to make significant capital expenditures in connection with the establishment of our own manufacturing facility. . . .

(*Id.* at 137.)

**C.**    **In March 2019, NIO Announced Poor Earnings Results, Lowered Guidance, and Called Off the Shanghai Facility (the Alleged Corrective Disclosure)**

On March 6, 2019, NIO announced disappointing financial results for the fourth quarter and full year 2018.  (56.1 ¶ 55; Ex. 80, 4Q18 Earnings Release.)  NIO reported (i) a net loss of approximately $1.4 billion for FY 2018, a 92% increase from FY 2017; (ii) "greater than anticipated slowdown in monthly deliveries" due to the phase-out of the government subsidies for EV buyers, among other things; and (iii) "expect[ed] deliveries in the second quarter 2019 to reflect continued weakness."  (56.1 ¶ 56; Ex. 80, 4Q18 Earnings Release at 3-5.)  During NIO's corresponding earnings call, NIO CEO William Li also noted that NIO's new EV model, the ES8, had "experienced a lot of challenges" and that NIO "need[s] to improve a lot."  (56.1 ¶ 57; Ex. 81, 4Q18 Earnings Call at 14.)

NIO also disclosed that it had "agreed in principle . . . to terminate the plan for [the Shanghai Facility]."  (56.1 ¶ 58; Ex. 80, 4Q18 Earnings Release at 4.)  NIO explained this would enable it to "focus on the joint manufacturing model in the long term," which it believed would "give [NIO] capacity and flexibility to support its market penetration and growth plans for the next two to three years."  (56.1 ¶ 58; Ex. 80, 4Q18 Earnings Release at 4.)  Significantly, for purposes of this motion, ***NIO did not disclose that construction never began***.  In the accompanying earnings call, NIO executives elaborated on the primary reasons for terminating the Shanghai Facility project:

First, in 2018, a new policy was issued by the government authorities, which allow[s] and encourage[s] the entities that operate its vehicle research and development and design to work with vehicle manufacturing companies to manufacture vehicles cooperatively.  This joint manufacturing model between NIO

10

and JAC is endorsed and perceived as an innovative manufacturing model in China. Secondly, through an efficiency perspective, we can leverage the existing capacity of NIO's JAC plant and enjoy the flexibilities to expand the capacity to support NIO's market penetration and growth plans for the next 2 or 3 years.

(56.1 ¶ 59; Ex. 81, 4Q18 Earnings Call at 5.)  NIO executives also explained other benefits of the decision, including that the Company would no longer "need to apply for [manufacturing] subsidies or the carbon emission credit via JAC" and that this arrangement would be better for "long-term strategic funding."  (56.1 ¶ 60; Ex. 81, 4Q18 Earnings Call at 9.)  Indeed, a new Chinese Ministry of Industry and Information Technology policy implemented after NIO's IPO allowed NIO to benefit from manufacturing subsidies and NEV credits without operating its own plant.  (Ex. 2, Gompers Decl. ¶ 11.)

The market reacted positively to NIO's decision to terminate the Shanghai Facility project.  (56.1 ¶ 60, 62-65; *see also* Ex. 2, Gompers Decl. § 6.)  One analyst commented on NIO's plan to terminate construction of the Shanghai Facility during NIO's earnings call, agreeing that terminating the project "could have a very positive implication for return on invested capital."  (56.1 ¶ 60; Ex. 81, 4Q18 Earnings Call at 9.)  Following that call, Deutsche Bank analysts reported this was a positive development, explaining that "NIO's current production business model will not hinder the original sales outlook," "this [is] a more flexible option with potentially lower capex outlay," and "[t]he advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency."  (56.1 ¶ 62; Ex. 82, DB Report at 1, 3-5.)  In fact, the Deutsche Bank analysts "raise[d] [their] price target from USD8.6 to USD10.2 mainly on [the] lower overall capex estimate given the termination of the [Shanghai Facility] and hence better free cash flow."  (56.1 ¶ 62; Ex. 82, DB Report at 5.)  Morgan Stanley analysts similarly reported they "view the joint manufacturing mode as [a] positive" that "could save on capex

11

while keeping sufficient capacity." (56.1 ¶ 63; Ex. 83, MS Report at 1.)  Likewise, J.P. Morgan

analysts placed the termination "on the positive side" of the Q4/FY18 Earnings Announcements

and highlighted that it would allow NIO to "leverag[e] JAC's existing capacity" and "implies

cost savings and better investment returns" that could "translate to higher ROIC [return on

invested capital] in the long-run." (56.1 ¶ 64; Ex. 84, JPM Report at 1, 3.)

### D.    NIO Continued to Face Headwinds Throughout 2019

NIO's challenges continued over the ensuing months.  On May 28, 2019, NIO confirmed

that the Chinese EV subsidy reduction and a downturn in the Chinese economy generally had

caused a "greater than anticipated slowdown in monthly deliveries" of the ES8 model.  (56.1

¶ 66; Ex. 86, 1Q19 Earnings Release at 6.)  On September 24, 2019, NIO announced a further

decrease in vehicle sales during the second quarter of 2019 because of the subsidy reduction.

(56.1 ¶ 67; Ex. 87, 2Q19 Earnings Release at 2, 4.)  NIO also issued a battery recall for the ES8

due to fires.  (56.1 ¶ 64; Ex. 87, 2Q19 Earnings Release at 2.)

### E.    Procedural History of the Litigation

NIO's challenging start as a public company led to several federal securities actions as

well as four other related state actions.  Following consolidation of the respective state and

federal cases, the state plaintiffs' Consolidated Complaint alleged NIO's Offering Documents

misrepresented or omitted (i) the impact of the reduction in government subsidies for EVs; (ii)

quality control issues; and (iii) NIO's plan for the Shanghai Facility.  (*See* Consolidated Class

Action Complaint ¶¶ 7-9, *In re NIO Inc. Sec. Litig.*, No. 653422/2019 (Sup. Ct. N.Y. Cnty. filed

Oct. 25, 2019), NYSCEF No. 37.)  The state plaintiffs later dropped the claims about the

Shanghai Facility.  (*See* Consolidated Amended Class Action Complaint ¶¶ 7-8, *In re NIO Inc.

Sec. Litig.*, No. 653422/2019 (Sup. Ct. N.Y. Cnty. filed Apr. 2, 2021), NYSCEF No. 134.)  The

12

federal Plaintiffs, by contrast, abandoned all claims except those regarding the Shanghai Facility. (SAC ¶ 10.)

Defendants moved to dismiss both actions. Defendants' motion to dismiss the state action was granted in its entirety, (Decision & Order at 10, *In re NIO Inc. Sec. Litig.*, No. 653422/2019 (Sup. Ct. N.Y. Cnty. Oct. 4, 2021), NYSCEF No. 170), and the dismissal was affirmed on appeal. *See In re NIO Inc. Sec. Litig.*, 211 A.D.3d 464 (1st Dep't 2022). On August 12, 2021, this Court denied the motion to dismiss the federal action. *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *6 (E.D.N.Y. Aug. 12, 2021) ("*NIO I*"). The parties subsequently engaged in lengthy and extensive document discovery that has since closed. Defendants collectively produced more than 100,000 documents and on December 14, 2022, Plaintiffs conducted a Rule 30(b)(6) deposition of Mr. Rui Chen, NIO's current head of investor relations.

In December 2022, Plaintiffs moved for class certification, which Defendants opposed. (ECF Nos. 120, 121.) On August 8, 2023, this Court granted Plaintiffs' motion and certified a Securities Act Class as well as an Exchange Act Subclass. *See In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615, at *17 (E.D.N.Y. Aug. 8, 2023) ("*NIO II*"). On September 30, 2024, Plaintiffs served a motion for partial summary judgment only on the issue of falsity.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)). "But where 'the burden of proof at trial would fall on the

13

nonmoving party,' the moving party can shift the initial burden by 'point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'" *Jaffer*, 887 F.3d at 114 (alteration in original) (quoting *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 334 (E.D.N.Y. 2019) (Garaufis, J.) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

## ARGUMENT

### I.    THE UNDISPUTED FACTS SHOW THAT THE CHALLENGED STATEMENTS IN THE OFFERING DOCUMENTS WERE ACCURATE

To prevail on a Section 11 claim, Plaintiffs must prove that the Offering Documents "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Similarly, to prevail on a Section 10(b) and Rule 10b-5 claim, Plaintiffs must prove that, in the Offering Documents, Defendants "made a false statement or omission of material fact." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998). For both a Section 10(b) and a Section 11 claim, "[t]o fulfill the materiality requirement, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ("The test for whether a statement is materially misleading" is the same "under Section 10(b) and Section 11[.]"). The undisputed facts show that the statements that Plaintiffs challenge in the Offering Documents

14

were accurate, and therefore, Defendants are entitled to summary judgment on all claims (and Plaintiffs' Motion should be denied).

**A.    The Offering Documents Accurately Disclosed That Construction on the Shanghai Facility Had Begun**

The undisputed evidence in this case confirms that NIO accurately disclosed that "construction ha[d] started" and the Shanghai Facility was "currently under construction by certain Shanghai government entities" at the time of NIO's September 2018 IPO.  Photographs from as early as March 2018 clearly show construction was underway.  For example, a photograph dated March 28, 2018 shows that representatives from NIO and its government partner attended a trial piling ceremony held at the construction site for the Shanghai Facility. (56.1 ¶ 30; Underwriters 56.1 ¶¶ 8-10; Ex. 51.)  The same photograph also shows concrete piles, cranes, bulldozers, and personnel at the construction site, confirming that on site construction was underway well before the IPO.  (56.1 ¶ 19; Underwriters 56.1 ¶¶ 8-10; Ex. 52.

Moreover, progress reports from Century 3—the company hired by Shanghai Autocity to oversee construction—detail significant construction work conducted on site from March to May 2018.  (56.1 ¶ 32; Exs. 27, 54-57; 59-62.)  This includes flattening and backfilling land, digging temporary trenches for drainage, connecting the plant to water and electricity, trial piling, and erecting temporary walls.  (56.1 ¶ 32; Exs. 27, 54-57; 59-62.)  The progress reports also include photographs of temporary walls and gates to close off the site, and reference onsite equipment, including more than 100 machines, and more than 150 workers dispatched by three contractors as of April 2018.  (56.1 ¶¶ 32, 34-35; Exs. 27, 54-57; 59-62.)  By the end of April 2018, land refilling was complete, and a static piling test with 13 concrete piles was finished.  (56.1 ¶ 36; Ex. 64.)  A report on the piling test was submitted on April 26, 2018.  (56.1 ¶ 36; Ex. 64.)  In April 2018, as part of the due diligence for the IPO, Shanghai Autocity, NIO's government

15

partner, confirmed that the Shanghai Facility was "under construction." (56.1 ¶ 39; Ex. 66, at -21.) Plaintiffs do not dispute *any* of the above facts. In fact, they *concede* that significant work was done on the Shanghai Facility months before the IPO, including "(a) putting up temporary fences and gates to close off the construction site, (b) digging a temporary trench for drainage, (c) backfilling and ground leveling, and (d) load testing of trial piles." (Pls. MSJ at 6.)

Applying these undisputed facts to the plain meaning of "construction," it is clear that, as a matter of law, construction had begun and was continuing at the time of the IPO. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) ("[W]e presume that a reasonable investor can comprehend the basic meaning of plain-English disclosures and will not credit Plaintiffs' narrow reading . . . .") For example, Merriam-Webster defines "construction" as "the *process*, art, or manner of constructing something,"[5] (56.1 ¶ 12; Underwriters 56.1 ¶ 16; Ex. 9), and further defines "constructing" as "to make or form by combining or arranging parts or elements"[6] (Underwriters 56.1 ¶ 17). Similarly, the Oxford English Dictionary defines "construction" as "the action of framing, *devising*, or forming, by the *putting together of parts*; erection, building" generally. (56.1 ¶ 13; Ex. 10, (construction, n., Oxford English Dictionary (2020)); *see also* Under Construction, collocation, Cambridge Advanced Learner's Dictionary & Thesaurus ("Under construction" means "in the process of being created or built").)[7] That is

---

[5] *Construction*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/construction?src=search-dict-box (last visited Jan. 28, 2025).

[6] *Construct*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/constructing (last visited Jan. 28, 2025).

[7] New York courts have considered the definition of "substantial construction" in an analogous context of zoning decisions, in that "where a more restrictive zoning ordinance is enacted, an owner will be permitted to complete a structure or a development which an amendment has rendered nonconforming only where the owner has undertaken substantial construction." *Ellington Constr. Corp. v. Zoning Bd. of Appeals of Inc. Vill. of New Hempstead*, 77 N.Y.2d 114, 122 (1990). Courts have found that construction activities similar to those done on the Shanghai Facility to constitute substantial construction. *See, e.g.*, *id.* at 119 ("drainage facilities, water and sewer lines, fire hydrants, curbs and curb cuts, and underground telephone and electric service"); *Schoonmaker*
*(cont'd)*

16

clearly what happened here. Century 3 and others spent thousands of hours preparing the site, flattening the land and digging trenches, among other things. (Ex. 1, Qiu Decl. ¶ 23.) Indeed, Plaintiff's admission that a "shovel in the ground" means "[a]ctual construction is underway" (56.1 ¶ 15; Ex. 12, Mundy Tr. 156: 7-12), is dispositive of Plaintiffs' claim, as it is undisputed that there were "shovels in the ground."

Faced with these undisputed facts, Plaintiffs' Motion asks this Court to ignore the plethora of direct evidence in the record that construction of the Shanghai Facility had begun six months before the IPO (*see supra*, pp. 15-16), in favor of two statements that postdate the IPO. For example, Plaintiffs rely on a third-party environmental impact assessment report to argue that "six months after the supposed start of construction, the Shanghai Facility construction site was still 'vacant and agricultural land' with overgrown weeds and pond formations." (Pls. MSJ at 9-10 (quoting Ex. 78 Environmental Impact Report at 154, 173.)) This report—which was issued the same month that NIO terminated the project altogether—is entirely consistent with the fact that construction, which was underway at the time of the IPO, later stalled. (Ex. 78 Environmental Impact Report at 154, 173.) Even so, Plaintiffs have failed to demonstrate how this one statement contained in a 200-page report issued six months ***after*** the IPO is relevant to the status of construction of the Shanghai Facility ***before*** the IPO.

Moreover, any suggestion that NIO "admit[ted] to Goldman Sachs that construction did not start" is unfounded. (Pls. MSJ at 7, 11.) The internal Goldman Sachs document, which was prepared in connection with an additional round of financing and not the September 2018 IPO,

---

*Homes--John Steinberg, Inc. v. Vill. of Maybrook*, 178 App. Div. 2d 722, 726 (1991) ("sanitary, sewer, water and storm water systems as well as roads . . . grading and utility plans, interest on improvement bonds and general subdivision improvements"); *Town of Orangetown v. Magee*, 156 Misc. 2d 881, 883, 885, 888 (N.Y. Sup. Ct. Rockland Cnty. 1992) (excavation of fill, installation of drainage, clearing, and placing a temporary storage building on the site), *aff'd and mod. on other grounds*, 215 App. Div. 2d 469 (1995).

states that, as of January 2019, "Tesla has broken ground for its factory in Shanghai," whereas "During the due diligence, [NIO] disclosed that its Shanghai plant has not broken ground yet." (*See* Pls. MSJ Ex. 35.) The document does not clarify if NIO purportedly made this disclosure during due diligence for the IPO or during post-IPO due diligence for additional financing, nor does it cite a single specific source for this statement or explain what is meant by "broken ground."

In any event, neither of these documents are from NIO or any of the entities actually responsible for construction of the Shanghai Facility (*e.g.*, Shanghai Autocity, Shanghai Jiawei, Century 3). And both are from months after the IPO and cannot speak to the progress and construction that had occurred at the Shanghai Facility as of the IPO.

**B.      Plaintiffs Offer No Justification for Applying Hyper-Technical Definitions of Construction, Based on Chinese Law**

Unable to deny these facts, or that they clearly satisfy the ordinary, plain meaning of "construction," Plaintiffs' Motion attempts to redefine "construction" to exclude the construction Plaintiffs admit had occurred. They contend that this pre-IPO work is not real "construction," but mere "prefatory activities" or "pre-construction." (Pls. MSJ at 6.) Plaintiffs base this argument on their interpretation of a Chinese law that is not even referenced in the Offering Documents. But Plaintiffs' hair-splitting is a red herring. The Offering Documents did not invoke any technical definition of "construction," let alone one under a particular Chinese statute, and Plaintiffs' interpretation is accordingly unsupportable. *See Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809, at *19 (S.D.N.Y. Feb. 26, 2019) ("There is no reason here to substitute plaintiffs' own 'linguistic preference[s]' for those of the Company's . . ."), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019). And Plaintiffs have come forward with no evidence that any reasonable investor would have

18

interpreted "construction" in the narrow, contrived sense that Plaintiffs suggest (indeed Lead Plaintiff Mundy did not).  (Ex. 12, Mundy Tr. 156:7-12.)

Plaintiffs' purported expert does not even attempt to opine on the definition of "construction" under Chinese law generally.  Indeed, he opines only on "what constitute[s] construction works that require a construction work commencement permit" (Wu Decl. ¶ 86) according to *one* PRC regulation while ignoring all of the other potentially applicable Chinese laws and regulations concerning construction.  (Ex. 1, Qiu Decl. at ¶¶ 15-18.)

But this is not enough to create a material issue of fact, much less warrant summary judgment in Plaintiffs' favor.  In fact, the same PRC regulation that Plaintiffs cite includes varying definitions of "commencement of construction" that, depending on the type of project, may or may not require a construction work commencement permit.  For some projects, "construction" work requiring such permits includes "pouring of the first layer of concrete for the foundation of the main plant building," or "the excavation of the main engineering foundation and the excavation of the line foundation."  (Qiu Decl. at ¶ 40.)  But for projects of a different nature, different definitions of "commencement of construction" may apply, resulting in different licensing requirements, including when such licenses are required.  Hence, the PRC regulations Plaintiffs cite show only that, for some types of projects, the "construction" work that was indisputably undertaken here (such as ground leveling, backfilling, and excavation) may require a permit—not that it always does in all cases across all project types.  However, even with the close of document discovery, Plaintiffs have still failed to adduce any evidence to show that the construction of the Shanghai Facility belongs in the category of projects that would have required the permits that Plaintiffs claim were needed.

Importantly, Plaintiffs also are wrong regarding whether NIO received necessary permits. As Defendants' expert Chiang Qiu notes: "at least some of the permits or licenses that [Plaintiffs' expert] claimed were needed for certain types of construction and development work were, in fact, issued before NIO's IPO." (Ex. 1, Qiu Decl. ¶ 28.)  And Plaintiffs' purported search for permits in the public records was incomplete as it is unclear whether certain permits would appear on the government websites reviewed. (Ex. 1, Qiu Decl. ¶¶ 27-28.)  But even if no permits were issued for the Shanghai Facility, construction regularly occurs in China without permitting. (Ex. 1, Qiu Decl. ¶ 36-37.)  Moreover, the Offering Documents did not claim that all permits had been obtained or that a formal lease had been executed.  To the contrary, the Offering Documents explicitly cautioned that the Shanghai Facility was subject to myriad approval procedures that were still in process and could result in delays, fines, or suspension of the project:

> Under PRC law, ***construction projects are subject to broad and strict government supervision and approval procedures,*** including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, the pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. ***Some of the construction projects being carried out by us are undergoing necessary approval procedures as required by law.***  As a result, the relevant entities operating such construction projects may be subject to ***administrative uncertainty construction projects in question within a specified time frame, fines or the suspension of use of such projects.***  Any of the foregoing could have a material adverse impact on our operations.

(Ex. 3, Prospectus at 32 (emphasis added).)[8]

---

[8] Plaintiffs' cases are inapposite. (Pls. MSJ at 9.)  In stark contrast to NIO's caveats and risk warnings, the defendants in *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005), falsely represented that a $25 million private equity fundraising effort "ha[d] been completed," when in reality less than $2 million had been received and much of the remaining funds were contingent on investor approval of a business plan and a new CEO. *Id.* at 945.  Plaintiffs' other cited case is even further afield. (Pls. MSJ at 9.)  In *SEC v. GenAudio, Inc.*, 32 F.4th 902 (10th Cir. 2022), the defendant CEO falsely told investors that he was discussing the "business side" of a potential acquisition by Apple when no such discussions were occurring. *Id.* at 923.  To the contrary, Apple "had made it crystal clear that no business negotiations would take place . . .

*(cont'd)*

20

In any event, Plaintiffs' strained definition of "construction" is also inconsistent with the way the term construction is used in China. Defendants' expert found that "[t]he equipment and materials shown in the pictures described above are consistent with the equipment and materials necessary for trial piling and land flattening work, which are part of the construction process, and these images were corroborated by progress reports and other pre-IPO internal correspondence regarding both onsite and offsite construction work." (Ex. 1, Qiu Decl. ¶ 26.) Thus, "NIO's usage of the term 'construction' is consistent with how an engineer or a project manager involved in the project on the ground would understand the term in the construction trade." (Ex. 1, Qiu Decl. ¶ 13.)

## C. In Any Event, Whether "Construction" Under Plaintiffs' Strained Definition Had Begun Is Immaterial

Even if Plaintiffs could show a triable issue of fact that the Offering Documents contained a technical misstatement (which they cannot), the alleged misstatement is indisputably immaterial. Plaintiffs argue that the challenged statements were material because the "Shanghai Facility would alleviate investors' concerns about NIO's reliance on JAC," and that "25% of the IPO proceeds were allocated for the" project. (Pls. MSJ at 11.) But that simply relates to whether NIO had a plan to build the Shanghai Facility, something that Plaintiffs *do not, and cannot challenge*.[9] It is undisputed that NIO, along with its government partner, engaged in

---

until after there was 'exec buy-in,' and the record provide[d] no basis for a reasonable belief that such buy-in had occurred." *Id.* at 924. There was "no doubt that the . . . statement at issue was false" and made "in blatant disregard of obvious facts." *Id.* The CEO also made other statements that "contained fabrications, fanciful facts, and lies—blatant and implicit—regarding material matters related to GenAudio's negotiations with Apple." *Id.* at 938. No comparable facts exist here. Far from it being "crystal clear" that construction had not started, extensive work had been and was being done at the Shanghai Facility, and significant time, money, and resources had been invested in the project at the time of NIO's IPO, regardless of any pending permits or contracts.

[9]  Plaintiffs arguments that the project was "obviously material" to "alleviate investors' concerns about NIO's reliance on JAC–an inexperienced and 'third-tier' manufacturer unbefitting NIO's premium brand" do not even move the needle. (Pls. MSJ at 11.) To show the Shanghai Facility was material, Plaintiffs only cite a variety of

*(cont'd)*

21

good faith efforts to make significant progress on the Shanghai Facility project long before the IPO.

Thus, the question of materiality at issue here is not whether the Shanghai Facility project overall was material, but whether the ***precise status of construction*** on the IPO date was material to investors.[10]  Plaintiffs must prove that it would have made a material difference to investors if one stone had been permanently laid (which would constitute "construction" under Plaintiffs' view), as opposed to the pre-IPO work that admittedly was done.  If one stone had been permanently laid, under Plaintiffs' view, construction had started, and so there was no misstatement.  If that one stone was laid the day after the IPO, there was a misstatement.  Plaintiffs have come forward with no evidence supporting such an unrealistic position.  Indeed, Plaintiffs' position is contrary to applicable law.  *See ProShares*, 728 F.3d at 104 (rejecting securities claims where it was "implausible that substituting [plaintiffs' preferred language] for [defendant's actual disclosure] [wa]s a change substantially likely to be viewed by a reasonable investor as having significantly altered the import of the total mix of information . . . available");  *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005) (whether

---

communications between investors and analysts expressing ***general*** concerns with JAC.  (Pls Rule 56.1 St. ¶¶ 6 (a)-(f); 7(a)-(b)).  But emails between investors and analysts, without more, cannot demonstrate that Defendants committed securities fraud to alleviate investors' concerns about JAC.  It is not even clear whether NIO ever saw these communications.  Furthermore, the email Plaintiffs rely on to show NIO "was so worried about JAC hurting its image" that it "sought an exception from the Chinese government to hide JAC's name from its EVs" does not confirm that anyone at NIO actually said this or that NIO itself sought an exception for this reason. (Pls. MSJ at 3; *see* Pls. MSJ Ex. 14.)  When viewed in context, the email is simply about the "Branding of 'JAC-NIO'" and the concern that "users [were] aware of NIO brand only."  (Pls. MSJ Ex. 14 at -46.)  Plaintiffs cannot conflate concerns about customer confusion with an allegation that NIO was embarrassed by its affiliation with JAC.

10    Contrary to Plaintiffs' narrative, many analysts viewed NIO's ultimate termination of the project as a positive development, including because it freed up cash for other uses and because the manufacturing partnership with JAC gave NIO greater flexibility.  (*See infra*, pp. 32-33.)  Regardless, whether the Shanghai Facility itself was material is beside the point.  The only relevant issue, given the case that Plaintiffs have pled, is whether the Company's disclosure that "construction has begun" was material.  As shown above, it is not.

transactions "were improperly characterized as trades rather than loans . . . would have not have been material to reasonable investors").

Plaintiffs' position is made all the more unreasonable given the significant work that NIO and its partners undertook for the project. In addition to this onsite construction work described above, and which indisputably occurred, various other critical tasks were carried out long before the IPO that also constituted construction. By December 2017, design plans—including drawings for the Shanghai Facility, garage, and landscape—had been reviewed by NIO and its government partner, Shanghai Autocity. (56.1 ¶¶ 20-21; Exs. 14-21.) These design plans were continuously refined in the subsequent months. (56.1 ¶ 21; Exs. 15-21.) They included the land planning and composition of the site—*e.g.*, the factory building, warehouses, parking lots, and connecting corridors. (56.1 ¶ 19; Ex. 13 at -73-83; Ex. 1, Qiu Decl. ¶ 20.) NIO also circulated drawings of the plant, and emailed Shanghai Autocity construction drawings as well. (56.1 ¶ 20; Ex. 14; 56.1 ¶ 21; Ex. 16 at -01-09.) These documents clearly indicate that the layout and structural designs for the Shanghai Facility were well-developed months before NIO's IPO. (Ex. 1, Qiu Decl. ¶ 20.)

By the end of 2017, NIO founded NIO New Energy, which would be responsible for operating the Shanghai Facility after construction. (56.1 ¶ 8; Ex. 6, NIO New Energy Business License at -38-39.) In January 2018, the Shanghai government announced the site for the Shanghai Facility and noted that the relevant parties had "communicated thoroughly [o]n aspects of factory construction, plan design, environmental assessment formulation and approval, so as to advance vigorously the construction of the project within the shortest time at the fastest speed." (56.1 ¶ 23; Ex. 22, Jan. 5, 2018 Announcement; Ex. 23, Jan. 17, 2018 Jiading Government Announcement.) In March 2018, NIO began the procurement process to acquire

23

equipment for the Shanghai Facility and entered into two procurement contracts with a European supplier for production equipment, priced at EUR 19,650,000 (~$20.6 million) and RMB 101,505,000 (~$14 million). (56.1 ¶ 43; Ex. 71; Ex. 72; Ex. 70, Gongcheng Article.) By May 15, 2018, Shanghai Autocity, through Shanghai Jiawei, had executed various contracts for work relating to the Shanghai Facility, such as surveying, environmental impact assessment, and green design, with a total combined contract price of RMB 52 million. (56.1 ¶¶ 40-41; Ex. 67 at -160; Ex. 68 at -170.) Environmental impact assessments were completed in September 2018 and March 2019. (56.1 ¶ 47.) In addition to financing support and tax incentives from Shanghai Autocity, in May 2018, NIO obtained approval from the Bank of Shanghai for a loan of RMB 1.5 billion for constructing the Shanghai Facility. (56.1 ¶ 11, Ex. 8, Bank of Shanghai Loan Agreement at -04-29.) By the time of the IPO, Century 3 had engaged various subcontractors, including Zhejiang Qinye Construction Group Co., Ltd., Zhong Chuan Surveying Design Institute Co., Ltd., and Shanghai Jiangong Machinery. (56.1 ¶ 27; Exs. 27, 24, 48, 49.)

Finally, the immateriality of the precise status of the construction project is underscored by the fact that the Offering Documents made clear that the Shanghai Facility was not "expect[ed] to be ready [until] the end of 2020"—two years after the IPO. (Ex. 3, Prospectus at 32.) They further warned that "construction [was] largely outside of [NIO's] control and could experience delays or other difficulties." (*Id.*) The Offering Documents also expressly acknowledged the possibility that construction may not be completed "on time *or at all.*" (*Id.* at 33 (emphasis added).) Given this protracted timeline and likely risk of further delay (and even potentially termination of the project), the precise status of construction did not significantly alter the total mix of information for investors. Indeed, Plaintiffs fail to explain why—let alone prove that—the market would care about this information. As such, "no reasonable jury could find the

24

alleged misrepresentations at issue to be material." *In re Moody's Corp. Sec. Litig.*, No. 07 Civ. 8375 (GBD), 2013 WL 4516788, at *7 (S.D.N.Y. Aug. 23, 2013).

**D.       The Offering Documents Did Not Omit Any Risks**

The SAC also asserts an omission theory that the Offering Documents "failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations," and "[t]here was no indication and no warning that the Shanghai Facility may not be built at all." (SAC ¶¶ 10, 15.)  The Court did not rule on this theory at the pleading stage, *NIO I*, 2021 WL 3566300, at *6 n.5, and Plaintiffs do not seek summary judgment on it.  It is unclear if Plaintiffs still intend to pursue this theory.  Regardless, it fails.

As a threshold matter, pure omission claims like this are no longer actionable under Rule 10b-5(b).  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 260 (2024) ("Pure omissions are not actionable under Rule 10b–5(b).").  Plaintiffs' Exchange Act claims fail as a matter of law on this basis alone.

Plaintiffs' omission theory likewise fails because the Offering Documents disclosed the information Plaintiffs claim was omitted.  Plaintiffs contend NIO "failed to warn investors that the construction of the Shanghai Facility depended on NIO having sufficient cash flow and its sales meeting expectations." (SAC ¶ 10.)  Yet, the Offering Documents specifically disclosed: (i) "[we] expect to require significant capital and incur substantial costs in setting up, equipping and improving our future manufacturing plant in Shanghai"; (ii) "capital expenditures will be significantly affected by user demand for our products"; and (iii) "[i]f we are unable to raise sufficient funds, we will have to . . . delay or cancel our planned activities." (Ex. 3, Prospectus at 26-27.)  Plaintiffs also claim NIO gave "no warning that the Shanghai Facility may not be built

at all." (SAC ¶ 15.) But the Offering Documents expressly warned that NIO may be "unable to successfully complete construction on time or at all." (Ex. 3, Prospectus at 33.)

Nothing more was required by Items 303 or 503 of Regulation S-K. Item 303 requires disclosure of any trend, demand, commitment, event, or uncertainty that is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation. *See* 17 C.F.R. § 229.303. Plaintiffs claim the Offering Documents violated Item 303 by "not disclos[ing] any uncertainties that could potentially derail NIO's plan to build the Shanghai Facility." (SAC ¶ 96.) But the Offering Documents *did* disclose such uncertainties, as shown above. The Offering Documents also disclosed that the project was "largely outside of [NIO's] control and could experience delays or other difficulties," and that it was "subject to administrative uncertainty," and "subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits," or could result in "the suspension of use of such projects." (Ex. 3, Prospectus at 32.)

Plaintiffs also have proffered no evidence that NIO knew at the time of the IPO about (i) the subsequent policy change that ultimately led it to cancel the Shanghai Facility project; or (ii) the alleged slowdown in demand and "cash shortage" that Plaintiffs claim (incorrectly) were the reasons NIO canceled the project. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("It is obvious, of course, that a . . . problem which does not emerge until January [2019] (at the earliest) cannot be disclosed in September [2018]. An earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized."), *aff'd,* 347 F. App'x 617 (2d Cir. 2009).

Similarly, NIO has satisfied the requirements of Item 503, which, at the time of NIO's IPO, only called for disclosure of "the most significant factors that make an offering speculative

26

or risky." 17 C.F.R. § 229.503(c).  The Offering Documents did that at length in 60 pages of risk factors.  There is no evidence that, as of the IPO, the possibility that NIO would cancel the Shanghai Facility project was a material factor that made the offering speculative or risky.[11]

Finally, no additional disclosure was needed to prevent other statements in the Offering Documents from being misleading.  Contrary to Plaintiffs' repeated claims, NIO did not misleadingly "present[] the Shanghai Facility as a *fait accompli.*"  (*See, e.g.,* SAC ¶¶ 15, 93, 110.)  Again, the Offering Documents warned of many uncertainties surrounding the project and the risks it entailed, including that the Shanghai Facility might not be completed on time or at all.

## II.    PLAINTIFFS CANNOT SHOW A GENUINE DISPUTE OF FACT AS TO LOSS CAUSATION

An independent and additional basis to grant summary judgment in Defendants' favor on all claims is Plaintiffs' inability to put forth a modicum of evidence supporting loss causation. Plaintiffs allege a single corrective disclosure date, March 6, 2019, and claim that the value of NIO's ADS dropped approximately 30% on this day and the next.  (SAC ¶ 146.)  While this may have been sufficient at the pleading stage to draw an inference that Plaintiffs' losses were caused by the alleged revelation of fraud, *NIO I*, 2021 WL 3566300, *10, the rubber has now met the road at summary judgment.[12]

---

[11]   To the extent that Plaintiffs attempt to base a claim against the Individual Defendants or Underwriter Defendants on the purported violation of Item 503, any such claim would fail for the additional reason that Item 503 does not apply to any non-issuer.  Item 503 requires "the registrant" to furnish specified information.  17 C.F.R. § 229.503.  The term "registrant" is defined as the "issuer of the securities" and no one else.  17 CFR § 230.405; *see also Sharma v. Rent the Runway, Inc.*, No. 22-CV-06935 (OEM) (VMS), 2024 WL 4287229, at *10 (E.D.N.Y. Sept. 25, 2024) (holding that Item 503 "addresses the disclosure of risks" and "[s]pecifically, it requires an issuer to include in its disclosures 'a discussion of the most significant factors that make the offering speculative or risky'") (emphasis added).  Because Item 503 specifically imposes a duty of disclosure only on the issuer, Plaintiffs' claim against Individual Defendants and the Underwriter Defendants must be dismissed insofar as it is based on any alleged violation of Item 503.

[12]   *See* Plaintiffs' Reply in Further Support of Motion for Class Certification ("Pls' Class Cert Reply") (ECF No. 122) at 16 ("Loss causation should be adjudicated on a class-wide basis at summary judgment or trial.").

On their Section 10(b) claims, Plaintiffs carry the burden of proving that their losses were caused by the alleged revelation of fraud. *See In re Omnicom Grp., Inc. Sec. Litig*, 597 F.3d 501, 509-14 (2d Cir. 2010). Defendants carry the burden of proving their negative loss causation defense to Plaintiffs' Section 11 claims and must show "that an otherwise recoverable loss was not caused by the alleged misstatement or omission." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010). In any event, however, "the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images[.]" *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 DLC, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005). Where, as here, no price decline is attributable to any revelation of alleged fraud, both loss causation and negative loss causation can be adjudicated as a matter of law and summary judgment granted in Defendants' favor. *See Moody's*, 2013 WL 4516788, at *12.

## A.     Plaintiffs' Alleged Corrective Disclosure Was Not Corrective

The March 6, 2019 disclosure did not "correct" the alleged misstatement in the Offering Documents that construction had started at the time of NIO's IPO. Accordingly, there is no way for any of the price decline in NIO's ADS to be attributable to the alleged misstatements in the Offering Documents.

Where, as here, a plaintiff alleges a corrective disclosure theory of loss causation—as opposed to a materialization of the risk theory—loss causation must be premised on a "corrective disclosure to the market" that "reveal[s] . . . the falsity of [prior] recommendations." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175, n.4 (2d Cir. 2005). Thus, if "[t]here is no [evidence] that the market reacted negatively to a corrective disclosure regarding the falsity of [the alleged misstatements], . . . [t]his is fatal under Second Circuit precedent." *Id.* at 175. And "[w]hile a disclosure need not reflect every detail of an alleged fraud, it must reveal some aspect of it." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*, 597 F.3d

28

501 (2d Cir. 2010); *see also In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 52 (2d Cir. 2018), *as amended* (Nov. 20, 2018) (summary judgment in a defendant's favor is appropriate where it "has conclusively proven that the subject of the . . . misstatements and omissions was not the cause of [any] actual loss suffered") (internal quotation removed).

Here, Plaintiffs claim that the following alleged statements in NIO's Offering Documents were false:

- "Construction *has started* on our own manufacturing facility in Shanghai[.]"

- "Our own manufacturing facility in Shanghai *is currently under construction* by certain Shanghai government entities."

- "We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020.  Such manufacturing facility is *currently being constructed* by relevant Shanghai authorities."

(Pls. MSJ at 4; 56.1 ¶ 48; Ex. 3, Prospectus at 32, 122, 137.)

The Q4/18 Earnings Announcement (and accompanying earnings call), which Plaintiffs claim was the sole corrective disclosure, stated that "the Company has agreed in principle with [its] contractual counterparties to *terminate* the plan for th[e Shanghai] manufacturing plant." (56.1 ¶ 58; Ex. 80, Q4/18 Earnings Announcement, dated March 6, 2019, at 4 (emphasis added); *see also* Ex. 2, Gompers Decl. ¶ 34 ("[T]he March 6, 2019 Announcements did not disclose that construction of the Shanghai plant had never commenced.  Nor did they disclose anything about the status of the construction project, including that construction had not started by the time of the IPO.").)  This does not "correct" any alleged misstatement that construction had ***begun*** on site.  *Omnicom*, 597 F.3d at 511 ("[N]one of [this statement] even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint [that construction had not started at the time of the IPO].")  To state the obvious, the fact that NIO decided to "terminate" construction of the Shanghai Facility says nothing whatsoever about

29

whether construction had "begun." A half-completed project could still be suspended or terminated before completion. Unsurprisingly, not a single media report following NIO's March 6, 2019 disclosure interpreted it to mean that construction had not previously begun. (Ex. 2, Gompers Decl. ¶ 34.)

Plaintiffs cannot overcome this mismatch between their theory of falsity and their alleged "corrective disclosure." *See Moody's*, 2013 WL 4516788, at *12. The Q4/18 Earnings Announcement revealed only that NIO was calling off the project due to changed circumstances. It revealed nothing about the status of construction and thus Plaintiffs' only alleged corrective disclosure provided no information whatsoever as to the veracity of the Offering Documents. Indeed, NIO *never* disclosed the status of construction at any point prior to the project's termination. (*Compare supra* § I.A *with* Pls. MSJ § II.D.)

Nor can any decline in the ADS prices before the alleged corrective disclosure be attributable to the alleged misstatements in the Offering Documents because there is no evidence that the "truth," as Plaintiffs claim it, was known to the market before that date. (*See* Pls' Class Cert Reply at 13-14 ("[T]he market was not aware that construction had never started and . . . prior to the March [6] announcement, the market did not know NIO would not have a Shanghai Facility.") Thus, the market price of NIO's ADSs could not have been reacting to the revelation of such "truth."

As such, *none* of the NIO ADS price decline following the IPO, including any declines following March 6, 2019—the only alleged corrective disclosure date—can be attributed to Plaintiffs' theory of falsity. Defendants are entitled to summary judgment on this basis alone.

**B.      The Decline in NIO's ADS Price Was Caused by Other News**

The decline in NIO's ADS price following March 6, 2019—the only declines that under Plaintiffs' theory are even potentially caused by the alleged truth of the construction status being

30

disclosed—was fully attributable to the disclosure of other, unrelated information.  Even if Plaintiffs could show that the March 6, 2019 disclosure that NIO was calling off the project due to changed circumstances was corrective—which they cannot—Plaintiffs cannot disaggregate the effect that such a revelation of alleged fraud had on NIO's ADS price from any declines attributable to the disclosure of other, unrelated news.

As the Supreme Court has made clear, under Section 10(b), loss causation excludes stock price declines due to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  Similarly, under Section 11, Defendants are not liable for damages resulting from factors "other than the depreciation in value of [NIO's ADS] resulting from" the alleged misrepresentations.  15 U.S.C. § 77k(e).  Even if Plaintiffs were to somehow show that the announcement of the termination of the Shanghai Facility project caused them *any* losses, they would then have to "disaggregate" those losses from those caused by the disclosure of other information.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).[13]

As an initial matter, Plaintiffs have not proposed a means to—nor pointed to any evidence that would allow them to—conduct such a disaggregation.  This Court, in opining at the class certification stage on whether the alleged misstatements in NIO's Offering Documents had

---

[13]    Although Defendants carry the burden on their negative loss causation defense, that burden is met where, as here, Defendants "establish[] that the misstatement was barely material and . . . the public failed to react adversely to its disclosure."  *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 343 (2d Cir. 1987).  As discussed *supra*, p. 30, Dr. Gompers concludes that *none* of the decline in NIO ADS price following March 6, 2019 was attributable to any revelation as to the status of construction, nor could any of the decline before March 6, 2019 have been attributable to the revelation of the status of the construction given that Plaintiffs never allege, nor could they, that the status of the construction project was disclosed before March 6, 2019.

a "price impact,"[14] noted that "Plaintiffs' arguments that the drastic reduction in NIO's revenue—also disclosed in the March 2019 6-K—had no role in the decline of NIO's value *are simply not plausible*." *NIO II*, 2023 WL 5048615, at *16. The evidence has now established that *all* of the negative price reaction was attributable to other sources.

### 1. The Market Viewed the Termination of the Shanghai Facility as a Positive

The evidence confirms that the market reacted favorably to the March 6, 2019 disclosure that the Shanghai Facility project was being terminated.[15] For example, Deutsche Bank analysts reported that the termination of the Shanghai Facility was a positive development, explaining that "NIO's current production business model will not hinder the original sales outlook," that they "view this as a more flexible option with potentially lower capex outlay," and that "[t]he advantage of this arrangement for NIO is that it should be able to apply for subsidies and carbon credits directly, as well as directly manage the joint operation to enhance efficiency." (56.1 ¶ 62; Ex. 82, Deutsche Bank Report at 1, 3-5.) The Deutsche Bank analysts "raise[d] [their] price target from USD8.6 to USD10.2 mainly on [a] lower overall capex estimate given the termination of the [Shanghai Facility] and hence better free cash flow." (56.1 ¶ 62; Ex. 82,

---

[14]    At class certification, courts consider whether alleged misrepresentations and/or omissions had a price impact, and "[p]rice impact is primarily concerned with 'front-end' impact—that is, the extent to which the security's price was inflated by the misrepresentation—but can be inferred from a 'back-end' impact, meaning the amount the price fell following a corrective disclosure." *NIO II*, 2023 WL 5048615, at *14. Moreover, whereas a class certification analysis may look to an event study to determine whether stock price movements were unique to the company at issue as compared to the market generally, "[a]n event study . . . cannot separately isolate and measure the impact of different pieces of company-specific information released simultaneously (*i.e.*, it cannot separately measure the effects of corrective and confounding information [released by the company])." (Ex. 2, Gompers Decl. ¶ 18.)

[15]    Plaintiffs did not move on loss causation and therefore, their Local Rule 56.1 Statement is silent with respect to loss causation. (*See generally*, Pl. 56.1.) In opposition however, Plaintiffs must "come forward with specific facts showing that there is a genuine issue for trial, *i.e.*, evidence suggesting that the price decline actually resulted from the alleged misstatement." *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2017 WL 4082305, at *10 (S.D.N.Y. Sept. 13, 2017) (internal quotation removed), *aff'd,* 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).

Deutsche Bank Report at 5.)[16]  Morgan Stanley analysts similarly "view[ed] the joint manufacturing model as [a] positive" that "could save on capex while keeping sufficient capacity."  (56.1 ¶ 63; Ex. 83, Morgan Stanley Report at 1.)  Likewise, J.P. Morgan analysts placed the termination "on the positive side" of the Q4/FY18 Earnings Announcements and highlighted that it would allow NIO to "leverag[e] JAC's existing capacity" and "implies cost savings and better investment returns" that could "translate to higher ROIC [return on invested capital] in the long-run."  (56.1 ¶ 64; Ex. 84, J.P. Morgan Report at 1, 3.)

The fact that the market reacted positively to the termination of the Shanghai Facility belies any inference that the Offering Documents had artificially inflated NIO's ADS price by stating that construction was underway.  Indeed, Defendants' expert, Dr. Gompers, found that "[n]one of the analysts [covering NIO] attributed the ADS price decline to the news regarding the Shanghai plant."  (Ex. 2, Gompers Decl. ¶ 35.)  Rather, "analysts stated that terminating the Shanghai plant would likely improve the Company's cash flow and profitability."  (*Id.* at 42.)

Dr. Gompers's Report warrants granting summary judgment in Defendants' favor.  *See Goldkrantz v. Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ("Defendants' uncontested claim that there was a complete lack of reaction in the financial press to the [alleged corrective disclosures], even though [defendant] was well covered by analysts, is nearly sufficient, by itself, to carry their burden.

---

[16]  To the extent Plaintiffs seek to repeat their argument made on class certification that the analysts' reports are not trustworthy because the institutions they are affiliated with are defendants in this litigation, that argument is baseless.  Not all of the analysts that Dr. Gompers reviewed are affiliated with defendants here, and Plaintiffs' own class certification experts relied on statements from the same analysts.  Moreover, the underwriting and analyst divisions of these banks are separated by ethical walls and there is no evidence or even allegation of collusion to print false analyst reports or that these ethical walls were violated.  *See, e.g.*, *Lowe v. Salomon Smith Barney, Inc.*, 206 F. Supp. 2d 442, 443 (W.D.N.Y. 2002) (describing the "traditional practice in the brokerage industry" of an "'ethical screen' or 'Chinese wall' between [a bank's] research analysts and its investment bankers, in order to ensure that its analysts' recommendations would not be influenced by [its] business interests").

The analysts' reports show that the market's view of [defendant]'s value was driven by other factors."); *see also Madden v. Deloitte & Touche LLP*, 118 F. App'x 150, 153-54 (9th Cir. 2004) (affirming summary judgment on loss causation where "[u]ndisputed expert testimony established that . . . stock decrease . . . was not caused by revelations" of alleged misrepresentations); *Barclays*, 2017 WL 4082305, at *21 ("Courts may grant summary judgment on negative loss causation where, as here, the alleged misrepresentations had minimal materiality and the market failed to react in any discernible [negative] way to the corrective revelations." (internal quotation removed).)[17]

### 2.    Any Drop in NIO's ADS Price Was Instead Entirely Attributable to Other, Unrelated Negative News.

Further, Plaintiffs have ignored the other significant negative news announced in the Q4/18 Earnings Announcement.  Specifically, NIO reported, among other things, "a greater than anticipated slowdown in monthly deliveries" for January and February due to "accelerated deliveries made at the end of last year in anticipation of EV subsidy reductions in China in 2019, the seasonal slowdowns surrounding the January 1st and Lunar New Year holidays, as well as the current slowdown of macro-economic conditions in China, particularly in the automotive sector."  (56.1 ¶¶ 55-56; Ex. 80, 4Q/18 Earnings Release at 3-5; *see also* 56.1 ¶ 57; Ex. 81, 4Q/18 Earnings Call at 3-5, 8.)  Worse still, NIO warned that this weak demand likely would continue.  (56.1 ¶ 56; Ex. 80, 4Q/18 Earnings Release at 5; 56.1 ¶ 57; Ex. 81, 4Q/18 Earnings Call at 3.)  It was this news—not the termination of the Shanghai Facility—that sparked strong negative reactions from investors and analysts.

---

[17]    Plaintiffs will, of course, attempt to rebut Dr. Gompers, but they "must advance more than mere speculation in order to overcome the showing that their loss was attributable to an intervening cause." *Shanahan v. Vallat*, No. 03 Civ. 3496 (PAC), 2008 WL 4525452, at *6 (S.D.N.Y. Oct. 3, 2008); *Goldkrantz*, 1999 WL 191540, at *5 (plaintiff's "conclusory critique of defendants' statistical analysis is insufficient to create a material question of fact" with respect to loss causation).

Plaintiffs' arguments to the contrary do not move the needle.  On class certification, Plaintiffs' expert, Dr. Werner, identified "additional coverage of the March 2019 6-K which [was] more negative (or more equivocal) regarding the construction project's cancellation." *NIO II*, 2023 WL 5048615, at *15.  This coverage, however, consisted of three articles from news sources that reported the fact that the Shanghai Facility project had been terminated without any financial analysis of the impact of that development.  Each of the articles either never claimed that the termination of the Shanghai Facility project itself was a negative development or did so under the impression of incorrect facts.[18]  One even highlighted that the termination "will save the company hundreds of millions of capex dollars."  (ECF No. 122-10, Werner Rebuttal Decl. ¶ 55.)  And, as Dr. Gompers opines, the three news reports "did not make a causal link between the ADS price decline and the Shanghai plant termination or explain the mechanism by which terminating the plant would be a negative for NIO's expected future cash flows and/or risk." (Ex. 2, Gompers Decl. ¶ 43.)

Moreover, unlike professional analysts, online news reporters do not digest financial information in order to produce a price target.  *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 719 (S.D.N.Y. 2022) ("Analysts prepare financial models that, among other things, set price targets for a stock and make buy, hold, and sell recommendations for companies they cover."); Ex. 2,

---

[18]  Specifically, the Seeking Alpha article cited by Dr. Werner noted that the termination would "result in NIO not obtaining its own EV manufacturing license for the foreseeable future [and] [a]s a consequence, the company might not enjoy potential benefits from China's new energy vehicle credit score system."  (ECF No. 122-10, Werner Rebuttal Decl. ¶ 55.)  This, of course, was false given the changes in Chinese regulation relating to EV tax credits which, as discussed *supra*, p. 11, allowed NIO to benefit from them under its partnership manufacturing model with JAC.  (56.1 ¶ 60; Ex. 81.)  Plaintiffs do not contend otherwise.  The Bloomberg article cited by Dr. Werner simply noted that the Shanghai Facility was being terminated and that NIO's share price was down, without linking the two or describing how they could have been correlated.  (ECF No. 122-10, Werner Rebuttal Decl. ¶ 56.)  Finally, the Dow Jones article Dr. Werner relied on noted that NIO's "ADRs *could be impacted* by the company's decision to *halt* construction of a factory in Shanghai."  (ECF No. 122-10, Werner Rebuttal Decl. ¶ 57 (emphases added).)  For NIO to have "halted" construction necessarily means that it had actually begun.  But, moreover, the Dow Jones article too fails to put forth any financial analysis of how the termination could affect NIO's financials.

Gompers Decl. ¶ 20 ("Analysts themselves must pass an exam[,] the 'Series 86 / 87 Exam[,]' . . . be certified by the New York Stock Exchange or NASDAQ exchange[,] . . . [and] demonstrate knowledge and skills relevant to preparing their research reports[.]").  The articles—which offer no support for their characterizations of the Shanghai Facility cancellation—do not purport to be based on any analysis or reliable information and do not create a genuine issue of fact with respect to the analyst reports that resoundingly viewed the termination as positive.  *See, e.g.*, *In re E-House Sec. Litig.*, No. 20 Civ. 2943 (ER), 2021 WL 4461777, at *15 (S.D.N.Y. Sept. 29, 2021) ("[M]edia reports that consist of generalized forecasting or factually unsourced speculation do not, without more, satisfy the PSLRA['s pleading standards].").  At his deposition, when shown the analyst reports covering NIO during the relevant time period, Dr. Werner conceded that they characterized the termination as a positive.  (56.1 ¶ 65; Ex. 85, Werner Tr. 222:20-224:10, 227:13-228:19, 229:25-231:11.)

Dr. Gompers reviewed all available analyst reports covering NIO from September 12, 2018 to May 29, 2019 and all media articles referencing NIO from March 6, 2019 to March 13, 2019 and concluded that "in an efficient market, declines in NIO's ADS price following NIO's March 6, 2019 Announcements were not caused by the alleged corrective disclosure that NIO had terminated its construction of the Shanghai plant . . . [rather,] ADS price declines following the March 6, 2019 Announcements were driven solely by confounding factors."  (Ex. 2, Gompers Decl. ¶¶ 22-23, 53.)  This is an additional basis for the Court to find that Plaintiffs' alleged losses were not caused by the revelation of alleged fraud—to the extent there was such a revelation—and grant summary judgment in Defendants' favor.

36

**C.      Any Revelation that Prior Construction Was Not Previously Underway Did Not Create Independent Loss**

Finally, Plaintiffs must also disaggregate any alleged losses stemming specifically from any revelation that construction had ***not started***—which, as explained above, is contrary to fact and was not "news" that any source "disclosed," (*see supra* § II.A)—from losses stemming from the separate announcement that the Shanghai Facility project would be ***terminated***.  *See Moody's*, 2013 WL 4516788, at *12 ("While they are not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation, summary judgment is appropriate if [Plaintiffs] cannot show that at least some of the price drop was due to the fraud.") (internal quotations removed); *see also Boluka Garment Co. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021).

Plaintiffs cannot show losses stemming specifically from any revelation of prior construction progress.  Indeed, even after the IPO, when NIO indicated it was in no hurry to complete construction of the Shanghai Facility, there was no significant market reaction, indicating that the precise status of construction was not a material concern to investors.  For example, a JP Morgan analyst report dated January 14, 2019 stated:

> [NIO] is in no rush . . . to have a [wholly-owned assembly] plant . . . expansion of the JAC plant from its current ~120K units capacity to a higher ~170K units seems a more efficient use of capital than opening a new plant. . . .  And a number of automakers (and now even perhaps supplier Magna International) are interested in producing vehicles for NIO, again suggesting less need for a wholly-owned plant in the near-term.  Management instead plans to allocate capital toward R&D, increasing consumer satisfaction, and boosting sales.  Management also intends to expand overseas in an asset-light way, for example through distribution partners instead of via a system of NIO.

(56.1 ¶ 52; Ex. 79, Ryan Brinkman et al., "Takeaways from JPM's CES Auto Tech Conference for Aptiv, NIO, & Veneoneer," J.P. Morgan, January 14, 2019.)  There was no statistically

37

significant price reaction to that news, and no other analyst or media report commented on it. (Ex. 2, Gompers Decl. ¶ 40.)

Any investor who viewed as a "positive" the specific statement that construction had begun at the time of the IPO—which Plaintiffs claim inflated the price of NIO's stock—would have viewed as a negative the January 2019 comments that construction was being deprioritized. But this was not what happened. As evidenced by the market reaction to the above-quoted January 2019 announcement that NIO was in no rush to build its own manufacturing facility, the market simply *did not care*. See *Ramirez v. Exxon Mobil Corp.*, No. 16 Civ. 03111-K, 2023 WL 5415315, at *19 (N.D. Tex. Aug. 21, 2023) ("Plaintiff presents no evidence that the market connected the three [corrective disclosures] to Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon . . . [because] similar articles that explicitly pertain to [the same issue] . . . had no statistically significant negative impact."); *In re DVI, Inc. Sec. Litig.*, No. 03 Civ. 05336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010).

The SAC alleges that, for example, "NIO's dependence on JAC Motors to manufacture its vehicles carries many risks for NIO and its investors." (SAC ¶ 7.) Even if true and NIO's future outlook was negatively affected by termination of the construction of its own manufacturing plant, any losses stemming therefrom would be *unrelated to the status of construction at the time of the IPO*. Regardless of the precise status of construction at the time of the IPO, termination of the project altogether would only have caused NIO to continue to manufacture all vehicles with JAC and the market would have reacted accordingly. In fact, if construction progress had been further along, NIO necessarily would have spent more on the factory and would have had fewer capex savings from cancellation. Thus, the market would have been *relieved* about that fact, rather than reacting negatively to it. (Ex. 2, Gompers Decl.

38

¶ 42 n.68.)  Moreover, if it was revealed that NIO had not previously wasted cash on a now-terminated project, that would have had a positive impact on the Company's expected future value and therefore ADS price, as "one of the central tenets of modern finance is that the value of equity in a company is equal to the discounted value of the expected future after-tax cash flows to equity holders."  (Ex. 2, Gompers Decl. ¶ 41.)

Thus, to the extent the market was concerned at all about the March 6, 2019 disclosure that construction was being terminated, it was not due to any updated timetable for completion or prior construction status, but rather whether the Shanghai Facility was built *at all*.  The losses stemming from the disclosure relating to the Shanghai Facility, if any, therefore did not arise from the revelation, if any, that construction had not previously started.

Accordingly, "Plaintiffs fail to establish a connection between the loss-causing events and the actual share price declines as required to survive summary judgment with respect to loss causation" and Defendants' motion should be granted.  *Moody's*, 2013 WL 4516788, at \*12.

## III.   PLAINTIFFS CANNOT SHOW A GENUINE DISPUTE OF MATERIAL FACT AS TO SCIENTER

Finally, "[t]o establish liability under [Section] 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted); *see also Dalberth v. Xerox Corp.*, 766 F.3d 172, 182-83 (2d Cir. 2014). Plaintiffs can satisfy this requirement "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Gross v. GFI Grp. Inc.*, 310 F. Supp. 3d 384, 394 (S.D.N.Y. 2018).  Here, because Plaintiffs do not even attempt to allege motive and opportunity, "the strength of the circumstantial allegations [of recklessness] must be

39

correspondingly greater." *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996) (citation omitted).

Recklessness constitutes an "extreme departure from the standards of ordinary care." *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 230, 247-48 (S.D.N.Y. 2014) (quoting *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)). Conduct satisfies such a heightened degree of recklessness only if it is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). Plaintiffs' recklessness arguments fail as it is undisputed that significant work occurred at the Shanghai Facility before the IPO.

*First*, Plaintiffs argue that it is "unfathomable" that the Defendants did not know construction on the Shanghai Facility was not underway, because (i) Defendants were "required to have reasonable assurance that construction of the Shanghai Facility was progressing in a satisfactory manner"; and (ii) the construction site was "so close to NIO's headquarters." (SAC ¶¶ 141, 142, 145.) Here, the record demonstrates that Defendants' knowledge was consistent with the language of the Offering Documents. NIO's government partner confirmed the Shanghai Facility was "under construction" in April 2018 as part of due diligence for the Company's IPO (*see* 56.1 ¶ 39; Underwriters 56.1 ¶ 20; Ex. 66, at -21) and critically, in the months leading up to the IPO, Century 3, the Shanghai Facility's project manager, provided NIO with contemporaneous progress reports describing the ongoing construction in detail. (*See supra*, pp. 7-8.) The progress reports described backfilling, trial piling, drainage ditch excavation, pile driving, and temporary electrical installation all as "construction progress." (*Id.*)

Even assuming *arguendo* it was inaccurate to describe that work as "construction" (and it was not), no fact finder could reasonably conclude this description was knowingly or recklessly misleading in light of the undisputed work that had occurred and the updates and assurances Defendants received from the entities in charge of construction.

Plaintiffs, on the other hand, cannot identify any evidence indicating Defendants were aware construction had never started (which would be impossible because construction had begun). This is fatal to Plaintiffs' claims. *In re Puda Coal*, 30 F. Supp. 3d at 247-48 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.")

***Second***, Plaintiffs also argue that "NIO's reliance on JAC—a Chinese state-owned enterprise with little experience manufacturing passenger vehicles and described as "third tier" by analysts—was a source of embarrassment for NIO" and therefore the Company "falsely told investors that construction on the Shanghai Facility was already underway." (SAC ¶¶ 139, 140). As a threshold matter, no evidence exists that NIO ever intended the Shanghai Facility to ***replace*** the Company's manufacturing partnership with JAC. In fact, the Offering Documents made clear that NIO was building the Shanghai Facility to ***expand*** the Company's manufacturing capabilities by ***supplementing*** its existing manufacturing partnership. (*See, e.g.*, Ex. 3, Prospectus at 121-22 ("Construction has started on our own manufacturing facility in Shanghai in order to ***expand manufacturing capacity*** for the ET7 and future models, ***complementing our JAC manufacturing alliance*** supplying the ES8 and ES6.") (emphasis added); *see also id.* at 137.) Nothing in the language of the Offering Documents falsely assured investors that NIO intended to immediately (or eventually) cut ties with JAC once the Shanghai Facility was completed.

*Finally*, "[e]ven under [the recklessness] standard, a plaintiff must establish that a material benefit *could have* been obtained through the misstatement." *Gross*, 310 F. Supp. 3d at 395 (emphasis added); *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). Thus, Plaintiffs have to argue that Defendants would have benefitted from lying about whether construction (under Plaintiffs' definition) had begun or not. Here, as demonstrated above, Plaintiffs have not even attempted to show that any investor cared or would have cared (or understood) the difference between "pre-construction" work or "construction" work that occurred on site. (*Supra* § I.A-C.)

Accordingly, there is no genuine dispute about scienter, and Defendants' motion for summary judgment should be granted for this reason as well.

## IV.    PLAINTIFFS' CONTROL PERSON CLAIMS FAIL

Plaintiffs' claims for control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act fail in the absence of a primary violation of those statutes. *See Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Plaintiffs also cannot prove culpable participation for any Individual Defendant for substantially the reasons outlined above. (*See supra* §§ I-III.)

## V.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSITY SHOULD BE DENIED

In addition to granting Defendants' motion, this court should also deny Plaintiffs' Motion. The crux of Plaintiffs' argument is that Defendants' statements are false and misleading because steps required to construct the Shanghai Facility had not yet occurred, including that NIO had not: "[o]btained any of the necessary permits and approvals to begin construction"; "[i]nitiated bids from general contractors to begin on-site construction"; "[f]ulfilled a contractual prerequisite for construction to begin (*i.e.*, NIO signing a lease for the Shanghai Facility with

42

Jiawei, as required by the Framework Agreement)"; and "[b]egun any permanent works." (Pls. MSJ at 9.) For the reasons demonstrated above, Plaintiffs arguments fail, and their motion should be denied in its entirety. (*See supra* § I.A-I.D.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment and deny Plaintiffs' motion for partial summary judgment.

43

Dated: New York, New York
January 30, 2025

 /s/ Jed M. Schwartz
Scott A. Edelman
  (sedelman@milbank.com)
Jed M. Schwartz
  (jschwartz@milbank.com)
Rachel G. Wolf
  (rwolf@milbank.com)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001-2163
Tel: (212) 530-5000

*Counsel for Defendants Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, UBS Securities LLC and WR Securities, LLC*

 /s/ Robert A. Fumerton
Robert A. Fumerton
  (robert.fumerton@skadden.com)
Scott D. Musoff
  (scott.musoff@skadden.com)
Michael C. Griffin
  (michael.griffin@skadden.com)
Judith A. Flumenbaum
  (judy.flumenbaum@skadden.com)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Defendants NIO Inc., Bin Li, Louis T. Hsieh, Lihong Qin, Yaqin Zhang, Tian Cheng, Hai Wu, Xiang Li and Padmasree Warrior*

 /s/ Andrew J. Ehrlich
Andrew J. Ehrlich
  (aehrlich@paulweiss.com)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000

*Counsel for Defendants Xiangping Zhong and Zhaohui Li*

**CERTIFICATE OF COMPLIANCE**

I, Robert A. Fumerton, an attorney duly admitted to practice before this Court, hereby certify that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 14,733 words in accordance with Local Rule 7.1(c) and does not exceed 50 pages as allowed by Judge Garaufis's January 24, 2025 Minute Order.

Dated: New York, New York
       January 30, 2025

                                                    */s/ Robert A. Fumerton*
                                                    Robert A. Fumerton